```
 1
 2                        THE UNITED STATES DISTRICT COURT

 3                     FOR THE NORTHERN DISTRICT OF TEXAS

 4                            FORT WORTH DIVISION

 5

 6   UNITED STATES OF AMERICA, )
                              )
 7        Government,         ) CASE NO. 4:21-cr-289-O
                              )
 8   VS.                      ) FORT WORTH, TEXAS
                              )
 9   HOLLIS MORRISON GREENLAW )
     (1), BENJAMIN LEE WISSINK )
10   (2), CARA DELIN OBERT (3),)
     JEFFREY BRANDON JESTER   )
11   (4),                     )
                              )
12        Defendants.         )

13

14

15                            January 12, 2022

16                              VOLUME 2
                    TRANSCRIPT OF OPENING STATEMENTS
17            BEFORE THE HONORABLE REED C. O'CONNOR
                 UNITED STATES DISTRICT COURT JUDGE
18

19

20

21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S:

 3    FOR THE GOVERNMENT:

 4              TIFFANY EGGERS, ESQ.
               RACHAEL JONES, ESQ.
 5             ELYSE LYONS, ESQ.
               ASSISTANT UNITED STATES ATTORNEYS
 6             NORTHERN DISTRICT OF TEXAS
               801 Cherry Street, Suite 1700
 7             Fort Worth, Texas  76102
               Telephone:  817.252.5200

 8

 9    FOR THE DEFENDANT GREENLAW:

10             PAUL PELLETIER, ESQ.
               3500 Morningside Drive
11             Fairfax, Virginia 22031
               Telephone:  (202)617-9151

12
               ROSE ROMERO, ESQ.
13             ROMERO KOZUB
               325 NE Loop 820, Suite 310
14             Hurst, Texas 76053
               Telephone:  (682)267-1351

15

16    FOR THE DEFENDANT WISSINK:

17             GUY A. LEWIS, ESQ.
               LAW OFFICES OF GUY A. LEWIS, PLLC
18             12575 SW 67th Street
               Pinecrest, Florida   33156
19             Telephone:  (305)442.1101

20

21

22

23

24

25
```

```
 1

 2    FOR THE DEFENDANT OBERT:

 3
              NEAL J. STEPHENS, ESQ.
 4            KELSEY DAVIDSON
              JONES DAY
 5            1744 Embarcadero Road
              Palo Alto, California
 6            Telephone:  (650)739.3939

 7
      FOR THE DEFENDANT JESTER:
 8
              JEFFREY J. ANSLEY, ESQ.
 9            ARIANNA GOODMAN, ESQ.
              VEDDER PRICE
10            100 Crescent Court, Suite 350
              Dallas, Texas
11            Telephone:  (469)895.4780

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2                                  ***

3          (Following is opening statements.)

4              THE COURT:  So with that said, I'm going to turn

5     the floor over to Miss Eggers.

6              MS. EGGERS:  Yes, your Honor.

7              Thank you, your Honor.  May it please the Court,

8     Counsel.

9              I expect the evidence is going to show this,

10    Defendant Greenlaw, who's seated right there, him and

11    another man formed what we will call the UDF entities as a

12    whole.

13             First one, UDF I, basic business model was

14    investors would give their money entrusted to Mr. Greenlaw

15    and his business partner and the front persons that work

16    with them.  They were then to loan this money to developers.

17    The developers, sort of was using it like a bank, the

18    developers then would use the money to improve pieces of

19    real property to get them to a place where they could be

20    sold.

21             And then what they would do, the developers is,

22    pay back the loans to Defendant Greenlaw.  And any interest

23    that they paid back, that was going to be the distributions

24    paid to the investors.  Makes sense.  That's how it started.

25             They formed UDF III, and they told the members of

1   the general public, they filed filings for the SEC, filings

2   that Defendant Obert submitted to the SEC, that Defendant

3   Greenlaw signed off on, that Defendant Wissink signed off

4   on.

5                   And then this one, UDF III, they told the

6   investing public that the distributions that they were going

7   to be paid was going to be cash available for distribution

8   are the funds received by UDF III from operations.  That

9   interest the developers were paying back on these loans.

10  That's the basic idea.

11                  There was a snag.  The snag was this, the

12  developers were not paying back their loans quickly enough.

13  They weren't paying back their loans quickly enough, and

14  although the defendants were never required to pay even one

15  dollar in distribution, they did.

16                  Because the developers were not paying back the

17  loans quickly enough, the defendants formed UDF IV.  So what

18  did they do then with UDF IV?  Those new investors that

19  entrusted their money to defendants Greenlaw, Obert,

20  Wissink, and another man, they took those people's money.

21                  UDF IV's investors' money.  They moved it around a

22  number of bank accounts.  And then what did they do?  They

23  paid distributions to those earlier investors.  Well, that

24  wasn't enough either, because the developers still were not

25  paying those loans back enough, fast enough.

1              So what did they do then?  They made a strategic

2    decision to create UDF V.  And when they created UDF V, they

3    filed filings with the SEC that said this, UDF V will not

4    participate in any investment with its advisor entities or

5    their affiliates.

6              UDF V will not participate in any investment with

7    its advisor entities or their affiliates.

8              UDF V will not participate in any investments with

9    its advisor entities or affiliates, including fire fund

10   entities.

11             UDF V shall not sell any loan to, acquire any loan

12   from, or participate in any loan with those prior UDF

13   entities.

14             UDF V shall not sell any asset to acquire any

15   asset from, participate with any of the limited partnerships

16   that were affilitated.

17             UDF V will not make loans to participate in real

18   estate investments with or provide credit enhancements for

19   its affiliates for those prior UDF funds, its cosponsors,

20   advisor entities, asset managers, or the prior UDF entities.

21             And UDF V intends to use substantially all of the

22   net proceeds to originate, purchase, and hold for investment

23   secured loans.  That's what the defendants filed with the

24   SEC.

25             Defendant Greenlaw did sort of a sales pitch.

1    He'd go around to brokers and dealers and he'd go out of his

2    way, along with Defendant Wissink and Defendant Obert,

3    they'd go out of their way when they were soliciting new

4    investors for UDF V, and say, we will not engage in

5    affiliate transactions.

6            He didn't have to do that but he did.  What I

7    expect you're going to hear is the reason the defendants

8    made that strategic decision is they are some

9    broker/dealers, some financial advisors that will not allow

10   such an offering, a fund to be on their platform.  They

11   would not offer that to their client investors.

12           So because they had run out of money for UDF IV,

13   they needed new investors, they opened up a new pool.

14   That's why we're here.  We're here because of what they did

15   with the money, and you are going to see a lot of financial

16   tracing in this case.

17           We're also here because along the way, the

18   defendants obtained loans from financial institutions, brick

19   and mortar banks, and in those loans that they obtained,

20   they made representations.

21           For instance, one loan they obtained from Capital

22   Bank, they told the bank that it would not -- what it would

23   do specifically with the money that it obtained.

24           They did not disclose to Capital Bank that they

25   were actually going to get money from Capital Bank for a

1    loan by UDF IV so they could solely use it to pay investors,

2    distributions in UDF III.  They hid things from the banks.

3    They hid things from the public filings.

4              Now, along the way, one of their two biggest

5    broker/developers, a company by the name of Buffington, in

6    September of 2014 Blake Buffington told Defendant Greenlaw,

7    Defendant Wissink, and Defendant Jester, point blank, we

8    can't do this anymore.

9              The interest that is accruing on our loans with

10   you, on UDF I, UDF III, and UDF IV, is over $2,000,000 a

11   month.  It is not feasibly possible for us to move forward;

12   we need to wind down this relationship.

13             The defendants never told the investing public

14   that.  The Defendants never told their auditors that.  They

15   hid that information from their auditors.

16             So what happens then?  Not long after, their

17   outside auditor, you are going to learn about auditing,

18   publicly filed companies, they have to have audits for their

19   financial statements, they have to have an outside auditor.

20   The auditor asks for cash flow projections.

21             They ask for that from Defendant Jester.  He was

22   the one that was supposed to get it to them.  What did

23   Defendant Jester do?  He goes to Mr. Buffington, and he asks

24   Mr. Buffington's company, give me your cash flow

25   projections.

1        Well, it wasn't good enough, see.  Like Blake

2   Buffington said, that loan, they can never pay them back.

3   They gave them the cash flow projections, Buffington did.

4        So what does Defendant Jester do?  Him and another

5   guy by the name of Gilpatrick, they start adding projects on

6   there.  They start manipulating the numbers to make it look

7   like it's going to pay off.

8        Why did they do that?  Because they knew good and

9   well they -- if they told their outside auditor that our

10  second to largest borrower is telling us that we can't pay

11  it back, the auditor would have to disclose that.

12       You're going to hear the various roles.  I

13  describe the Defendant Greenlaw, you're going to hear he

14  would do a lot of the sales pitching.

15       You are going to hear Defendant Wissink, he was

16  the guy moving the money.  He's the one that, every month

17  when this company called DST would say, hey, the

18  distributions for UDF III this month are $2,000,000,

19  Defendant Wissink would send directions to various ladies in

20  their office to do this, move the money from here, move the

21  money from there.

22       Defendant Jester, what was he doing?  He would go

23  to those borrowers, like Blake Buffington, and he would

24  cause them to fill out paperwork to make it look like they

25  actually were asking for the money, but they weren't.

1          The only reason the money was being moved was so

2    they could pay distributions to those earlier investors,

3    that's it.

4          What was Defendant Obert's role in this?  She's

5    the one on each and every one of the SEC filings.  She's the

6    one on the SEC filing that says UDF V will not do all those

7    things I went through.

8          I expect when you get to the end of this case,

9    ladies and gentlemen, the evidence is going to show the

10   scheme they were involved in for that five years, for five

11   years the distributions they paid out to the UDF III was

12   approximately 133,000,000, but because developers were not

13   paying the loans back fast enough, because the interest was

14   accruing so high, the defendants caused money to come from

15   UDF IV and UDF V subsequent investors to the tune of

16   $79,000,000 of investors in UDF IV, their money was moved

17   around through multiple bank accounts, and then paid to UDF

18   III's investors.  That's from UDF IV to pay UDF III's

19   investors, the earlier investors.

20         UDF V, approximately $4,000,000 went from the

21   investors' money, went from their bank accounts, gets

22   entrusted to the defendants.  And then what do they do, they

23   cause it to go out the door to be paid in distributions to

24   those early investors.

25         I expect the evidence goes to show this is much

1   like a Ponzi scheme.  And at the conclusion of this trial,

2   I'm going to ask you to find the defendants guilty.

3            THE COURT:  Thank you.

4            Mr. Pelletier.

5            MR. PELLETIER:  If it pleases the Court.

6            Judge, may I have a moment to set up?

7            Thank you, your Honor.  Please the Court.

8            THE COURT:  Yes.

9            MR. PELLETIER:  Ladies and gentlemen of the jury,

10  the government has got this wrong.  The story they just told

11  you, it's not true.  It's built on sand.  And for the same

12  reason constructors, builders, home builders won't build on

13  sand, it won't hold the structure, it won't hold the truth

14  here.  Why is that?

15           Well, they got it wrong, ladies and gentlemen of

16  the jury, because they don't understand this business.  And

17  more importantly, as you will see during this trial, they've

18  chosen not to try to understand this business stand.

19           MS. EGGERS:  Your Honor, I'm going to object to

20  argument.

21           THE COURT:  Overruled.

22           MR. PELLETIER:  They will tell you bits and pieces

23  of the story.  Their theory, but not the whole story.  But

24  you need all the facts to find the truth.  And the truth is,

25  you will see from the evidence is, that you UDF is a real

1   business with real employees, making real loans for the

2   development of hundreds, hundreds of real real estate

3   communities here in North Texas and in Central Texas for the

4   past 18 years.  That's right, 18 years.

5           You're going to hear that, to this day, UDF

6   continues to finance successful real estate developments,

7   much needed here in Northern Central Texas and they continue

8   to do so today.

9           Now, the government says that the charged criminal

10  conduct ended in 2015, but you will hear that UDF continues

11  to this day to conduct its financing business in much the

12  very same way as they always have, open and transparent, no

13  cheating, no scheme to defraud, no stealing.

14          Ladies and gentlemen, this is a disclosure case,

15  and you will see through the evidence that UDF discloses

16  what they do and they say what they do.  And they properly

17  account, as you will see, for every single penny.

18          As I said, the evidence will show that the

19  government got this wrong, and they carry the burden of

20  proof here, as the judge has told you.  They must prove the

21  elements of the charged crimes beyond and to the exclusion

22  of every reasonable doubt.

23          This, ladies and gentlemen, as the Court has

24  explained, is a very heavy burden.  It's the heaviest burden

25  in our judicial system.  And we believe that the judge will

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 2 January 12, 2022                    Page 13

 1    instruct you that the government must prove beyond its

 2    exclusion of any reasonable doubt that these UDF executives

 3    violated the law by intentionally devising a scheme to --

 4         MS. EGGERS:  Your Honor, object to argument.

 5         THE COURT:  Overruled.

 6         MR. PELLETIER:  -- intentionally devising a scheme

 7    to deprive UDF investors of money or property, and that they

 8    intentionally made material or false statements, and that

 9    they specifically intended to mislead or injure investors of

10    UDF III, UDF IV, and UDF V.

11         And they cannot meet this burden because the

12    evidence, their story, their theory, is simply not true.

13    And you know what you won't hear from this witness stand?

14    You won't hear any, any witness, or any credible witness

15    come in here and swear under oath that any of these UDF

16    executives schemed to deprive anyone of anything or

17    purposefully mislead anyone.

18         In fact, they did the exact opposite of what

19    criminals do.  They told investors exactly what they did and

20    how they did it.  Investors were fully aware of the nature

21    of UDF's business and all of the investing risk because they

22    were fully disclosed.

23         Now, I'm sorry, my name is Paul Pelletier and I,

24    along with Rose Romero, have the privilege of representing

25    Hollis Greenlaw, who is the CEO of the UDF companies.

1          I want to thank you in advance for your time and

2    attention in this trial.  I don't have to tell you how very

3    important this is for our clients.

4          I also want to just tell you, on a personal note,

5    I tend to speak loud.  And I'm not yelling.  I'm not mad.  I

6    tend to speak loud, but I grew up with seven sisters so I

7    had to learn how to speak loud in order to be heard.  Okay?

8    So don't take umbrage of the depth of my voice.

9          So you're going to hear that it was the vision of

10   UDF and Hollis Greenlaw in particular that has fulfilled the

11   funding demands of developers, home builders in Texas,

12   especially after the banks stopped lending to the developers

13   in 2008.  And you will also see that Hollis Greenlaw did

14   another thing very well, he hired good people.

15         Now, the evidence will show that UDF provided

16   critical funding that was essential to the development of

17   these Texas communities.

18         Now, it's a simple but sophisticated business.

19   There's no magic.  It's simple but sophisticated, and we're

20   going to tell you how it works, and the evidence will show

21   that.

22         It all starts with this, it all starts with an

23   acre of land.  Now, of course, we're talking about hundreds

24   of acres, because we are talking about communities, right,

25   with hundreds and hundreds of houses.

