1              THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS

3                    FORT WORTH DIVISION

4                CASE NO. 4:21-cr-289-O

5

6   UNITED STATES OF AMERICA, )
                              )
7                Government,  )
                              )
8   VS.                       )
                              )
9                             )
    HOLLIS MORRISON GREENLAW   )
10  (1), BENJAMIN LEE WISSINK )
    (2), CARA DELIN OBERT (3),)
11  JEFFREY BRANDON JESTER     )
    (4),                      )
12                            )
                 Defendants.  )
13

14

15                  January 12, 2022

16                     VOLUME 3
               TRANSCRIPT OF THE JURY TRIAL
17        BEFORE THE HONORABLE REED C. O'CONNOR
                UNITED STATES DISTRICT JUDGE
18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3   FOR THE GOVERNMENT:
          TIFFANY EGGERS, ESQ.
 4        RACHAEL JONES, ESQ.
          ELYSE LYONS, ESQ.
 5        ASSISTANT UNITED STATES ATTORNEYS
          NORTHERN DISTRICT OF TEXAS
 6        801 Cherry Street, Suite 100
          Fort Worth, Texas  76102
 7        Telephone:  817.252.5200

 8

 9
     FOR THE DEFENDANT GREENLAW:
10

11        PAUL PELLETIER, ESQ.
          3500 Morningside Drive
12        Fairfax, Virginia 22031
          Telephone:  (202)617-9151
13
          -and-
14
          ROSE ROMERO, ESQ.
15        ROMERO KOZUB
          325 NE Loop 820, Suite 310
16        Hurst, Texas 76053
          Telephone:  (682)267-1351
17

18

19

20

21

22

23

24

25
```

```
 1

 2    FOR THE DEFENDANT WISSINK:

 3            GUY A. LEWIS, ESQ.
              LAW OFFICES OF GUY A. LEWIS, PLLC
 4            12575 SW 67th Street
              Pinecrest, Florida
 5            Telephone:  (305)442.1101

 6    FOR THE DEFENDANT OBERT:

 7             NEAL J. STEPHENS
               KELSEY DAVIDSON
 8             JONES DAY
               1744 Embarcadero Road
 9             Palo Alto, California
               Telephone:  (650)739.3939
10

11    FOR THE DEFENDANT JESTER:

12            JEFFREY J. ANSLEY, ESQ.
              ARIANNA GOODMAN, ESQ.
13            VEDDER PRICE
              100 Crescent Court, Suite 350
14            Dallas, Texas
              Telephone:  (469)895.4780
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 3 January 12, 2022                    Page 4

```
 1                  I N D E X

 2        WITNESSES

 3   THOMAS BLAKE BUFFINGTON

 4        Direct Examination by Ms. Eggers ........   10

 5        Cross-Examination by Mr. Ansley .........   39

 6        Cross-Examination by Mr. Pelletier .......  70

 7        Redirect Examination by Ms. Eggers .......  74

 8

 9   JAMES DORNEY

10        Direct Examination by Ms. Eggers ........   77

11        Cross-Examination by Mr. Ansley ..........  97

12        Cross-Examination by Mr. Pelletier ....... 108

13

14   MATT PARKER

15        Direct Examination by Ms. Eggers ........  113

16        Cross-Examination by Mr. Pelletier ....... 126

17        Cross-Examination by Mr. Stephens ........ 141

18        Redirect Examination by Ms. Eggers ....... 142

19        Cross-Examination by Mr. Ansley .......... 144

20

21   CASEY FORD

22        Direct Examination by Ms. Jones .......... 146

23        Cross-Examination by Mr. Ansley .......... 155

24        Cross-Examination by Mr. Lewis ........... 164

25        Redirect Examination by Ms. Jones ........ 166
```

1   TYSON WALTER

2       Direct Examination by Ms. Jones ...........  169

3       Cross-Examination by Mr. Lewis ............  194

4       Cross-Examination by Mr. Ansley ..........  200

5       Cross-Examination by Mr. Pelletier .......  205

6

7   TY FOWLE

8       Direct Examination by Ms. Eggers ..........  208

9       Cross-Examination by Ms. Romero ...........  214

10      Redirect Examination by Ms. Eggers ........  217

11

12  THOMAS TEDDER

13      Direct Examination by Ms. Eggers ..........  219

14      Cross-Examination by Mr. Pelletier .......  235

15      Redirect Examination by Ms. Eggers .......  239

16

17  SANG HO CHUNG

18      Direct Examination by Ms. Eggers ..........  241

19

20  PAMELA HANSON

21      Direct Examination by Ms. Lyons ...........  251

22

23  THOMAS COOK

24      Direct Examination by Ms. Eggers ..........  254

25

1                    E X H I B I T S

2   GOVERNMENT EXHIBITS

3   Government's Exhibit 123 ...............   26

4   Government's Exhibit 124A ..............   34

5   Government's Exhibit 124B ..............   34

6   Government's Exhibit 113 ...............   82

7   Government's Exhibit 114 ...............   83

8   Government's Exhibit 115 ...............   84

9   Government's Exhibit 116 ...............   86

10  Government's Exhibit 126 ...............   88

11  Government's Exhibit 127 ...............   89

12  Government's Exhibit 118 ...............   91

13  Government's Exhibit 487A ..............   91

14  Government's Exhibit 487B ..............   91

15  Government's Exhibit 125 ...............   93

16  Government's Exhibit 119 ...............   94

17  Government's Exhibit 120 ...............   94

18  Government's Exhibit 485 ...............   95

19  Government's Exhibit 121 ...............   96

20  Government's Exhibit 122 ...............   96

21  Government's Exhibit 117 ...............  119

22  Government's Exhibit 102 ...............  121

23  Government's Exhibit 103 ...............  121

24  Government's Exhibit 128 ...............  125

25  Government's Exhibit 260 ...............  154

```
 1    Government's Exhibit 246 ...............    175

 2    Government's Exhibit 247 ...............    175

 3    Government's Exhibit 241 ...............    181

 4    Government's Exhibit 110 ...............    225

 5    Government's Exhibit 87 ................    226

 6    Government's Exhibit 88 ................    230

 7    Government's Exhibit 89 ................    230

 8    Government's Exhibit 496 ...............    230

 9    Government's Exhibit 583 ...............    230

10    Government's Exhibit 584 ...............    230

11    Government's Exhibit 585 ...............    230

12    Government's Exhibit 586 ...............    230

13    Government's Exhibits  ................    247

14       85 to 89, 124B, 143, 144, 146 to 157, 165 to
         168, 170 to 171, 174 and 175, 195 to 198, 200 to
15       245, 248 to 271, 279 to 303, 309 to 314,
         350 (p. 13-21), 351 (p. 10-26), 352 (p. 14-44),
16       353 (p. 14-20), 354 (p. 20-23), 355 (p. 19-27),
         356 (p. 20-23), 357 (p. 24-34), 358 (p. 22-28),
17       359 (p. 22-31), 360 (p. 12-16), 361 (p. 13-18),
         362 (p. 17-58), 363 (p. 13-50), 364 (p. 12-71),
18       365 (p. 15-54), 366 (p. 18-52), 367 (p. 16-45),
         368 (p. 17-43), 369 (p. 15-46), 370 (p. 19-69),
19       371 (p. 15-74), 372 (p. 18-55), 373 (p. 8-12),
         374 (p. 7-21), 375 (p. 15-44), 376 (p. 13-38),
20       377 (p. 16-67), 378 (p. 21-40), 379 (p. 20-35),
         380 (p. 14-29), 381 (p. 27-71), 382 (p. 37-68),
21       383 (p. 21-52), 384 (p. 9-29), 385 (p. 13-54),
         386 (p. 15-82), 387 (p. 22-56), 388 (p. 14-68),
22       389 (p. 18-41), 390 (p. 25-48), 391 (p. 28-65),
         392 (p. 17-57), 393 (p. 21-65), 394 (p. 21-134),
23       395 (p. 20-61), 396 (p. 25-108), 397 (p. 12-19),
         398 (p. 20-39), 399 (p. 21-72), 400 (p. 32-91),
24       401 (p. 26-38), 402 (p. 18-54), 403 (p. 20-38),
         404 (p. 28-70), 405 (p. 12-92), 406 (p. 28-95),
25       407 (p. 23-66), 408 (p. 19-61),  409 (p. 17-84),
         431 to 437, 441 to 464, 487A and 487B, 488, 493 to
```

1    496, 498 to 512, 514 to 515, 517 to 544B, 545 to
     547, 552A to 552B, 573 to 574, 579A to 579J, 583
2    to 586, and 593 to 599

3

4    Government's Exhibit 111 ...................... 253

5    Government's Exhibit 112 ...................... 253

6    Government's Exhibit 82 ....................... 258

7    Government's Exhibit 83 ....................... 258

8    Government's Exhibit 84 ....................... 258

9    Government's Exhibit 1 to 16  ................ 259

10   Government's Exhibit 17 ....................... 260

11   Government's Exhibits 18 to 66 and 75 to 81 .. 262

12   Government's Exhibits 67 to 74 ............... 263

13   Government's Exhibit 616 to 623 .............. 265

14   Government's Exhibits 129A and 129B .......... 268

15   Government's Exhibits 273A and 273B .......... 268

16

17

18

19

20

21

22

23

24

25

1

2  **DEFENSE EXHIBITS**

3      Defense Exhibit 2078 ....................    54

4      Defense Exhibit 8305 ....................    57

5      Defense Exhibit 2079 ....................    58

6      Defense Exhibit 8306 ....................    60

7      Defense Exhibit 3907 ....................   161

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                      January 12, 2020

 3                            oOo

 4             (Following is Day 1 the testimony portion

 5        of the trial beginning at 12:20 p.m.)

 6             THE COURT:  Thank you.

 7             Do you have a witness?

 8             MS. EGGERS:  Oh, yes, your Honor.  I'm

 9   sorry.  Blake Buffington.

10             THE COURT:  Would you raise your hand to

11   be sworn?

12             (The oath was administered.)

13             THE WITNESS:  I do.

14             THE COURT:  Go ahead and drop your mask,

15   speak up good and loud so everyone can hear what you

16   have to say.

17                    DIRECT EXAMINATION

18   (BY MS. EGGERS:)

19   Q.   If you would, please state your name.

20   A.   Thomas Blake Buffington, Jr.

21   Q.   Mr. Buffington, not your actual home address,

22   but what general part of the state of Texas do you

23   live in?

24   A.   I live in Austin.  In Austin.

25   Q.   What line of work have you held over the years?
```

1  A.    I'm a licensed attorney in Texas, and I've also

2  been involved in home building and real estate

3  development.

4  Q.    Approximately how long have you been involved

5  in home building and real estate development?

6  A.    For, primarily, since the end of 2012.  So

7  since the beginning of 2013.

8  Q.    And what's the name of the business that you

9  worked for or with between approximately 2009 until

10 just not long ago?

11 A.    Buffington Land.

12 Q.    And was that a family-owned business or who was

13 that?

14 A.    The business was owned by my father and another

15 gentleman.

16 Q.    And who was the other gentleman?

17 A.    Mr. Patrick Starley.

18 Q.    And just generally describe the type of

19 business?

20 A.    Residential land development in central Texas,

21 buying undeveloped acreage, entitling it, and

22 developing it into single-family lots for homes.

23 Q.    And over the course of the time that you had

24 that or you worked for that company, did you hold

25 the same position the whole time, or did you hold

1  different roles at periods of time?

2  A.    I was essentially outside counsel as an

3  attorney from January of 2009 through December of

4  2012.  And then, in December of 2012, my primary

5  focus changed to my role as a vice president of

6  Buffington Land, primarily in business activities at

7  that point.

8  Q.    And just generally describe that role when you

9  went from being a lawyer to being vice president for

10 us.

11 A.    So I worked with my father and James Dorney,

12 who was the president of the company and also, of

13 course, our staff in developing land, entitling land

14 to sell to our related home building company and

15 other home builders.

16 Q.    And with the Buffington Land, did y'all have

17 loans from, like, regular financial institutions,

18 like Bank of America, Wells Fargo, that type of

19 thing?

20 A.    Yes.  My father and Mr. Starley had commercial

21 loans initially.

22 Q.    Did that, at some point, change where, other

23 than the commercial loans, that there was a

24 different kind of lender that was utilized?

25 A.    Yeah.  Prior to my association, Mr. Starley and

1  my father were not able to get those commercial

2  loans renewed.  And in approximately May of 2008,

3  they refinanced their facility into UDF facilities.

4  Q.   And once you took the position of vice

5  president, did you become familiar with the terms of

6  the UDF facilities, those loans that had been

7  obtained by Buffington Land?

8  A.   Yeah.  Beginning in December of 2012, my father

9  asked me to really get my arms around the loan

10  portfolio.  Mr. Starley was leaving the company and

11  my father wanted me to get more involved.

12  Q.   Okay.  In that position, though, did you

13  actually, like, I don't want to say learn the

14  different terms, but the different interest rates

15  and all the different lending that was involved by

16  UDF --

17  A.   I did.

18  Q.   -- entities?

19  A.   Yes, I did.

20  Q.   Okay.  Once you started saying, basically, the

21  books and the lending -- the agreements that had

22  been reached prior to that, what observations, if

23  any, did you make about Buffington Land's ability to

24  repay the loans at the terms that they had?

25  A.   Well, I was -- I was really confused and trying

1  to get a better understanding of all of it, because

2  what I could see, that they had refinanced

3  approximately $60,000,000 into facilities that had a

4  blended interest rate of about 19 percent per annum.

5  Q.    I'm going to stop you there real quick.

6  A.    Yeah.

7  Q.    Explain what 19 percent -- a blended interest

8  rate of 19 percent, explain that to us.

9  A.    There was a UDF I facility that had a

10  30 percent interest rate.

11  Q.    Did you say 30?

12  A.    Thirty.

13  Q.    Okay.

14  A.    There was $19,000,000 that was refinanced into

15  that facility.  And then there's a facility with UDF

16  III at 15 percent and that was $40,000,000.  So the

17  two of those worked out to an average rate of

18  19 percent.

19  Q.    Okay.  And so seeing that, what was involved

20  with those, did you ever try to have a conversation

21  with any of the defendants in this case about

22  concerns you had with Buffington, and I'm talking

23  early on, with Buffington's ability to repay?

24              THE COURT:  Hang on a second.

25              MR.STEPHENS:  Your Honor, I'm going to

1    object under 401 and 403, and I also have a concern

2    about the instructive amendment.

3              THE COURT:  I didn't hear you.

4              MR.STEPHENS:  About the instructive

5    amendment.

6              THE COURT:  Overruled.

7              You can answer.

8              THE WITNESS:  Yes.  I think it was

9    January of 2013, Mr. Wissink was meeting with my

10   father and happened to step out in the hall as I was

11   passing by.  I told him that my father asked me to

12   get my arms around it, and I was in the early stages

13   of that, but it was pretty clear that we needed to

14   have a conversation about the different strategies

15   to figure out how we were going to repay everything.

16   And Mr. Wissink's response was that that

17   conversation was long overdue.

18   (BY MS. EGGERS:)

19   Q.   Now, once you became the vice president, took

20   on that position, did you have any interactions or

21   frequent, infrequent interactions with either

22   Brandon Jester or a guy by the name of Jeff

23   Gilpatrick?

24   A.   Yes, I did.  Starting about that same time, so

25   it would have been in about December of 2012 and

 1  continuing weekly thereafter, we would have one

 2  meeting in person and one meeting by phone, myself,

 3  and James Dorney, typically, with Mr. Jester, prior

 4  to Mr. Gilpatrick becoming a part of UDF.  And after

 5  he joined UDF, it was Mr. Jester and Mr. Gilpatrick.

 6  Q.   And do you see in the courtroom today the

 7  individual that you know by the name of Brandon

 8  Jester?

 9  A.   Yes, I do.

10  Q.   If you would please point to him and identify a

11  article of clothing?

12  A.   Actually, there's Brandon right over there.

13  Dark suit.

14          MS. EGGERS:  Your Honor, if the record

15  would reflect Mr. Buffington has pointed to the

16  defendant, Brandon Jester.

17          THE COURT:  Mr. Jester, yes.

18  (BY MS. EGGERS:)

19  Q.   Now, you said that y'all you would have weekly

20  meetings or have bi-weekly meetings, once over the

21  phone and then one once in person.

22          Just generally describe for us what

23  the purpose of those meetings were, and what you

24  would discuss, and who else was in attendance.

25  A.   James Dorney and myself typically.  The purpose

1  of the meetings was to go through the entire

2  portfolio to talk about status of development,

3  status of entitlement, projects that we were looking

4  at and doing due diligence on.  Projects that they

5  had asked us to take a look at.  Just really a very

6  detailed review of everything.

7  Q.   Did you ever talk -- I mean, you've mentioned

8  that conversation you had with Mr. Wissink in the

9  hallway, did you ever notify Mr. Jester, the

10  defendant in this case, that you had concerns about

11  the ability for Buffington to be able to repay the

12  loan?

13  A.   It was kind of a constant running conversation

14  that we were always trying to come up with ideas,

15  could we perhaps get a reduction of the principal or

16  interest, or have the interest rate reduced from a

17  higher rate to a very low rate, different

18  strategies.  The answer was always, well, we'll have

19  to get with Mr. Wissink and get back to you.

20  Q.   Okay.  Let me ask you this.  You mentioned UDF

21  I and UDF III.  Was there a loan or loans ever

22  obtained by Buffington from UDF IV?

23  A.   Yes, beginning in, I believe, 2012.

24  Q.   And did that have -- what approximately was the

25  interest rate for the UDF IV loan?

1  A.    13 percent with one point origination.  So we

2  thought of it as a 14 percent rate.

3  Q.    So 14 as compared to 15 percent and the

4  30 percent on UDF I; is that correct?

5  A.    That's correct.

6  Q.    And just generally, the business that

7  Buffington had, had there been any agreement as to

8  UDF paying for overhead?

9        Allowing y'all to have draws to pay for

10 overhead?

11 A.    So the way that the loans worked until about

12 August -- well, excuse me, let me start over.

13       I'm sorry, could you repeat the question?

14 Q.    Was there any type of agreement, at any point,

15 where Buffington could request draws on the loans in

16 order to fund your actual overhead, like, to keep

17 the lights on, pay employees, that type of thing?

18 A.    Thank you.

19       So what I meant to say was that we had a

20 release price associated with the collateral that

21 had liens on it.  When the lots were sold, the

22 agreement had been that 90 percent of the remaining

23 dollars would go towards paying down the loan

24 facilities and 10 percent would be allowed to be

25 retained by Buffington Land in order to fund

 1  overhead.

 2      But then that arrangement changed where they

 3  would -- wanted 100 percent of the release price.

 4  And so then there was no more money to fund

 5  overhead.

 6  Q.   And so, where were y'all coming up with money

 7  to pay the overhead if you weren't able to take

 8  draws to get access to that money?

 9      The release price, you weren't getting that

10  10 percent back?

11  A.   Yeah.  So from August of '13, really continuing

12  until things went an entirely different direction,

13  until September of '14, my father was having to fund

14  that personally.

15  Q.   You said your father was having to fund that?

16  A.   Yes.

17  Q.   Now, in your position as vice president, did

18  you ever make any observations about draws that were

19  not being -- when I say draws, I mean requests for

20  money to be pulled out on the loan -- did you ever

21  make any observations about draws being initiated,

22  not by Buffington, but rather by the folks over at

23  UDF?

24  A.   Yes.  It was brought to my attention at some

25  point by our accounting people that they were having

1  some problems and that the balances, loan balances

2  shown on our internal accounting was not matching up

3  with the monthly loan statements that we were

4  receiving from UDF.

5      I recall one example there was about a million

6  and a half dollar discrepancy.  That UDF statement

7  was showing about a million and a half dollars we

8  were owed.  So we inquired to try to figure out what

9  was going on.  What we were told is that they were

10 prefunding.

11     That it was something that we should be happy

12 about.  It was for our benefit, because it was

13 refinancing more expensive debt at 19 percent into a

14 UDF IV facility at 14 percent.  Therefore, we were

15 lowering our costs of funds, saving money.

16 Q.   Who told you that?

17 A.   Mr. Jester.

18 Q.   Did you have any discussions with Mr. Jester

19 whether you did or did not want those prefunding

20 events to continue?

21 A.   Yes.  We asked that they not do that.  That it

22 was creating a lot of confusion, a lot of problems.

23 That we philosophically thought it was better to pay

24 a lower interest rate, but they were doing so

25 without our consent.

1    The response to that was, well, Tom and Patrick

2  had already signed a document saying they could use

3  certain types of advances, and they could use these

4  advances as part of this.

5  Q.   Did you ultimately find out that some type of

6  document had been executed that allowed the lender

7  to initiate advances like were being done?

8  A.   Yes, there was a document to that effect.

9  Q.   Was there ever occasion where you were asked to

10  back date any documents by anyone at UDF?

11  A.   Yes.  Mr. Jester had talked to me, called me,

12  and said that they had done a prefunding some six

13  weeks prior and that would I be willing to sign a

14  consent back dated to the time of the funding.

15  Q.   What did you tell Defendant Jester?

16  A.   I told him, no, that we didn't want them to do

17  that in the first place.  We certainly weren't going

18  to back date a consent.

19  Q.   Now, you said these weekly meetings via

20  telephone and in person, that initially it was

21  Defendant Jester, and then when Mr. Gilpatrick came

22  on board at UDF he started attending the meetings as

23  well?

24  A.   That's correct.

25  Q.   During any of these weekly meetings was there

 1  ever an occasion when somebody, other than those two

 2  men, also showed up?

 3  A.   September 3rd, 2014, we were expecting to have

 4  our normal weekly meeting with Mr. Jester and

 5  Gilpatrick and Mr. Wissink and Mr. Greenlaw walked

 6  in with him.

 7  Q.   Tell us about what happened at that meeting

 8  when Defendants Wissink and Greenlaw walked in?

 9  A.   So we didn't have our normal meeting.  Really,

10  it more kind of fell to Mr. Greenlaw.  He was

11  explaining to us that they had come up with the

12  answer to giving us back for overhead funding and,

13  you know, creating a path to repayment on all these

14  facilities.

15  Q.   Explain what he told you.

16  A.   So what he told us is that they were in the

17  process of starting a new fund which was going to be

18  called UDF V, and that we would need to form a new

19  entity which was being referred to as Buffington

20  Land II.  And that that entity would be owned by my

21  father, but almost in name only.  That there would

22  be a to-be-determined third-party designee that UDF

23  would put in place to be able to make all decisions,

24  except for maybe bankruptcy, would be reserved for

25  my father, in that entity.

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                    Vol 3 January 12, 2022                    Page 23

1       And this entity would need to take out UDF V

2   loans, and that the interest rate would be the same

3   as UDF IV.  And that it would be for acquiring and

4   developing properties all over the state of Texas in

5   support of a home building company they had just

6   bought and their home builder clients.  And that we

7   needed to be on board and ready to go.  That they

8   expected to start doing this within 30 to 60 days.

9   Q.   Do for me a favor, if you would just keep your

10  mic right in front of your face, they're

11  directional.  So when do you that, we lose you.

12  A.   I apologize.

13  Q.   That's okay.

14       So do you see the individual that you know by

15  the name of Hollis Greenlaw in the courtroom today

16  that made this pitch to you and Mr. Dorney?

17  A.   I do.

18  Q.   If you would please point to him and identify

19  an article of clothing?

20  A.   Dark suit.

21          MS. EGGERS:  Your Honor, if the record

22  would reflect Mr. Buffington's pointing to the

23  defendant, Hollis Greenlaw.

24          THE COURT:  Yes.

25

```
 1  (BY MS. EGGERS:)
 2  Q.   And so you said that this meeting was on
 3  September 3rd; is that correct?
 4  A.   September 3rd, 2014.
 5  Q.   Now, did you ask -- Defendant Greenlaw and
 6  Mr. Wissink and you said Mr. Jester and Gilpatrick
 7  were there as well; is that correct?
 8  A.   That's correct.
 9  Q.   Did you ask about trying to, you know, this is
10  going back to writing down the principal or changing
11  the interest rate on that UDF I and UDF III loans?
12  A.   Yes.  After he laid out this path to repayment,
13  I went back to that and asked if we could do those
14  kinds of things.  And he definitively said, no, that
15  his path, his plan was the only plan.  That we
16  weren't going to be able to do any of those other
17  things.
18  Q.   Was that the first time you had actually heard
19  from the mouths of somebody at UDF that they would
20  never be writing down the interest or the principal
21  or reducing down the interest?
22  A.   Yeah.  To the best of my knowledge, that was
23  the first definitive statement that I heard on it.
24  Q.   What about, you had said earlier that they had
25  stopped funding overhead, that 90/10 percent, was
```

1  there any discussion about whether or not y'all

2  would be able to get overhead funded again?

3  A.   Yes.  This plan that was being laid out by

4  Mr. Greenlaw would allow us to get back to overhead

5  funding.

6  Q.   Now, you said Mr. Dorney was there with you on

7  the Buffington side; is that correct?

8  A.   Yes.

9  Q.   Was your father, Thomas Buffington, there?

10 A.   He was not.

11 Q.   So what did you say?  Yes?  No?  What?

12 A.   We said we would have to visit with Tom and

13 that we'd get back to them.

14 Q.   And did you do that?

15      Did you visit with your father?

16 A.   On approximately September the 8th, we had --

17 Mr. Dorney and I had a conversation with my father.

18 And then we relayed the details of that conversation

19 to Mr. Gilpatrick and Mr. Jester on September 11th.

20 Q.   Was that over the telephone or in person when

21 you relayed it to Defendant Jester and

22 Mr. Gilpatrick?

23 A.   My recollection it was on the phone with me and

24 James and my father and Brandon and Jeff.

25 Q.   Now, so we're talking September time frame, did

 1  you, during that September time frame, did you send

 2  any letters to the folks at UDF about what was going

 3  on or anything like that?

 4  A.   Yes.  So after we had the conversation, we let

 5  them know on the 11th that we were refusing the

 6  Buffington Land II, UDF V plan, and that we needed

 7  to unwind the relationship, whatever that looked

 8  like.  We needed to start figuring that out.

 9        So on the 24th of September, when we hadn't

10  heard anything back, I sent a letter to UDF.

11             MS. EGGERS:  Your Honor, at this time I

12  would ask to introduce government's Exhibit 123.

13             THE COURT:  All right.

14             MR. ANSLEY:  No objection.

15             THE COURT:  123 will be admitted.

16             (Exhibit 123 was admitted into evidence.)

17  (BY MS. EGGERS:)

18  Q.   So who did you send the letter to?

19        And I'm going to enlarge it, Mr. Buffington.

20        Who did you email the letter to?

21  A.   To Ben Wissink with a copy to Melissa

22  Youngblood.

23  Q.   And who was Melissa Youngblood?

24  A.   She was an attorney that worked for UDF.

25  Q.   And attached is there a copy of the letter that

1  you sent to them?

2  A.   Yes, that is the letter.

3  Q.   And what is the regarding section of the

4  letter?

5  A.   UDF advances for overhead and management fees.

6  Q.   Okay.  And just the first paragraph.  This

7  exhibit will be in evidence, Government's Exhibit

8  123, but if you would please read aloud that.

9  A.   This letter is written on behalf of Buffington

10  Land Group, Limited; Buffington Land, Limited; and

11  Buffington Land Development, LLC, and their

12  respective --

13  Q.   Slow down just a little bit.

14  A.   Oh, sorry.

15  Q.   The lady in front of you has to type it down.

16  A.   Oh, I'm so sorry.

17  Q.   12 keys for the whole alphabet.  So slow down.

18  A.   I didn't want to bore anybody.

19       Okay.  And their respective subsidiary

20  entities.

21       As you know from our conversations over the

22  last several months, we are becoming increasingly

23  concerned about UDF, United Development Funding,

24  LLP; United Development Funding III, LP; United

25  Development Funding IV, and their applicable lender

1  assignee affiliates, collectively referred to as the

2  UDF Group, in particular with respect to UDF Group's

3  failure to respond to our request to advance funds

4  for budgeted overhead obligations.

5  Q.    Now, this is on September 24th, this whole

6  letter will be in, this is in follow up to that

7  conversation you said that y'all had over the phone;

8  is that correct?

9  A.    That's correct.

10  Q.    After that September 24th letter was written,

11  were you contacted or was there another meeting with

12  Defendant Greenlaw involved?

13  A.    Yes.  Contemporaneously with their receipt of

14  the letter, I was contacted by Melissa Youngblood

15  and attorneys representing us and UDF counsel began

16  to negotiate what was called a prenegotiation

17  agreement in anticipation of a meeting.

18  Q.    Explain to me, what is a prenegotiation?

19  A.    It was basically a confidentiality agreement.

20  It's an agreement with the government to

21  confidentiality of the parties in the meeting that

22  we were going to have to talk about the loan

23  facility.

24  Q.    And so was there a second meeting with

25  Defendant Greenlaw present?

1  A.    Yes.  On October 17th at our offices, there was

2  a meeting with myself, my father, Mr. Greenlaw,

3  Mr. Wissink, and Mr. Jester, to the best of my

4  recollection.

5  Q.    I don't think I asked you this earlier.  Do you

6  see the man that you know by the name of Benjamin

7  Wissink, do you see him in court today?

8  A.    Yes, I do.  Right there.

9  Q.    If you would just describe what color tie or

10 something he has on?

11 A.    Mr. Wissink has on a yellow tie.

12           MR. LEWIS:  We will stipulate to the

13 identification.

14           THE COURT:  Okay.  Thank you.

15           MS. EGGERS:  Thank you.

16 (BY MS. EGGERS:)

17 Q.    Tell us about this meeting.  Now your dad is

18 present, you're there, your father's present?

19 A.    Right.

20 Q.    Tell us about it.

21 A.    My understanding was that, since my dad had not

22 been at the September 3rd meeting, Mr. Greenlaw felt

23 that it would be helpful for him to come back into

24 town and sit down and actually explain the UDF V,

25 Buffington Land II path to the repayment that they

1  wanted us to go down.

2  Q.   And did he describe it?

3  A.   He did.  I mean, he began, I think very

4  animated, and really just explaining that it was

5  this great thing that they had figured out.  That it

6  was going to allow us to get our overhead funded

7  again.  And that we should be throwing rose petals

8  at his feet, it was such a great idea.

9  Q.   He said, "rose petals at his feet"?

10  A.   That's what I recall.

11  Q.   And that's who?  Which of the men that was in

12  the meeting?

13  A.   Mr. Greenlaw.

14  Q.   Okay.  And go ahead and describe for us or tell

15  members of the jury what he said this new path to

16  repayment was so y'all could get your overhead

17  funded?

18  A.   Well, it's what they had laid out in the

19  September 3rd meeting, more or less.  That we would

20  form a new entity.  And this entity would be the

21  land development arm all over the state.  That we

22  would take out loans with UDF V and that would allow

23  us to do more deals and also to refinance UDF IV and

24  UDF III and UDF I debt.

25  Q.   Did he say anything about the SEC or SEC

1    approval or anything?

2    A.   He said they had already received SEC approval

3    and they expected to be ready to go within 30 to 60

4    days.

5    Q.   And what about talking about any other folks?

6         Were any other folks already on board?

7         Did he mention anything like that?

8    A.   He mentioned that other builders had already

9    said, yes.  That everybody -- the train was moving

10   and we needed to jump on.

11   Q.   Okay.  Did you question Defendant Greenlaw

12   about this repayment?

13   A.   Yeah, I did.  It was just myself and my father

14   in the room.  I couldn't see how it could possibly

15   be a path to repayment.  The interest rate for UDF V

16   was the same as UDF IV.

17   Q.   Let me stop you.  Again, what was the interest

18   rate for UDF IV?

19   A.   The 13 plus one or 14.

20   Q.   And Defendant Greenlaw told you it was going to

21   be the same interest rate for UDF V?

22   A.   That's correct.

23   Q.   Okay.  So did you question him about that?

24   A.   Well, yes.  So I had a really hard time seeing

25   how that was going to get us there.  And as he had,

1  you know, already told us on September 3rd, that

2  they were not going to do any write-downs of

3  principal or interest or change the interest rate or

4  do anything like that, and so I couldn't imagine how

5  it could possibly be a path to repayment.

6  Q.   And what did you say to him?

7  A.   So I asked him if he knew how much interest

8  accrued every month on our facility.  He didn't

9  respond to that.  So I said, you know, our

10 calculation is it's about two and a half million

11 dollars a month in interest.

12 Q.   Two and a half million?

13 A.   2.5.

14 Q.   And did you question him?

15 A.   And so, I said, so I don't see how it's a path

16 to repayment.  And he said, well, they tell me it

17 is.

18 Q.   And who was the "they" he was referring to in

19 the room?

20 A.   He was pointing down to the row of people on

21 his side, Mr. Wissink and Mr. Jester.

22 Q.   Now, did y'all say, yes, we'll do it?  We will

23 refinance everything?  We will change the entity?

24        MR. LEWIS:  I'm going to object to the

25 form of the question, please.

1          THE COURT:  I will sustain everything

2   after "did y'all say yes."

3   (BY MS. EGGERS:)

4   Q.    Did y'all say yes?

5   A.    No.

6   Q.    What did y'all say?

7   A.    My father said, we're not interested in that.

8   We want to wind down the relationship.  We need to

9   go ahead and wrap this up.

10  Q.    And when Defendant Greenlaw was told no, what

11  did he say in response?

12  A.    He was -- the mood changed pretty quickly.  He

13  seemed to be pretty upset.  He said to my dad, so

14  you're telling me to go F myself?  You're telling me

15  you're not going to pay your F'ing loans?

16  Q.    Did he use just the letter f or did he use the

17  expletive?

18  A.    No, he used the expletive.

19  Q.    How did it go from there?

20  A.    My father said, no, that's not what I'm saying.

21  What I'm saying is we need to unwind the

22  relationship.  And that was pretty much the end of

23  the meeting.  They kind of left unhappy.

24  Q.    After that meeting did you send any letters to

25  document what had occurred?

1  A.   Yeah.  I believe it was October 23rd I sent an

2  email to Mr. Wissink just following up on that

3  meeting, asking if they had put together any

4  proposal for the wind out.  He responded, I believe

5  on the next day, on the 24th, to let me know that

6  they were working on it.

7          MS. EGGERS:  Your Honor, at this time I

8  would ask to introduce Government Exhibits 124A and

9  124B.

10         MR. PELLETIER:  No, objection, your Honor.

11         THE COURT:  Okay.  They will be admitted.

12         (Exhibits 124A and 124B were admitted into

13     evidence.)

14  (BY MS. EGGERS:)

15  Q.   You said again that meeting -- that second

16  meeting, the second Austin meeting was October 22nd;

17  is that correct?

18  A.   Yes, that's correct.

19  Q.   And this is the email that you sent subsequent

20  to that October 27th meeting?

21  A.   Yes, it is.

22  Q.   And the subject, does it say, follow up to

23  meeting?

24  A.   Follow up to meeting 10-17, Buffington Land and

25  UDF matters.

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                Vol 3 January 12, 2022                Page 35

1  Q.   And the second paragraph that begins with UDF

2  proposed?

3  A.   UDF proposed a continuation of finance,

4  development, and disposition of Buffington Land's

5  portfolio of assets using UDF V as a financing

6  vehicle.

7               Tom rejected that proposal as being

8  inconsistent with his intent to end his ongoing

9  management of Buffington Land, but wanted to do so

10 without creating any issues or problems to your

11 proposed UDF V program.

12              Do you want me to continue?

13 Q.   Yes.

14 A.   Tom suggested UDF take over, through whatever

15 entity is selected, the ownership of Buffington Land

16 entity, directly or indirectly, so UDF may carry out

17 the ongoing land development and disposition goals

18 on its own terms.  Tom's proposal included a release

19 of his guaranty.

20 Q.   Now, that was on, you said, what date again?

21 A.   October 22nd, 2014.

22 Q.   And hold on one second, please.

23 A.   Sorry, that was my blue mark.

24 Q.   Let's go to -- was there a response email, you

25 said?

1  A.    Yes.  It was the following day, on

2  October 23rd.

3  Q.    So we can stay in government's Exhibit 124B,

4  your email; is that correct?

5  A.    I'm sorry?

6  Q.    We can see right here on the screen 124B, page

7  two, we can see your email; is that correct?

8  A.    That is correct.  That is my email.

9  Q.    And then we will go to the first page.

10                    And what did Defendant Wissink write

11  back on October 23rd?

12  A.    On October 23rd, Mr. Wissink wrote:  We are

13  working on a proposed resolution to Buffington Land.

14  We will be in touch the next few days to have

15  further discussions with Tom and/or yourself.

16                    In our meeting, you referenced a

17  package to market and sell Buffington Homes.  Could

18  you provide me with a copy of that package?

19  Q.    And then, did you respond as well?

20  A.    I did.

21  Q.    And?

22  A.    I responded that same day, it looks like,

23  October 23rd.

24  Q.    I'm not going to ask you to read that because

25  this will be in evidence, government's Exhibit 124B.

 1  A.    All right.

 2  Q.    Now, that day, how did the meeting end?

 3              The October 17th, I didn't ask you

 4  that.

 5              You talked about the response that

 6  Defendant Greenlaw had.

 7  A.    It ended very quickly after the exchange

 8  between my father and Mr. Greenlaw.  We made it

 9  clear that we weren't going to do what they

10  proposed, and Mr. Greenlaw was unhappy about it.

11  They pretty much just got up and left.

12              MS. EGGERS:  If I may have one moment,

13  your Honor?

14              THE COURT:  Yes.

15              MS. EGGERS:  Nothing further at this time,

16  your Honor.

17              THE COURT:  Okay.  Ladies and gentlemen,

18  why don't we go ahead and take our lunch break.

19  Because of the COVID, the judiciary has got more

20  money to help with jury trials.  And so what I've

21  been doing is using some of that money to buy lunch

22  for the jury.  There are sandwiches back in the jury

23  room for you all to have for your lunch.

24              If you don't like sandwiches or you

25  don't like these sandwiches and you want to go

1    somewhere else, that's fine.  You're not held

2    hostage in the jury room.  But those sandwiches are

3    there for you to have over the lunchtime.  That

4    keeps you from having to wander around downtown

5    trying to find a place to eat that you might like.

6    There's not a lot of places on this end of downtown.

7    So I think it's just a good use to have that all

8    available to you.

9                    We will take about an hour break.  We

10   will start up at about 2:00.  So either eat these

11   sandwiches or go get you something.  Please try to

12   be back.  We can't get started unless all of you are

13   available to be in the jury box at the same time.

14                    As I told you already, the more

15   you're in the jury box, the more you're hearing

16   testimony, the more efficient the case is going to

17   be presented.  So please try to be back on time.

18                    You're not going to be coming in and

19   out of these doors anymore.  You're going to be

20   coming in and out of the jury room, which is

21   actually up a flight of stairs and behind us here.

22   And so you will be coming to and from the third

23   floor, going forward now that you are in your role

24   as the jury in this case.

25                    So please remember my instructions.

1  Please have a good lunch and we will see you back in

2  about an hour.

3              (The lunch recess was had at 12:54 p.m.)

4              THE COURT SECURITY OFFICER:  All rise.

5              (The jurors entered the courtroom.)

6              THE COURT:  Okay.  Please be seated.

7              Ready?

8              MR. ANSLEY:  Yes, your Honor.  Thank you.

9                      CROSS-EXAMINATION

10 BY MR. ANSLEY:

11 Q.    Mr. Buffington, I want to talk to you about

12 some of the issues that covered in your direct which

13 include whether or not UDF was paying overhead for

14 Buffington.

15     Do you recall that testimony on direct?

16 A.    I do.

17 Q.    The reality is UDF continued paying overhead

18 for you through September of 2014?  Is that true?

19 A.    I'm sorry.  Is that a question?

20 Q.    Yes.

21 A.    No, I believe what I testified to was that in

22 August of '13 that they changed the amount of the

23 partial release and thereby we didn't have funds

24 available for overhead.

25 Q.    But the expectation that Buffington had was

1  that they would -- UDF would continue paying

2  overhead through fall of 2014?

3  A.    From the time that the release price was

4  changed, we asked, in our weekly meetings

5  continually that we figure out a way to pay the

6  overhead, but it was not --

7          THE COURT:  What's the expectation is what

8  he's asking.

9          THE WITNESS:  The expectation was that we

10  would figure out a way to get them -- the parties

11  were working together to try to come up with a way

12  to do that.

13  BY MR. ANSLEY:

14  Q.    And you continued to ask UDF, you being

15  Buffington the company, for overhead payments

16  through fall of 2014?

17  A.    Yes.  Absolutely.

18  Q.    And would it surprise if UDF paid overhead

19  payments to Buffington between August of '13 and

20  September of '14 of about $1.2 million?

21  A.    Yes.  I'm not aware of that.

22  Q.    And do you recall telling the Grand Jury that

23  UDF stopped paying overhead in August of 2013?

24  A.    That is my recollection.

25  Q.    And yet you would be -- wouldn't be surprised

1  if the -- if overhead payments continued even after

2  that date?

3  A.   Yes, that is not -- I wasn't aware of that.

4  I'm not familiar with that.

5  Q.   Who is James Dorney?

6  A.   He was the president of the company -- the

7  president of Buffington Land.

8  Q.   Was he president during the time period you

9  were at Buffington before as well?

10  A.   Yes.

11  Q.   Did James Dorney in fact ask UDF in the fall of

12  '14 where things stand on paying current overhead

13  draws, isn't that true?

14  A.   Well, you would have to did Mr. Dorney.

15       I know that we were constantly asking UDF when

16  they were going to catch up with the overhead that

17  wasn't being paid.

18           THE COURT:  And your next question.

19           MS. EGGERS:  Yes, your Honor.

20           Can I refresh the witness, your Honor?

21  BY MS. EGGERS:

22  Q.   Just read that to yourself.

23  A.   All right.

24  Q.   Does that refresh you, sir, as to whether or

25  not Buffington, the entity, expected UDF to continue

1  paying current overhead draws in September of 2014?

2  A.   Yes.  Evidently I was copied on that email.

3  Q.   I'm sorry.  I misunderstood you.

4  A.   I said evidently --

5         THE COURT:  Hold on a second.

6         Does that refresh your memory?

7         THE WITNESS:  Yes, sir, it does.

8         THE COURT:  Okay.

9         Go ahead and ask your next question.

10 BY MR. ANSLEY:

11 Q.   Having been refreshed, Buffington expected and

12 asked UDF to pay overhead, its overhead expenses

13 through September 2014?

14 A.   Yes.  That is what that email from James --

15 Q.   That's not evidence.

16        THE COURT:  Okay.  He's answered it.

17        MR. ANSLEY:  Thank you, sir.

18 BY MR. ANSLEY:

19 Q.   That is inconsistent with what you told the

20 Grand Jury, isn't it?  You told the Grand Jury that

21 overhead payments stopped in August of 2013.

22 A.   Well, overhead payments -- the email is asking

23 for them to catch up on back overhead that hadn't

24 been paid.

25 Q.   And current overhead payments, too?

1  A.    Sure.

2  Q.    Yes?

3  A.    But they weren't being paid.

4  Q.    We're talking about current overhead payments

5  in September of '14 after your grand jury testimony

6  was they stopped in August of '13.

7        Isn't that true?

8  A.    Yes, that's correct.

9  Q.    If we can pull up Government's Exhibit 123.

10  That's in evidence.

11        Mr. Buffington, that's that September 24, 2014

12  letter you spoke about during your direct.

13        Do you recall that?

14  A.    Yes, I do.

15  Q.    And in that letter, I guess -- well, is that

16  the email or the letter?

17  A.    I believe it was an attachment to that email.

18  Q.    Okay.  Let's go to the first page.  There we

19  go.

20        This, sir, this letter, I know your father who

21  has now passed, he worked at Buffington as well.

22        This letter is signed by you; is that correct?

23  A.    Yes, that is correct.

24  Q.    This letter, looking at the first page, we see

25  what the topic of the letter is, specifically UDF

1   advances for overhead and management fees.  And

2   again this is September 2014, correct?

3   A.   Yes.   That is correct.

4   Q.   After you told the Grand Jury overhead payments

5   stopped in August of '13, right?

6   A.   I don't believe I'm being inconsistent.

7   Overhead payments did stop in August of '13.  We

8   continued to ask for overhead to be paid after

9   August of '13.

10  Q.   Okay.  We'll round that out later.

11       And what we don't see in this letter, as I read

12  it, is anything about you telling UDF -- this letter

13  is addressed to UDF -- you telling UDF that

14  Buffington cannot pay the UDF loan anymore.

15  A.   Well, the -- this letter is directly related to

16  UDF advances for overhead management fees.

17  Q.   It certainly is.

18       But I understood your direct testimony to be

19  that you had been telling my client and others, Mr.

20  Jester and others at UDF for, as I took it, months,

21  that Buffington couldn't pay.

22           MS. EGGERS:  I'm going object to the form

23  of the question.  The counsel is testifying.

24           THE COURT:  Overruled.

25

 1  BY MR. ANSLEY:

 2  Q.   Did you tell me Mr. Jester or others at UDF

 3  that Buffington could not repay the UDF III loan?

 4  A.   We were continuing to try to come up with

 5  different ways to repay the loans up until September

 6  the 3rd of '14, when we heard definitively that UDF

 7  would not be able willing to agree to any kind of

 8  pay down or forgiveness of principal or interest.

 9       At that time, we determined that we would not

10  be able to pay the loans and we asked to wind down.

11  Q.   And I'm not clear what time, when you say "that

12  time," when did you determine --

13  A.   September 3rd of 2014.

14  Q.   September 3rd of 2014?

15  A.   Yes, sir.

16  Q.   And in this letter, do we see anything in this

17  letter, post dating that September 24th, anything in

18  this two-page letter that makes reference to being

19  unable to make good on the loan you had with UDF?

20  A.   No.  This letter was specifically directed

21  towards the conversation about overhead management

22  fees.  It was a follow up to the meeting on the 11th

23  where we let them know that we would not be doing

24  the Buffington Land 2 and UDF V, and we hadn't heard

25  anything back.

 1  Q.   Let's ask it this way:  The subject of that

 2  letter is overhead?

 3  A.    Correct.

 4  Q.    And management fees?

 5  A.    Yes, sir.

 6  Q.    The subject of the letter is not restructuring

 7  the loan?

 8  A.    Correct.

 9  Q.    The subject of the letter is not interest rate

10  forgiveness, correct?

11  A.    Yes, sir.

12  Q.    It is not reduction of the principal amount, is

13  it?

14  A.    That's correct.

15  Q.    It is not, we need to modify the loan, is it?

16  A.    It is not.

17  Q.    If I read through the body of the letter, I'm

18  not going to see any of those words in the letter,

19  am I?

20  A.    No, this letter does not address any of those

21  issues.

22  Q.    In fact, if you look at the bottom of page 1

23  and the top of page 2, we see reference to -- well,

24  let me back up.

25          The letter is, in summary, is complaining about

1  supposedly not paying overhead that's impacting

2  Buffington's ability to continue to be -- continue

3  to do business, is that fair?

4  A.   Absolutely.

5  Q.   And if we look at the top of page 4 -- I'm

6  sorry, page 2 -- we see that failure that's

7  happening could materially impact the projections

8  for repayment of the loans made by the UDF funds.

9      Do you see that?

10 A.   Yes.

11 Q.   So we're in late September 2014, right?

12 A.   Right.

13 Q.   After you determined, you said a few minutes

14 ago, on September 3rd, you can't repay the loan,

15 correct?

16 A.   Right.

17 Q.   And you're saying three weeks later, that if

18 overhead is not paid, that could affect our

19 projections on repayment of those loans.

20     And that sentence even says 2015, doesn't it?

21 A.   Yeah.  I think you have to understand the

22 context about repayments.  It's not repaying the

23 loan to zero.  It's that we need to continue to have

24 staff and employees, if we're going to run a

25 business that is going to sell lots that is then

 1  going to make payments on loans.

 2  Q.   But this points out inability, potentially, to

 3  meet projections on paying these loans, repaying

 4  these loans into the next calendar year, 2015?

 5  A.   Yes.

 6       At this point we hadn't agreed on any kind of a

 7  wind down plan or structure and we were still in

 8  business.  But if we can't pay our people, we are

 9  not going to be in business very long.

10  Q.   And there's nothing in here otherwise that

11  talks about we can't repay, period?

12  A.   That's correct.

13  Q.   Instead it talks about we've got projections on

14  repaying it in 2015?

15  A.   Yes.  That is what it says.

16  Q.   And we don't have anything -- let's talk about

17  what's in writing and what's not in writing.

18       Did you communicate with UDF by email?

19  A.   There are, I'm sure, 10s of thousands of

20  emails.

21  Q.   Sure.  Email communications, phone calls,

22  meetings you talked about on direct as well, right?

23  A.   That's right.  Yes, sir.

24  Q.   Would it surprise you if there is not a single

25  written communication out there that talks about --

1                MS. ROMERO:  Objection, your Honor,

2    counsel is testifying.

3                THE COURT:  Do you know of any

4    communication out there on the subject in email

5    form?

6                THE WITNESS:  Other than oral?

7                THE COURT:  In email form.

8                THE WITNESS:  In email form?  No, sir.

9    BY MR. ANSLEY:

10   Q.   Did you ever send any sort of -- let's talk

11   first about a restructuring memo to UDF about

12   restructuring the loan.

13        That's a yes or no.

14   A.   I guess no.

15   Q.   Are you aware that there was a restructuring

16   memo that was prepared by Buffington back in 2010

17   about restructuring loans, then, of 1 and 3 through

18   the use of the UDF IV?  Are you aware of that

19   restructuring memo?

20   A.   I'm not aware of that specific memo, but I'm

21   certainly aware that UDF IV was part of -- partly

22   intended to restructure 1 and 3.

23   Q.   But you're also aware that there's a process of

24   restructuring a multimillion-dollar loan, right?

25   A.   Yes.

 1  Q.   And that certainly, in that instance, that
 2  includes putting together a packet, a proposal of
 3  how that can be restructured?
 4  A.   That's correct.
 5  Q.   And in your case, it involves talking to
 6  somebody once, twice, whatever, with no written
 7  communications whatsoever.  We have nothing in
 8  writing, that you're aware of, that supports the
 9  idea that you or anybody else at Buffington said
10  that it could not repay the loan before
11  October 2014?
12  A.   We met with them in person.  Once we were on
13  the phone with him, also once a week, we had lots of
14  opportunities to talk about these issues.  I mean,
15  there would be no email follow up on certain things
16  because we're talking so much.
17  Q.   You consistently emailed UDF regarding multiple
18  topics, including overhead?
19  A.   Sure.
20  Q.   And yet there are no emails at all about the
21  topic of --
22          MS. EGGERS:  Objection, asked and
23  answered.
24          THE COURT:  Sustained.
25

1  BY MR. ANSLEY:

2  Q.    And we have meeting agendas for those meetings

3  with UDF, don't we?

4  A.    Yes, we do.

5  Q.    And those meeting agendas are utterly silent

6  about the topic of "we can't repay the loan."

7  A.    Meeting agendas were to go through all of the

8  different projects and potential projects.

9  Q.    Did you understand my question?

10  A.    I did.

11  Q.    Those meeting agendas were silent as to any

12  statements or information about "we can cannot repay

13  the loan"?

14  A.    I -- I -- that would -- that would seem to make

15  sense.  I don't recall every meeting agenda to know

16  that for sure, but that sounds right.

17  Q.    And the agenda meetings, of course, they are

18  intended to cover the topics addressed during these

19  meetings with UDF representatives?  That's the whole

20  point of an agenda of a meeting?

21  A.    That's correct.

22  Q.    I want to talk to you about the advance

23  requests that were submitted to UDF as well.

24        You talked briefly about those on direct.

25        How late, to the extent that you remember, how

1  late into the game would Buffington submit advance

2  requests to UDF?

3  A.   I don't know that I can give you a date.

4  Q.   They were submitted into at least September of

5  2014, weren't they?

6  A.   Yeah.  I would imagine that's probably right.

7  Up until the point that we knew that we weren't

8  going to be able to move forward.

9  Q.   And you signed off on advance requests to UDF

10 in August of 2014?

11 A.   I take your word for it.  I very rarely signed

12 the advance requests.

13 Q.   I can show it to you, if you need me to.

14 A.   No, I believe you.

15 Q.   And then you know, James, of course, you're

16 vice president of UDF -- I'm sorry -- of Buffington

17 in fall of '14; is that right?

18 A.   That's correct.

19 Q.   And general counsel, too?

20 A.   No.  I resigned all of my legal positions

21 December 12th of '12.

22 Q.   Okay.  I'm sorry.

23      So in the fall of '14, you're VP.  You're aware

24 that advance requests are being submitted, the one

25 you signed off on in September -- August of '14.

 1        There were later advance requests submitted in
 2   September of 2014.
 3        Do you agree with me?
 4   A.   I'm -- I'm aware that we made a number of
 5   advance requests.  It was part of the process with
 6   UDF.
 7   Q.   And those advance requests contain, as you know
 8   from signing some, certain certifications regarding
 9   the status of Buffington and its solvency, don't
10   they?
11   A.   I suppose so.
12              MR. ANSLEY:  Can I approach, your Honor,
13   to refresh?
14   BY MR. ANSLEY:
15   Q.   Sir, I'm handing you what's marked as
16   Government's Exhibit 2078.
17        Without telling people, everybody what it is,
18   do you recognize that document?
19   A.   Yes, I do.
20   Q.   I'm sorry.  Defendant's Exhibit 2078.  I
21   apologize.
22   A.   Yes, I recognize this document.
23   Q.   What is that document?
24   A.   It is an advance request.
25   Q.   And is that signed by you on the second page?

 1  Multiple times?

 2  A.    Yes, it is.

 3  Q.    That advance request is directed to whom?

 4  A.    To United Development Funding III.

 5  Q.    The date on that is what?

 6  A.    It says August 13th, 2014.

 7            MR. ANSLEY:  The defense moves for Defense

 8  Exhibit 2078, your Honor.

 9            MS. EGGERS:  No objection.

10            THE COURT:  That that will be admitted.

11            (The referred-to document was admitted in

12        Evidence as Defense Exhibit 2078.)

13  BY MR. ANSLEY:

14  Q.   We can pull up -- and you will see it, too,

15  electronically, sir, pull up the first page of that

16  draw request.

17        So this is the one you signed in August of '14.

18  That red box, if we could blow that up a little bit.

19        We spoke, Mr. Buffington, about certain

20  certifications you couldn't recall the details of.

21        Do you see that now?

22  A.    I do.

23  Q.   And what -- in summary, those certifications

24  are representing the financial -- my words, not

25  those, correct me if I'm wrong, but the financial

1  status of Buffington and its solvency?

2  A.    Yes.  More or less.

3        I mean, it's talking about, in the first one,

4  reps and warranties made by borrower and borrower

5  purchasing the note, and each other loan document

6  are true and correct in all material respects.

7        So they continue to be true and correct.

8  Q.   And those loan documents, without going into

9  the details, those loan documents make

10 representations, many of which include covenants

11 about the solvency of Buffington?

12 A.    That's correct.

13 Q.   And this certifies that those things have not

14 changed, those representations have been -- are

15 unchanged in August of '14?

16 A.    Each of those loans had financial

17 certifications attached to them with our balance

18 sheet.  And so the balance sheets were always

19 accurate and would show exactly the situation with

20 the consolidated group and remained to be the

21 situation during the certifications.

22 Q.   Okay.  So you were certifying here the

23 representations in those loan documents, whatever

24 their dates are remain accurate?

25 A.    I mean, I would have to go back and look at

 1 | them.
 2 | Q.   No, you're saying --
 3 |          THE COURT:  Hold on.  Don't talk over each
 4 | other.  Wait for him to finish.
 5 |          THE WITNESS:  I'm sorry.
 6 | BY MR. ANSLEY:
 7 | Q.   You're saying here in summary that the
 8 | certifications -- the representations in the loan
 9 | documents are still accurate?
10 | A.   Yes.  That is what this certification says.
11 |          MR. ANSLEY:  Can we --
12 |          May I approach, your Honor?
13 | BY MR. ANSLEY:
14 | Q.   Sir, I handed you what's marked as Defense
15 | Exhibit 8335.
16 |      Do you recognize what that document?
17 | A.   This is an advance request.
18 | Q.   Dated?
19 | A.   September 9, 2014.
20 | Q.   Signed by whom on page 2?
21 | A.   Mr. Dorney.
22 | Q.   Mr. Dorney was what of UDF --I'm sorry --
23 | Buffington in September '14?
24 | A.   President.
25 | Q.   You recognize the signature, don't you?

```
 1  A.    I do.
 2  Q.    And attached to that following pages we have a
 3  number of documents relating to various projects
 4  that you guys were working on with UDF?
 5  A.    Yes.  That's correct.
 6            MR. ANSLEY:  Defense moves for admission
 7  of Defense Exhibit 8305.
 8            MS. EGGERS:  No objection, your Honor.
 9            THE WITNESS:  8305 will be admitted.
10            (The referred-to document was admitted in
11        Evidence as Defense Exhibit 8305.)
12  BY MR. ANSLEY:
13  Q.    Quickly, sir, we will look at the same exact,
14  same certifications at the bottom of page 1 of this
15  exhibit as well.
16        And if we can zero in on that same section.
17        Would you argue with me if I said these
18  certifications in Section 3 are identical to those
19  that we just looked at the previous one for August?
20  A.    They do appear to be identical.
21  Q.    And then there was also an advance request
22  submitted in -- by Buffington in August of 2014 as
23  well, wasn't there?
24        I'm sorry.  October.  I think I said August.
25        Is that what you've handed me?
```

```
 1   Q.   No, sir.
 2            MR. ANSLEY:  Can I approach, your Honor?
 3   BY MR. ANSLEY:
 4   Q.   Do you recognize that document, sir?
 5   A.   Yes.  It's an advance request.
 6   Q.   For what month?
 7   A.   This would be UDF III.
 8   Q.   For what month?
 9   A.   It is dated October the 9th of 2014.
10   Q.   Do you see Mr. Dorney's signatures again
11   multiple times on page 2?
12   A.   I do.
13            MR. ANSLEY:  The defense moves for
14   admission of -- what number does that say?  The
15   exhibit number on that?
16            THE WITNESS:  Oh, yeah.  It looks like
17   DX 2079.
18            MR. ANSLEY:  Defense 2079, your Honor.
19            THE COURT:  It will be admitted.
20            (The referred-to document was admitted
21        into Evidence as Defense Exhibit 2079.)
22   BY MR. ANSLEY:
23   Q.   Quickly, the same certifications, if we can
24   pull those up on that page.
25   A.   Yes.  It appears to be the same certifications,
```

1  same language.

2  Q.   I've got one more to ask you about as far as

3  advance requests.

4       Are you aware that Buffington submitted an

5  advance request on November 10, 2014, to UDF?

6       Do you know?

7  A.   I assume you've got another exhibit back there,

8  so, yes.

9  Q.   Do you know one way or the other?

10 A.   No, I don't know that for sure.

11 Q.   All right.

12           MR. ANSLEY:   Can I approach, your Honor?

13 BY MR. ANSLEY:

14 Q.   Do you recognize that, sir?

15 A.   Yes.  It is an advance request.  It is dated

16 November the 10th of 2014.  It is a request made on

17 United Development Funding III.

18 Q.   Who signed it?

19 A.   It appears to be Mr. Dorney's signature.

20 Q.   Page 1, how much was that advance request for?

21 A.   Principal amount.  Advance request, $27,294.19.

22           MR. ANSLEY:   Defense moves for admission

23 of Defense 8306, your Honor.

24           MS. EGGERS:   No objection.

25           THE COURT:   8306 will be admitted.

```
 1              (The referred-to document was admitted in
 2         Evidence as Defense Exhibit 8306.)
 3  BY MR. ANSLEY:
 4  Q.   Let's blow up this one, let's blow up that same
 5  section.
 6         What is missing there on page 1?
 7  A.   I don't see -- at least on that page, the same
 8  certifications.
 9  Q.   Do you know who removed those certifications?
10  A.   No, I do not.
11  Q.   Do you know why they were removed?
12  A.   No, I don't.
13  Q.   Whose document is this, do you know whose form
14  this document is?
15  A.   Well, it would be a lender-agreed form, so I
16  would say it's UDF's form.
17  Q.   So if Buffington changed that, that would be
18  Buffington changing a UDF form?
19              MS. EGGERS:  Objection, your Honor.  He's
20  already said he doesn't know who did --
21              THE COURT:  Sustained.
22  BY MR. ANSLEY:
23  Q.   After this one in November of 2014, if you
24  know, were there any additional draw requests that
25  Buffington submitted to UDF after that date?
```

 1  A.    I don't know.

 2  Q.    As I understand your testimony, you're telling

 3  the jury that, in so many words, that Buffington

 4  claimed it could not repaint the UDF loan, is that a

 5  fair summary?

 6  A.    In full.

 7  Q.    In full.

 8        Did -- are you aware of loan applications and

 9  guaranty agreements that were signed by Buffington

10  in the fall of 2014 that addressed Buffington's

11  financial solvency?

12  A.    I'm not aware of any loans that were taken out

13  after September of '14.  There were no new loans,

14  there were no new modifications of loans.

15  Q.    What about a guaranty agreement on the BLG Hoss

16  LLC?

17  A.    I don't know the date of that.

18  Q.    Are you aware of that agreement?

19  A.    Yes, I am aware of a commercial lender who made

20  a loan and then UDF was in a second position.

21  Q.    Are you aware of that agreement was dated

22  September 18, 2014?

23  A.    I'm not aware of that.

24  Q.    I'm sorry?

25  A.    I'm not aware of that.

```
 1              MR. ANSLEY:  Can I approach, your Honor?
 2  BY MR. ANSLEY
 3  Q.   It is marked as Defense 8300.
 4       Do you recognize that document?
 5  A.   I do.
 6  Q.   What is that?
 7  A.   It is a guaranty agreement between Buffington
 8  Capital Holdings and Washington Federal.
 9  Q.   And is Buffington Capital Holdings --
10              MS. EGGERS:  Your Honor, I'm going to
11  object, if we can approach.
12              (The following proceedings were had at
13         sidebar without being reported:)
14  BY MR. ANSLEY:
15  Q.   Do you recall having a conversation with Jeff
16  Gilpatrick in June of 2020 regarding the amount owed
17  to UDF?
18  A.   I having a phone conversation can Jeff
19  Gilpatrick.
20  Q.   Did you recall telling Mr. Gilpatrick during
21  that conversation that you had every intention and
22  belief that the UDF loan you had could be repaid?
23  A.   I think -- there was some conditional language
24  around that.  I don't recall it exactly.
25              MR. ANSLEY:  May I approach, your Honor?
```

 1              That's marked Defense Exhibit 29.

 2              THE WITNESS:  I'm sorry?

 3              MR. ANSLEY:  Can I approach one more time,

 4   Judge?

 5              That is transcripts.  8160, I'm sorry,

 6   sir.  I meant Defense 8160.

 7              Your Honor, this is an impeachment

 8   exhibit.

 9              MS. EGGERS:  Your Honor, I would object to

10   the use of this exhibit, and it has been --

11              THE COURT:  To the use of this exhibit and

12   then you said something --

13              MS. EGGERS:  And the manner that it's been

14   provided to the Government, your Honor.  It's a

15   transcript.  The Government doesn't have the actual

16   call itself.  This was just recently provided to the

17   Government and we don't have the actual original

18   recording.

19              THE COURT:  Okay.

20              So, sir, you will have to -- I'm going to

21   allow them to show you this document.  If you

22   believe it's true, then you that need to say it is

23   true.  If you don't know, you need to say you don't

24   know.  But you need to answer it honestly as to your

25   personal knowledge.

 1                THE WITNESS:  All right.

 2                If there was a question, I need you to

 3    repeat it.

 4                THE COURT:  He's going to ask one.  I just

 5    wanted to lay that sort of ground work.

 6                MR. ANSLEY:  I'm sorry, your Honor.

 7                THE COURT:  Because I was not aware of

 8    what it was.

 9                MR. ANSLEY:  I have a copy for the Court.

10                THE COURT:  Got it.

11    BY MR. ANSLEY:

12    Q.   Sir, if I can turn your attention to page 2 of

13    this exhibit.  If you can just kind of look at

14    page 2, around line 13 and read it to yourself.

15         Tell me when you're finished.

16    A.   I've read it.

17    Q.   This is a conversation between you and Jeff

18    Gilpatrick, who we talked about a few minutes ago,

19    isn't it?

20    A.   Yes.  As I recall, it was a Saturday morning --

21                THE COURT:  Hold on.  Hold on.

22    BY MR. ANSLEY:

23    Q.   That's okay.

24                THE COURT:  Just only answer the question

25    asked.

 1            THE WITNESS:  Okay, I'm sorry.

 2  BY MR. ANSLEY:

 3  Q.   You told the Court and Jury a few minutes ago

 4  you spoke to Mr. Gilpatrick?

 5  A.   That's correct.

 6  Q.   In June of 2020?

 7  A.   Yes.

 8  Q.   And this appears to be that phone call, doesn't

 9  it?

10  A.   I wasn't aware it was being recorded.  This

11  appears to be a transcript from that call.

12  Q.   Okay.  But you talked -- okay.

13  A.   I did talk to him.

14  Q.   And do you see there where it refers to

15  Mr. Gilpatrick saying, in so many words, that, "I

16  mean, when you guys signed those draws with the

17  certifications --"

18            THE COURT:  Hold on.

19            MR. ANSLEY:  Yes.

20            I will withdraw the question, your Honor.

21            THE COURT:  Yes, okay.

22  BY MR. ANSLEY:

23  Q.   Having read this, sir, does this refresh your

24  recollection as whether or not you told

25  Mr. Gilpatrick in June of 2020 that you believed you

 1    could repay the loan?

 2    A.    I'm responding to his statement.

 3             THE COURT:  No.  Hold on.  So you've read

 4    the portion that he's told you.  And so the question

 5    to you is, does that refresh your recollection about

 6    whether you told this individual you could repay the

 7    loan.  It either does or it doesn't refresh your

 8    recollection as to whether you said that.

 9             And that's the question before you.

10             THE WITNESS:  It does not refresh my

11    recollection as to whether or not we could repay the

12    loan.

13    BY MR. ANSLEY:

14    Q.    And the question is whether it refreshes you on

15    whether you told Mr. Gilpatrick that you believed

16    you could repay the UDF loan.

17    A.    I'm sorry.  Ask that again.

18    Q.    Yes.

19             Does it refresh your recollection as to whether

20    or not you told Jeff Gilpatrick in June of 2020 that

21    you believed that Buffington could repay its loan?

22    A.    It does not refresh my recollection of that.

23    Q.    So you're denying that you told him that?

24    A.    I'm not denying that.  It refreshes my

25    recollection that he asked me if the certifications

1  we signed, that we believed at the time that we

2  signed certain certifications that we could repay

3  the loan.

4  Q.   And those certifications continued to be signed

5  off until -- through what date?

6  A.   I don't know.  We just went through them.

7  Q.   At least October 2014?

8  A.   That sounds right.

9  Q.   And you submitted draw requests through at

10  least November of 2014, correct?  We looked at that

11  one, too?

12  A.   Correct.

13  Q.   That's the one that had the certifications

14  removed from it.

15       Do you recall that?

16  A.   I recall reviewing that document with you.

17  Q.   And you talked, I think, towards the beginning

18  of your direct examination about a conversation you

19  had, I think it was in September of 2014, with

20  certain representatives, a phone call with certain

21  representatives for UDF.

22       Do you recall that?

23  A.   I do.

24  Q.   During that conversation, who was present on

25  that phone call?

1  A.    If you're referring to the September 11, 2014

2  conversation, that was myself; my father, Tom

3  Buffington; and James Dorney.  And we were on the

4  phone with Brandon Jester and Jeff Gilpatrick.

5  Q.    And at that point was -- I apologize for

6  asking, but did your father speak during that call

7  about health concerns that he had?

8  A.    Not that I recall.

9  Q.    Not that you recall?

10  A.    No, sir.

11  Q.    Was there anything said during that phone call

12  about an orderly transition that he wanted to, he

13  being your father, he wanted to discontinue

14  operations, in a slow and orderly step away from the

15  business?

16  A.    Certainly on the September 11th call we were

17  saying we wanted to have an orderly wind down of

18  business operations with them.

19  Q.    And explain to the Jury what an orderly wind

20  down of operations with UDF would be?  What that

21  looks like.

22  A.    Compromise the settlement agreement to dispose

23  of the loans, to transfer assets, transfer entities,

24  do whatever we could just to wrap it all up.

25  Q.    To what, to wrap it up?

 1  A.    To wrap it up.

 2  Q.    How long, it may be hard to say, how long -- an

 3  orderly wind down, to me, suggests it's going to

 4  take some time, right?

 5  A.    Yes.  I mean, we would have liked it to be

 6  expedited, but it does often take a lot of time.

 7  Q.    And an orderly wind down is going to take, I

 8  would assume, at least a period of months?

 9  A.    I would assume that's right.

10  Q.    If not longer than that?

11  A.    Correct.

12  Q.    An orderly wind down is not consistent with,

13  we're done, we can no longer fund things, we are

14  insolvent?

15  A.    I would say that it's consistent that when we

16  want to wind down the relationship, we are no longer

17  moving forward in the relationship.  We're done.

18  Q.    You aren't moving forward but, and I didn't

19  mean to cut your answer off --

20  A.    No, that was it.

21  Q.    That's not consistent though, an orderly wind

22  down with we are going no cease operations with you

23  now because we cannot repay the loans?  Those are

24  two different things, aren't they?

25  A.    To literally just cease operations would have

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                  Vol 3 January 12, 2022                  Page 70

 1  been even more damaging and destructive to the

 2  facilities.

 3       You need to work together to wind it down or

 4  you're not going to be able to repay as much as

 5  possible.

 6  Q.   And that takes time, doesn't it?

 7  A.   Yes, sir.

 8  Q.   That can take, like you said, months if not a

 9  year or more?  Is that correct?

10  A.   That would be why you continue to submit an

11  advance requests, you have to continue to operate

12  the business even though you're trying to wind it

13  down.

14  Q.   And when between, in fact, when did Buffington

15  stop doing business with UDF?

16  A.   The final separation had an effective date of

17  December 31st, 2016.

18  Q.   A couple of years later?

19  A.   Yes, sir.

20           MR. ANSLEY:  Thank you, sir.

21           I pass the witness.

22                   CROSS-EXAMINATION

23  BY MR. PELLETIER:

24  Q.   My name is Paul Pelletier; I represent Hollis

25  Greenlaw.

1        Buffington Homes was engaged with UDF for quite

2   a long period of time, correct?

3   A.    Not Buffington Homes.

4   Q.    Buffington Land?

5   A.    Yes, sir.

6   Q.    And Buffington Land bought, acquired land and

7   built developments with the money they borrowed from

8   UDF all over the Austin area, correct?

9   A.    That's correct.

10  Q.    Hundreds of homes?

11  A.    Well, Land didn't actually build any homes.

12  Q.    Land doesn't build homes?

13  A.    No.

14  Q.    Buffington Land develops and then it sells to

15  Buffington Homes and they build homes?

16  A.    Yes.  Buffington Land develops lots and they

17  sell to Buffington Homes and other builders.

18  Q.    Hundreds and hundreds of homes, correct?

19  A.    Yes, sir.

20  Q.    More than $100 million?

21  A.    Of -- of --

22  Q.    Loans.  To Buffington Land.  So they could do

23  this, correct?

24  A.    I think that's right.

25  Q.    Yeah.

1          And during that period of time, you said

2    towards the end of 2013 or '14, that you wanted to

3    reduce at least the interest on the loan, correct?

4    A.    That conversation first came up in January of

5    '13 with Mr. Wissink.  But, yes, we continued to

6    talk about it.

7    Q.    Right.

8          And you wanted to reduce that interest because

9    you thought it was a good idea for Buffington Land,

10   correct?

11   A.    19 percent compounding interest is really tough

12   to deal with.

13   Q.    And the one time that Buffington -- excuse

14   me -- that UDF paid down a 19 percent loan with a

15   14 percent loan for you, you told them, don't do it

16   because it's creating problems in our accounting,

17   right?

18   A.    There were many, many times that they

19   pre-funded UDF IV loans to pay down I and III loans.

20   Q.    So they're paying down a 19 percent loan with a

21   14 percent loan, pursuant to contract, and you're

22   telling them don't do it because it's bothering your

23   accounting department?

24   A.    No.  I think actually what we said is don't do

25   it without our consent, don't do it without our

 1  knowledge.

 2  Q.    You said that the contract -- you're a lawyer,

 3  right?  You're before's lawyer?

 4  A.    It depends when you are talking about.

 5  Q.    At some point in time --

 6  A.    Yeah.

 7  Q.    -- during the relationship, you had reviewed

 8  these loan documents, you knew that they had the

 9  right to do that, you said they did.

10  A.    Okay.

11  Q.    All right.

12        So they're doing it, they're saving you money

13  by reducing the very interest you want to reduce,

14  and you tell your accounting department, don't do

15  it -- you tell them not to do because it is an

16  accounting hassle?

17  A.    We were in favor of saving money; we just

18  didn't want them to do it without our consent.

19            MR. PELLETIER:  I have no further

20  questions, your Honor.

21            MR. LEWIS:  Thank you, Judge.  No

22  questions.

23            MR. STEPHENS:  No, your Honor.

24

25

1                    REDIRECT EXAMINATION

2    BY MS. EGGERS:

3    Q.    Mr. Buffington, those advance requests that are

4    in front of you.  What are the amounts on them?

5    A.    Exhibit 8305 is in the amount of 36,317, I

6    believe.

7    Q.    36,000 and some change?

8    A.    Yes.

9    Q.    Okay.

10         What's another one?

11   A.    Defendants' Exhibit 2079 is 41,407 and change.

12   Q.    41,000?

13   A.    Yes, ma'am.

14   Q.    Okay.

15   A.    Exhibit 8306, we may have already covered that,

16   but 27,294, I believe.

17   Q.    27,000?

18   A.    27,000, yes.

19         Those are the ones that I have.

20   Q.    And those were so y'all could pay the bills, to

21   pay the vendors or whomever who had done work?

22   A.    That's correct.  People that were owed money

23   for work done.

24   Q.    Mr. Ansley was asking about what was or was not

25   said and when they stopped paying advances and they

 1  didn't.

 2      This letter that you wrote in September of

 3  2014, does this letter address the fact that there

 4  were advances and overhead management fees that had

 5  not been paid?

 6  A.   Yes.

 7  Q.   And is that the purpose of this letter here?

 8  A.   Yes, it is.

 9  Q.   And you said something a moment ago, you said

10  compounding interest.

11      Explain to us what compounding interest is to

12  you.

13  A.   You know, we're quite familiar with the concept

14  in our credit cards.  But interest that continues to

15  accrue and then as the amount climbs with the

16  additional interest added, then interest then also

17  is calculated on that.

18  Q.   So you said earlier that the interest accruing

19  with that blended rate was what percentage again?

20  A.   19 percent, UDF I and III.

21  Q.   So if you don't pay the $2.5 million in

22  interest one month, then that gets rolled into the

23  next month and it just keeps compounding on itself?

24  A.   That's my understanding.

25  Q.   Defense counsel was asking about whether or not

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

1  you had sent any other communication to point out

2  how dire the situation was.

3        Were there emails where either you or Mr.

4  Dorney were contacting Mr. Gilpatrick asking that

5  they pay advances because y'all needed to be able to

6  pay the workers?

7  A.    A number of emails.

8  Q.    When all of this was happening, you're seeking

9  an advance request for, I think you said 27,000,

10  30 something thousand and 40 something thousand,

11  were y'all making those interest payments every

12  month of 2.5?

13  A.    Interest payments could only be made as lots

14  were sold.  So as lots would get sold, money would

15  go to the pay downs on the loans.

16  Q.    Towards the interest?

17  A.    First interest, then the principal.

18        MS. EGGERS:  No further questions at this

19  time, your Honor.

20        MR. ANSLEY:  No, your Honor.

21        MR. PELLETIER:  No, your Honor.

22        MR. LEWIS:  No, sir.

23        MR. STEPHENS:  No, your Honor.

24        THE COURT:  Okay.  You may step down.

25        MS. EGGERS:  The Government will call

1    James Dorney.

2            And, your Honor, the Government would ask

3    that the rule of sequestration be invoked.

4            THE COURT:  If y'all would look -- would

5    you raise your hand to be sworn.

6            (JAMES DORNEY was duly sworn by the Court}

7            THE COURT:  I'm going to let y'all see if

8    you have any witnesses in the courtroom, excuse

9    them, and explain to them what the rule is.  And we

10   will try to do it on the fly.

11           MS. EGGERS:  The Government had previously

12   notified their witnesses, your Honor.

13           MR. PELLETIER:  Your Honor, can we

14   approach on one second about that sequestration?

15           (The following proceedings were had at

16        sidebar without being reported:)

17                    DIRECT EXAMINATION

18   BY MS. EGGERS:

19   Q.   If you would, sir, please state your name.

20   A.   James Dorney.

21   Q.   And you are going to have speak up.

22        Mr. Dorney, where do you live?  Not your street

23   address, but the general location.

24   A.   Austin, Texas.

25   Q.   Did you fly up here, Mr. Dorney?

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

| 4:21-cr-289-O | Vol 3 January 12, 2022 | Page 78 |
|---|---|---|

```
 1   A.    I did.

 2   Q.    Did you check your bag or did you carry on?

 3   A.    I checked it.

 4   Q.    Did you get your bag when you got to Dallas?

 5   Is that why you're wearing jeans to federal court?

 6   A.    Yes, ma'am.  Sorry.

 7   Q.    Mr. Dorney, let me ask you this:  What line of

 8   work are you in?

 9   A.    Real estate development and home building.

10   Q.    And approximately how long have you been in

11   that line of work, just approximately?

12   A.    Twenty years.

13   Q.    And were you previously employed with

14   Buffington Land?

15   A.    Yes.

16   Q.    And approximately how long were you employed

17   with Buffington Land?

18   A.    Thirteen years.

19   Q.    So what time frame are we talking about for

20   those 13 years?

21   A.    2008 through recently.

22   Q.    And did you work with Thomas Buffington, who is

23   now deceased?

24   A.    I did.

25   Q.    And what about Blake Buffington, did you also
```

 1  work with Blake Buffington?

 2  A.    I did.

 3  Q.    And what was your position with Buffington

 4  Land?

 5  A.    President.

 6  Q.    Describe for us just generally your duties and

 7  responsibilities as president on any given day.

 8  A.    The entire operations of any land development,

 9  acquiring the land, making sure that it was good

10  land that would work, putting the entitlements in

11  place to the city, the county, state, whatever it

12  might be.

13       Working with the civil engineers to do

14  preliminary plans, final plats, construction

15  drawings.  And then bidding it out to contractors

16  that would put the streets in and the pipe in the

17  ground and the ponds in the entries and all of the

18  things you -- you would put the lots in the ground

19  for selling to home buyers or homeowners.

20  Q.    And over the course of your time with

21  Buffington, did it obtain loans from any of the UDF

22  entities?

23  A.    Yes.

24  Q.    And who was your primary like weekly contact

25  with at UDF for your engagement with UDF personally?

 1  A.   It was Brandon Jester.

 2  Q.   Was there later another individual that you

 3  would have meetings with as well?

 4  A.   Yes.  In the -- towards the end, it was Brandon

 5  Jester and Jeff Gilpatrick.

 6  Q.   And these meetings, where would they generally

 7  occur, how often were they?

 8  A.   At the end, they were -- they were very

 9  frequent.  Normally, we would call it once a week

10  and they would come to our office and our conference

11  room.  There were phone calls as well as emails, of

12  course.  But they were pretty frequent.

13  Q.   And would Mr. Blake Buffington attend those

14  meetings with you?

15  A.   At the end, yes, Blake was in those meetings.

16  Blake and I would be in those meetings.

17  Q.   Did there come a time in September of 2014 when

18  someone other than Brandon Jester and Mr. Gilpatrick

19  came to the meetings?

20  A.   Yes.

21  Q.   Okay.

22       And who different, other than those two men

23  came to the weekly meetings?

24  A.   Hollis.

25  Q.   When you say --

```
 1  A.    Hollis Greenlaw --
 2  Q.    And were you present during the presentation
 3  that Defendant Greenlaw gave about moving forward
 4  between the two entities?
 5  A.    I was.
 6  Q.    And during that meeting, did Mr. Greenlaw
 7  say --
 8            MR. PELLETIER:  Objection, leading.
 9            THE COURT:  Overruled.
10  BY MS. EGGERS:
11  Q.    Did he say that the way to move forward was
12  taking out loans from UDF V, a discussion of UDF V?
13  A.    Yes.  UDF V was brought up, yes.
14  Q.    Now, after that, did you and Mr. Blake
15  Buffington, did y'all talk to Thomas Buffington
16  about this proposal?
17  A.    Yes, yes, we always would, yes.
18  Q.    Now, leading up to that and prior to that, the
19  relationship that Buffington had with UDF, were
20  y'all ever trying to get advances so that you could
21  pay overhead at UDF?
22  A.    Yes.
23  Q.    And did there come some point in time when that
24  become difficult for y'all to get actually money to
25  keep the lights on and pay the staff?
```

 1  A.    Yes.

 2  Q.    And were there emails that you had with

 3  defendant Jester where you're asking for money to

 4  try and do those things?

 5  A.    Yes.

 6              MS. EGGERS:  Your Honor, at this time I

 7  would ask to introduce Government's Exhibit No. 113.

 8              THE COURT:  It will be admitted.

 9              (The referred-to document was admitted in

10      Evidence as Government's Exhibit 113.)

11  BY MS. EGGERS:

12  Q.    This particular -- and it should be showing up

13  on your screen in front of you, Mr. Dorney -- what

14  is the date of this email?

15  A.    August 27th, 2013.

16  Q.    And what's the subject of it?

17  A.    It's overhead.

18  Q.    Okay.  And what did you -- you wrote it to

19  Mr. Jeff Gilpatrick, is that correct?

20  A.    Correct.

21  Q.    And what does it say right there?

22  A.    Please let me know as soon as you can, we do

23  not have funds to cover the draw.  Thanks, Jeff.

24  Q.    This was back in August of 2013, is that

25  correct?

 1  A.    Yes.

 2  Q.    And then prior to that, were you able to

 3  confirm that this would fund?  Is that earlier in

 4  the email chain?

 5  A.    Yes.  Tuesday, August 27th at 6:15 in 2013,

 6  were you able to confirm this would fund?

 7              MS. EGGERS:  Your Honor, at this time I

 8  would ask to introduce Government's Exhibit 114.

 9              THE COURT:  114?

10              MS. EGGERS:  Yes, sir.  Sorry.

11              THE COURT:  That will be admitted.

12              (The referred-to document was admitted in

13        Evidence as Government's Exhibit 114.)

14  BY MS. EGGERS:

15  Q.    Mr. Dorney, looking at this one, who was Skye

16  Payette?

17  A.    Skye was the controller from the Buffington

18  side.

19  Q.    And this looks as though it's from Skye Payette

20  to Jeff Gilpatrick and cc'ing you, is that correct?

21  A.    Yes.

22  Q.    And says, OH draw, July and August.

23        What does "OH" mean?

24  A.    Overhead draw.

25  Q.    And this is an email in September of 2013?

```
 1   A.    Yes.

 2   Q.    Does it talk about your next payroll, when it's

 3   due and when the funds will be deducted?

 4   A.    It does.

 5   Q.    And the sentence below that, does it say the

 6   July and August OH, overhead draws, are still

 7   outstanding?

 8   A.    Yes.

 9   Q.    And after that, what did you write?

10   A.    Please help.

11             MS. EGGERS:  Your Honor, at this time I

12   would ask to introduce Government's Exhibit 115.

13             THE COURT:  That will be admitted.

14             (The referred-to document was admitted in

15        Evidence as Government's Exhibit 115.)

16   BY MS. EGGERS:

17   Q.    Now, this particular chain is a little bit of a

18   longer chain.  You said Ms. Payette, she was there

19   at Buffington, is that correct?

20   A.    Correct.

21   Q.    And does this appear to be an email chain that

22   starts in October of 2013?

23   A.    Yes, it does.

24   Q.    And it's invoices from Land to Buffington for

25   reimbursement for some types of invoices for 37
```

1  grand, is that right?

2  A.    Correct.

3  Q.    That was written to a Cheryl Cox, is that

4  right?

5  A.    Correct.

6  Q.    And the Defendant Jester says:  "See below and

7  attached, need to get this factored into the OH

8  budget."

9        Do you see that?

10  A.    I do.

11  Q.    And then -- defendant, or excuse me, Jeff

12  Gilpatrick says:  Can you send over the updated

13  budget through the end of '14, is that correct?

14  A.    Correct.

15  Q.    Was there a man by the name of Kyle at

16  Buffington at the time?

17  A.    Kyle Mentor.

18  Q.    And it looks like you wrote:  Already gave Kyle

19  all he needs to update the model and asked him to do

20  ASAP, is that correct?

21  A.    Yes.

22  Q.    And then Defendant Jester, the formatting page

23  of the email or what have you, writes:  "James, what

24  does M mean when you say I have no answers?  Have no

25  answers for what?"

1          Was the Defendant Jester, was that someone that

2    y'all spoke about requesting overhead funding?  That

3    y'all spoke to --

4    A.   Yes, I would have spoke to Brandon asking him

5    for it.

6    Q.   And what did you write back in October of 2013?

7    A.   No answers equal no cash.

8    Q.   What does that mean?

9    A.   We didn't have any money.

10          MS. EGGERS:  Your Honor, at this time I'd

11    ask to introduce Government's Exhibit 116.

12          THE COURT:  That will be admitted.

13          (The referred-to document was admitted in

14      Evidence as Plaintiff's Exhibit 116.)

15    BY MS. EGGERS:

16    Q.   This is a different chain.  We're still in

17    2013.

18          What is the subject of this one on page 3 of

19    116?

20    A.   I see an email from Monday, November 11,

21    overhead.

22    Q.   I'm sorry.  November 11?

23    A.   That's okay.  It's overhead, subject.

24    Q.   And does Jeff Gilpatrick asks:  "Are you going

25    to need overhead funding this week, if so, why and

1  how much?"

2  A.    He asked when and how much, yes.

3  Q.    And then Ms. Payette writes back: "We will need

4  overhead funding."

5        Was this something constant y'all were having

6  to go back to them and ask for money just to meet

7  payroll?

8  A.    Yes.

9  Q.    Does Ms. Payette write on November 11 with the

10 time of 11:54:  "Would you mind clarifying?  We

11 submitted the October overhead draw, if that can get

12 funded then that gets us through this upcoming bay

13 roll as a Band-aid"?

14 A.    She wrote that.

15 Q.    She used the word "band-aid"?

16 A.    She did.

17 Q.    Then on November 20th, does she write another

18 email to Jeff Gilpatrick:  I just wanted to follow

19 up on the October funding request?

20 A.    She did.

21 Q.    Let's go --

22          MS. EGGERS:  At this time, your Honor, I

23 would ask to introduce Government's Exhibit 126.

24          THE COURT:  That will be admitted.

25

1            (The referred-to document was admitted in
2         Evidence as Government's Exhibit 126.)
3    BY MS. EGGERS:
4    Q.   And this particular email, was it the bottom of
5    it, is it from Jeff Gilpatrick to you to Blake
6    Buffington and then Brandon Jester is cc'd?
7    A.   It is.
8    Q.   And what is the date of this email?
9    A.   March the 5th, 2014.
10   Q.   And does Jeff Gilpatrick write:  We didn't
11   discuss this on the call, Blake and I discussed
12   briefly on Monday, the main UDF III loan is maturing
13   at the end of the month.  We need a roll up pro
14   forma of the Buffington portfolio as it stands today
15   to see where the balances stand.
16        What is a roll up pro forma?
17   A.   I'm not the finance guy, but basically you
18   would take every single individual project and all
19   of the cash flows associated with it, the revenue
20   and the costs to get to a bottom line distributable
21   cash number.
22        And you would put them all together and roll
23   them up into one big answer.
24   Q.   Now, there's a Matt -- I'm sorry.  There is a
25   Matt that's mentioned here.  Who is Matt?  Or who

1  was Matt?  Right here, it says from you to Jeff:

2  "Matt will be back in the office."

3  A.    That would have been -- at that time Matt

4  Parker.

5  Q.    Okay.  And would he have been the person to do

6  that type of --

7  A.    Yes, he's definitely the finance guy.

8  Q.    And this is somebody at UDF asking for this

9  information from your folks, is that correct?

10  A.    That's correct.

11  Q.    And then on March 7th, 2014, what did Defendant

12  Jester write?

13  A.    We need this by the end of next week.

14  Q.    And did you say, okay, thanks?

15  A.    I did.

16  Q.    So that was on March 7.

17           MS. EGGERS:  Your Honor, at this time I

18  would ask to introduce Government's Exhibit 127.

19           THE COURT:  That will be admitted.

20           (The referred-to document was admitted in

21       Evidence as Government's Exhibit 127.)

22  BY MS. EGGERS:

23  Q.    Let's go here.  Is this an email on March 12,

24  2014?

25  A.    Right.

 1  Q.   Is that correct?

 2  A.   Yes.  Yes, ma'am, it is.  March 12.

 3  Q.   Is that from Defendant Jester to you and

 4  Mr. Buffington?

 5  A.   It is to Blake and myself.

 6  Q.   And was he following up on the status of the

 7  updated cash flow for Buffington Land 1 and 3?

 8  A.   He was.

 9  Q.   And did he say:  "I need to make sure we

10  receive this on Friday as previously requested," and

11  then read that next sentence.

12  A.   "Our auditors have now requested the same

13  information and I'm obligated to provide this on

14  Monday morning.  Please ensure that we receive this

15  information on time."

16  Q.   And did you write that, that Matt, which would

17  have been Matt Parker, that he was working on it?

18  A.   I said Matt has been working on it all day,

19  it's a big project.

20          MS. EGGERS:  Your Honor, at this time I

21  would ask to introduce Government --

22  BY MS. EGGERS:

23  Q.   And that again, the date of that was March 12,

24  is that correct?

25  A.   The date that I said Matt has been working on

1  it, yes, ma'am, March 12 at 3:30.  3:23 in the

2  afternoon.

3          MS. EGGERS:  Let's go to Government's

4  Exhibit 118.

5          Your Honor, at this time I would ask to

6  introduce Government's Exhibit 118?

7          THE COURT:  That will be admitted.

8          (The referred-to document was admitted in

9      Evidence as Government's Exhibit 118.)

10 BY MS. EGGERS:

11 Q.   Is the subject of this another email requesting

12 overhead draws?  Now for March?

13 A.   It is.

14 Q.   And did you write, on March 25th:  Please do

15 what you can, I do not have an answer to cover

16 overhead at this point?

17 A.   I did.

18          MS. EGGERS:  Your Honor, I would ask to

19 introduce Government's Exhibit 487A and 487B.

20          THE COURT:  That will be admitted.

21          (The referred-to document was admitted in

22      Evidence as Government's Exhibit 487A and

23      487B.)

24 BY MS. EGGERS:

25 Q.   Looking at this email, Mr. Dorney, what is the

1  date of this email?

2  A.    March 31st, 2014.    Monday.

3  Q.    And if you would, please read what Jeff

4  Gilpatrick wrote to you and Mr. Dorney?

5  A.    "Skye/Matt, based on the portfolio models, we

6  have made the advances listed below to pay down the

7  before UDF/UDF III loans to continue to lower your

8  cost of funds.    Please send draw requests for these

9  advances that were made today.    $500,000 in Crystal

10  Springs."

11  Q.    I'm going to stop you there.    And the next

12  amount and the name of the development?

13  A.    324,000, in Mason Park.    500,000 at Park at

14  Brushy Creek.

15  Q.    So this is from Jeff Gilpatrick telling y'all

16  to take advances on loans?

17  A.    It is.

18          MS. EGGERS:    Let's go to 487B.

19  BY MS. EGGERS:

20  Q.    And I will flip through these.

21      Was that something that you would sign, advance

22  requests?

23  A.    I would.

24  Q.    And this is an advance request where your

25  lender is telling you to take the advance request,

1  is that correct?

2  A.   It's related to those three dollar amounts,

3  yes.

4  Q.   We could flip through, but this exhibit will be

5  in evidence.  There were multiple, I think three

6  developments that were listed, is that correct?

7  A.   There were three projects in that email, yes.

8  Q.   We can see there's a second one there.

9       And then a third one there, is that correct?

10 A.   Correct.

11            MS. EGGERS:  Your Honor, at this time I

12 would ask to introduce Government's Exhibit 125.

13            THE COURT:  Exhibit 125 will be admitted.

14            (The referred-to document was admitted in

15      Evidence as Government's Exhibit 125.)

16 BY MS. EGGERS:

17 Q.   Is this an email in April of 2014 from

18 April 4th -- excuse me -- 2014, same chain, the

19 portfolio advances where Jeff Gilpatrick is saying,

20 I need these?

21 A.   It is.  April the 14th from Jeff.  I need

22 these.

23      I might have misspoke.  It was April 4 of 2014.

24            MS. EGGERS:  Your Honor, at this time I

25 would ask to introduce Government's Exhibit 119?

1              THE COURT:  It will be admitted.

2                (The referred-to document was admitted in

3          Evidence as Government's Exhibit 119.)

4  BY MS. EGGERS:

5  Q.   And is this an email chain where Ms. Laytham?

6  A.   Leightman.

7  Q.   Leightman is making a request about open CT

8  Corp. invoices that Buffington had?

9  A.   It is.

10              MS. EGGERS:  Your Honor, at this time I

11  would ask to introduce Government's Exhibit 120.

12              THE COURT:  120 will be admitted.

13                (The referred-to document was admitted in

14          Evidence as Government's Exhibit 120.)

15  BY MS. EGGERS:

16  Q.   And the subject of this email chain, and it's

17  has been a year now, we've been looking at emails,

18  but the subject of this one is vendor checks/July

19  draws?

20  A.   It is.

21  Q.   What did you write to Jeff Gilpatrick?

22  A.   "Jeff, these guys are going to walk the job.

23  Can you find out -- can you fund out a UDF loan

24  facility we have in place?"

25  Q.   What does "walk the job" mean?

1  A.   You don't pay them, they leave.  They'll go do

2  something else.

3  Q.   We saw those advance requests a few moments

4  ago --

5          MS. EGGERS:  Your Honor, at this time I

6  would ask to introduce -- I'm sorry -- Government's

7  Exhibit 485.

8          THE COURT:  458 will be admitted.

9          (The referred-to document was admitted in

10      Evidence as Government's Exhibit 485.)

11  BY MS. EGGERS

12  Q.   We saw those advance requests a moment ago that

13  were attached to an email chain.

14      Do you see this advance request, Mr. Dorney?

15  A.   I do.

16  Q.   How much is that advance request?

17  A.   A million dollars.

18  Q.   And is this another example of where the lender

19  is telling y'all to take an advance request?

20  A.   Yes.

21          MS. EGGERS:  Your Honor, at this time I

22  would ask to introduce Government's Exhibit 121.

23          THE COURT:  121 will be admitted.

24

25

1              (The referred-to document was admitted in

2         Evidence as Government's Exhibit 121.)

3    BY MS. EGGERS:

4    Q.    And this -- excuse me -- is this an email from

5    Blake Buffington to Jeff Gilpatrick where you are

6    cc'd?

7    A.    It is.

8    Q.    And the subject of it, or the regarding

9    section, is it regarding payroll needs?

10   A.    It is.

11   Q.    Let me ask you this:  Was it a constant trying

12   to get money just to make payroll?

13   A.    It was.

14            MS. EGGERS:  Your Honor, at this time I

15   would ask to introduce Government's Exhibit 122.

16            THE COURT:  122 will be admitted.

17            (The referred-to document was admitted in

18        Evidence as Government's Exhibit 122.)

19   BY MS. EGGERS:

20   Q.    And this email chain, what is the subject of

21   this email chain?

22   A.    UDF IV overhead funding.

23            MS. EGGERS:  May I have one moment, your

24   Honor?

25            No further questions at this time, your

 1   Honor.

 2                   MR. ANSLEY:  Yes, your Honor.

 3                      CROSS-EXAMINATION

 4   BY MR. ANSLEY:

 5   Q.   Good afternoon, Mr. Dorney.

 6   A.   Good afternoon.

 7   Q.   If we can pull up Government's Exhibit 115,

 8   again, please.

 9        And, sir, you just visited with Ms. Eggers

10   about, this is one of the overhead emails that y'all

11   spoke about a moment ago?

12   A.   Correct.

13   Q.   If we can zero in on -- do you see the middle

14   part of the page, it looks like an email from my

15   client, Brandon Jester?

16   A.   I do.

17   Q.   Will you read to the jury what -- the paragraph

18   starting also.  Read what that paragraph says.

19   A.   "Also we funded you guys a great number of UDF

20   I and III draws on Friday, and the reminder will

21   come once I can sit down face-to-face with Ben to

22   review.  You guys should have easily been able to

23   cover any overhead obligations with what we funded

24   last week."

25

 1                    THE COURT:  And when you read, be sure
 2    you're projecting into that microphone.
 3                    THE WITNESS:  I'm sorry.  Yes, sir.
 4    BY MR. ANSLEY:
 5    Q.    Thank you, sir.
 6          And to be clear, you, I think you said on
 7    direct, you're not a finance guy.  At least at
 8    Buffington, you were not a finance guy?
 9    A.    No, I'm operations guy.
10    Q.    You are not a finance guy now?
11    A.    No.
12    Q.    By operations, so how that is different from
13    finance, at a high level?
14    A.    You have finance guys who give you the answers
15    as the operator.
16    Q.    And you're out there, your job at Buffington,
17    in so many words, was to try to source deals, try to
18    find deals, is that fair?
19    A.    That was part of my job.
20    Q.    Beyond that, what else?
21    A.    Source them, entitle them, develop them,
22    dispose of the assets.  Disposition.
23    Q.    You went through -- you went through a number
24    of emails on direct regarding overhead, which we
25    just looked at including this one.

1          But paying overhead, that's different from loan
2    draws that are intended to -- intended to help move
3    projects forward that Buffington was working on,
4    those are two different things, aren't they?
5    A.    Obviously, yes.
6    Q.    So if there's -- whether or not a $25,000
7    payment is being made for overhead to a contractor,
8    whomever else, that doesn't impact directly whether
9    or not a loan project rather is moving forward,
10   that's -- that's a loan draw as opposed to a purely
11   overhead draw, isn't it?
12   A.    You might want to ask that question another way
13   because I think I disagree with you.
14   Q.    Well, what we looked at a few minutes ago,
15   those overhead draw emails back and forth, that does
16   not mean that Buffington does not have the funds
17   that it needs to keep pushing the project forward or
18   the projects forward.
19   A.    Part of being able to move projects forward at
20   any type of pace is you have to be have people to be
21   able to do it.
22   Q.    And also part of it is having access to large
23   sums of capital, large loans, which Buffington was
24   receiving from UDF and UDF I, UDF III, UDF IV?
25   Which you're aware of in your role as operation?

1    A.    Whether they received loans?

2    Q.    Yes, sir.

3    A.    Yes.

4    Q.    Isn't it part of your job, what you were

5    doing -- I didn't mean to minimize it -- but part of

6    it was to use those funds received to see what sort

7    of projects you could help source and find, you

8    know, for your employer Buffington?

9    A.    Correct.

10   Q.    And without those funds received from UDF as a

11   lender, you don't have the ability or, I guess, you

12   wouldn't go out there and try to source those deals,

13   would you, try to find those deals?

14   A.    Only what they source of financing.

15   Q.    I'm sorry, sir?

16   A.    Only what they source of financing would you,

17   in all equity or debt and equity or whatever the

18   structure was.

19   Q.    And you worked with UDF and you worked to try

20   to source deals through 2013, is that correct?

21   A.    Getting close to 2013, I would say, yes.

22   Q.    2014 as well?

23   A.    I was at that point so busy trying to manage

24   the assets that we had to get as much value out of

25   it as I could, we didn't have people really to do

1    it.

2    Q.    In looking at Government's Exhibit 487A, if we

3    could pull that up, please, and, Mr. Dorney, that

4    was an email in which you're basically the sum and

5    substance is you're being -- that's UDF initiating a

6    draw request, is that fair to say?

7    A.    Correct.

8    Q.    And if you don't know this, that is fine, but

9    do you know, are you aware that UDF under its

10    agreements with Buffington has -- they've got the

11    authority to do things just like this, meaning

12    specifically, initiate draw requests like we're

13    looking at here?

14    A.    I can speak with 100 percent certainty that

15    that was in the documents.  I'm not saying it's not,

16    but I just can't say yes or no.

17    Q.    That's outside your flight pattern, is that

18    fair?

19    A.    I'm sorry?

20    Q.    That's outside your flight pattern as far as

21    operations?  That's different -- that's outside of

22    what you're aware of?

23    A.    Sure, sure.

24    Q.    From a financing standpoint, at least during

25    the time that you were at Buffington, who -- who was

1  or who were the people in charge of financing at

2  Buffington?

3  A.    Initially, when I first came over, Patrick

4  Starley.

5  Q.    When did Mr. Starley leave?

6  A.    I don't want to misspeak.  I'm not positive of

7  the exact year.  I mean, I can tell you about it,

8  but I don't want to say -- maybe 2009.

9  Q.    As far as the issue of --

10  A.    Excuse me, not 2009.

11       No, no, no.  2012.

12  Q.    Okay.  Thank you.

13       And on the -- on the side of things, as far as

14  access to funds, from whether it's UDF or other

15  lenders, that's more in the arm of Patrick Starley

16  and finance as opposed to you on the operational

17  side of things?

18  A.    Securing those types of vehicles to fund, yes,

19  absolutely.  But when it came to me approving a

20  dollar to spend because the work was done, it was

21  done to satisfaction, then I would be more involved

22  in that.  That's more operational.

23  Q.    As far as from an operational versus finance

24  side, you had no direct involvement in making

25  payments by Buffington?  Whether you're going to pay

1  vendors, for instance, were you involved in that?

2  A.    Only on the approval side.  Absolutely they

3  would come from -- from our side.  But it wasn't me

4  actually handing them a check.

5       Excuse me.

6  Q.    And what about the status of payments?  Are you

7  keeping up with that operationally, too, or is that

8  more on the finance side?

9  A.    You have to know what your budget, actual

10 budget is.  So, I mean, whether or not a finance guy

11 does it for you and you review it, I mean, I knew.

12 I knew what our costs were.  You have to.

13 Q.    You looked a few minutes ago, I think you

14 referred to those pro formas.

15      Let's pull up Government's Exhibit 126, please.

16      Do you see that, sir?

17 A.    I do.

18 Q.    You if we go to -- that's a request basically

19 to see where, the question is to see what the status

20 or where rather the Buffington loan stands, is that

21 a fair summary of that request?

22 A.    It is.

23 Q.    And as far as preparing the pro forma,

24 that's -- you had no involvement, if there is one

25 prepared, you had no involvement in that at all?

```
 1  A.    I wouldn't have prepared, no, I'm not an Excel

 2  guy.  Not one you want to use anyway.

 3  Q.    I'm sorry, sir?

 4  A.    I'm not an Excel guy so that would have been

 5  prepared -- at this time that would have been Matt

 6  doing that.

 7  Q.    So putting the date in that, whether it's a pro

 8  forma cash flow analysis, you had no involvement

 9  inputting that data together?

10  A.    I definitely would know the assumptions that

11  would go in that work, that would make sense that

12  could actually be done in the field.

13  Q.    So, operationally, you're inputting your

14  operational knowledge into that --

15  A.    Sure.

16  Q.    -- and then Excel people --

17  A.    Not actually building it.

18          THE COURT:  Be sure you let Mr. Ansley

19  finish his question before you answer, so that she

20  can take it down.

21  BY MR. ANSLEY:

22  Q.    Tell me again when you started Buffington.

23  A.    2008.

24  Q.    2008.

25          So you're aware, starting in 2008, that
```

1    Buffington prepared models like that where they

2    would model, you know, what their portfolio looked

3    like, and model projection -- make projections based

4    on those models going forward.  You're aware that

5    those -- you didn't create them, but you're aware

6    that those spreadsheets were created going back

7    several years?

8    A.    Typically what would be put in place were

9    project level pro fores.  You do an individual

10   project, you track it, you make sure it works, and

11   it is doing what you think.

12        So, typically, we had at my level would be

13   project level.

14   Q.    Okay.

15   A.    Specific communities.

16   Q.    Okay.  And I want to put a fine point on that

17   because that sounds important.

18        So a project level pro formas, what do you mean

19   by that?

20   A.    It deals with a specific community.  You have

21   100 acres, you have 1000 homes sites, how much do

22   they cost, how much do you sell them for, so related

23   to a specific community.

24   Q.    Okay.

25        So what's the status of that existing project

1  at that point in time?

2  A.    Correct.

3  Q.    Got it.

4        As opposed to -- well, the only pro formas

5  you're familiar with are those project level pro

6  formas, is that fair?

7  A.    Because once I give some feedback on the

8  project level, then whatever they would do with it,

9  they already had the feedback.  It's not going to

10  change when you roll 10 of them together, it's going

11  to be the same one by one that aggregated into 10 to

12  give you one big number.

13  Q.    And that's at the project level only, correct?

14  A.    Correct.

15  Q.    How late in the game, as far as Buffington

16  goes, how late in the game did you guys close deals

17  with UDF?

18  A.    I can't recall for certain.  But the last

19  couple deals we closed, they sputtered, didn't make

20  it to fruition.

21  Q.    Did you close deals in 2013?

22  A.    The last deals we did were Hawks, whatever year

23  that was, and Crystal Springs, which didn't make it.

24  Closed the land and that was it.

25        And Hawks stalled after one section of being

```
 1  constructed.  Those are the last two I recall.

 2  Q.   Did you closed Gosling in 2013?

 3  A.   Gosling was down in Houston.

 4  Q.   I'm sorry?

 5  A.   Yes, Gosling was down in Houston.

 6  Q.   Was that closed in 2013, if you know?

 7  A.   No, I don't know for certain.  I don't want to

 8  misspeak.

 9  Q.   Did you close Westpointe in 2013?  If you know?

10  A.   No, I don't recall a Westpointe.

11  Q.   Okay.  What about Bratton?

12  A.   Bratton was another stalled project.

13  Q.   Okay.  So that was not closed?

14  A.   I don't recall where exactly that one ended up.

15  Q.   So that could have closed?

16  A.   I don't recall exactly.  I don't want to

17  misspeak or mislead anybody.

18  Q.   Did Scenic Loop close in 2013?

19  A.   Scenic Loop was a deal in San Antonio.  Yes.

20  Q.   So yes?

21  A.   Yes.  Assuming it's '13.  I can't say for

22  certain, but I think it was.

23  Q.   The Park at Brushy Creek, 4A, 4B?  Did that

24  close in 2013?

25  A.   It closed, but I can't say it's '13.  It might
```

1  have been sooner than that.  But, yes, it did close.

2  Q.   It could have been, you're not sure?

3  A.   It did close.

4          MR. ANSLEY:  Okay.  Thank you, sir.

5          Pass the witness.

6          THE WITNESS:  Thank you.

7          MR. PELLETIER:  Briefly, your Honor.

8                  CROSS-EXAMINATION

9  BY MR. PELLETIER:

10 Q.   Mr. Dorney, my name is Paul Pelletier; I

11 represent Mr. Greenlaw.

12      So you did project-level loans, UDF III -- UDF

13 IV did project-level loans and UDF III made loans

14 and had been making loans to your business

15 enterprises, is that correct?

16 A.   UDF III did loan money, yes.

17 Q.   Yes.

18      And so when you were just talking with counsel

19 about project-level loans, you also have to

20 determine where your business is going in the

21 future, right?  To know whether or not you were

22 going to get loans this month, next month, next

23 year, right?

24 A.   Ask your question a different way.

25 Q.   Well, in other words, in determining how you're

1  going to run your business, you routinely, every two

2  weeks, look at future projects that you are going to

3  be acquiring or potentially acquiring to put in your

4  portfolio, right?  Buffington Land?

5  A.   You would always look at projects, not

6  necessarily every two weeks, but as they were

7  available.

8  Q.   Right.

9       And so we just talked about several projects

10 that you closed in 2013, right?

11 A.   Correct.

12 Q.   And that was part of your business, right?  You

13 were in Austin, a very vibrant home building market,

14 correct?

15 A.   I suppose so.

16 Q.   Suppose -- you're not aware that it's the

17 number 1 home building area in the country for

18 almost the past 10 years?

19 A.   Totally fine.  Yes.

20 Q.   Okay.

21      So you said that you had financed some other

22 loans.  So other institutions had financed loans,

23 not just UDF, correct?

24 A.   I don't recall saying that at this point, but

25 yes, that is the case.

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

| 4:21-cr-289-O | Vol 3 January 12, 2022 | Page 110 |
|---|---|---|

```
 1   Q.    You had other banks?

 2   A.    Yes.

 3   Q.    And they entered in 2013, 2014, correct?

 4   A.    We had -- yes.

 5   Q.    And did you tell any of those other banks that

 6   you couldn't pay your UDF loans?

 7   A.    To directly answer?  No.

 8   Q.    Now --

 9   A.    However.

10   Q.    -- you dealt with Mr. Jester and

11   Mr. Gilpatrick, correct?

12   A.    Yes.

13   Q.    As a matter of fact, Mr. Gilpatrick worked for

14   you, right?

15   A.    He did at one point.

16   Q.    Very, very competent fellow, wasn't he?

17   A.    Jeff was good.

18   Q.    Knew his job?

19   A.    He was good at finance, yes.

20   Q.    Did it well?

21   A.    I would say yes.

22   Q.    Honest and straightforward?

23   A.    I would say yes.

24   Q.    And you would say the same thing about all of

25   the people you worked with at UDF, wouldn't you?
```

```
 1  A.   I wouldn't say they weren't.  I wouldn't say
 2  they were.  I never even thought about it that way.
 3  Q.   You never thought about it?  All right.
 4       Now, took -- you talked about getting paid
 5  overhead, correct?
 6  A.   That was a discussion that was had between UDF
 7  and Buffington.  It wasn't a one-sided discussion.
 8  Q.   And those were discretionary payments by
 9  UDF III, right?  You knew they were discretionary,
10  right?
11  A.   Everything in the loan is discretionary for a
12  lender.
13  Q.   Once they give you the money, they give you the
14  money, right?  That's not discretionary.  But
15  overhead payments were discretionary, weren't they?
16  A.   I don't know how the documents were written.
17  Q.   Okay.
18       Now, it became a problem in 2012, when
19  Buffington Land finally gave the general ledger over
20  to UDF, isn't that correct?  When -- when it became
21  a problem with the overhead payments?  Do you
22  remember that?
23  A.   I'm not certain.  If you're referencing -- I'm
24  not sure what you're talking about.  You have to
25  give me some clarity.
```

1  Q.   Okay.  I will give you clarity, if I can.

2       So when you turned your general ledger over to

3  UDF, they learned that Patrick Starley was taking

4  airplane trips to the University of Texas games and

5  billing them to overhead, isn't that correct?

6  A.   That -- I know -- I don't know exactly what

7  they saw, but I know they weren't happy.  And I know

8  they could understand that.

9  Q.   So they weren't happy that their lender was

10 misspending their loan money, right?

11 A.   To -- yes.

12 Q.   And you knew they had investors and they have

13 fiduciary duties to investors, you know that, right?

14 A.   I wasn't doing anything --

15 Q.   I'm sorry.

16 A.   I don't understand your questions.  Why this

17 angle?

18 Q.   They have to protect their investor's money,

19 correct?

20 A.   Everybody should protect their investors's

21 money.

22 Q.   And when they found out that what they believed

23 was Patrick Starley was misspending the overhead,

24 they said, no more, correct?

25 A.   I don't know.  I wasn't in those conversations.

1          MR. PELLETIER:  I have no further

2   questions, your Honor.

3          MR. LEWIS:  No, thank you, Judge.

4          MR. STEPHENS:  No, sir, your Honor.

5          MS. EGGERS:  No redirect, your Honor.

6          THE COURT:  Okay.  Thank you.  You may

7   step down.

8          MS. EGGERS:  And if this witness may be

9   released, your Honor.

10          The Government would call Matt Parker.

11          THE COURT:  He needs to ...

12          Thank you.

13          THE WITNESS:  Thank you, sir.

14          MS. EGGERS:  The Government would call

15   Matt Parker.

16          THE COURT:  Could you raise your hand to

17   be sworn?

18          (MATT PARKER was duly sworn by the Clerk.)

19                  DIRECT EXAMINATION

20   BY MS. EGGERS:

21   Q.   Good afternoon.

22   A.   Good afternoon.

23          THE COURT:  Go ahead and drop the mask.

24   BY MS. EGGERS:

25   Q.   If you would, please state your name.

1  A.    Matthew Douglas Parker.

2  Q.    And, Mr. Parker, don't give us like the street

3  address, where generally do you live?

4  A.    Northern California.

5  Q.    About how long have you lived in northern

6  California?

7  A.    Since January of 2015.

8  Q.    And before that, did you live here in Texas?

9  A.    Yes.

10 Q.    And whereabouts in Texas?

11 A.    In Austin.

12 Q.    Were you ever employed at, I'll call it the

13 Buffington Land family of businesses or Buffington

14 Group?

15 A.    I was.

16 Q.    What position did you hold there?  And how long

17 were you employed there?

18 A.    I was the vice president.  I was employed from

19 approximately mid August of 2012 to mid April of

20 2014.

21 Q.    And explain to us, what you did in that role as

22 vice president?

23 A.    Yes.  I did several things.  I was -- I did

24 financial modeling.  So financial projections for

25 potential acquisitions and underwriting.

1        I did some portfolio-level cash flows, so

2   basically looking at these subdivisions that

3   Buffington owned and projecting what revenue we

4   would receive when we sold the lots to home

5   builders.

6   Q.   What is your educational background to be doing

7   this type of finance work like?

8   A.   Most recently, I have an MBA from the

9   University of Pennsylvania, the Wharton School in

10  real estate.  Prior to that, I have a masters in

11  urban planning from UCLA.  And I have an

12  undergraduate degree from Steven F. Austin in

13  environmental science.

14  Q.   And what other employment have you had over the

15  course of your career?

16  A.   I was an officer in the Marine Corps from 1995

17  to 2006.  I worked for a vineyard management and

18  acquisition company, in a similar role, like buying

19  and underwriting land deals, and I worked for a

20  couple of developers.

21  Q.   And so, you said one of the things that you --

22  your primary duties at Buffington was, did I hear

23  you say like pro formas or cash rolls or something

24  like that?  Explain that further.

25  A.   Yes.

1        So if we're looking at potentially acquiring a

2    new acquisition, I would project how much it would

3    cost to develop, how much revenue we would get when

4    we developed and sold the lots.

5        That was one function I had.

6        Another function I had was creating

7    portfolio-level cash flows of subdivisions, so

8    Buffington owned approximately 15 subdivisions and

9    we were buying more occasionally, and so I would

10   roll up -- roll those projects up into a monthly

11   cash flow.

12   Q.   So sort of all of the projects into one Excel

13   spreadsheet?

14   A.   That's correct, basically.

15   Q.   Did there ever come a point in time you were

16   asked to provide a cash roll spreadsheet or some

17   type of portfolio cash flow projection for

18   Buffington but to the entity UDF?

19   A.   Yes.

20   Q.   Tell us how that came about.

21   A.    I believe in the spring of '13, my boss, James

22   Dorney, emailed myself and another analyst, who did

23   a similar thing that I did, and said, that UDF

24   needed this for, I believe it was for an audit, and

25   asked us to -- or asked me to start working on it.

1        And we had kind of the basic bare bones of this

2    model, so I continued to work on it and refine it

3    over time.

4    Q.    Now, prior to that, and you said that was --

5    could it have been the spring of '14?  Was that --

6    we'll get to the emails in just a little bit.

7    A.    Yes.

8    Q.    But it was the spring time, is that right?

9    A.    Yes.

10   Q.    Prior to that, had you had involvement with the

11   lending relationship between UDF and Buffington?

12   A.    I was aware of it.  I was on many email chains.

13   Q.    And by becoming aware of it, did anything, I

14   mean, you knew what Buffington's finances were, you

15   were sort of the finance guy that you've been

16   describing, is that right?

17   A.    Yes.

18   Q.    Were you aware of Buffington's situation and

19   did you start to look into anything as it concerns

20   UDF?

21   A.    Yes.

22   Q.    Tell us about that and when you did that.

23   A.    There were really two main levels of concern.

24   One was the amount of debt that we were carrying

25   specifically related to the earlier vintage funds of

1    UDF and UDF III, given how much of collateral was

2    left in our various subdivisions.

3           And the other area of concern was that we were

4    refinancing loans that were with UDF I and III, we

5    were refinancing with UDF IV money, and I wasn't

6    sure of the function of that or how it would be paid

7    off in the end.

8    Q.   As a result of seeing that that's what

9    Buffington was doing, refinancing I and III, the

10   vintage funds with money from UDF IV, did you take

11   any steps or look into anything?

12   A.   Yes.

13   Q.   What did you look into?

14   A.   I took it upon myself to start looking into

15   UDF's SEC filings, 10-Ks and 10-Qs, trying to

16   understand more how they were looking at our loan

17   balances, and so I looked into it on my own.

18   Q.   And after you looked at those various filings

19   with the SEC, did you notify the Securities and

20   Exchange Commission as to what you had observed?

21   A.   Yes.

22   Q.   Sometimes people call that being a

23   whistleblower.

24          Are you a whistleblower, sir?

25   A.   Yes.

1  Q.   Now, do you recall when you made that

2  whistleblower complaint as it concerns UDF?

3  A.   December of 2013.

4          MR. PELLETIER:  I'm sorry.  I didn't hear

5  that.

6          MS. EGGERS:  December of 2013.

7          Now, your Honor, at this time I would ask

8  to introduce Government's Exhibit 117.

9          THE COURT:  117 will be admitted.

10         (The referred-to document was admitted in

11     Evidence as Government's Exhibit 117.)

12 BY MS. EGGERS:

13 Q.   Mr. Parker, I'm going to enlarge this.

14     This is an email dated March 18, 2014, from

15 you, is that correct?

16 A.   That's correct.

17 Q.   And it says:  "Attached is a summary and 5028

18 cash flow."

19     What is a 5028 cash flow?

20 A.   That was, I believe it was a loan number,

21 collateralized by the projects you see below it.

22 Q.   And it appears as though there was a

23 spreadsheet attached, is that correct?

24 A.   That's correct.

25 Q.   And is this one of those sort of a portfolio

 1  where you would bring everything together in one

 2  spreadsheet?

 3  A.    That's correct.

 4  Q.    And it has a date of February 28, 2014, is that

 5  correct?

 6  A.    Yes.

 7  Q.    And then down, listed there, there is projects

 8  listed, is that correct?

 9  A.    Correct.

10  Q.    And looking at those projects, the first one is

11  Bratton, is that correct?

12  A.    Yes.

13  Q.    And the last one is Westpointe?

14  A.    Yes.

15  Q.    It appears, since I highlighted them,

16  highlighting them like that, that appears to be

17  approximately -- or appears to be how many projects?

18  A.    Twenty-three.

19  Q.    And is this -- would this have been then the

20  spreadsheet that you would have sent to the folks

21  over at UDF, specifically Brandon Jester and Jeff

22  Gilpatrick on March 18, 2014?

23  A.    Yes.

24  Q.    So let's remember Westpointe being the last

25  one, okay?

 1        Now, this is after you have filed -- you have

 2   lodged the information with the SEC, is that

 3   correct?

 4   A.    That's correct.

 5   Q.    Did you tell anybody at UDF that you had gone

 6   to the SEC about what they -- what you observed?

 7   A.    No.

 8   Q.    No?

 9   A.    No.

10            MS. EGGERS:  Your Honor, at this time I

11   would ask to introduce Government's Exhibits 102 and

12   103.

13            THE COURT:  They will be admitted.

14            (The referred-to documents were admitted

15        in Evidence as Government's Exhibits 102 and

16        103.)

17   BY MS. EGGERS:

18   Q.    Now, that email that you were on, that went

19   from you to Buffington, the one we just saw, is that

20   correct?  117?

21   A.    I would have to look at the address list again.

22   But, yes, to Brandon, Jeff, cc, James and Blake.

23   Q.    And you're going to have keep your voice up.

24   When you look at the screen, your head turns away.

25        Let's then go to Government's Exhibit 102.

1          And this is an email dated March 25th, 2014, is

2    that correct?  Approximately a week later?

3              MR. ANSLEY:  Your Honor, objection.  It

4    appears the witness is not on this email chain.

5              THE WITNESS:  He's not what?

6              MR. ANSLEY:  He's not on this email chain.

7              THE COURT:  So the question was, this was

8    sent a week later?

9              MS. EGGERS:  Yes.

10             THE COURT:  He's not on this -- so how

11   does he have personal knowledge?

12             MS. EGGERS:  He would not, your Honor,

13   other than the spreadsheet.  And that's why I asked

14   to introduce it, and there was no objection.  So I'm

15   sorry, I didn't think there was going to be an

16   objection.  We have a custodian-of-record affidavit

17   for it.

18             THE COURT:  Do you object to the custodian

19   of record evidence?

20             MR. STEPHENS:  Your Honor, we would also

21   make a 403 and 401 objection.

22             MR. ANSLEY:  Your Honor, this

23   certification authenticates the exhibit but does not

24   establish --

25             MS. EGGERS:  Your Honor, if we may

 1   approach.
 2            THE COURT:  Bring that.
 3            (The following proceedings were had at
 4       sidebar without being reported:)
 5   BY MS. EGGERS:
 6   Q.   Mr. Parker, I'm going to go back to, I believe
 7   we were at Government's Exhibit 103.
 8        And you were not on this email, do you agree?
 9   A.   I agree.
10   Q.   And at the very end of it, you were not on it
11   at the very end of it either, do you agree?
12   A.   Agreed.
13   Q.   And this is one week after you sent
14   Government's Exhibit 117, is that correct?
15   A.   That's correct.
16   Q.   And it looks as though there were Excel
17   spreadsheets, attached?
18   A.   It looks as if that's the case.
19   Q.   And looking at this, sir, are you able to see
20   it in front of you?
21   A.   Yes.
22   Q.   Does it say Buffington Land Group Portfolio
23   Summary, February 28, 2014?
24   A.   That's correct.
25   Q.   And the first project listed there is what?

1  A.    Bratton.

2  Q.    And we get to project number 23, which we just

3  highlighted them, and does it have Westpointe there?

4  A.    That's correct.

5  Q.    So let's go below.

6        Were there 11 other names below the Westpointe,

7  which was the last one on yours?

8  A.    That's correct.

9  Q.    Westpointe.

10  Q.   Do you know who put those on there?

11  A.   No.

12        MS. EGGERS:  May I have on moment, your

13  Honor?

14        THE COURT:  Just for the record, at the

15  bench, all defendants objected to 103 on hearsay

16  grounds, 401 and 403 grounds, and after reviewing

17  the affidavit, I overruled those objections.

18        Is that sufficient?

19        MR. ANSLEY:  Yes, your Honor.

20        THE COURT:  For the record, our discussion

21  at the bench?

22        MR. STEPHENS:  Yes, sir, your Honor.

23        MR. PELLETIER:  Yes, your Honor.

24        THE COURT:  Okay.

25        MS. EGGERS:  Your Honor, at this time I

 1  would ask to introduce Government's Exhibit 128.

 2          THE COURT:  That will be admitted.

 3          (The referred-to document was admitted in

 4      Evidence as Government's Exhibit 128.)

 5  BY MS. EGGERS:

 6  Q.   Mr. Parker, I'm going to show you Government's

 7  Exhibit 128.

 8      Now, this is an email from you on April 2nd,

 9  2014, is that correct?

10  A.   That's correct.

11  Q.   And it looks as though there is a spreadsheet

12  attached?

13  A.   Correct.

14  Q.   And it's from you to Jeff Gilpatrick, is that

15  correct?

16  A.   Correct.

17  Q.   What is this?  This spreadsheet?

18  A.   It's a loan schedule.

19  Q.   Explain to us what that means.

20  A.   These are various loans.  So one of your

21  previous questions on an email was what did 5028

22  mean.

23      So if you look in row 6, you see loan number

24  5028 referenced.  And then in the fund is column E.

25  Q.   And so the fund, the lender for those would be

 1  the draws coming from UDF IV, those first that we
 2  see, is that correct?
 3  A.    That's correct.
 4  Q.    It is a six-month projected loan draw repayment
 5  schedule.
 6        So where are the draws and where is the
 7  repayment?
 8  A.    I would have to scroll down to see for sure,
 9  but I believe what we're looking at are the draws
10  and then the -- yeah.  If you look at where you're
11  at now below -- below row 40 is repayments.
12  Q.    Okay.  And this was another spreadsheet that
13  you would have sent, is that correct?
14  A.    It appears to be, yes.
15           MS. EGGERS:  If I may have one more
16  moment, your Honor.
17           Nothing further at this time, your Honor.
18                    CROSS-EXAMINATION
19  BY MR. PELLETIER:
20  Q.    Good afternoon, Mr. Parker.  My name is Paul
21  Pelletier.
22  A.    Good afternoon.
23  Q.    I represent Hollis Greenlaw.
24        First of all, thank you for your service.
25  A.    Thank you.

1   Q.   So before you worked for Buffington, had you

2   done any real estate development residential

3   financing in Texas business before?  Had you ever

4   been in the residential real estate financing in

5   Texas before you started working for Buffington?

6   A.   Not in that specific role.

7   Q.   I'm sorry?

8   A.   Not in that specific role that you described.

9   Q.   Okay.

10       And so what did Buffington Land do?

11  A.   We would basically buy raw land, so think about

12  a field, put in streets, entitlements, utilities,

13  and then sell lots to both the Buffington Home

14  Building Group, so an affiliated group and third

15  parties.

16  Q.   And you would obtain financing for that entire

17  process, correct?  When I say you, Buffington Land?

18  A.   Yes.  There was financing involved.

19  Q.   And you talked about entitlements.

20       Could you tell the Jury what entitlements are?

21  A.   An entitlement is basically the -- a

22  government-granted right to do something on a

23  project, such as build a home or subdivide it.

24  Q.   And when you started doing this for Buffington,

25  did you come to learn that entitlements were very

```
 1  valuable?

 2  A.    There's value.

 3  Q.    I'm sorry?

 4  A.    There is value.

 5  Q.    And in Texas, I'm going to call it, you know

 6  what a MUD is or a PID?

 7  A.    I'm familiar, yes.

 8  Q.    So a MUD is a municipal utility district?

 9  A.    Correct.

10  Q.    And a PID is a public --

11  A.    Public improvement district.

12  Q.    -- Improvement district, right?

13  A.    Correct.

14  Q.    They can add value of up to 15,000 or more

15  dollars per lot, isn't that correct?

16  A.    I'm assuming.  I don't recall the exact number.

17  I wouldn't want to attest to that.

18  Q.    Well, isn't that something you would have to

19  include in your pro formas because aren't you

20  projecting the amount of money that will be repaid

21  on those projects?

22  A.    That's part of it.

23  Q.    So it's very important, is it not, to

24  understand how much you are going to be reimbursed

25  for the PIDs and the MUDs and the entitlements that
```

1  Buffington Land put in and increased so much in

2  value of the property, that's important, right?

3  A.    I would agree with that.

4  Q.    And as it relates to Buffington, you said that

5  when you first got there, you determined that -- you

6  tried to find out what was going on with the loans

7  and how much -- how much they owed to UDF, is that

8  correct?

9  A.    It was not when I first got there, but it was

10  throughout my tenure there.

11  Q.    Well, I think -- did you not say that at some

12  point in time, maybe even your whistleblower

13  complaint to the SEC, that in about August of 2012,

14  you were assigned a project to determine that?

15  A.    Can you repeat the question?

16  Q.    Yes.

17        Did you not affirmatively say to the SEC that

18  in or about August, August through October of 2012,

19  after you started there, you were assigned the

20  project of determining the repayment of UDF loans?

21  A.    Yes.  That's part of what I did.

22  Q.    And did you not do an analysis, I'm going to

23  say on October 1st, 2012, and did that analysis show

24  that you believed that the UDF loan was under water

25  by 67 million.

1          Do you remember that?

2    A.   I don't remember that specifically, but that

3    sounds reasonable.

4    Q.   I'm going to show you Government's Exhibit --

5    excuse me -- Defendant's Exhibit 8247.

6              MS. EGGERS:  Your Honor, that's the same

7    objection as earlier.  The number itself is not --

8              THE COURT:  Go ahead and show it to him

9    and see if it at least refreshes his memory.

10   BY MR. PELLETIER:

11   Q.   I ask you if this helps.

12             MR. PELLETIER:  May I approach, your

13   Honor?

14             THE COURT:  Yes.

15   BY MR. PELLETIER:

16   Q.   If this helps refresh your recollection.

17        I apologize for the size of the print.

18             THE COURT:  The question is, does that

19   refresh your memory as to this subject?

20             THE WITNESS:  It refreshes my memory

21   somewhat.  I do recall this being involved with

22   this, but I don't recall the exact specifics.

23   BY MR. PELLETIER:

24   Q.   All right.  I get that.

25        But you did a project and you reported back by

 1  email -- correct me if I'm wrong -- that the UDF
 2  loan was under water by 67 million in October of
 3  2012.
 4       That's correct, right?
 5  A.   I don't have a specific recollection of
 6  reporting that number at that date, but if you say
 7  so and you have an email, then I'm not disagreeing
 8  with you.
 9            THE COURT:  No.  You should only testify
10  what you can recall now.  Testify to the best of
11  your ability.
12            THE WITNESS:  Yes, I recall that.  It
13  sounds reasonable.
14  BY MR. PELLETIER:
15  Q.   I'm sorry?
16  A.   That sounds reasonable.
17  Q.   Okay.
18       And that was in October, correct?
19  A.   Correct.
20  Q.   All right.
21       And then did you do another analysis -- and by
22  the way, what you're doing -- correct me if I'm
23  wrong -- is you're doing a -- an evaluation of
24  project-level loans.
25       You're evaluating the projects that are

1   currently on the ground, correct?  And the

2   repayments?

3   A.   That was part of the analysis.

4   Q.   Had you ever done these residential real estate

5   project level loans before October of 2001.  And

6   when I say that, had you ever done a pro forma on

7   residential real estate project loans before that?

8   A.   Not -- not exactly like this.

9   Q.   Okay.  And so you agree that the first -- the

10  first scrub you took at October was that there was

11  67 million under water.  And I'm going to ask you if

12  you recall in doing the same exercise in February

13  if -- if you recall doing the same exercise in

14  February of 2013, I'm going to say six months later?

15  A.   No.  I mean -- I worked on many projects.  I

16  don't recall the specific one, but if you have

17  something to refresh my memory.

18          THE COURT:  You said no, you don't recall.

19          Next question.

20  BY MR. PELLETIER:

21  Q.   If I showed you a document that might refresh

22  your recollection.

23          MR. PELLETIER:  Might I do that, your

24  Honor?

25

1            I'm going to show you Government's Exhibit
2   8240 for impeachment.  I'm sorry.  Defendants' 8240
3   for impeachment, your Honor.
4            May I approach, your Honor?
5   BY MR. PELLETIER:
6   Q.   Does this refresh your recollection that in
7   January you did the same exercise again and you came
8   up with a $323 million in arrearage number for that
9   UDF III loan?
10  A.   I vaguely recall this.
11  Q.   All right.
12            THE COURT:  Hold on.
13            So that does refresh your recollection as
14  to that subject on that day and those amounts?
15            THE WITNESS:  As to the general subject.
16            THE COURT:  Okay.  So let him ask you
17  another question.
18  BY MR. PELLETIER:
19  Q.   So did you do a project analysis in January
20  that arrived at a deficiency of a UDF loan six
21  months later at 360 million, around that number?
22  A.   You're asking specifically about the
23  spreadsheet?
24  Q.   I'm asking if you recall doing it and arriving
25  at that conclusion.

1  A.    Vaguely.

2  Q.    Okay.

3        Well, did you do it?

4             THE COURT:  What do you mean by that?  Is

5  that a yes?  Or --

6             THE WITNESS:  Well, I remember working on

7  the specific project.  But if you're asking me am I

8  100 percent sure that I produced this spreadsheet

9  that I have in my hand --

10             THE COURT:  No.  Stop.  That's not the

11  question about whether you produced that spreadsheet

12  or not.

13        The question just is, does that

14  spreadsheet refresh your recollection as to this

15  assignment at work on this occasion in these

16  amounts?

17        Does that spreadsheet trigger in your mind

18  a memory that you did this project on this date and

19  found these amounts?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.

22             MR. PELLETIER:  If we could pull up

23  Government's Exhibit 117, please.

24  BY MR. PELLETIER:

25  Q.   Now, this was shown to you earlier.  This is an

1   analysis that you did in it March 18th of 2014.

2        Do you see that?

3   A.    Yes.

4   Q.    And do you remember the prosecutor asking you

5   the question whether or not you had prepared this

6   pursuant to a -- she showed you a prior email that

7   said because -- because -- excuse me -- Jeff

8   Gilpatrick had asked, had asked you on March 6th --

9   I think the email will bear out the right date --

10  whether or not you could help him because he needed

11  to something for the auditors.

12       Do you remember that email?

13  A.    Yes.

14  Q.    I'm sorry if I got the date wrong.  It might

15  have been March 12th.

16       Isn't it true that you had already been

17  preparing this spreadsheet because you were doing an

18  evaluation of whether or not to renew the UDF III

19  loan, that you had already been working on?

20       As a matter of fact -- well, let me ask you

21  this first, I don't want to compound it.

22       Isn't that true?

23  A.    Again, I worked on many spreadsheets, I don't

24  remember the specific instance you're asking about.

25  Q.    Well, if you look at the attachment, it says,

1  BLG Portfolio NCF Summary, 2/28/14.

2      You had been working on that summary since

3  February 28th of '14, isn't that correct?

4  A.   I had been working on this specific project

5  that you're referencing.  Probably from before that.

6  Q.   So you will admit that Jeff Gilpatrick was

7  saying, I need it for the loan renewal, right?  And

8  he kept pestering you for it, isn't that correct?

9  A.   I do not recall.

10  Q.   Can we go to the spreadsheet that's attached?

11      Did you spreadsheet this out to say that this

12  loan to UDF III in 2 of '14 was going to owe more

13  than $4 billion?

14  A.   And when you say owe more than $4 billion,

15  you're referencing some point in the future?

16  Q.   Yes.

17  A.   Yes.

18  Q.   So you said that this loan was going to be

19  under water -- originally, a year earlier, a year

20  and a half earlier you said it was going to be under

21  water 67 million, and then 360 million six months

22  later, and then on 2/14 more than $4 billion,

23  correct?

24  A.   I don't think you're presenting it accurately.

25  Q.   Okay.

 1      Help me out.
 2 A.   Well, the first one you referenced, I'm not
 3 sure if that's equivalent to what we are talking --
 4 what you're talking about in 2 and 3.  I would have
 5 to have a pretty detailed look at the spreadsheet
 6 support.
 7      And then with -- between 2 and 3, the
 8 $4 billion, I believe you're referencing a date many
 9 years in the future where after decades or years, if
10 not decades of interest accrual from my memory.  But
11 you would have to look at the later dates in the
12 spreadsheet.
13 Q.   So I think what you're saying, and correct me
14 if I'm wrong, that that's not a realistic date or
15 amount because that's presuming that there are no
16 payments made on the loan, right?
17 A.   That's not correct.  You're -- there are
18 payments in the top half of the spreadsheet.
19 Q.   All right.
20      So if no other business is done by UDF -- by
21 Buffington?
22 A.   I can't speculate on what other business you're
23 proposing.
24 Q.   I'm not proposing any business.
25      What was Buffington in the business of doing?

1  I thought you said it was developing land and

2  acquiring assets, land to build developments.  Isn't

3  that what they were in the business of?

4  A.    That's correct.

5  Q.    And so as a matter of fact, in 2013, they added

6  seven projects to the portfolio, correct?

7  A.    I don't recall how many were added in '13.

8  Q.    All right.

9      Well, if -- if the evidence in this case shows

10  or will show that they added seven projects --

11          MS. EGGERS:  Objection, your Honor.

12  Counsel is testifying.  The witness just said he

13  didn't recall.

14          MR. PELLETIER:  I will withdraw the

15  question.

16          THE COURT:  Okay.

17  BY MR. PELLETIER:

18  Q.    Does seven sound right?

19  A.    Seven sounds approximately right.

20  Q.    All right.

21      So the business of Buffington was to acquire

22  projects to build them and use those projects, the

23  funding of those projects and the revenue from those

24  projects to repay UDF's loans, isn't that the way is

25  worked?

 1  A.    That's correct.

 2  Q.    And you know that as it relates to determining

 3  what -- whether a company can repay its bills,

 4  future acquisitions are very important, because your

 5  business isn't going to end at the end of this

 6  fiscal year, right?  The business is going to

 7  continue, isn't that correct?

 8  A.    You're asking me if their business is going to

 9  continue?

10  Q.    Yes.

11  A.    Presumably.

12  Q.    And so when you're trying to determine whether

13  a project level loan can be paid, that's one thing.

14  When you're trying to determine whether an

15  enterprise loan, like UDF III was, which relies upon

16  the continuation of your business, that's a

17  different model, isn't it?

18  A.    There are differences in modeling that, that's

19  correct.

20  Q.    And so as it relates to these projections, and

21  as it relates to exactly what is going on, in 2012,

22  December, you filed a whistleblower complaint?

23  A.    No, '13.

24  Q.    I stand corrected.  2013.

25        In December, you filed a whistleblower

 1  complaint with the SEC, correct?

 2  A.   Correct.

 3  Q.   And in that whistleblower complaint, you

 4  said -- by the way, did you ever tell anyone at UDF

 5  that -- that you believed that UDF -- that

 6  Buffington couldn't pay UDF's UDF III loan, and if

 7  so, who did you tell?

 8  A.   I did not tell anybody.

 9  Q.   And so in December of 2013, you filed the

10  whistleblower complaint.  And then in July of 2020,

11  you called up Special Agent Edson, didn't you?

12  A.   I don't recall.  Possibly.

13  Q.   And you asked whether or not you were going to

14  get your money from the whistleblower complaint,

15  isn't that correct?

16  A.   Possibly.

17  Q.   And then I want to say about six months later,

18  that was in July of 2020?

19          MS. EGGERS:  Your Honor, can we approach?

20          THE COURT:  You may.

21          (The following proceedings were had at

22      sidebar without being reported:)

23          MR. PELLETIER:  May I have one moment,

24  your Honor?

25          I have no further questions, your Honor.

```
 1              MR. STEPHENS:  Thank you, your Honor.
 2                      CROSS-EXAMINATION
 3   BY MR. STEPHENS
 4   Q.   Mr. Parker, my name is Neal Stephens.  I
 5   represent Ms. Obert.
 6        How are you?
 7   A.   Well.
 8   Q.   In December of 2013, when you raised this
 9   whistleblower issue with the SEC, who were you
10   working for at Buffington?
11   A.   My direct boss was James Dorney.
12   Q.   Did you work with Patrick Starley?
13   A.   Not at that point in time.  But I did when I
14   first started at Buffington.
15   Q.   So you knew Mr. Starley?
16   A.   Yes.
17   Q.   Have you ever told Mr. Starley that you filed
18   with the SEC?
19   A.   No.
20   Q.   In December of 2013, is it your testimony that
21   you had any conversations at all with Mr. Starley
22   about the SEC?
23   A.   Correct.
24   Q.   You had no conversations is what your testimony
25   is?
```

 1  A.   Correct.

 2            MR. STEPHENS:  Thank you.

 3            MR. LEWIS:  No, sir, thank you.

 4            MR. ANSLEY:  No questions, your Honor.

 5            MS. EGGERS:  Yes, your Honor, just very

 6  briefly.

 7                    REDIRECT EXAMINATION

 8  BY MS. EGGERS:

 9  Q.   The email that you sent, Mr. Parker, it was

10  dated March 18 of 2014, is that correct?

11  A.   That's correct.

12  Q.   And then going to -- that's Government's

13  Exhibit 117.  Let's go to Government's Exhibit 127.

14       This is the one with you earlier, but who --

15  what is the date of this email right here, 127 and

16  the part that I have enlarged?

17  A.   March 12, 2014.

18  Q.   And who is listed as having written the email?

19  A.   Brandon Jester.

20  Q.   And does he say:  "Following up on the status

21  of the updated cash flow for Buffington Land 1 and

22  3"?

23  A.   Correct.

24  Q.   I need to make sure I receive this on Friday as

25  previously requested?

1  A.    Correct.

2  Q.    Our auditors have now requested this same

3  information and I'm obligated to provide this on

4  Monday morning.

5        Is that correct?

6  A.    Yes.

7  Q.    Please ensure that we receive this information

8  on time.  Is that correct?

9  A.    That's correct.

10 Q.    Do you have a crystal ball or something,

11 anything like that?

12 A.    No.

13 Q.    Did you know at the time that somebody had

14 manipulated your spreadsheet and added things to

15 your --

16        MR. PELLETIER:  Objection, your Honor.

17        THE COURT:  What is the objection?

18        MR. ANSLEY:  Leading.

19        MR. PELLETIER:  Leading; facts not in

20 evidence.

21        THE COURT:  Okay.  I'm going to strike the

22 crystal ball question, but overrule the objections

23 to did you know anyone had edited your spreadsheet.

24        THE WITNESS:  I did not know.

25

 1  BY MS. EGGERS:

 2  Q.   And the complaint that you filed, that was with

 3  the SEC, is that correct?

 4  A.   That's correct.

 5  Q.   And this female to my right, immediate right,

 6  that is Special Agent Christine Edson with the FBI,

 7  is that correct?

 8  A.   That's correct.

 9           MS. EGGERS:  No further questions, your

10  Honor.

11           MR. ANSLEY:  Your Honor, follow up?

12           THE COURT:  Yes.

13           MR. ANSLEY:  Will you pull that same

14  exhibit up again, please?

15           Try 127.

16                    CROSS-EXAMINATION

17  BY MR. ANSLEY:

18  Q.   Okay.

19      Do you see that again, Mr. Parker?

20  A.   Yes.

21  Q.   After this email exchange, Jeff Gilpatrick sent

22  you an email in which he included an updated pro

23  forma spreadsheet based on what you had sent him?

24  A.   I would have to see the email and spreadsheet

25  to confirm or deny that.  I mean, I don't remember

 1  the specific email you're referencing.

 2  Q.   You don't dispute -- well, you don't remember

 3  one way or the other whether that happened, is that

 4  correct?

 5  A.   What's your question?

 6  Q.   You don't recall one way or the other receiving

 7  an email after that, this date, with an updated

 8  spreadsheet from Jeff Gilpatrick?

 9  A.   No.

10  Q.   Okay.

11            MR. ANSLEY:  Thanks, sir.

12            THE COURT:  Okay.  Anything else?

13            MS. EGGERS:  No, your Honor.  This witness

14  may be released.

15            THE COURT:  Any objections to that?

16            MR. PELLETIER:  Yes, absolutely.

17            MR. STEPHENS:  No objection.

18            MR. LEWIS:  No objection.

19            THE COURT:  Okay.  So you are free to go.

20  And we will take our afternoon break.  So why don't

21  we take about a 10-minute break and stretch your

22  legs, et cetera.  Then we will get you right back

23  in.

24            THE COURT SECURITY OFFICER:  All rise.

25            (The jurors exited the courtroom.)

```
 1                    (Thereupon, a recess was taken, after
 2          which the following proceedings were held:)
 3                    THE COURT:  Please be seated.
 4                    MS. EGGERS:  Casey Ford, your Honor.
 5                    (CASEY FORD was duly sworn by the Court.)
 6                    THE COURT:  Yes, okay.
 7                    THE COURT SECURITY OFFICER:  All rise.
 8                    (The jurors entered the courtroom.)
 9                    THE COURT:  Okay.  Please be seated.  And
10   this witness has previously been sworn in.
11                    MS. JONES:  Thank you, your Honor.
12                          DIRECT EXAMINATION
13   BY MS. JONES:
14   Q.    Please state your name for the record.
15   A.    Casey Ford.
16   Q.    I'm going to need you -- can you pull the
17   microphone a little closer to you, please?
18         Thank you.
19         Mr. Ford, what do you do?
20   A.    I'm a CPA.
21   Q.    And how long have you been a CPA?
22   A.    Since 2007.
23   Q.    Where do you currently work?
24   A.    At HCVT at the public accounting firm.
25   Q.    Now, where did you work prior to there?
```

```
 1  A.   Centurion American.   Prior to that I was at

 2  Ernst & Young.

 3  Q.   And are you, I think you said, you're a

 4  licensed CPA?

 5  A.   Yes.

 6  Q.   So have you done accounting work your whole

 7  career?

 8  A.   Yes.

 9  Q.   Where did you obtain your bachelor's degree?

10  A.   Baylor University.

11  Q.   And how long have you been a CPA?

12  A.   Since 2007.   In the state of Texas.

13  Q.   Now, how long did you work at Centurion?

14  A.   From 2012 to around July 20th of 2015.

15  Q.   Are you familiar with United Development

16  Funding otherwise known as UDF?

17  A.   Yes.

18  Q.   Did you have a relationship with them when you

19  worked at Centurion?

20  A.   Yes.

21  Q.   What was Centurion's relationship with UDF?

22  A.   Centurion's relationship was, we developed land

23  and would obtain loans from UDF to help fund the

24  development of the land for residential lots.

25  Q.   What was your position at Centurion?
```

1  A.   I started off as the tax manager and then was

2  promoted to the CFO role towards the end of 2012.

3  And that's when I left, I was the CFO.

4  Q.   What year did you leave again?

5  A.   2015.

6  Q.   And during that time that you were at

7  Centurion, did you -- did you become familiar with

8  the UDF loans that Centurion had?

9  A.   Yes.

10  Q.   Now, did they have loans with different UDF

11  funds or just one?

12  A.   Multiple funds, UDF III and UDF IV, and I

13  believe UDF V was coming on line, but I don't quite

14  remember if that was on line at the time.

15  Q.   When you were there, towards the end of '14 and

16  '15, approximately how much, if you recall, were the

17  total amount of the loans at Centurion had with UDF?

18  A.   Around 600 to 700 million.

19  Q.   And Centurion is located where?

20  A.   Carrollton/Farmers Branch.

21  Q.   And do they do developments in other places

22  besides the Dallas area?

23  A.   Yes, all across the state of Texas.

24  Q.   You said the total was about 6- to 700 million

25  when you were there?

```
 1  A.    Correct.
 2  Q.    As CFO, did you have the opportunity to review
 3  some things on those loans and have an idea of how
 4  those loans worked?
 5  A.    Yes.
 6  Q.    Are you familiar with if those loans allowed
 7  for overhead to be funded at Centurion?
 8  A.    Yes.
 9  Q.    And tell me -- the jury how that works.
10  A.    So the way it would work was we would have
11  monthly meetings with my boss and his boss and a
12  couple of other individuals, and we would have
13  monthly meetings to see what we needed to draw down
14  on the loan to pay for the infrastructure, putting
15  roads in, utilities, paying property taxes, other
16  expenses.  Payroll was another thing.  We had a
17  management fee agreement where we could pull -- it
18  was roughly $85,000 biweekly, so we could fund
19  payroll as well.
20  Q.    Now, when you would fund payroll, did that come
21  out of a specific project loan or was it a general
22  loan?
23  A.    Originally, it would have been UDF's general
24  loan, because UDF III was more of a general loan
25  where it funded several developments, several
```

1  builds.

2      And then down the road, my recollection is

3  UDF IV had deal-specific loans, so then we would

4  have funded off deal-specific loans.  I couldn't

5  tell you exactly which loan it did, though.

6  Q.   When you say "deal-specific loans," can you

7  tell the Jury what that means?

8  A.   Correct.

9      So -- so the UDF III, the loan, it was a

10 general loan, it would fund multiple deals so you

11 had deals 1 through 20, you could pull off that loan

12 and then fund those specific deals to fund the

13 infrastructure, payroll, everything I just talked

14 about.

15     "Deal specific" means that loan should be only

16 utilized for that specific deal.  So say we added

17 Deal 11 down the road, then Loan No. 2 could only go

18 to Deal No. 11.

19     Then we added another deal, say Deal 12, then

20 Loan No. 3 could only go to Deal 12.

21 Q.   Did you have multiple projects going at one

22 time that UDF was a lender for?

23 A.   Yes.

24 Q.   Now, are you familiar with the term "a draw

25 request" on those loans?

1    A.    Yes.

2    Q.    Can you tell the Jury how that would work?

3    A.    So the draw request was, we would do the

4    monthly meetings, see what bills we needed to pay,

5    what we needed to fund.  Then our accountants would

6    send the draw requests to UDF.  They would review

7    it, pull down the funds, and then remit the money to

8    Centurion to pay their bills.

9    Q.    Now, so when, say, somebody that poured

10   concrete at one of these projects, how would they

11   get paid?

12   A.    They would invoice the Centurion entity that

13   they did the work for.  We would have a monthly

14   meeting, draw down the loan, and then pay -- with

15   the monies we received off the loan from UDF, we

16   would then take that money, and turn around and pay

17   that invoice to the concrete vendor.

18   Q.    So would Centurion send the invoice to UDF and

19   ask for the money to be withdrawn?

20   A.    Yes.  They would review it, make sure it was a

21   legitimate expense.

22   Q.    Was there ever a time when there were draw

23   requests and that wasn't the process?

24   A.    Yeah, there were times when UDF would actually

25   approach us for a draw.

1  Q.   Did you notice anything about the timing of

2  those requests?

3  A.   Yes.  Usually it was around when distributions

4  had to go out to the investors.

5  Q.   Now, when you say they would approach you, what

6  do you mean by that?

7  A.   TPG would approach Centurion and want to

8  discuss how to make certain draws to fund -- to fund

9  whatever they needed to fund.  And usually that

10  would happen right around when the investors had to

11  get paid.

12  Q.   And when they would approach you, and you're

13  saying on a draw, give a scenario of what you mean

14  by that, like what they would do.

15  A.   I know towards -- towards the end -- so we

16  would also have meetings every once in a while --

17  once a week with UDF.  And I recall a few times

18  after the meetings, in the hallways, I think it was

19  either -- I want to say it was Ben Wissink would ask

20  Mehrdad Moayedi, who he was the owner of Centurion,

21  hey, we have distributions that we need to get out.

22  Can we discuss, you know, doing a certain loan?

23      I don't know all the details, because then they

24  would go into a back office meeting, and then hash

25  it out there.  And then usually a draw would occur.

1    Q.    Now, you said Mehrdad Moayedi.  What is his

2    position?

3    A.    He was the chief executive officer and the

4    owner of Centurion.

5    Q.    Are you aware if he had personal guaranties

6    associated with the loans?

7    A.    Yes, he had $10 million of personal guaranty

8    for the loans at UDF.

9    Q.    Now, did there ever come a time that you were

10   concerned about Centurion's ability to pay back that

11   6- to 700 million?

12   A.    Yes.

13   Q.    And why was that?

14   A.    Because the loans were so substantial, I didn't

15   see how it was viable for the business to pay them

16   back.

17         And, additionally, I would have conversations

18   with Tyson Walter and Jeff Shirley, where they had

19   mentioned in passing that there was no way that we

20   could pay the loans back, so that was very

21   concerning with me.

22   Q.    And were you familiar with cash flow

23   projections that say Mr. Walter would do for the

24   loans and the projects at Centurion?

25   A.    Yes, my understanding, he was one of the

1  analysts and helped with the loan process for UDF,

2  and he specifically said that there's no way we can

3  pay this back.  The only way you could ever pay

4  these loans back is if you stopped accruing

5  interest.

6        Well, the notes say you have to accrue interest

7  and the rate was pretty substantial.

8  Q.   How much was the interest, if you recall?

9  A.   They were generally between 16 and 20 percent.

10 Q.   Now, you said earlier --

11          MS. JONES:  Your Honor, I will move to

12 admit 260 into evidence.  Government's Exhibit 260

13 into evidence?

14          THE COURT:  260 will be admitted.

15          (The referred-to document was admitted in

16     Evidence as Plaintiff's Exhibit 260.)

17 BY MS. JONES:

18 Q.   Now, you can see 260 is up on the screen.

19      What is 260?

20 A.   This is an email of me sending Tyson Walter a

21 request for payroll funding on Monday, January 6,

22 2014.

23 Q.   When you -- you said Tyson Walter.  Was he one

24 of the asset managers for UDF?

25 A.   Yes.

1   Q.   And is this -- when you say "payroll," is that

2   the overhead expense that we were talking about

3   earlier?

4   A.   Correct.

5   Q.   And so this week is payroll and it will need to

6   be funded.

7        What are you asking?

8   A.   Basically I'm asking to please draw off your

9   line of credit that we have.  I don't know what

10  specific line you're going to draw it off of, and

11  please fund us the money so we can pay or employees.

12  Q.   Did you say pay the employees?

13  A.   Pay our employees, correct.

14  Q.   You trailed off a little bit --

15  A.   I'll do better.

16  Q.   I was just making sure.

17       May I have just a moment, your Honor?

18            THE COURT:  Yes.

19            MS. JONES:  Pass the witness.

20            MR. ANSLEY:  Yes, sir.

21                 CROSS-EXAMINATION

22  BY MR. ANSLEY:

23  Q.   Good afternoon, sir.

24  A.   Good afternoon.

25  Q.   You said you were the CFO for Centurion

1  American for, it looks like, about three years?

2  A.    Yes.

3  Q.    And during that time period, did you -- did you

4  work with first, Linda Visser?

5  A.    Yes.

6  Q.    What was her position at Centurion?

7  A.    She's was a controller.

8  Q.    Is she still there, if you know?

9  A.    I don't know.

10  Q.    What about Renee Mueller?

11  A.    She was an accountant.

12  Q.    Okay.

13        In the same division, the same section as

14  Ms. Visser?

15  A.    Yes.

16  Q.    You talked about at least Centurion's lending

17  relationships a little bit, and which included UDF.

18        Would -- who were the people within Centurion

19  who were responsible for handling Centurion's

20  lending relationships with outside lenders?

21  A.    Jeff Shirley.  He was the main point of contact

22  for UDF and with Centurion, to put all of the loans

23  in place that UDF -- he previously even worked at

24  UDF.

25        We also had a few other -- I want to say his

```
 1  name was Dustin.  I don't recall his last name.

 2  Q.   Does the name Dustin Warren ring a bell?

 3  A.   Yeah, Dustin Warren.

 4  Q.   Dustin Warren?

 5  A.   Yes, sir.

 6       Yes, he helped put in loans in place.  I helped

 7  on the 2M side, which is a different portion of the

 8  company.  So I helped put maybe five loans in place,

 9  as I recall.

10  Q.   Got it.  What about -- I'm sorry.

11       Go ahead.

12  A.   And then it was either Elaine or Eleanor.  We

13  hired her --

14  Q.   Does the name Elaine Edinger ring a bell?

15  A.   That's correct.  That's the name.

16  Q.   So from the standpoint of -- to summarize, from

17  the standpoint of Centurion's relationships with

18  outside lenders, handling those relationships,

19  interacting, you're not -- you're not part of the

20  group?

21  A.   I was not the main point of contact, that's

22  correct.

23  Q.   Talking about UDF -- UDF's loans, you mentioned

24  this a little bit on direct, during the time that

25  you were with Centurion, there was a UDF III loan
```

 1  that Centurion had?

 2  A.    Correct.

 3  Q.    And there was a UDF IV loan that Centurion had?

 4  A.    Correct.

 5  Q.    And you think V may have been on line?

 6  A.    Yeah, I don't recall if that fund came on line.

 7  Q.    As I understand what you told us about III and

 8  IV, III was -- I think you described it as a master

 9  loan, is that correct?

10  A.    Correct, yeah.  It was a loan where you could

11  pull off for several different deals.

12  Q.    Okay.

13        And that may be the answer, but when you say

14  "master loan," what exactly do you mean by that?

15  A.    By that I mean, say you have a master loan for

16  $100 million.  You could pull off $100 million and

17  fund anything for Deals 1 through 10.

18  Q.    Then with IV, was that a project-specific loan?

19  A.    Yes.  They were the ones I was saying were deal

20  specific, the same thing.

21  Q.    And the same question there, what's, to the

22  extent that you know, a project-specific loan?  What

23  do you mean by that with IV?

24  A.    That you can only pull off that specific loan

25  to pay expenses for that specific project.

 1  Q.   Meaning that there are different purposes, at a

 2  high level, different purposes for UDF III loan

 3  versus UDF IV loan?

 4  A.   Correct.

 5  Q.   And then if V is on line while you were there,

 6  was UDF V also a project-specific loan?

 7  A.   I don't know.

 8  Q.   Okay.

 9       Your contact with UDF personnel was pretty

10  limited, wasn't it?

11  A.   Correct.

12  Q.   And by that I mean, very few interactions with

13  them directly.

14  A.   Right.

15       I think I had some emails to Tyson, Ben Wissink

16  for a few fundings here or there.  I think I copied

17  them on the payroll emails.  Because I just saw that

18  in the exhibit.  I had limited contact.

19  Q.   I'm sorry.  Limited contact?

20  A.   Limited contact, yes, sir.

21  Q.   In looking at those, the loans with UDF, you

22  talked about on direct examination, about -- I

23  guess, first of all, Centurion submitting draw

24  requests to UDF.

25       Do you recall that?

1  A.    Yes.

2  Q.    And as I understand it, this draw request that

3  you described, they're for, you know, things like

4  payroll, different types of overhead expenses, is

5  that correct?

6  A.    Correct.

7  Q.    And then you also talked about receiving

8  sometimes draw requests where Centurion received

9  those from UDF?

10  A.    Those weren't actual emails.  They were just

11  conversations I heard and was there and witnessed.

12  Q.    Okay.

13      Were there any conversations where you knew

14  what the types of draws; we have got the payroll

15  requests and the overhead request going from

16  Centurion to UDF.

17      Did you hear anything about the details of what

18  the -- these other draws that would -- requests

19  would be coming from UDF to Centurion, anything

20  about the character of what those would be?

21  A.    Yes.  They had distributions they had for

22  investors and wanted to discuss potentially doing a

23  draw of the loan.

24  Q.    Yes.  So it's not for overhead?

25  A.    It's not for overhead.

1   Q.   It's not for payroll?

2   A.   Not for payroll.

3   Q.   It's not for keeping the lights turned on or

4   for helping to pay for an engineer on a project, is

5   it?

6   A.   Correct.

7   Q.   It is instead more loan level as opposed to

8   project level?

9   A.   Correct.

10  Q.   Did you ever see -- I think you answered

11  this -- did you ever see draw requests coming from

12  UDF or Centurion, or simply hear people talking

13  about it?

14  A.   I witnessed them talking about it.

15          MR. ANSLEY:  Your Honor, at this time the

16  defense moves for admission of Defense Exhibit 3907.

17          THE COURT:  Okay.  That will be admitted.

18  3907.

19          MR. ANSLEY:  Thank you, your Honor.

20          (The referred-to document was admitted

21      into Evidence as Defense Exhibit 3907.)

22  BY MR. ANSLEY:

23  Q.   Sir, on the screen, do you see what that

24  document is, a loan agreement, there at the top?

25  A.   Yes.

1  Q.   And that's a UDF -- you can see at the top it's

2  Shahan Prairie UDF V loan, 9005.

3       Do you see that?

4  A.   Yes.

5  Q.   And there are multiple individuals and entities

6  named.  Do you see in the first paragraph reference

7  to first the company CTMGT towards the bottom?

8  A.   Correct.

9  Q.   And who is that?  Or what is that?

10  A.   Yes, I see CTMGT LLC.

11  Q.   And is that the holding company for Centurion

12  American, for lack of a better term?

13  A.   Yes, that was a holding company for Centurion

14  American for -- for developments they did with UDF.

15  Q.   Okay.  And we see Mehrdad Moayedi, who you

16  mentioned on direct as well.

17  A.   Yes.

18  Q.   And he was the president and CEO of Centurion

19  as well?

20  A.   Correct.

21  Q.   And he still is?

22  A.   Yes, to the best that I recall.

23  Q.   Do you show anything about the Shahan Prairie

24  loan agreement here?  Any direct --

25  A.   Not that I recall.

```
 1              MR. ANSLEY:  Turn the page, if you would,
 2   Paige -- page 11, please.  If we highlight there at
 3   the bottom the last paragraph.
 4   BY MR. ANSLEY:
 5   Q.   Read with me, sir, and tell me if I read this
 6   right:  "Discretionary advances lender" -- and this
 7   agreement defines lender as UDF -- "is authorized
 8   from time to time to make advances without notice to
 9   borrower if lender, in its sole discretion, deems
10   necessary or desirable upon the occurrence of," and
11   then it mentions a number of different types of
12   events.
13        Do you see where I just read?
14   A.   Yes.
15   Q.   And in this agreement, borrower would be -- we
16   looked at the first page -- borrower is either CTMGT
17   or some -- it's a Centurion American entity?
18   A.   Yes.
19   Q.   And as I read this, this means the lender, UDF
20   can, and it has the discretion contractually to
21   initiate, on its own, draw requests directed to
22   Centurion American.
23   A.   That's how it reads to me.
24   Q.   In it's sole discretion is how it reads as
25   well, right?
```

1  A.   Yes, it says:  In its sole discretion.

2           MR. ANSLEY:  Thank you, sir.

3           Pass the witness.

4           MR. LEWIS:  A couple of questions, Judge.

5  Thank you.

6           THE COURT:  Thank you.

7                   CROSS-EXAMINATION

8  BY MR. LEWIS:

9  Q.   Mr. Ford, you knew Ty Walter from UDF?

10 A.   Yes.

11 Q.   He came him over and worked at Centurion for a

12 while?

13 A.   My understanding is he was employed by UDF, but

14 he would be in our offices quite a bit.

15 Q.   That's right.

16      And you became friends with him, correct?

17 A.   Yes.  I mean, I didn't go out and have a beer

18 with him after work, but I liked working with him.

19 Q.   That's right.

20      You helped him get a loan from Mr. Moayedi,

21 right?

22 A.   I don't recall doing that.

23 Q.   A $25,000 loan?

24 A.   I don't remember.

25 Q.   Are you saying it didn't happen or you just

```
 1   don't --
 2   A.   I don't recall that happening.  It could have
 3   happened.
 4   Q.   It could have happened?
 5   A.   It could have.
 6   Q.   Okay.
 7        But you weren't involved in it, if it did
 8   happen, is that what you're telling the jury?
 9            MS. JONES:  Your Honor, objection,
10   speculation.  He said he doesn't recall.
11            MR. LEWIS:  I believe he said it might
12   have happened.
13            THE COURT:  Overruled.
14            THE WITNESS:  Can you repeat the question?
15            MR. LEWIS:  Yes.
16   BY MR. LEWIS:
17   Q.   Are you saying that it didn't happen or you
18   just don't recall it happening?
19   A.   I'm saying I don't recall it happening.
20   Q.   But it could have.
21   A.   But it could have.
22   Q.   Okay.
23        Were you aware of whether or not Mr. Walter had
24   a temper management problem at the times he was at
25   Centurion?
```

```
 1  A.    I'm not aware of that.

 2  Q.    You didn't hear about him hitting the wall and

 3  putting a hole in the wall?

 4  A.    No.

 5              MR. LEWIS:   Thank you.

 6              THE COURT:   Mr. Stephens?

 7              MR. STEPHENS:   I'm sorry.  No, your Honor.

 8              MS. JONES:   Thank you, your Honor.

 9                  REDIRECT EXAMINATION

10  BY MS. JONES:

11  Q.    Mr. Ford --

12              MS. JONES:   Can we have defense

13  Exhibit 3907 again, please?

14  BY MS. JONES:

15  Q.    While they're pulling that up, I have another

16  question for you.

17        So you were saying earlier that you left

18  Centurion when?

19  A.    Right around July 20, 2015.

20  Q.    And at that time was the loan 600 to

21  700 million?

22  A.    Yes.   That's what I recall it being, yes.

23  Q.    And Centurion is in the development business?

24  A.    Yes.

25  Q.    Approximately how much of Centurion's
```

1    residential development did UDF have, like, the

2    percentage of their loans?

3    A.    I would say anywhere between 70 and 80 percent

4    of the loans that we had were with UDF.

5                    MS. JONES:  And are we ready on 3907?

6                    Can I please have Defense 3907 again?  May

7    I borrow that?

8                    May I approach, your Honor?

9    BY MS. JONES:

10   Q.    This is the exhibit that was just admitted.

11        If you can look at this top section, what day

12   was that loan agreement executed?

13   A.    The 9th day of June 2015.

14   Q.    And so at the time that this loan agreement was

15   executed, Centurion owed 600 to $700 million on the

16   loan to UDF?

17                   MR. LEWIS:  Objection, leading.

18   BY MS. JONES:

19   Q.    Is that right?

20                   THE COURT:  Overruled.

21                   THE WITNESS:  Correct.

22   BY MS. JONES:

23   Q.    And I'm sorry.  Can you answer?

24   A.    Yes.  That's correct.

25   Q.    Thank you.

1      And at some point did you have a discussion

2  with the FBI?

3  A.   Yes.

4  Q.   Did you explain to them what we've talked about

5  today?

6  A.   Yes.

7  Q.   Approximately when was that?

8  A.   I would say it was -- I left around --

9  July 20th.  I probably spoke with them two or three

10  days before that.

11  Q.   So the loan agreement signed on the 9th day of

12  June 2015, somewhere around July 20th, within a few

13  days of that of 2015, you spoke to the FBI and

14  shortly after that is when you left Centurion?

15  A.   Correct.

16           MS. JONES:  Thank you.

17           I will pass the witness.

18           MR. ANSLEY:  No, your Honor.

19           MR. STEPHENS:  No.

20           MR. LEWIS:  No.

21           MR. PELLETIER:  No, your Honor.

22           THE COURT:  Okay.  You may step down.

23  Thank you.

24           MS. JONES:  Your Honor, may this witness

25  be released?

```
 1                    MR. ANSLEY:  Yes.

 2                    MR. STEPHENS:  Yes, sir.

 3                    MR. PELLETIER:  Yes.

 4               THE COURT:  Okay.  Yes.

 5               MS. LYONS:  The Government calls Tyson

 6   Walter.

 7               THE COURT:  Would you raise your hand to

 8   be sworn.

 9               (TYSON WALTER was duly sworn by the

10          Court.)

11               THE COURT:  Sir, you can take off your

12   mask, if you're comfortable, so the court reporter

13   can hear you.

14               THE WITNESS:  Thank you.

15                    DIRECT EXAMINATION

16   BY MS. JONES:

17   Q.   Please state your name for the record.

18   A.   Tyson Walter.

19   Q.   Mr. Walter, how old are you?

20   A.   43.

21   Q.   And do you currently work?

22   A.   No, I do not.

23   Q.   Can you move that microphone just a little bit

24   closer to you so they can hear you?

25   A.   No, I do not.
```

```
 1   Q.    I think the base will move.

 2   A.    It's at the edge.

 3   Q.    Okay.  All right.

 4         And so you currently do not work.

 5         In the past, have you worked at a place called

 6   United Development Funding?

 7   A.    Yes.

 8   Q.    And what did you do for them?

 9   A.    I was an asset manager.

10   Q.    And as an asset manager, what was your job?

11   A.    Mainly help underwrite and monitor investments

12   that UDF made.

13   Q.    Did you work -- were you the asset manager for

14   a particular borrower at UDF?

15   A.    Predominantly one.

16   Q.    And what's the name of that borrower?

17   A.    That was Centurion.

18   Q.    Now, when you worked at UDF, being an asset

19   manager, did you use any financial background to do

20   that?

21   A.    Just my schooling.  Yes.

22   Q.    And let's talk about your schooling.

23         Where did you obtain your undergraduate?

24   A.    Ohio State.

25   Q.    What was your major?
```

```
 1   A.    I had majors in finance, economics, and risk
 2   management.
 3   Q.    And did you also play football for Ohio State?
 4   A.    Yes.
 5   Q.    And did you play football after Ohio State?
 6   A.    Yes.
 7   Q.    And so you played in the pros for how many
 8   different teams?
 9   A.    Four.
10   Q.    Now, you said you obtained a degree in finance.
11         Would there be times that you would create a
12   cash forma or cash flow projection sheets?
13   A.    Yes.
14   Q.    Were those Excel spreadsheets?
15   A.    Yes, they were.
16   Q.    Now, approximately how long did you play
17   football?
18   A.    Six seasons in the NFL.
19   Q.    And when did you start working at UDF?  What
20   year?
21   A.    I started doing things with UDF in -- around
22   maybe February of 2004, I believe.
23   Q.    And did you leave when?
24   A.    I left in '16.
25   Q.    Now, approximately what time frame, in that
```

1  time frame, did you work mainly with Centurion?  Or

2  was it the whole time?

3  A.   The last few years with UDF, I wasn't doing as

4  much, but up until probably '13, 2013, the whole

5  time at some level involved with Centurion.

6  Q.   Now, did -- are you familiar, having worked at

7  UDF, with their basic loan structure in the various

8  funds that they have?

9  A.   Yes.

10 Q.   Did UDF or Centurion have loans in UDF III?

11 A.   Yes, they did.

12 Q.   What about UDF IV?

13 A.   Yes.

14 Q.   And were you there when they had loans with UDF

15 V?

16 A.   I can't -- I'm not sure about that.  Because

17 UDF V was kind of at the very end, or just after I

18 left, but I -- I don't know exactly.

19 Q.   So your work was mainly with UDF IV and UDF

20 III?

21 A.   And previous funds, yes.

22 Q.   Now, I want to focus in on UDF III and UDF IV.

23      Are you familiar with some of the distinctions

24 between those two funds?

25 A.   Yes.

1    Q.    What are some distinctions?

2    A.    UDF III was more, originally designed to be

3    more of a subordinate lender.  And then in the

4    longer term, land development plays, where UDF IV

5    had more ability to get into finished lots and home

6    building as well.  And the entire life cycle of

7    development of land in the single family home

8    building.

9    Q.    And when you say UDF III was a subordinate

10   lender, explain to the Jury what you mean by that?

11   A.    In developments, you get financing, it's like

12   your first lender would be usually a normal bank of

13   some sort, and they would fund the majority of the

14   loan, say, 60 percent.

15        And then if the borrower needed extra financing

16   for funds to develop, then UDF III, in this case

17   that we're discussing, would provide up to another

18   25 percent to get a loan-to-value to a maximum of

19   85 percent.

20   Q.    When you say "loan-to-value," what do you mean

21   by that?

22   A.    For risk management standards you don't -- no

23   financial institution really, well, especially land

24   development in this industry, loans out 100 or

25   percent or over 100 percent.  Usually, for risk

1  management, the total loan-to-value, all that you

2  can put on an asset is 85 percent of the value of

3  that asset.

4  Q.   Are you aware of UDF III paying distributions?

5  A.   Yes.

6  Q.   What about UDF IV?

7  A.   Yes.

8  Q.   Now, as an asset manager, we talked about

9  earlier how you have to do cash forma projections,

10  cash flow spreadsheets.  Are those basically the

11  same thing?

12  A.   I believe you were meaning pro formas and cash

13  flows --

14  Q.   I was pretty sure I messed that up when I said

15  it.

16  A.   Yes.

17  Q.   And usually one has a preference of which term

18  they use, right?

19  A.   Usually.

20  Q.   Okay.

21          MS. JONES:  And can we look at

22  Government's Exhibit 246, please?

23          The Government moves to admit 246 and 247.

24          THE COURT:  They will be admitted.

25

```
 1              (The referred-to documents were admitted
 2          in Evidence as Government's Exhibits 246 and
 3          247.)
 4   BY MS. JONES:
 5   Q.   You can look at 246 on your screen.  What is
 6   246?
 7   A.   It's an email.
 8   Q.   And who is it from?
 9   A.   It's from myself.
10   Q.   Who is it to?
11   A.   Odette.
12   Q.   And who is Odette?
13   A.   Odette was another asset manager, as I'm not
14   sure what her --
15              THE COURT:  Drop the speed of your answer
16   down so we can hear.
17              THE WITNESS:  Yes, sir.
18              Odette was another asset manager.
19   BY MS. JONES:
20   Q.   That's perfect, how you just did it.  Thank
21   you.
22        Did she also work with Centurion?
23   A.   Yes, she did.
24   Q.   Now, I'm going to look at this.  You have
25   the -- the attachment is T. Walter of UDF number
```

1   1026, UDF III 1529, UDF 1530.  All project roll up.

2         What does that mean?

3   A.    Those were three loans that were all together,

4   basic general credit facilities for Centurion.

5   Q.    When you say "general credit facilities," what

6   do you mean by that?

7   A.    For the most part, they weren't a loan for a

8   specific project; they were a catchall, for lack of

9   a better phrase.

10  Q.    So they could -- they have various funds going

11  to different projects?

12  A.    Correct.

13  Q.    And then what does it mean to be an all project

14  roll up?

15  A.    Centurion had many projects with UDF.  So what

16  this roll up would do would show the individual

17  loans and projects they had -- investments that UDF

18  had made in them, and how they would repay those

19  individual deals.

20        And that to the point that there was any

21  residual cash flows, those monies from those

22  individual projects would then go and pay down these

23  general credit facilities -- excuse me -- after all

24  of their individual projects were completed.

25  Q.    Now, you say, and I want you follow along with

1  me, in the body of the email you say:  Sell D172.

2      What is that?  Is that a particular part of the

3  spreadsheet?

4  A.   It would be, yes.

5  Q.   Okay.

6      "It's all you need to know to confirm that it

7  can't work."

8      What did you mean by that?

9  A.   That there was an issue with the numbers in

10  that cell and however it was computing at the time.

11  Q.   What do you mean an issue?  What do you mean it

12  can't work?

13  A.   Well, what we're talking about here, I believe

14  was how the cash flows that were supposed to come

15  from individuals, individual projects were flowing,

16  how much money was coming down to repay these three

17  specific loans, which didn't have specific cash

18  flows tied to them from projects.

19      And then how those loans were being compounded

20  and calculated.

21  Q.   All right.

22      And then you go on to say:  "Using the correct

23  weighted rate as the discount rate, you can only

24  break even if the current principal is 59.8 million

25  or less.  These are at 143 million.  I'm running a

1  few more scenarios."

2       What do you mean when you say, "You can only

3  break even if the current principal is 59.8"?

4  A.   Like with any loan, you have a principal

5  balance.  And for these projects, to repay all of

6  the money that was outstanding, which at the time

7  was 143 million, if you use their various interest

8  rates and weigh them properly, that 143 number would

9  not be supported, it could not be repaid, if that

10 was the actual principal balance, which it was at

11 the time.

12      And in this email, I'm saying that the most

13 that 143 could be would be 59.8 million.

14            MS. JONES:  So then let's look at

15 Exhibit 247.

16 BY MS. JONES

17 Q.   And this dated May 21st, 2012.  Again, it looks

18 to be the same numbers.  You can follow along with

19 me.

20      Is this to you from Odette Girourd?

21 A.   Yes.

22 Q.   And here is one scenario, requires a rate

23 reduction on all three loans and leaves no room for

24 error really.

25      Is this her response to you?

 1  A.   Yes, it is.

 2  Q.   So what is she saying there, "requires a rate

 3  reduction"?  What's the conversation you're having?

 4  A.   So what she's saying is that each of these

 5  three loans has a different interest rate, and the

 6  correct rates that they were at could not be

 7  supported and she's saying that those rates needed

 8  to be reduced.

 9      And I'm not sure what it -- it doesn't say

10  right here on this email, but she was saying -- she

11  was confirming my earlier email saying that the math

12  didn't work.

13  Q.   So overall, was your concern at that current

14  rate that it wouldn't be able to get paid back?

15  A.   Yes.

16  Q.   Now, did you ever express those concerns to

17  anybody in management at UDF?

18  A.   Yes, I did.

19  Q.   Who did you express it to?

20  A.   Hollis, Ben, Melissa Youngblood, and other

21  asset managers we had obvious conversations about

22  this.

23  Q.   Now, first off, let me start, you said "other

24  asset managers."  Do you know an individual by the

25  name of Brandon Jester?

 1  A.    Yes.

 2  Q.    Do you see him in the courtroom?

 3  A.    Yes.

 4  Q.    Okay.  Can you please identify him by

 5  something --

 6  A.    Excuse me?

 7  Q.    Can you please identify him?

 8  A.    Yes.  He's sitting at that table over there.

 9          MS. JONES:  Let the record reflect that

10  the witness has identified the defendant.

11  BY MS. JONES

12  Q.    And what was your relationship to Brandon

13  Jester?  What did he do while you were there?

14  A.    For the majority of the time he was a fellow

15  asset manager.

16  Q.    Did there come a point when he was your

17  supervisor as an asset manager?

18  A.    Yes.  He was elevated to head of asset

19  management, I believe was the title at the time.

20  Q.    I'm sorry, so that last part again.

21  A.    I believe his title at the time was head asset

22  manager, head asset manager or something along those

23  lines.

24  Q.    Now, so you said that you had discussions with

25  Brandon Jester.

```
 1   A.   Yes.
 2   Q.   And expressed concern that could not be paid
 3   off?
 4           MR. ANSLEY:  Objection, mischaracterizes
 5   his testimony.
 6           MS. JONES:  I can rephrase it, your Honor.
 7   BY MS. JONES:
 8   Q.   What was your discussion with Brandon Jester
 9   about these lines?
10   A.   The discussion with Brandon was the same at
11   that time.  Initially, it was with all asset
12   managers that we had concerns about the Centurion
13   portfolio because, almost all of the asset managers
14   had at least some involvement with Centurion.  It
15   was just the amount, I guess you could say.
16   Q.   And then you also said Ben.  Who is Ben?
17   A.   Ben Wissink.
18   Q.   And what was Ben Wissink's position?
19   A.    I don't recall his exact title.  I would call
20   him COO.  And I think at on -- I think he became a
21   CEO or president of one of the entities, I'm not
22   sure exactly, but he was over the asset managers.
23   Q.   All right.
24        So he was Brandon Jester's boss?
25   A.   Yes.
```

 1  Q.   All right.

 2       And then you said Hollis.  Who is Hollis?

 3  A.   Hollis Greenlaw.

 4  Q.   Do you see Hollis Greenlaw in the courtroom?

 5  A.   Yes.

 6  Q.   Please identify him.

 7  A.   He's sitting at the table there.

 8            MS. JONES:  Let the record reflect the

 9  witness has identified the Defendant Hollis

10  Greenlaw.

11            THE COURT:  Yes.

12  BY MS. JONES:

13  Q.   And what was Mr. Greenlaw's position?

14  A.   He was founder of UDF and president and CEO.

15  He had a bunch of titles, but he was the head of

16  UDF.

17  Q.   What was your conversation with Mr. Wissink

18  about this loan paying off?  Was it any different

19  than what you just described with Mr. Jester?

20  A.   Mr. Jester initially had the same concerns as

21  the rest of the asset managers.  And then when he

22  was elevated, it became less of a concern.  Not that

23  it was none, but he took the position of

24  Mr. Greenlaw and Mr. Wissink, where it was, don't

25  worry about it, we'll take care of it.

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                        Vol 3 January 12, 2022                        Page 183

1  Q.   And what was your conversation with

2  Mr. Wissink?

3  A.   It was -- whenever it was brought up to

4  Mr. Wissink, he was very dismissive of it.

5  Q.   And what about Mr. Greenlaw?

6  A.   The same thing.

7  Q.   Did you send him copies of your cash flow

8  projections?

9  A.   Yes.

10 Q.   And was there ever a time that you had to give

11 cash flow projections to the auditors for UDF?

12 A.   UDF would -- we, as asset managers, send them

13 usually to Ben or Melissa Youngblood, at one time,

14 and then they would handle the interface with

15 auditors or whoever.

16 Q.   Now, and when I say the cash flow projections,

17 are those the types of things that would be sent to

18 the auditors that were in 246 and 247, that the

19 jurors just looked at the emails, with those

20 attachments?

21 A.   Yes.

22 Q.   Now, as part of your job as an asset manager,

23 did you also look at future projects?

24 A.   Yes.

25 Q.   And what would you do in analyzing future

 1   projects?

 2   A.    It would just be traditional underwriting.  So

 3   you would look at what the first of the projects

 4   would be:  Is it raw land?  Are they partially -- is

 5   it partially improved land?  Are they finished lots?

 6   Are we looking at some home building projects or

 7   what have you?

 8        So you would start there, and then you'd go

 9   into the price, the value, how an area is doing

10   economically overall.  We would look at how sales

11   for homes have been doing and finished lots, and

12   then you start to evaluate the viability of the

13   investment, whether it's a good idea or not.

14   Q.    And would you take make a recommendation on

15   future projects?

16   A.    Yes.

17   Q.    And were there times that you said you thought

18   a future project was viable?

19   A.    Yes.

20   Q.    Were there times that you said a future project

21   was not viable?

22   A.    Yes.

23   Q.    What would happen if you said a future project

24   was not viable?

25   A.    If it was a case with Centurion, if Centurion

1  wanted the deal done, they would go over my head and

2  call Mr. Wissink or Greenlaw directly and state

3  their case there, and usually the project would get

4  green lit.

5  Q.    It would get what?

6  A.    It would get approved.

7  Q.    It would get approved, meaning it would be

8  taken on and done?

9  A.    Yes.

10  Q.    Now, did you have to do anything with draw

11  requests when you were at UDF?

12  A.    Yes.

13  Q.    What would you have to do?

14  A.    I would prepare them.

15  Q.    And when you say "prepare them," what do you

16  mean?

17  A.    It involves project level -- the borrower, who

18  we had made the loan with would submit invoices from

19  work that had been done on these projects.  I would

20  have copies of them, detail it out on a line item

21  basis, make sure -- see whether they fit in terms of

22  the budget of this development or this investment.

23  And then submit them to Ben and then they would get

24  submitted to accounting for funding.

25           MS. JONES:  Now, the Government will move

 1  to admit Exhibit 241.

 2              THE COURT:  241 will be admitted.

 3              (The referred-to document was admitted in

 4      Evidence as Government's Exhibit 241.)

 5  BY MS. JONES:

 6  Q.    All right.

 7        Looking at Exhibit 241, if we can scroll to the

 8  second page.  Is this an email from you, Mr. Walter?

 9  A.    Yes.

10  Q.    And if we can -- what are the items that are

11  listed on page 2?

12  A.    The items are listed are different loans that

13  we have made and how much to advance under those

14  loans.

15  Q.    And when it says Terracina, Carter Ranch,

16  Montalcino, Grandbury, High Trophy Development, what

17  are those specifically?

18  A.    Those are specific project loans that UDF made

19  to Centurion.

20  Q.    So were those land development projects?

21  A.    Yes, in some way, shape, or form.  I don't

22  recall where this is in the timeline of development

23  in the each of these, but yes.

24  Q.    And on each of those, you have an amount listed

25  next to it.  Like let's just say, Terracina, for

1  $190,272.84, and it says "Development draw."

2      What does that mean?

3  A.   That means for those -- for those deals that

4  were submitted were for actual development of the

5  project, whether it be putting in sewers or roads or

6  what have you.

7  Q.   And then you have under Carter Ranch, 55,000

8  for taxes.

9  A.   Uh-huh.

10  Q.   What would that be?

11  A.   Well, the -- that would be -- because they're

12  paying taxes, obviously, so on an annual basis,

13  those would have to be paid, and that's what that

14  was.

15  Q.   You say support is attached?

16  A.   Yes.

17  Q.   So, for example, what might be the support for

18  that?

19  A.   That would be the county tax bill, for

20  instance.

21  Q.   Then on UDF III, it says, letter of credit,

22  1530.

23      What is 1530?

24  A.   1530 is what we were referring to earlier in

25  those three.  It was a general credit facility for

1  Centurion.

2  Q.   It says 905,000, general draw.  What does that

3  mean?

4  A.   It means, at a certain point, it just became

5  with Centurion, they agreed because Centurion needed

6  so much money for ongoing operations and

7  miscellaneous things that -- that I believe UDF just

8  agreed to limit it to 905,000 on a monthly basis at

9  that time, unless there was something extraordinary.

10 Q.   And is one of the general draws, could it be to

11 fund overhead?

12 A.   Yes.

13          MS. JONES:  And can we please look at 260,

14 which is already in evidence?

15 BY MS. JONES:

16 Q.   Do you recognize 260?

17 A.   Yes.

18 Q.   And, again, is this from Casey Ford?

19 A.   Yes.

20 Q.   Is it discussing payroll?

21 A.   Yes, it is.

22          MS. JONES:  Back to 241.

23 BY MS. JONES:

24 Q.   On page 1, so you've asked for those draws.

25      And then without going into it, do you have a

1  correction on one of them that you give to Cheryl?

2  A.   Yes.

3  Q.   All right.

4       And then who is Cheryl Cox up in the "to"?

5  A.   She was an accountant at UDF.

6          MS. JONES:  And then if we can scroll up,

7  please.

8  BY MS. JONES:

9  Q.   And is there a response to your email from Ben

10 Wissink?

11 A.   Yes, there was.

12 Q.   This is on 1/27/2012.  Please read along with

13 me:  "Tyson, UDF III doesn't have the capital to

14 fund these draws.  What avenues do we have for

15 UDF IV to fund a repayment on CTMGT to provide

16 capital to UDF III on Monday morning?"

17      What are y'all discussing?

18 A.   That is saying that -- so 1530, the 15 notation

19 at the front of the loan, it was a UDF III loan.

20 And so what he's saying here, that 1530, which is

21 UDF III, doesn't have the money to fund that general

22 draw that you spoke of previously.

23      And he's saying what loans does Centurion have

24 with UDF under UDF IV that that money could be

25 advanced to Centurion under UDF IV, and then

1  Centurion would turn around and repay it on some

2  UDF III facility so then it could be readvanced.

3  Q.   Now, we just talked about the draws that you

4  would do.

5       Were there ever times there were draws that you

6  did not start for deals like this?

7  A.   Repeat your question.  I'm sorry.

8  Q.   So were there any draw requests that you had to

9  handle that were not with regard to this type, where

10 it had a bill attached to it for some development?

11 A.   Yes.

12 Q.   And what were those?

13 A.   There would be times when Ben, Ben Wissink

14 would send an email to me saying, for example,

15 distributions need to be funded, I'm coming up, so

16 get an advance for $2 million to Centurion so we can

17 do that.  And funnel that around so we can fund

18 distributions out to the various UDF funds.

19 Q.   And what would you have to do to make that

20 happen?

21 A.   I would -- I would make draw requests.  I would

22 take it to Mehrdad Moayedi of Centurion.  He would

23 sign it usually and then send it back to UDF.

24 Q.   Was there anything unusual about when you would

25 take it to him to get it signed?

```
 1  A.   They would have it around times of when
 2  distributions were made.  I don't remember if it was
 3  exactly the end of the month or the third week of
 4  the month or what have you, but it was consistent.
 5  Q.   Now, you said earlier you would sometimes have
 6  to give your cash flow projections to the auditors.
 7       Do you recall having any conversations with
 8  anyone about the auditors in management?
 9  A.   There would be conversations with them leading
10  up to talking about, just reaffirming that everybody
11  gets them done and submits them on a timely basis
12  and then there would be conversations ongoing, if
13  they needed something, or if they had other
14  questions.
15  Q.   Did you have conversations with Ben Wissink
16  about auditors?
17  A.   Yes.  He would be involved in those
18  conversations.
19  Q.   What about Hollis Greenlaw?
20  A.   He would comment on those conversations.
21  Q.   Were there ever times that the auditors had
22  questions?
23  A.   Yes.  My understanding.
24  Q.   And you say your understanding, were you
25  sometimes given -- why would it be your
```

 1  understanding?

 2  A.    Because the interfacing --

 3          MR. LEWIS:  Objection, unless there's a

 4  predicate laid, your Honor.

 5          THE COURT:  You can answer this question.

 6  Why would you -- the question was, why did you

 7  qualify it as your understanding?

 8  BY MS. JONES:

 9  Q.   Yes.  Why did you know that the auditors had

10  questions?

11          THE COURT:  Overruled.

12          THE WITNESS:  Because it was brought up by

13  Ben or Hollis or Melissa Youngblood, when she was

14  involved with these situations.

15  BY MS. JONES:

16  Q.   Did you say "Ben"?

17  A.    Ben, yes.

18  Q.   All right.  I just wanted to make sure.

19  A.    I'm sorry.  My throat's a little dry.

20  Q.   And so you had discussions with Ben Wissink or

21  Hollis Greenlaw about it?

22  A.    Yes.

23  Q.   All right.

24       I want to zone in on some of those discussions.

25       Did they talk to you about the questions?

1  A.    They would bring them up.

2  Q.    What would they say?

3  A.    They were -- they would say that the auditors

4  had questions, and they would say how they didn't

5  understand how the UDF businesses were working and

6  that it was -- they would laugh at them because then

7  there were specific comments made that the auditors

8  would just give up, because they didn't understand

9  it enough and then move on, basically.

10 Q.    What do you mean them to move on?

11 A.    The auditors would just stop asking questions,

12 because regardless what answers they were provided

13 with, they still didn't understand the replies that

14 UDF was providing.  And so they were kind of mocking

15 the fact that they didn't understand them, and the

16 auditors would just stop their lines of questioning

17 because they were frustrated or what have you.

18 Q.    And so what would happen when they stopped

19 their lines of questions, according to Mr. Greenlaw

20 and Mr. Wissink?

21 A.    That they would move on and basically they

22 would just proceed with -- with whatever else they

23 were doing in the audit.

24 Q.    And so what would happen to their questions?

25 A.    As far as I know, they wouldn't get answered.

1   Q.   All right.

2        And that's from what Mr. Wissink and

3   Mr. Greenlaw would say?

4   A.   Yes.

5   Q.   All right.

6             MS. JONES:   Thank you, sir.

7             I pass the witness.

8                    CROSS-EXAMINATION

9   BY MR. LEWIS:

10  Q.   When and where did that last conversation occur

11  with Mr. Wissink?

12  A.   Those would have been --

13  Q.   When and where exactly?

14  A.   I do not have an exact date and time.

15  Q.   Do you have a single piece of paper or email

16  that substantiates your testimony what the

17  prosecutor just brought out?

18  A.   I don't have any emails.

19  Q.   No.

20       And, in fact, you've met with the prosecutors

21  several times, haven't you?

22  A.   Yes.

23  Q.   They've gone over emails with you, correct?

24  A.   I have had conversations with prosecutors.

25  Q.   You're telling the Jury that they have not

 1  shown you any papers?

 2  A.   They have shown me the exhibits that I just

 3  saw.

 4  Q.   Of course.  They have shown you emails,

 5  correct?

 6  A.   They have shown me emails, yes.

 7  Q.   And you met with the FBI as well, correct?

 8  A.   I just remember being with attorneys.  I don't

 9  know who else was -- I don't recall.

10  Q.   Do you recognize an FBI agent at the table?

11  A.   I'm honestly not sure who works for whom.

12  Q.   Okay.

13       Did you meet with any of these three or four

14  ladies at the table?

15  A.   The attorney who was just questioning me, yes.

16  Q.   How many times did you meet with her?

17  A.   I can't recall off the top of my head.  At

18  least once.

19  Q.   Could it be more than once?

20  A.   It's possible.

21  Q.   Does your memory fail you, sir?

22  A.   I just don't recall how many times I've met

23  with the attorney.

24  Q.   You tried to actually to get out of testifying

25  down here today, didn't you?

1  A.    No.  I have never tried to get out of

2  testifying.

3  Q.    Didn't you instruct your attorney to let the

4  Government know that your memory was failing?

5  A.    No.  I did not try to get out of this

6  testimony.

7                MR. LEWIS:  May I have one moment, Judge?

8                May I approach, Judge?

9  BY MR. LEWIS:

10  Q.   If I showed you an FBI report, might that

11  refresh your memory?

12               MS. JONES:  Your Honor, I'm going to

13  object.  He said FBI report.

14               THE COURT:  You can show him that and ask

15  him if that refreshes his memory.

16               MR. LEWIS:  Yes, sir.

17               THE COURT:  Go ahead and show him that.

18               So, sir, he's going to point you to read

19  something, and then the question will be, does that

20  refresh your memory about the subject?  Either it

21  does or it does not.

22  BY MR. LEWIS:

23  Q.   Sir, does that refresh your recollection?

24  A.   Could you repeat the question?  Regarding?

25  Q.   Whether or not you instructed your attorney to

1  call the Government and tell them you had memory

2  problems?

3  A.    I did not instruct my attorney to say anything.

4  Q.    Your attorney is Cameron Smith, is that

5  correct?

6  A.    Yes.

7            THE COURT:  Well, hold on.  Let me just

8  stop you.

9            So the question -- the question Mr. Lewis

10  initially asked was, did you seek to not testify

11  because you had memory loss?  Okay.

12            Now, the question is, now that you have

13  read that document, okay?  Does that refresh your

14  memory about whether you said this or not?  That's

15  the question.  Does that refresh your memory about

16  whether you said this or not?

17            THE WITNESS:  About whether -- hold on.

18  I'm sorry.  I'm confused.

19            Are we saying -- can you repeat what you

20  just said?

21            THE COURT:  So does that refresh your

22  memory about this subject that Mr. Lewis has brought

23  up?  That's the only question.  Does it refresh your

24  memory?  Does it cause your memory to recall you

25  saying that?

1              THE WITNESS:  What I said to my attorney?

2              THE COURT:  On this subject.

3              THE WITNESS:  We discussed that situation,

4    but it was never an attempt to get out of anything.

5              THE COURT:  Did you say you had memory

6    loss?  Let's put it that way.

7              THE WITNESS:  It was a conversation with

8    my attorney.  I don't know if you -- isn't that -- I

9    don't know if that's privileged or -- I'm confused.

10             MS. JONES:  Your Honor, I'm going to

11   object with regard to the specific conversation with

12   his attorney.  I don't have an objection if

13   Mr. Lewis asks if he has memory issues, but I think

14   the question --

15             THE COURT:  Well, all I'm saying is if --

16   if this gentleman's attorney has conveyed

17   information about what this witness has said to

18   people outside of the privileged environment, then

19   it's not privileged.

20             And I understand Mr. Lewis to be saying he

21   has some information that indicates this statement

22   was conveyed to someone in the Government.  So

23   that's what I understand the lay of the land to be.

24             MS. JONES:  Yes.

25             THE COURT:  And so he's now asking this

 1  witness, did the witness say it.  I think it is

 2  proper for Mr. Lewis to inquire about whether the

 3  witness has told his lawyer, which has since been

 4  waived, that privilege has since been waived, about

 5  whether this witness has had memory loss.

 6          And so that's the question to you, sir.

 7  Have you conveyed that you had memory loss?

 8          THE WITNESS:  I have conveyed to my

 9  attorney that I have memory issues.

10          THE COURT:  Okay.  Very good.

11  BY MR. LEWIS:

12  Q.   You knew Casey Ford at Centurion?

13  A.   Yes.

14  Q.   Were you friends?

15  A.   Just acquaintances.

16  Q.   Did Casey help you get a loan?

17  A.   Casey -- there was a loan.

18  Q.   Yes.  And that loan that Casey -- by the way,

19  do you know that Casey just testified before this

20  Jury?

21  A.   Yes.

22  Q.   Because you were outside and you watched him

23  come in and you watched him go out, correct?

24  A.   Yes.

25  Q.   And your testimony to these Ladies and

1  Gentlemen is that Casey helped you get a loan?

2  A.   Yes.

3  Q.   And that loan was for $25,000?

4  A.   I believe that was the amount.

5  Q.   And the loan was from the owner of Centurion,

6  correct?

7  A.   I believe.

8  Q.   That's correct, isn't it, sir?

9  A.   I believe so.

10  Q.   And that's where Casey worked, at Centurion,

11  correct?

12  A.   Yes.

13  Q.   And you know that Casey didn't tell the owner

14  of Centurion about that $25,000 loan, that's true,

15  too, isn't it, sir?

16  A.   I do not know what Casey said.

17            MR. LEWIS:  Nothing further.

18            MR. STEPHENS:  No questions, your Honor.

19            MR. ANSLEY:  Yes, your Honor, please.

20                  CROSS-EXAMINATION

21  BY MR. ANSLEY:

22  Q.   Mr. Walter, you talked earlier about Brandon

23  Jester.  The fact is, he was never an asset manager

24  for the Centurion account, was he?

25  A.   He had projects with Centurion that were

1    Centurion's or were -- Centurion was involved in.

2    Q.    But he was not things asset manager for those,

3    it was other people at that level?

4    A.    From my recollection, Centurion ended up doing

5    things with Brandon, I believe, in Austin, some of

6    the areas where he primarily focused.  There wasn't

7    a single one Centurion asset manager.

8    Q.    So Centurion had projects in Austin?

9    A.    Yes, I believe -- yeah, I think they had

10    projects down there.  They took some over at some

11    point for other issues, from my recollection.

12    Q.    Which projects were those, sir?

13    A.    I don't recall off the top of my head.

14    Q.    Do you know when that was the Centurion had

15    these projects in Austin?

16    A.    Probably -- I mean, it was when I was at UDF.

17    Q.    Okay.  Which was -- what was that date range?

18    A.    The very first was, like I said, probably

19    around February of 2004, and then actively, like,

20    2013, 2014.

21    Q.    So between 2004 and 2013 or so Centurion had

22    projects in Austin?

23    A.    There were some.

24    Q.    You talked about future projects.

25          Your testimony was they could be viable, is

 1  that correct?

 2  A.    They could be.

 3  Q.    Sometimes -- sometimes you said no.

 4  A.    I would say no, sometimes, yes.

 5  Q.    And by sometimes you would say no, would you

 6  say no, is that to Centurion, when you're saying no?

 7  A.    I would say that I don't recommend them.  It

 8  would still be brought up to UDF, and then it would

 9  be an opinion there.

10  Q.    Would you bring it up to UDF yourself?

11  A.    I would bring some up to UDF, but they were --

12  like I mentioned, Centurion, the principal, Mehrdad

13  Moayedi had close contact with Mr. Wissink and

14  Mr. Greenlaw, specifically.

15  Q.    What you're saying is that Mr. Moayedi would go

16  over your head at UDF and cause these projects to be

17  included on these analysis?

18  A.    Yes.

19  Q.    And how often did that happen?

20  A.    Several times.  I couldn't between give you an

21  exact number.

22  Q.    And that's after you, the UDF employee said no,

23  Centurion made it happen?

24  A.    They would call and speak to benefits and try

25  to discredit me, or my assumptions because, when

1  you're investing, you have to make assumptions.

2  Q.   Were you ever part of those conversations?

3  A.   On some occasions.

4  Q.   How often?

5  A.   I couldn't give you an exact number.

6  Q.   Okay.  Was it always for Centurion, was it

7  always Mr. Moayedi?

8  A.   How so?  I don't understand what you're asking,

9  I'm sorry.

10  Q.   Those conversations, when Centurion is going

11  over your head at UDF and making UDF do something,

12  is it always Mr. Moayedi doing it?

13  A.   He would be the one, but I wouldn't say that he

14  made UDF do anything.

15  Q.   You had said no.  He goes over your head and it

16  happens?  Is that fair?

17  A.   I don't -- he doesn't make them do anything.

18  Q.   You talked about the auditors earlier, these

19  are the auditors for UDF, correct?

20  A.   They were auditing UDF, yes.

21  Q.   Which firm was that?

22  A.   I believe it was Whitley Penn.

23  Q.   Okay.

24       Did you ever talk to the auditors yourself at

25  Whitley Penn?

 1  A.    No, I did not.

 2  Q.    No communications, meetings, any contact

 3  whatsoever of any kind?

 4  A.    No.  Not that I recall.

 5  Q.    Okay.

 6        And your testimony is that you discussed

 7  auditor communications that Mr. Greenlaw and

 8  Mr. Wissink had, and they would basically laugh at

 9  the auditors' lack of understanding of UDF's

10  business?

11  A.    At points, yes.

12  Q.    And your understanding, your testimony is that

13  that somehow made the auditors just stop asking

14  questions?

15  A.    That's what they said.

16  Q.    "They said" being who?

17  A.    Hollis and Ben.

18  Q.    Isn't it, if you know this, isn't the job of

19  auditors to ask questions of their audit clients?

20  A.    It is to ask, but the connotation and the

21  comments were that they stopped asking while they

22  still didn't understand.

23  Q.    But you never spoke directly with the auditors

24  a single time in your life?

25  A.    No.

1  Q.    So whether or not they stopped asking

2  questions, whether or not their questions were

3  answered, you simply directly do not know that, even

4  a little bit, do you?

5  A.    Unless Mr. Greenlaw and Mr. Wissink were lying

6  when they made those statements.  That's what I'm

7  going off of.

8  Q.    I mean directly, sir.

9  A.    Directly from the auditors, no.

10            MR. ANSLEY:  Okay.  Thank you, sir.

11            Pass the witness.

12                    CROSS-EXAMINATION

13  BY MR. PELLETIER:

14  Q.    Mr. Jester was your boss?

15  A.    He became head of asset management toward the

16  very tail of my time at UDF.

17  Q.    Who was your boss?

18  A.    Hollis and Ben.

19  Q.    You reported to Mr. Greenlaw?

20  A.    At different times.

21  Q.    And so what was Mr. Jester's relationship to

22  you?

23  A.    For the majority of the time, he was an asset

24  manager like I was.

25  Q.    Oh.  And how about Ben Wissink?  Did you report

 1  to him?

 2  A.    Yes.  He was over asset managers.

 3  Q.    So he was your boss?

 4  A.    There were multiple bosses.

 5  Q.    Well, how many meetings did you have -- you

 6  weren't part of the audit function at UDF, were you?

 7  A.    I prepared information that was used in audits.

 8  Q.    Okay.

 9        And how many meetings did you have with

10  Mr. Greenlaw about the audit, the documents prepared

11  for the audit function?

12  A.    Since they were on a yearly basis, it was a few

13  times over the years.

14  Q.    All right.

15        Do you remember this particular meeting that

16  you're talking where people were yucking it up about

17  the auditors not understanding their complicated

18  business?

19  A.    Yes.

20  Q.    What day was that?

21  A.    I don't know the exact date.  I remember the

22  situation, though.

23  Q.    Well, you don't remember how many times you met

24  with the prosecutor, right?

25  A.    With that specific prosecutor, no, I don't know

1    the names of everybody I met with.

2    Q.    And that was pretty recent, right?

3    A.    Well, yesterday.  I remember that.

4    Q.    Yes.

5          And --

6              MR. ANSLEY:  Your Honor, I apologize.

7              May we approach briefly?

8              (The following proceedings were had at

9          sidebar without being reported:)

10   BY MR. PELLETIER:

11   Q.   Mr. Walter, do you know what year this meeting

12   was with Mr. Greenlaw when he told you this?

13   A.    I can speculate roughly.

14   Q.    All right.

15         And he, Ben Wissink, and Brandon Jester all

16   told you the exact same story, the exact same thing?

17   A.    It was the situation that we're talking about

18   now, it was during an asset manager meeting when

19   everybody was there.  In this case, Mr. Jester was

20   not, this was Mr. Wissink and Mr. Greenlaw, but the

21   ones that were making the --

22   Q.    So it was Mr. Wissink was there and

23   Mr. Greenlaw was there.

24         You just don't remember when?

25   A.    Like I said, I couldn't speculate, but I don't

 1  remember exactly.

 2          MR. PELLETIER:  No further questions.

 3          MS. JONES:  May I have moment?

 4          No further questions, your Honor.

 5          THE COURT:  Okay.  Thank you, sir.

 6          MS. JONES:  Your Honor, may this witness

 7  be excused?

 8          MR. STEPHENS:  Yes, sir.

 9          MR. LEWIS:  Yes, sir.

10          MR. PELLETIER:  Yes, your Honor.

11          THE COURT:  Yes, you are free to go.

12          MS. EGGERS:  Ty Fowle.

13          (TY FOWLE was duly sworn by the Court.)

14                  DIRECT EXAMINATION

15  BY MS. EGGERS:

16  Q.   If you would, go ahead and state your name.

17  A.   Ty Fowle.

18  Q.   And you are going to have to speak up.

19  A.   Ty Fowle.

20  Q.   Okay.  Pull it a little bit closer.  Sorry.

21  It's a large room and the floors make it hard to

22  hear.

23  A.   I understand.

24  Q.   You said Ty Fowle, is that correct?

25  A.   That's right.

 1  Q.    And, Mr. Fowle, where do you work?

 2  A.    For UDF.

 3  Q.    Okay.

 4        And how long have you worked for UDF?

 5  A.    Since October of 2008.

 6  Q.    And what position do you hold with UDF?

 7  A.    IT director.

 8  Q.    And are you a full-on employee?  Are you a

 9  contract employee?  How does your --

10  A.    I'm a contractor, yes.

11  Q.    Make sure you let me finish because that poor

12  lady's got 12 keys for the whole alphabet.  It's

13  very tough.  I don't understand how they do it,

14  okay.

15        You said you're a contract employee?

16  A.    Correct.

17  Q.    You said your position again is what?

18  A.    IT director.

19  Q.    IT manager?

20  A.    Director, yes.

21  Q.    IT director.

22        And have you held that position your entire

23  time with UDF?

24  A.    Yes.

25  Q.    Were you working at the UDF offices on

```
 1  February 18th of 2016?

 2  A.   Yes.

 3  Q.   And what is the address of y'all's office

 4  there?

 5  A.   1301 Municipal Way, Grapevine, Texas.

 6  Q.   So it's here in the Northern District of Texas

 7  in Grapevine, is that correct?

 8  A.   Yes.

 9  Q.   On that date, February 18, 2016, was a search

10  warrant executed by the Federal Bureau of

11  Investigation?

12  A.   Yes.

13  Q.   And were you present you said?

14  A.   Yes.

15  Q.   And once the FBI got there, did you work with

16  the FBI, the members of the FBI that were looking

17  for the digital media to be able to make images of

18  the digital media that were there at the office?

19  A.   Yes.

20  Q.   And were you helpful and walked them around and

21  everything?

22  A.   Yes.

23  Q.   Okay.

24       And as a part of your helping them so that they

25  could get the materials pursuant to the search
```

1  warrant, did you provide them with a copy of PST or

2  Outlook files for various UDF employees?

3  A.   Yes.  At the instruction of Mr. Thomas Tedder.

4  Q.   I can't hear you.

5  A.   Thomas Tedder, the agent in charge, I followed

6  his direction and provided the PST files as

7  instructed.

8  Q.   Okay.

9       You did that on that day, on February 18, 2016?

10 A.   Yes.

11 Q.   Okay.  And was it like a hard drive or

12 something that you gave to him or what?

13 A.   I copied the files and then he provided the

14 hard drive to copy them on to.

15 Q.   Okay.

16      And, Mr. Fowle, I'm going to bring you

17 something real quick, all right?

18 A.   Yes.

19          MS. EGGERS:  Your Honor, if I may

20 approach.  I will get this later on.  It is a Court

21 exhibit, not as an actual trial exhibit.

22 BY MS. EGGERS:

23 Q.   Mr. Fowle, if you would look at what I will

24 mark as Court exhibit -- Government Exhibit B.

25 A.   Okay.

1  Q.   Did you prepare an affidavit as a part of this

2  case?

3  A.   Yes.

4  Q.   Okay.  And attached to -- sorry.  Attached to

5  your affidavit is there a two-page list of various

6  government exhibits?

7  A.   Yes.

8  Q.   And prior to this trial starting, did you

9  actually go to the US Attorneys Office and look at

10  all of those exhibits that are on that attachment?

11  A.   I did.

12  Q.   And when you looked at all of those exhibits,

13  and then pages of certain exhibits that are on that

14  attachment, were you able to confirm that those

15  actually were, not all, obviously, but were those

16  emails that had been placed on the hard drive by you

17  and given to Special Agent Tom Tedder?

18  A.   Yes.  With reasonable certainty.

19  Q.   Say that again?

20  A.   With good certainty, yes.

21  Q.   You don't have reason to believe any of them

22  have been manipulated or anything, do you?

23  A.   I don't.

24  Q.   Okay.

25       So that two-page list, those are just

1  Government exhibits, Government exhibits that are

2  identified, and when it gets to Government's

3  Exhibit 350, to Government's Exhibit 409, there were

4  just certain pages in those that you were able to

5  confirm that those were emails -- not your emails --

6  but --

7  A.    In the UMTH email system, yes.

8  Q.    I cannot hear you.

9  A.    In the UMTH email system, yes.

10  Q.    And UTMH, is that one of the UDF entities?

11  A.    It's the domain that they're under, the

12  UMTH.com.

13  Q.    Okay.  It would be TyFowle@UMTH.com?

14  A.    Correct.

15  Q.    And so those emails then, were those records

16  made and kept in the normal course of UDF's

17  business?

18  A.    That's correct.

19  Q.    And you, as the IT director, you would be the

20  one to sort of know how those are kept, is that

21  right?

22  A.    That is correct.

23          MS. EGGERS:  Your Honor, if I may have one

24  moment.

25          If I may have one moment, your Honor?

1              Nothing further, Mr. Fowle.

2              THE COURT:  Okay.

3              MS. ROMERO:  One second, your Honor.

4                         CROSS-EXAMINATION

5    BY MS. ROMERO:

6    Q.    Mr. Fowle, I understand you said that you've

7    been working there since February -- since 2008, is

8    that correct?

9    A.    That's correct.

10   Q.    What, that's almost 14 years.

11   A.    That's correct.

12   Q.    And you work there now, today?

13   A.    Yes, I do.

14   Q.    And today UDF still sits there on Centurion

15   Drive, is that correct?

16   A.    Municipal Way.

17   Q.    I'm sorry.  Municipal Way.

18         And they're still doing business?

19   A.    Yes.

20   Q.    The same business they were in, that is loaning

21   money to developers to build homes, to build

22   communities in North Texas, and I guess they've

23   spread out to other states as well, is that correct?

24   A.    That's correct.

25   Q.    Now, the prosecutor asked you about the search

1  warrant that happened in February of 2018.  I

2  believe it was February 8th.  Is that correct?

3  A.    February 18th.

4  Q.    February 8th -- 18th, 2018.

5  A.    2016.

6  Q.    I'm sorry.  I've got this all backwards here.

7  It's late in the day.

8      So that's more than what?  Four years ago, I

9  guess.

10 A.    Six years ago.

11 Q.    So, in those six years, have you been a part of

12 the employees at UDF cooperating with the Government

13 providing documents, et cetera?

14 A.   Yes.  Everything requested of me I have

15 provided.

16 Q.   Okay.  And what about other employees at UDF,

17 are you aware of --

18          MS. EGGERS:  Objection, your Honor,

19 outside the scope.

20          THE COURT:  Overruled.

21 BY MS. ROMERO:

22 Q.   Are you aware of whether any other employees

23 have also worked to cooperate with the Government

24 whenever asked?

25 A.   Everything to my knowledge, yes.

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                    Vol 3 January 12, 2022                    Page 216

1   Q.    And before the search warrant that the

2   prosecutor brought up, February 18, 2016, did UDF

3   cooperate with authorities at that time by providing

4   documents whenever asked?

5   A.    Yes.

6   Q.    And were you a part of that?

7   A.    Yes.

8   Q.    Are you aware of whether or not any employees,

9   before the search warrant, after the search warrant,

10  up to today, have ever hid or concealed any

11  documents, anything in the UDF files, the UDF

12  servers, their hard copies in their filing cabinets,

13  from the Government authorities in any way?

14  A.    No.

15  Q.    Okay.

16        What about any accountants in any way?

17  A.    No.

18  Q.    What about any of your auditors, if they've

19  ever asked?

20  A.    No.

21  Q.    What about any regulators, have you hid or

22  anybody at the company that you know of, hid any

23  documents or concealed anything?

24  A.    No.  Nothing.

25  Q.    Was there a shred party ever going on in the

 1  six years that UDF has been under investigation?

 2  A.    No.

 3  Q.    Did Mr. Greenlaw ever ask you to hide anything

 4  or do anything like that, shred documents, hide

 5  anything?

 6  A.    Never.

 7  Q.    What about any of the other defendants sitting

 8  here today?

 9  A.    No.

10  Q.    Cara Obert?  Brandon Jester?  Ben Wissink --

11  I'm sorry?  Can you say -- are you saying no?  I

12  know you're shaking your head, but --

13  A.    No.

14        MS. ROMERO:  I have no further questions,

15  your Honor.

16        MR. STEPHENS:  No, your Honor.

17        MR. LEWIS:  No, sir.

18                REDIRECT EXAMINATION

19  BY MS. EGGERS:

20  Q.    Mr. Fowle, let me ask you, who are you talking

21  about that members of UDF provided records to the

22  Government before the February 18th, 2016 date?

23  A.    I'm sorry.  I'm not sure what you're asking.

24  Q.    Well, Ms. Romero was asking you a series of

25  questions about folks providing records before the

```
 1   search warrant was executed.
 2        Do you recall that?
 3   A.   I do recall that, yes.
 4   Q.   Do you know who UDF was providing records to
 5   before that search warrant was executed?
 6   A.   The attorneys would ask for certain email
 7   records.  And I don't -- and I would provide the
 8   attorneys the records that they asked for.
 9             THE COURT:  She's not asking about you.
10   She's asking about others.  Do you know who, others,
11   provided this information?
12             THE WITNESS:  You mean who was requesting
13   information?
14             THE COURT:  No, no.  You were telling
15   Ms. Romero that other people cooperated, other
16   people provided documents, she's asking who are
17   those other people.
18             THE WITNESS:  Everybody at the company
19   that work -- I mean, I can name all of the
20   executives, if you want.
21   BY MS. EGGERS:
22   Q.   Well, my question is, who were they providing
23   the records to?
24   A.   I don't know that I can answer the question.
25   Q.   Okay.
```

1          So you're not suggesting that people at UDF

2    were providing records to the FBI, or the US

3    Attorneys Office before the execution of the search

4    warrant?

5    A.    Like I said, I worked with the attorneys on the

6    media side.  So I would provide the documents.  I

7    didn't always know who they were requesting the

8    documents for.

9              MS. EGGERS:  Thank you, sir.

10              THE COURT:  Okay, anything else?

11              MS. ROMERO:  Nothing further.

12              MS. EGGERS:  No further, your Honor.

13              The Government call Special Agent Thomas

14    Tedder.

15              THE COURT:  Can you raise your hand to be

16    sworn.

17              (THOMAS TEDDER was duly sworn by the

18         Court.)

19                    DIRECT EXAMINATION

20    BY MS. EGGERS:

21    Q.    If you would, go ahead and state your name.

22    A.    Thomas Tedder.

23    Q.    And how are you employed, sir?

24    A.    I'm a supervisor special agent with the FBI.

25    I'm also the North Texas Regional Computer

1   Laboratory Forensics Director.

2   Q.   And how long have you been a special agent with

3   the FBI?

4   A.   A little over 21 years -- 23 years now, I'm

5   sorry.

6   Q.   And you said you're the regional director of

7   what, again?

8   A.   North Texas Regional Computer Forensics

9   Laboratory.

10  Q.   Is that the FBI's laboratory that's here local

11  or what is that?

12  A.   It is a coordinated effort.  It's not just the

13  FBI laboratory; we also have local police

14  departments involved in the laboratory as well.

15  Q.   And do y'all work on processing electronic

16  evidence and that type of thing when they're

17  obtained?

18  A.   All types of digital evidence, yes, that's

19  correct.

20  Q.   And how long have been the director?

21  A.   I have been the director since October of 2019.

22  Q.   And have you received -- so before October of

23  2019, what, if any, involvement did you have with

24  the RCFL before then?

25  A.   Digitally speaking, I was certified in 2006

1  through IACIS, as a certified computer forensics

2  expert.  "IACIS" stands for International

3  Association of Computer Investigative Specialists.

4      Then in 2008, I was certified again as a CFCE

5  through the FBI's CART program.  CART is the

6  Computer Analysis Response Team.

7  Q.   And so you said that started, approximately,

8  when did your certifications --

9  A.   First, in 2006 through IACIS.  And then again

10  in 2008 through the FBI's CART program.

11  Q.   And did you, in that capacity with the RCFL --

12  I'm going to abbreviate it -- the North Texas RCFL

13  --

14  A.   We call it the NTRCFL.

15  Q.   Okay.  Did you -- were you involved in the

16  execution of the search warrant at UDF, the UDF

17  offices on February 18th, 2016?

18  A.   I was.

19  Q.   Okay.  And if you would just generally describe

20  what steps you took that day on February 18th, 2016.

21  A.   We were there to assist the seizing agents with

22  identifying digital evidence at the location, and

23  either imaging it on site mor determining whether we

24  need to take it back to the laboratory to image it

25  back at the lab.

1  Q.   Okay.  And we just have just met a man by the

2  name of Ty Fowle.  I think y'all passed as you were

3  coming in.

4       Was there somebody on site at UDF when y'all

5  executed the search warrants that assisted so y'all

6  could find the various servers and know where things

7  were located?

8  A.   Mr. Fowle did assist us with the execution of

9  certain parts of the search warrant, yes.

10 Q.   And what about email accounts?  PST files or

11 Outlook accounts, did he assist in any way regarding

12 that?

13 A.   He did.

14      So using the search warrant, we identified 24

15 accounts that we needed to be PST files, personal

16 storage tables that we needed to be downloaded.  We

17 provided them with a forensically-wiped 2 terabyte

18 hard drive, which he was able to then take those

19 files off of the server and download those for us.

20      He is actually as the systems admin, understood

21 where those files were at much quicker than we

22 would.  So he was able to take those files and put

23 them on a hard drive for us before we brought the

24 server down.

25 Q.   And then so we're going to talk about that.  So

 1  did y'all that hard drive with you that day, of the

 2  PST files?

 3  A.   We did not take the drive hard.  We gave it to

 4  the seizing agents and they took it.

 5  Q.   I'm sorry.  I say y'all, I mean the FBI.

 6       So just that was given to the seizing agent

 7  that day?

 8  A.   That's correct.

 9  Q.   And then in addition to that, so that the PSTs.

10       Did y'all -- and I say y'all, now I'm meaning

11  you -- did you and the other members of the RCFL do

12  any forensic analysis and try to image the servers

13  or the electronic media that was there at UDF?

14  A.   We tried to image some of the cell phones and

15  some of the computers in the offices on site.

16  Quickly determined we were going to have to take the

17  servers and several of the computers back to the lab

18  to do imaging, and that was just based on time.

19       In total, it took us almost a week to image

20  everything, which means if we had stayed on site, we

21  would have had the business shut down for a week.

22  Q.   And then once everything was imaged, were the

23  items then returned?

24  A.   The items were then returned to the seizing

25  agents, on site at the RCFL.  They came over and we

1  turned them over to UDF personnel.

2  Q.   Now, again, we'll talk about the emails in just

3  a little bit.  But are there certain Government

4  exhibits that you've had an opportunity to review

5  prior to coming here today, so that you could tell

6  the members of the Jury where certain items that

7  were electronically seized were actually located,

8  either on a hard drive or on a server, that type of

9  thing?

10 A.   I was.

11 Q.   Okay.

12      And was there -- let me ask you this:  As a

13 part of the process, the general process of

14 executing a search warrant, is there some kind of

15 drawing or map or something so we know where

16 different rooms are?

17 A.   Yes.  As far as -- as part of a search warrant,

18 there is a person on our team that will go ahead and

19 document the layout of the location.  In this case,

20 the UDF location.

21      MS. EGGERS:  Your Honor, at this time, I

22 would ask to admit Government's Exhibit 110.

23      THE COURT:  Okay.  110 will be admitted.

24

25

1              (The referred-to document was admitted in

2         Evidence as Government's Exhibit 110.)

3    BY MS. EGGERS:

4    Q.   And Special Agent Tedder, looking at

5    Government's Exhibit 110, the address, was it

6    1301 Municipal Way, Grapevine, Texas, which is in

7    the Northern District of Texas?

8    A.   That is correct.

9    Q.   And this first page, it says page 1 of 2, of

10   the diagram sketch, was it a two-story, two-story

11   office space?

12   A.   That is correct.  That's actually the second

13   story, I believe.

14   Q.   I've got it very small.  So I apologize.

15         So is each room actually labeled with a number

16   and a letter?

17   A.   That is correct.

18   Q.   Let's go to -- then the third page of this, is

19   there a list so we can see something was found, what

20   room it was found in?

21   A.   That is correct.

22            MS. EGGERS:  Your Honor, at this time I

23   would ask to introduce Government's Exhibit 87 into

24   evidence.

25            THE COURT:  87 will be admitted.

1              (The referred-to document was admitted in

2          Evidence as Government's Exhibit 87.)

3    BY MS. EGGERS:

4    Q.    Since y'all were doing a search of electronic

5    media, were there various spreadsheets that were

6    seized and that have now been marked as exhibits in

7    this case?

8    A.    That's correct.

9    Q.    And looking at Government's Exhibit 87, are you

10   able to tell members of the Jury where that looks

11   like some type of Excel spreadsheet called Cash

12   Outflows at the top?  Are you able to tell them

13   where that item was seized?

14   A.    I can.

15   Q.    If you will go ahead and do that, please.

16   A.    So Exhibit 87 -- may I back up a little bit and

17   explain this?

18   Q.    Yes.

19   A.    So when we initially started to do our

20   examination on the evidence, we set up a taint

21   review locally.  That quickly did not go as planned.

22   It was a massive undertaking, and we decided to use

23   another system at headquarters called BIDMAS.

24   Forgive me if I butcher the name, but it's Bureau of

25   Investigative Data Management Analysis System.

1    They were able then to take documents that they

2    can ingest into that system and review them up

3    there.

4    So after we had processed all of the evidence

5    into our system, we ran a script and took out

6    everything that we could take out that could be

7    ingested into the BIDMAS system.

8    As part of us doing that, we also indexed every

9    file, every folder, every word in our forensic

10   software.  As part of that, we give it an item

11   number.  We appended that item number to every file

12   and every folder as we exported them out one piece

13   of evidence at a time so that we could track from

14   the BIDMAS system when they came back to our system

15   because they're dissimilar systems.

16   So the way that I tracked that number or that

17   file, your exhibit that was given to me was -- I was

18   able to see that it came off a certain piece of

19   evidence, when it got back to me via the item

20   number, I could then cross reference that back into

21   my system and then review that document.

22   Q.   And so in preparation of coming here today,

23   were you asked to figure out through that process

24   that you've described that had the identifier that

25   you had placed before it went to BIDMAS, is that how

1  you're able to tell the location?

2  A.    That's correct.

3  Q.    So Government's Exhibit 87, which is Cash

4  Outflows, just an Excel spreadsheet, where was that

5  located?

6  A.    That was located on two pieces of evidence.

7  One in a storage room on the first floor.  And we

8  used a naming convention to mirror -- for every

9  image that we created, we used a naming convention

10 to mirror the room numbers that were shown on the

11 sketch earlier.

12      So we had a naming convention of F14RV Room V.

13 External media 2 is the second piece of external

14 media found in that room and that search room

15 location was the storage room.

16      The other piece of evidence that we found that

17 exhibit on was F1RW Computer 1, C1, which stood for

18 computer underscore 2.  The second hard drive in

19 that computer.  And that was found in Ty Fowle's

20 office.

21 Q.    So I'm going to slow you down for just a

22 second.

23      So you found it in two locations, is that

24 correct?

25 A.    That's correct.

1  Q.   One of which was Ty Fowle's office?

2  A.   That's correct.

3  Q.   And what was room?  We've got the diagram,

4  Government's Exhibit 110.

5  A.   If you should RW, so find room W.

6  Q.   On the first floor?

7  A.   On the first floor.  Right -- yes, right here.

8  That's correct.

9  Q.   Now, and then you said it was found in a second

10 location as well, is that correct?

11 A.   That's correct.

12      So that would be Room V.

13 Q.   Right next door?

14 A.   Correct.

15 Q.   Okay.  That's Government's Exhibit 87.

16      Are there other exhibits that we're going to

17 through so you can tell us and don't worry --

18 A.   We used the same methodology to determine where

19 every piece of evidence was found in the search

20 location.  That's how we documented it in our

21 examinations.

22          MS. EGGERS:  Your Honor, at this time I

23 would ask to introduce Government's Exhibits 88, 89,

24 496, 583 through 586.

25          THE COURT:  Okay.  86 and 89 will be

1  admitted.

2           MS. EGGERS:  I'm sorry.  88 and 89.

3           THE COURT:  I'm sorry.  88 and 89 will be

4  admitted.  496 will be admitted and 583 through to

5  589.

6           MS. EGGERS:  586, I'm sorry.

7           THE COURT:  586 through 589.

8           (The referred-to documents were admitted

9       in Evidence as Government's Exhibits 88, 89,

10       496, 583, 584, 585, and 586.)

11  BY MS. EGGERS:

12  Q.   So, Special Agent Tedder, you told us about

13  Government's Exhibit 8 --

14           MS. EGGERS:  One correction, your Honor.

15  583 through 586.

16           583 to 586, I'm sorry.

17           So 88, 89, 496, 583 to 586.

18           THE COURT:  Those will be admitted.

19  BY MS. EGGERS:

20  Q.   So you've told us where Government's Exhibit 87

21  was.

22       Where was Government's Exhibit 88?

23  A.   Government's Exhibit 88 was found in the server

24  room.

25  Q.   In the server room?

```
 1  A.   Correct.

 2  Q.   Were there a number of items found in the

 3  server room?

 4  A.   There were.

 5  Q.   Okay.

 6       And so I don't to go slow to get through these,

 7  so 88, you said, was in the server room?

 8  A.   Correct.  Which is Room J.

 9  Q.   Room J?

10  A.   Correct.

11  Q.   And what about Government's Exhibit 89?

12  A.   That was also found in the server room.

13  Q.   Are both of those items both spreadsheets?

14  A.   Spreadsheet and -- yes.

15  Q.   Let's go to Government's Exhibit 496.

16       Where was Government's Exhibit 496 found?

17  A.   It was found in the server room as well.

18  Q.   And is 496, is it some document entitled Wire

19  Authorization Cash Transfer Form?

20       If you just look at the screen next to you.

21  A.   Yes.

22  Q.   Okay.

23       And the amount for this wire authorization cash

24  transfer form is how much?

25  A.   It was $1,100,000.
```

1  Q.   And it indicates there, 5116 to pay down on

2  1503.

3       Is that what it says?

4  A.   That is correct.

5  Q.   Let's go to Government's Exhibit 583.

6       Where was that found?

7  A.   That was found in two locations, Douglas

8  Ballast's office and Ty Fowle's office.

9  Q.   Government's Exhibit 584?

10 A.   That was found in three locations.

11      Ty Fowle's office.  A second floor hallway.

12 And Adriana Tidwell's office.

13 Q.   585?

14 A.   That was found in Ty Fowle's office.

15 Q.   And is 585 a spreadsheet of some kind?

16 A.   It is.  I have it as a CR -- yes, the only

17 locator I can also -- it is an Excel spreadsheet.

18 Q.   And then, finally, Government's Exhibit 586,

19 where was that found?

20 A.   That was found in four locations.  They would

21 Ty Fowle's office, Douglas Ballast's office, Adriana

22 Tidwell's office and Ty Fowle's office again,

23 another hard drive.

24 Q.   Now, you were saying something after y'all went

25 and y'all had to bring some stuff back to the RCFL.

1  You got the hard drive with the PSTs on it.

2      When y'all were processing data y'all didn't

3  have the ability, did I understand you correctly, to

4  put a filter in place so that it could easily be

5  used by a filter agent, is that correct?

6  A.   We put a filter in place there and was

7  successful.  The issue was, there was an over -- a

8  large amount of taint review.  It would take months

9  and months.  And one agent came over to do that, and

10  forgive me, I don't remember his name off the top of

11  my head.  But he went back and said that this was

12  going to be impossible to do the way it was.

13  Q.   So y'all had the filter, it's just the volume

14  of data?

15  A.   The volume of data was overwhelming to that

16  agent.

17  Q.   Okay.  And so as a result, the data you said,

18  and you talked about running a script.  And then

19  ended up getting load files up to BIDMAS; is that

20  correct?

21  A.   That's correct.

22          MS. EGGERS:  If I may have a moment, your

23  Honor.

24  BY MS. EGGERS:

25  Q.   And I didn't ask this, how long have you been

1   an agent again?

2   A.   I have been an agent for if -- I have been with

3   the Bureau since 1997.  So let's clarify that.

4   Q.   Okay.

5   A.   So I was a supervisor over the IT department

6   starting in 1997, for about four and a half years.

7   I went through the Academy in October -- September

8   of 2001, and I've been an agent since then.

9   Q.   And you said a filter was put into place, so

10  y'all put a filter into place.

11       I didn't ask you, what is filter?  What do you

12  mean by that?  What is a filter?  You know, a filter

13  was put into place?

14  A.   So I was -- one of the co-case agents gave us a

15  list of taint terms that was provided to them.  We

16  took those taint terms and created a script.

17       We ran that script against every piece of

18  evidence in every examination.  We had broken down

19  this case into, I believe, nine initial examinations

20  to break the data up.  There's probably about 60

21  terabytes of data, if I remember correctly.

22       So we ran those taint terms against every piece

23  of evidence and every examination, and we flagged

24  those items that could be possible taint material.

25  Q.   And you are using the word "taint," and you're

1  using the word "filter."

2      Is this in order to make sure the FBI doesn't

3  get -- doesn't have come into contact with -- or the

4  case agent doesn't come into contact with its

5  potentially privileged information, is that what a

6  filter is?

7  A.   That's correct.

8      So we have the ability with our software to

9  create a digital fence.  So we can give one agent

10 access to everything.  And if he tags that or checks

11 that item, the other side, we can set that they

12 don't have the same rights to see those files on our

13 forensic software.

14 Q.   So there's a filter agent and then there's --

15 A.   And there's an investigative agent.

16          MS. EGGERS:  No further questions, your

17 Honor.

18              CROSS-EXAMINATION

19 BY MR. PELLETIER:

20 Q.   Agent Tedder, you talked about a filter team

21 running search terms?

22 A.   I ran the search terms.

23 Q.   And when did you do that, sir?

24 A.   Probably May of 2017, was the last time that we

25 run the search terms to create -- I'm sorry.  We ran

1  the search terms earlier than that.  May would be

2  the last time that we actually created the load

3  files for BIDMAS.  I'm sorry.

4       Probably within a couple of weeks of getting

5  everything processed.

6  Q.   Probably or definitely?

7  A.   Definitely.

8  Q.   All right.

9       Do you know what date that was?

10 A.   I do not have a date in front of me, no, sir.

11 Q.   Now, when you went in to search this premises,

12 there was a private company on the first floor that

13 you guys tried to go in and search.

14      Do you remember this?

15          MS. EGGERS:  Your Honor, I'm going to

16 object, if we may approach.

17          THE COURT:  Okay.

18          (The following proceedings were had at

19      sidebar without being reported:)

20 BY MR. PELLETIER:

21 Q.   So it is true there was a private company, the

22 Hartnett Group on the first floor, and you didn't

23 know that when you went in there, did you?

24 A.   I didn't go in there.

25 Q.   All right.

1        And you tried to go in there; is that correct?

2   A.   Again, I was not part of the initial search

3   team.   The CART people, the forensic examiners

4   didn't enter the building until the building was

5   secured.   So I wasn't part of that.   I don't know if

6   they tried to go in there or not.

7   Q.   All right.

8        And so you're getting all of your information

9   about where items were searched from, from that

10  chart?

11  A.   I'm not following you.

12  Q.   You said that things were seized from Ty

13  Fowle's office, for instance?

14  A.   That's correct.

15       And that was done by -- somebody else created

16  that sketch.

17  Q.   So you're basing your statement as to where it

18  came from, from what you saw on that chart?

19  A.   From where we saw it on the chart and the

20  seizing agents, that's correct.

21  Q.   Okay.

22       And you have a brother named Michael, correct?

23  A.   I do.

24  Q.   And he's both a friend and a business partner

25  of an individual named Kyle Bass, isn't he?

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                           Vol 3 January 12, 2022                           Page 238

```
 1  A.   That's correct.  They've been friends since
 2  high school.
 3  Q.   And you know, do you not, that Kyle Bass wanted
 4  to acquire UDF's assets, don't you?
 5  A.   I'm not aware of that.
 6  Q.   Well, how many times do you meet with Kyle Bass
 7  and your brother?
 8  A.   The last time I met with Kyle Bass and my
 9  brother would be March 26th of 2020.
10  Q.   All right.
11       And how about before that?  How often have you
12  met with Kyle Bass?
13  A.   The time before that would have been a few
14  years back before that.
15  Q.   How about before the search?
16  A.   We didn't meet before the search.
17  Q.   Well, the search, ever before the search,
18  before 2016, you never met with Kyle Bass?
19  A.   That's correct.
20  Q.   And how about your brother?
21  A.   I don't know.
22  Q.   You do know that Kyle Bass was tipped off to
23  the search, don't you?
24  A.   No, I don't.
25  Q.   You never heard that?
```

```
 1  A.    I've never heard that.
 2              MR. PELLETIER:  May I have a moment, your
 3  Honor?
 4              Thank you.  No further questions, your
 5  Honor.
 6              MR. STEPHENS:  No, your Honor.
 7                      REDIRECT EXAMINATION
 8  BY MS. EGGERS:
 9  Q.    What were you doing on March 26th, 2020, when
10  you came into contact with Kyle Bass?
11  A.    I got a call from my brother at 2:15 in the
12  morning.  He had called me, his daughter was killed,
13  my niece, in a horrible -- in a -- four-wheeler
14  accident.
15        So I had to go down to Fredricksburg.  I got
16  there by 8:15 in the morning.  And during that time,
17  my brother called several other of his friends.  And
18  I believe Mr. Bass was one of those people that were
19  friends with Mike at the time.  And he had come down
20  there to console my brother because he was not in a
21  good way.
22  Q.    Did you and Kyle Bass discuss UDF at your -- at
23  this -- in March of 2020, when you're there
24  consoling your brother because of the loss of his
25  daughter?
```

 1   A.    No, ma'am.

 2         So Mr. Bass and several of his friends took

 3   care of my brother, while I went and cleaned up the

 4   blood and brain matter off the road.

 5   Q.    And then before that, you said that there was

 6   one time a few years back that you saw Mr. Bass?

 7   A.    That's correct.

 8   Q.    When was that?

 9   A.    Mr. Bass's mother had died.  My mother was

10   friends with Mrs. Bass, because my brother and Kyle

11   were friends at the time.  My mother was friends

12   with all of my friends' friends and my brother's

13   friends, and they were friends.  And when Mrs. Bass

14   died, my mother wanted to go to the memorial

15   service.  So I took her to the memorial service.

16   Q.    Did you talk about UDF at the memorial of

17   service of Mr. Bass's mother?

18   A.    No.

19             MS. EGGERS:  Thank you, sir.

20             MR. PELLETIER:  Nothing more, your Honor.

21             MR. STEPHENS:  No, sir.

22             MR. LEWIS:  No, sir.

23             THE COURT:  Thank you.  You may step down.

24             MS. EGGERS:  Sang Chung.

25             (SANG HO CHUNG was duly sworn by the

```
 1        Court.)
 2                      DIRECT EXAMINATION
 3   BY MS. EGGERS:
 4   Q.    Go ahead and please state your name.
 5   A.    Sang Ho Chung.
 6   Q.    Okay.  And if you feel comfortable enough to
 7   take off your mask, you're allowed to take off your
 8   mask while you're speaking.  Yes, sir.
 9   A.    Sure.
10   Q.    And if you could say your name again, I'm.
11   Sorry?
12   A.    Sang Ho Chung.  C-H-U-N-G, last name.
13   Q.    Mr. Chung, where are you employed?
14   A.    I work for the FBI, the Federal Bureau of
15   Investigation.
16   Q.    And what position do you hold for the FBI?
17   A.    My title is supervisory computer specialist.
18   And I'm in charge in that BIDMAS program at the FBI.
19              THE COURT:  Let me stop you there.  I'm
20   going to ask you speak into that microphone
21   directly, so that your voice projects loud and talk
22   good and slow.
23              THE WITNESS:  Okay.  Sure.  Sorry about
24   that.
25
```

```
 1  BY MS. EGGERS:

 2  Q.   You said you work at BIDMAS; is that correct?

 3  A.   Yes.

 4  Q.   Okay.  And what position do you hold at BIDMAS?

 5  A.   I'm in charge of the BIDMAS program.

 6  Q.   I'm sorry.  There was talking behind me.

 7       You're in charge of what?

 8  A.   The BIDMAS program.

 9  Q.   And what is the BIDMAS program?

10  A.   It's basically it's an acronym for Bureau of

11  Investigative Document Management and Analysis

12  System.  It's basically a document review platform.

13  Q.   A document review platform?

14  A.   Yes.

15  Q.   Okay.  And how long have you held that

16  position?

17  A.   Since 2009.

18  Q.   And what is your educational background,

19  Mr. Chung?

20  A.   I have a mechanical engineering degree from

21  Virginia Tech.

22  Q.   A mechanical engineering degree?

23  A.   Yes.

24  Q.   And the BIDMAS platform, was the BISMAS

25  platform used in this particular case that we're
```

1  here about today?

2  A.   Yes, correct.

3  Q.   And did you receive data both in -- both PSTs

4  or email and non-PST information as well?

5  A.   Yes.  We usually receive a copy of the data.

6  It comes in DVDs or hard drives from the agent.

7  Q.   And then go ahead and just generally explain to

8  us what you do, once you receive the data, what you

9  did when you received data in this case?

10  A.   Sure.  Basically, we be learning the data set

11  from the copy that we are provided from the agent.

12  So, basically, the loading process is a two-step

13  process.  Step one is basically discovery of the

14  data set, what type of data that we have.

15      Usually, the category into two areas, one would

16  be a PST email, and second would be a catchall,

17  basically all loose files.  Loose files contain

18  Excel spreadsheets, Word documents, .pdf, or

19  anything else that comes with it.  That's step one.

20      And step two process is to load the data.

21  Basically, as we load the data set, or ingest into

22  BIDMAS system, assign a unique identifier, we call a

23  document -- a document number, which we call it DOC

24  ID.

25      And the second thing we do on the ingestion

 1  side is that system indexes the data set, so it
 2  would be easier and faster for a user to search the
 3  data that's been loaded into BIDMAS.
 4  Q.   And is that the process that you followed in
 5  this case that you're here testifying about today?
 6  A.   Yes.
 7  Q.   And in a situation like this one, where there
 8  is a filter that's put into place, does BIDMAS take
 9  any steps to filter information?
10  A.   That's correct.  Well, basically, what we do is
11  if the agent notifies us that there could be
12  potentially a privileged document, we ask for the
13  list of, I guess the names and search terms they
14  want us to run after we load the data set.  So
15  basically after we do all of the data, we use those
16  terms against the data set that's already been
17  loaded, and then we search it and we segregate those
18  datasets into a folder that's not available to the
19  investigative team.
20  Q.   So there's stuff that is taken hidden not
21  available to the investigative team; is that
22  correct?
23  A.   Correct.
24  Q.   And if is there filter agent or filter AUSA on
25  it, are they given access to the other side of the

 1  data?

 2  A.    Yes.

 3  Q.    And that was the process utilized in this

 4  particular case?

 5  A.    Yes.

 6          MS. EGGERS:  Your Honor, if I may

 7  approach.

 8  BY MS. EGGERS:

 9  Q.    Mr. Chung, prior to coming here today, did you

10  look at various of the Government's exhibits and

11  then certain pages of various Government's Exhibits?

12  A.    Yes.

13  Q.    In order to -- I'm going to hand you a list, in

14  order to determine if those were documents for PSTs

15  that were processed by BIDMAS in this particular

16  case?

17  A.    Yes.

18  Q.    Okay.

19          And that list that I have handed you, are those

20  the exhibit numbers and then the some between 350

21  and 409 that the specific pages on that range, are

22  those items that were processed by BIDMAS?

23  A.    Correct.

24  Q.    And those were all items that came from the

25  execution of the search in this particular -- or the

1  data that y'all received at BIDMAS.

2  A.    Okay.  All of the data we have received from

3  the case agent.

4  Q.    Here down in Texas, we have the RCFL.  So if we

5  heard that the RCFL is the one that was giving you

6  the data, does that make sense?

7  A.    Basically, the RCFL were processing the

8  datasets and provide the copies to the case agent.

9  And the case agent will make me a copy and send it

10  to the headquarters in DC.  That's where we load the

11  data.

12  Q.    And that filter process was put into place into

13  this case; is that correct?

14  A.    Yes.  Correct.

15         MS. EGGERS:  Your Honor, I can provide the

16  list to the Court, but I have a list of number of

17  Government's exhibits.  I would rather do this than

18  just reading them aloud.  I thought that might be a

19  more -- but at this time the list, and Mr. Pelletier

20  has a copy of the list as well, your Honor.  And

21  this is a subset of some of the items that Mr. Fowle

22  previously authenticated.

23         But I would be moving at this time, your

24  Honor, for all of the items that are listed on the

25  list I gave to Mr. Pelletier.  I would be asking to

 1   introduce them into evidence.

 2              THE COURT:  Okay.  And you want to give me

 3   the list?

 4              MS. EGGERS:  Yes, your Honor.

 5              And the Court will see that there's

 6   certain of the exhibits, it's just certain pages of

 7   them.

 8              THE COURT:  Right.

 9              Any objection?

10              These will be admitted into evidence.

11              MS. EGGERS:  If it would help, I will

12   always provide Madam Court Reporter.

13              THE COURT:  Yes.

14              (The referred-to documents were admitted

15         in Evidence as Government's Exhibits 85 to 89,

16         124B, 143, 144, 146 to 157, 165 to 168, 170 to

17         171, 174 and 175, 195 to 198, 200 to 245 248 to

18         271, 279 to 303, 309 to 314, 350 (p. 13-21),

19         351 (p. 10-26), 352 (p. 14-44), 353 (p. 14-20),

20         354 (p. 20-23), 355 (p. 19-27), 356 (p. 20-23),

21         357 (p. 24-34), 358 (p. 22-28), 359 (p. 22-31),

22         360 (p. 12-16), 361 (p. 13-18), 362 (p. 17-58),

23         363 (p. 13-50), 364 (p. 12-71), 365 (p. 15-54),

24         366 (p. 18-52), 367 (p. 16-45), 368 (p. 17-43),

25         369 (p. 15-46), 370 (p. 19-69), 371 (p. 15-74),

```
 1              372 (p. 18-55), 373 (p. 8-12), 374 (p. 7-21),
 2              375 (p. 15-44), 376 (p. 13-38), 377 (p. 16-67),
 3              378 (p. 21-40), 379 (p. 20-35), 380 (p. 14-29),
 4              381 (p. 27-71), 382 (p. 37-68), 383 (p. 21-52),
 5              384 (p. 9-29), 385 (p. 13-54), 386 (p. 15-82),
 6              387 (p. 22-56), 388 (p. 14-68), 389 (p. 18-41),
 7              390 (p. 25-48), 391 (p. 28-65), 392 (p. 17-57),
 8              393 (p. 21-65), 394 (p. 21-134), 395 (p.
 9              20-61), 396 (p. 25-108), 397 (p. 12-19), 398
10              (p. 20-39), 399 (p. 21-72), 400 (p. 32-91), 401
11              (p. 26-38), 402 (p. 18-54), 403 (p. 20-38), 404
12              (p. 28-70), 405 (p. 12-92), 406 (p. 28-95), 407
13              (p. 23-66), 408 (p. 19-61),  409 (p. 17-84),
14              431 to 437, 441 to 464, 487A and 487B, 488, 493
15              to 496, 498 to 512, 514 to 515, 517 to 544B,
16              545 to 547, 552A to 552B, 573 to 574, 579A to
17              579J, 583 to 586, and 593 to 599.)
18      BY MS. EGGERS:
19      Q.   You said that there was a DOC ID or some kind
20      of name or something?
21      A.   Yes.  A unique identify for each document that
22      we ingest into BIDMAS.
23      Q.   Now, so there's PSTs.  That's some of the items
24      that were found.  And then there were also, you said
25      non-PSTs; is that right?
```

```
 1   A.    Yes.

 2   Q.    Okay.

 3         And so looking at Government's Exhibit 124B,

 4   which is on the list of exhibits, looking at

 5   Government's Exhibit 124B, down here at the bottom,

 6   there's a number.

 7   A.    Correct.  That is the BIDMAS document ID number

 8   for each document that we have ingested into BIDMAS

 9   for this case, yes.

10   Q.    And so on this particular one, the DOC ID

11   number is down at the bottom; is that correct?

12   A.    Yes.

13         That's where we usually put the DOC ID.

14   Q.    And then also on this one, there is a -- what I

15   will call Bates number on the bottom right; is that

16   correct?

17   A.    Correct.  That's what the agent/prosecutor

18   asked us to put it in.

19   Q.    Have the DOC ID and then some other Bates

20   number on top of it?

21   A.    It makes it easier for us at the BIDMAS team to

22   use the DOC ID to search the documents versus the

23   Bates number provided on the right side.

24   Q.    And then going to -- I'm just going to show one

25   so we can see it's a little bit different, going to
```

1   Government's Exhibit 350, and the specific pages

2   that -- going to Government's Exhibit 350, and that

3   portion that you have authenticated, is page 13

4   through page 21.

5        Now, this one is also an email, but it looks

6   like the DOC ID is at the top.  Explain to us why it

7   looks different?

8   A.   One of the reasons it was not Bates stamped,

9   but someone, maybe the agent or analyst, has printed

10  this document, and the first part, the top part that

11  you see, we call it the document header information.

12       The first one, the first line is a document ID

13  number and on below, it tells you all of the

14  relevant information we need for the document.

15       In this case, it's an email, it shows you data

16  from, to, cc, bcc, and subject and data and

17  attachment information.  So I know this came from a

18  BIDMAS printout.

19  Q.   So somebody went into BIDMAS that had their

20  access, and they printed it out from BIDMAS there,

21  correct?

22  A.   We allow the printing of a document from the

23  system itself.  So ...

24  Q.   And the same data set, both PSTs, but this

25  one's just been printed directly out of BIDMAS and

1  the other one was when y'all produced the data.

2  A.   Yes, we exported out the case.

3          MS. EGGERS:  Can I have one moment, your

4  Honor?

5          Nothing further at this time, your Honor.

6          MR. PELLETIER:  No questions.

7          MR. STEPHENS:  No, no, sir.

8          MR. ANSLEY:  No, your Honor.

9          THE COURT:  Thank you, you may step down.

10          Thank you very much.

11          MS. EGGERS:  Pam Hanson, your Honor.

12          (PAMELA HANSON was duly sworn by the

13      Clerk.)

14                    DIRECT EXAMINATION

15  BY MS. LYONS:

16  Q.   Good afternoon.  Can you please introduce

17  yourself to the members of the Jury?

18      Yes, you can remove your mask.

19  A.   Pamela Hanson.

20  Q.   And, Ms. Hanson, how are you employed?

21  A.   I'm an agent with the FBI.

22  Q.   How long have you been an FBI agent?

23  A.   Eleven years.

24  Q.   And as an FBI agent, do you regularly execute

25  federal search warrants as part of your job?

```
 1   A.    I do.

 2   Q.    Did you participate in the execution of a

 3   search warrant at the UDF premises on February 18,

 4   2016?

 5   A.    I did.

 6   Q.    And was that located at 1301 Municipal Way in

 7   Grapevine, Texas?

 8   A.    Yes, it was.

 9   Q.    Is that in the Northern District of Texas?

10   A.    Yes, it is.

11   Q.    Can you please generally describe how the

12   search warrant was executed?

13   A.    I was the seizing agent for the search warrant.

14   So basically my role was to manage the search, make

15   sure that pictures were taken, and a sketch was done

16   and I was available for questions.

17   Q.    And as part of the execution of that search

18   warrant, were physical documents seized from 1301

19   Municipal Way in Grapevine?

20   A.    Yes.

21   Q.    Do you see these two boxes here that have been

22   labeled Exhibits 111 and 112?

23   A.    Yes.

24   Q.    Were these items seized from the UDF premises

25   on February 18, 2016?
```

```
 1  A.   Yes, they were.

 2            MS. EGGERS:  I'd like to offer

 3  Government's Exhibit 111 and 112.

 4            THE COURT:  Okay.  They will be admitted.

 5            (The referred-to documents were admitted

 6       in Evidence as Government's Exhibits 111 and

 7       112.)

 8  BY MS. LYONS:

 9  Q.   And, Ms. Hanson, once these boxes were seized,

10  were their contents digitized?

11  A.   Yes.

12  Q.   How was that done?

13  A.   When I just scanned them, is that what you're

14  asking me?

15       Yeah, I scanned them last week.

16  Q.   And did you personally scan the contents of

17  these files?

18  A.   Yes.

19            MR. GOTTFRIED:  Thank you.  No further

20  questions.

21            THE COURT:  Nobody?

22            MR. STEPHENS:  No, sir.

23            MR. LEWIS:  No.

24            THE COURT:  You may step down.

25            MS. EGGERS:  Special Agent Tom Cook.
```

```
 1              THE COURT:  Raise your hand to be sworn.
 2              (THOMAS COOK was duly sworn by the Clerk.)
 3                    DIRECT EXAMINATION
 4    BY MS. EGGERS:
 5    Q.    Please state your name.
 6    A.    Special Agent Thomas Cook.
 7    Q.    And you said you're a Special Agent.  What
 8    agency do you work for?
 9    A.    I work in the FBI, and I'm assigned to the
10    Dallas division.
11    Q.    And how long have you been a Special Agent with
12    the FBI?
13    A.    Since August of 2014.
14    Q.    And did you work for the FBI prior to that?
15    A.    I did.  I was an intelligence analyst.  And I
16    started with the Bureau in 2011.
17    Q.    And what squad are you currently assigned to at
18    the FBI?
19    A.    I'm currently assigned to a cyber squad.
20    Q.    Have you been involved in this investigation in
21    this case?
22    A.    Yes, I have.
23    Q.    And during the course of the investigation,
24    were records obtained from various sources?
25    A.    Yes, ma'am, they were.
```

```
 1  Q.   Okay.
 2       And were some of the records obtained, did they
 3  actually come from the Securities and Exchange
 4  Commission?
 5  A.   Yes, that's correct.
 6  Q.   And were those records either that were filed
 7  with the SEC or records that the SEC received from
 8  the UDF entities?
 9  A.   Yes.  Both instances are in this case.
10           MS. EGGERS:  Your Honor, if I may
11  approach.
12           THE COURT:  Yes.
13  BY MS. EGGERS:
14  Q.   So I don't mess up reading numbers, which I
15  will do in a heartbeat.  I'm going to hand you a
16  list of records that were provided to the SEC by the
17  UDF entities.
18       Have you looked at these -- these Government's
19  exhibits that are listed in front of you?
20  A.   Yes.  I have reviewed all of these Government
21  exhibits.
22  Q.   And were all of those records, were they
23  received by either the US Attorneys Office or the
24  FBI from the Securities and Exchange Commission?
25  A.   That's correct.
```

1    Q.   And these items that are listed here, and we'll

2    get to the certified copies of something else in the

3    moment, were all of these records that were received

4    from or by the SEC from the UDF entities?

5    A.   Yes.  All of these numbers here were received

6    by the SEC from UDF entities, that's correct.

7              MS. EGGERS:  Your Honor, at this time I

8    would ask to introduce, and I can bring a list up to

9    the Court and I will bring it to the court reporter.

10   But I would ask to introduce the Government's

11   exhibits that are listed on the paper.

12             Mr. Ansley has a copy and Mr. Pelletier

13   has a copy.

14             MR. ANSLEY:  Your Honor, can I speak with

15   Mr. Pelletier briefly?

16             THE COURT:  Yes.

17             MR. ANSLEY:  Thank you.

18             Your Honor, on this list, the defense does

19   not dispute that the agent can authenticate these

20   records.  There are some exhibits that I agree can

21   also be -- can also be introduced through the agent

22   as well.  But there are a number that I believe he

23   can authenticate and that's as far as he can go.

24             I can identify to the Court as far as I've

25   gone with this list, but I'm not finished going

 1  through it yet this afternoon.  I can tell the Court

 2  and the Government, you can see my view concerning

 3  the individual exhibits as far as I have gotten so

 4  far.

 5          THE COURT:  Okay.

 6          MS. EGGERS:  Your Honor, these were all

 7  provided by UDF's counsel to the Securities and

 8  Exchange Commission.  So ...

 9          MR. ANSLEY:  We don't dispute that, your

10  Honor.

11          THE COURT:  Okay.  Do you need to get into

12  the specific exhibits?

13          MS. EGGERS:  Not the specifics, your

14  Honor, but I've brought somebody in because we

15  couldn't get a stipulation on this issue.  Somebody

16  with the SEC has been waiting here all day.

17          So I don't want to let her go and then

18  need to have her come in and say these are the

19  records we got.

20          THE COURT:  Well, we may have to bring her

21  in.

22          MS. EGGERS:  Okay.

23  BY MS. EGGERS

24  Q.   And, Special Agent Cook, in addition that these

25  that are listed on the document in front of you,

1  during the course of the investigation, were

2  certified copies of the SEC filings by UDF III,

3  UDF IV, and UDF V, obtained from the SEC?

4  A.    Correct.  10-Ks and 10-Qs, that's correct.

5  Q.    And then also 8-Ks as well?

6  A.    I believe that's correct.

7  Q.    And those are -- we actually got certified

8  copies of those from the SEC, but the filings

9  themselves are what were filed by the UDF entities;

10  is that correct?

11  A.    Correct.  Those public filings were received

12  from the SEC with the certification, that's correct.

13          MS. EGGERS:  Your Honor, at this time, I

14  would ask to introduce Government's Exhibits 82, 83,

15  and 84.

16          THE COURT:  I heard the first two, but not

17  the third.

18          MS. EGGERS:  I'm sorry.  82, 83, and 84.

19          THE COURT:  Those will be admitted.

20          (The referred-to documents were admitted

21      in Evidence as Government's Exhibits 82, 83,

22      and 84.)

23  BY MS. EGGERS:

24  Q.    Now, in addition to getting records from the

25  SEC, during the course of this investigation, were

1 | certified copies of various incorporation records
2 | for the various UDF entities obtained by the FBI?
3 | A.   Yes, they were.
4 | Q.   And have those been marked as Government's
5 | Exhibit 1 through Government's Exhibit 16?
6 | A.   1 through 16, that's correct.
7 |           MS. EGGERS:  Your Honor, at this time I
8 | would ask to introduce certified copies of the
9 | various incorporation records for the UDF entities
10 | that have been marked as Government's Exhibit 1
11 | through Government's Exhibit 16.
12 |           THE COURT:  Those will be admitted.
13 |           (The referred-to documents were admitted
14 |      in Evidence as Government's Exhibits 1 to 16.)
15 | BY MS. EGGERS:
16 | Q.   Now, a little later we're going to hear about a
17 | company called DST, which is a third-party company.
18 | Again, DST.
19 |      Were incorporation records obtained for the
20 | entity DST?
21 | A.   Yes, I'm familiar, they were.  Those are
22 | Exhibit 17.
23 |           MS. EGGERS:  Your Honor, at this time, I
24 | would ask to introduce Government's Exhibit 17, a
25 | certified copy of the third party entity's

1  incorporation records.

2          THE COURT:  That will be admitted.

3          (The referred-to document was admitted in

4      Evidence as Government's Exhibit 17.)

5  BY MS. EGGERS:

6  Q.   Now, during the course of this investigation,

7  was a forensic accountant with the FBI, did he work

8  on the case?

9  A.   Yes, he did.

10 Q.   And did he obtain records from various

11 financial institutions?

12 A.   He as well as other agents with the FBI

13 obtained records through subpoena, that's correct.

14 Q.   And those -- you said he conducted financial

15 analysis; is that correct?

16 A.   He did conduct financial analysis.

17 Q.   And you're not here to talk about his financial

18 analysis, are you?

19 A.   No.  That's is his financial analysis.

20 Q.   Okay.  But are you here so that we can

21 introduce the various bank accounts that it's your

22 understanding he relied upon for his financial

23 analysis?

24 A.   Correct.  He's explained his financial analysis

25 to me, how it's prepared.  And then what I looked at

1  was the bank records that make up that financial

2  analysis.  So I've looked at each of the bank

3  accounts and bank records that would make up that

4  exhibit.

5          MS. EGGERS:  Your Honor, at this time, I

6  would ask to introduce Government's Exhibit -- and

7  also let me back up.

8  BY MS. EGGERS

9  Q.   They are bank accounts, are they financial

10 institutions?

11 A.   Yes, they are.

12       And I think you're referring to the FDIC

13 certifications that they are insured banks.

14 Q.   So were also copies, certified copies of the

15 FDIC certificates for the various financial

16 institutions, were they obtained as well?

17 A.   Yes.

18          MS. EGGERS:  Your Honor, at this time, I

19 would ask to introduce Government's Exhibit 18

20 through Government's Exhibit 66, and Government's

21 Exhibit 75 through Government's Exhibit 81.  Again,

22 that's 18 through 66.  And 75 through 81.

23          THE COURT:  18 through 66 will be

24 admitted.

25          MR. PELLETIER:  Your Honor --

1              THE COURT:  No.  Hold on.

2              MR. PELLETIER:  Excuse me.

3              THE COURT:  Go ahead.

4              MR. PELLETIER:  Are those FDIC

5    certifications, are they actual bank records, bank

6    account records?

7              MS. EGGERS:  They are both.

8              MR. PELLETIER:  All right.  I have an

9    objection to personal bank records.

10             MS. EGGERS:  That is not included.

11             MR. PELLETIER:  No objection.

12             MS. EGGERS:  These were --

13             MR. PELLETIER:  No objection.

14             THE COURT:  Okay.  Then 18 through 66 and

15   then it was 75 through what?

16             MS. EGGERS:  81, your Honor.

17             THE COURT:  75 through 81 will be

18   admitted.

19             (The referred-to documents were admitted

20       in Evidence as Government's Exhibits 18 to 66

21       and 75 to 81.)

22   BY MS. EGGERS:

23   Q.   Now, certified copies of the various UDF

24   entities incorporation records were obtained.  The

25   DST, the third party company was obtained.

1      What about certified copies of incorporation

2  records for various developments, limited

3  partnership developments?

4  A.   Yes, that's correct.

5          MS. EGGERS:  Uh-huh.  Your Honor, at this

6  time I would ask to introduce Government's

7  Exhibit 67 through 74, certified copies of

8  incorporation records for various land developments.

9          THE COURT:  Okay.  Then they will be

10  admitted.

11          (The referred-to documents were admitted

12      in Evidence as Government's Exhibits 67 to 74.)

13  BY MS. EGGERS:

14  Q.   And then, finally, in addition, what

15  Mr. Pelletier was just talking about, were bank

16  accounts obtained for the Defendants' individual

17  bank accounts and then for Defendant Wissink and

18  Defendant Greenlaw, closely-held entity bank

19  accounts they had as well.

20  A.   That's correct.  In their individual capacity

21  or in which they were signors of limited

22  partnerships.

23          MS. EGGERS:  Your Honor, at this time --

24  this is the one I think what Mr. Pelletier wanted

25  preserve his objection -- Government's Exhibits 616

1  through 623.  Government's Exhibits 616 through 623.

2          THE COURT:  Okay.

3          MR. PELLETIER:  Same objection, your

4  Honor.

5          THE COURT:  Yes.

6          Okay.  Tell me those numbers one more

7  time.

8          MS. EGGERS:  I'm sorry, your Honor.

9          The last batch was Government's

10  Exhibits 616 through 623.

11          THE COURT:  616 through 623.

12          Okay.  I will overrule the objection.  I

13  will admit those exhibits for -- only for the

14  purpose of showing motive or to the extent anybody

15  has made any guaranties, any personal guaranties in

16  this case.  That's the only purpose that you can

17  consider these exhibits, if they show motive.  And

18  the Government will have to explain that in final

19  argument or some sort of guarantee.  Then you can

20  consider them for those reasons only.

21          Not for any other reason.  Not to show how

22  much -- for any improper consideration of wealth or

23  anything like that.

24          Only for motive.

25          MS. EGGERS:  Before we get into the actual

1  exhibits, your Honor, we will make sure to alert the

2  Court as well.

3            THE COURT:  Thank you.

4            (The referred-to documents were admitted

5       in Evidence as Government's Exhibits 616 to

6       623.)

7            MS. EGGERS:  Your Honor, at this time, I'd

8  ask to go through the various exhibits that UDF's

9  counsel provided to the SEC so that we can have

10 those placed on the record to try and ferret out the

11 objections, I guess.  I don't know if the Court

12 wants to do that after court.

13           THE COURT:  Why don't we go ahead break

14 here and take that issue up?  We've been going late

15 enough.

16           Ladies and gentlemen, why don't we go

17 ahead and end here for today.  We'll stay and take

18 up these matters, so we don't have to take your time

19 hashing these through, with you sitting there and

20 you just not being able to hear that.  We will end

21 today.

22           When you get home your family members,

23 friends, will ask you where you've been, to the

24 extent they don't know, and once you tell them that

25 you've been selected to serve on this jury, they

1    will start peppering you with questions.  You've got

2    to tell them that it's improper for you to talk

3    about the case.  Hopefully, they will understand.

4    If not, tell them I specifically instructed you not

5    to talk.

6            Remember what I said earlier today, don't

7    do any independent investigation, don't search on

8    the Internet or social media.  Don't post about

9    this, if you post a lot on social media.  Don't take

10   a picture of the courthouse and start talking about

11   the case.  Please refrain from doing all those

12   things.

13           Thank you for all of your hard work.  As

14   I've told you repeatedly at this point, we can

15   minimize the number of days you have to come down

16   here by working a little longer during the day.  So

17   that's what I try to do.  So that the number of days

18   you have to come down here is mitigated just a

19   little bit.

20           So with that said, we will start at 9 a.m.

21   We can't get started unless all of you are here.  If

22   one of you is not here, we will all be waiting.

23   Again, we need you in the box, we need a witness on

24   the stand and we need information being produced to

25   keep this case moving sufficiently.  If y'all get

 1    here before 9:00, we will be early here.  If all you

 2    are here at 8:30, we will get you in the box.  We

 3    try not to start officially at 8:30 because I don't

 4    know what y'all's circumstances are.  If you all can

 5    be here at 8:30, be here at 8:30, and we can get

 6    started.  No later than 9 in the morning.

 7            With that said, go with the court security

 8    officer.  We will see you in the morning.

 9            THE COURT SECURITY OFFICER:  All rise.

10            (The jurors exited the courtroom.)

11            THE COURT:  Okay.  Please be seated.

12            Okay.  So now that the Jury is out of the

13    room, let's go ahead and talk about these exhibits.

14            MS. EGGERS:  Yes, your Honor.

15            So it sounded as though Mr. Ansley didn't

16    have objection to some, but does have an objection

17    to others, so I'm not sure which is which.  But

18    Government's Exhibit 129A.  That is actually an

19    email, and I apologize, there was an error in the

20    exhibit list.  I wrote 2021; it should have been

21    2014.

22            MR. ANSLEY:  Your Honor, may I tell the

23    Court and the Government which ones we have no issue

24    with?  That will speed things up.

25            THE COURT:  Yes.

```
 1              MR. ANSLEY:  129A, we are agreeable to
 2    129A, 129B.  All of the 129s.
 3              THE COURT:  Those will be admitted.
 4              (The referred-to documents were admitted
 5         in Evidence as Government's Exhibits 129A and
 6         129B.)
 7              MR. ANSLEY:  I believe 247 is already in
 8    evidence, your Honor.
 9              THE COURT:  All right.  To the extent it's
10    not, it's admitted.
11              MR. ANSLEY:  Between 129 to 247.  We do
12    object on hearsay grounds.
13              We are agreeable to 273 Alpha and Bravo.
14              THE COURT:  So 273A and B will be
15    admitted.
16              (The referred-to documents were admitted
17         in Evidence as Government's Exhibits 273A and
18         273B.)
19              MS. EGGERS:  But not C.
20              MR. ANSLEY:  275, your Honor.  277.  278.
21    304.  308.  349.  485.  And 516, I believe.  The top
22    of that is hearsay, but I believe the bottom portion
23    of the email communication is a party admission.
24    Therefore, it's admissible.
25              THE COURT:  Okay.  So you agree that those
```

1    numbers that you just called out should be admitted?

2              MR. ANSLEY:  Yes, sir.

3              THE COURT:  And then you object, you

4    object to the numbers you have not called.

5              MR. ANSLEY:  That's correct.  And to be

6    clear, I don't question whether or not this, the

7    agent or the SEC can authenticate these exhibits,

8    but its hearsay objection that --

9              THE COURT:  Hearsay.

10             Okay.  Ms. Eggers, all of the defendants

11   object to the hearsay nature of the remaining

12   exhibits, and so what is your view on these?

13             MS. EGGERS:  The authors of the various --

14   well, I think 246 -- can I confirm that 246 didn't

15   go into evidence?

16             THE COURT:  246 is already in.

17             MS. EGGERS:  Yes.  246 is already in.  So

18   I won't address it.

19             So 246 and 247 are already in.

20             THE COURT:  Correct.

21             MS. EGGERS:  Okay.  If my math is somewhat

22   correct, that leaves us with 177, 178, 273C.

23             THE COURT:  Correct.  272A and B.

24             MS. EGGERS:  272A and B.

25             THE COURT:  274.

1              MS. EGGERS:  Well, with regard to 272A and

2    B, your Honor, it's the Government's position this

3    email by Melissa Youngblood, her name is on that

4    sealed notice.  So the hearsay exception is going to

5    being addressed in that.

6              MR. PELLETIER:  Judge, if I might, and

7    I'm -- there is now material of privileged.

8              MS. EGGERS:  That is what was produced to

9    the SEC.  So presumably K&L Gates.  The Bates number

10   at the bottom right-hand corner.

11             MR. PELLETIER:  If it was produced to the

12   SEC, there is no privilege, for sure.  I take your

13   word for it.  We just have the hearsay objection.

14             MR. ANSLEY:  I'm not objecting to 273A and

15   B.

16             THE COURT:  You do not?

17             MR. ANSLEY:  That's correct, your Honor.  I

18   do not.

19             THE COURT:  You do to C, though?

20             MR. ANSLEY:  Yes.

21             THE COURT:  Right.

22             But 272A and 272B, right?

23             MR. ANSLEY:  Yes.  We did object on

24   hearsay grounds.

25             MS. EGGERS:  Your Honor, the Government

1  filed a sealed notice pursuant to one of the

2  Defendants' motion in limine, and I would rather not

3  speak any more about that.  But I identified other

4  individuals --

5            THE COURT:  Is it your view that this is a

6  co-conspirator --

7            MS. EGGERS:  Yes, your Honor.  Yes.  The

8  from is, yes.

9            THE COURT:  And do all of the outstanding

10  exhibits apply to Melissa Youngblood?

11            MS. EGGERS:  No, your Honor.  And I don't

12  want to -- no.  There are, I think, three of these.

13  The witnesses are here and outside and ready, so

14  I'll bring them in and they can authenticate it that

15  way.  But this one is for sure, and then I

16  believe --

17            THE COURT:  You have to tell me the names

18  of those people.

19            MS. EGGERS:  So this one, 227A and B,

20  those are both from Melissa Youngblood.

21            177.  That is an email of Odette Muller.

22  The Government subpoenaed her.

23            178.  This was an exchange between Odette

24  Muller and a Steven Joseph.

25            I'm going down the list.  273C, I think

```
 1   that's the next one.

 2               THE COURT:  272A and B.

 3               MS. EGGERS:  272A and B, those are Melissa

 4   Youngblood.

 5               THE COURT:  273C, yes.

 6               MS. EGGERS:  Yes, sir.

 7               That one, the Government has a witness,

 8   Mr. -- this is actually an exchange between Cara

 9   Obert, the defendant, and Anthony Kramer and two

10   other individuals.

11               So to the extent it is not the Defendants'

12   statement, the Government can redact that.  But, I

13   mean, it's the Defendants' statement, so that's the

14   exception there.

15               MR. ANSLEY:  That's agreeable, your Honor.

16   I agree.

17               THE COURT:  That's C?

18               MS. EGGERS:  273C, yes.

19               THE COURT:  So that will be admitted.

20               MS. EGGERS:  And then 274?

21               THE COURT:  Correct.

22               MS. EGGERS:  This is the same exception as

23   Ms. Youngblood.  This individual was also identified

24   on the Government's list.  Todd Etter.

25               THE COURT:  Can I see the whole document?
```

1           MR. PELLETIER:  Okay.  Thank you.

2           MS. EGGERS:  274, your Honor.

3           THE COURT:  Melissa Youngblood?

4           MS. EGGERS:  No.  It's Todd Etter, who is

5    also on the list.

6           275.

7           THE COURT:  No, he's agreed to that.  The

8    next one is 305 to 306 and 307.

9           MS. EGGERS:  305, that's I think the

10   Government's next witness, so we will have him here

11   in a little bit, or tomorrow I should say.

12          The remainder of the chain is the

13   Defendants' statements and then Mr. Etter's

14   statement.  So 305 and you said 306?

15          This is Mr. Etter.  Then the next one I

16   have is 491.

17          THE COURT:  486.

18          MR. ANSLEY:  I would add to the objection

19   486, it appears that it might be a combined

20   document.

21          THE COURT:  I couldn't hear.

22          MR. ANSLEY:  It appears that it might be a

23   combined document.  A draw request and then emails

24   from a reliability standpoint, it's not clear

25   whether it's a single document or more than one.

1          MS. EGGERS:  The Bates numbers are

2    chronological from UDF's counsel.  It's the backup

3    documentation that they were maintaining for draw

4    requests.  So I'm not sure, I mean, that goes more

5    to the weight, not the admissibility.

6          MR. ANSLEY:  I don't object about that.

7          THE COURT:  Then 491.  And 593.

8          MS. EGGERS:  491, we will have that

9    witness that is in the chain, but again the

10   communications with Defendant Benjamin Wissink, so

11   he's a defendant in the case.  So it's just an

12   exchange between the defendant and an employee.

13         The last one -- I'm sorry, your Honor.

14         THE COURT:  592.

15         MS. EGGERS:  592 is, this is the letter

16   from K&L Gates disclosing these materials, what

17   matters about this is the date, your Honor.

18         And we will tie that up later.  But this

19   is -- it is -- how do I say it, it is an agency

20   letter.  These defendants are the UDF executives and

21   counsel for the UDF entities sent this letter to the

22   SEC.  And this is the earliest date of submission.

23   This is going to become relevant to some disclosures

24   later on.  That's why we need that date.

25         To the extent there's a hearsay objection,

 1  I mean, this is their agency.  It's counsel for the

 2  UDF entities and the defendants are the UDF

 3  executives, they said repeatedly.

 4           MR. ANSLEY:  We object also, your Honor,

 5  to relevancy.  And it's unduly prejudicial as well.

 6  It effectively injects the SEC investigation into

 7  this case.

 8           THE COURT:  What do you say to the

 9  co-conspirator exception to the hearsay rule that is

10  the bulk, the bulk of these documents appear, it

11  appears to me that the bulk of these documents in

12  response to your hearsay objection is the

13  co-conspirator rule and/or, it could be both.

14  Statements by your clients, that they're admissions.

15           MR. ANSLEY:  Yes, your Honor.  As far as

16  the second part is easy where it it's an email chain

17  that can be broken up to allow the Defendant's

18  admission, we are agreeable to that.

19           At this point, I don't believe that, I

20  think it's only Mr. Etter and Ms. Youngblood.  I

21  don't believe it's been sufficiently tied to either

22  one of them or both are co-conspirators in the case,

23  therefore, I think we're not at the place where the

24  co-conspirator exception would apply.

25           MR. PELLETIER:  Or Odette Muller as well.

1              MS. EGGERS:  I have not suggested that.

2   We have --

3              THE COURT:  You said she's outside.

4              MS. EGGERS:  Yes, your Honor.

5              THE COURT:  Okay.  So, essentially, then

6   it sounds to me like where we are procedurally, Mr.

7   Ansley and all of the Defendants have joined this

8   objection.  They are of the view that these remain

9   hearsay because you haven't established that, at

10  least as it relates to Ms. Melissa Youngblood and

11  Etter, that they are co-conspirators.

12             MS. EGGERS:  Yes, your Honor.  The

13  Government believes we have, as it concerns

14  Ms. Youngblood.  As the Court recalls,

15  Mr. Buffington said that it was Mrs. Youngblood that

16  he was communicating with.  That is what ultimately

17  led to Defendant Greenlaw coming down and making

18  that sales pitch.  And then also the email letter

19  back saying we're not going to do UDF V,

20  Ms. Youngblood was also on that as well.

21             At that point, and then also as the Court

22  knows, you can look at the document itself and

23  looking at the document itself you're going to see

24  that Ms. Youngblood is getting records to Navigant,

25  which is what I will call manipulated spreadsheets.

 1            So even the document itself would help
 2    support that she's a member of it.  That's as it
 3    concerns Ms. Youngblood, your Honor.
 4            As it concerns Mr. Etter, if we look at
 5    those emails, it's going to be communications back
 6    and forth between the Defendant and Mr. Etter.  I
 7    can provide the Court with cases that when you have
 8    a defendant that is charged engaging with other
 9    people, if the Court doesn't feel we've gotten there
10    yet, I think we will later with Mr. Etter when we
11    get to some of our bank personnel, but the Court can
12    allow the entirety of the statement because
13    otherwise it's one-half of a conversation.
14            I mean, if a defendant was having a
15    speaking conversation with a third party, you
16    wouldn't just have one side of it.  It's an exchange
17    and an email is no different.  And I can provide
18    cases to the Court tonight if the Court would like
19    for that as it concerns Mr. Etter.
20            THE COURT:  Okay.  And as it relates to
21    the last objection on, I guess this is Exhibit 592,
22    you need it you say because of this April 30, 2014
23    date.
24            MS. EGGERS:  Yes, your Honor.
25            THE COURT:  But what to Mr. Ansley's

1  objection that introducing the entire document is

2  prejudicial because apart from the date, they

3  probably don't object to just the date, is the

4  balance of this would be unfairly prejudicial by

5  inserting --

6           MS. EGGERS:  And I'm fine with redacting

7  the rest of it, your Honor.  All, quite honestly,

8  the Government needs out of this is that it is K&L

9  Gates, in re the matter of United Development

10 Funding, and that first paragraph listing, you know,

11 we're providing these documents.

12          The remainder of it, I honestly don't

13 care.  But that date is going to matter to the

14 Government when we get further in witnesses because

15 there was a certification signed by these

16 Defendants.

17          THE COURT:  What do you say to that?

18          MR. ANSLEY:  Your Honor, we would

19 stipulate, I believe, that the date of production of

20 documents to the SEC.  The law firm, I don't think

21 we care about.  But the in re line, that is --

22 anybody who knows, knows that is in reference to an

23 enforcement investigation by the SEC.  So we would

24 object at a minimum to that in re line.

25          THE COURT:  Okay.  Well, y'all can talk

1  about some agreeable stipulation.  And however you

2  want to characterize the disclosure.  I will think

3  some more about the Melissa Youngblood status at

4  this stage overnight.  And I'll let you know, first

5  thing in the morning.  And I do, I do agree that to

6  the extent there are statements to Etter that

7  contextually you can get those in, so I will allow

8  that in.

9              MR. STEPHENS:  Your Honor, if I could one

10  more objection on the record.

11              THE COURT:  Speak up good and loud.

12              MR. STEPHENS:  Yes, sir.  This is a

13  potential constructive amendment of the indictment

14  because it's going to alter the theory that they're

15  presenting to the Jury and that they've got in their

16  indictment.

17              MR. PELLETIER:  I think we're talking

18  about this document tonight, right?

19              THE COURT:  This one.  That's Exhibit No.

20  592.

21              MR. PELLETIER:  I think maybe we can hash

22  it out.

23              MS. EGGERS:  I think we can reach a

24  stipulation, if the parties could talk.

25              THE COURT:  So tonight y'all talk about

1  592.  The Etter documents, I'm not -- I'm going to

2  overrule the objection.  And the Melissa Youngblood

3  documents, I'm going to think through and go over my

4  notes about the status of the evidence vis-a-vis

5  Melissa Youngblood.

6            MS. EGGERS:  Yes, your Honor.

7            THE COURT:  Anything else?

8            MS. EGGERS:  No, your Honor.  Since we've

9  been here so late, the Government still needs to

10 have that meeting with Ms. Youngblood and the other

11 attorney as well.

12           THE COURT:  And you will go do that now.

13           Anything else?

14           MR. PELLETIER:  None, your Honor.

15 Nothing.

16           MR. STEPHENS:  No.

17           MR. LEWIS:  No.

18           THE COURT:  Okay.  Try to be here by 8:30,

19 in case they take me up on it.  We don't want to not

20 be ready.  We will see you in the morning.

21           THE COURT SECURITY OFFICER:  All rise.

22           (Proceedings adjourned at 6:51 p.m.)

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3              We, Zoie M. Williams, FCCR, and Kelli

 4  Ann Willis, CSR/CRR, certify that the foregoing is a

 5  transcript from the record of the proceedings in the

 6  foregoing entitled matter.

 7              We further certify that the transcript

 8  fees format comply with those prescribed by the

 9  Court and the Judicial Conference of the United

10  States.

11              This 13th day of January 2021.

12

13                      s/ Zoie M. Williams
                        s/ Kelli Ann Willis
14                      Zoie M. Williams, FCCR
                        Kelli Ann Willis, CSR No. 10195
15                      Official Court Reporter
                        The Northern District of Texas
16                      Dallas Division

17

18

19

20

21

22

23

24

25
```

**$**

**$1,100,000** 231:25

**$1.2** 40:20

**$10** 153:7

**$100** 71:20 158:16

**$19,000,000** 14:14

**$190,272.84** 187:1

**$2** 190:16

**$2.5** 75:21

**$25,000** 99:6 164:23
200:3,14

**$27,294.19** 59:21

**$323** 133:8

**$4** 136:13,14,22 137:8

**$40,000,000** 14:16

**$500,000** 92:9

**$60,000,000** 14:3

**$700** 167:15

**$85,000** 149:18

**-**

**--i'm** 56:22

**1**

**1** 10:4 46:22 49:17,22
57:14 59:20 60:6 90:7
109:17 142:21 150:11
158:17 188:24 225:9
228:17 259:5,6,10,14

**1/27/2012** 189:12

**10** 18:24 19:10 59:5
106:10,11 109:18
158:17

**10-17** 34:24

**10-26** 247:19

**10-ks** 118:15 258:4

**10-minute** 145:21

**10-qs** 118:15 258:4

**100** 19:3 101:14 105:21
134:8 173:24,25

**1000** 105:21

**102** 121:11,15,25

**1026** 176:1

**103** 121:12,16 123:7
124:15

**10s** 48:19

**10th** 59:16

**11** 68:1 86:20,22 87:9
124:6 150:17,18 163:2

**110** 224:22,23 225:2,5
229:4

**111** 252:22 253:3,6

**112** 252:22 253:3,7

**113** 82:7,10

**114** 83:8,9,13

**115** 84:12,15 97:7

**116** 86:11,14,19

**117** 119:8,9,11 121:20
123:14 134:23 142:13

**118** 91:4,6,9

**119** 93:25 94:3

**11:54** 87:10

**11th** 25:19 26:5 45:22
68:16

**12** 10:2 27:17 52:21
89:23 90:2,23 91:1
142:17 150:19,20
209:12

**12-16** 247:22

**12-19** 248:9

**12-71** 247:23

**12-92** 248:12

**120** 94:11,12,14

**121** 95:22,23 96:2

**122** 96:15,16,18

**123** 26:12,15,16 27:8
43:9

**124A** 34:8,12

**124B** 34:9,12 36:3,6,25
247:16 249:3,5

**125** 93:12,13,15

**126** 87:23 88:2 103:15

**127** 89:18,21 142:13,15
144:15

**128** 125:1,4,7

**129** 268:11

**129A** 267:18 268:1,2,5

**129B** 268:2,6

**129s** 268:2

**12:20** 10:5

**12:54** 39:3

**12th** 52:21 135:15

**13** 18:1 19:11 31:19
39:22 40:19 43:6 44:5,
7,9 64:14 72:5 78:20
107:21,25 116:21 138:7
139:23 172:4 250:3

**13-18** 247:22

**13-21** 247:18

**13-38** 248:2

**13-50** 247:23

**13-54** 248:5

**1301** 210:5 225:6 252:6,
18

**13th** 54:6

**14** 18:2,3 19:13 20:14
31:19 40:20 41:12 43:5
45:6 52:17,23,25 54:17
55:15 56:23 61:13 72:2,
15,21 85:13 117:5
136:3,12 148:15 214:10

**14-20** 247:19

**14-29** 248:3

**14-44** 247:19

**14-68** 248:6

**143** 177:25 178:7,8,13
247:16

**144** 247:16

**146** 247:16

**14th** 93:21

**15** 14:16 18:3 116:8
148:16 189:18

**15,000** 128:14

**15-44** 248:2

**15-46** 247:25

**15-54** 247:23

**15-74** 247:25

**15-82** 248:5

**1503** 232:2

**1529** 176:1

**1530** 176:1 187:22,23,
24 189:18,20

**157** 247:16

**16** 154:9 171:24 259:5,
6,11,14

**16-45** 247:24

**16-67** 248:2

**165** 247:16

**168** 247:16

**17** 259:22,24 260:4

**17-43** 247:24

**17-57** 248:7

**17-58** 247:22

**17-84** 248:13

**170** 247:16

**171** 247:17

**174** 247:17

**175** 247:17

**177** 269:22 271:21

**178** 269:22 271:23

**17th** 29:1 37:3

**18** 61:22 119:14 120:22
142:10 210:9 211:9
216:2 252:3,25 261:19,
22,23 262:14,20

**18-41** 248:6

**18-52** 247:24

**18-54** 248:11

**18-55** 248:1

**18th** 135:1 210:1 215:3, 4 217:22 221:17,20

**19** 14:4,7,8,18 20:13 72:11,14,20 75:20

**19-27** 247:20

**19-61** 248:13

**19-69** 247:25

**195** 247:17

**198** 247:17

**1995** 115:16

**1997** 234:3,6

**1st** 129:23

—————————

**2**

**2** 45:24 46:23 47:6 56:20 58:11 64:12,14 136:12 137:4,7 150:17 186:11 222:17 225:9 228:13,18

**2.5** 32:13 76:12

**2/14** 136:22

**2/28/14** 136:1

**20** 150:11 154:9 166:19

**20-23** 247:20

**20-35** 248:3

**20-38** 248:11

**20-39** 248:10

**20-61** 248:9

**200** 247:17

**2001** 132:5 234:8

**2004** 171:22 201:19,21

**2006** 115:17 220:25 221:9

**2007** 146:22 147:12

**2008** 13:2 78:21 104:23, 24,25 209:5 214:7 221:4,10

**2009** 11:9 12:3 102:8,10 242:17

**2010** 49:16

**2011** 254:16

**2012** 11:6 12:4 13:8 15:25 17:23 102:11 111:18 114:19 129:13, 18,23 131:3 139:21 147:14 148:2 178:17

**2013** 11:7 15:9 40:23 42:21 72:2 82:15,24 83:5,25 84:22 86:6,17 100:20,21 106:21 107:2,6,9,18,24 109:10 110:3 119:3,6 132:14 138:5 139:24 140:9 141:8,20 172:4 201:20, 21

**2014** 22:3 24:4 35:21 39:18 40:2,16 42:1,13 43:11 44:2 45:13,14 47:11 50:11 52:5,10 53:2 54:6 56:19 57:22 58:9 59:5,16 60:23 61:10,22 67:7,10,19 68:1 75:3 80:17 88:9 89:11,24 92:2 93:17,18, 23 100:22 110:3 114:20 119:14 120:4,22 122:1 123:23 125:9 135:1 142:10,17 154:22 201:20 254:13 267:21 277:22

**2015** 47:20 48:4,14 114:7 147:14 148:5 166:19 167:13 168:12, 13

**2016** 70:17 210:1,9 211:9 215:5 216:2 217:22 221:17,20 238:18 252:4,25

**2017** 235:24

**2018** 215:1,4

**2019** 220:21,23

**2020** 10:2 62:16 65:6,25 66:20 140:10,18 238:9 239:9,23

**2021** 267:20

**2078** 53:16,20 54:8,12

**2079** 58:17,18,21 74:11

**20th** 87:17 147:14 168:9,12

**21** 220:4 250:4

**21-134** 248:8

**21-40** 248:3

**21-52** 248:4

**21-65** 248:8

**21-72** 248:10

**21st** 178:17

**22-28** 247:21

**22-31** 247:21

**22-56** 248:6

**227A** 271:19

**22nd** 34:16 35:21

**23** 124:2 220:4

**23-66** 248:13

**23rd** 34:1 36:2,11,12,23

**24** 43:11 222:14

**24-34** 247:21

**241** 186:1,2,4,7 188:22

**245** 247:17

**246** 174:22,23 175:2,5,6 183:18 269:14,16,17,19

**247** 174:23 175:3 178:15 183:18 268:7,11 269:19

**248** 247:17

**24th** 26:9 28:5,10 34:5 45:17

**25** 173:18

**25-108** 248:9

**25-48** 248:7

**25th** 91:14 122:1

**26-38** 248:11

**260** 154:12,14,16,18,19 188:13,16

**26th** 238:9 239:9

**27,000** 74:17,18 76:9

**27,294** 74:16

**27-71** 248:4

**271** 247:18

**272A** 269:23,24 270:1, 22 272:2,3

**272B** 270:22

**273** 268:13

**273A** 268:14,17 270:14

**273B** 268:18

**273C** 269:22 271:25 272:5,18

**274** 269:25 272:20 273:2

**275** 268:20 273:6

**277** 268:20

**278** 268:20

**279** 247:18

**27th** 34:20 82:15 83:5

**28** 120:4 123:23

**28-65** 248:7

**28-70** 248:12

**28-95** 248:12

**28th** 136:3

**29** 63:1

**2:00** 38:10

**2:15** 239:11

**2M** 157:7

**2nd** 125:8

—————————

**3**

**3** 49:17,22 57:18 86:18 90:7 137:4,7 142:22 150:20

**30** 14:10,11 18:4 23:8 31:3 76:10 277:22

**303** 247:18

**304** 268:21

**305** 273:8,9,14

**306** 273:8,14

**307** 273:8

**308** 268:21

**309** 247:18

**314** 247:18

**31st** 70:17 92:2

**32-91** 248:10

**324,000** 92:13

**349** 268:21

**350** 213:3 245:20
247:18 250:1,2

**351** 247:19

**352** 247:19

**353** 247:19

**354** 247:20

**355** 247:20

**356** 247:20

**357** 247:21

**358** 247:21

**359** 247:21

**36,000** 74:7

**36,317** 74:5

**360** 133:21 136:21
247:22

**361** 247:22

**362** 247:22

**363** 247:23

**364** 247:23

**365** 247:23

**366** 247:24

**367** 247:24

**368** 247:24

**369** 247:25

**37** 84:25

**37-68** 248:4

**370** 247:25

**371** 247:25

**372** 248:1

**373** 248:1

**374** 248:1

**375** 248:2

**376** 248:2

**377** 248:2

**378** 248:3

**379** 248:3

**380** 248:3

**381** 248:4

**382** 248:4

**383** 248:4

**384** 248:5

**385** 248:5

**386** 248:5

**387** 248:6

**388** 248:6

**389** 248:6

**390** 248:7

**3907** 161:16,18,21
166:13 167:5,6

**391** 248:7

**392** 248:7

**393** 248:8

**394** 248:8

**395** 248:8

**396** 248:9

**397** 248:9

**398** 248:9

**399** 248:10

**3:23** 91:1

**3:30** 91:1

**3rd** 22:3 24:3,4 29:22
30:19 32:1 45:6,13,14
47:14

---

**4**

**4** 47:5 93:23

**40** 76:10 126:11

**400** 248:10

**401** 15:1 122:21 124:16
248:10

**402** 248:11

**403** 15:1 122:21 124:16
248:11

**404** 248:11

**405** 248:12

**406** 248:12

**407** 248:12

**408** 248:13

**409** 213:3 245:21
248:13

**41,000** 74:12

**41,407** 74:11

**43** 169:20

**431** 248:14

**437** 248:14

**441** 248:14

**458** 95:8

**464** 248:14

**485** 95:7,10 268:21

**486** 273:17,19

**487A** 91:19,22 101:2
248:14

**487B** 91:19,23 92:18
248:14

**488** 248:14

**491** 273:16 274:7,8

**493** 248:14

**496** 229:24 230:4,10,17
231:15,16,18 248:15

**498** 248:15

**4A** 107:23

**4B** 107:23

**4th** 93:18

---

**5**

**500,000** 92:13

**5028** 119:17,19 125:21,
24

**5116** 232:1

**512** 248:15

**514** 248:15

**515** 248:15

**516** 268:21

**517** 248:15

**544B** 248:15

**545** 248:16

**547** 248:16

**55,000** 187:7

**552A** 248:16

**552B** 248:16

**573** 248:16

**574** 248:16

**579A** 248:16

**579J** 248:17

**583** 229:24 230:4,10,15,
16,17 232:5 248:17

**584** 230:10 232:9

**585** 230:10 232:13,15

**586** 229:24 230:6,7,10,
15,16,17 232:18 248:17

**589** 230:5,7

**59.8** 177:24 178:3,13

**592** 274:14,15 277:21

**593** 248:17 274:7

**599** 248:17

**5th** 88:9

---

**6**

**6** 125:23 154:21

**6-** 148:24 153:11

**60** 23:8 31:3 173:14
234:20

**600** 148:18 166:20
167:15

**616** 263:25 264:1,10,11
265:5

**623** 264:1,10,11 265:6

**66** 261:20,22,23 262:14,
20

**67** 129:25 131:2 132:11
136:21 263:7,12

**6:15** 83:5

**6th** 135:8

---

**7**

**7** 89:16

**7-21** 248:1

**70** 167:3

**700** 148:18,24 153:11
166:21

**74** 263:7,12

**75** 261:21,22 262:15,17,
21

**7th** 89:11

---

**8**

**8** 230:13

**8-12** 248:1

**8-ks** 258:5

**80** 167:3

**81** 261:21,22 262:16,17,
21

**8160** 63:5,6

**82** 258:14,18,21

**8240** 133:2

**8247** 130:5

**83** 258:14,18,21

**8300** 62:3

**8305** 57:7,9,11 74:5

**8306** 59:23,25 60:2
74:15

**8335** 56:15

**84** 258:15,18,22

**85** 173:19 174:2 247:15

**86** 229:25

**87** 225:23,25 226:2,9,16
228:3 229:15 230:20

**88** 229:23 230:2,3,9,17,
22,23 231:7

**89** 229:23,25 230:2,3,9,
17 231:11 247:15

**8:15** 239:16

**8:30** 267:2,3,5

**8th** 25:16 215:2,4

---

**9**

**9** 56:19 266:20 267:6

**9-29** 248:5

**90** 18:22

**90/10** 24:25

**9005** 162:2

**905,000** 188:2,8

**9:00** 267:1

**9th** 58:9 167:13 168:11

---

**A**

**a.m.** 266:20

**abbreviate** 221:12

**ability** 13:23 14:23
17:11 47:2 100:11
131:11 153:10 173:5
233:3 235:8

**absolutely** 40:17 47:4
102:19 103:2 145:16

**Academy** 234:7

**access** 19:8 99:22
102:14 235:10 244:25
250:20

**accident** 239:14

**account** 200:24 262:6

**accountant** 156:11
189:5 260:7

**accountants** 151:5
216:16

**accounting** 19:25 20:2
72:16,23 73:14,16
146:24 147:6 185:24

**accounts** 222:10,11,15
260:21 261:3,9 263:16,
17,19

**accrual** 137:10

**accrue** 75:15 154:6

**accrued** 32:8

**accruing** 75:18 154:4

**accurate** 55:19,24 56:9

**accurately** 136:24

**acquaintances** 199:15

**acquire** 138:21 238:4

**acquired** 71:6

**acquiring** 23:3 79:9
109:3 116:1 138:2

**acquisition** 115:18
116:2

**acquisitions** 114:25
139:4

**acreage** 11:21

**acres** 105:21

**acronym** 242:10

**actively** 201:19

**activities** 12:6

**actual** 10:21 18:16
63:15,17 103:9 160:10
178:10 187:4 211:21
262:5 264:25

**add** 128:14 273:18

**added** 75:16 138:5,7,10
143:14 150:16,19

**addition** 223:9 257:24
258:24 263:14

**additional** 60:24 75:16

**additionally** 153:17

**address** 10:21 46:20
75:3 77:23 114:3
121:21 210:3 225:5
269:18

**addressed** 44:13

**51:18 61:10 270:5**

**admin** 222:20

**administered** 10:12

**admissibility** 274:5

**admissible** 268:24

**admission** 57:6 58:14
59:22 161:16 268:23
275:18

**admissions** 275:14

**admit** 136:6 154:12
174:23 186:1 224:22
264:13

**admitted** 26:15,16
34:11,12 54:10,11 57:9,
10 58:19,20 59:25 60:1
82:8,9 83:11,12 84:13,
14 86:12,13 87:24 88:1
89:19,20 91:7,8,20,21
93:13,14 94:1,2,12,13
95:8,9,23 96:1,16,17
119:9,10 121:13,14
125:2,3 154:14,15
161:17,20 167:10
174:24 175:1 186:2,3
224:23 225:1,25 226:1
230:1,4,8,18 247:10,14
253:4,5 258:19,20
259:12,13 260:2,3
261:24 262:18,19
263:10,11 265:4 268:3,
4,10,15,16 269:1
272:19

**Adriana** 232:12,21

**advance** 28:3 51:22
52:1,9,12,24 53:1,5,7,
24 54:3 56:17 57:21
58:5 59:3,5,15,20,21
70:11 74:3 76:9 92:21,
24,25 95:3,12,14,16,19
186:13 190:16

**advanced** 189:25

**advances** 21:3,4,7
27:5 44:1,16 74:25 75:4
76:5 81:20 92:6,9,16
93:19 163:6,8

**affect** 47:18

**affidavit** 122:16 124:17
212:1,5

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 286 of 313    PageID 11581
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                              Vol 3 January 12, 2022                    Index: affiliated..assumptions

**affiliated** 127:14

**affiliates** 28:1

**affirmatively** 129:17

**afternoon** 91:2 97:5,6
113:21,22 126:20,22
145:20 155:23,24
251:16 257:1

**agency** 254:8 274:19
275:1

**agenda** 51:15,17,20

**agendas** 51:2,5,7,11

**agent** 140:11 144:6
195:10 211:5 212:17
219:13,24 220:2 223:6
225:4 230:12 233:5,9,
16 234:1,2,8 235:4,9,
14,15,20 243:6,11
244:11,24 246:3,8,9
250:9 251:21,22,24
252:13 253:25 254:6,7,
11 256:19,21 257:24
269:7

**agent/prosecutor**
249:17

**agents** 221:21 223:4,25
234:14 237:20 260:12

**aggregated** 106:11

**agree** 45:7 53:3 123:8,
9,11 129:3 132:9
256:20 268:25 272:16

**agreeable** 268:1,13
272:15 275:18

**agreed** 48:6 123:12
188:5,8 273:7

**agreement** 18:7,14,22
28:17,19,20 61:15,18,
21 62:7 68:22 149:17
161:24 162:24 163:7,15
167:12,14 168:11

**agreements** 13:21
61:9 101:10

**ahead** 10:14 30:14 33:9
37:18 42:9 113:23
130:8 157:11 196:17
208:16 219:21 224:18
226:15 241:4 243:7
262:3 265:13,17 267:13

**airplane** 112:4

**alert** 265:1

**allowed** 18:24 21:6
149:6 241:7

**Allowing** 18:9

**aloud** 27:8 246:18

**Alpha** 268:13

**alphabet** 27:17 209:12

**amendment** 15:2,5

**America** 12:18

**American** 147:1 156:1
162:12,14 163:17,22

**amount** 39:22 46:12
59:21 62:16 74:5 75:15
92:12 117:24 128:20
137:15 148:17 181:15
186:24 200:4 231:23
233:8

**amounts** 74:4 93:2
133:14 134:16,19

**analysis** 104:8 129:22,
23 131:21 132:3 133:19
135:1 202:17 221:6
223:12 226:25 242:11
260:15,16,18,19,23,24
261:2

**analyst** 116:22 250:9
254:15

**analysts** 154:1

**analyzing** 183:25

**and/or** 36:15 275:13

**angle** 112:17

**animated** 30:4

**annual** 187:12

**annum** 14:4

**Ansley** 26:14 39:8,10
40:13 42:10,17,18 45:1
49:9 51:1 53:12,14
54:7,13 56:6,11,13
57:6,12 58:2,3,13,18,22
59:12,13,22 60:3,22
62:1,2,14,25 63:3 64:6,
9,11,22 65:2,19,22
66:13 70:20 74:24
76:20 97:2,4 98:4

104:18,21 108:4 122:3,
6,22 124:19 142:4
143:18 144:11,13,17
145:11 155:20,22
161:15,19,22 163:1,4
164:2 168:18 169:1
181:4 200:19,21 205:10
207:6 251:8 256:12,14,
17 257:9 267:15,22
268:1,7,11,20 269:2,5
270:14,17,20,23 272:15
273:18,22 274:6 275:4,
15 276:7 278:18

**Ansley's** 277:25

**answers** 85:24,25 86:7
98:14 193:12

**Anthony** 272:9

**anticipation** 28:17

**Antonio** 107:19

**anymore** 38:19 44:14

**apologize** 23:12 53:21
68:5 130:17 207:6
225:14 267:19

**appears** 58:25 59:19
65:8,11 119:22 120:15,
16,17 122:4 126:14
273:19,22 275:11

**appended** 227:11

**applicable** 27:25

**applications** 61:8

**apply** 271:10 275:24

**approach** 53:12 56:12
58:2 59:12 62:1,11,25
63:3 77:14 123:1
130:12 133:4 140:19
151:25 152:5,7,12
167:8 196:8 207:7
211:20 236:16 245:7
255:11

**approval** 31:1,2 103:2

**approved** 185:6,7

**approving** 102:19

**approximately** 11:4,9
13:2 14:3 17:24 25:16
78:10,11,16 114:19
116:8 120:17 122:2
138:19 148:16 166:25

168:7 171:16,25 221:7

**April** 93:17,18,21,23
114:19 125:8 277:22

**area** 71:8 109:17 118:3
148:22 184:9

**areas** 201:6 243:15

**argue** 57:17

**argument** 264:19

**arm** 30:21 102:15

**arms** 13:9 15:12

**arrangement** 19:2

**arrearage** 133:8

**arrived** 133:20

**arriving** 133:24

**article** 16:11 23:19

**ASAP** 85:20

**asks** 86:24 198:13

**asset** 154:24 170:9,10,
13,18 174:2,3,8 175:13,
18 179:21,24 180:15,
17,18,21,22 181:11,13,
22 182:21 183:12,22
200:23 201:2,7 205:15,
23 206:2 207:18

**assets** 35:5 68:23
98:22 100:24 138:2
238:4

**assign** 243:22

**assigned** 129:14,19
254:9,17,19

**assignee** 28:1

**assignment** 134:15

**assist** 221:21 222:8,11

**assisted** 222:5

**association** 12:25
221:3

**assume** 59:7 69:8,9

**assuming** 107:21
128:16

**assumptions** 104:10
202:25 203:1

**attached** 26:25 55:17 57:2 85:7 95:13 119:17, 23 123:17 125:12 136:10 187:15 190:10 212:4

**attachment** 43:17 135:25 175:25 212:10, 14 250:17

**attachments** 183:20

**attempt** 198:4

**attend** 80:13

**attendance** 16:24

**attending** 21:22

**attention** 19:24 64:12

**attest** 128:17

**attorney** 11:1 12:3 26:24 195:15,23 196:3, 25 197:3,4 198:1,8,12, 16 199:9

**attorneys** 28:15 195:8 212:9 218:6,8 219:3,5 255:23

**audit** 116:24 193:23 204:19 206:6,10,11

**auditing** 203:20

**auditor** 204:7

**auditors** 90:12 135:11 143:2 183:11,15,18 191:6,8,16,21 192:9 193:3,7,11,16 203:18, 19,24 204:13,19,23 205:9 206:17 216:18

**auditors'** 204:9

**audits** 206:7

**August** 18:12 19:11 39:22 40:19,23 42:21 43:6 44:5,7,9 52:10,25 54:6,17 55:15 57:19,22, 24 82:15,24 83:5,22 84:6 114:19 129:13,18 254:13

**AUSA** 244:24

**Austin** 10:24 34:16 71:8 77:24 109:13 114:11 115:12 201:5,8, 15,22

**authenticate** 256:19, 23 269:7 271:14

**authenticated** 246:22 250:3

**authenticates** 122:23

**authorities** 216:3,13

**authority** 101:11

**authorization** 231:19, 23

**authorized** 163:7

**authors** 269:13

**avenues** 189:14

**average** 14:17

**aware** 40:21 41:3 49:15,18,20,21,23 50:8 52:23 53:4 59:4 61:8, 12,18,19,21,23,25 64:7 65:10 99:25 101:9,22 104:25 105:4,5 109:16 117:12,13,18 153:5 165:23 166:1 174:4 215:17,22 216:8 238:5

————————————

**B**

**bachelor's** 147:9

**back** 17:19 19:10 21:10,14,18 22:12 24:10,13 25:4,13 26:10 29:23 36:11 37:22 38:12,17 39:1 42:23 45:25 46:24 49:16 55:25 59:7 82:24 86:6 87:3,6 89:2 99:15 105:6 123:6 130:25 145:22 152:24 153:10,16,20 154:3,4 179:14 188:22 190:23 221:24,25 223:17 226:16 227:14, 19,20 232:25 233:11 238:14 240:6 261:7 276:19 277:5

**background** 115:6 170:19 242:18

**backup** 274:2

**backwards** 215:6

**bag** 78:2,4

**balance** 55:17,18 178:5,10 278:4

**balances** 20:1 88:15 118:17

**ball** 143:10,22

**Ballast's** 232:8,21

**band-aid** 87:13,15

**bank** 12:18 173:12 260:21 261:1,2,3,9 262:5,9 263:15,17,18 277:11

**bankruptcy** 22:24

**banks** 110:1,5 261:13

**bare** 117:1

**base** 170:1

**based** 92:5 105:3 144:23 223:18

**basic** 117:1 172:7 176:4

**basically** 13:20 28:19 88:17 101:4 103:18 115:2 116:14 127:11,21 155:8 174:10 193:9,21 204:8 242:10,12 243:10,12,13,17,21 244:10,15 246:7 252:14

**basing** 237:17

**basis** 185:21 187:12 188:8 191:11 206:12

**Bass** 237:25 238:3,6,8, 12,18,22 239:10,18,22 240:2,6,10,13

**Bass's** 240:9,17

**batch** 264:9

**Bates** 249:15,19,23 250:8 270:9 274:1

**bay** 87:12

**Baylor** 147:10

**bcc** 250:16

**bear** 135:9

**beer** 164:17

**before's** 73:3

**began** 28:15 30:3

**beginning** 10:5 11:7 13:8 17:23 67:17

**begins** 35:1

**behalf** 27:9

**belief** 62:22

**believed** 65:25 66:15, 21 67:1 112:22 129:24 140:5

**believes** 276:13

**bell** 157:2,14

**Ben** 26:21 97:21 152:19 159:15 179:20 181:16, 17,18 183:13 185:23 189:9 190:13 191:15 192:13,16,17,20 204:17 205:18,25 207:15 217:10

**bench** 124:15,21

**benefit** 20:12

**benefits** 202:24

**Benjamin** 29:6 274:10

**bi-weekly** 16:20

**bidding** 79:15

**BIDMAS** 226:23 227:7, 14,25 233:19 236:3 241:18 242:2,4,5,8,9,24 243:22 244:3,8 245:15, 22 246:1 248:22 249:7, 8,21 250:18,19,20,25

**big** 88:23 90:19 106:12

**bill** 187:19 190:10

**billing** 112:5

**billion** 136:13,14,22 137:8

**bills** 74:20 139:3 151:4, 8

**BISMAS** 242:24

**bit** 27:13 54:18 84:17 117:6 155:14 156:17 157:24 164:14 169:23 205:4 208:20 224:3 226:16 249:25 266:19 273:11

**biweekly** 149:18

**Blake** 10:9,20 78:25 79:1 80:13,15,16 81:14 88:5,11 90:5 96:5 121:22

**blended** 14:4,7 75:19

**BLG** 61:15 136:1

**blood** 240:4

**blow** 54:18 60:4

**blue** 35:23

**board** 21:22 23:7 31:6

**body** 46:17 177:1

**bones** 117:1

**books** 13:21

**bore** 27:18

**borrow** 167:7

**borrowed** 71:7

**borrower** 55:4 163:9, 15,16 170:14,16 173:15 185:17

**boss** 116:21 141:11 149:11 181:24 205:14, 17 206:3

**bosses** 206:4

**bothering** 72:22

**bottom** 46:22 57:14 88:4,20 162:7 163:3 249:5,11,15 268:22 270:10

**bought** 23:6 71:6

**box** 38:13,15 54:18 266:23 267:2

**boxes** 252:21 253:9

**brain** 240:4

**Branch** 148:20

**Brandon** 15:22 16:7, 12,16 25:24 68:4 80:1, 4,18 86:4 88:6 97:15 120:21 121:22 142:19 179:25 180:12,25 181:8,10,24 200:22 201:5 207:15 217:10

**Bratton** 107:11,12 120:11 124:1

**Bravo** 268:13

**break** 37:18 38:9 145:20,21 177:24 178:3 234:20 265:13

**briefly** 51:24 88:12 108:7 142:6 207:7 256:15

**bring** 120:1 123:2 193:1 202:10,11 211:16 232:25 256:8,9 257:20 271:14

**broken** 234:18 275:17

**brother** 237:22 238:7, 9,20 239:11,17,20,24 240:3,10

**brother's** 240:12

**brought** 19:24 81:13 183:3 192:12 194:17 197:22 202:8 216:2 222:23 257:14

**Brushy** 92:14 107:23

**budget** 85:8,13 103:9, 10 185:22

**budgeted** 28:4

**Buffington** 10:9,20,21 11:11 12:6,16 13:7,23 14:22 16:15 17:11,22 18:7,15,25 19:22 22:19 25:7,9 26:6,19 27:9,10, 11 29:25 34:24 35:4,9, 15 36:13,17 39:11,14, 25 40:15,19 41:7,9,25 42:11 43:11,21 44:14, 21 45:3,24 49:16 50:9 52:1,16 53:9 54:19 55:1,11 56:23 57:22 59:4 60:17,18,25 61:3,9 62:7,9 66:21 68:3 70:14 71:1,3,4,6,14,15,16,17, 22 72:9,13 74:3 78:14, 17,22,25 79:1,3,21 80:13 81:15,19 83:17 84:19,24 85:16 88:6,14 90:4,7 94:8 96:5 98:8, 16 99:3,16,23 100:8 101:10,25 102:2,25 103:20 104:22 105:1 106:15 109:4 111:7,19

114:13 115:3,22 116:8, 18 117:11 118:9 121:19 123:22 127:1,5,10,13, 17,24 129:1,4 137:21, 25 138:21 140:6 141:10,14 142:21 276:15

**Buffington's** 14:23 23:22 47:2 61:10 117:14,18

**build** 71:11,12,15 127:23 138:2,22 214:21

**builder** 23:6

**builders** 12:15 31:8 71:17 115:5

**building** 11:2,5 12:14 23:5 78:9 104:17 109:13,17 127:14 173:6,8 184:6 237:4

**builds** 150:1

**built** 71:7

**bulk** 275:10,11

**bunch** 182:15

**Bureau** 210:10 226:24 234:3 241:14 242:10 254:16

**business** 11:8,12,14, 19 12:6 18:6 47:3,25 48:8,9 68:15,18 70:12, 15 108:14,20 109:1,12 127:3 137:20,22,24,25 138:3,21 139:5,6,8,16 153:15 166:23 204:10 206:18 213:17 214:18, 20 223:21 237:24

**businesses** 114:13 193:5

**busy** 100:23

**butcher** 226:24

**buy** 37:21 127:11

**buyers** 79:19

**buying** 11:21 115:18 116:9

**C**

**C-H-U-N-G** 241:12

**C1** 228:17

**cabinets** 216:12

**calculated** 75:17 177:20

**calculation** 32:10

**calendar** 48:4

**California** 114:4,6

**call** 63:16 65:8,11 67:20,25 68:6,11,16 76:25 80:9 88:11 113:10,14 114:12 118:22 128:5 181:19 185:2 197:1 202:24 219:13 221:14 239:11 243:22,23 249:15 250:11 276:25

**called** 21:11 22:18 28:16 140:11 170:5 226:11,23 239:12,17 259:17 269:1,4

**calls** 48:21 80:11 169:5

**Cameron** 197:4

**capacity** 221:11 263:20

**capital** 62:8,9 99:23 189:13,16

**Cara** 217:10 272:8

**cards** 75:14

**care** 182:25 240:3 278:13,21

**career** 115:15 147:7

**Carrollton/farmers** 148:20

**carry** 35:16 78:2

**carrying** 117:24

**CART** 221:5,10 237:3

**Carter** 186:15 187:7

**case** 14:21 17:10 38:16, 24 50:5 109:25 123:18 138:9 173:16 184:25

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 289 of 313    PageID 11584
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 3 January 12, 2022                    Index: cases..computer

185:3 207:19 212:2
224:19 226:7 234:19
235:4 242:25 243:9
244:5 245:4,16 246:3,8,
9,13 249:9 250:15
251:2 254:21 255:9
260:8 264:16 266:3,11,
25 274:11 275:7,22

**cases** 277:7,18

**casey** 146:4,5,15
188:18 199:12,16,17,
18,19 200:1,10,13,16

**cash** 86:7 88:19,21
90:7 104:8 115:1,23
116:7,11,16,17 119:18,
19 142:21 153:22
171:12 174:9,10,12
176:21 177:14,17
183:7,11,16 191:6
226:11 228:3 231:19,23

**catch** 41:16 42:23

**catchall** 176:8 243:16

**category** 243:15

**cc'd** 88:6 96:6

**cc'ing** 83:20

**cease** 69:22,25

**cell** 177:10 223:14

**central** 11:20

**Centurion** 147:1,13,19,
25 148:7,8,17,19 149:7
151:8,12,18 152:7,20
153:4,24 155:25 156:6,
18,22 157:25 158:1,3
159:23 160:8,16,19
161:12 162:11,13,18
163:17,22 164:11
165:25 166:18,23
167:15 168:14 170:17
172:1,5,10 175:22
176:4,15 181:12,14
184:25 186:19 188:1,5
189:23,25 190:1,16,22
199:12 200:5,10,14,24,
25 201:1,4,7,8,14,21
202:6,12,23 203:6,10
214:14

**Centurion's** 147:21,22
153:10 156:16,19
157:17 166:25 201:1

**CEO** 162:18 181:21
182:14

**certainty** 101:14
212:18,20

**certificates** 261:15

**certification** 56:10
122:23 258:12 278:15

**certifications** 53:8
54:20,23 55:17,21 56:8
57:14,18 58:23,25 60:8,
9 65:17 66:25 67:2,4,13
221:8 261:13 262:5

**certified** 220:25 221:1,
4 256:2 258:2,7 259:1,
8,25 261:14 262:23
263:1,7

**certifies** 55:13

**certifying** 55:22

**cetera** 145:22 215:13

**CFCE** 221:4

**CFO** 148:2,3 149:2
155:25

**chain** 83:4 84:17,18,21
86:16 93:18 94:5,16
95:13 96:20,21 122:4,6
273:12 274:9 275:16

**chains** 117:12

**change** 12:22 32:3,23
74:7,11 106:10

**changed** 12:5 19:2
33:12 39:22 40:4 55:14
60:17

**changing** 24:10 60:18

**character** 160:20

**charge** 102:1 211:5
241:18 242:5,7

**charged** 277:8

**chart** 237:10,18,19

**check** 78:2 103:4

**checked** 78:3

**checks** 235:10

**checks/july** 94:18

**Cheryl** 85:3 189:1,4

**chief** 153:3

**Christine** 144:6

**chronological** 274:2

**Chung** 240:24,25
241:5,12,13 242:19
245:9

**circumstances** 267:4

**city** 79:11

**civil** 79:13

**claimed** 61:4

**clarify** 234:3

**clarifying** 87:10

**clarity** 111:25 112:1

**cleaned** 240:3

**clear** 15:13 37:9 45:11
98:6 269:6 273:24

**Clerk** 113:18 251:13
254:2

**client** 44:19 97:15

**clients** 23:6 204:19
275:14

**climbs** 75:15

**close** 100:21 106:16,21
107:9,18,24 108:1,3
202:13

**closed** 106:19,24
107:2,6,13,15,25
109:10

**closely-held** 263:18

**closer** 146:17 169:24
208:20

**clothing** 16:11 23:19

**co-case** 234:14

**co-conspirator** 271:6
275:9,13,24

**co-conspirators**
275:22 276:11

**collateral** 18:20 118:1

**collateralized** 119:21

**collectively** 28:1

**color** 29:9

**column** 125:24

**combined** 273:19,23

**comfortable** 169:12
241:6

**comment** 191:20

**comments** 193:7
204:21

**commercial** 12:20,23
13:1 61:19

**Commission** 118:20
255:4,24 257:8

**communicate** 48:18

**communicating**
276:16

**communication** 48:25
49:4 76:1 268:23

**communications**
48:21 50:7 204:2,7
274:10 277:5

**communities** 105:15
214:22

**community** 105:20,23

**company** 11:24 12:12,
14 13:10 23:5 40:15
41:6 115:18 139:3
157:8 162:7,11,13
216:22 218:18 236:12,
21 259:17 262:25

**compared** 18:3

**competent** 110:16

**complaining** 46:25

**complaint** 119:2
129:13 139:22 140:1,3,
10,14 144:2

**completed** 176:24

**complicated** 206:17

**compound** 135:21

**compounded** 177:19

**compounding** 72:11
75:10,11,23

**Compromise** 68:22

**computer** 219:25
220:8 221:1,3,6 228:17,

18,19 241:17

**computers** 223:15,17

**computing** 177:10

**concealed** 216:10,23

**concept** 75:13

**concern** 15:1 117:23
118:3 179:13 181:2
182:22

**concerned** 27:23
153:10

**concerns** 14:22 17:10
68:7 117:19 119:2
179:16 181:12 182:20
276:13 277:3,4,19

**conclusion** 133:25

**concrete** 151:10,17

**conditional** 62:23

**conduct** 260:16

**conducted** 260:14

**conference** 80:10

**confidentiality** 28:19,
21

**confirm** 83:3,6 144:25
177:6 212:14 213:5
269:14

**confirming** 179:11

**confused** 13:25 197:18
198:9

**confusion** 20:22

**connotation** 204:20

**consent** 20:25 21:14,
18 72:25 73:18

**consideration** 264:22

**consistent** 69:12,15,
21 191:4

**consistently** 50:17

**console** 239:20

**consolidated** 55:20

**consoling** 239:24

**constant** 17:13 87:5
96:11

**constantly** 41:15

**constructed** 107:1

**construction** 79:14

**contact** 79:24 156:21
157:21 159:9,18,19,20
202:13 204:2 235:3,4
239:10

**contacted** 28:11,14

**contacting** 76:4

**Contemporaneously**
28:13

**contents** 253:10,16

**context** 47:22

**continually** 40:5

**continuation** 35:3
139:16

**continue** 20:20 35:12
40:1 41:25 47:2,23 55:7
70:10,11 92:7 139:7,9

**continued** 39:17 40:14
41:1 44:8 67:4 72:5
117:2

**continues** 75:14

**continuing** 16:1 19:11
45:4

**contract** 72:21 73:2
209:9,15

**contractor** 99:7 209:10

**contractors** 79:15

**contractually** 163:20

**controller** 83:17 156:7

**convention** 228:8,9,12

**conversation** 14:20
15:14,17 17:8,13 25:17,
18 26:4 28:7 45:21
62:15,18,21 64:17
67:18,24 68:2 72:4
179:3 182:17 183:1
194:10 198:7,11
277:13,15

**conversations** 27:21
112:25 141:21,24
153:17 160:11,13
179:21 191:7,9,12,15,

18,20 194:24 203:2,10

**conveyed** 198:16,22
199:7,8

**COO** 181:20

**Cook** 253:25 254:2,6
257:24

**cooperate** 215:23
216:3

**cooperated** 218:15

**cooperating** 215:12

**coordinated** 220:12

**copied** 42:2 159:16
211:13

**copies** 183:7 185:20
216:12 246:8 256:2
258:2,8 259:1,8 261:14
262:23 263:1,7

**copy** 26:21,25 36:18
64:9 211:1,14 243:5,11
246:9,20 256:12,13
259:25

**corner** 270:10

**Corp** 94:8

**Corps** 115:16

**correct** 18:4,5 21:24
24:3,7,8 25:7 28:8,9
31:22 34:17,18 36:4,7,8
43:8,22,23 44:2,3 46:3,
8,10,14 47:15 48:12
50:4 51:21 52:18 54:25
55:6,7,12 57:5 65:5
67:10,12 69:11 70:9
71:2,8,9,18,23 72:3,10
74:22 82:19,20,25
83:20 84:19,20 85:2,5,
13,14,20 89:9,10 90:1,
24 93:1,6,9,10 97:12
100:9,20 101:7 106:2,
13,14 108:15 109:11,
14,23 110:3,11 111:5,
20 112:5,19,24 116:14
119:15,16,23,24 120:3,
5,8,9,11 121:3,4,20
122:2 123:14,15,24
124:4,8 125:9,10,13,15,
16 126:2,3,13 127:17
128:9,13,15 129:8
131:1,4,18,19,22 132:1
136:3,8,23 137:13,17

138:4,6 139:1,7,19
140:1,2,15 141:23
142:1,10,11,23 143:1,5,
8,9 144:3,4,7,8 145:4
149:1 150:8 155:4,13
157:15,22 158:2,4,9,10
159:4,11 160:5,6 161:6,
9 162:8,20 164:16
167:21,24 168:15
176:12 177:22 179:6
194:23 195:5,7 197:5
199:23 200:6,8,11
202:1 203:19 208:24
209:16 210:7 213:14,
18,22 214:8,9,11,15,23,
24 215:2 220:19 223:8
225:8,12,17,21 226:8
228:2,24,25 229:2,8,10,
11,14 231:1,8,10 232:4
233:5,20,21 235:7
237:1,14,20,22 238:1,
19 240:7 242:2 243:2
244:10,22,23 245:23
246:13,14 249:7,11,16,
17 250:21 255:5,25
256:6 258:4,6,10,11,12
259:6 260:13,15,24
263:4,20 269:5,20,22,
23 270:17 272:21

**corrected** 139:24

**correction** 189:1
230:14

**correctly** 233:3 234:21

**cost** 92:8 105:22 116:3

**costs** 20:15 88:20
103:12

**counsel** 12:2 28:15
44:23 49:2 52:19 75:25
108:18 138:12 257:7
265:9 274:2,21 275:1

**country** 109:17

**county** 79:11 187:19

**couple** 70:18 106:19
115:20 149:12 164:4
236:4

**court** 10:6,10,14 14:24
15:3,6 16:17 23:24
26:13,15 29:7,14 33:1
34:11 37:14,17 39:4,6
40:7 41:18 42:5,8,16
44:24 49:3,7 50:24

54:10 56:3 58:19 59:25 60:21 63:11,19 64:4,7, 9,10,21,24 65:3,18,21 66:3 76:24 77:4,6,7 78:5 81:9 82:8 83:9,11 84:13 86:12 87:24 89:19 91:7,20 93:13 94:1,12 95:8,23 96:16 98:1 104:18 113:6,11, 16,23 119:9 121:13 122:7,10,18 123:2 124:14,20,24 125:2 130:8,14,18 131:9 132:18 133:12,16 134:4,10,21 138:16 140:20 143:17,21 144:12 145:12,15,19,24 146:3,5,6,7,9 154:14 155:18 161:17 164:6 165:13 166:6 167:20 168:22 169:4,7,10,11, 12 174:24 175:15 182:11 186:2 192:5,11 196:14,17 197:7,21 198:2,5,15,25 199:10 208:5,11,13 211:20,24 214:2 215:20 218:9,14 219:10,15,18 224:23 225:25 229:25 230:3,7, 18 236:17 240:23 241:1,19 246:16 247:2, 5,8,12,13 251:9 253:4, 21,24 254:1 255:12 256:9,16,24 257:1,5,11, 20 258:16,19 259:12 260:2 261:23 262:1,3, 14,17 263:9 264:2,5,11 265:2,3,11,12,13 267:7, 9,11,23,25 268:3,9,14, 25 269:3,9,16,20,23,25 270:16,19,21 271:5,9, 17 272:2,5,17,19,21,25 273:3,7,17,21 274:7,14 275:8 276:3,5,14,21 277:7,9,11,18,20,25 278:17,25

**courthouse** 266:10

**courtroom** 16:6 23:15 39:5 77:8 145:25 146:8 180:2 182:4 267:10

**covenants** 55:10

**cover** 51:18 82:23 91:15 97:23

**covered** 39:12 74:15

**COVID** 37:19

**Cox** 85:3 189:4

**CPA** 146:20,21 147:4, 11

**CR** 232:16

**create** 105:5 171:11 235:9,25

**created** 105:6 228:9 234:16 236:2 237:15

**creating** 20:22 22:13 35:10 72:16 116:6

**credit** 75:14 155:9 176:4,5,23 187:21,25

**Creek** 92:14 107:23

**cross** 227:20

**CROSS-EXAMINATION** 39:9 70:22 97:3 108:8 126:18 141:2 144:16 155:21 164:7 194:8 200:20 205:12 214:4 235:18

**crystal** 92:9 106:23 143:10,22

**CT** 94:7

**CTMGT** 162:7,10 163:16 189:15

**current** 41:12 42:1,25 43:4 177:24 178:3 179:13

**custodian** 122:18

**custodian-of-record** 122:16

**cut** 69:19

**cyber** 254:19

**cycle** 173:6

――――――――――

**D**

――――――――――

**D172** 177:1

**dad** 29:17,21 33:13

**Dallas** 78:4 148:22 254:10

**damaging** 70:1

**Dark** 16:13 23:20

**data** 104:9 226:25 233:2,14,15,17 234:20, 21 243:3,5,8,9,10,14, 20,21 244:1,3,14,15,16 245:1 246:1,2,6,11 250:15,16,24 251:1

**datasets** 244:18 246:8

**date** 21:10,18 35:20 41:2 52:3 54:5 60:25 61:17 67:5 70:16 82:14 88:8 90:23,25 92:1 104:7 120:4 131:6 134:18 135:9,14 137:8, 14 142:15 145:7 194:14 201:17 206:21 210:9 217:22 236:9,10 274:17,22,24 277:23 278:2,3,13,19

**dated** 21:14 56:18 58:9 59:15 61:21 119:14 122:1 142:10 178:17

**dates** 55:24 137:11

**dating** 45:17

**daughter** 239:12,25

**day** 10:4 34:5 36:1,22 37:2 79:7 90:18 133:14 167:11,13 168:11 206:20 211:9 215:7 221:20 223:1,7 257:16 266:16

**days** 23:8 31:4 36:14 168:10,13 266:15,17

**DC** 246:10

**deal** 72:12 107:19 150:15,16,17,18,19,20 158:19 185:1

**deal-specific** 150:3,4, 6

**deals** 30:23 98:17,18 100:12,13,20 105:20 106:16,19,21,22 115:19 150:10,11,12 158:11,17 176:19 187:3 190:6

**dealt** 110:10

**debt** 20:13 30:24 100:17 117:24

**decades** 137:9,10

**deceased** 78:23

**December** 12:3,4 13:8 15:25 52:21 70:17 119:3,6 139:22,25 140:9 141:8,20

**decided** 226:22

**decisions** 22:23

**deducted** 84:3

**deems** 163:9

**defendant** 16:16 17:10 21:15,21 23:23 24:5 25:21 28:12,25 31:11, 20 33:10 36:10 37:6 81:3 82:3 85:6,11,22 86:1 89:11 90:3 180:10 182:9 263:17,18 272:9 274:10,11,12 276:17 277:6,8,14

**Defendant's** 53:20 130:5 275:17

**defendants** 14:21 22:8 124:15 217:7 269:10 274:20 275:2 276:7 278:16

**Defendants'** 74:11 133:2 263:16 271:2 272:11,13 273:13

**defense** 54:7,12 56:14 57:6,7,11 58:13,18,21 59:22,23 60:2 62:3 63:1,6 75:25 161:16,21 166:12 167:6 256:18

**deficiency** 133:20

**defines** 163:7

**definitive** 24:23

**definitively** 24:14 45:6

**degree** 115:12 147:9 171:10 242:20,22

**deny** 144:25

**denying** 66:23,24

**department** 72:23 73:14 234:5

**departments** 220:14

**depends** 73:4

**describe** 11:18 12:8 16:22 29:9 30:2,14 79:6 221:19 252:11

**describing** 117:16

**designed** 173:2

**designee** 22:22

**desirable** 163:10

**destructive** 70:1

**detail** 185:20

**detailed** 17:6 137:5

**details** 25:18 54:20 55:9 152:23 160:17

**determine** 45:12 108:20 129:14 139:12, 14 229:18 245:14

**determined** 45:9 47:13 129:5 223:16

**determining** 108:25 129:20 139:2 221:23

**develop** 98:21 116:3 173:16

**developed** 116:4 147:22

**developers** 115:20 214:21

**developing** 11:22 12:13 23:4 138:1

**development** 11:3,5, 20 17:2 27:11,23,24,25 30:21 35:4,17 54:4 59:17 78:9 79:8 92:12 127:2 147:15,24 166:23 167:1 170:6 173:4,7,24 185:22 186:16,20,22 187:1,4 190:10 278:9

**developments** 71:7 93:6 138:2 148:21 149:25 162:14 173:11 263:2,3,8

**develops** 71:14,16

**diagram** 225:10 229:3

**died** 240:9,14

**differences** 139:18

**difficult** 81:24

**digital** 210:17,18 220:18 221:22 235:9

**Digitally** 220:25

**digitized** 253:10

**diligence** 17:4

**dire** 76:2

**direct** 10:17 39:12,15 43:12 44:18 48:22 51:24 67:18 77:17 98:7, 24 102:24 113:19 141:11 146:12 157:24 159:22 162:16,24 169:15 208:14 219:19 241:2 251:14 254:3

**directed** 45:20 54:3 163:21

**direction** 19:12 211:6

**directional** 23:11

**directly** 35:16 44:15 99:8 110:7 159:13 185:2 204:23 205:3,8,9 241:21 250:25

**director** 209:7,18,20,21 213:19 220:1,6,20,21

**disagree** 99:13

**disagreeing** 131:7

**disclosing** 274:16

**disclosures** 274:23

**discontinue** 68:13

**discount** 177:23

**discovery** 243:13

**discredit** 202:25

**discrepancy** 20:6

**discretion** 163:9,20,24 164:1

**discretionary** 111:8,9, 11,14,15 163:6

**discuss** 16:24 88:11 152:8,22 160:22 239:22

**discussed** 88:11 198:3 204:6

**discussing** 173:17 188:20 189:17

**discussion** 25:1 81:12 111:6,7 124:20 168:1 181:8,10

**discussions** 20:18 36:15 180:24 192:20,24

**dismissive** 183:4

**dispose** 68:22 98:22

**disposition** 35:4,17 98:22

**dispute** 145:2 256:19 257:9

**dissimilar** 227:15

**distinctions** 172:23 173:1

**distributable** 88:20

**distributions** 152:3,21 160:21 174:4 190:15,18 191:2

**district** 128:8,11,12 210:6 225:7 252:9

**division** 156:13 254:10

**DOC** 243:23 248:19 249:10,13,19,22 250:6

**document** 21:2,6,8 33:25 53:18,22,23 54:11 55:5 56:16 57:10 58:4,20 60:1,13,14 62:4 63:21 67:16 82:9 83:12 84:14 86:13 88:1 89:20 91:8,21 93:14 94:2,13 95:9 96:1,17 119:10 125:3 132:21 154:15 161:20,24 186:3 197:13 224:19 225:1 226:1 227:21 231:18 242:11, 12,13 243:23 244:12 248:21 249:7,8 250:10, 11,12,14,22 257:25 260:3 272:25 273:20, 23,25 276:22,23 277:1 278:1

**documentation** 274:3

**documented** 229:20

**documents** 21:10 55:8,9,23 56:9 57:3 73:8 101:15 111:16 121:14 175:1 206:10 215:13 216:4,11,23

217:4 218:16 219:6,8 227:1 230:8 243:18 245:14 247:14 249:22 252:18 253:5 258:20 259:13 262:19 263:11 265:4 268:4,16 275:10, 11 278:11,20

**dollar** 20:6 93:2 102:20

**dollars** 18:23 20:7 32:11 95:17 128:15

**domain** 213:11

**door** 229:13

**doors** 38:19

**Dorney** 12:11 16:3,25 23:16 25:6,17 41:5,11, 14 56:21,22 68:3 76:4 77:1,6,20,22,25 78:7 82:13 83:15 91:25 92:4 95:14 97:5 101:3 108:10 116:22 141:11

**Dorney's** 58:10 59:19

**Douglas** 114:1 232:7, 21

**download** 222:19

**downloaded** 222:16

**downs** 76:15

**downtown** 38:4,6

**draw** 54:16 60:24 67:9 82:23 83:22,24 87:11 92:8 99:10,11,15 101:6, 12 126:4 149:13 150:24 151:3,6,14,22,25 152:13,25 155:8,10 159:23 160:2,8,23 161:11 163:21 185:10 187:1 188:2 189:22 190:8,21 273:23 274:3

**drawing** 224:15

**drawings** 79:15

**draws** 18:9,15 19:8,18, 19,21 41:13 42:1 65:16 84:6 91:12 94:19 97:20 99:2 126:1,6,9 152:8 160:14,18 188:10,24 189:14 190:3,5

**drive** 211:11,14 212:16 214:15 222:18,23

223:1,3 224:8 228:18
232:23 233:1

**drives** 243:6

**drop** 10:14 113:23
175:15

**dry** 192:19

**DST** 259:17,18,20
262:25

**due** 17:4 84:3

**duly** 77:6 113:18 146:5
169:9 208:13 219:17
240:25 251:12 254:2

**Dustin** 157:1,2,3,4

**duties** 79:6 112:13
115:22

**DVDS** 243:6

**DX** 58:17

—————————

**E**

—————————

**earlier** 24:24 29:5
75:18 83:3 117:25
130:7 134:25 136:19,20
142:14 154:10 155:3
166:17 174:9 179:11
187:24 191:5 200:22
203:18 228:11 236:1
266:6

**earliest** 274:22

**early** 14:23 15:12 267:1

**easier** 244:2 249:21

**easily** 97:22 233:4

**easy** 275:16

**eat** 38:5,10

**economically** 184:10

**economics** 171:1

**edge** 170:2

**Edinger** 157:14

**edited** 143:23

**Edson** 140:11 144:6

**educational** 115:6
242:18

**effect** 21:8

**effective** 70:16

**effectively** 275:6

**efficient** 38:16

**effort** 220:12

**Eggers** 10:8,18 15:18
16:14,18 23:21 24:1
26:11,17 29:15,16 33:3
34:7,14 37:12,15 41:19,
21 44:22 50:22 54:9
57:8 59:24 60:19 62:10
63:9,13 74:2 76:18,25
77:11,18 81:10 82:6,11
83:7,10,14 84:11,16
86:10,15 87:22 88:3
89:17,22 90:20,22 91:3,
10,18,24 92:18,19
93:11,16,24 94:4,10,15
95:5,11,21 96:3,14,19,
23 97:9 113:5,8,14,20,
24 119:6,12 121:10,17
122:9,12,25 123:5
124:12,25 125:5 126:15
130:6 138:11 140:19
142:5,8 144:1,9 145:13
146:4 208:12,15
211:19,22 213:23
215:18 217:19 218:21
219:9,12,20 224:21
225:3,22 226:3 229:22
230:2,6,11,14,19
233:22,24 235:16
236:15 239:8 240:19,24
241:3 242:1 245:6,8
246:15 247:4,11 248:18
251:3,11 253:2,25
254:4 255:10,13 256:7
257:6,13,22,23 258:13,
18,23 259:7,15,23
260:5 261:5,8,18 262:7,
10,12,16,22 263:5,13,
23 264:8,25 265:7
267:14 268:19 269:10,
13,17,21,24 270:1,8,25
271:7,11,19 272:3,6,18,
20,22 273:2,4,9 274:1,
8,15 276:1,4,12 277:24
278:6

**Elaine** 157:12,14

**Eleanor** 157:12

**electronic** 220:15
223:13 226:4

**electronically** 54:15
224:7

**elevated** 180:18
182:22

**Eleven** 251:23

**email** 26:20 34:2,19
35:24 36:4,7,8 42:2,14,
22 43:16,17 48:18,21
49:4,7,8 50:15 82:14
83:4,25 84:21 85:23
86:20 87:18 88:4,8
89:23 91:11,25 92:1
93:7,17 94:5,16 95:13
96:4,20,21 97:14 101:4
117:12 119:14 121:18
122:1,4,6 123:8 125:8,
21 131:1,7 135:6,9,12
142:9,15,18 144:21,22,
24 145:1,7 154:20
175:7 177:1 178:12
179:10,11 186:8 189:9
190:14 194:15 213:7,9
218:6 222:10 243:4,16
250:5,15 267:19 268:23
270:3 271:21 275:16
276:18 277:17

**emailed** 50:17 116:22

**emails** 48:20 50:20
76:3,7 80:11 82:2 94:17
97:10 98:24 99:15
117:6 159:15,17 160:10
183:19 194:18,23
195:4,6 212:16 213:5,
15 224:2 273:23 277:5

**employed** 78:13,16
114:12,17,18 164:13
219:23 241:13 251:20

**employee** 202:22
209:8,9,15 274:12

**employees** 18:17
47:24 155:11,12,13
211:2 215:12,16,22
216:8

**employer** 100:8

**employment** 115:14

**end** 11:6 33:22 35:8
37:2 38:6 72:2 80:4,8,
15 85:13 88:13 89:13
118:7 123:10,11 139:5
148:2,15 152:15 172:17

191:3 265:17,20

**ended** 37:7 107:14
201:4 233:19

**enforcement** 278:23

**engaged** 71:1

**engagement** 79:25

**engaging** 277:8

**engineer** 161:4

**engineering** 242:20,22

**engineers** 79:13

**enlarge** 26:19 119:13

**enlarged** 142:16

**ensure** 90:14 143:7

**enter** 237:4

**entered** 39:5 110:3
146:8

**enterprise** 139:15

**enterprises** 108:15

**entire** 17:1 79:8 127:16
173:6 209:22 278:1

**entirety** 277:12

**entities** 13:18 27:20
68:23 79:22 81:4 162:5
181:21 213:10 255:8,17
256:4,6 258:9 259:2,9
262:24 274:21 275:2

**entitle** 98:21

**entitled** 231:18

**entitlement** 17:3
127:21

**entitlements** 79:10
127:12,19,20,25 128:25

**entitling** 11:21 12:13

**entity** 22:19,20,25 23:1
30:20 32:23 35:15,16
41:25 116:18 151:12
163:17 259:20 263:18

**entity's** 259:25

**entries** 79:17

**environment** 198:18

**environmental** 115:13

**equal** 86:7

**equity** 100:17

**equivalent** 137:3

**Ernst** 147:2

**error** 178:24 267:19

**essentially** 12:2 276:5

**establish** 122:24

**established** 276:9

**estate** 11:2,5 78:9
115:10 127:2,4 132:4,7

**Etter** 272:24 273:4,15
275:20 276:11 277:4,6,
10,19

**Etter's** 273:13

**evaluate** 184:12

**evaluating** 131:25

**evaluation** 131:23
135:18

**events** 20:20 163:12

**evidence** 26:16 27:7
34:13 36:25 42:15
43:10 54:12 57:11
58:21 60:2 82:10 83:13
84:15 86:14 88:2 89:21
91:9,22 93:5,15 94:3,14
95:10 96:2,18 119:11
121:15 122:19 125:4
138:9 143:20 154:12,
13,16 161:21 175:2
186:4 188:14 220:16,18
221:22 225:2,24 226:2,
20 227:4,13,19 228:6,
16 229:19 230:9
234:18,23 247:1,10,15
253:6 258:21 259:14
260:4 262:20 263:12
265:5 268:5,8,17
269:15

**evidently** 42:2,4

**exact** 57:13 102:7
128:16 130:22 181:19
194:14 202:21 203:5
206:21 207:16

**examination** 10:17
67:18 74:1 77:17
113:19 142:7 146:12
159:22 166:9 169:15

208:14 217:18 219:19
226:20 234:18,23 239:7
241:2 251:14 254:3

**examinations** 229:21
234:19

**examiners** 237:3

**Excel** 104:1,4,16
116:12 123:16 171:14
226:11 228:4 232:17
243:18

**exception** 270:4
272:14,22 275:9,24

**exchange** 37:7 118:20
144:21 255:3,24 257:8
271:23 272:8 274:12
277:16

**excuse** 18:12 72:13
77:8 85:11 93:18 96:4
102:10 103:5 130:5
135:7 176:23 180:6
262:2

**excused** 208:7

**execute** 251:24

**executed** 21:6 167:12,
15 210:10 218:1,5
222:5 252:12

**executing** 224:14

**execution** 219:3
221:16 222:8 245:25
252:2,17

**executive** 153:3

**executives** 218:20
274:20 275:3

**exercise** 132:12,13
133:7

**exhibit** 26:12,16 27:7
36:3,25 43:9 53:16,20
54:8,12 56:15 57:7,11,
15 58:15,21 59:7 60:2
63:1,8,10,11 64:13
74:5,11,15 82:7,10
83:8,13 84:12,15 86:11,
14 87:23 88:2 89:18,21
91:4,6,9,19,22 93:4,12,
13,15,25 94:3,11,14
95:7,10,22 96:2,15,18
97:7 101:2 103:15
119:8,11 121:25 122:23

123:7,14 125:1,4,7
130:4,5 133:1 134:23
142:13 144:14 154:12,
16 159:18 161:16,21
166:13 167:10 174:22
178:15 186:1,4,7
211:21,24 213:3 224:22
225:2,5,23 226:2,9,16
227:17 228:3,17 229:4,
15 230:13,20,22,23
231:11,15,16 232:5,9,
18 245:20 249:3,5
250:1,2 253:3 259:5,10,
11,22,24 260:4 261:4,6,
19,20,21 263:7 267:18,
20 277:21

**exhibits** 34:8,12
121:11,15 175:2 195:2
212:6,10,12,13 213:1
224:4 226:6 229:16,23
230:9 245:10,11 246:17
247:6,15 249:4 252:22
253:6 255:19,21
256:11,20 257:3,12
258:14,21 259:14
262:20 263:12,25
264:1,10,13,17 265:1,5,
8 267:13 268:5,17
269:7,12 271:10

**existing** 105:25

**exited** 145:25 267:10

**expectation** 39:25
40:7,9

**expected** 23:8 31:3
41:25 42:11

**expecting** 22:3

**expedited** 69:6

**expense** 151:21 155:2

**expenses** 42:12
149:16 158:25 160:4

**expensive** 20:13

**expert** 221:2

**explain** 14:7,8 22:15
28:18 29:24 68:19
75:11 77:9 114:21
115:24 125:19 168:4
173:10 226:17 243:7
250:6 264:18

**explained** 260:24

**explaining** 22:11 30:4

**expletive** 33:17,18

**exported** 227:12 251:2

**express** 179:16,19

**expressed** 181:2

**extent** 51:25 158:22
264:14 265:24 268:9
272:11 274:25

**external** 228:13

**extra** 173:15

**extraordinary** 188:9

**F**

**F'ING** 33:15

**F14rv** 228:12

**F1rw** 228:17

**face** 23:10

**face-to-face** 97:21

**facilities** 13:3,6 14:3
18:24 22:14 70:2 176:4,
5,23

**facility** 13:3 14:9,15
20:14 28:23 32:8 94:24
187:25 190:2

**fact** 41:11 46:22 70:14
75:3 110:13 135:20
138:5 193:15 194:20
200:23

**factored** 85:7

**facts** 143:19

**fail** 195:21

**failing** 196:4

**failure** 28:3 47:6

**fair** 47:3 61:5 98:18
101:6,18 103:21 106:6
203:16

**fall** 40:2,16 41:11 52:17,
23 61:10

**familiar** 13:5 41:4
75:13 106:5 128:7
147:15 148:7 149:6
150:24 153:22 172:6,23

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 295 of 313    PageID 11590
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                              Vol 3 January 12, 2022                    Index: family..front

259:21

**family** 114:13 173:7
265:22

**family-owned** 11:12

**Fargo** 12:18

**faster** 244:2

**father** 11:14 12:11,20
13:1,8,11 15:10,11
19:13,15 22:21,25 25:9,
15,17,24 29:2 31:13
33:7,20 37:8 43:20
68:2,6,13

**father's** 29:18

**favor** 23:9 73:17

**FBI** 144:6 168:2,13
195:7,10 196:10,13
210:15,16 219:2,24
220:3,13 223:5 235:2
241:14,16,18 251:21,
22,24 254:9,12,14,18
255:24 259:2 260:7,12

**FBI's** 220:10 221:5,10

**FDIC** 261:12,15 262:4

**February** 120:4 123:23
132:12,14 136:3 171:22
201:19 210:1,9 211:9
214:7 215:1,2,3,4 216:2
217:22 221:17,20
252:3,25

**federal** 62:8 78:5
210:10 241:14 251:25

**fee** 149:17

**feedback** 106:7,9

**feel** 241:6 277:9

**fees** 27:5 44:1,16 45:22
46:4 75:4

**feet** 30:8,9

**fell** 22:10

**fellow** 110:16 180:14

**felt** 29:22

**female** 144:5

**fence** 235:9

**ferret** 265:10

**fiduciary** 112:13

**field** 104:12 127:12

**figure** 15:15 20:8 40:5,
10 227:23

**figured** 30:5

**figuring** 26:8

**file** 227:9,11,17

**filed** 121:1 139:22,25
140:9 141:17 144:2
255:6 258:9 271:1

**files** 211:2,6,13 216:11
222:10,15,19,21,22
223:2 233:19 235:12
236:3 243:17 253:17

**filing** 216:12

**filings** 118:15,18 258:2,
8,11

**filter** 233:4,5,6,13
234:9,10,11,12 235:1,6,
14,20 244:8,9,24
246:12

**final** 70:16 79:14
264:18

**finally** 111:19 232:18
263:14

**finance** 35:3 88:17
89:7 98:7,8,10,13,14
102:16,23 103:8,10
110:19 115:7 117:15
171:1,10

**financed** 109:21,22

**finances** 117:14

**financial** 12:17 54:24,
25 55:16 61:11 114:24
170:19 173:23 260:11,
14,16,17,19,22,24
261:1,9,15

**financing** 35:5 100:14,
16 101:24 102:1 127:3,
4,16,18 173:11,15

**find** 21:5 38:5 94:23
98:18 100:7,13 129:6
222:6 229:5

**fine** 38:1 101:8 105:16
109:19 278:6

**finish** 56:4 104:19
209:11

**finished** 64:15 173:5
184:5,11 256:25

**firm** 146:24 203:21
278:20

**fiscal** 139:6

**fit** 185:21

**flagged** 234:23

**flight** 38:21 101:17,20

**flip** 92:20 93:4

**floor** 38:23 228:7 229:6,
7 232:11 236:12,22

**floors** 208:21

**flow** 90:7 104:8 116:11,
17 119:18,19 142:21
153:22 171:12 174:10
183:7,11,16 191:6

**flowing** 177:15

**flows** 88:19 115:1
116:7 174:13 176:21
177:14,18

**fly** 77:10,25

**focus** 12:5 172:22

**focused** 201:6

**folder** 227:9,12 244:18

**folks** 19:22 26:2 31:5,6
89:9 120:20 217:25

**follow** 28:6 34:22,24
45:22 50:15 87:18
144:11 176:25 178:18

**football** 171:3,5,17

**Ford** 146:4,5,15,19
164:9 166:11 188:18
199:12

**forensic** 223:12 227:9
235:13 237:3 260:7

**forensically-wiped**
222:17

**forensics** 220:1,8
221:1

**fores** 105:9

**forgive** 226:24 233:10

**forgiveness** 45:8
46:10

**form** 22:18 30:20 32:25
44:22 49:5,7,8 60:13,
15,16,18 186:21
231:19,24

**forma** 88:14,16 103:23
104:8 132:6 144:23
171:12 174:9

**formas** 103:14 105:18
106:4,6 115:23 128:19
174:12

**formatting** 85:22

**forward** 38:23 52:8
69:17,18 81:3,11 99:3,
9,17,18,19 105:4

**found** 112:22 134:19
225:19,20 228:14,16,
19,23 229:9,19 230:23
231:2,12,16,17 232:6,7,
10,14,19,20 248:24

**founder** 182:14

**four-wheeler** 239:13

**Fowle** 208:12,13,17,19,
24 209:1 211:16,23
214:1,6 217:20 222:2,8
246:21

**Fowle's** 228:19 229:1
232:8,11,14,21,22
237:13

**frame** 25:25 26:1 78:19
171:25 172:1

**Fredricksburg** 239:15

**free** 145:19 208:11

**frequent** 15:21 80:9,12

**Friday** 90:10 97:20
142:24

**friend** 237:24

**friends** 164:16 199:14
238:1 239:17,19 240:2,
10,11,12,13 265:23

**friends'** 240:12

**front** 23:10 27:15 74:4
82:13 123:20 189:19
236:10 255:19 257:25

fruition 106:20

frustrated 193:17

full 61:6,7

full-on 209:8

function 116:5,6 118:6
206:6,11

fund 18:16,25 19:4,13,
15 22:17 69:13 83:3,6
94:23 102:18 125:24,25
147:23 149:18,20
150:10,12 151:5 152:8,
9 155:11 158:6,17
173:13 188:11 189:14,
15,21 190:17

funded 25:2 30:6,17
87:12 97:19,23 149:7,
25 150:4 155:6 190:15

funding 21:14 22:12
24:25 25:5 27:23,24,25
54:4 59:17 86:2,25
87:4,19 96:22 138:23
147:16 154:21 170:6
185:24 278:10

fundings 159:16

funds 20:15 28:3 39:23
47:8 82:23 84:3 92:8
99:16 100:6,10 102:14
117:25 118:10 148:11,
12 151:7 172:8,21,24
173:16 176:10 190:18

funnel 190:17

future 108:21 109:2
136:15 137:9 139:4
183:23,25 184:15,18,
20,23 201:24

G

game 52:1 106:15,16

games 112:4

Gates 270:9 274:16
278:9

gave 81:3 85:18 111:19
211:12 223:3 234:14
246:25

general 10:22 52:19
77:23 111:19 112:2

133:15 149:21,23,24
150:10 176:4,5,23
187:25 188:2,10 189:21
224:13

generally 11:18 12:8
16:22 18:6 79:6 80:6
114:3 154:9 221:19
243:7 252:11

gentleman 11:15,16

gentleman's 198:16

gentlemen 37:17
200:1 265:16

Gilpatrick 15:23 16:4,5
21:21 22:5 24:6 25:19,
22 62:16,19,20 64:18
65:4,15,25 66:15,20
68:4 76:4 80:5,18 82:19
83:20 85:12 86:24
87:18 88:5,10 92:4,15
93:19 94:21 96:5
110:11,13 120:22
125:14 135:8 136:6
144:21 145:8

Girourd 178:20

give 52:3 98:14 106:7,
12 111:13,25 112:1
114:2 152:13 183:10
189:1 191:6 193:8
202:20 203:5 227:10
235:9 247:2

giving 22:12 246:5

goals 35:17

good 10:15 38:7 39:1
45:19 72:9 79:9 97:5,6
110:17,19 113:21,22
126:20,22 155:23,24
184:13 199:10 212:20
239:21 241:22 251:16

Gosling 107:2,3,5

GOTTFRIED 253:19

government 28:20
34:8 63:14,15,17 76:25
77:2,11 90:21 113:10,
14 169:5 174:23 185:25
196:4 197:1 198:22
211:24 212:6 213:1
215:12,23 216:13
217:22 219:13 224:3
255:20 257:2 264:18

267:23 270:25 271:22
272:7,12 276:13 278:8,
14

government's 26:12
27:7 36:3,25 43:9 53:16
82:7,10 83:8,13 84:12,
15 86:11 87:23 88:2
89:18,21 91:3,6,9,19,22
93:12,15,25 94:3,11,14
95:6,10,22 96:2,15,18
97:7 101:2 103:15
119:8,11 121:11,15,25
123:7,14 125:1,4,6
130:4 133:1 134:23
142:12,13 154:12
174:22 175:2 186:4
213:2,3 224:22 225:2,5,
23 226:2,9 228:3 229:4,
15,23 230:9,13,20,22,
23 231:11,15,16 232:5,
9,18 245:10,11 246:17
247:15 249:3,5 250:1,2
253:3,6 255:18 256:10
258:14,21 259:4,5,10,
11,14,24 260:4 261:6,
19,20,21 262:20 263:6,
12,25 264:1,9 265:5
267:18 268:5,17 270:2
272:24 273:10

government-granted
127:22

grand 40:22 42:20 43:5
44:4 85:1

Grandbury 186:16

Grapevine 210:5,7
225:6 252:7,19

great 30:5,8 97:19

green 185:4

Greenlaw 22:5,8,10
23:15,23 24:5 25:4
28:12,25 29:2,22 30:13
31:11,20 33:10 37:6,8,
10 70:25 81:1,3,6
108:11 126:23 182:3,4,
10,24 183:5 185:2
191:19 192:21 193:19
194:3 202:14 204:7
205:5,19 206:10
207:12,20,23 217:3
263:18 276:17

Greenlaw's 182:13

ground 64:5 79:17,18
132:1

grounds 124:16
268:12 270:24

group 27:10 28:2 55:20
114:14 123:22 127:14
157:20 236:22

Group's 28:2

guarantee 264:19

guaranties 153:5
264:15

guaranty 35:19 61:9,15
62:7 153:7

guess 43:15 49:14
100:11 159:23 181:15
214:22 215:9 244:13
265:11 277:21

guy 15:22 88:17 89:7
98:7,8,9,10 103:10
104:2,4 117:15

guys 57:4 65:16 94:22
97:19,22 98:14 106:16
236:13

H

half 20:6,7 32:10,12
136:20 137:18 234:6

hall 15:10

hallway 17:9 232:11

hallways 152:18

hand 10:10 77:5 113:16
134:9 169:7 219:15
245:13 254:1 255:15

handed 56:14 57:25
245:19

handing 53:15 103:4

handle 183:14 190:9

handling 156:19
157:18

Hang 14:24

Hanson 251:11,12,19,
20 253:9

happen 152:10 164:25
165:8,17 184:23 190:20

193:18,24 202:19,23

**happened** 15:10 22:7
145:3 165:3,4,12 215:1

**happening** 47:7 76:8
165:2,18,19

**happy** 20:11 112:7,9

**hard** 31:24 69:2 208:21
211:11,14 212:16
216:12 222:18,23
223:1,3 224:8 228:18
232:23 233:1 243:6
266:13

**Hartnett** 236:22

**hash** 152:24

**hashing** 265:19

**hassle** 73:16

**Hawks** 106:22,25

**HCVT** 146:24

**head** 121:24 180:18,21,
22 182:15 185:1 195:17
201:13 202:16 203:11,
15 205:15 217:12
233:11

**header** 250:11

**headquarters** 226:23
246:10

**health** 68:7

**hear** 10:15 15:3 115:22
119:4 160:17 161:12
166:2 169:13,24 175:16
208:22 211:4 213:8
259:16 265:20 273:21

**heard** 24:18,23 26:10
45:6,24 160:11 238:25
239:1 246:5 258:16

**hearing** 38:15

**hearsay** 124:15
268:12,22 269:8,9,11
270:4,13,24 274:25
275:9,12 276:9

**heartbeat** 255:15

**held** 10:25 38:1 146:2
209:22 242:15

**helped** 154:1 157:6,8
164:20 200:1

**helpful** 29:23 210:20

**helping** 161:4 210:24

**helps** 130:11,16

**hey** 152:21

**hid** 216:10,21,22

**hidden** 244:20

**hide** 217:3,4

**high** 98:13 159:2
186:16 238:2

**higher** 17:17

**highlight** 163:2

**highlighted** 120:15
124:3

**highlighting** 120:16

**hired** 157:13

**hitting** 166:2

**Ho** 240:25 241:5,12

**hold** 11:24,25 35:22
42:5 56:3 64:21 65:18
66:3 114:16 133:12
197:7,17 209:6 241:16
242:4 262:1

**holding** 162:11,13

**Holdings** 62:8,9

**hole** 166:3

**Hollis** 23:15,23 70:24
80:24 81:1 126:23
179:20 182:2,3,4,9
191:19 192:13,21
204:17 205:18

**home** 10:21 11:2,5
12:14,15 23:5,6 78:9
79:19 109:13,17 115:4
127:13,23 173:5,7
184:6 265:22

**homeowners** 79:19

**homes** 11:22 36:17
71:1,3,10,11,12,15,17,
18 105:21 184:11
214:21

**Honest** 110:22

**honestly** 63:24 195:11
278:7,12

**Honor** 10:8 14:25 16:14
23:21 26:11 34:7,10
37:13,16 39:8 41:19,20
49:1 53:12 54:8 56:12
57:8 58:2,18 59:12,23
60:19 62:1,10,25 63:7,
9,14 64:6 65:20 73:20,
23 76:19,20,21,23 77:2,
12,13 82:6 83:7 84:11
86:10 87:22 89:17
90:20 91:5,18 93:11,24
94:10 95:5,21 96:14,24
97:1,2 108:7 113:2,4,5,
9 119:7 121:10 122:3,
12,20,22,25 124:13,19,
22,23,25 126:16,17
130:6,13 132:24 133:3,
4 138:11 140:19,24,25
141:1 142:4,5 143:16
144:10,11 145:13
146:4,11 154:11 155:17
161:15,19 165:9 166:7,
8 167:8 168:18,21,24
181:6 192:4 196:12
198:10 200:18,19 207:6
208:4,6,10 211:19
213:23,25 214:3 215:18
217:15,16 219:12
224:21 225:22 229:22
230:14 233:23 235:17
236:15 239:3,5,6
240:20 245:6 246:15,
20,24 247:4 251:4,5,8,
11 255:10 256:7,14,18
257:6,10,14 258:13
259:7,23 261:5,18,25
262:16 263:5,23 264:4,
8 265:1,7 267:14,22
268:8,20 270:2,17,25
271:7,11 272:15 273:2
274:13,17 275:4,15
276:4,12 277:3,24
278:7,18

**horrible** 239:13

**Hoss** 61:15

**hostage** 38:2

**hour** 38:9 39:2

**Houston** 107:3,5

**hundreds** 71:10,18

## I

**IACIS** 221:1,2,9

**ID** 243:24 248:19 249:7,
10,13,19,22 250:6,12

**idea** 30:8 50:9 72:9
149:3 184:13

**ideas** 17:14

**identical** 57:18,20

**identification** 29:13

**identified** 180:10 182:9
213:2 222:14 271:3
272:23

**identifier** 227:24
243:22

**identify** 16:10 23:18
180:4,7 182:6 248:21
256:24

**identifying** 221:22

**II** 22:20 26:6 29:25

**III** 14:16 17:21 24:11
27:24 30:24 45:3 54:4
58:7 59:17 72:19 75:20
88:12 92:7 97:20 99:24
108:12,13,16 111:9
118:1,4,9 133:9 135:18
136:12 139:15 140:6
148:12 149:24 150:9
157:25 158:7,8 159:2
172:10,20,22 173:2,9,
16 174:4 176:1 187:21
189:13,16,19,21 190:2
258:2

**image** 221:24 223:12,
14,19 228:9

**imaged** 223:22

**images** 210:17

**imagine** 32:4 52:6

**imaging** 221:23 223:18

**impact** 47:7 99:8

**impacting** 47:1

**impeachment** 63:7
133:2,3

**important** 105:17

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 298 of 313    PageID 11593
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                           Vol 3 January 12, 2022                    Index: impossible..Jeff

128:23 129:2 139:4

**impossible** 233:12

**improper** 264:22 266:2

**improved** 184:5

**improvement** 128:11, 12

**inability** 48:2

**include** 39:13 55:10 128:19

**included** 35:18 144:22 156:17 202:17 262:10

**includes** 50:2

**including** 50:18 98:25

**inconsistent** 35:8 42:19 44:6

**incorporation** 259:1,9, 19 260:1 262:24 263:1, 8

**increased** 129:1

**increasingly** 27:22

**independent** 266:7

**indexed** 227:8

**indexes** 244:1

**indirectly** 35:16

**individual** 16:7 23:14 66:6 80:2 88:18 105:9 176:16,19,22,24 177:15 179:24 237:25 257:3 263:16,20 272:23

**individuals** 149:12 162:5 177:15 271:4 272:10

**industry** 173:24

**information** 51:12 89:9 90:13,15 121:2 143:3,7 198:17,21 206:7 218:11,13 235:5 237:8 243:4 244:9 250:11,14,17 266:24

**infrastructure** 149:14 150:13

**infrequent** 15:21

**ingest** 227:2 243:21

248:22

**ingested** 227:7 249:8

**ingestion** 243:25

**initial** 234:19 237:2

**initially** 12:21 21:20 102:3 181:11 182:20 197:10 226:19

**initiate** 21:7 101:12 163:21

**initiated** 19:21

**initiating** 101:5

**injects** 275:6

**inputting** 104:9,13

**inquire** 199:2

**inquired** 20:8

**inserting** 278:5

**insolvent** 69:14

**instance** 50:1 103:1 135:24 187:20 237:13

**instances** 255:9

**institution** 173:23

**institutions** 12:17 109:22 260:11 261:10, 16

**instruct** 196:3 197:3

**instructed** 196:25 211:7 266:4

**instruction** 211:3

**instructions** 38:25

**instructive** 15:2,4

**insured** 261:13

**intelligence** 254:15

**intended** 49:22 51:18 99:2

**intent** 35:8

**intention** 62:21

**interacting** 157:19

**interactions** 15:20,21 159:12

**interest** 13:14 14:4,7,

10 17:16,25 20:24 23:2 24:11,20,21 31:15,17, 21 32:3,7,11 45:8 46:9 72:3,8,11 73:13 75:10, 11,14,16,18,22 76:11, 13,16,17 137:10 154:5, 6,8 178:7 179:5

**interested** 33:7

**interface** 183:14

**interfacing** 192:2

**internal** 20:2

**International** 221:2

**Internet** 266:8

**introduce** 26:12 34:8 82:7 83:8 84:12 86:11 87:23 89:18 90:21 91:6, 19 93:12,25 94:11 95:6, 22 96:15 119:8 121:11 122:14 125:1 225:23 229:23 247:1 251:16 256:8,10 258:14 259:8, 24 260:21 261:6,19 263:6

**introduced** 256:21

**introducing** 278:1

**investigation** 210:11 217:1 241:15 254:20,23 258:1,25 260:6 266:7 275:6 278:23

**investigative** 221:3 226:25 235:15 242:11 244:19,21

**investing** 203:1

**investment** 184:13 185:22

**investments** 170:11 176:17

**investor's** 112:18

**investors** 112:12,13 152:4,10 160:22

**investors's** 112:20

**invoice** 151:12,17,18

**invoices** 84:24,25 94:8 185:18

**invoked** 77:3

**involved** 11:2,4 13:11, 15 14:19 28:12 102:21 103:1 127:18 130:21 165:7 172:5 191:17 192:14 201:1 220:14 221:15 254:20

**involvement** 102:24 103:24,25 104:8 117:10 181:14 220:23

**involves** 50:5 185:17

**issue** 102:9 141:9 177:9,11 233:7 257:15 265:14 267:23

**issues** 35:10 39:12 46:21 50:14 198:13 199:9 201:11

**item** 185:20 226:13 227:10,11,19 235:11

**items** 186:10,12 223:23,24 224:6 231:2, 13 234:24 237:9 245:22,24 246:21,24 248:23 252:24 256:1

**IV** 17:22,25 20:14 23:3 27:25 30:23 31:16,18 49:18,21 72:19 96:22 99:24 108:13 118:5,10 126:1 148:12 150:3 158:3,8,18,23 159:3 172:12,19,22 173:4 174:6 189:15,24,25 258:3

**J**

**james** 12:11 16:3,25 25:24 41:5,11 42:14 52:15 68:3 77:1,6,20 85:23 116:21 121:22 141:11

**January** 10:2 12:3 15:9 72:4 114:7 133:7,19 154:21

**jeans** 78:5

**Jeff** 15:22 25:24 62:15, 18 64:17 66:20 68:4 80:5 82:19,23 83:20 85:11 86:24 87:18 88:5, 10 89:1 92:3,15 93:19, 21 94:21,22 96:5

110:17 120:21 121:22 125:14 135:7 136:6 144:21 145:8 153:18 156:21

**Jester** 15:22 16:3,5,8, 16,17 17:9 20:17,18 21:11,15,21 22:4 24:6 25:19,21 29:3 32:21 44:20 45:2 68:4 80:1,5, 18 82:3 85:6,22 86:1 88:6 89:12 90:3 97:15 110:10 120:21 142:19 179:25 180:13,25 181:8 182:19,20 200:23 205:14 207:15,19 217:10

**Jester's** 181:24 205:21

**job** 94:22,25 98:16,19 100:4 110:18 170:10 183:22 204:18 251:25

**joined** 16:5 276:7

**JONES** 146:11,13 154:11,17 155:19 165:9 166:8,10,12,14 167:5,9, 18,22 168:16,24 169:16 174:21 175:4,19 178:14,16 180:9,11 181:6,7 182:8,12 185:25 186:5 188:13, 15,22,23 189:6,8 192:8, 15 194:6 196:12 198:10,24 208:3,6

**Joseph** 271:24

**Jr** 10:20

**Judge** 63:4 73:21 113:3 164:4 196:7,8 270:6

**judiciary** 37:19

**July** 83:22 84:6 140:10, 18 147:14 166:19 168:9,12

**jump** 31:10

**June** 62:16 65:6,25 66:20 167:13 168:12

**jurors** 39:5 145:25 146:8 183:19 267:10

**jury** 30:15 37:20,22 38:2,13,15,20,24 40:22 42:20 43:5 44:4 61:3 65:3 68:19 97:17

127:20 149:9 150:7 151:2 165:8 173:10 194:25 199:20 224:6 226:10 251:17 265:25 267:12

---

### K

**K&I** 270:9 274:16 278:8

**keeping** 103:7 161:3

**keys** 27:17 209:12

**killed** 239:12

**kind** 12:24 17:13 22:10 33:23 45:7 48:6 64:13 117:1 172:17 193:14 204:3 224:14 232:15 248:19

**kinds** 24:14

**knew** 32:7 52:7 73:8 103:11,12 110:18 111:9 112:12 117:14 141:15 160:13 164:9 199:12

**knowledge** 24:22 63:25 73:1 104:14 122:11 215:25

**Kramer** 272:9

**Kyle** 85:15,17,18 237:25 238:3,6,8,12,18, 22 239:10,22 240:10

---

### L

**lab** 221:25 223:17

**labeled** 225:15 252:22

**laboratory** 220:1,9,10, 13,14 221:24

**lack** 162:12 176:8 204:9

**ladies** 37:17 195:14 199:25 265:16

**lady** 27:15

**lady's** 209:12

**laid** 24:12 25:3 30:18 192:4

**land** 11:11,20 12:6,13, 16 13:7 18:25 22:20 26:6 27:10,11 29:25

30:21 34:24 35:9,15,17 36:13 41:7 45:24 71:4, 6,11,12,14,16,22 72:9 78:14,17 79:4,8,9,10 84:24 90:7 106:24 109:4 111:19 114:13 115:19 123:22 127:10, 11,17 129:1 138:1,2 142:21 147:22,24 173:4,7,23 184:4,5 186:20 198:23 263:8

**Land's** 13:23 35:4

**language** 59:1 62:23

**large** 99:22,23 208:21 233:8

**late** 47:11 51:25 52:1 106:15,16 215:7 265:14

**laugh** 193:6 204:8

**law** 278:20

**lawyer** 12:9 73:2,3 199:3

**lay** 64:5 198:23

**layout** 224:19

**Laytham** 94:5

**leading** 81:8,18 143:18,19 167:17 191:9

**learn** 13:13 127:25

**learned** 112:3

**learning** 243:10

**leave** 95:1 102:5 148:4 171:23

**leaves** 178:23 269:22

**leaving** 13:10

**led** 276:17

**ledger** 111:19 112:2

**left** 33:23 37:11 118:2 148:3 166:17 168:8,14 171:24 172:18

**legal** 52:20

**legitimate** 151:21

**legs** 145:22

**Leightman** 94:6,7

**lender** 12:24 21:6 27:25 61:19 92:25 95:18 100:11 111:12 112:9 125:25 150:22 163:6,7,9,19 173:3,10, 12

**lender-agreed** 60:15

**lenders** 102:15 156:20 157:18

**lending** 13:15,21 117:11 156:16,20

**letter** 26:10,18,20,25 27:2,4,9 28:6,10,14 33:16 43:12,15,16,20, 22,24,25 44:11,12,15 45:16,17,18,20 46:2,6, 9,17,18,20,25 75:2,3,7 187:21 225:16 274:15, 20,21 276:18

**letters** 26:2 33:24

**level** 98:13 105:9,12,13, 18 106:5,8,13 132:5 139:13 159:2 161:7,8 172:5 185:17 201:3

**levels** 117:23

**Lewis** 29:12 32:24 73:21 76:22 113:3 142:3 145:18 164:4,8 165:11,15,16 166:5 167:17 168:20 192:3 194:9 196:7,9,16,22 197:9,22 198:13,20 199:2,11 200:17 208:9 217:17 240:22 253:23

**licensed** 11:1 147:4

**liens** 18:21

**life** 173:6 204:24

**lights** 18:17 81:25 161:3

**limine** 271:2

**limit** 188:8

**limited** 27:10 159:10, 18,19,20 263:2,21

**Linda** 156:4

**lines** 180:23 181:9 193:16,19

list 121:21 212:5,25
225:19 234:15 244:13
245:13,19 246:16,19,
20,25 247:3 249:4
255:16 256:8,18,25
267:20 271:25 272:24
273:5

listed 92:6 93:6 120:7,8
123:25 142:18 186:11,
12,24 246:24 255:19
256:1,11 257:25

listing 278:10

lit 185:4

literally 69:25

live 10:23,24 77:22
114:3,8

lived 114:5

LLC 27:11 61:16 162:10

LLP 27:24

load 233:19 236:2
243:20,21 244:14
246:10

loaded 244:3,17

loading 243:12

loan 13:9 17:12,21,25
18:23 19:20 20:1,3
28:22 44:14 45:3,19
46:7,15 47:14,23 49:12,
24 50:10 51:6,13 55:5,
8,9,23 56:8 61:4,8,20
62:22 66:1,7,12,16,21
67:3 72:3,14,15,20,21
73:8 88:12 94:23 99:1,
9,10 103:20 108:16
111:11 112:10 118:16
119:20 125:18,23 126:4
129:24 131:2 133:9,20
135:19 136:7,12,18
137:16 139:13,15 140:6
149:14,21,22,24 150:5,
9,10,11,15,17,20
151:14,15 152:22 154:1
157:25 158:3,9,10,14,
15,18,22,24 159:2,3,6
160:23 161:7,24 162:2,
24 164:20,23 166:20
167:12,14,16 168:11
172:7 173:14 176:7
178:4 182:18 185:18
189:19 199:16,17,18

200:1,3,5,14

loan-to-value 173:18,
20 174:1

loaning 214:20

loans 12:17,21,23 13:2,
6,24 17:21 18:11,15
23:2 24:11 30:22 33:15
45:5,10 47:8,19 48:1,3,
4 49:17 55:16 61:12,13,
14 68:23 69:23 71:22
72:19 76:15 79:21
81:12 92:7,16 99:23
100:1 108:12,13,14,19,
22 109:22 110:6 118:4
125:20 129:6,20 131:24
132:5,7 138:24 147:23
148:8,10,17 149:3,4,6
150:3,4,6,25 153:6,8,
14,20,24 154:4 156:22
157:6,8,23 159:21
167:2,4 172:10,14
173:24 176:3,17
177:17,19 178:23 179:5
186:12,14,18 189:23

local 220:10,13

locally 226:21

located 148:19 222:7
224:7 228:5,6 252:6

location 77:23 221:22
224:19,20 228:1,15
229:10,20

locations 228:23
232:7,10,20

locator 232:17

lodged 121:2

long 11:4,10 15:17 48:9
69:2 71:2 78:10,16
114:5,16 146:21
147:11,13 171:16 209:4
220:2,20 233:25 242:15
251:22 254:11

longer 69:10,13,16
84:18 173:4 266:16

looked 26:7 57:19
67:10 98:25 99:14
103:13 105:2 118:17,18
163:16 183:19 212:12
255:18 260:25 261:2

Loop 107:18,19

loose 243:17

lose 23:11

loss 197:11 198:6
199:5,7 239:24

lot 20:22 38:6 69:6
128:15 266:9

lots 11:22 18:21 47:25
50:13 71:16 76:13,14
79:18 115:4 116:4
127:13 147:24 173:5
184:5,11

loud 10:15 241:21

low 17:17

lower 20:24 92:7

lowering 20:15

LP 27:24

lunch 37:18,21,23 39:1,
3

lunchtime 38:3

lying 205:5

LYONS 169:5 251:15
253:8


M

Madam 247:12

made 23:16 37:8 47:8
53:4 55:4 59:16 61:19
76:13 92:6,9 99:7
108:13 119:1 137:16
170:12 176:18 185:18
186:13,18 191:2 193:7
202:23 203:14 204:13
205:6 213:16 264:15

main 88:12 117:23
156:21 157:21

maintaining 274:3

major 170:25

majority 173:13 180:14
205:23

majors 171:1

make 13:23 19:18,21
22:23 45:19 48:1 51:14

55:9 90:9 96:12 104:11
105:3,10 106:19,23
122:21 142:24 151:20
152:8 163:8 184:14
185:21 190:19,21
192:18 203:1,17 208:21
209:11 210:17 235:2
246:6,9 252:14 261:1,3
265:1

makes 45:18 249:21

making 76:11 79:9
94:7 102:24 108:14
155:16 203:11 207:21
276:17

man 29:6 85:15 222:1

manage 100:23 252:14

management 27:5
35:9 44:1,16 45:21 46:4
75:4 115:17 149:17
165:24 171:2 173:22
174:1 179:17 180:19
191:8 205:15 226:25
242:11

manager 148:1 170:9,
10,13,19 174:8 175:13,
18 180:15,17,22 183:22
200:23 201:2,7 205:24
207:18 209:19

managers 154:24
179:21,24 181:12,13,22
182:21 183:12 206:2

manipulated 143:14
212:22 276:25

manner 63:13

map 224:15

March 88:9 89:11,16,23
90:2,23 91:1,12,14 92:2
119:14 120:22 122:1
135:1,8,15 142:10,17
238:9 239:9,23

Marine 115:16

mark 35:23 211:24

marked 53:15 56:14
62:3 63:1 226:6 259:4,
10

market 36:17 109:13

mask 10:14 113:23
169:12 241:7,8 251:18

**Mason** 92:13

**massive** 226:22

**master** 158:8,14,15

**masters** 115:10

**matching** 20:2

**material** 55:6 234:24 270:7

**materially** 47:7

**materials** 210:25 274:16

**math** 179:11 269:21

**matt** 88:24,25 89:1,2,3 90:16,17,18,25 104:5 113:10,15,18

**matter** 110:13 135:20 138:5 240:4 278:9,13

**matters** 34:25 265:18 274:17

**Matthew** 114:1

**maturing** 88:12

**maximum** 173:18

**MBA** 115:8

**meaning** 101:11 159:1 174:12 185:7 223:10

**means** 125:19 150:7,15 163:19 187:3 188:4 223:20

**meant** 18:19 63:6

**mechanical** 242:20,22

**media** 210:17,18 219:6 223:13 226:5 228:13,14 266:8,9

**meet** 48:3 87:6 195:13, 16 238:6,16

**meeting** 15:9 16:2 22:4,7,9 24:2 28:11,17, 21,24 29:2,17,22 30:12, 19 33:23,24 34:3,15,16, 20,23,24 36:16 37:2 45:22 51:2,5,7,11,15,20 81:6 151:14 152:24 206:15 207:11,18

**meetings** 16:20,23 17:1 21:19,22,25 40:4

48:22 51:2,17,19 80:3, 6,14,15,16,19,23 149:11,13 151:4 152:16,18 204:2 206:5, 9

**Mehrdad** 152:20 153:1 162:15 190:22 202:12

**Melissa** 26:21,23 28:14 179:20 183:13 192:13 270:3 271:10,20 272:3 273:3 276:10

**member** 277:2

**members** 30:15 210:16 217:21 223:11 224:6 226:10 251:17 265:22

**memo** 49:11,16,19,20

**memorial** 240:14,15,16

**memory** 42:6 130:9,19, 20 132:17 134:18 137:10 195:21 196:4, 11,15,20 197:1,11,14, 15,22,24 198:5,13 199:5,7,9

**men** 22:2 30:11 80:22

**mention** 31:7

**mentioned** 17:7,20 31:8 88:25 153:19 157:23 162:16 202:12

**mentions** 163:11

**Mentor** 85:17

**mess** 255:14

**messed** 174:14

**met** 50:12 194:20 195:7,22 206:23 207:1 222:1 238:8,12,18

**methodology** 229:18

**mic** 23:10

**Michael** 237:22

**microphone** 98:2 146:17 169:23 241:20

**mid** 114:19

**middle** 97:13

**Mike** 239:19

**million** 20:5,7 32:10,12 40:20 71:20 75:21 95:17 129:25 131:2 132:11 133:8,21 136:21 148:18,24 153:7,11 158:16 166:21 167:15 177:24,25 178:7,13 190:16

**mind** 87:10 134:17

**minimize** 100:5 266:15

**minimum** 278:24

**minutes** 47:13 64:18 65:3 99:14 103:13

**mirror** 228:8,10

**miscellaneous** 188:7

**mischaracterizes** 181:4

**mislead** 107:17

**missing** 60:6

**misspeak** 102:6 107:8, 17

**misspending** 112:10, 23

**misspoke** 93:23

**misunderstood** 42:3

**mitigated** 266:18

**Moayedi** 152:20 153:1 162:15 164:20 190:22 202:13,15 203:7,12

**mocking** 193:14

**model** 85:19 105:2,3 117:2 139:17

**modeling** 114:24 139:18

**models** 92:5 105:1,4

**modifications** 61:14

**modify** 46:15

**moment** 37:12 75:9 95:12 96:23 97:11 124:12 126:16 140:23 155:17 196:7 208:3 213:24,25 233:22 239:2 251:3 256:3

**moments** 95:3

**Monday** 86:20 88:12 90:14 92:2 143:4 154:21 189:16

**money** 19:4,6,8,20 20:15 37:20,21 71:7 73:12,17 74:22 76:14 81:24 82:3 86:9 87:6 96:12 108:16 111:13,14 112:10,18,21 118:5,10 128:20 140:14 151:7, 16,19 155:11 177:16 178:6 188:6 189:21,24 214:21

**monies** 151:15 176:21

**monitor** 170:11

**Montalcino** 186:16

**month** 32:8,11 58:6,8 75:22,23 76:12 88:13 108:22 191:3,4

**monthly** 20:3 116:10 149:11,13 151:4,13 188:8

**months** 27:22 44:20 69:8 70:8 132:14 133:21 136:21 140:17 233:8,9

**mood** 33:12

**mor** 221:23

**morning** 64:20 90:14 143:4 189:16 239:12,16 267:6,8

**mother** 240:9,11,14,17

**motion** 271:2

**motive** 264:14,17,24

**mouths** 24:19

**move** 52:8 81:11 99:2, 19 154:11 169:23 170:1 185:25 193:9,10,21

**moves** 54:7 57:6 58:13 59:22 161:16 174:23

**moving** 31:9 69:17,18 81:3 99:9 246:23 266:25

**MR.STEPHENS** 14:25 15:4

**MUD** 128:6,8

**MUDS** 128:25

**Mueller** 156:10

**Muller** 271:21,24
275:25

**multimillion-dollar**
49:24

**multiple** 50:17 54:1
58:11 93:5 148:12
150:10,21 162:5 206:4

**municipal** 128:8 210:5
214:16,17 225:6 252:6,
19

---

**N**

**named** 162:6 237:22,25

**names** 124:6 207:1
244:13 271:17

**naming** 228:8,9,12

**nature** 269:11

**Navigant** 276:24

**NCF** 136:1

**Neal** 141:4

**necessarily** 109:6

**needed** 15:13 23:7
26:6,8 31:10 76:5
116:24 135:10 149:13
151:4,5 152:9 173:15
179:7 188:5 191:13
222:15,16

**negotiate** 28:16

**NFL** 171:18

**niece** 239:13

**non-pst** 243:4

**non-psts** 248:25

**normal** 22:4,9 173:12
213:16

**North** 214:22 219:25
220:8 221:12

**northern** 114:4,5 210:6
225:7 252:9

**notation** 189:18

**note** 55:5

**notes** 154:6

**notice** 152:1 163:8
270:4 271:1

**notified** 77:12

**notifies** 244:11

**notify** 17:9 118:19

**November** 59:5,16
60:23 67:10 86:20,22
87:9,17

**NTRCFL** 221:14

**number** 53:4 57:3
58:14,15 76:7 88:21
97:19 98:23 106:12
109:17 119:20 124:2
125:23 128:16 130:7
131:6 133:8,21 163:11
175:25 178:8 202:21
203:5 225:15 227:11,
16,20 231:2 243:23
246:16 249:6,7,11,15,
20,23 250:13 256:22
266:15,17 270:9

**numbers** 177:9 178:18
228:10 245:20 255:14
256:5 264:6 269:1,4
274:1

---

**O**

**oath** 10:12

**Obert** 141:5 217:10
272:9

**object** 15:1 32:24 44:22
62:11 63:9 122:18
196:13 198:11 236:16
268:12 269:3,4,11
270:23 274:6 275:4
278:3,24

**objected** 124:15

**objecting** 270:14

**objection** 26:14 34:10
49:1 50:22 54:9 57:8
59:24 60:19 81:8 122:3,
14,16,21 130:7 138:11
143:16,17 145:17,18
165:9 167:17 181:4
192:3 198:12 215:18

247:9 262:9,11,13
263:25 264:3,12 267:16
269:8 270:13 273:18
274:25 275:12 276:8
277:21 278:1

**objections** 124:17
143:22 145:15 265:11

**obligated** 90:13 143:3

**obligations** 28:4 97:23

**observations** 13:22
19:18,21

**observed** 118:20 121:6

**obtain** 79:21 127:16
147:9,23 170:23 260:10

**obtained** 13:7 17:22
171:10 220:17 254:24
255:2 258:3 259:2,19
260:13 261:16 262:24,
25 263:16

**obvious** 179:21

**occasion** 21:9 22:1
134:15

**occasionally** 116:9

**occasions** 203:3

**occur** 80:7 152:25
194:10

**occurred** 33:25

**occurrence** 163:10

**October** 29:1 34:1,16,
20 35:21 36:2,11,12,23
37:3 50:11 57:24 58:9
67:7 84:22 86:6 87:11,
19 129:18,23 131:2,18
132:5,10 209:5 220:21,
22 234:7

**Odette** 175:11,12,13,18
178:20 271:21,23
275:25

**offer** 253:2

**office** 80:10 89:2
152:24 210:3,18 212:9
219:3 225:11 228:20
229:1 232:8,11,12,14,
21,22 237:13 255:23

**officer** 39:4 115:16
145:24 146:7 153:3

267:8,9

**offices** 29:1 164:14
209:25 221:17 223:15

**officially** 267:3

**Ohio** 170:24 171:3,5

**one's** 250:25

**one-half** 277:13

**one-sided** 111:7

**ongoing** 35:8,17 188:6
191:12

**open** 94:7

**operate** 70:11

**operation** 99:25

**operational** 102:16,22,
23 104:14

**operationally** 103:7
104:13

**operations** 68:14,18,
20 69:22,25 79:8 98:9,
12 101:21 188:6

**operator** 98:15

**opinion** 202:9

**opportunities** 50:14

**opportunity** 149:2
224:4

**opposed** 99:10 102:16
106:4 161:7

**oral** 49:6

**order** 18:16,25 235:2
245:13,14

**orderly** 68:12,14,17,19
69:3,7,12,21

**original** 63:17

**originally** 136:19
149:23 173:2

**origination** 18:1

**Outflows** 226:12 228:4

**Outlook** 211:2 222:11

**outstanding** 84:7
178:6 271:9

**overdue** 15:17

**overhead** 18:8,10,16
19:1,5,7 22:12 24:25
25:2,4 27:5 28:4 30:6,
16 39:13,17,24 40:2,6,
15,18,23 41:1,12,16
42:1,12,21,22,23,25
43:4 44:1,4,7,8,16
45:21 46:2 47:1,18
50:18 75:4 81:21 82:17
83:24 84:6 86:2,21,23,
25 87:4,11 91:12,16
96:22 97:10,23 98:24
99:1,7,11,15 111:5,15,
21 112:5,23 149:7
155:2 160:4,15,24,25
188:11

**overrule** 143:22 264:12

**overruled** 15:6 44:24
81:9 124:17 165:13
167:20 192:11 215:20

**overwhelming** 233:15

**owe** 136:12,14

**owed** 20:8 62:16 74:22
129:7 167:15

**owned** 11:14 22:20
115:3 116:8

**owner** 152:20 153:4
200:5,13

**ownership** 35:15

————————

**P**

————————

**p** 247:18,19,20,21,22,
23,24,25 248:1,2,3,4,5,
6,7,8,9,10,11,12,13

**p.m.** 10:5 39:3

**pace** 99:20

**package** 36:17,18

**packet** 50:2

**pages** 57:2 212:13
213:4 245:11,21 247:6
250:1

**paid** 40:18 41:17 42:24
43:3 44:8 47:18 72:14
75:5 111:4 118:6
139:13 151:11 152:11
179:14 181:2 187:13

**Paige** 163:2

**Pam** 251:11

**pamela** 251:12,19

**paper** 194:15 256:11

**papers** 195:1

**paragraph** 27:6 35:1
97:17,18 162:6 163:3
278:10

**Park** 92:13 107:23

**Parker** 89:4 90:17
113:10,15,18 114:1,2
119:13 123:6 125:6
126:20 141:4 142:9
144:19

**part** 10:22 16:4 21:4
49:21 53:5 97:14 98:19
99:19,22 100:4,5
109:12 128:22 129:21
132:3 142:16 157:19
176:7 177:2 180:20
183:22 203:2 206:6
210:24 212:1 215:11
216:6 224:13,17 227:8,
10 237:2,5 250:10
251:25 252:17 275:16

**partial** 39:23

**partially** 184:4,5

**participate** 252:2

**parties** 28:21 40:10
127:15

**partly** 49:21

**partner** 237:24

**partnership** 263:3

**partnerships** 263:22

**parts** 222:9

**party** 216:25 259:25
262:25 268:23 277:15

**pass** 70:21 108:5
155:19 164:3 168:17
194:7 205:11

**passed** 43:21 222:2

**passing** 15:11 153:19

**past** 109:18 170:5

**path** 22:13 24:12,15
29:25 30:15 31:15 32:5,
15

**Patrick** 11:17 21:1
102:3,15 112:3,23
141:12

**pattern** 101:17,20

**Paul** 70:24 108:10
126:20

**pay** 18:9,17 19:7 20:23
33:15 40:5 42:12 44:14,
21 45:8,10 48:8 72:19
74:20,21 75:21 76:5,6,
15 81:21,25 92:6 95:1
102:25 110:6 140:6
149:14 151:4,8,14,16
153:10,15,20 154:3
155:11,12,13 158:25
161:4 176:22 232:1

**Payette** 83:16,19 84:18
87:3,9

**paying** 18:8,23 39:13,
17 40:1,23 41:12 42:1
47:1 48:3 72:20 74:25
99:1 149:15 174:4
182:18 187:12

**payment** 99:7

**payments** 40:15,19
41:1 42:21,22,25 43:4
44:4,7 48:1 76:11,13
102:25 103:6 111:8,15,
21 137:16,18

**payroll** 84:2 87:7 96:9,
12 149:16,19,20 150:13
154:21 155:1,5 159:17
160:4,14 161:1,2
188:20

**pdf** 243:18

**Pelletier** 34:10 70:23,
24 73:19 76:21 77:13
81:8 108:7,9,10 113:1
119:4 124:23 126:19,21
130:10,12,15,23 131:14
132:20,23 133:5,18
134:22,24 138:14,17
140:23 143:16,19
145:16 168:21 169:3
205:13 207:10 208:2,10
235:19 236:20 239:2
240:20 246:19,25 251:6

256:12,15 261:25
262:2,4,8,11,13 263:15,
24 264:3 270:6,11
273:1 275:25

**Penn** 203:22,25

**Pennsylvania** 115:9

**people** 19:25 32:20
48:8 53:17 74:22 99:20
100:25 102:1 104:16
110:25 118:22 156:18
161:12 198:18 201:3
206:16 218:15,16,17
219:1 237:3 239:18
271:18 277:9

**peppering** 266:1

**percent** 14:4,7,8,10,16,
18 18:1,2,3,4,22,24
19:3,10 20:13,14 24:25
72:11,14,15,20,21
75:20 101:14 134:8
154:9 167:3 173:14,18,
19,25 174:2

**percentage** 75:19
167:2

**perfect** 175:20

**period** 41:8 48:11 69:8
71:2 72:1 156:3

**periods** 12:1

**person** 16:2,21 21:20
25:20 50:12 89:5
224:18

**personal** 63:25 122:11
153:5,7 222:15 262:9
264:15

**personally** 19:14
79:25 253:16

**personnel** 159:9 224:1
277:11

**pestering** 136:8

**petals** 30:7,9

**philosophically** 20:23

**phone** 16:2,21 25:23
28:7 48:21 50:13 62:18
65:8 67:20,25 68:4,11
80:11

**phones** 223:14

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 304 of 313    PageID 11599
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 3 January 12, 2022
Index: phrase..project

**phrase** 176:9

**physical** 252:18

**picture** 266:10

**pictures** 252:15

**PID** 128:6,10

**PIDS** 128:25

**piece** 194:15 227:12,18
228:13,16 229:19
234:17,22

**pieces** 228:6

**pipe** 79:16

**pitch** 23:16 276:18

**place** 21:17 22:23 38:5
79:11 94:24 105:8
156:23 157:6,8 170:5
233:4,6 234:9,10,13
244:8 246:12 275:23

**places** 38:6 148:21

**Plaintiff's** 86:14
154:16

**plan** 24:15 25:3 26:6
48:7

**planned** 226:21

**planning** 115:11

**plans** 79:14

**platform** 242:12,13,24,
25

**plats** 79:14

**play** 171:3,5,16

**played** 171:7

**plays** 173:4

**point** 12:7,22 16:10
18:1,14 19:25 23:18
48:6 51:20 52:7 68:5
73:5 76:1 81:23 91:16
100:23 105:16 106:1
109:24 110:15 116:15
129:12 136:15 141:13
156:21 157:21 168:1
176:20 180:16 188:4
196:18 201:11 266:14
275:19 276:21

**pointed** 16:15

**pointing** 23:22 32:20

**points** 48:2 204:11

**police** 220:13

**ponds** 79:17

**poor** 209:11

**portfolio** 13:10 17:2
35:5 88:14 92:5 93:19
105:2 109:4 116:17
119:25 123:22 136:1
138:6 181:13

**portfolio-level** 115:1
116:7

**portion** 10:4 66:4 157:7
250:3 268:22

**position** 11:25 13:4,12
15:20 19:17 61:20 79:3
114:16 147:25 153:2
156:6 181:18 182:13,23
209:6,17,22 241:16
242:4,16 270:2

**positions** 52:20

**positive** 102:6

**possibly** 31:14 32:5
140:12,16

**post** 45:17 266:8,9

**potential** 51:8 114:25

**potentially** 48:2 109:3
116:1 160:22 235:5
244:12

**poured** 151:9

**Prairie** 162:2,23

**pre-funded** 72:19

**predicate** 192:1

**Predominantly** 170:15

**preference** 174:17

**prefunding** 20:10,19
21:12

**prejudicial** 275:5
278:2,4

**preliminary** 79:14

**premises** 236:11
252:3,24

**prenegotiation** 28:16,
18

**preparation** 227:22

**prepare** 185:14,15
212:1

**prepared** 49:16 103:25
104:1,5 105:1 135:5
206:7,10 260:25

**preparing** 103:23
135:17

**present** 28:25 29:18
67:24 81:2 210:13

**presentation** 81:2

**presented** 38:17

**presenting** 136:24

**preserve** 263:25

**president** 12:5,9,12
13:5 15:19 19:17 41:6,
7,8 52:16 56:24 79:5,7
114:18,22 162:18
181:21 182:14

**presuming** 137:15

**pretty** 15:13 33:12,13,
22 37:11 80:12 137:5
154:7 159:9 174:14
207:2

**previous** 57:19 125:21
172:21

**previously** 77:11
78:13 90:10 142:25
146:10 156:23 189:22
246:22

**price** 18:20 19:3,9 40:3
184:9

**primarily** 11:6 12:6
201:6

**primary** 12:4 79:24
115:22

**principal** 17:15 24:10,
20 32:3 45:8 46:12
59:21 76:17 177:24
178:3,4,10 202:12

**print** 130:17

**printed** 250:9,20,25

**printing** 250:22

**printout** 250:18

**prior** 12:25 13:22 16:3
21:13 81:18 83:2
115:10 117:4,10 135:6
146:25 147:1 212:8
224:5 245:9 254:14

**private** 236:12,21

**privilege** 199:4 270:12

**privileged** 198:9,18,19
235:5 244:12 270:7

**pro** 88:13,16 103:14,23
104:7 105:9,18 106:4,5
115:23 128:19 132:6
144:22 174:12

**problem** 111:18,21
165:24

**problems** 20:1,22
35:10 72:16 197:2

**procedurally** 276:6

**proceed** 193:22

**proceedings** 62:12
77:15 123:3 140:21
146:2 207:8 236:18

**process** 22:17 49:23
53:5 127:17 151:23
154:1 224:13 227:23
243:12,13,20 244:4
245:3 246:12

**processed** 227:4
236:5 245:15,22

**processing** 220:15
233:2 246:7

**produced** 134:8,11
251:1 266:24 270:8,11

**production** 278:19

**program** 35:11 221:5,
10 241:18 242:5,8,9

**project** 88:18 90:19
99:9,17 105:9,10,13,18,
25 106:5,8,13 107:12
116:2 123:25 124:2
127:23 129:14,20
130:25 132:5,7 133:19
134:7,18 136:4 139:13
149:21 158:25 161:4,8
176:1,8,13 184:18,20,
23 185:3,17 186:18

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 305 of 313    PageID 11600
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                      Vol 3 January 12, 2022                    Index: project-level..recall

187:5

**project-level** 108:12,
13,19 131:24

**project-specific**
158:18,22 159:6

**projected** 126:4

**projecting** 98:2 115:3
128:20

**projection** 105:3
116:17 171:12

**projections** 47:7,19
48:3,13 105:3 114:24
139:20 153:23 174:9
183:8,11,16 191:6

**projects** 17:3,4 51:8
57:3 93:7 99:3,18,19
100:7 109:2,5,9 116:10,
12 119:21 120:7,10,17
128:21 131:25 132:15
138:6,10,22,23,24
150:21 151:10 153:24
176:11,15,17,22,24
177:15,18 178:5 183:23
184:1,3,6,15 185:19
186:20 200:25 201:8,
10,12,15,22,24 202:16
241:21

**promoted** 148:2

**proper** 199:2

**properly** 178:8

**properties** 23:4

**property** 129:2 149:15

**proposal** 34:4 35:7,18
50:2 81:16

**proposed** 35:2,3,11
36:13 37:10

**proposing** 137:23,24

**pros** 171:7

**prosecutor** 135:4
194:17 206:24,25
214:25 216:2

**prosecutors** 194:20,
24

**protect** 112:18,20

**provide** 36:18 90:13
116:16 143:3 173:17

189:15 211:1 218:7
219:6 246:8,15 247:12
277:7,17

**provided** 63:14,16
193:12 211:6,13 215:15
217:21 218:11,16
222:17 234:15 243:11
249:23 255:16 257:7
265:9

**providing** 193:14
215:13 216:3 217:25
218:4,22 219:2 278:11

**PST** 211:1,6 222:10,15
223:2 243:16

**PSTS** 223:9 233:1
243:3 245:14 248:23
250:24

**public** 128:10,11
146:24 258:11

**pull** 43:9 54:14,15
58:24 97:7 101:3
103:15 134:22 144:13
146:16 149:17 150:11
151:7 158:11,16,24
208:20

**pulled** 19:20

**pulling** 166:15

**purchasing** 55:5

**purely** 99:10

**purpose** 16:23,25 75:7
264:14,16

**purposes** 159:1,2

**pursuant** 72:21 135:6
210:25 271:1

**pushing** 99:17

**put** 22:23 34:3 79:16,18
88:22 105:8,16 109:3
124:10 127:12 129:1
156:22 157:6,8 174:2
198:6 222:22 233:4,6
234:9,10,13 244:8
246:12 249:13,18

**putting** 50:2 79:10
104:7 149:14 166:3
187:5

**Q**

**qualify** 192:7

**question** 18:13 31:11,
23 32:14,25 39:19
41:18 42:9 44:23 51:9
64:2,24 65:20 66:4,9,14
99:12 103:19 104:19
108:24 122:7 129:15
130:18 132:19 133:17
134:11,13 135:5 138:15
143:22 145:5 158:21
165:14 166:16 190:7
192:5,6 196:19,24
197:9,12,15,23 198:14
199:6 218:22,24 269:6

**questioning** 193:16
195:15

**questions** 73:20,22
76:18 96:25 112:16
113:2 125:21 140:25
142:4 144:9 164:4
191:14,22 192:10,25
193:4,11,19,24 200:18
204:14,19 205:2 208:2,
4 217:14,25 235:16
239:4 251:6 252:16
253:20 266:1

**quick** 14:5 211:17

**quicker** 222:21

**quickly** 33:12 37:7
57:13 58:23 223:16
226:21

**R**

**raise** 10:10 77:5 113:16
169:7 219:15 254:1

**raised** 141:8

**ran** 227:5 234:17,22
235:22,25

**Ranch** 186:15 187:7

**range** 201:17 245:21

**rarely** 52:11

**rate** 14:4,8,10,17 17:16,
17,25 18:2 20:24 23:2
24:11 31:15,18,21 32:3
46:9 75:19 154:7

177:23 178:22 179:2,5,
14

**rates** 13:14 178:8
179:6,7

**raw** 127:11 184:4

**RCFL** 220:24 221:11,12
223:11,25 232:25
246:4,5,7

**reached** 13:22

**read** 27:8 36:24 41:22
44:11 46:17 64:14,16
65:23 66:3 90:11 92:3
97:17,18 98:1 163:5,13,
19 189:12 196:18
197:13

**reading** 246:18 255:14

**reads** 163:23,24

**readvanced** 190:2

**ready** 23:7 31:3 39:7
167:5 271:13

**reaffirming** 191:10

**real** 11:2,5 14:5 78:9
115:10 127:2,4 132:4,7
211:17

**realistic** 137:14

**reality** 39:17

**reason** 212:21 264:21

**reasonable** 130:3
131:13,16 212:18

**reasons** 250:8 264:20

**recall** 20:5 30:10 39:15
40:22 43:13 51:15
54:20 62:15,20,24
64:20 67:15,16,22 68:8,
9 106:18 107:1,10,14,
16 109:24 119:1 128:16
130:21,22 131:10,12
132:12,13,16,18
133:10,24 136:9 138:7,
13 140:12 145:6 148:16
152:17 154:8 157:1,9
158:6 159:25 162:22,25
164:22 165:2,10,18,19
166:22 181:19 186:22
191:7 195:9,17,22
197:24 201:13 204:4
218:2,3

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 306 of 313    PageID 11601
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                        Vol 3 January 12, 2022                 Index: recalls..reporter

**recalls** 276:14

**receipt** 28:13

**receive** 90:10,14 115:4 142:24 143:7 243:3,5,8

**received** 31:2 100:1,6, 10 151:15 160:8 220:22 243:9 246:1,2 255:7,23 256:3,5 258:11

**receiving** 20:4 99:24 145:6 160:7

**recent** 207:2

**recently** 63:16 78:21 115:8

**recess** 39:3 146:1

**recognize** 53:18,22 56:16,25 58:4 59:14 62:4 188:16 195:10

**recollection** 25:23 29:4 40:24 65:24 66:5, 8,11,19,22,25 130:16 131:5 132:22 133:6,13 134:14 150:2 196:23 201:4,11

**recommend** 202:7

**recommendation** 184:14

**record** 16:14 23:21 122:19 124:14,20 146:14 169:17 180:9 182:8 265:10

**recorded** 65:10

**recording** 63:18

**records** 213:15 217:21, 25 218:4,7,8,23 219:2 254:24 255:2,6,7,16,22 256:3,20 257:19 258:24 259:1,9,19 260:1,10,13 261:1,3 262:5,6,9,24 263:2,8 276:24

**red** 54:18

**redact** 272:12

**redacting** 278:6

**redirect** 74:1 113:5 142:7 166:9 217:18 239:7

**reduce** 72:3,8 73:13

**reduced** 17:16 179:8

**reducing** 24:21 73:13

**reduction** 17:15 46:12 178:23 179:3

**reference** 45:18 46:23 162:6 227:20 278:22

**referenced** 36:16 125:24 137:2

**referencing** 111:23 136:5,15 137:8 145:1

**referred** 22:19 28:1 103:14

**referred-to** 54:11 57:10 58:20 60:1 82:9 83:12 84:14 86:13 88:1 89:20 91:8,21 93:14 94:2,13 95:9 96:1,17 119:10 121:14 125:3 154:15 161:20 175:1 186:3 225:1 226:1 230:8 247:14 253:5 258:20 259:13 260:3 262:19 263:11 265:4 268:4,16

**referring** 32:18 68:1 187:24 261:12

**refers** 65:14

**refinance** 30:23 32:23

**refinanced** 13:3 14:2, 14

**refinancing** 20:13 118:4,5,9

**refine** 117:2

**reflect** 16:15 23:22 180:9 182:8

**refrain** 266:11

**refresh** 41:20,24 42:6 53:13 65:23 66:5,7,10, 19,22 130:16,19 132:17,21 133:6,13 134:14 196:11,20,23 197:13,15,21,23

**refreshed** 42:11

**refreshes** 66:14,24 130:9,20 196:15

**refusing** 26:5

**regard** 190:9 198:11 270:1

**regional** 219:25 220:6, 8

**regular** 12:17

**regularly** 251:24

**regulators** 216:21

**reimbursed** 128:24

**reimbursement** 84:25

**rejected** 35:7

**related** 12:14 44:15 93:2 105:22 117:25

**relates** 129:4 139:2,20, 21 276:10 277:20

**relating** 57:3

**relationship** 26:7 33:8, 22 69:16,17 73:7 81:19 117:11 147:18,21,22 180:12 205:21

**relationships** 156:17, 20 157:17,18

**relayed** 25:18,21

**release** 18:20 19:3,9 35:18 39:23 40:3

**released** 113:9 145:14 168:25

**relevancy** 275:5

**relevant** 250:14 274:23

**reliability** 273:24

**relied** 260:22

**relies** 139:15

**remain** 55:24 276:8

**remainder** 273:12 278:12

**remained** 55:20

**remaining** 18:22 269:11

**remember** 38:25 51:25 111:22 120:24 130:1,2 134:6 135:4,12,24 144:25 145:2 148:14

164:24 191:2 195:8 206:15,21,23 207:3,24 208:1 233:10 234:21 236:14 266:6

**reminder** 97:20

**remit** 151:7

**remove** 251:18

**removed** 60:9,11 67:14

**Renee** 156:10

**renew** 135:18

**renewal** 136:7

**renewed** 13:2

**repaid** 62:22 128:20 178:9

**repaint** 61:4

**repay** 13:24 14:23 15:15 17:11 45:3,5 47:14 48:11 50:10 51:6, 12 66:1,6,11,16,21 67:2 69:23 70:4 138:24 139:3 176:18 177:16 178:5 190:1

**repaying** 47:22 48:3,14

**repayment** 22:13 24:12 29:25 30:16 31:12,15 32:5,16 47:8, 19 126:4,7 129:20 189:15

**repayments** 47:22 126:11 132:2

**repeat** 18:13 64:3 129:15 165:14 190:7 196:24 197:19

**repeatedly** 266:14 275:3

**rephrase** 181:6

**replies** 193:13

**report** 196:10,13 205:25

**reported** 62:13 77:16 123:4 130:25 140:22 205:19 207:9 236:19

**reporter** 169:12 247:12 256:9

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 307 of 313    PageID 11602
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                          Vol 3 January 12, 2022                Index: reporting..seized

**reporting** 131:6

**represent** 70:24
108:11 126:23 141:5

**representations**
55:10,14,23 56:8

**representatives** 51:19
67:20,21

**representing** 28:15
54:24

**reps** 55:4

**request** 18:15 28:3
53:24 54:3,16 56:17
57:21 58:5 59:5,15,16,
20,21 76:9 87:19 92:24,
25 94:7 95:14,16,19
101:6 103:18,21 150:25
151:3 154:21 160:2,15
273:23

**requested** 90:10,12
142:25 143:2 215:14

**requesting** 86:2 91:11
218:12 219:7

**requests** 19:19 51:23
52:2,9,12,24 53:1,5,7
59:3 60:24 67:9 70:11
74:3 92:8,22 95:3,12
101:12 151:6,23 152:2
159:24 160:8,15,18
161:11 163:21 185:11
190:8,21 274:4

**requires** 178:22 179:2

**reserved** 22:24

**residential** 11:20
127:2,4 132:4,7 147:24
167:1

**residual** 176:21

**resigned** 52:20

**resolution** 36:13

**respect** 28:2

**respective** 27:12,19

**respects** 55:6

**respond** 28:3 32:9
36:19

**responded** 34:4 36:22

**responding** 66:2

**response** 15:16 21:1
33:11 35:24 37:5
178:25 189:9 221:6
275:12

**responsibilities** 79:7

**responsible** 156:19

**rest** 182:21 278:7

**restructure** 49:22

**restructured** 50:3

**restructuring** 46:6
49:11,12,15,17,19,24

**result** 118:8 233:17

**retained** 18:25

**returned** 223:23,24

**revenue** 88:19 115:3
116:3 138:23

**review** 17:6 97:22
103:11 149:2 151:6,20
224:4 226:21 227:2,21
233:8 242:12,13

**reviewed** 73:7 255:20

**reviewing** 67:16
124:16

**right-hand** 270:10

**rights** 235:12

**ring** 157:2,14

**rise** 39:4 145:24 146:7
267:9

**risk** 171:1 173:22,25

**road** 150:2,17 240:4

**roads** 149:15 187:5

**role** 12:5,8 38:23 99:25
114:21 115:18 127:6,8
148:2 252:14

**roles** 12:1

**roll** 87:13 88:13,16,22
106:10 116:10,16
176:1,14,16

**rolled** 75:22

**rolls** 115:23

**Romero** 49:1 214:3,5
215:21 217:14,24

**room** 31:14 32:19
37:23 38:2,20 80:11
178:23 208:21 225:15,
20 228:7,10,12,14,15
229:3,5,12 230:24,25
231:3,7,8,9,12,17
267:13

**rooms** 224:16

**rose** 30:7,9

**roughly** 149:18 207:13

**round** 44:10

**routinely** 109:1

**row** 32:20 125:23
126:11

**rule** 77:3,9 275:9,13

**run** 47:24 109:1 235:25
244:14

**running** 17:13 177:25
233:18 235:21

**RW** 229:5

**S**

**sales** 184:10 276:18

**San** 107:19

**sandwiches** 37:22,24,
25 38:2,11

**sang** 240:24,25 241:5,
12

**satisfaction** 102:21

**Saturday** 64:20

**saving** 20:15 73:12,17

**scan** 253:16

**scanned** 253:13,15

**scenario** 152:13
178:22

**scenarios** 178:1

**Scenic** 107:18,19

**schedule** 125:18 126:5

**school** 115:9 238:2

**schooling** 170:21,22

**science** 115:13

**scope** 215:19

**screen** 36:6 82:13
121:24 154:18 161:23
175:5 231:20

**script** 227:5 233:18
234:16,17

**scroll** 126:8 186:7
189:6

**scrub** 132:10

**sealed** 270:4 271:1

**search** 210:9,25 214:25
216:1,9 218:1,5 219:3
221:16 222:5,9,14
224:14,17 226:4 228:14
229:19 235:21,22,25
236:1,11,13 237:2
238:15,16,17,23 244:2,
13,17 245:25 249:22
251:25 252:3,12,13,14,
17 266:7

**searched** 237:9

**seasons** 171:18

**seated** 39:6 146:3,9
267:11

**SEC** 30:25 31:2 118:15,
19 121:2,6 129:13,17
140:1 141:9,18,22
144:3 255:7,16 256:4,6
257:16 258:2,3,8,12,25
265:9 269:7 270:9,12
274:22 275:6 278:20,23

**section** 27:3 57:16,18
60:5 96:9 106:25
156:13 167:11

**secured** 237:5

**Securing** 102:18

**Securities** 118:19
255:3,24 257:7

**security** 39:4 145:24
146:7 267:7,9

**seek** 197:10

**seeking** 76:8

**segregate** 244:17

**seized** 224:7 226:6,13
237:12 252:18,24 253:9

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 308 of 313    PageID 11603
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                        Vol 3 January 12, 2022                    Index: seizing..speculate

**seizing** 221:21 223:4,6,
24 237:20 252:13

**selected** 35:15 265:25

**sell** 12:14 36:17 47:25
71:17 105:22 127:13
177:1

**selling** 79:19

**sells** 71:14

**send** 26:1,18 33:24
49:10 85:12 92:8 151:6,
18 183:7,12 190:14,23
246:9

**sending** 154:20

**sense** 51:15 104:11
246:6

**sentence** 47:20 84:5
90:11

**separation** 70:16

**September** 19:13 22:3
24:3,4 25:16,19,25
26:1,9 28:5,10 29:22
30:19 32:1 39:18 40:20
42:1,13 43:5,11 44:2
45:5,13,14,17 47:11,14
52:4,25 53:2 56:19,23
61:13,22 67:19 68:1,16
75:2 80:17 83:25 234:7

**sequestration** 77:3,14

**series** 217:24

**serve** 265:25

**server** 222:19,24 224:8
230:23,25 231:3,7,12,
17

**servers** 216:12 222:6
223:12,17

**service** 126:24 240:15,
17

**set** 226:20 235:11
243:10,14,21 244:1,14,
16 250:24

**settlement** 68:22

**sewers** 187:5

**Shahan** 162:2,23

**shaking** 217:12

**shape** 186:21

**sheet** 55:18

**sheets** 55:18 171:12

**Shirley** 153:18 156:21

**shortly** 168:14

**show** 52:13 55:19
63:21 125:6 129:23
130:4,8 133:1 138:10
162:23 176:16 196:14,
17 249:24 264:17,21

**showed** 22:2 132:21
135:6 196:10

**showing** 20:7 82:12
264:14

**shown** 20:2 134:25
195:1,2,4,6 228:10

**shows** 138:9 250:15

**shred** 216:25 217:4

**shut** 223:21

**side** 25:7 32:21 83:18
102:13,17,24 103:2,3,8
157:7 219:6 235:11
244:1,25 249:23 277:16

**sidebar** 62:13 77:16
123:4 140:22 207:9
236:19

**sign** 21:13 92:21
190:23

**signature** 56:25 59:19

**signatures** 58:10

**signed** 21:2 43:22 52:9,
11,25 53:25 54:17
56:20 59:18 61:9 65:16
67:1,2,4 168:11 190:25
278:15

**signing** 53:8

**signors** 263:21

**silent** 51:5,11

**similar** 115:18 116:23

**simply** 161:12 205:3

**single** 48:24 88:18
173:7 194:15 201:7
204:24 273:25

**single-family** 11:22

**sir** 41:24 42:7,17 43:20
45:15 46:5,11 48:23
49:8 53:15 54:15 56:14
57:13 58:1,4 59:14
63:6,20 64:12 65:23
68:10 70:7,19,20 71:5,
19 76:22 77:19 83:10
97:9 98:3,5 100:2,15
103:16 104:3 108:4
113:4,13 118:24 123:19
124:22 142:3 145:11
155:20,23 157:5 159:20
161:23 163:5 164:2
169:2,11 175:17 194:6
195:21 196:16,18,23
199:6 200:8,15 201:12
205:8,10 208:5,8,9
217:17 219:9,23 235:23
236:10 240:19,21,22
241:8 251:7 253:22
269:2 272:6

**sit** 29:24 97:21

**site** 221:23 222:4
223:15,20,25

**sites** 105:21

**sits** 214:14

**sitting** 180:8 182:7
217:7 265:19

**situation** 55:19,21 76:2
117:18 198:3 206:22
207:17 244:7

**situations** 192:14

**six-month** 126:4

**size** 130:17

**sketch** 225:10 228:11
237:16 252:15

**Skye** 83:15,17,19

**Skye/matt** 92:5

**slow** 27:13,17 68:14
228:21 231:6 241:22

**small** 225:14

**Smith** 197:4

**social** 266:8,9

**software** 227:10 235:8,
13

**sold** 18:21 76:14 115:4
116:4

**sole** 163:9,24 164:1

**solvency** 53:9 55:1,11
61:11

**sooner** 108:1

**sort** 49:10 64:5 100:6
116:12 117:15 119:25
173:13 213:20 264:19

**sound** 138:18

**sounded** 267:15

**sounds** 51:16 67:8
105:17 130:3 131:13,16
138:19 276:6

**source** 98:17,21 100:7,
12,14,16,20

**sources** 254:24

**space** 225:11

**speak** 10:15 68:6 77:21
101:14 202:24 208:18
241:20 256:14 271:3

**speaking** 220:25 241:8
277:15

**special** 140:11 144:6
212:17 219:13,24 220:2
225:4 230:12 253:25
254:6,7,11 257:24

**specialist** 241:17

**Specialists** 221:3

**specific** 49:20 105:15,
20,23 127:6,8 131:5
132:16 134:7 135:24
136:4 145:1 149:21
150:12,15,16 155:10
158:20,24,25 176:8
177:17 186:18 193:7
198:11 206:25 245:21
250:1 257:12

**specifically** 43:25
45:20 101:12 117:25
120:21 130:2 133:22
154:2 186:17 202:14
266:4

**specifics** 130:22
257:13

**speculate** 137:22

207:13,25

**speculation** 165:10

**speed** 175:15 267:24

**spend** 102:20

**spoke** 43:12 54:19 65:4
86:2,3,4 97:11 168:9,13
189:22 204:23

**spread** 214:23

**spreadsheet** 116:13,
16 119:23 120:2,20
122:13 125:11,17
126:12 133:23 134:8,
11,14,17 135:17
136:10,11 137:5,12,18
143:14,23 144:23,24
145:8 177:3 226:11
228:4 231:14 232:15,17

**spreadsheets** 105:6
123:17 135:23 171:14
174:10 226:5 231:13
243:18 276:25

**spring** 116:21 117:5,8

**Springs** 92:10 106:23

**sputtered** 106:19

**squad** 254:17,19

**staff** 12:13 47:24 81:25

**stages** 15:12

**stairs** 38:21

**stalled** 106:25 107:12

**stamped** 250:8

**stand** 41:12 88:15
139:24 266:24

**standards** 173:22

**standpoint** 101:24
157:16,17 273:24

**stands** 88:14 103:20
221:2

**Starley** 11:17 12:20,25
13:10 102:4,5,15 112:3,
23 141:12,15,17,21

**start** 18:12 23:8 26:8
38:10 116:25 117:19
118:14 171:19 179:23
184:8,12 190:6 266:1,

10,20 267:3

**started** 13:20 21:22
38:12 104:22 127:5,24
129:19 141:14 148:1
171:21 221:7 226:19
254:16 266:21 267:6

**starting** 15:24 22:17
97:18 104:25 212:8
234:6

**starts** 84:22

**state** 10:19,22 23:4
30:21 77:19 79:11
113:25 146:14 147:12
148:23 169:17 170:24
171:3,5 185:2 208:16
219:21 241:4 254:5

**statement** 20:6 24:23
66:2 198:21 237:17
272:12,13 273:14
277:12

**statements** 20:3 51:12
205:6 273:13 275:14

**states** 214:23

**status** 17:2,3 53:9 55:1
90:6 103:6,19 105:25
142:20

**stay** 36:3 265:17

**stayed** 223:20

**step** 15:10 68:14 76:24
113:7 168:22 240:23
243:13,19,20 251:9
253:24

**Stephens** 73:23 76:23
113:4 122:20 124:22
141:1,3,4 142:2 145:17
166:6,7 168:19 169:2
200:18 208:8 217:16
239:6 240:21 251:7
253:22

**steps** 118:11 221:20
244:9

**Steven** 115:12 271:24

**stipulate** 29:12 278:19

**stipulation** 257:15

**stood** 228:17

**stop** 14:5 31:17 44:7
70:15 92:11 134:10

193:11,16 197:8 204:13
241:19

**stopped** 24:25 40:23
42:21 43:6 44:5 74:25
154:4 193:18 204:21
205:1

**storage** 222:16 228:7,
15

**story** 207:16 225:13

**straightforward**
110:22

**strategies** 15:14 17:18

**street** 77:22 114:2

**streets** 79:16 127:12

**stretch** 145:21

**strike** 143:21

**structure** 48:7 100:18
172:7

**stuff** 232:25 244:20

**subdivide** 127:23

**subdivisions** 115:2
116:7,8 118:2

**subject** 34:22 46:1,6,9
49:4 82:16 86:18,23
91:11 94:16,18 96:8,20
130:19 133:14,15
196:20 197:22 198:2
250:16

**submission** 274:22

**submit** 52:1 70:10
185:18,23

**submits** 191:11

**submitted** 51:23 52:4,
24 53:1 57:22 59:4
60:25 67:9 87:11
185:24 187:4

**submitting** 159:23

**subordinate** 173:3,9

**subpoena** 260:13

**subpoenaed** 271:22

**subsequent** 34:19

**subset** 246:21

**subsidiary** 27:19

**substance** 101:5

**substantial** 153:14
154:7

**substantiates** 194:16

**successful** 233:7

**sufficient** 124:18

**sufficiently** 266:25
275:21

**suggested** 35:14
276:1

**suggesting** 219:1

**suggests** 69:3

**suit** 16:13 23:20

**sum** 101:4

**summarize** 157:16

**summary** 46:25 54:23
56:7 61:5 103:21
119:17 123:23 136:1,2

**sums** 99:23

**supervisor** 180:17
219:24 234:5

**supervisory** 241:17

**support** 23:5 137:6
187:15,17 277:2

**supported** 178:9 179:7

**supports** 50:8

**suppose** 53:11 109:15,
16

**supposed** 177:14

**supposedly** 47:1

**surprise** 40:18 48:24

**surprised** 40:25

**sustain** 33:1

**Sustained** 50:24 60:21

**sworn** 10:11 77:5,6
113:17,18 146:5,10
169:8,9 208:13 219:16,
17 240:25 251:12
254:1,2

**system** 213:7,9 226:23,

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 310 of 313    PageID 11605
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                      Vol 3 January 12, 2022                      Index: systems..top

25 227:2,5,7,14,21
242:12 243:22 244:1
250:23

**systems** 222:20
227:15

_____

**T**

**table** 180:8 182:7
195:10,14

**tables** 222:16

**tags** 235:10

**tail** 205:16

**taint** 226:20 233:8
234:15,16,22,24,25

**takes** 70:6

**taking** 81:12 112:3

**talk** 17:2,7 28:22 39:11
48:16 49:10 50:14
51:22 56:3 65:13 72:6
81:15 84:2 170:22
192:25 203:24 222:25
224:2 240:16 241:21
260:17 266:2,5 267:13
278:25

**talked** 21:11 37:5 48:22
51:24 64:18 65:12
67:17 109:9 111:4
127:19 150:13 156:16
159:22 160:7 168:4
174:8 190:3 200:22
201:24 203:18 233:18
235:20

**talking** 14:22 25:25
31:5 43:4 50:5,16 55:3
73:4 78:19 108:18
111:24 137:3,4 155:2
157:23 161:12,14
177:13 191:10 206:16
207:17 217:20 242:6
263:15 266:10

**talks** 48:11,13,25

**tax** 148:1 187:19

**taxes** 149:15 187:8,12

**team** 221:6 224:18
235:20 237:3 244:19,21
249:21

**teams** 171:8

**Tech** 242:21

**Tedder** 211:3,5 212:17
219:14,17,22 225:4
230:12 235:20

**telephone** 21:20 25:20

**telling** 33:14 40:22
44:12,13,19 53:17 61:2
62:20 72:22 92:15,25
95:19 165:8 194:25
218:14

**tells** 250:13

**temper** 165:24

**tenure** 129:10

**terabyte** 222:17

**terabytes** 234:21

**term** 150:24 162:12
173:4 174:17

**terms** 13:5,14,24 35:18
185:21 234:15,16,22
235:21,22,25 236:1
244:13,16

**Terracina** 186:15,25

**testified** 39:21 199:19

**testify** 131:9,10 197:10

**testifying** 44:23 49:2
138:12 195:24 196:2
244:5

**testimony** 10:4 38:16
39:15 43:5 44:18 61:2
141:20,24 181:5 194:16
196:6 199:25 201:25
204:6,12

**Texas** 10:22 11:1,20
23:4 77:24 112:4 114:8,
10 127:3,5 128:5
147:12 148:23 210:5,6
214:22 219:25 220:8
221:12 225:6,7 246:4
252:7,9

**thing** 12:19 18:17 30:5
110:24 116:23 139:13
149:16 158:20 174:11
183:6 207:16 220:16
224:9 243:25

**things** 19:12 24:14,17

41:12 50:15 55:13
69:13,24 79:18 82:4
99:4 101:11 102:13,17
114:23 115:21 143:14
149:3 160:3 171:21
183:17 188:7 201:2,5
222:6 237:12 266:12
267:24

**third-party** 22:22
259:17

**Thirteen** 78:18

**Thirty** 14:12

**thomas** 10:20 25:9
78:22 81:15 211:3,5
219:13,17,22 254:2,6

**thought** 18:2 20:23
72:9 111:2,3 138:1
184:17 246:18

**thousand** 76:10

**thousands** 48:19

**throat's** 192:19

**throwing** 30:7

**Tidwell's** 232:12,22

**tie** 29:9,11 274:18

**tied** 177:18 275:21

**time** 11:23,25 12:1
15:24 21:14 24:18
25:25 26:1,11 31:24
34:7 37:15 38:13,17
40:3 41:8 45:9,11,12
63:3 67:1 69:4,6 70:6
71:2 72:1,13 73:5 76:19
78:19 79:20 80:17
81:23 82:6 83:7 84:11
85:16 86:10 87:10,22
89:3,17 90:15,20 91:5
93:11,24 94:10 95:5,21
96:14,25 101:25 104:5
106:1 116:15 117:3,8
119:7 121:10 124:25
126:17 129:12 141:13
143:8,13 148:6,14
150:22 151:22 153:9
156:3 157:24 161:15
163:8 166:20 167:14
171:25 172:1,2,5
177:10 178:6,11
180:14,19,21 181:11
183:10,13 188:9 194:14

204:24 205:16,23
209:23 216:3 223:18
224:21 225:22 227:13
229:22 235:24 236:2
238:8,13 239:16,19
240:6,11 246:19,23
251:5 256:7 258:13
259:7,23 261:5,18
263:6,23 264:7 265:7,
18

**timeline** 186:22

**timely** 191:11

**times** 54:1 58:11 72:18
151:24 152:17 165:24
171:11 184:17,20
190:5,13 191:1,21
194:21 195:16,22
202:20 205:20 206:13,
23 238:6

**timing** 152:1

**tipped** 238:22

**title** 180:19,21 181:19
241:17

**titles** 182:15

**to-be-determined**
22:22

**today** 16:6 23:15 29:7
88:14 92:9 168:5
195:25 214:12,14
216:10 217:8 224:5
227:22 243:1 244:5
245:9 265:17,21 266:6

**Todd** 272:24 273:4

**told** 15:11 20:9,16
21:16 22:15,16 31:20
32:1 33:10 38:14 42:19,
20 44:4 65:3,24 66:4,6,
15,20,23 72:15 141:17
158:7 199:3 207:12,16
230:12,20 266:14

**Tom** 21:1 25:12 35:7,14
36:15 68:2 212:17
253:25

**Tom's** 35:18

**tomorrow** 273:11

**tonight** 277:18

**top** 46:23 47:5 137:18
161:24 162:1 167:11

195:17 201:13 226:12
233:10 249:20 250:6,10
268:21

**topic** 43:25 50:21 51:6

**topics** 50:18 51:18

**total** 148:17,24 174:1
223:19

**Totally** 109:19

**touch** 36:14

**tough** 72:11 209:13

**town** 29:24

**TPG** 152:7

**track** 105:10 227:13

**tracked** 227:16

**traditional** 184:2

**trailed** 155:14

**train** 31:9

**transcript** 63:15 65:11

**transcripts** 63:5

**transfer** 68:23 231:19,
24

**transition** 68:12

**trial** 10:5 211:21 212:8

**trials** 37:20

**trigger** 134:17

**trips** 112:4

**Trophy** 186:16

**true** 39:18 41:13 43:7
55:6,7 63:22,23 135:16,
22 200:14 236:21

**Tuesday** 83:5

**turn** 64:12 151:16 163:1
190:1

**turned** 112:2 161:3
224:1

**turns** 121:24

**Twenty** 78:12

**Twenty-three** 120:18

**two-page** 45:18 212:5,
25

**two-step** 243:12

**two-story** 225:10

**ty** 164:9 208:12,13,17,
19,24 222:2 228:19
229:1 232:8,11,14,21,
22 237:12

**Tyfowle@umth.com**
213:13

**type** 11:18 12:18 18:14,
17 21:5 27:15 89:6
99:20 115:7 116:17
190:9 220:16 224:8
226:11 243:14

**types** 21:3 84:25
102:18 160:4,14 163:11
183:17 220:18

**typically** 16:3,25
105:8,12

**tyson** 153:18 154:20,23
159:15 169:5,9,18
189:13


---

                U

**UCLA** 115:11

**UDF** 13:3,6,16 14:9,15
16:4,5 17:20,21,22,25
18:4,8 19:23 20:4,6,14
21:10,22 22:18,22 23:1,
3 24:11,19 26:2,6,10,24
27:5,23 28:2,15 29:24
30:22,23,24 31:15,16,
18,21 34:25 35:1,3,5,
11,14,16 39:13,17 40:1,
14,18,23 41:11,15,25
42:12 43:25 44:12,13,
14,16,20 45:2,3,6,19,24
47:8 48:18 49:11,18,21
50:17 51:3,19,23 52:2,
9,16 53:6 56:22 57:4
58:7 59:5 60:18,25
61:4,20 62:17,22 66:16
67:21 68:20 70:15 71:1,
8 72:14,19 75:20 79:21,
25 81:12,13,19,21
88:12 89:8 94:23 96:22
97:19 99:24 100:10,19
101:5,9 102:14 106:17
108:12,13,16 109:23
110:6,25 111:6,9,20
112:3 116:18,23

117:11,20 118:1,4,5,10
119:2 120:21 121:5
126:1 129:7,20,24
131:1 133:9,20 135:18
136:12 137:20 139:15
140:4,5,6 147:16,21,23
148:8,10,12,13,17
149:24 150:3,9,22
151:6,15,18,24 152:17
153:8 154:1,24 156:17,
22,23,24 157:23,25
158:3 159:2,3,6,9,21,24
160:9,16,19 161:12
162:1,2,14 163:7,19
164:9,13 167:1,4,16
170:12,14,18 171:19,21
172:3,7,10,12,14,17,19,
22 173:2,4,9,16 174:4,6
175:25 176:1,15,17
179:17 182:14,16
183:11,12 185:11
186:18 187:21 188:7
189:5,13,15,16,19,21,
24,25 190:2,18,23
193:5,14 201:16 202:8,
10,11,16,22 203:11,14,
19,20 205:16 206:6
209:2,4,6,23,25 211:2
213:10 214:14 215:12,
16 216:2,11 217:1,21
218:4 219:1 221:16
222:4 223:13 224:1,20
239:22 240:16 252:3,24
255:8,17 256:4,6 258:2,
3,9 259:2,9 262:23
274:20,21 275:2 276:19

**UDF's** 60:16 118:15
138:24 140:6 149:23
157:23 204:9 213:16
238:4 257:7 265:8
274:2

**UDF/UDF** 92:7

**Uh-huh** 187:9 263:5

**ultimately** 21:5 276:16

**UMTH** 213:7,9

**Umth.com.** 213:12

**unable** 45:19

**unchanged** 55:15

**undergraduate**
115:12 170:23

**underscore** 228:18

**understand** 47:21 51:9
61:2 112:8,16 118:16
128:24 158:7 160:2
193:5,8,13,15 198:20,
23 203:8 204:22 208:23
209:13 214:6 233:3
266:3

**understanding** 14:1
29:21 75:24 153:25
164:13 191:23,24
192:1,7 204:9,12
206:17 260:22

**understood** 44:18
222:20

**undertaking** 226:22

**underwrite** 170:11

**underwriting** 114:25
115:19 184:2

**undeveloped** 11:21

**unduly** 275:5

**unfairly** 278:4

**unhappy** 33:23 37:10

**unique** 243:22 248:21

**United** 27:23,24 54:4
59:17 147:15 170:6
278:9

**University** 112:4 115:9
147:10

**unusual** 190:24

**unwind** 26:7 33:21

**upcoming** 87:12

**update** 85:19

**updated** 85:12 90:7
142:21 144:22 145:7

**upset** 33:13

**urban** 115:11

**user** 244:2

**utilities** 127:12 149:15

**utility** 128:8

**utilized** 12:24 150:16
245:3

**UTMH** 213:10

**utterly** 51:5

---

**V**

**vaguely** 133:10 134:1

**valuable** 128:1

**vehicle** 35:6

**vehicles** 102:18

**vendor** 94:18 151:17

**vendors** 74:21 103:1

**versus** 102:23 159:3 249:22

**viability** 184:12

**viable** 153:15 184:18, 21,24 201:25

**vibrant** 109:13

**vice** 12:5,9 13:4 15:19 19:17 52:16 114:18,22

**view** 257:2 269:12 271:5 276:8

**vineyard** 115:17

**vintage** 117:25 118:10

**Virginia** 242:21

**visit** 25:12,15

**visited** 97:9

**Visser** 156:4,14

**voice** 121:23 241:21

**volume** 233:13,15

**VP** 52:23

---

**W**

**Wait** 56:4

**waiting** 257:16 266:22

**waived** 199:4

**walk** 94:22,25

**walked** 22:5,8 210:20

**wall** 166:2,3

**Walter** 153:18,23

154:20,23 164:9 165:23 169:6,9,18,19 175:25 186:8 200:22 207:11

**wander** 38:4

**wanted** 13:11 19:3 30:1 35:9 64:5 68:12,13,17 72:2,8 87:18 160:22 185:1 192:18 238:3 240:14 263:24

**warrant** 210:10 211:1 215:1 216:1,9 218:1,5 219:4 221:16 222:9,14 224:14,17 252:3,12,13, 18

**warranties** 55:4

**warrants** 222:5 251:25

**Warren** 157:2,3,4

**Washington** 62:8

**watched** 199:22,23

**water** 129:24 131:2 132:11 136:19,21

**ways** 45:5

**wealth** 264:22

**wearing** 78:5

**week** 50:13 80:9 86:25 89:13 97:24 122:2,8 123:13 152:17 155:5 191:3 223:19,21 253:15

**weekly** 16:1,19 21:19, 25 22:4 40:4 79:24 80:23

**weeks** 21:13 47:17 109:2,6 236:4

**weigh** 178:8

**weight** 274:5

**weighted** 177:23

**Wells** 12:18

**Westpointe** 107:9,10 120:13,24 124:3,6,9

**Wharton** 115:9

**whatsoever** 50:7 204:3

**whereabouts** 114:10

**whistleblower** 118:23, 24 119:2 129:12 139:22,25 140:3,10,14 141:9

**Whitley** 203:22,25

**whomever** 74:21 99:8

**wind** 33:8 34:4 45:10 48:7 68:17,19 69:3,7, 12,16,21 70:3,12

**wire** 231:18,23

**Wissink** 15:9 17:8,19 22:5,8 24:6 26:21 29:3, 7,11 32:21 34:2 36:10, 12 72:5 152:19 159:15 181:17 182:17,24 183:2,4 185:2 189:10 190:13 191:15 192:20 193:20 194:2,11 202:13 204:8 205:5,25 207:15, 20,22 217:10 263:17 274:10

**Wissink's** 15:16 181:18

**withdraw** 65:20 138:14

**withdrawn** 151:19

**witnessed** 160:11 161:14

**witnesses** 77:8,12 271:13 278:14

**word** 52:11 87:15 227:9 234:25 235:1 243:18 270:13

**words** 46:18 54:24 61:3 65:15 98:17 108:25

**work** 10:25 64:5 70:3 74:21,23 78:8,11,22 79:1,10 102:20 104:11 115:7 117:2 134:15 141:12 146:23,25 147:6,13 149:10 151:2, 13 156:4 164:18 169:21 170:4,13 172:1,19 175:22 177:7,12 179:12 185:19 209:1 210:15 214:12 218:19 220:15 241:14 242:2 254:8,9, 14 260:7 266:13

**worked** 11:9,24 12:11 14:17 18:11 26:24

43:21 100:19 110:13,25 115:17,19 127:1 132:15 135:23 138:25 147:19 149:4 156:23 164:11 170:5,18 172:6 200:10 209:4 215:23 219:5

**workers** 76:6

**working** 34:6 36:13 40:11 57:4 79:13 90:17, 18,25 99:3 116:25 127:5 134:6 135:19 136:2,4 141:10 164:18 171:19 193:5 209:25 214:7 266:16

**works** 105:10 149:9 195:11

**worry** 182:25 229:17

**wrap** 33:9 68:24,25 69:1

**write** 36:10 84:9 86:6 87:9,17 88:10 89:12 90:16 91:14 94:21

**write-downs** 32:2

**writes** 85:23 87:3

**writing** 24:10,20 48:17 50:8

**written** 27:9 28:10 48:25 50:6 85:3 111:16 142:18

**wrong** 54:25 131:1,23 135:14 137:14

**wrote** 36:12 75:2 82:18 85:18 87:14 92:4 267:20

---

**Y**

**y'all** 12:16 16:19 18:9 19:6 25:1 28:7 30:16 32:22 33:2,4,6 74:20 76:5,11 77:4,7 81:15, 20,24 86:2,3 87:5 92:15 95:19 97:10 189:17 220:15 222:2,4,5 223:1, 5,10 226:4 232:24,25 233:2,13 234:10 246:1 251:1 266:25 278:25

**y'all's** 210:3 267:4

Case 4:21-cr-00289-O    Document 303    Filed 01/29/22    Page 313 of 313    PageID 11608
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 3 January 12, 2022                    Index: year..zone

**year**  48:4 70:9 94:17
102:7 106:22 108:23
136:19 139:6 148:4
171:20 207:11

**yearly**  206:12

**years**  10:25 70:18
78:12,18,20 105:7
109:18 137:9 156:1
172:3 206:13 214:10
215:8,10,11 217:1
220:4 234:6 238:14
240:6 251:23

**yellow**  29:11

**yesterday**  207:3

**Young**  147:2

**Youngblood**  26:22,23
28:14 179:20 183:13
192:13 270:3 271:10,20
272:4,23 273:3 275:20
276:10,14,15,20,24
277:3

**yucking**  206:16

———————————

**Z**

———————————

**zone**  192:24