```
 1           And that acre of land, I'm sorry, my -- the

 2   example we're going to show you, that acre of land will sell

 3   for $10,000 an acre and developers will buy hundreds -- a

 4   hundred acres or 200 acres at a time.

 5           Over time, through the development process, that

 6   acre will be split into four lots.  By the time they sell

 7   these lots to developers, excuse me, to home builders, those

 8   lots will be sold for anywhere upwards of $60,000.

 9           So the effort of development and financing of

10   development is to get from here, $10,000 an acre to here,

11   which is $240,000 an acre.  So you can see it's an

12   enterprise that involves the development of properties that

13   consumes cash.

14           Now, let me tell you about a little bit about how

15   this happens.

16           Your Honor, I apologize that I'm blocking you.

17           I will try to see if this will hold up here.  So

18   this is the development life cycle.  I'm trying not to block

19   you, I'm sorry if I do.  So this is the land acquisition

20   that I'm talking about.  Now, developers will borrow the

21   money to acquire land and UDF III will lend it.

22           And then, through each of these processes, the

23   entire process, you're going to hear about all the

24   entitlements process.  You will be sick of hearing about

25   entitlements, but they're very, very, very valuable.
```

1            And then there's going to be lot construction.

2    And then finally, there's going to be finished lots where

3    home builders are going to pay, are going to pay $60,000 an

4    acre, a lot, for these pieces of property.

5            All these parts of the construction process

6    consume cash.  There's nobody putting any cash in except for

7    financiers.  And that's what UDF does.  UDF III in

8    particular started in 2006 to provide the necessary funding.

9            Now, banks in 2006 were lending as well.  So you

10   will hear UDF was coming in at a, what we call, a second

11   level.  Okay?  So they would fund at a second level, but

12   they're funding these steps.  They're funding operations.

13   They're funding overhead.  They're funding all this process

14   with the hopes of getting where we're selling an acre at

15   240,000.

16           But this process can take up to 15 years for every

17   phase of the development.  If you've ever seen the

18   developments around here, they're built one phase at a time,

19   right?  So every one takes this same process, and this takes

20   a lot of money.  A lot of money.

21           And that's what UDF III does.  And then in 2008

22   something drastic happened in this country and we all still

23   remember it, right?  It was the great financial crisis and

24   the banks pulled out of lending.

25           So the next stage of lending is this part of

1  lending where you lend the home developers to get from the

2  finished lots, the houses, and then to build the houses.

3  And that's what the banks did, they abandoned it.

4          So UDF, because they're keen and good at what they

5  do, said, we will take the banks -- we will take the place

6  of the banks and we will finance that, and that's how they

7  created UDF IV.

8          So when the prosecutor tells you that the evidence

9  is going to show that UDF IV was broke -- that's why they

10  created UDF IV, it has nothing to do with it.  I will tell

11  you why UDF IV wasn't broke.  This process here creates

12  great, great value.  Great value.

13          And UDF has a lien interest or pledged interest in

14  all the value created.  That's how they -- now, can you sell

15  that?  Not easily.  It's illiquid value, but just because

16  they're illiquid, they have what's called, as you know, they

17  have solvency, right?  So they're asset rich.  They're rich

18  in assets.

19          So all they do is have financing to continue this

20  and use their assets to borrow so that they can pay the

21  developers, pay the investors, and keep the process going.

22          Because, remember, they developed in excess of 250

23  communities here in Texas and continue to do so.  They're

24  still doing it.  That's over 90,000 houses.  90,000 houses.

25  That's what they're doing.  There's nobody broke.

 1          There's nobody that doesn't -- that is lying to

 2    investors.  These people are conducting a business and

 3    they're very, very, very good at it, and you will hear that

 4    evidence.

 5          THE COURT:  You've used 10 minutes.

 6          MR. PELLETIER:  So ladies and gentlemen of the

 7    jury, in a moment I'm going to turn this over to my

 8    colleagues who continue to tell you the rest of the UDF

 9    success story, but I want you to know that when you hear all

10    the evidence in this case, you will agree with me that the

11    government has got this wrong.

12          Hollis Greenlaw and UDF employees and executives

13    were indeed always innocent and should be found not guilty.

14    Thank you for your time.

15          Thank you, your Honor.

16          THE COURT:  Thank you.

17          MR. ANSLEY:  Yes, your Honor.

18          May it please the Court.

19          THE COURT:  Thank you.

20          MR. ANSLEY:  Ladies and gentlemen, your Honor,

21    Counsel, and clients as well, my name is Jeff Ansley, and

22    together with Arianna Goodman, we have the pleasure of

23    representing Brandon Jester in this case.

24          Now, first of all, I want to tell you about

25    Brandon Jester who I have gotten to know over the last

 1  several years as a person and as an individual working at

 2  United Development Fund.

 3         He began at UDF in 2008 as an asset manager and

 4  served as an asset manager for a number of years at UDF

 5  before being promoted to being director of asset management

 6  in 2012.  That means -- he's still there today -- that means

 7  for 14 years, including to the present, Brandon Jester has

 8  worked at UDF.

 9         He's risen there and he's done that, because he's

10  good at his job.  People around him, internal and external

11  around him, recognize that he's good at his job.

12         I want to talk to you first about what asset

13  managers at UDF do.  Generally, they work with Texas-based

14  developers, property developers in residential space, like,

15  Buffington, who you will hear about, like, Centurion

16  American, who you will hear about, in helping them manage

17  their portfolios and also manage the developments and push

18  their projects forward as their residential projects

19  throughout Texas are growing.

20         They do that by helping first in managing the

21  day-to-day expenses and needs of those developers.  They

22  also do it by helping those developers grow their business,

23  both large and small businesses.

24         And they do so also by helping the developers get

25  access to, at a high level, cash, and the financial

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 2 January 12, 2022                    Page 20

 1   resources necessary that, as those developers grow,

 2   therefore, their financial needs grow as well.  We provide

 3   all those resources to developers and continue to do so.

 4            And in doing that, that set, that third point,

 5   that is the active portfolio management that UDF is so good

 6   at, and their borrowers and developers recognize they're

 7   good at that.  That's one of the reasons why we're singled

 8   out and identified and used by developers and successful

 9   developers in order to do just that.

10            The starting point for the process we're talking

11   about, first, is to, you know, get the initial funding

12   available to these developers.  That's the project level

13   draws, the project level funding provide.

14            These are basic invoices for services for

15   consultants, for people who are laying pipe on locations,

16   for people who are laying sewer lines, things like that.

17            That's the project level invoicing for which UDF

18   provides services -- I'm sorry, provides funding for those

19   developers to engage in.

20            That process involves the paying, the submission

21   of invoices from the contractors in those locations, up to

22   the asset managers, who then aggregate those invoices, send

23   them to UDF headquarters in Grapevine, Texas, where they

24   look at those invoices, they're approved.

25            They're ultimately sent back for payment by the

1    borrowers to those people who are engaging in brick and

2    mortar work on these location.  That is the process of

3    project level draws.

4          But there's a second manner in which UDF assists

5    its borrowers, its developer borrowers, and that is that

6    high-level portfolio management assistance that they provide

7    that is active portfolio management that distinguishes UDF

8    from so many lenders out there.

9          And to be clear, UDF is not a bank.  It's not an

10   FDIC insured bank.  Do they lend money?  Do they lend funds?

11   Absolutely.  But UDF is different because they go out there

12   and find people like Brandon Jester, find others who know

13   the home building business, have been in that space already.

14         They come to UDF, bring that knowledge, that skill

15   set, that expertise that is not present at a Legacy Bank,

16   and they bring that and helping the borrowers, these

17   developers, manage at that 30,000-foot level their

18   portfolios and availability of funds, as they're necessary

19   in growing these projects.

20         Let's discuss what that portfolio level funding

21   actually looks like.  But, first of all, I want to talk

22   about what it looks like when we see these developments.  I

23   mean, we've got Centurion American.  We've got Hawk's

24   Landing.

25         From start to finish we are helping developers at

 1    the very beginning of the project, before dirt is even
 2    turned, all the way to the conclusion of that project.  That
 3    is what we do.
 4            That's not what somebody does who's moving money
 5    from one fund to another.  That's what you do when you are
 6    helping developers take a project with one type of loan and
 7    with another of type loan, develop it further, that project,
 8    to ultimately completion, like we see in those slides.
 9            You'll also hear, with this portfolio level
10    funding, that we are contractually authorized, we are
11    expressly allowed to initiate draw requests.  We will talk
12    about draw requests in this case.
13            What that means is essentially either you're a
14    borrower or a lender, UDF initiates a request for funding.
15    And we have contracts that expressly show contracts with a
16    loan agreement with Centurion American, one of our
17    borrowers.  It expressly says, expressly, that UDF has the
18    contractual authority to initiate draw requests.
19            I don't think it could be more clear, they as the
20    lender, can initiate that request.  The borrower is not
21    required to, absolutely not.
22            And as we see that in practice, we look at what
23    happens with Shahan Prairie.  In this instance you see Erin
24    Richards, who was an asset manager at UDF, so that's a UDF
25    employee, who's sending an email to Renee Mueller, who's an

 1  employee at Centurion American, the borrower at the time,

 2  borrower today, saying, initiate a draw request from V, UDF

 3  5, that's one of the funds in order to pay down on UDF IV.

 4          Those are two loans held by Centurion American.

 5  In other words, the same borrower, and that is, a UDF

 6  employee initiating, pursuant to that contract, that that

 7  draw request and that draw itself go from V to IV for the

 8  express purpose of what?  Of paying down that IV loan.

 9          There's nothing hidden about that.  That could not

10  be more transparent.  That could not be more contractual.

11  We're allowed to do that.  Our borrowers know that because

12  they sign it.

13          On top of that, because we're good at our jobs, we

14  constantly communicate with our borrowers.  We have weekly

15  meetings with them.  We're out there, at the asset manager

16  level, at the higher levels, having weekly meetings, phone

17  calls, emails.  You will see a lot of emails.  Constant

18  communication, constant contact with our borrowers who are

19  absolute read into what it is that we are doing.

20          There's nothing hidden about this.  It could not

21  be more transparent.  It could not be more disclosed to our

22  borrowers, to our developers, to the regulators of the SEC,

23  and certainly to our investors.

24          When you look at it, that's because loans serve

25  different purposes.  It's a lot like refinancing.  If you've

1    refinanced your house or refinanced anything, you know that

2    you have a second loan that comes in and can replace the

3    first loan.

4             And when that happens, that second loan which

5    serves that different purpose of replacing the first, takes

6    the place of the first.  You may have a release of

7    collateral, release of a lien, but that second loan comes in

8    and replaces the first.  That's simple refinancing.  That's

9    Lending 101 is what that is.

10            And that is, in large measure, what UDF does and

11   continues to do, because different loans provided by UDF to

12   its developer clients, as you will hear, serve different

13   purposes.

14            UDF IV, UDF V, those funds are used in order to

15   push projects forward for these developers, help them grow,

16   help them become the things that we looked at a few minutes

17   ago, which are communities here in North Texas, in Central

18   Texas, that you can drive by and see today.

19            That is the process of active portfolio

20   management.  We're very good at it.  We've been good at it

21   for years, because we have expertise, skill set, and our

22   clients recognize that.

23            Now, I want to talk about something that's

24   related, but a little bit different, and that's that we also

25   model the loan portfolios that we run.  And by that, that's

1    just what portfolios we're talking about UDF V, IV, all the

2    others.

3              We model the portfolios to see whether or not, and

4    the individual loans in these portfolios too, to determine

5    whether or not, from cash flow standpoint, will they pay

6    off?  Are they going to be cash positive for us?  Do we have

7    exposure?  So we model those consistently.

8              And we do that in the way that any business would

9    do it, whether it's us or whether it's Ford selling cars.

10   We look at, what are the existing assets in that portfolio,

11   meaning, what projects are live in play right now?

12             And then with that developer, and then based on

13   that developers' history our expertise in the industry,

14   based on the area we're working in North Texas, Austin, what

15   do we project?  What do we forecast?  Projects in the future

16   by that developer could do to produce revenue on that loan?

17             That again is Business 101.  Every company out

18   there does that.  You will hear witnesses talk about

19   forecasting just like that.  That's what any business does.

20   That's what Ford does.  That's what UDF does as well.

21             And you will hear that we do that for the purpose

22   of assessing the cash flow that comes from those projects,

23   and whether or not that cash flow is sufficient to keep

24   those loans covered and protected.

25             That is what the evidence in this case is going to

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                Vol 2 January 12, 2022                Page 26

1    show.  It's not going to show Ponzi-scheme payments.  It's

2    not going to show money flowing from one fund to another

3    with no purpose.

4            It will show money flowing in different loans, but

5    different loans serving different purposes, and that's what

6    you're going to see in the evidence.  You are going to see

7    the draw request.  Did we initiate draw requests?

8    Absolutely.  Were we allowed to?  Absolutely.  Everybody

9    knew it.  Everybody knew it.  They signed off on it.

10           Ms. Mueller didn't say, what are you talking

11   about?  She said, okay.  That's because they knew.  We

12   communicate with our clients, and they're well aware.  They

13   seek us out for the skill set, this expertise reflected in

14   draw requests just like that.

15           And because of that, you're going to see that our

16   client, Mr. Jester, acted in nothing but good faith.  He

17   received draw requests.  He sent those up the chain in the

18   corporation, as he should.  They were taken care of.  They

19   were approved or disapproved, depending what the contents

20   were.

21           And then they were sent back to the developers for

22   them to take care of.  And then on top of that, he would

23   participate, when appropriate, in initiating draw requests.

24   That is what a good employee does.  That is what a good

25   company does.

1          And it was all consistently done in the context of
2    appropriate disclosures, everybody knowing what we're doing,
3    written contracts saying we could do these things, and a
4    virtually constant flow of information between our borrowers
5    and our borrower builder clients, because they knew what
6    we're doing.  We're doing all this in the light of day.  And
7    that's all it's going to show.

8          THE COURT:  You've used 10 minutes.

9          MR. ANSLEY:  It's going to show my client and
10   everybody else here operated in good faith.

11         At the end of this case, I'm going to ask you to
12   come back and return the only verdict which this evidence
13   will support, which is not guilty.  Thank you.

14         THE COURT:  Thank you.

15         MR. LEWIS:  May it please the Court.

16         THE COURT:  Thank you.

17         MR. LEWIS:  Thank you, Judge.

18         Jurors, good morning still.  My name is Guy Lewis.
19   I have the privilege of representing Ben Wissink.  As the
20   judge said, he may be up and out at times, but I will be
21   here and arguing this case.

22         Jurors, the evidence will show that this is a case
23   about telling the truth and UDF told the truth.  The
24   evidence will show that they were honest, they were open,
25   they were transparent, and truthful.

 1              And the evidence will show, jurors, that they got

 2     it right.  They got the accounting right.  They got the

 3     disclosures right.  They were forthright, and they were

 4     transparent.

 5              The evidence will show that they sought the advice

 6     of lawyers and accountants and other professionals.  They

 7     didn't hide anything.  Indeed, for six years, as the

 8     government investigated this case, UDF tried its best to

 9     cooperate.

10              And in those six years, they continued to do

11     business, as they do today, to make loans, still working

12     hard for their investors, all the while still telling the

13     truth.

14              The accountants will say that, jurors, the asset

15     managers will say this, the UDF lenders will say this, the

16     experts will say this, the investors will say this, and the

17     documents will reflect this.

18              As you've heard, this is a disclosure case, and as

19     Mr. Pelletier said, the burden is on the government.  And as

20     the judge has said before, this is what the government has

21     to prove beyond a reasonable doubt.

22              All of these, all of these parts, did we hide or

23     misrepresent anything?  The answer is no.  Did we act with a

24     specific intent to cheat or mislead anybody?  Absolutely

25     not.

1    Now, before we talk about the disclosures

2    themselves, I want to show you some of this in my limited

3    time this morning.  I want to introduce you to Ben Wissink,

4    the salt of the earth, born and raised in Iowa.

5    Went to the school at the University of Iowa and

6    graduated with a degree in business.  Went out, started

7    working in the home building industry.  Did that all his

8    career.  Started working at Lennar, gained additional

9    experience, and then was recruited by, as Mr. Pelletier here

10   said, someone who had an eye for talent, Hollis Greenlaw.

11   He worked hard to manage the finances of UDF.  To

12   work with the asset managers like Mr. Jester, liked to know

13   the projects, to know the finances, to know what's coming in

14   and what's going out.  And why is that important, jurors?

15   Because UDF, unlike a bank that can go to the

16   federal reserve and draw government money to make loans,

17   they use their own money, they use investor money, they use

18   bank loans, and they use lines of credit to then make loans

19   to developers, all disclosed.  You will see every bit of

20   this.

21   That, of course, means that they must be, their --

22   the management, they must do it with skill and precision,

23   and they did.  That's what the evidence will show.

24   Now, there's two important tools that you will

25   hear about in this trial that showed why they did it so

 1   good.  First, is no idle cash.  No idle cash.  Second is

 2   Just-in-Time Financing.

 3            Let's talk about no idle cash first.  Fund III

 4   wasn't disclosed.  The 10-K, which is the annual report that

 5   Miss Eggers was referring to that was filed with the SEC,

 6   indicates in there, we avoid the need for large idle cash

 7   reserves.  Fund IV, page number, UDF, "Manages the time of

 8   cash receipts."

 9            Fund V on their prospectus, which, jurors, you

10   will see and hear is one of these documents that, if you're

11   an investor, the company draws up, with the help of their

12   lawyers, with the help of their accountants, with the help

13   of all of their professionals and give the prospectus to the

14   potential investor.

15            And in that, also, in writing, everything there,

16   about no idle cash.  We have secured a line of credit to

17   manage the timing of our cash receipts and funding

18   requirements.

19            Now, does this idle cash make sense?  Absolutely.

20   The last thing that investors want is for UDF to take their

21   investment, to take their money, put it into a bank account

22   and earn, what, in savings right now, at any time, not even

23   1 percent.

24            Instead, they take that same investment, loan it

25   out to developers at maybe 10, 12, 13 percent.  And, of

1   course, the investors know about it.  Of course, the

2   borrower developers know about it.  They don't want idle

3   cash to be sitting in a bank account.  What investor would?

4           So when the government says that UDF III or IV was

5   broke, the evidence is not going to -- it's not going to

6   support that.

7           The evidence will show that this shifting sand

8   theory doesn't take into account, jurors, what was coming

9   in, what loans were coming in, what reimbursements were

10  coming in, payments in and out, timing, all of that, which

11  is what a good asset -- a good financial manager does.

12          I mean, if here today I have $5 in my pocket, but

13  I own my house, and my brother is going to pay me back the

14  money he owes me on Friday, I'm not broke.  Fund III and UDF

15  IV were not broke.  They weren't then, they're not broke

16  now.

17          The second important point, jurors, is the flip

18  side of Just-in-Time Financing, which is, no idle cash, it's

19  Just-in-Time Financing.  In other words, when you hear that

20  money was moving from account to account from V to IV or IV

21  to III, not true.

22          Jurors, there was always a borrower in the middle

23  of that transaction, fully disclosed, fully -- just like

24  refinancing a house, as Mr. Ansley said.  You wind up, the

25  lien exists, the loan papers exist, the appraisals exist,

 1    all fully documented.

 2            Now, why does that make sense?  Because if I

 3    borrow that first loan from UDF to buy the land, which is

 4    the most risky part and pay 20 percent, for example, and I

 5    could refinance it after years of development and equity and

 6    growth for 12 percent or 13 percent, jurors, that's

 7    7 percent to someone who's borrowed millions and millions,

 8    tens of millions of dollars, that means something to go from

 9    high interest rate to lower interest rate, and that's what

10    was happening, jurors.

11            Please look at the paperwork.  You're going to see

12    a lot of it.  Please look at the transactions.  Please look

13    at the disclosures.

14            Again, do the documents bear this out?

15    Absolutely.  And when the payments were made and

16    distributions were made, again, all reflected in the

17    documents that you're going to see, for example, UDF III at

18    the top there, "We may fund our distribution from borrowings

19    and the amount of distributions paid at any time do not

20    reflect current cash flow from our investments."

21            Over and over again you're going to see this.  And

22    it's, as Mr. Pelletier said, illiquidity is not insolvency.

23    UDF was not broke.  UDF told the truth.  They did nothing

24    wrong.

25            You will hear from a lot of witnesses in this

 1   case.  And they're going to tell you UDF did nothing wrong.

 2   They told the truth.  This was our business model.  It was

 3   good for investors.  It was good for developers.  It was

 4   good for UDF.  That's exactly why developers kept coming

 5   back.

 6            I find a good bank, I go back to it.  There was no

 7   conspiracy.  There was no intent to defraud.  Indeed, there

 8   were -- it was a real business, that did make real loans to

 9   real developers who built real homes, at the end of the day,

10   for real families here in Texas.

11            The evidence will demonstrate, and I will ask you

12   at the end of this case to consider all the evidence,

13   carefully consider the Judge's instructions and return the

14   only true and just verdict in this case, which is not guilty

15   as to all defendants.

16            THE COURT:  Thank you.

17            MR. STEPHENS:  Your Honor, good morning.  May it

18   please the Court.

19            THE COURT:  Yes, sir.  Thank you.

20            MR. STEPHENS:  Ladies and gentlemen, good morning.

21   My name is Neal Stephens, and I represent Cara Olbert.  I'm

22   going to start about talking a little bit Cara.  Cara grew

23   up in West Texas, in Dimmitt, Texas, a small farming town.

24            She was one of the first in her family to go to

25   college.  She went to Texas Tech.  She studied accounting at

 1  Texas Tech and graduated in the early 1990s.

 2          She was hired at UDF in 2003 and works there till

 3  this day.  She is the chief financial officer of UDF IV.

 4  Along the way, Ms. Obert had two young children in the early

 5  '90s, Sy and Chloe.  They have now graduated college and

 6  they're beginning their own careers.  That's Cara Olbert.

 7          What the evidence is going to show about Ms. Obert

 8  is that she's honest, open, and acts with integrity in

 9  everything she does.

10          I will give you one example.  In February of this

11  year, in the midst of this investigation, Ms. Obert agreed

12  to come and meet with the prosecutors and the agents on this

13  case and answer any and every question that they have.

14          Of all the millions of documents in this case and

15  the millions of emails they could confront her with anything

16  and ask her any question whatsoever.  And in that interview,

17  Miss Obert was honest, open, and trustworthy, and you will

18  not hear any evidence to the contrary related to that

19  interview.

20          What I want to talk to you about today is the

21  rules of the road for UDF III, UDF IV, and UDF V.  There are

22  three funds that we're going to talk about.  And those rules

23  of the road are contained in disclosures that have already

24  been referenced by both sides today.

25          These disclosures are available to the public and

1    to investors.  They contain terms like an S11 or a

2    prospectus or a Form 10-K or a Form 10-Q, those documents

3    will be in evidence, both sides will refer to them, and you

4    will be able to review them.

5            What I want to do is describe today what the

6    differences are in UDF V, UDF III, and UDF IV.  I'm going to

7    that by describing what UDF V, which is the last fund said

8    it would not do, contrast that against what UDF V can do,

9    and then talk to you about what UDF III and UDF IV can do as

10   well.

11           The reason why I want to do this is you're going

12   to hear about a series of transactions, a lot of

13   transactions.  I'm trying to give you a framework by which

14   you can analyze the evidence so you can reach an accurate

15   verdict.

16           What I want you to think about, as these

17   transactions are being discussed, is first, identify the

18   correct fund.  Which fund are we speaking of?  Are we

19   speaking of UDF III, UDF IV or UDF V?

20           And then apply the correct rules of road for that

21   fund, which will be discussed by witnesses on the witness

22   stand to you.  And then ask this question, did the UDF fund

23   follow its rules of the road?

24           The evidence is going to show that they did and

25   that there is no crime here.  So let me start by talking

1   about what UDF V said it would not do.  UDF V said it would

2   not originate loans, participate in loans, or provide credit

3   enhancements to affiliates.  And there are disclosures that

4   lay that out.  We will go through that at trial.

5            So an affiliate.  An affiliate is defined in UDF's

6   disclosures, and for our purposes, basically what it means

7   is that another UDF entity, such as, UDF III or UDF IV

8   qualifies as an affiliate.

9            So what UDF V was saying is UDF will not originate

10  a loan, participate in a loan or provide a credit

11  enhancement to UDF III or to UDF IV.

12           What the evidence is going to show is that UDF V

13  never did any of those things.  It's a sample set in total

14  of eight loans.  They're all structured similarly.  None of

15  them are an originating loan, participating loan or

16  providing a credit enhancement to one of the other UDF

17  funds.

18           So what can UDF V do?  What I want to focus on

19  today is that UDF V can originate loans with common

20  borrowers.  They can originate a loan with a borrower that

21  has a loan with UDF III or UDF IV.

22           According to the disclosures, that's fine.  That's

23  okay.  And you're going to see documents in this case,

24  here's one from SK Research and one from Mick & Associates.

25  These are analysts that study disclosures and summarize them

 1   for investors.  And what does SK Research say?  Well, they

 2   say the company is not -- the company being UDF V --

 3             MS. EGGERS:  Your Honor, I'm going to object, if

 4   we may approach?  I'm sorry.

 5             THE COURT:  Okay.

 6             MR. STEPHENS:  All right.  Ladies and gentlemen,

 7   let me refrain where I was on this slide.  What I'm going to

 8   talk about is SK Research.  What we're talking about again

 9   is the concept of common borrowers and UDF V being allowed

10   to loan to common borrowers.

11             What SK Research does, after analyzing all the

12   disclosures as UDF V is beginning to operate is it says the

13   following, the company, which is UDF V, is not prohibited

14   from lending to borrowers of prior UDF-sponsored programs.

15   That would be, for example, UDF III and UDF IV.

16             And then they cite an example, Frisco 113.  That's

17   the first loan in UDF V.  It's the 9001 loan that you are

18   going to hear about.  Frisco 113 is a Centurion project, and

19   Centurion had loans with UDF III and UDF IV.  They're

20   describing that it's a refinance of the borrowers' land

21   acquisition of 81 acres to develop it into single-family

22   residential lots.

23             That's what Mr. Pelletier was suggesting to you

24   earlier where you have the initial loan for land

25   acquisition, but then you're going to land construction.

1  You need more financing.  That's in our disclosures and

2  that's okay.

3          So now let me transition and talk about what UDF

4  III and IV can do so you understand the rules of the road

5  for III and IV.  And what the concept that I want to focus

6  you on is the fourth bullet point, that UDF IV could

7  refinance UDF III loans, to lower the finance cost, again,

8  for a common borrower.  So there's going to be common

9  borrowers between III and IV.  That's okay.

10          And here's the disclosure on top from UDF III and

11  down below for UDF IV, both laying out there's going to be

12  this refinancing concept.  It's anticipating, the market

13  knows it.

14          The UDF IV one says, our asset manager manages the

15  sale or refinancing of loans and investments by and between

16  United Development programs.  What that's saying is there

17  could be refinancing transactions between UDF IV and UDF

18  III.  UDF III loan is about 15 percent, typically, that's

19  what the evidence is going to show.  UDF IV loan is at about

20  13 percent.  It helps the borrower to reduce their cost of

21  funds.

22          So let me transition to this slide here because

23  it's key to the case.  This is a UDF V loan, as an example.

24  What the UDF V investors want?  They want their money to be

25  lent out so it can start earning that 13 percent interest

 1    that I mentioned.

 2              So when UDF V is going to issue a new loan, it's

 3    going to go to a common borrower.  That common borrower is

 4    going to take some of the proceeds of that loan and start

 5    developing the projects in that next phase to try to get it

 6    to where you get finished lots out so homebuilders can come

 7    build after land acquisition.

 8              But a portion of that loan, it has to pay off the

 9    original land acquisition loan.  You will see that original

10    land acquisition loan will have been held either by UDF III

11    or IV.

12              So the UDF III and IV investors in this loan

13    scenario are going to benefit because their loan just got

14    repaid, and when their loan gets repaid, they now have funds

15    available.  They've got funds available to lend.  So they

16    can send out a new loan and start earning interest on

17    another UDF III loan, for example, or they can pay

18    distribution because they've just got the money coming in.

19    That's good.  It's a benefit.

20              What they need to do though is they now have been

21    paid off, and this common borrower doesn't owe them any more

22    money.  So they have a lien on the property which they need

23    to release.  So they release the lien.  Who needs the lien?

24              Well, it's the UDF V investors and UDF V investors

25    need the lien, because they've just lent money to the common

1    borrow and that secures this land and this investment for

2    them.

3            It is a massive benefit for these UDF V investors

4    to have that lien on the property, because it's going to

5    secure that the common borrower is going to pay them.

6            So in this situation, everyone benefits.  Okay?

7    So what I want to get across is this, because I'm going to

8    use this slide.

9            What the flaw in the government's theory is, is

10   the government is saying that the investors on this side in

11   a V transaction or on this side in a IV to III transaction,

12   that these individuals schemed to deprive them of money or

13   property.

14           Well, what the government does is they ignore all

15   the benefits that are flowing from the right side of this

16   chart to the left side of this chart.  They don't consider

17   that.  It's a flawed investigation.

18           You have to consider the benefits coming across

19   when you're trying to analyze whether these UDF executives

20   acted in good faith, acted openly and transparently, and

21   what they did was legal.

22           Everyone is benefiting from this, but you're only

23   seeing half of the picture.  So it's our job to demonstrate

24   to you that you're not seeing the whole picture.  When all

25   the evidence is in, and we'll get this on cross-examination

1    of their witnesses, there's only one conclusion, that these

2    individuals acted in good faith.

3              They acted openly, transparently, with integrity;

4    there is no crime here.  So we will stand up in closing

5    argument and ask that you answer a verdict of not guilty on

6    each and every count of the indictment for all four

7    individuals.

8              Your Honor, thank you.

9        (Opening statements concluded at 12:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          REPORTER'S CERTIFICATE

4

5          I, ZOIE WILLIAMS, RMR, RDR, FCRR, certify that

6     the foregoing is a true and correct transcript from

7     the record of proceedings in the foregoing entitled

8     matter to the best of my ability to hear.

9          Further, due to the COVID-19 pandemic, all participants

10    were wearing masks, so proceedings were transcribed to the

11    best of my ability.

12         I further certify that the transcript fees format

13    comply with those prescribed by the Court and the Judicial

14    Conference of the United States.

15         Signed this 15th day of January, 2022.

16

17                          ___/s/ Zoie Williams_____
                            Zoie Williams, RMR, RDR, FCRR
18                             Official Court Reporter
                            Northern District of Texas
19                              Fort Worth Division

20
      Business Address:      501 W. 10th Street, Room 532
21                           Fort Worth, Texas 76102
                             zwilliams.rmr@gmail.com
22                           817.850.6630

23

24

25

Case 4:21-cr-00289-O    Document 302    Filed 01/29/22    Page 43 of 51    PageID 11287
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 2 January 12, 2022                    Index: $10,000..bank

## $

$10,000  15:3,10
$2,000,000  8:10 9:18
$240,000  15:11
$4,000,000  10:20
$5  31:12
$60,000  15:8 16:3
$79,000,000  10:16

## 1

1  30:23
10  18:5 27:8 30:25
10-K  30:4 35:2
10-Q  35:2
101  24:9 25:17
113  37:16,18
12  30:25 32:6
12:20  41:9
13  30:25 32:6 38:20,25
133,000,000  10:12
14  19:7
15  16:16 38:18
18  12:4
1990s  34:1

## 2

20  32:4
200  15:4
2003  34:2
2006  16:8,9
2008  14:13 16:21 19:3
2012  19:6
2014  8:6
2015  12:10
240,000  16:15

250  17:22

## 3

30,000-foot  21:17

## 5

5  23:3

## 7

7  32:7

## 8

81  37:21

## 9

90,000  17:24
9001  37:17
90s  34:5

## A

abandoned  17:3
absolute  23:19
absolutely  21:11 22:21
26:8 28:24 30:19 32:15
access  19:25
account  12:17 30:21
31:3,8,20
accountants  28:6,14
30:12
accounting  28:2 33:25
accounts  5:22 10:17,
21
accruing  8:9 10:14
accurate  35:14
acquire  6:11,14 15:21
acquisition  15:19
37:21,25 39:7,9,10
acre  14:23 15:1,2,3,6,

10,11 16:4,14
acres  14:24 15:4 37:21
act  28:23
acted  26:16 40:20 41:2,
3
active  20:5 21:7 24:19
acts  34:8
adding  9:5
additional  29:8
advance  14:1
advice  28:5
advisor  6:4,7,9,20
advisors  7:9
affiliate  7:5 36:5,8
affiliates  6:5,7,9,19
36:3
affiliated  6:16
agents  34:12
aggregate  20:22
agree  18:10
agreed  34:11
agreement  22:16
allowed  22:11 23:11
26:8 37:9
American  19:16 21:23
22:16 23:1,4
amount  32:19
analysts  36:25
analyze  35:14 40:19
analyzing  37:11
annual  30:4
Ansley  18:17,20,21
27:9 31:24
anticipating  38:12
anymore  8:8
apologize  15:16
apply  35:20
appraisals  31:25

approach  37:4
approved  20:24 26:19
approximately  10:12,
20
area  25:14
arguing  27:21
argument  11:20 13:4
41:5
Arianna  18:22
asks  8:20,23
assessing  25:22
asset  6:14,15,20 17:17
19:3,4,5,12 20:22 22:24
23:15 28:14 29:12
31:11 38:14
assets  17:18,20 25:10
assistance  21:6
assists  21:4
Associates  36:24
attention  14:2
auditing  8:17
auditor  8:17,19,20 9:9,
11
auditors  8:14,15
audits  8:18
Austin  25:14
authority  22:18
authorized  22:10
availability  21:18
avoid  30:6
aware  13:20 26:12

## B

back  4:22,23 5:9,12,13,
16,25 9:2,11 10:13
20:25 26:21 27:12
31:13 33:5,6
bank  4:17 5:22 7:22,24,
25 10:17,21 21:9,10,15
29:15,18 30:21 31:3
33:6

**banks** 7:19 8:2 14:12
  16:9,24 17:3,5,6

**based** 25:12,14

**basic** 4:13 5:10 20:14

**basically** 36:6

**bear** 32:14

**began** 19:3

**beginning** 22:1 34:6
  37:12

**Ben** 27:19 29:3

**benefit** 39:13,19 40:3

**benefiting** 40:22

**benefits** 40:6,15,18

**biggest** 8:4

**bit** 15:14 24:24 29:19
  33:22

**bits** 11:22

**Blake** 8:6 9:1,23

**blank** 8:7

**block** 15:18

**blocking** 15:16

**born** 29:4

**borrow** 15:20 17:20
  32:3 40:1

**borrowed** 32:7

**borrower** 9:10 22:14,
  20 23:1,2,5 27:5 31:2,
  22 36:20 38:8,20 39:3,
  21 40:5

**borrowers** 9:23 20:6
  21:1,5,16 22:17 23:11,
  14,18,22 27:4 36:20
  37:9,10,14 38:9

**borrowers'** 37:20

**borrowings** 32:18

**Brandon** 18:23,25 19:7
  21:12

**brick** 7:18 21:1

**bring** 21:14,16

**broke** 17:9,11,25 31:5,
  14,15 32:23

**broker/dealers** 7:9

**broker/developers**
  8:5

**brokers** 7:1

**brother** 31:13

**Buffington** 8:5,6,23
  9:2,3,23 19:15

**Buffington's** 8:24

**build** 11:12 17:2 39:7

**builder** 27:5

**builders** 11:12 14:11
  15:7 16:3

**building** 21:13 29:7

**built** 11:11 16:18 33:9

**bullet** 38:6

**burden** 12:19,24 13:11
  28:19

**business** 4:13,15
  11:16,18 12:1,11 13:21
  14:18 18:2 19:22 21:13
  25:8,17,19 28:11 29:6
  33:2,8

**businesses** 19:23

**buy** 15:3 32:3

---

**C**

---

**call** 4:11 16:10

**called** 9:17 17:16

**calls** 23:17

**Capital** 7:21,24,25

**Cara** 33:21,22 34:6

**care** 26:18,22

**career** 29:8

**careers** 34:6

**carefully** 33:13

**carry** 12:19

**cars** 25:9

**case** 7:16 10:8 12:14
  18:10,23 22:12 25:25
  27:11,21,22 28:8,18
  33:1,12,14 34:13,14

36:23 38:23

**cash** 5:7 8:20,24 9:3
  15:13 16:6 19:25 25:5,
  6,22,23 30:1,3,6,8,16,
  17,19 31:3,18 32:20

**caused** 10:14

**Central** 12:3,7 24:17

**Centurion** 19:15 21:23
  22:16 23:1,4 37:18,19

**CEO** 13:25

**chain** 26:17

**charged** 12:9,21

**chart** 40:16

**cheat** 28:24

**cheating** 12:13

**chief** 34:3

**children** 34:4

**Chloe** 34:5

**chosen** 11:18

**cite** 37:16

**clear** 21:9 22:19

**client** 7:11 26:16 27:9

**clients** 14:3 18:21
  24:12,22 26:12 27:5

**closing** 41:4

**collateral** 24:7

**colleagues** 18:8

**college** 33:25 34:5

**common** 36:19 37:9,10
  38:8 39:3,21,25 40:5

**communicate** 23:14
  26:12

**communication** 23:18

**communities** 12:3
  14:17,24 17:23 24:17

**companies** 8:18 13:25

**company** 8:5,24 9:17
  25:17 26:25 30:11 37:2,
  13

**completion** 22:8

**concept** 37:9 38:5,12

**concluded** 41:9

**conclusion** 11:1 22:2
  41:1

**conduct** 12:10,11

**conducting** 18:2

**confront** 34:15

**consistently** 25:7 27:1

**conspiracy** 33:7

**constant** 23:17,18 27:4

**constantly** 23:14

**construction** 16:1,5
  37:25

**constructors** 11:12

**consultants** 20:15

**consume** 16:6

**consumes** 15:13

**contact** 23:18

**contained** 34:23

**contents** 26:19

**context** 27:1

**continue** 12:7 17:19,23
  18:8 20:3

**continued** 28:10

**continues** 12:6,10
  24:11

**contract** 23:6

**contractors** 20:21

**contracts** 22:15 27:3

**contractual** 22:18
  23:10

**contractually** 22:10

**contrary** 34:18

**contrast** 35:8

**cooperate** 28:9

**corporation** 26:18

**correct** 35:18,20

**cosponsors** 6:19

Case 4:21-cr-00289-O    Document 302    Filed 01/29/22    Page 45 of 51    PageID 11289
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 2 January 12, 2022                    Index: cost..exists

**cost** 38:7,20

**Counsel** 4:8 18:21

**count** 41:6

**country** 16:22

**Court** 4:4,7 11:3,5,7,8,
21 12:23 13:5 18:5,16,
18,19 27:8,14,15,16
33:16,18,19 37:5

**covered** 25:24

**create** 6:2

**created** 6:2 17:7,10,14

**creates** 17:11

**credible** 13:14

**credit** 6:18 29:18 30:16
36:2,10,16

**crime** 35:25 41:4

**crimes** 12:21

**criminal** 12:9

**criminals** 13:19

**crisis** 16:23

**critical** 14:16

**cross-examination**
40:25

**current** 32:20

**cycle** 15:18

                    **D**

**day** 12:5,11 27:6 33:9
34:3

**day-to-day** 19:21

**dealers** 7:1

**decision** 6:2 7:8

**Defendant** 4:10,22 5:2,
3 6:25 7:2 8:6,7,21,23
9:4,13,15,19,22 10:4

**defendants** 5:14,17,19
6:23 7:7,18 8:13,14
10:14,22 11:2 33:15

**defined** 36:5

**defraud** 12:13 33:7

**degree** 29:6

**demands** 14:11

**demonstrate** 33:11
40:23

**depending** 26:19

**deprive** 13:7,16 40:12

**depth** 14:8

**describe** 9:13 35:5

**describing** 35:7 37:20

**determine** 25:4

**develop** 22:7 37:21

**developed** 17:22

**developer** 21:5 24:12
25:12,16

**developers** 4:16,17,
18,21 5:9,12,16,24
10:12 14:11,12 15:3,7,
20 17:1,21 19:14,21,22,
24 20:1,3,6,8,9,12,19
21:17,25 22:6 23:22
24:15 26:21 29:19
30:25 31:2 33:3,4,9

**developers'** 25:13

**developing** 39:5

**development** 12:2
14:16 15:5,9,10,12,18
16:17 19:2 32:5 38:16

**developments** 12:6
16:18 19:17 21:22

**devising** 13:3,6

**differences** 35:6

**Dimmitt** 33:23

**directions** 9:19

**director** 19:5

**dirt** 22:1

**disapproved** 26:19

**disclose** 7:24 9:11

**disclosed** 13:22 23:21
29:19 30:4 31:23

**discloses** 12:15

**disclosure** 12:14
28:18 38:10

**disclosures** 27:2 28:3
29:1 32:13 34:23,25
36:3,6,22,25 37:12 38:1

**discuss** 21:20

**discussed** 35:17,21

**distinguishes** 21:7

**distribution** 5:7,15
32:18 39:18

**distributions** 4:23 5:6,
23 8:2 9:18 10:2,11,23
32:16,19

**documented** 32:1

**documents** 28:17
30:10 32:14,17 34:14
35:2 36:23

**dollar** 5:15

**dollars** 32:8

**door** 10:23

**doubt** 12:22 13:2 28:21

**drastic** 16:22

**draw** 22:11,12,18 23:2,
7 26:7,14,17,23 29:16

**draws** 20:13 21:3 30:11

**drive** 24:18

**DST** 9:17

                    **E**

**earlier** 5:23 10:2,19
37:24

**early** 10:24 34:1,4

**earn** 30:22

**earning** 38:25 39:16

**earth** 29:4

**easily** 17:15

**effort** 15:9

**Eggers** 4:5,6 11:19
13:4 30:5 37:3

**elements** 12:21

**email** 22:25

**emails** 23:17 34:15

**employee** 22:25 23:1,6
26:24

**employees** 12:1 18:12

**end** 10:8 27:11 33:9,12

**ended** 12:10

**engage** 7:4 20:19

**engaging** 21:1

**enhancement** 36:11,
16

**enhancements** 6:18
36:3

**enterprise** 15:12

**entire** 15:23

**entities** 4:11 6:4,7,9,
10,13,20

**entitlements** 15:24,25

**entity** 36:7

**entrusted** 4:14 5:19
10:22

**equity** 32:5

**Erin** 22:23

**essential** 14:16

**essentially** 22:13

**estate** 6:18 12:2,6

**evidence** 4:9 10:9,25
11:25 12:15,18 13:12
14:15,20 17:8 18:4,10
25:25 26:6 27:12,22,24
28:1,5 29:23 31:5,7
33:11,12 34:7,18 35:3,
14,24 36:12 38:19
40:25

**exact** 13:18

**excess** 17:22

**exclusion** 12:21 13:2

**excuse** 15:7

**executives** 13:2,16
18:12 40:19

**exist** 31:25

**existing** 25:10

**exists** 31:25

**expect** 4:9 7:7 10:8,25

**expenses** 19:21

**experience** 29:9

**expertise** 21:15 24:21 25:13 26:13

**experts** 28:16

**explained** 12:24

**exposure** 25:7

**express** 23:8

**expressly** 22:11,15,17

**external** 19:10

**eye** 29:10

---

**F**

**fact** 13:18

**facts** 11:24

**faith** 26:16 27:10 40:20 41:2

**false** 13:8

**families** 33:10

**family** 33:24

**farming** 33:23

**fast** 5:25 10:13

**FDIC** 21:10

**feasibly** 8:11

**February** 34:10

**federal** 29:16

**filed** 5:1 6:3,23 8:18 30:5

**filing** 10:6

**filings** 5:1 6:3 8:3 10:5

**fill** 9:24

**finally** 16:2

**finance** 12:6 17:6 38:7

**finances** 29:11,13

**financial** 7:9,15,18 8:19 16:23 19:25 20:2 31:11 34:3

**financiers** 16:7

**financing** 12:11 15:9 17:19 30:2 31:18,19 38:1

**find** 11:2,24 21:12 33:6

**fine** 36:22

**finish** 21:25

**finished** 16:2 17:2 39:6

**fire** 6:9

**flaw** 40:9

**flawed** 40:17

**flip** 31:17

**floor** 4:5

**flow** 8:20,24 9:3 25:5, 22,23 27:4 32:20

**flowing** 26:2,4 40:15

**focus** 36:18 38:5

**follow** 35:23

**Ford** 25:9,20

**forecast** 25:15

**forecasting** 25:19

**Form** 35:2

**formed** 4:11,25 5:17

**forthright** 28:3

**forward** 8:11 19:18 24:15

**found** 18:13

**fourth** 38:6

**framework** 35:13

**Friday** 31:14

**Frisco** 37:16,18

**front** 4:15

**fulfilled** 14:10

**fully** 13:20,22 31:23 32:1

**fund** 6:9 7:10 16:11 19:2 22:5 26:2 30:3,7,9 31:14 32:18 35:7,18,21, 22

**funding** 14:11,16 16:8, 12,13 20:11,13,18 21:20 22:10,14 30:17

**funds** 5:8 6:19 21:10,18 23:3 24:14 34:22 36:17 38:21 39:14,15

**future** 25:15

---

**G**

**gained** 29:8

**gave** 9:3

**general** 5:1

**Generally** 19:13

**gentlemen** 10:9 11:9, 15 12:14,23 18:6,20 33:20 37:6

**Gilpatrick** 9:5

**give** 4:14 8:24 30:13 34:10 35:13

**good** 9:1,8 14:14 17:4 18:3 19:10,11 20:5,7 23:13 24:20 26:16,24 27:10,18 30:1 31:11 33:3,4,6,17,20 39:19 40:20 41:2

**Goodman** 18:22

**government** 11:10 12:9,19 13:1 18:11 28:8,19,20 29:16 31:4 40:10,14

**government's** 40:9

**graduated** 29:6 34:1,5

**Grapevine** 20:23

**great** 16:23 17:12

**Greenlaw** 4:10,14,22 5:3,19 6:25 8:6 9:13 13:25 14:10,13 18:12 29:10

**grew** 14:6 33:22

**grow** 19:22 20:1,2 24:15

**growing** 19:19 21:19

**growth** 32:6

**guilty** 11:2 18:13 27:13 33:14 41:5

**guy** 9:5,16 27:18

---

**H**

**half** 40:23

**happened** 16:22

**happening** 32:10

**hard** 28:12 29:11

**Hawk's** 21:23

**headquarters** 20:23

**hear** 7:7 9:12,13,15 12:5,10 13:13,14 14:9 15:23 16:10 18:3,9 19:15,16 22:9 24:12 25:18,21 29:25 30:10 31:19 32:25 34:18 35:12 37:18

**heard** 14:7 28:18

**hearing** 15:24

**heaviest** 12:24

**heavy** 12:24

**held** 23:4 39:10

**helping** 19:16,20,22,24 21:16,25 22:6

**helps** 38:20

**hey** 9:17

**hid** 8:2,3,15

**hidden** 23:9,20

**hide** 28:7,22

**high** 10:14 19:25 32:9

**high-level** 21:6

**higher** 23:16

**hired** 14:14 34:2

**history** 25:13

**hold** 6:22 11:13 15:17

**Hollis** 13:25 14:10,13 18:12 29:10

**home** 11:12 14:11 15:7 16:3 17:1 21:13 29:7

Case 4:21-cr-00289-O    Document 302    Filed 01/29/22    Page 47 of 51    PageID 11291
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 2 January 12, 2022                    Index: homebuilders..live

homebuilders 39:6

homes 33:9

honest 27:24 34:8,17

Honor 4:6,7 11:7,19
13:4 15:16 18:15,17,20
33:17 37:3 41:8

hopes 16:14

house 24:1 31:13,24

houses 14:25 17:2,24

hundred 15:4

hundreds 12:2 14:23,
25 15:3

                    I

idea 5:10

identified 20:8

identify 35:17

idle 30:1,3,6,16,19 31:2,
18

ignore 40:14

III 4:25 5:5,8 8:2,10 9:18
10:11 13:10 15:21 16:7,
21 30:3 31:4,14,21
32:17 34:21 35:6,9,19
36:7,11,21 37:15,19
38:4,5,7,9,10,18 39:10,
12,17 40:11

III's 10:18

illiquid 17:15,16

illiquidity 32:22

important 14:3 29:14,
24 31:17

importantly 11:17

improve 4:18

including 6:9 19:7

indictment 41:6

individual 19:1 25:4

individuals 40:12 41:2,
7

industry 25:13 29:7

information 8:15 27:4

initial 20:11 37:24

initiate 22:11,18,20
23:2 26:7

initiates 22:14

initiating 23:6 26:23

injure 13:9

innocent 18:13

insolvency 32:22

instance 7:21 22:23

institutions 7:18

instruct 13:1

instructions 33:13

insured 21:10

integrity 34:8 41:3

intended 13:9

intends 6:21

intent 28:24 33:7

intentionally 13:3,6,8

interest 4:22 5:9 8:9
10:13 17:13 32:9 38:25
39:16

internal 19:10

interview 34:16,19

introduce 29:3

investigated 28:8

investigation 34:11
40:17

investing 5:6 8:13
13:21

investment 6:4,6,22
30:21,24 40:1

investments 6:8,18
32:20 38:15

investor 29:17 30:11,
14 31:3

investors 4:14,24 5:18,
23 7:4,11,13 8:1 10:2,
15,16,18,19,24 13:7,9,
19,20 17:21 18:2 23:23
28:12,16 30:20 31:1
33:3 35:1 37:1 38:24
39:12,24 40:3,10

investors' 5:21 10:21

invoices 20:14,21,22,
24

invoicing 20:17

involved 10:10

involves 15:12 20:20

Iowa 29:4,5

issue 39:2

IV 5:17,18 7:12 8:1,10
10:15,16,18 13:10 17:7,
9,10,11 23:3,7,8 24:14
25:1 30:7 31:4,15,20
34:3,21 35:6,9,19 36:7,
11,21 37:15,19 38:4,5,
6,9,11,14,17,19 39:11,
12 40:11

IV's 5:21

                    J

Jeff 18:21

Jester 8:7,21,23 9:4,22
18:23,25 19:7 21:12
26:16 29:12

job 19:10,11 40:23

jobs 23:13

judge 11:6 12:20,25
27:17,20 28:20

Judge's 33:13

judicial 12:25

jurors 27:18,22 28:1,14
29:14 30:9 31:8,17,22
32:6,10

jury 11:9,16 18:7

Just-in-time 30:2
31:18,19

                    K

keen 17:4

key 38:23

knew 9:8 26:9,11 27:5

knowing 27:2

knowledge 21:14

                    L

ladies 9:19 10:9 11:9,
15 12:14,23 18:6,20
33:20 37:6

land 14:23 15:1,2,19,21
32:3 37:20,24,25 39:7,
9,10 40:1

Landing 21:24

large 19:23 24:10 30:6

largest 9:10

law 13:3

lawyers 28:6 30:12

lay 36:4

laying 20:15,16 38:11

learn 8:17 14:7

left 40:16

Legacy 21:15

legal 40:21

lend 15:21 17:1 21:10
39:15

lender 22:14,20

lenders 21:8 28:15

lending 14:12 16:9,24,
25 17:1 24:9 37:14

Lennar 29:8

lent 38:25 39:25

level 16:11 19:25 20:12,
13,17 21:3,17,20 22:9
23:16

levels 23:16

Lewis 27:15,17,18

lien 17:13 24:7 31:25
39:22,23,25 40:4

life 15:18

light 27:6

limited 6:15 29:2

lines 20:16 29:18

live 25:11

Case 4:21-cr-00289-O    Document 302    Filed 01/29/22    Page 48 of 51    PageID 11292
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                           Vol 2 January 12, 2022                    Index: loan..Pelletier

**loan** 4:16 6:11,12 7:21 8:1 9:2 22:6,7,16 23:8 24:2,3,4,7,25 25:16 30:24 31:25 32:3 36:10, 15,20,21 37:10,17,24 38:18,19,23 39:2,4,8,9, 10,12,13,14,16,17

**loans** 4:22 5:9,12,13, 17,25 6:17,23 7:18,19 8:9 10:13 12:1 23:4,24 24:11 25:4,24 26:4,5 28:11 29:16,18 31:9 33:8 36:2,14,19 37:19 38:7,15

**location** 21:2

**locations** 20:15,21

**long** 8:16

**looked** 24:16

**lot** 7:15 9:14 16:1,4,20 23:17,25 32:12,25 35:12

**lots** 15:6,7,8 16:2 17:2 37:22 39:6

**loud** 14:5,6,7

**lower** 32:9 38:7

**lying** 18:1

**M**

**mad** 14:5

**made** 6:1 7:8,20 13:8 32:15,16

**magic** 14:19

**make** 6:17 9:6,24 28:11 29:16,18 30:19 32:2 33:8

**Makes** 4:24

**making** 12:1

**man** 4:11 5:20

**manage** 19:16,17 21:17 29:11 30:17

**management** 19:5 20:5 21:6,7 24:20 29:22

**manager** 19:3,4 22:24 23:15 31:11 38:14

**managers** 6:20 19:13 20:22 28:15 29:12

**manages** 30:7 38:14

**managing** 19:20

**manipulating** 9:6

**manner** 21:4

**market** 38:12

**massive** 40:3

**material** 13:8

**meaning** 25:11

**means** 19:6 22:13 29:21 32:8 36:6

**measure** 24:10

**meet** 13:11 34:12

**meetings** 23:15,16

**members** 4:25

**mentioned** 39:1

**Mick** 36:24

**middle** 31:22

**midst** 34:11

**millions** 32:7,8 34:14, 15

**minutes** 18:5 24:16 27:8

**mislead** 13:9,17 28:24

**misrepresent** 28:23

**model** 4:13 24:25 25:3, 7 33:2

**moment** 11:6 18:7

**money** 4:14,16,18 5:19, 20,21 7:12,15,23,25 9:16,20,21,25 10:1,14, 16,21 13:7 15:21 16:20 21:10 22:4 26:2,4 29:16,17 30:21 31:14, 20 38:24 39:18,22,25 40:12

**month** 8:11 9:16,18

**morning** 27:18 29:3 33:17,20

**mortar** 7:19 21:2

**move** 8:11 9:20

**moved** 5:21 10:1,16

**moving** 9:16 22:4 31:20

**Mueller** 22:25 26:10

**multiple** 10:17

**N**

**nature** 13:20

**Neal** 33:21

**needed** 7:13 12:7

**net** 6:22

**North** 12:3 24:17 25:14

**Northern** 12:7

**note** 14:4

**number** 5:22 19:4 30:7

**numbers** 9:6

**O**

**oath** 13:15

**Obert** 5:2,19 7:2 34:4,7, 11,17

**Obert's** 10:4

**object** 11:19 13:4 37:3

**obtained** 7:18,19,21,23

**offer** 7:11

**offering** 7:10

**office** 9:20

**officer** 34:3

**Olbert** 33:21 34:6

**open** 12:12 27:24 34:8, 17

**opened** 7:13

**opening** 4:3 41:9

**openly** 40:20 41:3

**operate** 37:12

**operated** 27:10

**operations** 5:8 16:12

**opposite** 13:18

**order** 14:7 20:9 23:3 24:14

**original** 39:9

**originate** 6:22 36:2,9, 19,20

**originating** 36:15

**overhead** 16:13

**Overruled** 11:21 13:5

**owe** 39:21

**owes** 31:14

**P**

**p.m.** 41:9

**paid** 4:23,24 5:7,23 10:11,17,23 32:19 39:21

**papers** 31:25

**paperwork** 9:24 32:11

**part** 16:25 32:4

**participate** 6:4,6,8,12, 15,17 26:23 36:2,10

**participating** 36:15

**partner** 4:15

**partnerships** 6:15

**parts** 16:5 28:22

**past** 12:4

**Paul** 13:23

**pay** 4:22 5:14 8:1 9:2,7, 10 10:2,18 16:3 17:20, 21 23:3 25:5 31:13 32:4 39:8,17 40:5

**paying** 5:9,12,13,16,25 10:13 20:20 23:8

**payment** 20:25

**payments** 26:1 31:10 32:15

**Pelletier** 11:4,5,9,22 13:6,23 18:6 28:19 29:9 32:22 37:23

**penny** 12:17

**people** 14:14 18:2 19:10 20:15,16 21:1,12

**people's** 5:20

**percent** 30:23,25 32:4, 6,7 38:18,20,25

**person** 19:1

**personal** 14:4

**persons** 4:15

**phase** 16:17,18 39:5

**phone** 23:16

**picture** 40:23,24

**pieces** 4:18 11:22 16:4

**pipe** 20:15

**pitch** 6:25

**pitching** 9:14

**place** 4:19 17:5 24:6

**platform** 7:10

**play** 25:11

**pleases** 11:5

**pleasure** 18:22

**pledged** 17:13

**pocket** 31:12

**point** 8:7 20:4,10 31:17 38:6

**Ponzi** 11:1

**Ponzi-scheme** 26:1

**pool** 7:13

**portfolio** 20:5 21:6,7, 20 22:9 24:19 25:10

**portfolios** 19:17 21:18 24:25 25:1,3,4

**portion** 39:8

**positive** 25:6

**potential** 30:14

**practice** 22:22

**Prairie** 22:23

**precision** 29:22

**present** 19:7 21:15

**prior** 6:12,19,20 37:14

**privilege** 13:24 27:19

**proceeds** 6:22 39:4

**process** 15:5,23,24 16:5,13,16,19 17:11,21 20:10,20 21:2 24:19

**processes** 15:22

**produce** 25:16

**professionals** 28:6 30:13

**programs** 37:14 38:16

**prohibited** 37:13

**project** 20:12,13,17 21:3 22:1,2,6,7 25:15 37:18

**projections** 8:20,25 9:3

**projects** 9:5 19:18 21:19 24:15 25:11,15, 22 29:13 39:5

**promoted** 19:5

**proof** 12:20

**properly** 12:16

**properties** 15:12

**property** 4:19 13:7 16:4 19:14 39:22 40:4, 13

**prosecutor** 17:8

**prosecutors** 34:12

**prospectus** 30:9,13 35:2

**protected** 25:24

**prove** 12:20 13:1 28:21

**provide** 6:18 16:8 20:2, 13 21:6 36:2,10

**provided** 14:15 24:11

**providing** 36:16

**public** 5:1,6 8:3,13 34:25

**publicly** 8:18

**pulled** 16:24

**purchase** 6:22

**purpose** 23:8 24:5 25:21 26:3

**purposefully** 13:17

**purposes** 23:25 24:13 26:5 36:6

**pursuant** 23:6

**push** 19:17 24:15

**put** 30:21

**putting** 16:6

———————

**Q**

**qualifies** 36:8

**question** 34:13,16 35:22

**quickly** 5:12,13,17

———————

**R**

**raised** 29:4

**rate** 32:9

**reach** 35:14

**read** 23:19

**real** 4:19 6:17 11:25 12:1,2,6 33:8,9,10

**reason** 7:7 10:1 11:12 35:11

**reasonable** 12:22 13:2 28:21

**reasons** 20:7

**receipts** 30:8,17

**received** 5:8 26:17

**recognize** 19:11 20:6 24:22

**recruited** 29:9

**reduce** 38:20

**refer** 35:3

**referenced** 34:24

**referring** 30:5

**refinance** 32:5 37:20 38:7

**refinanced** 24:1

**refinancing** 23:25 24:8 31:24 38:12,15,17

**reflect** 28:17 32:20

**reflected** 26:13 32:16

**refrain** 37:7

**regulators** 23:22

**reimbursements** 31:9

**related** 24:24 34:18

**relationship** 8:12

**release** 24:6,7 39:23

**remember** 16:23 17:22

**Renee** 22:25

**repaid** 39:14

**replace** 24:2

**replaces** 24:8

**replacing** 24:5

**report** 30:4

**represent** 33:21

**representations** 7:20

**representing** 13:24 18:23 27:19

**request** 22:14,20 23:2, 7 26:7

**requests** 22:11,12,18 26:7,14,17,23

**required** 5:14 22:21

**requirements** 30:18

**Research** 36:24 37:1, 8,11

**reserve** 29:16

**reserves** 30:7

**residential** 19:14,18 37:22

**resources** 20:1,3

**rest** 18:8

**return** 27:12 33:13

Case 4:21-cr-00289-O    Document 302    Filed 01/29/22    Page 50 of 51    PageID 11294
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                   Vol 2 January 12, 2022                    Index: revenue..Texas

revenue 25:16

review 35:4

rich 17:17

Richards 22:24

risen 19:9

risk 13:21

risky 32:4

road 34:21,23 35:20,23
    38:4

role 10:4

roles 9:12

Romero 13:24

Rose 13:24

rules 34:21,22 35:20,23
    38:4

run 7:12 24:25

——————————

**S**

S11 35:1

sale 38:15

sales 6:25 9:14

salt 29:4

sample 36:13

sand 11:11,13 31:7

savings 30:22

scenario 39:13

scheme 10:10 11:1
    12:13 13:3,6

schemed 13:16 40:12

school 29:5

seated 4:10

SEC 5:1,2 6:3,24 10:5,6
    23:22 30:5

secure 40:5

secured 6:23 30:16

secures 40:1

seek 26:13

sell 6:11,14 15:2,6
    17:14

selling 16:14 25:9

send 9:19 20:22 39:16

sending 22:25

sense 4:24 30:19 32:2

September 8:6

series 35:12

serve 23:24 24:12

served 19:4

serves 24:5

services 20:14,18

serving 26:5

set 11:6 20:4 21:15
    24:21 26:13 36:13

sewer 20:16

Shahan 22:23

shifting 31:7

show 4:9 10:9,25 12:18
    14:15,20 15:2 17:9
    22:15 26:1,2,4 27:7,9,
    22,24 28:1,5 29:2,23
    31:7 34:7 35:24 36:12
    38:19

showed 29:25

sick 15:24

side 31:18 40:10,11,15,
    16

sides 34:24 35:3

sign 23:12

signed 5:3 26:9

similarly 36:14

simple 14:18,19 24:8

simply 13:12

single 12:17

single-family 37:21

singled 20:7

sir 33:19

sisters 14:6

sitting 31:3

situation 40:6

SK 36:24 37:1,8,11

skill 21:14 24:21 26:13
    29:22

slide 37:7 38:22 40:8

slides 22:8

small 19:23 33:23

snag 5:11

sold 4:20 15:8

solely 8:1

soliciting 7:3

solvency 17:17

sophisticated 14:18,
    19

sort 4:17 6:25

sought 28:5

space 19:14 21:13

speak 14:5,6,7

speaking 35:18,19

specific 28:24

specifically 7:23 13:9

split 15:6

stage 16:25

stand 11:18 13:13
    35:22 41:4

standpoint 25:5

start 9:5,6 21:25 33:22
    35:25 38:25 39:4,16

started 4:24 16:8 29:6,
    8

starting 20:10

starts 14:22

statements 4:3 8:19
    13:8 41:9

stealing 12:13

Stephens 33:17,20,21
    37:6

steps 16:12

stopped 14:12

story 11:10,23 13:12
    18:9

strategic 6:1 7:8

structure 11:13

structured 36:14

studied 33:25

study 36:25

submission 20:20

submitted 5:2

subsequent 10:15

substantially 6:21

success 18:9

successful 12:6 20:8

sufficient 25:23

suggesting 37:23

summarize 36:25

support 27:13 31:6

supposed 8:22

swear 13:15

Sy 34:5

system 12:25

——————————

**T**

takes 16:19 24:5

talent 29:10

talk 19:12 21:21 22:11
    24:23 25:18 29:1 30:3
    34:20,22 35:9 37:8 38:3

talking 14:23,24 15:20
    20:10 25:1 26:10 33:22
    35:25 37:8

Tech 33:25 34:1

telling 9:10 27:23 28:12

tells 17:8

tend 14:5,6

tens 32:8

terms 35:1

Texas 12:3,7 14:11,17
    17:23 19:19 20:23
    24:17,18 25:14 33:10,
    23,25 34:1

Case 4:21-cr-00289-O   Document 302   Filed 01/29/22   Page 51 of 51   PageID 11295
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 2 January 12, 2022
Index: Texas-based..young

**Texas-based** 19:13

**theory** 11:23 13:12
31:8 40:9

**thing** 14:14 30:20

**things** 8:2,3 10:7 20:16
24:16 27:3 36:13

**till** 34:2

**time** 14:1 15:4,5,6
16:18 18:14 23:1 29:3
30:7,22 32:19

**times** 27:20

**timing** 30:17 31:10

**today** 12:8 19:6 23:2
24:18 28:11 31:12
34:20,24 35:5 36:19

**told** 4:25 5:5 7:22 8:6,
13,14 9:9 11:10 12:20
13:19 27:23 32:23 33:2

**tools** 29:24

**top** 23:13 26:22 32:18
38:10

**total** 36:13

**town** 33:23

**tracing** 7:16

**transaction** 31:23
40:11

**transactions** 7:5 32:12
35:12,13,17 38:17

**transition** 38:3,22

**transparent** 12:12
23:10,21 27:25 28:4

**transparently** 40:20
41:3

**trial** 11:1,17 14:2 29:25
36:4

**true** 11:11 13:12 31:21
33:14

**trustworthy** 34:17

**truth** 11:13,24 27:23
28:13 32:23 33:2

**truthful** 27:25

**tune** 10:15

**turn** 4:4 18:7

**turned** 22:2

**type** 22:6,7

**typically** 38:18

---

**U**

**UDF** 4:11,13,25 5:5,8,
17,18,21 6:2,3,6,8,11,
12,14,17,19,20,21 7:4,
12 8:1,2,10 9:18 10:6,
11,15,16,17,18,20
11:25 12:5,10,15 13:2,
7,10,15,25 14:10,15
15:21 16:7,10,21 17:4,
7,9,10,11,13 18:8,12
19:3,4,8,13 20:5,17,23
21:4,7,9,11,14 22:14,
17,24 23:2,3,5 24:10,
11,14 25:1,20 27:23
28:8,15 29:11,15 30:7,
20 31:4,14 32:3,17,23
33:1,4 34:2,3,21 35:6,7,
8,9,19,22 36:1,7,9,11,
12,16,18,19,21 37:2,9,
12,13,15,17,19 38:3,6,
7,10,11,14,17,18,19,23,
24 39:2,10,12,17,24
40:3,19

**UDF's** 13:21 36:5

**UDF-SPONSORED**
37:14

**ultimately** 20:25 22:8

**umbrage** 14:8

**understand** 11:16,18
38:4

**United** 19:2 38:16

**University** 29:5

**unlike** 29:15

**upwards** 15:8

---

**V**

**valuable** 15:25

**verdict** 27:12 33:14
35:15 41:5

**violated** 13:3

**virtually** 27:4

**vision** 14:9

**voice** 14:8

---

**W**

**weekly** 23:14,16

**West** 33:23

**whatsoever** 34:16

**wind** 8:12 31:24

**Wissink** 5:3,20 7:2 8:7
9:15,19 27:19 29:3

**witnesses** 25:18 32:25
35:21 41:1

**words** 23:5 31:19

**work** 4:15 19:13 21:2
29:12

**worked** 19:8 29:11

**working** 19:1 25:14
28:11 29:7,8

**works** 14:20 34:2

**writing** 30:15

**written** 27:3

**wrong** 11:10,15 12:19
18:11 32:24 33:1

---

**Y**

**year** 34:11

**years** 10:10,11 12:4
16:16 19:1,4,7 24:21
28:7,10 32:5

**yelling** 14:5

**young** 34:4