1              THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    FORT WORTH DIVISION

3

4    UNITED STATES OF AMERICA, )
                              )
5         Government,          ) CASE NO. 4:21-cr-289-O
                              )
6    VS.                      ) FORT WORTH, TEXAS
                              )
7    HOLLIS MORRISON GREENLAW  )
     (1), BENJAMIN LEE WISSINK )
8    (2), CARA DELIN OBERT (3),)
     JEFFREY BRANDON JESTER    )
9    (4),                      )
                              )
10        Defendants.          )

11

12

13                   January 20, 2022

14                      VOLUME 8
                 TRANSCRIPT OF JURY TRIAL
15      BEFORE THE HONORABLE REED C. O'CONNOR
          UNITED STATES DISTRICT COURT JUDGE

16

17

18

19

20

21

22

23

24

25

```
 1

 2   A P P E A R A N C E S:

 3   FOR THE GOVERNMENT:

 4          TIFFANY EGGERS, ESQ.
            RACHAEL JONES, ESQ.
 5          ELYSE LYONS, ESQ.
            ASSISTANT UNITED STATES ATTORNEYS
 6          NORTHERN DISTRICT OF TEXAS
            801 Cherry Street, Suite 1700
 7          Fort Worth, Texas  76102
            Telephone:  817.252.5200

 8

 9   FOR THE DEFENDANT GREENLAW:

10          PAUL PELLETIER, ESQ.
            3500 Morningside Drive
11          Fairfax, Virginia 22031
            Telephone:  (202)617-9151

12

13          ROSE ROMERO, ESQ.
            ROMERO KOZUB
14          325 NE Loop 820, Suite 310
            Hurst, Texas 76053
15          Telephone:  (682)267-1351

16

17   FOR THE DEFENDANT WISSINK:

18          GUY A. LEWIS, ESQ.
            LAW OFFICES OF GUY A. LEWIS, PLLC
19          12575 SW 67th Street
            Pinecrest, Florida    33156
20          Telephone:  (305)442.1101

21

22

23

24

25
```

```
1    FOR THE DEFENDANT OBERT:

2

             NEAL J. STEPHENS, ESQ.
3            KELSEY DAVIDSON
             JONES DAY
4            1744 Embarcadero Road
             Palo Alto, California
5            Telephone:  (650)739.3939

6

7    FOR THE DEFENDANT JESTER:

8            JEFFREY J. ANSLEY, ESQ.
             ARIANNA GOODMAN, ESQ.
9            VEDDER PRICE
             100 Crescent Court, Suite 350
10           Dallas, Texas
             Telephone:  (469)895.4780
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2     JURY CHARGE ................................ 1453

3

4     CLOSING ARGUMENTS

5         By Ms. Eggers ......................... 1484

6         By Mr. Pelletier ...................... 1509

7         By Ms. Goodman  ....................... 1522

8         By Mr. Stephens  ...................... 1535

9         By Mr. Lewis .......................... 1556

10        By Ms. Eggers ......................... 1572

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 8 January 20, 2022                    Page 1453

1              - P R O C E E D I N G S -

2              THE COURT:  Please be seated.

3              Okay.  Ladies and gentlemen, I have one final

4    instruction to give to you that I neglected to give to you

5    during the trial.

6              So to the extent the parties reference Exhibit 64A

7    this morning, or to the extent you look at it during your

8    deliberations, Exhibit 64A may not be used to contradict the

9    terms of any final written agreement and is not offered to

10   do so.

11             You may consider Exhibit 64A to determine whether

12   defendants encountered the restrictions placed on the line

13   of credit to prove intent.

14             So remember that on Exhibit 64A.

15             Now we're ready, both sides have rested and

16   closed, so we're ready to begin the final phase of the

17   trial.  And that is, I will read to you the jury charge.

18             So members of the jury, in any jury trial there

19   are, in effect, two judges.  I am one of the judges; the

20   jury is the other.  It is my duty to preside over the trial

21   and to decide what evidence is proper for your

22   consideration.

23             It is also my duty, at the end of the trial, to

24   explain to you the rules of law that you must follow and

25   apply in arriving at your verdict.

 1            First, I will give you some general instructions

 2    which apply in every case, for example, instructions about

 3    burden of proof and how to judge the believability of

 4    witnesses.  Then I will give you some specific rules of law

 5    about this particular case.  And finally, I will explain the

 6    procedures you should follow in your deliberations.

 7            You, as jurors, are judges of the facts.  But in

 8    determining what actually happened, that is, in reaching

 9    your decision as to the facts, it is your sworn duty to

10    follow all the rules of law as I explain them to you.

11            You have no right to disregard or give special

12    attention to any one instruction or to question the wisdom

13    or correctness of any rule I may state to you.  You must not

14    substitute or follow your own notions or opinions as to what

15    the law is or ought to be.  It is your duty to apply the law

16    as I explain it to you, regardless of the consequences.

17            It is also your duty to base your verdict solely

18    upon the evidence received during the trial and the law as

19    given and explained to you by the Court, without prejudice

20    or sympathy.  That was the promise you made and the oath you

21    took before being accepted as the jurors, and the Court and

22    the parties have the right to expect nothing less.

23            The indictment or formal charge against a

24    defendant is not evidence of guilt.  All defendants are

25    presumed by the law to be innocent.  A defendant begins with

 1  a clean slate.  The law does not require a defendant to

 2  prove his or her innocence or produce any evidence at all,

 3  and no inference whatever may be drawn from the election of

 4  a defendant not to testify.

 5          The government has the burden of proving each

 6  defendant guilty beyond a reasonable doubt.  And if it fails

 7  to do so, you must acquit any defendant whose guilt has not

 8  been proven beyond a reasonable doubt.  While the

 9  government's burden of proof is a strict or heavy burden, it

10  is not necessary that any defendants' guilt be proved beyond

11  all possible doubt.  It is only required that the

12  government's proof exclude any reasonable doubt concerning a

13  defendants' guilt.

14          A reasonable doubt is a doubt based upon reason

15  and common sense after careful and impartial consideration

16  of all the evidence in the case.  Proof beyond a reasonable

17  doubt, therefore, is proof of such a convincing character

18  that you would be willing to rely and act upon it without

19  hesitation in making the most important decision of your own

20  affairs.

21          As I told you earlier, it is your duty to

22  determine the facts.  To do so, you must consider only the

23  evidence presented during the trial.  Evidence is the sworn

24  testimony of the witnesses, including stipulations and

25  exhibits.  The questions, statements, objections, or

 1    arguments made by the lawyers are not evidence.

 2              The function of the lawyers is to point out those

 3    things that are most significant or most helpful to their

 4    respective sides of the case.  And in doing so, to call your

 5    attention to certain facts or inferences that might

 6    otherwise escape your final notice.

 7              In the final analysis, however, it is your own

 8    recollection and interpretation of the evidence that control

 9    in this case.  What the lawyers say is not binding upon you.

10              During the trial, I sustained objections to

11    certain questions and exhibits.  You must disregard those

12    questions and exhibits entirely.  Do not speculate as to

13    what the witness would have said if permitted to answer the

14    question or as to the contents of an exhibit.  Your verdict

15    must be based solely on the legally admissible evidence and

16    testimony.

17              Also, do not assume from anything I may have done

18    or said during the trial that I have any opinion concerning

19    any of the issues in this case.  Except for the instructions

20    to you on the law, you should disregard anything I may have

21    said during the trial in arriving at your own verdict.

22              In considering the evidence, you are permitted to

23    draw such reasonable inferences from the testimony and

24    exhibits as you feel are justified in the light of common

25    experience.  In other words, you may make deductions and

1    reach conclusions that reason and common sense lead you to

2    draw from the facts which have been established by the

3    evidence.

4           Do not be concerned about whether the evidence is

5    direct evidence or circumstantial evidence.  You should

6    consider and weigh all of the evidence that was presented to

7    you.

8           Direct evidence is the testimony of one who

9    asserts actual knowledge of a fact, such as an eyewitness.

10   Circumstantial evidence is proof of a chain of events and

11   circumstances indicating that something is or is not a fact.

12          The law makes no distinction between the weights

13   to be given either direct or circumstantial evidence.  But

14   the law requires that you, after weighing all of the

15   evidence, whether direct or circumstantial, be convinced of

16   the guilt of a defendant beyond a reasonable doubt before

17   you can find him or her guilty.

18          I remind you that it is your job to decide whether

19   or not the government has proved the guilt of each

20   defendant, individually, beyond a reasonable doubt.  In

21   doing so, you must consider all of the evidence.  This does

22   not mean, however, that you must accept all of the evidence

23   as true or accurate.

24          You are the sole judges of the credibility or

25   believability of each witness and the weight to be given to

1    the witness's testimony.  An important part of your job will

2    be making judgment about the testimony of witnesses,

3    including the defendants who testified in this case.

4            You should decide whether you believe all, some

5    part, or none of what each person had to say, and how

6    important that testimony was.

7            In making that decision, I suggest that you ask

8    yourself a few questions:  Did the person impress you as

9    honest?  Did the witness have any particular reason not to

10   tell the truth?  Did the witness have a personal interest in

11   the outcome of the case?  Did the witness have any

12   relationship with either the government or the defense?  Did

13   the witness seem to have a good memory?  Did the witness

14   clearly see or hear the things about which he or she

15   testified?

16           Did the witness have the opportunity and ability

17   to understand the questions clearly and answer them

18   directly?  Did the witness's testimony differ from the

19   testimony of other witnesses?  These are a few of the

20   considerations that will help you determine the accuracy of

21   what each witness said.

22           Hollis Greenlaw, Cara Obert, and Brandon Jester

23   have testified.  Their testimony should be weighed and their

24   credibility evaluated in the same way as that of any other

25   witness.

1          Your job is to think about the testimony of each

2   witness you have heard and decide how much you believe of

3   what each witness had to say.  In making up your mind and

4   reaching a verdict, do not make any decision simply because

5   there were more witnesses on one side than on the other.

6          Do not reach a conclusion on a particular point

7   just because there were more witnesses testifying for one

8   side on that point.  You will always bear in mind that the

9   law never imposes upon a defendant in a criminal case the

10  burden or duty of calling any witness or producing any

11  evidence.

12          Whether a defendant has offered evidence of good

13  reputation for opinion testimony -- this should be "or,"

14  right?  Is that right?  Whether a defendant is offered

15  evidence of good -- good general reputation or opinion

16  testimony?

17          MS. EGGERS:  Yes, your Honor.

18          MR. STEPHENS:  Yes, your Honor.

19          MS. GOODMAN:  Yes.

20          THE COURT:  All right.  So let me start over with

21  that sentence.  I found a typo.

22          Where a defendant has offered opinion -- has

23  offered evidence of good general reputation or opinion

24  testimony concerning truth and veracity, honesty and

25  integrity, or character as a law-abiding citizen, you should

1  consider such evidence, along with all the other evidence in

2  the case.

3            Evidence of a defendants' character, inconsistent

4  with those traits of character ordinarily involved in the

5  commission of the crime charged, may give rise to a

6  reasonable doubt, since you may think it improbable that a

7  person of good character with respect to those traits would

8  commit such a crime.

9            The testimony of a witness may be discredited by

10  showing that the witness testified falsely or by evidence

11  that, at some other time, the witness said or did something

12  or failed to say or do something, which is inconsistent with

13  the testimony the witness gave at this trial.

14            Earlier statements of a witness were not admitted

15  in evidence to prove that the content of those statements

16  are true.  You may not consider the earlier statements to

17  prove that the content of an earlier statement is true; you

18  may only use earlier statements to determine whether you

19  think the earlier statements are consistent or inconsistent

20  with the trail testimony of the witness and therefore,

21  whether they affect the credibility of that witness.

22            If you believe that a witness has been discredited

23  in this manner, it is your exclusive right to give the

24  testimony of that witness whatever weight you think it

25  deserves.

1          During the trial you heard testimony of certain

2    witnesses who expressed opinions concerning various

3    scientific, technical, or other matters involving

4    specialized knowledge.

5          If scientific, technical, or other specialized

6    knowledge might assist the jury in understanding the

7    evidence or in determining a fact in issue, a witness

8    qualified by knowledge, skill, experience, training, or

9    education may testify and state an opinion concerning such

10   matters.

11         Merely because such a witness has expressed an

12   opinion does not mean, however, that you muster accept this

13   opinion.  You should judge such testimony like any other

14   testimony.  You may accept it or reject it and give it as

15   much weight as you think it deserves, considering the

16   witness's education and experience, the soundness of the

17   reasons given for the opinion, and all other evidence in

18   this case.

19         You will note that the indictment charges that the

20   offenses were committed on or about a specified date.  The

21   government does not have to prove that the crimes were

22   committed on that exact date.  So long as the government

23   proves beyond a reasonable doubt that the defendant

24   committed the crime on a date reasonably near January 1,

25   2011, through December 29, 2015, the dates stated in the

 1   indictment.

 2          You are here to decide whether the government has

 3   proved, beyond a reasonable doubt, that each individual

 4   defendant is guilty of the crimes charged in the indictment.

 5   No defendant is on trial for any act, conduct, or offense

 6   not alleged in the indictment, neither are you called upon

 7   to return a verdict as to the guilt of any other person or

 8   persons not on trial as a defendant in this case except as

 9   you are otherwise instructed.

10          If a defendant is found guilty, it will be my duty

11   to decide what the punishment will be.  You should not be

12   concerned with punishment in any way.  It should not enter

13   your consideration or discussion.

14          A separate crime is charged against one or more of

15   the defendants in each count of the indictment.  Each count,

16   and the evidence pertaining to it, should be considered

17   separately.  The case of each defendant should be considered

18   separately and individually.

19          The fact that you may find one or more of the

20   accused guilty or not guilty of any of the crimes charged

21   should not control your verdict as to any other crime or any

22   other defendant.  You must give separate consideration to

23   the evidence as to each defendant.

24          As used in these instructions, a representation is

25   material if it has a natural tendency to influence or is

 1    capable of influencing the decision of the person or entity

 2    to which it is addressed.

 3                The government can prove materiality in either of

 4    two ways:  First, a representation is material if a

 5    reasonable person would attach importance to its existence

 6    or nonexistence in determining his or her choice of action

 7    in the transaction in question.

 8                Second, a statement could be material, even though

 9    only an unreasonable person would rely on it, if the person

10    who made the statement knew or had reason to know his or her

11    victim was likely to rely on it.

12                In determining materiality, you should consider

13    that naivety, carelessness, negligence, or stupidity of a

14    victim.  You should consider that naivety, carelessness,

15    negligence, or stupidity of a victim does not excuse

16    criminal conduct, if any, on the part of the defendant.

17                The word "knowingly" means that the act was done

18    voluntarily and intentionally not because of a mistake or an

19    accident.

20                Interstate commerce means commerce or travel

21    between one state, territory, or possession of the United

22    States in another state, territory, or possession of the

23    United States, including the District of Columbia.

24                Summary charts prepared or relied upon by a

25    witness have been received into evidence for the purpose of

1  explaining facts disclosed by testimony and exhibits which

2  are also in evidence in this case.

3            If you find that such summary chart correctly

4  reflects the other evidence in the case, you may rely upon

5  them.

6            And to the extent that you find that they are not

7  in truth summaries of the evidence in the case, you are to

8  disregard them.  The best evidence of what occurred are the

9  underlying records themselves.

10           Count I:  Conspiracy to commit wire fraud

11 affecting a financial institution.  The defendants are

12 charged in Count I of the indictment, conspiracy to commit

13 the offense of wire fraud affecting a financial institution

14 in violation of Title 18, United States Code, Section 1349

15 and Section 1343.

16           Title 18, United States Code, Section 1349, makes

17 it a crime for two or more persons to conspire or commit the

18 offense of wire fraud.

19           The elements of the crime of wire fraud affecting

20 a financial institution under Title 18, United States Code,

21 Section 1343, are explained below.  You are directed to read

22 those instructions on wire fraud before reaching a decision

23 on Count I.

24           A conspiracy is an agreement between two or more

25 persons to join together to accomplish some unlawful

 1   purpose.  It is a kind of partnership in crime in which each

 2   member of the conspiracy becomes the agent of every other

 3   member.

 4            For you to find the defendant guilty of this

 5   crime, you must be convinced that the government has proved

 6   each of the following beyond a reasonable doubt.

 7            First, that the defendant and at least one other

 8   person, agreed to commit the crime of wire fraud, as charged

 9   in the indictment.

10            Second, that the defendant knew the unlawful

11   purpose of the agreement.

12            Third, that the defendant joined in it willfully,

13   that is, with the intent to further the unlawful purpose.

14            One may become a member of a conspiracy without

15   knowing all the details of the unlawful scheme or the

16   identities of all the other alleged conspirators.

17            If a defendant understands the unlawful nature of

18   a plan or scheme and knowingly and intentionally joins in

19   that plan or scheme on one occasion, that is sufficient to

20   convict him or her for conspiracy, even though the defendant

21   had not participated before, and even though the defendant

22   played only a minor part.

23            The government does not need to prove that the

24   alleged conspirators entered into any formal agreement or

25   that they directly stated between themselves all the details

 1    of the scheme.  Likewise, the government does not need to

 2    prove that all of the details of the scheme alleged in the

 3    indictment were actually agreed upon or carried out.

 4            Nor must it prove that all of the persons alleged

 5    to have been members of the conspiracy were such or that the

 6    alleged conspirators actually succeeded in accomplishing

 7    their unlawful objectives.

 8            The mere presence at the scene of an event, even

 9    with knowledge that a crime is being committed, or the mere

10    fact that certain persons may have associated with each

11    other and may have assembled and discussed common aims and

12    interests does not necessarily establish proof of the

13    existence of a conspiracy.

14            Also, a person who has no knowledge of a

15    conspiracy but who happens to act in a way which advances

16    some purpose of a conspiracy does not thereby become a

17    conspirator.

18            Wire Fraud.  Title 18, United States Code,

19    Section 1343, makes it a crime for anyone to use interstate

20    wire communication in carrying out a scheme to defraud.

21            For you to find the defendant guilty of this

22    crime, you must be convinced that the government has proved

23    each of the following beyond a reasonable doubt:

24            First, that the defendant knowingly devised or

25    intended to devise a scheme to defraud the investing public

1   or shareholders of UDF III, UDF IV, and UDF V.

2           Second, that the scheme to defraud employed false

3   material representations.

4           Third, that the defendant transmitted or caused to

5   be transmitted, by way of wire communications in interstate

6   commerce, any writing for the purpose of executing such

7   scheme.

8           And fourth, that the defendant acted with a

9   specific intent to defraud.

10          Additionally, if you find the government has

11  proven the preceding four elements beyond a reasonable

12  doubt, you should consider whether the government has also

13  proven the following element beyond a reasonable doubt.

14          Fifth, that the scheme to defraud affected a

15  financial institution.

16          Although the indictment may charge the defendants

17  with committing an offense in several ways by using the word

18  "and," it is not necessary for the government to prove that

19  the defendants did each of the things named in the

20  indictment.

21          It is sufficient if the government proves beyond a

22  reasonable doubt that the defendant did one of the

23  alternative acts as charged; however, you must unanimously

24  agree on which of the act the defendant committed.

25          A scheme to defraud means any plan, pattern, or

 1    course of action intended to deprive another of money or

 2    property or bring about some financial gain to the person

 3    engaged in the scheme.

 4           A specific intent to defraud means a conscious,

 5    knowing intent to deceive or cheat someone.  A

 6    representation is false if it is known to be untrue or is

 7    made with reckless indifference as to its truth or falsity.

 8           A representation would also be false if it

 9    constitutes a half truth or effectively omits or conceals a

10    material fact, provided it is made with the intent to

11    defraud.

12           A representation is material if it has a natural

13    tendency to influence or is capable of influencing the

14    decision of the person or entity to which it is addressed.

15           The word "willfully," as that term has been used

16    from time to time in these instructions, means that the act

17    was committed voluntarily and purposely, with the specific

18    intent to do something the law forbids; that is to say, with

19    bad purpose either to disobey or disregard the law.

20           It connotes a higher degree of criminal spent than

21    knowingly.  Knowingly requires proof of knowledge of facts

22    that constitute the offense.  Willfully requires proof that

23    a defendant acted with knowledge that his conduct violated

24    the law.

25           It is not necessary that the government prove all

1    of the details alleged in the indictment concerning the

2    precise nature and purpose of the scheme.  What must be

3    proved beyond a reasonable doubt is that the defendant

4    knowingly devised or intended to devise a scheme to defraud

5    by means of false or fraudulent pretenses, representations,

6    or promises that was substantially the same as the one

7    alleged in the indictment.

8         It is also not necessary that the government prove

9    that the material transmitted by wire communications was

10   itself false or fraudulent, or that the use of the

11   interstate wire communications facilities was intended as

12   the specific or exclusive means of accomplishing the alleged

13   fraud.

14        What must be proved beyond a reasonable doubt is

15   the use of the interstate wire communication facilities was

16   closely related to the scheme because the defendant either

17   wired something or caused it to be wired in interstate

18   commerce in an attempt to execute or carry out the scheme.

19        The alleged scheme need not actually succeed in

20   defrauding anyone.

21        To cause interstate wire communications facilities

22   to be used is to do an act with knowledge that the use of

23   the wire communications facilities will follow in the

24   ordinary course of business or where such use can reasonably

25   be foreseen.

 1              "Financial institution" means a depository

 2    institution insured by the Federal Deposit Insurance

 3    Corporation.

 4              A scheme to defraud affects a financial

 5    institution if it exposes the financial institution to a new

 6    or increased risk of loss.  A financial institution need not

 7    have actually suffered a loss in order to have been affected

 8    by the scheme.  The mere utilization of a financial

 9    institution in the transfer of funds does not affect a

10    financial institution.

11              In determining whether or not a defendant acted

12    with criminal intent to defraud or deceive, you may consider

13    whether or not the defendant had a good faith belief that

14    what he or she was doing was legal.

15              If you have a reasonable doubt as to whether or

16    not the defendant had a good faith belief that what he or

17    she was doing was legal, you must acquit the defendant and

18    say by your verdict of not guilty.

19              Count II:  Conspiracy to commit securities fraud.

20    The defendants are charged in Count II of the indictment

21    with conspiracy to commit the offense of securities fraud in

22    violation of Title 18, United States Code, Section 1349 and

23    Section 1348.

24              Title 18, United States Code, Section 1349, makes

25    it a crime for two or more persons to conspire to commit the

 1    offense of securities fraud.

 2            The elements of the crime of securities under

 3    Title 18, United States Code, Section 1348, are explained to

 4    you below.  You are directed to read those instructions on

 5    securities fraud before reaching a decision as to Count II.

 6            A conspiracy is an agreement between two or more

 7    persons to join together to accomplish some unlawful

 8    purpose.  It is a kind of partnership in crime in which each

 9    member of the conspiracy becomes the agent of every other

10    member.

11            For you to find the defendant guilty of this

12    crime, or to find a defendant guilty of this crime, you must

13    be convinced that the government has proposed each of the

14    following beyond a reasonable doubt.

15            That the defendant, and at least one other person,

16    agreed to commit the crime of securities fraud as charged in

17    the indictment.  That the defendant knew the unlawful

18    purpose of the agreement.  That the defendant joined in it

19    willfully, that is, with the intent to further the unlawful

20    purpose.

21            One may become a member of a conspiracy without

22    knowing all the details of the unlawful scheme or the

23    identities of all the other alleged conspirators.

24            If a defendant understands the unlawful nature of

25    a plan or scheme and knowingly and intentionally joins in

1    that plan or scheme on one occasion, that is sufficient to

2    convict him or her for conspiracy, even though the defendant

3    had not participated before, and even though the defendant

4    played only a minor part.

5              The government does not need to prove that the

6    alleged conspirators entered into any formal agreement or

7    that they directly stated between themselves all the details

8    of the scheme.

9              Likewise, the government does not need proof that

10   all of the details of the scheme alleged in the indictment

11   were actually agreed upon and carried out.  Nor must it

12   prove that all the persons alleged to have been members of

13   the conspiracy were such, or that the alleged conspirators

14   actually succeeded in accomplishing their unlawful

15   objectives.

16             The mere presence at the scene of an event, even

17   with knowledge that a crime is being committed, or the mere

18   fact that certain persons may have been associated with each

19   other and may have assembled together and discussed common

20   aims and interests, does not necessarily establish proof of

21   the existence of a conspiracy.

22             Also, a person who has no knowledge of a

23   conspiracy but who happens to act in a way which advances

24   some purpose, does not thereby become a conspirator.

25             As I have told you, whether your verdict is guilty

 1   or not guilty, it must be unanimous.

 2          Count II of the indictment accuses the defendants

 3   of committing the crime or conspiracy to commit securities

 4   fraud by entering into an agreement to knowingly accomplish

 5   two unlawful objectives.

 6          The first is to enter into an agreement to

 7   knowingly accomplish a scheme to defraud a person in

 8   connection with UDF III, UDF IV, UDF V securities.

 9          The second is to enter into an agreement to

10   knowingly accomplish a scheme to obtain by means of

11   materially false and fraudulent pretenses, representations,

12   and promises, any money and property in connection with

13   purchase or sale of securities.

14          The government need not prove that the alleged

15   conspirators entered into any agreement to knowingly

16   accomplish both unlawful objectives for you to return a

17   guilty verdict on this charge.

18          Proof beyond a reasonable doubt that the alleged

19   conspirators entered into an agreement to knowingly

20   accomplish at least one of the unlawful objectives charged

21   in Count II is enough.

22          But in order to return a guilty verdict, all of

23   you must agree that the same unlawful objective was agreed

24   upon by the alleged conspirators.

25          All of you must agree that the government proved

1    beyond a reasonable doubt that the defendant agreed to enter

2    into a scheme to defraud or all of you must agree that the

3    government proved beyond a reasonable doubt that the

4    defendant agreed to enter into a scheme to obtain money or

5    property or all of you must agree that the government proved

6    beyond a reasonable doubt that the defendant committed both

7    acts.

8              I will now lay out the substantive elements for

9    securities fraud.  Counts III through X charge the

10   defendants with knowingly executing or attempting to execute

11   a scheme to defraud holders of securities or aiding and

12   abetting this offense, in violation of Title 18, United

13   States Code, Section 2(a).

14             The crime of committing or attempting to commit

15   securities fraud can be shown in either of the following two

16   ways:  One, Title 18, United States Code, Section 1348(1)

17   makes it a federal crime or offense for anyone to knowingly

18   execute or attempt to execute a scheme or artifice to

19   defraud any person in connection with any security of an

20   issuer of a class of securities registered under the

21   Securities Exchange Act of 1934 or of an issuer that is

22   required to file reports under that act.

23             Or two, Title 18, United States Code, Section

24   1348(2) makes it a federal crime for anyone to knowingly

25   execute or attempt to execute a scheme or artifice of fraud

1    by means of false or fraudulent pretenses, representations,

2    or promises any money or property in connection with the

3    purchase or sale of any commodity for future delivery or any

4    option on a commodity for future delivery or any security of

5    an issuer with a class of securities registered under the

6    Securities Exchange Act of 1934 or that is required to file

7    reports under that act.

8              I will now discuss the two alternative ways of

9    committing or attempting to commit securities fraud.

10             Section 1348(1), the defendants can be found

11   guilty of securities fraud, in violation of Title 18, United

12   States Code, Section 1348(1) only if each of the following

13   three elements is proven beyond a reasonable doubt:

14             First, that the defendants knowingly executed or

15   attempted to execute a scheme or artifice to defraud a

16   person in connection with UDF III or UDF V securities as

17   identified in the respective count of the indictment.

18             Second, that the defendants did so with the intent

19   to defraud.

20             And third, that UDF III or UDF V, as identified in

21   the respective count of the indictment, was an issuer that

22   registered its securities under Section 12 of the Securities

23   Exchange Act of 1934, or was otherwise required to file

24   reports under Section 15(d) of the Securities Exchange Act

25   of 1934.

1              Section 1348(2).  The defendants can be found

2     guilty of securities fraud in violation of Title 18, United

3     States Code, Section 1348(2), only if each of the following

4     four elements is proven beyond a reasonable doubt:

5              First, that the defendants knowingly executed or

6     attempted to execute a scheme or artifice to obtain money or

7     property by means of materially false or fraudulent

8     pretenses, representations, or promises.

9              Second, that the defendants executed or attempted

10    to execute their scheme in connection with the purchase or

11    sale of UDF III or UDF V securities as identified in the

12    respective count of the indictment.

13             Third, that the defendants acted with an intent to

14    defraud.

15             And fourth, that UDF III or UDF V., as identified

16    in the respective count of the indictment, was an issuer

17    that registered its securities under Section 12 of the

18    Securities Exchange Act of 1934 or was otherwise required to

19    file reports under Section 15(d) of the Securities Act of

20    1934.

21             To find the defendants guilty of committing or

22    attempting to commit securities fraud, you need find only

23    that the government proved beyond a reasonable doubt each

24    element of either Section 1348(1) or Section 1248(2).

25             As previously explained, although the indictment

1    may charge the defendants with committing an offense in

2    several ways by using the word "and," it is not necessary

3    for the government to prove the defendants did each of the

4    things named in the indictment.

5            It is sufficient the government proves beyond a

6    reasonable doubt that a defendant did one of the alternative

7    acts as charged; however, you must unanimously agree on

8    which act the defendant committed.

9            The following definitions may help you in your

10   deliberations.  The term "security" means any note, stock,

11   treasury stock, bond, debenture, certificate of interest, or

12   participation in any profit sharing agreement or, in

13   general, any instrument commonly known as a security or any

14   certificate of interest or participation in temporary or

15   interim certificate for, receipt for, or warrant, or right

16   to subscribe to or purchase any of the foregoing.

17           The phrase "in connection with any security,"

18   means that the scheme and artifice to defraud described in

19   the indictment must have had some relationship to or have

20   been connected to a security.

21           The term "in connection with the purchase or sale

22   of any security" means that the alleged fraudulent conduct

23   occurred in some phase of a transaction involving the

24   purchase or sale of a security.

25           The government need not show, however, that the

 1    defendant or anyone associated with him or her bought or

 2    sold any such securities.

 3            A "scheme to defraud" means any plan, pattern, or

 4    course of action intended to deprive another of money or

 5    property or bring about some financial gain to the person

 6    engaged in the scheme.

 7            An "intent to defraud" means a conscious, knowing

 8    intent to deceive or cheat someone.  A representation is

 9    false if it is known to be untrue or is made with reckless

10    indifference as to its truth or falsity.

11            A representation would be false if it constitutes

12    a half truth or effectively omits or conceals a material

13    fact, provided it is made with the intent to defraud.

14            A representation is material if it has a natural

15    tendency to influence or is capable of influencing the

16    decision of the person or entity to which it is addressed.

17            The term "affiliate" means a person that directly

18    or indirectly, through one or more intermediaries, controls

19    or is controlled by or is under common control with the

20    issuer.

21            The word "control" means the possession, direct or

22    indirect, of the power to direct or cause the direction of

23    management and policies of a person, whether through

24    ownership of voting securities, by contract, or otherwise.

25            The guilt of a defendant in a criminal case may be

1    established without proof that the defendant personally did

2    every act constituting the offense alleged.

3            The law recognizes that, ordinarily, anything a

4    person can do for himself may also be accomplished by him

5    through the direction of another person as his or her agent

6    or by in concert with, or under the direction of another

7    person or persons in a joint effort or enterprise.

8            If another person is acting under the direction of

9    the defendant or if the defendant joins another person and

10   performs acts with the intent to commit a crime, then the

11   law holds the defendant responsible for the acts and conduct

12   of such other persons just as though the defendant had

13   committed the acts or engaged in such conduct.

14           Before any defendant may be held criminally

15   responsible for the acts of others, it is necessary that the

16   accused deliberately associate himself in some way with the

17   crime and participate in it with the intent to bring about

18   the crime.

19           Mere presence at the scene of a crime and

20   knowledge that a crime is being committed are not sufficient

21   to establish that a defendant either directed or aided and

22   abetted the crime, unless you find beyond a reasonable doubt

23   that the defendant was a participant and not merely a

24   knowing spectator.

25           In other words, you may not find any defendant

 1  guilty unless you find beyond a reasonable doubt that every

 2  element of the offense, as defined in these instructions was

 3  committed by some person or persons, and that the defendant

 4  voluntarily participated in its commission with the intent

 5  to violate the law.

 6          For you to find a defendant guilty of this crime,

 7  you must be convinced that the government has proved each of

 8  the following beyond a reasonable doubt:

 9          First, that the offense of securities fraud, as

10  charged in Counts III through X of the indictment, was

11  committed by some person.

12          Second, that the defendant associated with the

13  criminal venture.

14          Third, that the defendant purposefully

15  participated in the criminal venture.

16          And fourth, that the defendant sought by action to

17  make the venture successful.

18          "To associate with the criminal venture," means

19  that the defendant shared the criminal intent of the

20  principal.  This element cannot be established if the

21  defendant had no knowledge of the principal's criminal

22  venture.

23          "To participate in the criminal venture means the

24  defendant engaged in some affirmative conduct designed to

25  aid the venture or to assist the principal of the crime.

1         A conspirator is responsible for offenses

2    committed by another conspirator if the conspirator was a

3    member of the conspiracy when the offense was committed and

4    if the offense was committed in furtherance of and as a

5    foreseeable consequence of the conspiracy.

6         Therefore, if you have first found the defendant

7    guilty of either the conspiracy charged in Counts I or II,

8    and if you find beyond a reasonable doubt that during the

9    time the defendant was a member of that conspiracy, another

10   conspirator committed the offenses in Count III through X,

11   both in furtherance of and as a foreseeable consequence of

12   that conspiracy, then you may find the defendant guilty of

13   the offenses charged in Counts III through X, even though

14   the defendant may not have participated in any of the acts

15   which constitute the offense described in Counts III through

16   X.

17        To reach a verdict, whether guilty or not guilty,

18   all of you must agree.  Your verdict must be unanimous as to

19   each count of the indictment.

20        Your deliberations will be secret.  You will never

21   have to explain your verdict to anyone.  It is your duty to

22   consult with one another and to deliberate in an effort to

23   reach an agreement, if you can do so.

24        Each of you must decide the case for yourselves,

25   but only after an impartial consideration of the evidence

1    with your fellow jurors.

2              Do not let any bias, sympathy, or prejudice that

3    you may feel toward one side or the other influence your

4    decision in any way.

5              In particular, do not let racial, ethnic, national

6    origin, or other bias influence your decision in any way.

7              During your deliberations, do not hesitate to

8    reexamine your own opinions and change your mind if

9    convinced that you were wrong.

10             But do not give up your honest beliefs as to the

11   weight or effect of the evidence solely because of the

12   opinion of your fellow jurors or for the mere purpose of

13   returning a verdict.

14             Remember, at all times, you are judges, judges of

15   the facts.  Your duty is to decide whether the government

16   has proved each defendant individually guilty beyond a

17   reasonable doubt.

18             When you go to the jury room, the first thing that

19   you should do is select one of your number as your

20   foreperson who will help guide your deliberation and speak

21   for you here in the courtroom.

22             A verdict form has been prepared for your

23   convenience.  The foreperson will write the unanimous answer

24   of the jury in the space provided for each count of the

25   indictment, either guilty or not guilty.

1          At the conclusion of your deliberations, the

2    foreperson should date and sign the verdict.  If you need to

3    communicate with me during your deliberations, your

4    foreperson should write the message and give it to our court

5    security officer.  I will either reply in writing or bring

6    you into the courtroom and answer your message.

7          Bear in mind that you are not to reveal to any

8    person, not even to me, how the jury stands numerically or

9    otherwise on any count of the indictment until after you

10   have reached a unanimous verdict, and I will sign this form.

11         Then the balance of the charge is the verdict

12   forms.  And they're self-explanatory, and they go through

13   each count of the indictment, Counts I through X, and you

14   will see, and I will just read this first one for you here.

15         Count I:  We, the jury, find the defendant, Hollis

16   Morrison Greenlaw, "blank" as to Count I of the indictment.

17   You will answer either not guilty or guilty.

18         The second question:  We, the jury, find the

19   defendant, Benjamin Lee Wissink, "blank" as to Count I of

20   the indictment.  You will answer not guilty or guilty.

21         The next question is:  We, the jury, find the

22   defendant, Cara Delin Obert, "blank" as to Count I of the

23   indictment.  You will answer not guilty or guilty.

24         And the next question asks:  We, the jury, find

25   the defendant, Jeffrey Brandon Jester, "blank" as to Count I

 1  of the indictment.  Answer not guilty or guilty.

 2          And then there's a follow-up question that asks:

 3  If you find the defendants guilty of Count I, did you

 4  find -- and it really should say, if you find "any" of the

 5  defendants -- if you find any of the defendants guilty of

 6  Count I, did you find that the scheme to defraud affected a

 7  financial institution?  And you will answer yes or no in the

 8  space that is provided for you.

 9          And then the same process applies to Count II.

10  You answer the same questions as related to Count No. II.

11  Count No. III.  Count No. IV.  Count No. V.  Count No. VI.

12  Count No. VII.  Count No. VIII.  Count No. VIIII.  And Count

13  No. X.

14          And on that form at the very bottom, you'll see,

15  or your presiding juror will see, there's a space for your

16  presiding juror to sign and a space for him to date the jury

17  charge.  Okay.

18          All right.  Well, that took a little longer than I

19  thought it would, so we're running a little late, but we

20  will get started.

21          Ms. Eggers.

22          MS. EGGERS:  Thank you.  May it please the Court,

23  Counsel.

24          THE COURT:  Yes.

25          MS. EGGERS:  Ladies and gentlemen, one of the

 1   first instructions Judge O'Connor gave you a few minutes ago

 2   on page 2 was something that we talked about last Wednesday.

 3   And that is, that a jury may never be allowed to consider

 4   bias, prejudice, or sympathy.

 5          Y'all might remember last Wednesday we talked

 6   about Lady Justice and she has the blindfold on.  Each

 7   closing argument I give, I always bring this instruction up,

 8   because I've heard, after the fact, a lot of times people

 9   say, "Well, you know what, government, you proved beyond all

10   reasonable doubt, but we felt sorry for someone," or "We

11   felt sympathetic for someone."

12          This instruction is in there.  And actually, Judge

13   O'Connor actually talked about it twice.  So I ask that,

14   when y'all go back behind that door and you start

15   deliberating, if at any time somebody says, "Yeah, you know

16   what, the government proved it beyond a reasonable doubt,

17   but I feel sorry for somebody," that one of you raise your

18   hand, and say, "Wait a second.  Judge O'Connor gave us this

19   instruction right here on page 2.  We can't do that."

20          The same thing, another instruction Judge O'Connor

21   gave you, and it was brought up last Wednesday as well, is

22   that a jury in federal court is never permitted to consider

23   punishment, the question of punishment.  That instruction is

24   in there and Judge O'Connor instructed you on it.

25          And for the same thing I ask that, when you go

1    behind that door and you start deliberating, if at any point

2    somebody says, "You know what, each of those elements were

3    proven beyond a reasonable doubt, but I don't want to see

4    somebody get in trouble.  I don't want to see somebody get

5    punished."  I ask that you raise your hand and say, "Wait a

6    second.  Judge O'Connor said we can't do that.  We can't

7    consider punishment."

8            Now, Judge O'Connor, he is the one that gives you

9    the law, and he went through all the various elements and

10   you will have the jury instructions.  Count I, again, is

11   conspiracy to commit wire fraud affecting a financial

12   institution.

13           In conspiracy, you will see Count II is conspiracy

14   as well.  So Counts I and II, they actually, for the

15   conspiracy aspects of it, they have generally the same

16   elements.  There's three elements:  That the defendant, and

17   at least one other person, agreed to commit the crime, for

18   Count I, it's wire fraud; two, that the defendant knew the

19   unlawful purpose of the agreement; and three, that the

20   defendant willfully joined in it, that is, with the unlawful

21   purpose to further the unlawful purpose of the scheme.

22           So as Judge O'Connor explained, if somebody is

23   charged with conspiracy -- well, since they're charged with

24   conspiracy to commit wire fraud, you need to know the

25   elements of what wire fraud are.

1          Before we get to that, though, with regards to

2   conspiracy, I hope nobody thought it was going to be like

3   TV, that there was going to be some email that was going to

4   be flashed upon the screen that was going to say, "We've got

5   this unlawful agreement, we're going to do this crime."

6   That's not how this works.

7          Under conspiracy law, one may become a member of a

8   conspiracy without knowing all the details of the unlawful

9   scheme.  If the defendant understands the unlawful nature of

10  the plan or scheme and intentionally joins in on it in one

11  occasion, that is enough for conspiracy.

12          I gave that crazy example of Ms. Jones,

13  Miss Lyons, and I getting involved in a conspiracy to rob a

14  bank.  That's a conspiracy.  What y'all see here is a

15  conspiracy.

16          The government does not need to prove any formal

17  agreement.  Again, I hope you didn't expect that there was

18  going to be some email, where it says, "Yes, let's go commit

19  securities fraud tomorrow."  That's just not how this works.

20          The government does not need to prove that all the

21  details were actually agreed upon or carried out when

22  charged with conspiracy.  The government does not have to

23  prove that all the persons alleged in the conspiracy are

24  actually members, but we did.

25          Each of these four defendants, you heard evidence

 1   concerning each of them.  And further, the government does

 2   not have to prove that the alleged conspirators actually

 3   succeeded, but we did.

 4          Remember that hypothetical with me robbing the

 5   bank, going inside and somebody catching me right as I came

 6   out?  We reached that agreement on the front end.  Even if I

 7   got caught coming out the door, we reached that agreement.

 8          So the elements -- what is wire fraud?  To know

 9   whether or not somebody -- whether or not we've met the

10   elements of conspiracy, we've got to figure out what wire

11   fraud is.  That the defendants knowingly devised or intended

12   to devise a scheme to defraud the investing public or

13   shareholders of UDF III, IV, or V.

14          Now, the evidence has shown that starting, at

15   least as early as January 2011, these defendants realized

16   there was not enough money coming in.  They realized, and

17   you were able to see it in that big chart, 410, they

18   realized that in order to keep those distributions going,

19   that, they were going have to pull the money from somewhere

20   else.  We know it started at least as early as January of

21   2011.

22          Why?  Why did they do it?  Because they didn't

23   have to.  It was made very clear that there was no promise

24   to pay distributions.  They were not required to pay

25   distributions.  But they all knew good and well that, if

1    they didn't pay money to those earlier investors, you

2    wouldn't get subsequent investors.

3                Number two, that the scheme to defraud employed

4    false material misrepresentations.  The defendants did not

5    tell UDF III investors there wasn't enough cash from

6    operations to pay the distributions.  The defendants did not

7    tell UDF IV's would-be investors that their money was going

8    to be used to issue loans so distributions could be paid to

9    earlier investors in III.

10               The defendants did not tell UDF III's investors

11   that there was not enough money to even pay its own Legacy

12   Texas Bank loan.  The defendants told UDF Vs would-be

13   investors that it would not engage in affiliate

14   transactions.

15               The defendants did not tell UDF V's would-be

16   investors that their money was going to be used to issue

17   loans so that distributions could be paid to those earlier

18   investors.  That's nowhere in those SEC files.

19               Number three, for wire fraud, that the defendant

20   transmitted or caused to be transmitted by wire, interstate

21   commerce, any writing for the purpose of executing this

22   scheme.

23               And y'all are probably wondering why we had poor

24   Ms. Tidwell come all the way in here and talk about her

25   uploading SEC documents to a company in New York City.

1    Well, for wire fraud, there actually has to be an interstate

2    transmission of some sort.

3                    You heard the number of ways.  You heard

4    Mr. Vlasak, there are wires that were from DST that included

5    investors' money.  The wires that were to DST that included

6    investors' money.  Wires from financial institutions.  All

7    the emails at UDF.  Emails which are wires to the company in

8    New York that she helped upload and do the web browsing, and

9    then uploading the SEC files themselves.  That has been

10   shown beyond all doubt.

11                   Fourth element of wire fraud, that the defendant

12   acted with the specific intent to defraud.  They did not

13   tell anyone in those SEC filings the true reason for the

14   advance requests, participations, and refinance that UDF IV

15   was doing with UDF III.

16                   Had they disclosed the real reason all those

17   participation, advance requests, and refinances were being

18   done, what person would want to put their money in UDF IV?

19                   They did not tell anyone in the SEC filings that

20   UDF III did not have enough money to pay its own

21   1.25 million quarterly payment.

22                   They did not tell anyone in the SEC about that

23   pitch, that pitch that Blake Buffington and Tom Buffington

24   and James Dorney were given.

25                   The defendants went out of their way, when they

 1   created UDF V., they went out of their way to make it as

 2   though that one was going to be different.

 3            The March 2014 manipulated spreadsheet that

 4   auditors were informed was based upon executed contracts.

 5   There was a lot going on back and forth in here about

 6   whether or not it had to have a contract, whether or not it

 7   didn't.

 8            But Government's Exhibit 96 shows you what the

 9   auditors were led to believe back in March of 2014, that

10   those were based on executed contracts.

11            The June 2014 manipulated spreadsheet being given

12   to this third-party company, Navigant.  Look at that email.

13   Navigant is a third-party company.  They're still continuing

14   to send this manipulated spreadsheet.

15            They cannot tell the board of directors for UDF V.

16   You heard Mr. Kahane.  The uncontroverted evidence is that

17   Mr. Kahane said he did not know about all these illegal

18   transactions.

19            What is wire fraud?  Affecting a financial

20   institution.  As Judge O'Connor explained, after you go

21   through the elements of wired fraud, one of the questions

22   that's going to be on the verdict form -- or conspiracy to

23   commit wire fraud is whether or not the scheme affected a

24   financial institution.

25            You heard that Veritex Bank, Capital Bank, Legacy

1   Texas Bank, all of those banks relied on the SEC filings,

2   all of them.

3            You heard about them trying to add to the UDF V

4   borrowing base at Prosperity Bank.  There's the exhibit for

5   that.

6            You heard about the late payments to Legacy Texas

7   Bank.  You saw those exhibits and the summary exhibits.  You

8   saw the late payments to Prosperity Bank.  You saw the late

9   payments to Independent Bank.

10           All of that evidence is before you and that's why

11  the defendants are guilty of Count I, conspiracy to commit

12  wire fraud affecting a financial institution.

13           Judge O'Connor went through a number of

14  definitions.  And these definition, some of them apply to

15  both Count I and the remainder of the counts as well.  He

16  read them twice to make sure that you see those definitions

17  apply.

18           But a scheme to defraud means a plan, pattern, or

19  course of action intended to deprive another of money or

20  property and intended to bring about some financial gain to

21  the person engaged in the scheme.

22           Now, Judge O'Connor is very clear, you heard the

23  testimony about the amount of money these defendants

24  received for their involvement with UDF.  The only reason

25  that you're to consider that is for motive.  Defendant

1   Greenlaw had significant motive.

2            A specific intent to defraud means a conscious,

3   knowing intent to deceive or cheat someone.

4            Other definitions that are included in there is

5   what exactly is "false"?  It seems crazy, but only lawyers

6   actually right down what a definition "false" is, but here

7   it is so we know all know.

8            A representation would be false if it constitutes

9   a half truth or effectively omits or conceals a material

10   fact provided it is made with the intent to defraud.

11            A reputation is material if it has a natural

12   tendency to or is capable of influencing the decision-maker.

13            For Counts I and II, the conspiracy counts,

14   there's also a definition of "willfully" involved in there.

15   Counts III through V do not include the word "willfully,"

16   but Counts I and II do.

17            The definition of "willfully" provides that the

18   act was committed voluntarily and purposely with the

19   specific intent to do something the law forbids, that is

20   with bad purpose either to disobey or disregard the law.

21            Now, for the wire fraud aspect of it.  It's not

22   actually required for the government to prove that something

23   false was in the wire communication.  That is not required.

24            The government does not have to prove, as I

25   mentioned before, that the scheme actually succeeded.

1          Now, with regards to that, determining whether or

2     not it affected a financial institution.  Quite a bit was

3     made that the banks were ultimately repaid.  No doubt about

4     it.  They were.  That is not required.

5          All that is required to prove a conspiracy to

6     commit wire fraud affecting a financial institution is that

7     it exposes the financial institution to a new or increased

8     risk of loss.  We did not have to show that they lost one

9     dollar.

10         All we had to show was that it exposed the

11    financial institution to a new or increased risk of loss.

12         The financial institution need not have actually

13    suffered a loss at all.  That's Count I, ladies and

14    gentlemen, and the defendants are guilty of Count I.

15         Count II, conspiracy to commit securities fraud.

16    You'll notice that the same elements apply to conspiracy

17    commit securities fraud.

18         And then once you get to that, just like with the

19    conspiracy to commit wire fraud, you can see one of those

20    elements of securities fraud to know whether or not they

21    actually engaged in conspiracy.

22         As Judge O'Connor explained, there are two ways

23    for a person to be guilty of securities fraud.  The first

24    way is under paragraph 1, and I've highlighted and put in

25    yellow the part that sort of -- the significant part of it.

1          But it's to knowingly execute or attempt to

2    execute a scheme or artifice to defraud any person in

3    connection with any security.

4          The second way is to knowingly execute or attempt

5    to execute a scheme or artifice -- and I, again, underlined

6    and made it yellow -- to obtain by means of false or

7    fraudulent pretenses, representations, or promises, any

8    money or property in connection with the sale or purchase.

9          Two different ways.  We only have to prove one,

10   and y'all do need to agree upon whichever way, or both, that

11   we've proven it.  I would submit that we've proven it both

12   ways.

13          The elements for securities fraud.  Just like wire

14   fraud, there's -- I like to call it like a recipe.  If you

15   don't have everything that goes into the cake, that cake is

16   not going to rise.  So we have to prove each of these

17   elements beyond a reasonable doubt for securities fraud

18   under subparagraph 1.

19          That the defendants knowingly executed or

20   attempted to execute an artifice to defraud a person in

21   connection with UDF III or IV securities as shown in each

22   count.

23          You'll see that each count of the substantive

24   counts concerns an SEC filing for various years, either a

25   10-K or a 10-Q.

1          Number two that the defendant so with the intent

2    to defraud.  And number three, that the securities were

3    registered.

4          I don't think there's going to be any dispute here

5    that these securities were registered.  So I don't think

6    that's where the dispute's going to be.

7          Elements for subparagraph two.  Again, that the

8    defendants knowingly executed or attempted to execute or

9    obtained money or property by means of material, false

10   pretenses, representations, or promises.  That they did it

11   in connection with the security, either III or V, as there

12   in the indictment.  That the defendants did so with the

13   intent to defraud.  And that, again, the securities were

14   registered.

15         So when you break those down, between

16   subparagraph one and subparagraph two of securities fraud,

17   it's basically whether or not we proved that they engaged in

18   a scheme or artifice to defraud in connection -- or to

19   defraud a person in connection with UDF III or V.  Or, under

20   subparagraph two, that they engaged in a scheme or artifice

21   to obtain money or property.

22         So what do we have?  What's our evidence for this?

23         We have, again, those same things I pointed out

24   earlier.  They did not tell anyone in the SEC filings the

25   true reason for the advance request participations.  They

 1    didn't tell anyone in the SEC filings they didn't have

 2    enough money to make their own loan payments.  All those

 3    things I pointed out earlier.

 4          They went out of their way to tell the investing

 5    public, V is going to be different.  They made that

 6    decision.  Nothing required them to do that, but y'all heard

 7    why they did.  They did because they needed to open it up to

 8    other groups like Cetera.

 9          Some definitions.  Again, there's a number of

10    definitions that is used in this part of the charge as well.

11    So I'm not going to re-go over those, but you heard Judge

12    O'Connor read some of them.  And that was the definition of

13    an "affiliate."

14          I expect there's going to be argument by defense

15    counsel saying this is sort of a mushy kind of thing, people

16    have different opinions.  You read the definition that

17    Judge O'Connor gives you.

18          The term "affiliate" means a person that, directly

19    or indirectly, through one or more intermediaries, controls

20    or is controlled by, or is under common control with the

21    issuer.

22          The word "control" means the possession, direct or

23    indirect, of the power to direct or cause the direction of

24    management and policies of a person, whether through

25    ownership of voting securities -- and then I underlined "by

1    contract."

2              They had it written into the contracts that they

3    made the decision.  They could decide what loans to draw on.

4    They made that decision.  And by doing that, they made

5    themselves affiliates with Centurion and Buffington.

6              Now, each of the counts, as I mentioned -- and

7    you'll see there's a -- the substantive counts, you'll see

8    in the indictment there's a chart for Counts III through X.

9    And that chart in each of them describes what the act and

10   execution of that scheme or that count is.

11             So, for instance, for Count III, you'll see that

12   the date -- that date is going to be the date that the SEC

13   filing was submitted to the SEC.  And the act or the falsity

14   in that particular SEC filing was causing Fund III to

15   report -- which fund -- we don't have to use generic

16   names -- so UDF III to report to public investors through

17   it's 2014 10-K, that's that annual filing, false and

18   misleading information concerning the source of funds used

19   to pay distributions and the Bank Loan 6.  That's the Legacy

20   Texas Bank loan.

21             Y'all remember there was that nomenclature summary

22   chart?  And this is where you're going to have to,

23   unfortunately, use it because of the way we have to write

24   the names.

25             So there's two ways that they lied in that one.

 1    One, how they were going to repay Legacy Texas Bank's loan.

 2    And number two, where their distribution for money was

 3    actually coming from.

 4            You'll see -- and you've got the bank records for

 5    Legacy Texas Bank, and you've also got a summary chart.

 6    They only make four payments, even though they're supposed

 7    to be made quarterly.  And you can look at the underlying

 8    documentation, you can trace the money looking at the bank

 9    accounts and looking at the wires in and wires out.  And by

10    doing so, you will be able to see that the money came from,

11    not UDF III, even though they were telling the investing

12    public that's what they were going to do.

13            Count IV -- and again, each of these has its own,

14    but Count IV concerns UDF V's 10-K for that same time

15    period.  And in that particular one, this one, false and

16    misleading information concerns the loans originated and

17    funded by UDF V, while concealing that the loans were made

18    to developments that had previously obtained loans from an

19    earlier fund entity and that UDF V loans were used to pay

20    off loans from that earlier fund entity.

21            And in that, you can look at the various pages of

22    the SEC filing.  So you would go to that particular 10-K.

23    For instance, on page 7 it explained their investment

24    objectives.  And nowhere in there does it say loaning money

25    to III, IV, to pay off their loans so we can pay

 1  distributions to earlier investors.

 2          And also we have, "We will not make loans to

 3  participate in real estate investments with, or provide

 4  credit enhancements for our affiliates."

 5          And then there's that allocation policy at

 6  page 455 and all those shall nots that they told the

 7  investing public that they would not do.

 8          And then 412 is a summary exhibit.  And you heard

 9  the testimony about how the money was used from UDF V's

10  investors to fund these other loans.

11          Count V was filed on May 15, 2015.  And that is

12  the 10-Q for the UDF III.  Again, the false and misleading

13  information concerning the source of the funds to pay

14  distributions and the fact that it did not indicate the

15  Bank 6 loan was concealing that funds were dry from

16  investors in UDF IV.

17          Defense counsel made a big deal, big deal about --

18  I think it was Government's Exhibit 420.  Special Agent --

19  or excuse me, Forensic Accountant Martinez didn't consider

20  the fact that in 420, UDF IV had enough money in other bank

21  accounts.  Well, that's in the bank records.  It's right

22  there plain as day.  But the defendants are still the ones

23  that made the decision to get money from a wholly different

24  entity to fund that.

25          They made that decision.  Why?  Don't know.  But

1    on Government's Exhibit 420, they made that decision.

2            Count VI.  This is another 10-Q.  This is a 10-Q

3    for UDF V.  And the falsity is concealing.  Again, those

4    loans were made to developments that had previously obtained

5    loans from an earlier entity.

6            Count VII.  This concerns -- again, this concerns

7    UDF III.  And the false and misleading information concerns

8    Legacy Texas Bank again and then also the information

9    concerning the source of funds to pay distributions.

10           They had multiple opportunities to tell the

11   investing public, "Hey, we don't have quite enough money

12   right now.  We're going to get a loan from one of our other

13   funds, and we're going to pay off this UDF III loan, so we

14   can pay back these earlier investors' money."  They didn't

15   do that.  They made the decision not to do that.

16           Count VIII.  Again, this is concerning UDF V.  And

17   in this particular one as well it's the fact that they

18   weren't disclosing UDF V loans that were being used and paid

19   out like that just so the distributions could be going to

20   UDF III.

21           Count VIIII, concerns the 10-Q filed November 16.

22   And the same type of thing, the distributions, where the

23   money was coming from.  And then also the fact that Legacy

24   Texas Bank was not able to be paid.  It was now being paid

25   by UDF V's investors.

 1              I urge you to look at the summary exhibits and
 2   look at the back-up documentation.
 3              And on that December 9, it is a mad scramble.
 4   Alice Anne Brown, bright and early December 9, she starts
 5   emailing the defendants that agreed they would be paid by
 6   December 9 -- or before December 10.
 7              And if you look at those emails, you're going to
 8   see Defendant Wissink, he does the same thing he'd been
 9   doing every month before.  The same thing he did in those
10   other 60, along with his other co-conspirators, he starts
11   figuring out, "Where are we going to do a draw from?  We've
12   got to get that money."  Their friend, Mr. Etter, had just
13   said the week before that they didn't have the money to pay.
14              Government's Exhibit 577, that's uncontroverted
15   evidence that Mr. Etter said on that phone on that day, on
16   December 3, "We didn't expect to make that payment either
17   and we don't have the money to pay it."
18              And then finally, Count X.  Count X is the SEC
19   filings for UDF V and now -- because they are now -- also
20   UDF V is being used to pay distributions to the UDF III
21   investors.  It has both the loans, the information, lack of
22   information, false information about the UDF V loans, but
23   also they're not disclosing that they used money prior to
24   that filing to pay UDF III's investors.
25              This chart, it's sort of all in one place,

 1   Government's Exhibit 413.  This chart shows the times that

 2   those UDF V investors, the people, the men and women that

 3   were told there wouldn't be any affiliate transactions.

 4   This shows all the occasions with UDF V where their money

 5   was used.

 6          UDF IV, those SEC filings, they acknowledge they

 7   were going to do them there.  Now, they didn't tell the

 8   investing public that we're going to do -- we're going to do

 9   affiliate transactions so we can pay UDF III.  They never

10   said that, because they knew if they said that kind of

11   thing, who would invest in UDF V?

12          But here are the occasions in Government's

13   Exhibit 413 when UDF V's money was used.

14          When Mr. Greenlaw testified, he didn't say

15   anything about that other member of the board of directors,

16   Mr. Kahane.

17          You heard Mr. Kahane say that he understood that

18   UDF V would not do affiliate transactions.  You heard

19   Mr. Kahane say, if an affiliated transaction were to occur,

20   it must be considered by the board.  You heard Mr. Kahane

21   say that affiliate transactions must be disclosed.  The

22   parties have to be identified by name, their relationship

23   has to be described.  The transaction has to be described

24   carefully and distinctly.

25          You heard Mr. Kahane say he would have considered

 1    money going from UDF V to UDF III to pay investors to be an

 2    affiliate transaction and he would not have approved it.

 3            You heard him say he would have considered money

 4    going from UDF V to pay the UDF III bank loan to be an

 5    affiliated transaction and he would not have approved it.

 6            You heard him say he would have considered money

 7    going from V to retire a UDF IV loan to be an affiliated

 8    transaction and he would not have approved it.

 9            I ask you, ladies and gentlemen, go through

10    Government's Exhibits 350, 349, go through them.  We didn't

11    sit here and go through all those pages and pages of emails,

12    but I urge you to do that.  And when you look at the

13    chronology, each one, it's going to go something like this.

14            Mr. Vlasak who's on that, the other guy by the

15    name of Sanchez, and I think there was a female at one

16    point.  They sent an email to the UDF folks.  It goes, "Hey,

17    this much ACH.  This much cash has got to be funded."

18            And then what you'll see is the mad scramble to

19    either issue a paper to do an advance request, or figure out

20    some way to get the money over into a UDF III bank account.

21    I ask you to read the emails.

22            Look at Government's Exhibit 410 which puts all

23    those 350 through 409 in one place.

24            Ladies and gentlemen, we're not here because

25    Mr. Martinez traced it and it only happened like five or six

1    times.  We're not here because he traced it happening like

2    10 or 20 times.  He traced the same thing happening 53 out

3    of 60 times.  And that is money coming from a subsequent

4    investor in order to pay distributions to somebody that had

5    invested before them.

6            Look at the things that they were doing beyond

7    just using investors' money.  Covering Greenlaw's margin

8    account.  And this is at Government's Exhibit 414 that sort

9    of goes across the screen.  UDF paying UDF I's Veritex loan.

10   UDF paying UDF III's Legacy loan.  UDF IV's Capital Bank

11   loan paying UDF III's Veritex loan.  And UDF V, ultimately,

12   on December 9, paying UDF III's Legacy loan.

13           One of the instructions Judge O'Connor gave you is

14   direct and circumstantial evidence.  Read that.  It goes

15   back to sort of what I brought up on the front end on

16   Wednesday.  This is not television.  I like those shows, all

17   of them, but it's not.  And you're not to consider any

18   distinction between direct and circumstantial.  They're

19   treated the same.  And that's one of the instructions that

20   Judge O'Connor gave you.

21           So what do we have here?  Some of the evidence.

22   We have Blake Buffington's testimony that on September 3 and

23   then on October 17, there was a sales pitch given by that

24   man right there.  And in that sales pitch, that man said,

25   "The way to move forward" -- "the path forward is we'll take

1    y'all's loans in I and III and IV and we'll roll them into

2    V.  That's the path forward."

3            James Dorney's testimony, because he wasn't at the

4    second meeting, but he was at the first.  Matt Parker's

5    testimony, the spreadsheet notifying the SEC of what he'd

6    seen.  Casey Ford's testimony that, each time a distribution

7    was needed, there ended up being some backroom conversations

8    over there at Centurion.

9            Tyson Walters' testimony that each time they

10   needed a distribution an advance request was done.  And

11   then, again, I go back to, read the emails.  Please read

12   them.

13           Some of the arguments just hearing the

14   cross-examination in this case that I expect may be made or

15   some takeaways might be, well, the developers' loans were

16   ultimately paid off.

17           Judge O'Connor just read the jury instructions to

18   you and you will have a copy of them.  Nowhere in the law in

19   the United States of America or in the instructions that you

20   were given does it say that that is a defense when wire

21   fraud or securities fraud is committed.  Doesn't matter.

22           The banks got paid back eventually.  Nowhere in

23   the jury instructions does that say, oh, no harm, no foul.

24   The person's not guilty if the bank didn't lose a dollar.

25   Nowhere.

1          It was suggested it was a good deal for the

2  developers.  I'm not really sure how refinancing a loan from

3  V -- that was at IV is a good deal when the interest rate is

4  the same, but okay.  Sounded like a good deal for UDF III's

5  investors, though, for them to get their 9.75 distribution.

6  But even if it was a good deal for the developers, that is

7  not a defense.

8          It was a good working environment.  No doubt.  It

9  sounded like a lot of people really did and still do enjoy

10  working there.  But ladies and gentlemen, that is not

11  relevant.  That is not a defense.

12          Nowhere in the jury instructions does it say,

13  "Well, if everybody enjoys their job, it's not a crime."

14          I had an error here.  It's Government's

15  Exhibit 429.  That's that summary exhibit.  So when you get

16  the indictment, you can go through and -- you know, you can

17  write on the indictment if you want so you can figure out

18  which entity is which entity.

19          You'll see in the beginning of the indictment,

20  there's a lot of descriptive information about financial

21  institutions, bank account numbers, the organizational

22  charts of these different UDF entities.  You only heard a

23  couple of them named, but there's a lot of UDF entities

24  listed there, and you'll need that chart for that.

25          One thing I think's very telling is to do a

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

1  comparison of UDF III and IV versus UDF V.  In UDF III and

2  IV, there was no promise to avoid affiliate transactions in

3  the SEC filings, funds moved between III and IV, and every

4  one of them agreed that it was permissible.

5       V, there was a promise in the SEC disclosures that

6  they would not engage in the transactions, money moved from

7  V to IV and III, but the defendants now still argue the same

8  thing they were doing before is okay.

9       I go back, ladies and gentlemen, to something I

10  started with.  And that is, you must not be influenced by

11  bias, prejudice, or sympathy, and you can't consider the

12  sentence in this case, or punishment.

13       I ask you, ladies and gentlemen, to listen to the

14  closing arguments of defense counsel.  When they start

15  talking about, "Oh, somebody's such a nice person" or

16  anything that might tug at your heartstrings, go back to

17  page 2 of the jury instructions.  You can't do that.

18       It's not television.  Just -- in the United States

19  of America, just because somebody wants something really bad

20  or just because somebody has done something good in the past

21  in their life, just because something starts off as a good

22  idea, no doubt, it sounded like it was a great idea.

23       The defendants in this case, at a certain point,

24  that good idea started running out and they started having

25  to take money from investors in UDF IV so that they could

1    keep on paying UDF III.  And when that money started running

2    out, they started taking UDF V investors' money.

3              Ladies and gentlemen, this is a Ponzi-like scheme.

4    They were taking money from later investors so they could

5    pay distributions to earlier investors.  They can sugarcoat

6    it all they want, but that's what it is.

7              And I'm going to ask you to find them guilty of

8    all 10 counts.

9              MR. STEPHENS:  Your Honor, I have a few objections

10   that I would like to take up at sidebar.

11             THE COURT:  Okay.

12        (A sidebar was had.)

13             MR. PELLETIER:  Please the Court.

14             THE COURT:  Thank you, yes.

15             MR. PELLETIER:  Good morning, ladies and gentlemen

16   of the Jury.  It's been a long short two weeks, and I thank

17   you for your attention during this time.  I know they've

18   been long days, but this is, as you know, very important to

19   us.

20             So I started off my original opening statement by

21   telling you that the government got it wrong.  And I think

22   the evidence, I believe the evidence showed exactly that.

23   And I'm going to walk you through, not only how the

24   government got it wrong, why they knew they got it wrong.

25   I'm going to focus on the bank evidence, but I'm going to

 1    talk about the case -- the entire case.

 2           So I don't know -- so the first thing we know,

 3    ladies and gentlemen of the jury, it's a real business,

 4    building real communities, real jobs.  Operating

 5    continuously for 18 years, you know that.

 6           And most important, the notion that there was no

 7    money, that there was some reason to do this because there

 8    was no money, or as the prosecutor -- the prosecutor's words

 9    that they used were, there wasn't enough, or the real

10    reason -- or the real reason they did this, certainly wasn't

11    money, but we'll talk about that.

12           So if it's a real business and a real company,

13    what did the prosecutor just tell you?  What did she say in

14    opening statement?  "I expect the evidence is going to show

15    this is much like a Ponzi scheme."  Now, why?  Why are you

16    using the words "Ponzi scheme"?  Because they're

17    inflammatory, right?  Because it makes people go, "Oh, my

18    goodness, a Ponzi scheme"?

19           Well, the fact that they believe it's a Ponzi

20    scheme is why we're here today.  But we know it wasn't.  It

21    never was.  Why is that why we're here today?

22           You heard Agent Martinez -- or excuse me.

23    Mr. Martinez, who's an analyst with the FBI, he said, when

24    they asked for more resources, they told him it's a

25    multi-hundred million- -- he didn't know whether it was a

 1  billion or hundred million dollar Ponzi scheme, in danger of

 2  imminent collapse.  We need resources.  We have a billion

 3  dollar Ponzi scheme here.  That's not true.  And that

 4  predated the search warrant.

 5          And then they got a search warrant.  And what

 6  happened in 2016?  Nothing.  2017, nothing.  2018, nothing.

 7  This Ponzi scheme, this billion dollar Ponzi scheme is on

 8  the verge of collapsing.  2019, what did the government do?

 9  Nothing.  2020, five years, nothing.  And here we are today,

10  2021, and now we see what it is.  Let's talk about what it

11  is.

12          So first of all, if it were a Ponzi scheme, we

13  would expect to see a front company with no real value,

14  investor money syphoned off by executives, jilted investors,

15  lack of transparency, that quickly collapses upon discovery.

16          And, of course, none of that is present here.

17  What did the evidence show?  UDF funds fully deployed.

18  Any -- excuse me.  What you didn't hear.  Did you hear any

19  UDF employee -- I think I read that wrong.  Yes.  What you

20  didn't hear, any UDF employee providing testimony about a

21  criminal scheme.  It's not just that they're happy about

22  their jobs.  That's not what they said, "I love my job."

23  They said there's no criminal activity going on here.

24          Any credible witness offering evidence of a

25  criminal scheme?  Did any witness come up here, any one, and

1   say there was a criminal scheme?  Was there any evidence of

2   misappropriated money?  Zero.  Any attempt by the government

3   to understand the business economics?  Agent Martinez said

4   no.  Why?  It's inconvenient.

5           Any evidence that the banks were misled or

6   suffered any harm?  They paid their interest payments late.

7   Well, I'm not so sure that's true.  There's a grace period;

8   it's not late.  And they did it consistently.  Why?  Because

9   they're a running a business.

10          Any evidence that the investors were misled or

11  suffered harm?  No.  Any evidence that anyone at UDF

12  intentionally did anything improper?  No.

13          Any evidence to corroborate the prosecution's

14  hypotheticals?  No.

15          What you did hear, you did hear that UDF funds

16  were fully deployed, collateralized, generating significant

17  income.  We saw on this front page that I showed you,

18  one billion in invested capital, 1.8 billion in revenue, a

19  real business.  Transparent, properly disclosed.  Still

20  conducting business to this day.  Fully repaid all bank

21  loans.  All investors benefited.

22          UDF provided unfettered access to outside experts

23  after the search warrant.  And before, remember when SK

24  Research, "Well, we don't really understand these

25  transactions."

1           "What do you want us to do?"

2           "Would you hire someone?"

3           "Yes."

4           "Who?"

5           "Baker Tilly."

6           Bring them on.  Bring them on.  Ernst & Young,

7      come on in.  Thompson & Knight, you heard Mr. McCormick,

8      come on in.  Anything you want to look at, please do.

9           Forensic Risk Alliance, Ernst & Young, we

10     cooperated with the government investigation.  Anybody you

11     want to talk to, do.  Please do.  Ask any question you want.

12     Ask for any document.  You got them all.  You took every

13     single piece of paper out of their offices.

14          The executives, these people, volunteered to go,

15     "What do you need to know?"

16          "Talk to the government."  Did you hear anything

17     about anything they said that was false?  What criminals do

18     that?

19          Greenlaw volunteered -- Mr. Greenlaw volunteered

20     to appear before the grand jury.  Who does that?  Criminals?

21     No.  Not a single dime misappropriated.  You didn't hear

22     evidence about one dime that went into someone's pocket that

23     wasn't supposed to be there.  Not one.

24          They did the opposite, ladies and gentlemen, of

25     what criminals do.

 1              Now, the judge is going to instruct you and the
 2    judge is going to tell you that we start with a clean slate,
 3    all these defendants.  And he already has told you that.
 4    And the law does not require a defendant to prove his or her
 5    innocence or produce any evidence at all.
 6              The government, as you know, has the burden of
 7    proving each defendant guilty beyond a reasonable doubt.
 8    Not just a reasonable doubt, beyond a reasonable doubt.
 9              And if it fails to do so, you must acquit any
10    defendant whose guilt has not been proven beyond a
11    reasonable doubt.
12              In determining whether the defendant acted with
13    criminal intent, if you have reasonable doubt as to whether
14    the defendant had a good-faith belief that he -- what he or
15    she was doing was legal, you must acquit the defendant and
16    say so by a verdict of not guilty.
17              They had to have a good faith belief they what
18    they were doing was right.  That's what all the evidence
19    shows.  And when a prosecutor tells you that just because
20    someone's nice, it's not a defense.  Well, the judge is
21    going to tell you something that's a little bit different
22    than that.
23              You remember Mr. Greenlaw, we called Mr. Towey,
24    who said he's known this man for a long time and he has a
25    reputation for honesty, integrity.

1         The judge is going to tell you that that type of

2    evidence, evidence of a defendant's character which is

3    inconsistent of those traits of character ordinarily

4    involved in the commission of a crime charged may, in and of

5    itself, despite what the prosecutor told you, give rise to a

6    reasonable doubt.

7         The government must prove beyond a reasonable

8    doubt that the defendants had the specific intent that they

9    intended to do what the law forbid.  And the judge is going

10   to tell you, has told you, that the mere utilization of a

11   financial institution in the transfer of funds does not

12   affect a financial institution.

13        Now, let's just talk quickly about the financial

14   institutions.  All loans are paid back in full.  What the

15   prosecutor called a mad scramble at the end of the month

16   when the bill was due, a mad scramble.  I don't think the

17   evidence was that at all.

18        But anyone who has ever run a business, everyone

19   has always balanced a checkbook, it's to make sure that, at

20   the end of the month, that money is there.  It's not a

21   crime, okay, to make sure that -- we heard payroll.  Every

22   business in America pulls the money together the day before

23   payroll is due.  It's not a crime.  It's the way businesses

24   are run.  Maybe not the way the government's run, but it's

25   the way businesses are run.

1          And I'm going to go quickly through these.  You

2  saw Alice Anne Brown, paid in full.  Any negative impact on

3  the bank?  No.  Mad scramble?  Nonsense.

4          Veritex Bank, "Were you repaid on every loan?"

5          "We were totally repaid on every loan."

6          Capital Bank, "Performed as required on the loan?"

7          "Yes."

8          "Totally paid in full, Independent Bank?"

9          "That's right."

10          And how about the investors?  How about the

11  investors?  UDF performed as they expected.  You remember

12  those two government witnesses?

13          "Can you think of any restriction on what UDF III

14  can do with that money once it gets it?"

15          "I don't believe so."

16          "Mr. Haan, would it surprise you that they said

17  they will be making loans to common borrowers?"

18          "It wouldn't surprise me."

19          "So other than the prosecutors telling you the

20  money was simply going to UDF III investors from IV, has

21  anybody else told you that?"

22          "No."

23          Mr. Murphy, the broker/dealer, "Did you know that

24  UDF III, II, IV, and V had common borrowers amongst them?"

25          "Yes."

 1              Mr. Breault, "We read all the prospectuses, all of

 2    our due diligence, we knew this company.  We spent a lot of

 3    time" -- and by the way, just so you know, Mr. Murphy said

 4    it took him two years to understand this business.  Two

 5    years before he would recommend it to his investors.  He

 6    looked at everything.

 7              "And, Mr. Breault, did you buy stock?"

 8              "I did."

 9              "How much of this stock did you personally buy?"

10              "I personally hold three-quarters-of-a-million

11    dollars."

12              These investors knew what they were buying.  And

13    they were -- there's no way in which they suffered any harm

14    at all.

15              UDF was a real business.  We know that.  All of

16    these bankers, "Did you go there and look at the

17    properties?"

18              "Yes."

19              "Were they there?"

20              "Yes."

21              "Was it real collateral that you took for your

22    loans?"

23              "Yes."

24              Veritex Bank, "Real land, correct?  Real

25    developer?"

1          "Yes."

2          "Did you go look at the properties?"

3          "Yes."

4          Alice Anne Brown, "Did you stand terra firma on

5    these properties?"

6          "No, but I drove by them.  They were there."

7          And honesty and integrity, they all told us,

8    "These are people of good character and integrity, that's

9    why we did business with them."  Good character and

10   integrity.

11         That works.  So what's left?  What is left?  Mad

12   scramble.  Interest payments late.  The principal payment's

13   extended, mad scramble.  That's not a crime.  It never was a

14   crime.  Can't be a crime.

15         Here it is, ladies and gentlemen, here's what's

16   left.  Remember when Mr. Kahane for the government talks

17   about he wouldn't approve that?

18         The comment said, if anybody ever had told you

19   that the money from investors from V was going to be used to

20   pay distributions to III, would you have considered that to

21   be an affiliated-party transaction?

22         He said, "Yes.  Sure.  Would have been if it

23   happened that way."

24         And then I said, "Isn't it true that the only

25   person that ever told you that is this prosecutor or the

 1  prosecutors in the grand jury and here today?"

 2          "Yes."

 3          "Okay.  Who is that?"

 4          "Counsel for U.S. government."

 5          They're not witnesses.  There was not a single

 6  witness who said that, ladies and gentlemen, is indeed an

 7  affiliated transaction and that these people believed it to

 8  be.  That these people believed it to be.

 9          So even if you believe something of which there's

10  no evidence, the nonsense that it was an affiliated

11  transaction in somebody's opinion that's not a witness,

12  these people have to believe it -- not a scrap.  Not a --

13  not a piece of paper this big says these people, anyone

14  believed that, anyone.

15          So what did we have here besides that?  I want you

16  to remember the testimony of Jeff Breault.  "And what did

17  you do when you heard there was a search warrant?"

18          "In 35 years, this has never happened to me.

19  Someone that I knew and respected being raided like that.  I

20  got on a plane and I flew down there.  And I don't know why,

21  I just felt like I needed to be there."

22          And remember, he said he introduced himself to the

23  agents.  And then I said to him, "Have they ever, ever, ever

24  called you since then to talk you?  Why did you have such

25  confidence in this company?  Why did you have 7,000 of your

 1  investors" -- "why did you tell them that this is a good

 2  investment?"

 3              They didn't ever call him?  Why?  Why?  Because it

 4  is an inconvenient truth.

 5              Ladies and gentlemen, what the government told you

 6  is a false narrative.  It's a hypothetical.  They got it

 7  wrong.  And they realized they got it wrong 2015, 2016, or

 8  2017.

 9              Now, they brought in a lot of good email readers

10  here, right?  People who could read emails.  Now, remember

11  the testimony, there's millions of emails.  They must have

12  read about 25 or 30 of the millions, and they want you to

13  say, "Oh, mad scramble.  Oh, an email, this is how I read

14  it."  You heard the witnesses.  You heard the witnesses.

15              During those six years that they -- after they did

16  the search -- and you heard Mr. Greenlaw denied the capital

17  markets.  Now we have no access, bank accounts closed,

18  because of a search warrant and nothing else.

19              Six years they maintained the business, maintained

20  their employees.  And you heard those employees, nice

21  people?  Yes.  But that's not what we're saying.  They all

22  told you that these were people of great moral character,

23  high integrity.

24              Ladies and gentlemen, the government has got this

25  wrong.  They woefully, woefully failed to meet their burden

1    here, and they refuse to do the right thing.  After six

2    years they bring you in, and they say, "We traced the money

3    and it wasn't there on the day before."

4              And, oh, the prosecutor told you in closing

5    argument there wasn't enough money, but you saw there was in

6    other bank accounts.  Okay.

7              "Why, I don't know," she said.  Why -- oh, because

8    you don't know, you don't know, and these people are guilty?

9    Well, the answer is in the evidence.  Just-in-time

10   Financing, we don't put the money from Account A into the

11   operating account to pay the distributions until the day

12   it's due.  So it's like a payroll account.  That's not a

13   crime.

14             You know, when the government's wrong, they're

15   supposed to admit they're wrong.  Okay?  They're supposed to

16   admit they're wrong, not do this.  This is wrong.  This is

17   wrong.  These people have run a business legitimately and

18   now someone wants to Monday morning quarterback a

19   hypothetical about whether something is, in fact, an

20   affiliated transaction.  And not one witness has said it

21   was.

22             Enough.  Enough.  Ladies and gentlemen, we urge

23   you, there isn't sufficient evidence to prove any, any of

24   these defendants' guilt, not even close.  Reasonable doubt

25   is easy in this case.  And I urge you by your verdict of not

 1   guilty to let these people go back to their jobs.  Let them

 2   do what they've been doing their entire lives, that's living

 3   honorable, decent lives.  And the government knows it.

 4           Nothing further, your Honor.

 5           MS. GOODMAN:  Yes, your Honor.

 6           May it please the Court.

 7           THE COURT:  Yes.  Thank you.

 8           MS. GOODMAN:  Counsel, ladies and gentlemen of the

 9   jury, conspiracies happen in the dark.  And UDF and Brandon

10   Jester operated in the light.

11           Now, first I want to thank you for your time over

12   the past week.  I want to apologize, my co-counsel, Jeff

13   Ansley, can't be here due to COVID.

14           But the government has a fundamental

15   misunderstanding about what UDF -- how it operates and what

16   it does.  That has been the case for over the past six

17   years.  And unfortunately, that is why Brandon Jester is

18   here, a misunderstanding.  Whether willful or not, that's

19   why he's here.

20           Brandon Jester is involved in the operational side

21   of UDF.  This isn't an operational and development case.

22   It's a disclosure case.  And we heard that through the

23   government's challenges of the disclosures as it pertains to

24   auditors, investors, regulators.  That's the core of this

25   case.

1          But the evidence that we saw about Brandon Jester

2    was at the asset manager level on the operations, like the

3    people you heard from, Aaron Richards, Jeff Gilpatrick,

4    Casey Ford, the witnesses who worked beside him as an asset

5    manager.  And Brandon was an asset manager from 2008 to 2012

6    and then became the director of asset management.

7          So another reason, how do we know this is a

8    disclosure case?  Ryan Burkhardt, one of the government's

9    witnesses, when he said that other lenders that work with

10   Centurion do the exact same thing that UDF does with regards

11   to the same land release payments, he was asked one question

12   on redirect by the government:  "Mr. Burkhardt, do you play

13   a role in UDF's SEC filings?"

14         When it comes to the operational side of things

15   where Mr. Jester is, the government essentially ignores the

16   fundamental center of the transactions that we do with our

17   borrowers, the economic substance of what our loans do with

18   our borrowers.

19         There are facts in this case that the government

20   is asking you to assume in order to find Brandon Jester

21   guilty of a crime.

22         Assume that there's no collateral between this

23   fund and this fund, a transaction, assume there's no

24   collateral in the middle.  Assume that loans are created

25   solely for the purpose of making distributions.

1          Assume that UDF V made loans with UDF III.  Assume

2    that modeling projections have to be based on an executed

3    contract.  And assume that other lenders do not do what

4    we're doing.  The government never asked any other lenders

5    if they operated this way.  We did.

6          You heard First Continental and Trez operated this

7    way.  Ryan Burkhardt told you that.  We asked that, you

8    heard that.  That was the first time the government had

9    heard it, too.

10         And in opening last week, we told you about Ford

11   Motors.  We said that there's -- we said that it's basically

12   the business decision, the forecast to model, to think about

13   what you're doing in the future.  That you're budgeting for

14   future projects.  That you're making a plan.  And we learned

15   that UDF operated the same way, business forecasts and

16   business models.

17         Because if you don't make projections, you're not

18   going to have work to do next year.  And lenders and land

19   developers, they can't stay in business without having

20   future projects.  Of course not.  It makes business sense,

21   they are running a business.

22         I want to talk to you about Buffington, Blake

23   Buffington, specifically.  On direct examination he told you

24   that Buffington couldn't pay its loans.  Said in September,

25   I'm out.  Can't do it.  We have to stop everything.

 1          Well, on cross-examination with Mr. Ansley, he

 2   said that in 2020 he recalled having a conversation with

 3   Jeff Gilpatrick where he did indicate he was going to repay

 4   those loans.  And we saw the letter.  I think it was

 5   September 24, 2014, where on direct examination he said,

 6   "That letter, I said we couldn't pay."  Well, when you

 7   really dug into that letter, it's on overhead costs.

 8          And he actually said on cross-examination, there's

 9   nothing in this letter that talks about we can't repay.

10   That letter, if you really look at it, it talks about

11   projections and repaying in 2015.

12          He also said in cross-examination that he wanted

13   an orderly transition, an orderly wind-down of the business.

14   That is exactly opposite of "We can't pay.  We're out.

15   We've got to cease operations."

16          And a wind-down, an orderly wind-down takes years.

17   And it did in this case.  2016 is when the business

18   concluded with Buffington.

19          Also, we heard about advance requests with

20   Mr. Buffington.  Remember, September of '14, he said, I'm

21   out, but we saw advance requests in August, September,

22   October, and November of 2014 where Buffington swears that

23   it certifies that the financial status of the loan has not

24   changed since origination.

25          Again and again and again, they certify.  And that

 1    is what's in writing.  There's no, "We're out.  We can't

 2    pay" in writing.  He told you that letter that they sent,

 3    that didn't cover it.

 4              We also heard from another Buffington

 5    representative.  We heard from James Dorney.  He claims that

 6    Buffington was not getting paid overhead.  Well, we learned

 7    that wasn't true.

 8              We heard from another government witness,

 9    Stephanie Andreatta.  She told you that in September -- or

10    August of 2013 to September of 2014, UDF paid over

11    $1.2 million in overhead draws.  Sounds to me like UDF was

12    still paying.

13              And let's talk about the spreadsheet, the

14    Buffington spreadsheet, where we looked at 11 future

15    projects.  The business decision that UDF made to put future

16    projects in a spreadsheet.  And when you get back in the

17    jury room and you're looking at the indictment, you're going

18    to see those future projects are nowhere in that indictment.

19              There's 11 projects we talked about.  The

20    government brought you two witnesses.  We heard from

21    Mr. Bascha on the Friesenhahn property.  He told you, "I

22    wasn't really involved in the property.  It could have been

23    2013.  It could have been 2014.  It was in our 2014

24    spreadsheet, that is not inappropriate."

25              You heard from Harry Adams who said in February of

 1    '14, UDF submitted an LOI.  In May of '14, that company

 2    reurged to collect LOIs.  Jeff Gilpatrick resubmitted.  He

 3    said, "We stand on the LOI that we submitted."

 4              Mr. Adams said the property went under contract in

 5    June.  Well, Aaron Richards testified that, "If we're good

 6    at our jobs, we're still paying attention to the properties

 7    that are under contract because how the market is, things

 8    fall apart.  Sometimes things don't make it through the

 9    feasibility period and you want to go in and scoop the

10    project up.  We submitted two LOIs.  Clearly there were

11    conversations and there was interest.  We put it in our

12    spreadsheet."  Nothing wrong with that.

13              We also heard from a number of witnesses who said

14    it doesn't need to be an executed contract, it doesn't need

15    to be in an LOI, and it can go in our spreadsheet because it

16    is a forecast.

17              You also heard from Susan Powell.  She said she

18    conducted a trend analysis and it was compatible with the

19    future projects.  She also said that Whitley Penn asked for

20    UDF's cash flow analysis.  And that's what they got.  They

21    got the spreadsheet that UDF created, not our borrowers,

22    UDF.

23              We brought you Jeff Gilpatrick, the individual who

24    actually worked up that spreadsheet.  And if you remember,

25    he had 11 binders surrounding him of all the due diligence

1    that he had on the projects that were in that spreadsheet.

2    He told you why he added them and he had reasons for doing

3    so.

4            Then you heard from Brandon Jester himself who

5    told you modeling portfolios with future projects is

6    appropriate, it's common, and I trust my asset manager, Jeff

7    Gilpatrick.  I knew he had projects coming down.  I knew he

8    had due diligence.

9            That's what we did with our spreadsheet and

10   Buffington knew about it.  And how do we know that?  We

11   heard from numerous asset managers that were in constant

12   contact with our borrowers.  We've got weekly meetings.

13   We've got phone calls; they know about it.  And on top of

14   that, Jeff Gilpatrick told you he sent his changes to Matt

15   Parker in an email, and said, "Here are my updates."

16           Now, I want to talk to you about Government's

17   Exhibit 96.  Ms. Eggers mentioned it earlier this morning.

18   That's the Whitley Penn loan impairment review in March of

19   2014.

20           As if that document somehow impacts what our

21   future projects have to be based on and that is just wrong

22   for a few different reasons.  Number one, the loan

23   impairment review document, the final document is dated

24   March 4th -- I'm sorry.  March 6th.  We don't even receive

25   Matt Parker's spreadsheet until after that.  It has nothing

 1    to do with our spreadsheet.

 2              Second, if you look at the bottom of that first

 3    page of the exhibit, you're going to see that UDF

 4    describes -- how it describes how UDF values the loan

 5    portfolio.  It's based on the market.  It's based on home

 6    supplies.  It's based on current and historic market trends.

 7              But the government seized on the sentence that

 8    said, "Cash flow forecast also include executed purchase

 9    contracts for lots."  The government just simply misreads

10    it, and they essentially read in, exclusively under

11    contract.  And if you really take a look at that document,

12    you're going to see that that applies to lot sales, but the

13    government disregards that.

14              And we spent a lot of time in this case on draw

15    requests.  As if the government is pretending that those

16    draw requests exclusively had to come from our borrowers,

17    and that's not the case.

18              In opening, we showed you the contract that says

19    in our sole discretion we can do this.  Our contracts say

20    that.  Our borrowers sign that.  And then you heard Aaron

21    Richards say, "Sometimes we have these conversations in

22    meetings and then I'll follow up afterwards and send it to

23    the staff, get in touch with the accounting staff.  Our

24    contracts allow us to do this."

25              We also heard a lot about the Frisco 113 loan.

1    And that was the loan where Aaron Rogers -- the draw

2    request -- Richards sent to Centurion's accounting crew.

3    This is a land loan pay-down.  A new loan.

4            A fact that the government either does not or just

5    will not see, we brought you Aaron Richards the author of

6    the email that we repeatedly saw in this case.  And he told

7    you we do this because it's our job to push these projects

8    forward.  You cannot move the projects forward unless you

9    release the land.

10           And on those emails, you heard from Linda Visser

11   who told you -- "What does UDF do?"

12               "We provide more documentation than the other

13   lenders who do the same thing as us.  We have additional

14   paperwork to make sure that we do this process the right

15   way."

16           And then we've talked a lot about the project

17   level and the portfolio level draws.  To this day, the

18   government, I think, just still does not under this because

19   you heard the government ask witness after witness, "Why are

20   we seeing over a million dollar draw request coming from UDF

21   to the borrowers instead of Centurion sending it to us?"

22           As if these are invoices for plumbing or sewage.

23   Of course, they're coming from us.  They're refinancing and

24   land releases.  We are moving projects forward.  This is

25   what we do, and we're allowed to do it.

1              Brandon Jester operates on the operational side of
2    this business?  He is not involved in disclosures.  He is
3    not involved in SEC filings.  He is not involved with
4    auditors or investors.
5              And I want to talk about the jury instruction that
6    applies to these facts.  I want to talk about good faith?
7    The judge just instructed you, and you'll have the
8    instruction, but you'll see it says, "If you have a
9    reasonable doubt as to whether or not Mr. Jester had a good
10   faith belief that what he was doing was legal, you must
11   acquit him and say so by your verdict of not guilty."
12             So what evidence do we have of Mr. Jester's intent
13   or his good faith?  Well, we know in December of 2020, he
14   voluntarily went in to meet with the government.  We know
15   that he spoke to Tim McCormick who was doing an internal
16   investigation.  He said he spoke to everyone and he got all
17   the records that he needed.
18             Mr. Jester operated openly, transparently, and in
19   the light, not in the dark.
20             You also heard UDF employees say Mr. Jester has
21   never asked me to do anything that I thought was improper.
22             But instead, the government showed you two emails
23   from Mr. Jester.  We saw it countless times, so let's just
24   talk about them.  "We need to show it paying off."  That's
25   what the email says.  It's a loan renewal exercise, there's

1    nothing wrong with that.

2            Second email, "Put everything that is a

3    possibility in there."  This is modeling future projects.

4    And I still don't see what the problem is with that.  It's a

5    business decision and we had due diligence.

6            And you heard from Harry Adams, "We don't know

7    what we're doing in the next few years, but I know based on

8    my skill and my experience that I'm going to get some

9    projects done."

10            So those two emails, those are the cover-up emails

11    in this case?  That's it.

12            I submit to you those are operational asset

13    manager emails between two employees doing their jobs.  And

14    that is not sufficient to find beyond a reasonable doubt

15    that Brandon Jester had any intent to commit a crime.

16            Brandon Jester got on that stand, and he told you

17    what he meant in those emails.  And Jeff Gilpatrick got on

18    the stand and told you what he understood from those emails.

19            You know, that spreadsheet did not rise and fall

20    on the issue of flexibility when it comes to a single future

21    project.  Mr. Parker sent us a spreadsheet that included

22    future projects.

23            You know, and keep in mind, Jeff Gilpatrick, he

24    worked at Buffington and then he worked at UDF, he's still

25    at UDF.  He knew about those Buffington spreadsheets from

1    his time there, and it continued to his time at UDF.

2                There is not sufficient evidence in this case to

3    have any belief that Brandon Jester had any intent to commit

4    a crime.  And by "intent," I mean that the government failed

5    to show any intent for any of the counts.  Because when

6    there's no showing of an intent to defraud, you must find

7    that there's no intent across the board, across all counts.

8                And you heard the evidence of Mr. Jester's good

9    faith starting with the government's witnesses.  You heard

10   he assisted in good faith modeling of the Buffington loan

11   with other asset managers and with the knowledge of the

12   Buffington personnel, who, again, had future projects in

13   their spreadsheet, too.

14               You heard that he participated in draw requests

15   for new loans and paid down earlier loans to move projects

16   forward, which benefits our borrowers.

17               Brandon Jester is here because the government

18   disagrees with the internal business decisions being made at

19   UDF.  This is an attempt at criminalization of business and

20   commerce.

21               You know, and Judge O'Connor instructed you on

22   character, and I want to reiterate something that my

23   colleague said on character:  "Because evidence of a

24   defendant's character may give rise to reasonable doubt."

25               And the first time we heard about Brandon Jester's

 1    character was through the government's case.  We heard from

 2    Stephanie Andreatta who said that she's worked with

 3    Mr. Jester, she believes him to be honest.

 4              On redirect examination, the government got up and

 5    put one of those email in front of her and said, "Would an

 6    honest man do this?"  Her response was, "I still think he's

 7    a honest man."

 8              We also heard from Jeff Kesler, another government

 9    witness, who said, "Mr. Jester acts in a way that you'd

10    expect in this industry.  He's honest."

11              Aaron Richards, again, we saw that email over and

12    over and over.  And we brought him to you.  And he's worked

13    with Mr. Jester and he told you he's honest.  And he also

14    explained the Frisco 113 email.

15              You know, and there was some insinuation about

16    money being paid to Mr. Jester that was dirty for the work

17    that he did over a five-year period at UDF.  And by my math,

18    that was about $145,000 a year.  That's not inappropriate.

19    It's not motive.  There's nothing dirty about it.  He does a

20    job.

21              And I think it's important for you to remember

22    that the government ran the search in 2016.  You heard about

23    the massive amounts of emails.  You heard that Tim McCormick

24    came in and did an investigation on behalf of the

25    independent trustees.  And you heard that after he reported

 1   his conclusion, every single one of these defendants is

 2   still employed.

 3           You heard from former UDF employees, you heard

 4   from current UDF employees, and you heard from Mr. Jester

 5   himself.

 6           I don't think the government has come close to

 7   proving beyond a reasonable doubt when it pertains to

 8   Mr. Jester.

 9           And at the end of this case, I am asking you to

10   return a verdict of not guilty to all counts on behalf of

11   Mr. Jester.  And I believe that is the only appropriate

12   verdict in this case.

13           Thank you.

14           MR. STEPHENS:  Would you like to take our morning

15   recess?

16           THE COURT:  No.

17           MR. STEPHENS:  Very well.  Your Honor, may it

18   please the Court.

19           THE COURT:  Yes, sir.

20           MR. STEPHENS:  Good morning, ladies and gentlemen.

21   It's good to see you again.  I hope everyone is having a

22   good morning so far.

23           As you know, my name is Neal Stephens, and I

24   represent Ms. Obert.

25           What I want to do is take you back a little bit to

1    where my opening statement was.  What I'm going to lay out

2    for you are a few things.  I'm going to describe the law at

3    the start.  And my colleagues have already touched on it a

4    little bit.  I'm going to go into a little bit more depth.

5            And then what I'm going to do is I'm going to go

6    back to where I was on my opening statement where I talk

7    about the rules of the road for UDF V, UDF III, and UDF IV,

8    so you basically have a toolbox by which you can marshal the

9    evidence against the charges in the case.

10           And then what I want to do is what I want to talk

11   about the government's investigation and confirmation bias

12   in the way that they conducted their investigation.  And I'm

13   going to be talking to you about Mr. Martinez and the way

14   that he analyzed the evidence.

15           And then what I want to do is I want to contrast

16   that against a legitimate investigation, one in which you

17   consider all aspect of the transaction and all of the

18   underlying documents so you can get an accurate snapshot of

19   what happened in those transactions to fully analyze what

20   the intent of these individuals was.

21           And what you're going to see is that they operated

22   in good faith.  And what the jury instructions are going to

23   tell you is if they operated in good faith, there is no case

24   here.

25           Then what I would like to do is walk through what

 1   I have as smoke and mirrors.  And we'll get there when we

 2   get there.

 3            Finally, what I would like to do is wrap up by

 4   summarizing the evidence related to my client, Ms. Obert.

 5   Okay?

 6            So let's start.  And let me start with the law.

 7   There's a presumption of innocence.  You've heard this both

 8   as you were getting impaneled and you heard it again this

 9   morning.  And it's important.

10            All of the defendants, it's a clean slate.  They

11   are all presumed by the law to be innocent.  They sit before

12   you innocent until you marshal the evidence against them.

13   That's what we're going to do here this morning.

14            The burden of proof.  Mr. Lewis will speak in

15   detail about this.  But for our purposes right now, the

16   government has the burden.  They have the burden throughout.

17   We have no burden.  But what I'm going to try and do this

18   morning is demonstrate the evidence that we brought forward

19   and how that demonstrates that they cannot meet their

20   burden.  If they fail to, you must acquit.  That's the law.

21   It's the United States of America, that's the Constitution.

22            Good faith.  I've already mentioned it.  This is

23   an important instruction.  It's going to appear at page 13

24   of the jury instructions.  You'll have a copy of the jury

25   instructions when you're back there.  Please read this

 1    instruction.

 2           It will tell you, "In determining whether or not

 3    the defendant acted with criminal intent, you may consider

 4    whether or not the defendant had a good-faith belief that

 5    what he or she was doing was legal."

 6           If you have reasonable doubt as to whether the

 7    defendant had a good faith belief, you must acquit.  You

 8    must find the defendant not guilty.  That's good faith.  I

 9    will demonstrate to you here today that the evidence shows

10    that all of these individuals acted in good faith.

11           Good character.  In her closing remarks, my

12    colleague from the government talked about, well, you know,

13    they're good people.  It doesn't mean this.  It doesn't mean

14    that.

15           There's going to be an instruction in the

16    instructions, it should appear, I think, at about page 5.

17    And what it says is, "Where a defendant has offered evidence

18    of good general reputation from opinion testimony concerning

19    truth, veracity, honesty, integrity, character, you should

20    consider such evidence."  That is on the table here today.

21           We heard it throughout the trial as to all four of

22    the individuals from all of the government's witness.

23           "Evidence of a defendant's character may give

24    right to a reasonable doubt since you may think it

25    improbable that a person of good character with respect to

 1  those traits would commit such a crime."

 2          That is on the table for you to consider.

 3          Willfully.  Now, what I want to do is walk you

 4  through some of the intent-driven instructions so you

 5  understand what the state of mind has to be for the

 6  government to prove their case.

 7          Willfully.  What that means is, the individual

 8  executives must have a specific intent to do something the

 9  law forbids; that is, they have to act with bad purpose

10  either to disobey or to disregard the law intentionally.

11          Willfully requires proof the defendants acted with

12  knowledge that his or her conduct violated the law.  And

13  just think about that against the emails and the other

14  evidence that you've seen in this case.  There's no evidence

15  of that.  They can't get to this standard.

16          Specific intent to defraud.  The government is

17  obligated to prove beyond a reasonable doubt a conscious,

18  knowing intent to deceive or cheat someone.  We're going to

19  talk more about this.  You heard the evidence from the

20  witnesses on the stand.  Can anyone identify a single

21  witness who said that Ms. Obert had a conscious knowing

22  intent to cheat or deceive anyone?  Mr. Greenlaw?  No.

23  Mr. Wissink?  No.  Mr. Jester?  No.

24          Falsity.  A representation -- this is a page 12,

25  19 through 20.  A representation is false if it's known to

1    be untrue provided it's made with the intent to defraud.

2           The thing about falsity, when you consider what's

3    at issue here, there is no law, they're charged with

4    securities fraud and wire fraud.  There is not a law in the

5    United States that says a company cannot do related-party

6    transactions.  There is not a single law in the country that

7    says a company cannot do affiliate transactions.

8           You heard from Mr. Kitchens, he that companies all

9    across America do those on a daily basis.  We're going to

10   get to the rules of road, but please understand, there is

11   not a single law that says a company cannot do an affiliate

12   transaction.  There is not a single law that says a company

13   cannot do a related-party transaction.

14          All right.  I'm also going to point you to some

15   testimony, which we'll get to, from two of the auditors in

16   this case, government witnesses, who said, "Reasonable

17   auditors acting in good faith considering the same

18   transaction could arrive at a different conclusion as to

19   whether something constituted a related-party transaction or

20   an affiliate transaction."

21          Both operating in good faith could reach a

22   different conclusion.  You cannot get to beyond a reasonable

23   doubt given that that's the testimony from two government

24   witnesses who analyzed this type of evidence.

25          Conspiracy to commit wire fraud.  These are the

1    actual charges now.  So to commit wire fraud, there has to

2    be an agreement to commit a crime, the crime of wire fraud

3    where the defendant would know the unlawful purpose and act

4    willfully with the intent to further the unlawful purpose.

5    There's that term "willfully" again.

6            Wire fraud affecting a financial institution.

7    "Did the defendant knowingly devised or intend to devise a

8    scheme to defraud the investing public, shareholders of

9    UDF III, IV, and V."

10           What's completely lacking in this case is any

11   evidence that any of these individuals were trying to harm

12   their investors.  And I will prove that to you as we walk

13   through the evidence that we have before you.

14           The defendant had to act with specific intent to

15   defraud and that scheme to defraud affected a financial

16   institution, which Mr. Pelletier has already summarized for

17   you.

18           Conspiracy to commit securities fraud.  "That the

19   defendant, and at least one other person, agree to commit a

20   crime of securities fraud."

21           There has to be an agreement to break the law.

22   That they knew the unlawful purpose.  And again, that they

23   had to reach that high standard of willful.

24           Securities fraud.  These are the substantive

25   accounts.  This is Counts III through X.  "The defendants

 1   knowingly attempted to execute a scheme or artifice to

 2   defraud with the intent to defraud."

 3          Again, we're back to intent.  And that -- when

 4   you're considering intent, you have to consider good faith,

 5   which is where we started.

 6          Securities fraud.  "Defense knowingly executed a

 7   scheme or artifice to obtain money or property by means of

 8   false or fraudulent pretenses."  Again, intent to defraud.

 9          All right.  And affiliate, we talked a little bit

10   about this, and we'll get to it on the rules of the road

11   because we will talk about UDF III and UDF IV and UDF V

12   being affiliates.  We acknowledge that.

13          What's different is when the government is trying

14   to extend the term, affiliated or related party, to someone

15   outside of that.  Centurion, for example.  That is not the

16   evidence in this case.  So when you talk about control, it's

17   the power to direct or cause the direction of the management

18   policies of a person.

19          UDF was not directing the management.  They were

20   not running Centurion.  That is not the evidence.  And I'll

21   show you some testimony from Mr. Kitchens on that very

22   point.

23          Okay.  So that's the law.  Now, let me get to

24   Chapter 2 which is the rules of the road.  And we did this

25   in opening.  And again, what I think is critical in this

 1   case is to understand the similarities and differences

 2   between UDF III, IV, and V, and how in these transactions

 3   everyone is benefiting and that's okay.

 4            UDF V, we started on this in my opening a few days

 5   ago, right?  And the attorney gave you a framework to

 6   evaluate the evidence in the case.  So for each action that

 7   you are considering, identify the correct fund.  Are we

 8   talking about UDF III, are we talking about UDF IV, or are

 9   we talking about UDF V?  And then apply the correct rules of

10   the road for that fund.

11            And what I told you in opening statement was if

12   you did that, marshaling the evidence, the answer is going

13   to be, yes, that UDF complied with its policies.  And I'm

14   going to demonstrate that to you here this morning.

15            All right.  This is another slide that I used in

16   my opening statement.  This comes from their disclosures.

17   And this is what UDF V said it would not do, and we don't

18   contest that.  So here's what UDF V said it would not do,

19   and did not do so.

20            It will not make loans to or participate in real

21   estate investments or provide credit enhancements with our

22   affiliates.  UDF will not sell any loan to, acquire any loan

23   from, participate in any loan with UDF affiliates.  This is

24   UDF V.  The UDF V will not sell any asset to, acquire any

25   asset from, participate in any asset with the UDF funds.

 1   And they did not do so.

 2              Okay.  How do we know that?  Well, let's look at

 3   some of the testimony.  Dale Kitchens, who reviewed all of

 4   these transactions and recalled he actually went through and

 5   looked at all the documents, underlying the loan files to

 6   figure out how the transactions were actually structured.

 7              His testimony is that, did UDF V do any of these

 8   things?  No, they did not.  Did UDF V -- that's the first

 9   one I have.  Did UDF V do any of that, selling any assets,

10   acquiring assets from, participating in any assets, did they

11   do any of those things?  No, they did not.  That's the

12   testimony.

13              Ms. Obert herself took the stand and subjected

14   herself to cross-examination, and the testimony from the

15   stand from Ms. Obert is consistent with Mr. Kitchens.

16              "Ms. Obert, did UDF V ever originate loans,

17   participate in loans, provide credit enhancements to any

18   affiliate at UDF V?"

19              "No, they did not."

20              "Did UDF V say that they would sell any loan to,

21   acquire any loan from, participate in any loan with any

22   other UDF funds?  Are you familiar with that?"

23              They say no.

24              "Did UDF V ever do any of those things?"

25              "No, they did not."

1          That is the testimony in this case.  UDF V did not

2     do -- wait.  UDF V did what it said it -- I'm going to say

3     this wrong.  Let me stop and get it right.  What UDF V said

4     it did not do, UDF V never did.  All right?

5          So related-party transaction, and I had touched on

6     this earlier.  The two auditors from the government got on

7     the stand and acknowledged that this is an area of judgment.

8     This is an area where reasonable people, objective people,

9     acting in good faith could look at the same transaction and

10    reach a different conclusion.

11         The only conclusions we have in this case is that

12    they're not affiliate transactions.  They are not

13    related-party transactions.  But even if there was testimony

14    going both ways, you could still have all of the executives

15    acting in good faith.  Why?  Because it's an area of

16    judgment.  They cannot get there on the evidence because of

17    this.

18         Here's Mr. Downey.  What Mr. Downey says.  "Our

19    auditors might have a different view as to what qualifies as

20    an undisclosed related-party transactions that needs to be

21    disclosed?"  Yes.

22         When we get back to where we were with Mr. Lawlis.

23    Mr. Lawlis was the audit partner at Whitley Penn.  What that

24    means is that a reasonable accountant, both acting in good

25    faith, could reach a conclusion that is different regarding

1    whether a particular transaction is a related-party

2    transaction.

3              Yes, I believe so.  Right?  So it's Mr. Downey.

4              No government witness said we did this.  No

5    government witness actually looked at the transactions and

6    said that UDF V did something that UDF V said it would not

7    do.  That evidence does not exist before you.  There can be

8    any guilt on any count related to UDF V based on that

9    evidence.  Okay?

10             What can UDF V do?  UDF V can do loans with common

11   borrowers.  That's okay.  And remember, we put up those

12   disclosures that talked about common borrowers.  That's

13   UDF V.  All of these funds can do transactions with common

14   borrowers.

15             Michael Bodwell, who was the audit partner on both

16   UDF III, UDF IV, and UDF V.  I asked him the question:

17   "It's okay for UDF V to originate loans to a common borrower

18   of UDF III and UDF IV; is that fair?"

19             "Yes, I believe so."

20             So that's the auditor.

21             Here's the due diligence analyst, Kevin Eades.

22   For example, the company's first investment -- this is

23   UDF V -- was a $10.7 million loan to Frisco 113 to refinance

24   the borrower's land acquisition.  Frisco 113 is a Centurion

25   special project, and it's a borrower's land acquisition of

1    81 acres of residential land in Collin County.

2          Management indicates that CTMG is not affiliated

3    with the -- Centurion SP is an affiliate of Centurion.

4          "Question:  It's not an affiliated transaction,

5    correct?"

6          "Correct."

7          So the auditors are telling you that these are not

8    affiliated transactions of UDF V.  The due diligence analyst

9    is telling you they are not affiliated transactions.

10         And then from the investor side, the

11   broker/dealer, Rick Murphy, says the same thing.

12         "Did you know that UDF II, III, IV, and V had

13   common borrowers amongst them?"

14         "Yes.  It was disclosed."  People knew it.  These

15   are not affiliated transactions.  These are loans with

16   common borrowers.

17         Let's transition away from UDF V and talk about

18   UDF III and UDF IV and what UDF III and UDF IV can do.  I

19   had this slide up in my opening to prepare you that we were

20   going to show evidence that UDF III loans can be refinanced

21   involving a common borrower.  And that UDF IV could do that.

22   It was anticipated.  It was expected.  It's okay.

23         Susan Powell, the audit partner at Whitley Penn.

24   I asked her:  "Ms. Obert told you that the money transfers

25   could be made from UDF IV to UDF III to pay off a higher

```
 1   interest rate loan if it's for the benefit of a common

 2   borrower; correct?"

 3                "Yes.  Correct."

 4                "Ms. Obert told you and you understood it was

 5   allowable under the loan documents between a common borrower

 6   in UDF IV and UDF III to do this type of transaction,

 7   correct?"

 8                "Yes."

 9                The outside auditors knew the business practice.

10   They knew how these transactions were structured.

11                Tom Carroci, government expert, came in and

12   admitted the same thing.  Government expert.

13                "This UDF IV disclosure that's there will be a

14   refinancing of loans and investments by and between the

15   United Development Funding programs?"

16                "Yes."

17                It was disclosed and everyone knew it, and even

18   the government's experts who looked at it after the fact

19   came in and agreed with our position.

20                Confirmation bias.  All right.  We talked about

21   Mr. Martinez.

22                "It's fair to say that you did not analyze whether

23   the UDF V investors received any benefit from those other

24   UDF V loans in conducting your analysis?"

25                "That's correct."
```

 1              "It's fair to say that your cash-tracing

 2    methodology was the same on the UDF IV transactions that

 3    involved a common borrower with UDF III as the UDF V

 4    transaction that involved a common borrower?"

 5              "I believe that's so, yes."

 6              My point with Mr. Martinez, they picked a

 7    conclusion and then designed their work to drive that

 8    conclusion.  And that is an inappropriate way to run an

 9    investigation.  That's just confirming your bias, but it's

10    not providing the men and women of the jury with the

11    analytical evidence that you need to martial the evidence to

12    reach an accurate result.

13              Same thing, "I did not consider economic benefits.

14    I did not consider economic benefits.  I only considered the

15    movement of money."

16              Now, what does he do with the bank accounts?

17    Mr. Pelletier talked about the payroll bank account.  This

18    is relevant.  What they were saying was that there's

19    insufficient money in an account.

20              "Well, did you look at all the cash available in

21    all the accounts?"

22              "No.  I just looked at this account."

23              "Well, had you looked at all the accounts, would

24    the result have been different?"

25              Yes, it would have been different, because in this

 1   example that we used with him, they were $11 million over

 2   what he said the shortfall was.  It's confirmation bias.

 3            Here's another mistake that he made.  Remember,

 4   the scheme is that all the money is flowing to the UDF III

 5   investors, and it's the UDF IV and V investors who were at

 6   risk.

 7            But if he actually looked underneath his

 8   documents, what would he have seen?  He would have seen

 9   money moving back in other transactions to the UDF IV and

10   the UDF V investors.  That is not a scheme to defraud.

11   That's the business as it's operating.

12            Third mistake, and this is of many, and I'm just

13   trying to summarize it in the time I have with you.

14            There are 18 transactions in Mr. Martinez's

15   53 transactions that have documentation in them

16   demonstrating that clear -- and evidence of anyone who's

17   going to read them that there is going to be money paid off

18   those transaction to distributions to UDF III investors.

19            It's open and transparent.  It's right there for

20   the auditors.  If you're running a scheme to defraud, you

21   don't run to your auditors with the evidence of fraud.

22   They're going to the auditors with the evidence of this is

23   how we run our business.  And I've already shown you from

24   the testimony, the auditors understood their business and

25   didn't have an issue with it.

```
 1              So I asked Mr. Kitchen: "What does that chart

 2    mean?"

 3              It represents that the 80 transactions over the

 4    60-month period were selected for testing.  It shows that

 5    the transparency of the company in giving access to these

 6    that were supposedly problematic transactions to the

 7    auditors.  Open and transparent.

 8              Mr. Ferguson said the same thing.

 9              "The fact that these documents exist in the

10    journal entries demonstrates what to you about

11    transparency?"

12              "The company was transparent in their accounting

13    practices."

14              Mr. Martinez.  Let's talk about his cash-tracing

15    model.

16              "Mr. Martinez, has that cash-tracing model ever

17    been qualified by any federal court to provide expert

18    testimony on your theory?"

19              "No.  Never."

20              What do the other experts say?

21              "Mr. Kitchen, in your 40 years of experience as a

22    financial fraud investigator focused on real estate

23    transactions, have you ever seen a fraud investigation based

24    exclusively only on a cash-tracing theory?"

25              Answer:  "I have never seen a fraud investigation
```

 1   based just on that."  Forty years.

 2   "Mr. Ferguson, in your 20 years of conducting fraud

 3   investigations, have you ever seen a financial fraud

 4   investigation based strictly and exclusively on simply cash

 5   tracing?"

 6            "No."

 7            It's confirmation bias.  That's not enough.

 8            Legitimate investigation.  What Mr. Ferguson, and

 9   particularly Mr. Kitchens did, is they went and read all the

10   documents.  Right?  They looked underneath these

11   transactions.

12            And I would direct you to Shahan Prairie.  Let me

13   give you the exhibit numbers.  And I know you don't have

14   notebooks, so bear with me.  Defendants' Exhibits 3905 to

15   3924.  It's the start of the 3900 series.  Most of our

16   exhibits are in the 3000 to 4000 series.  Please review

17   those.

18            These are the documents that you are going to see,

19   and they're going to show -- this is on the UDF IV example.

20   What you're going to see is what we covered before.  And I'm

21   not going to go through this at length; Mr. Kitchens did.

22            There are benefits flowing to UDF III and

23   IV investors, and then there's the subsequent loan.  When

24   the project's in the next phase, the bulk of that loan is

25   going to come to the common borrower.  And he's going to

 1   build to get to where they've got finished lots to sell.

 2           But a portion of that loan proceeds has to go pay

 3   off the original UDF III loans.  It's business.  Banks do it

 4   all the time.

 5           Same thing with the UDF IV and III loans.  There

 6   are benefits flowing in all directions.  Everyone is

 7   benefiting here.  That's good business.  Good faith.

 8           Here's Mr. Martinez's analysis by contrast.  He's

 9   just looking in one direction to confirm the bias that he

10   arrived at his investigation with.  That's not objective,

11   and it doesn't provide you the information you need to reach

12   an accurate result in this case.

13           Smoke and mirrors.  I'll go through this quickly.

14   The cash tracing, we've already covered.

15           Hypotheticals, Mr. Pelletier covered.

16           Solely to pay distributions, completely ignores

17   the common borrower.  And we demonstrated that to you on the

18   two charts I just had up, right?

19           UDF controls Centurion.  No, they do not.

20   Mr. Kitchens is clear as a bell, and this is the evidence in

21   the case.  That also goes to the definition of control.

22   This is the prosecutor asking the questions.

23           With respect -- the answer:  "With respect to the

24   loan but not with respect to the entity and the man,

25   Mr. Moayedi, there's no way that you can describe it as

1    control of the borrower or an affiliated transaction just

2    because there's that provision in the lending contract."

3              He's talking about the discretionary advance

4    language in that contract.  And the testimony from that

5    stand from an expert with 40 years in the field doing

6    affiliated transactions and reviewing related-party

7    transactions, there is no way that that provision in that

8    contract constitutes control such that it would be an

9    affiliated transaction.  No way.

10             Cash from operations.  And the relevant point

11   here, cash from operations is measured over a period of time

12   and you don't have a conclusion until the end of that

13   period.  So if the end of that period is measured to

14   December 31, you don't know what the cash from operation is

15   until you get right to December 31.

16             What the government is suggesting is that on

17   December 22, they're going to take a snapshot in time and

18   say you had $7 in your checking account, therefore, you do

19   not have cash from operations to cut that $100 check.  That

20   is not the way it works in accounting.

21             How do we know that?

22             Mr. Kitchen again, "In your 40 years of conducting

23   fraud investigations, have you ever seen a regulator suggest

24   that cash from operations should be measured at a specific

25   point in time in the middle of the time period under review,

1    just like the example I gave you?"

2        "No, I have never encountered that.  Not a single

3    time.  That is not the way you interpret cash from."

4        All right.  I'll wrap up here quickly with a

5    little bit of review of the evidence about Ms. Obert.

6        What did we hear?  Audit partner, Michael Bodwell,

7    worked with her for 13 years.  Smart, responsive,

8    professional, honest, respectful.

9        And not just Ms. Obert, her entire team.  It's the

10   way they run their business, all of them.

11       Jeff Lawlis.  Smart, responsive, polite,

12   respectful.  "If I asked her questions, she gave us

13   responses.  If she didn't have the information, she sent it

14   to someone on her team, members of her team brought us back

15   the information we needed."

16       Susan Powell.  Audit partner, UDF III.  These are

17   three audit partners that covered the three funds.  Smart,

18   responsive, friendly, respectful, polite.

19       Stephanie Braislin, also Whitley Penn, responsive,

20   her team, responsive.

21       Cheryl Cox, who works for Ms. Obert and has for

22   years and years, supportive, mentored her, helped her go to

23   school at night so she could get her agree and become a CPA.

24       Adrianna Tidwell also worked for her.  Good

25   mentor, absolutely.  Loved working for her.  That's

1    Ms. Obert.

2            What did the government put on the stand?  How

3    many witnesses took the stand and said anything negative

4    about Ms. Obert?  Think about it right now.  Think about it.

5    How many?  Zero.  Not a single witness.

6            It's for those reasons, ladies and gentlemen, that

7    we are asking that you return a verdict of not guilty on all

8    counts as to all defendants.

9            Thank you very much for your time.

10           THE COURT:  Thank you.

11           Mr. Lewis.

12           MR. LEWIS:  May it please the Court.

13           THE COURT:  Thank you, sir.

14           MR. LEWIS:  The last, but hopefully not least.

15           Thank you very much for your time.  I've watched

16   you and you've been on time, you've been listening very

17   carefully, and we appreciate it.  We truly do.  It's a very,

18   very important day for all four -- all four of these people.

19   This matters to them a lot.  And we appreciate you guys

20   studying the case and arriving at a fair and just verdict.

21           I am going to talk to you a little bit about what

22   the law is and the Constitution.  It's a great thing, the

23   Constitution.  It applies and protects all of us.  And I'm

24   going to spend some time talking to you about that.

25           But I do want to sort of start where I left off in

1    my opening, because, Jurors, I do think that the evidence

2    has shown that UDF was honest, they were open, they were

3    transparent, and they told the truth.

4              They got it right.  They got their disclosures

5    right.  They got their accounting right.

6              And I would suggest to you, Jurors, that there has

7    been no credible evidence, no credible evidence that any of

8    these four people acted with the specific intent to violate

9    the law.  Specific intent.

10             Think about what evidence would I want to see to

11   demonstrate that a person was acting with the specific

12   intent to cheat, lie, and steal, to violate the law as it

13   relates to securities, wire fraud, and the subsequent

14   counts.

15             I would suggest to you that there is no evidence.

16   And I do want to talk to you about what the presumptions are

17   and what the law is.  Very, very important.

18             I love actually hearing the judge speak about it

19   both during the voir dire process, when you were being

20   selected, and when he was reading the instruction that

21   you'll have a copy of.

22             And it's interesting because when he read the --

23   when he described the law to you when you first came in,

24   it's almost -- and I'm going to show you -- it's almost word

25   for word as to what he read to you just a few moment ago,

1    which tells you how important it is to the Court, who is the

2    judge of the law, and how important it is and I hope will be

3    to the Jury, who's the judge of the facts.

4            As the Judge indicated, as they sit here, they're

5    presumed innocent.  Again, that protects all of us.  They

6    are presumed by the law to be innocent.  They start with a

7    clean slate until, and only if -- that changes only if the

8    government proves -- meets its burden, proves beyond a

9    reasonable doubt.

10           Judge O'Connor told you the exact same thing --

11   again, without having the instructions before him, but told

12   you the exact same thing when you were being selected, "They

13   begin this trial with a clean slate, they are presumed

14   innocent."

15           Burden of proof.  Boy, is this important.  It's

16   what our country was founded on.  Again, it applies and

17   protects all of us.

18           The government has the burden of proving each

19   defendant as to each count guilty beyond a reasonable doubt.

20   And if it fails to, if you have, Jurors, a reasonable

21   doubt -- and I'll talk some more about this -- then the law

22   that applies to all of us says you must acquit.

23           He said the same thing, Judge O'Connor said the

24   same thing when we were picking the jury, again, without

25   reading it because he knows it.  It's not enough for you to

1  say that a person is likely guilty.  Maybe there's something

2  going on, but I can't quite put my finger on it.  It's not

3  enough for you to say that a person is likely guilt,

4  probably guilty, the proof must be made beyond a reasonable

5  doubt.

6          The judge also said when you were being selected

7  and sworn in, the burden is on the government to prove the

8  defendant guilty and they must do so beyond a reasonable

9  doubt.  The burden is solely on the government.

10         Jurors, as the Judge has said, the defense doesn't

11 have to do anything.  We could have actually -- consistent

12 with our Constitution, with our laws, we could have sat

13 there and done nothing, asked no questions, called no

14 witnesses, no cross-examination, nothing.  And that's what

15 our constitution allows.

16         Of course, we didn't.  We didn't.  We put on

17 substantial evidence.  The cross-examination, I would

18 suggest to you -- we'll go through it in a minute.  The

19 cross-examination was so enlighting.

20         But to hear one side of the story without the

21 cross-examination, oh, my goodness, how misleading.  And

22 I'll show you that in just a moment.  How misleading.

23         Reasonable doubt.  So let's talk about what is

24 reasonable doubt.  This is the heart -- this is the heart of

25 the instructions in the case regarding your deliberations

 1    and your consideration.

 2            A reasonable doubt is a doubt based on reason and

 3    common sense after careful consideration of all the evidence

 4    in the case.  And this, I would suggest, Jurors, is very,

 5    very important.

 6            Proof beyond a reasonable doubt, therefore, is

 7    proof of such a convincing character that you would be

 8    willing to rely upon it and act upon it without hesitation,

 9    without hesitation, without hesitation in making the most

10    important decision of your own affairs.  Wow.  So the most

11    important decisions of your own affairs.

12            First home purchase.  Did you think twice, three

13    times, four times about that?  Marriage, starting a family.

14    That's decisions that fall into that category and the way

15    you have to approach and treat this case.  I urge you to

16    look at that and think about that, Jurors.

17            Burden of proof.  The Judge has told you that it's

18    a strict burden.  It's not impossible, but it's a strict

19    burden.  The instructions say it's a heavy burden, as well

20    it should be.  And I think they would agree that the

21    government, to do what they're doing, it requires a strict

22    or heavy burden.

23            What that means, Jurors, that if there is one

24    reasonable scenario as you talk among yourselves and there's

25    one reasonable scenario that you could think of where UDF's

1    transactions are real, the business was real, they were

2    operating in good faith, that is not guilty.

3             If you're back there, Jurors, as you're

4    deliberating and you're thinking to yourself, well, maybe,

5    it's possible, that is not guilty based on our law.

6             It is the highest burden of proof in the law.  It

7    is not a civil case.  It is the highest burden of proof we

8    have.  Is it possible that reasonable people would differ,

9    it is not guilty.

10            Let's talk about reasonable doubt.  Reasonable

11   doubt.  And the Judge has given you instructions on

12   witnesses and how to weigh and evaluate their testimony.

13            Do you remember Casey Ford?  He came in and

14   testified.  He was the accountant from Centurion for three

15   years.

16            And this is really one of the reasons I love

17   practicing law.  During cross-examination, you listen to --

18   he was a government witness.  You listen to him and you

19   heard one side of the story and you think, Okay.  I've got

20   his testimony.  I'm going to evaluate him.  I've looked at

21   him.  I make a judgment like we do every day whether

22   somebody is telling the truth or not.

23            And then on cross-examination, we ask him, because

24   I knew that Tyson Walter, the ex-football player was coming

25   next, and I also know that the Judge imposes a rule which

1    says that witnesses can't talk to each other.

2            So on cross, "Mr. Ford, did you help Mr. Walter

3    with a $25,000 loan from Centurion?"  And all of a sudden

4    you could see the change in the way he was looking and the

5    change in the way he was reacting to that.

6            He reacted, Jurors.  He knew exactly where I was

7    going.  He thought for a minute, and he says, "I don't

8    recall doing that."

9            Do you remember?

10           And then I said, "Are you saying it didn't happen

11   or you just don't remember?"  And I didn't get a straight

12   answer, Jurors.  But the -- clearly, the import of his

13   testimony was I didn't get a $25,000 loan from Centurion.

14           Next witness.  Again, if you just listen to the

15   direct, with no cross-examination, it's all one-sided.

16   Cross-examination is a wonderful thing.  It really is sort

17   of the crucible of truth.  And it's hard to do.

18           You saw part of the cross-examination where

19   Ms. Eggers went at Mr. Jester.  It was "Yes or no?  Just yes

20   or no."

21           When Mr. Walter came in, we start going into this

22   about whether his lawyer had told him to tell the Judge he

23   can't show up because of the memory loss.

24           Do you remember that?

25           And it took some time, but he finally admitted to

```
 1   it.  That, yeah, he had said that he had had memory loss.
 2   But then we ended it, and said, "What about this loan from
 3   the prior witness?  You saw him when he walked out?"
 4             "Yes."
 5             "Did he help you get a loan?"
 6             He, without hesitating, "Yes."
 7             $25,000.  Truth?  Believable?  Reliable?
 8             Would you make a decision in the most important of
 9   your own affairs, the most important, based on that
10   testimony?
11             Reasonable doubt.  With all due respect to
12   Ms. Lawson, who flew in from San Francisco, you will
13   remember she was the auditor who seemed to answer questions
14   in a very long way, the answers seemed to just sort of go on
15   and on and on and on.
16             "Do you actually have any documents of that
17   transaction" -- and these -- I'm not casting blame.  I'm
18   not.  But I am saying that you have the burden of proving
19   beyond a reasonable doubt.  And the witness comes in here
20   who's actually supposed to say, "Hey, I reviewed.  I flew
21   all the way into Grapevine, met with the good people of UDF,
22   and interviewed them and talked to them, and then I got to
23   make decisions about their business."
24             "Did you actually have the documents of the
25   transaction?"
```

 1              Answer:  "No."

 2              "Did you review the documents of the transaction?"

 3              "No."

 4         Almost exactly the same testimony as Martinez.

 5              Would you rely on her, Jurors, in the making

 6    decisions for you or your family in the most important of

 7    your own affairs?

 8              And then at the end.  "Well, actually, I'm telling

 9    them that Snyder Kearney" -- which is what she said she

10    relied on completely, which certainly could be.  Could be.

11    And that's what it can't be.  It can't be, could be, maybe,

12    could be, possibly, that's reasonable doubt.

13              We talked to her father, and again, I wasn't

14    asking, "Answer the questions, ma'am.  Answer them.  Yes?

15    No?"  I was actually trying to be -- I was trying to be

16    polite.

17              And I say if an investor receives the benefit that

18    the investor is seeking through the investment that the

19    investor made, in your mind, is that a good thing?

20              Let me repeat that real quickly.  The question:

21    If an investor receives the benefit that the investor is

22    seeking through the investment that the investor made, is

23    that a good thing?

24              I don't think that's a trick question.  It's not

25    like, "When did you stop" -- and we will talk about trick

 1    questions in a minute.  Because we heard some trick
 2    questions.  And some hypotheticals.  I will address that in
 3    a minute.
 4            But I don't think that's a trick question.  What's
 5    her answer?  "That's such a hard question.  It could go
 6    either way.  It's just so complex."  And of course, she
 7    didn't do anything to look at the document.  She went down
 8    there knowing that she wasn't going to understand anything.
 9    "I don't know.  I think that -- that that was up to us to
10    truly understand and we couldn't."
11            Would you rely on her in the most important of
12    your own affairs?  Jurors, that is textbook reasonable
13    doubt.  Reasonable doubt.
14            Jeff Lawlis.  I asked him about related-party
15    transactions.  Mr. Stephens put this up on the screen, but
16    it's worth another look.  When asking him about
17    related-party transactions -- and he's the auditor from
18    Whitley Penn.
19            Reasonable accountants, reasonable accountants,
20    both acting in good faith, could reach a conclusion that is
21    different regarding whether a particular transaction is a
22    related-party transaction; is that a fair statement?  I
23    believe that was Mr. Stephens' question on
24    cross-examination.  Again, a fair question, I think.
25            And he said, "I believe so."

1           Is that proof beyond -- when you've got two

2   people, it's fair to give you two opinions in an

3   accounting -- in an accounting or a business decision.  And

4   the government's own witness, the auditor from Whitley Penn

5   says "Could have been A, could have been B."  And they want

6   you to convict on that testimony.

7           Reasonable doubt.

8           Reasonable doubt, Jurors.  When your expert who

9   comes in from FINRA, and he's supposed to, again, give us

10  some information on affiliated-party transactions and

11  these -- all of these documents and everything that you've

12  got before you -- I'm not an accountant, not a CPA, no

13  education consistent with that, never been certified.  No.

14  No.  Real estate -- real estate.

15          Boy, oh, boy.  Compare him with the witness that

16  Mr. Stephens put on who had been doing it for 40 years.

17  Never seen a REIT.  Never drafted disclosures.  That was the

18  testimony.

19          It's not because Mr. Stephens is trying to

20  embarrass him or anything, but the government is asking you

21  to convict based on this evidence.

22          Would you rely on him in the most important of

23  your own affairs?  With you?  Your family?  Your kids?

24          Reasonable doubt, Jurors.  That is what this is.

25  Reasonable doubt.

```
 1              "I can't recall.  No.  I can't recall.  No.  No.
 2   No.  No."  And again, you know, he was a nice man.
 3              But Mr. Martinez as well.
 4              "Have you ever audited a lender?"
 5              "No."
 6              "Involved in real estate?"
 7              "No."
 8              "Audited a REIT, correct?"
 9              "No."
10              "Auditor?"
11              "No.  Me personally, no."
12              "Been on an audit committee?"
13              "No."
14              And we put aside that he just looked at it from
15   one perspective.  And he reached the result that the
16   government wanted him to reach.  Ever -- no.  No.  No.
17              Reasonable doubt, Jurors.  It's all reasonable
18   doubt.
19              And this is the actual testimony.  This is the
20   questions and the answers.  Again, I'm sure he's a nice man,
21   but the question is, would you rely on this in the most
22   important of your own affairs?  To conclude beyond a
23   reasonable doubt?
24              I suggest to you, Jurors, that the answer is no.
25              Toward the very end, he again said, when
```

 1    Mr. Stephens was asking him, "I did not" -- "Do you contest

 2    that those homes built at Shahan Prairie were built with

 3    financing provided by III or IV?"

 4              "I couldn't tell you either way."

 5              He knew.  I mean, surely, goodness, he's been

 6    working -- what did he say, how long he had been working on

 7    the case?  It was a long time, I think.  I don't remember if

 8    he said five or six years.

 9              I couldn't tell you either way.

10              That's reasonable doubt, Jurors.  And then this

11    one, the last one which it's just almost hard to believe.

12              "Can you describe the difference to the men and

13    women of the Jury of what a land acquisition -- a land

14    acquisition loan is and what a development loan is?"  Land

15    acquisition, development, related to this case?  They took

16    every computer, every document out of their place back in --

17    six years ago.  They knew what the case was about.  The case

18    was indicted last fall.

19              Surely, we knew what the issues were.  Land

20    acquisition, land development.  "I do not know with

21    certainty what each difference is.  I do not know what the

22    difference is between a land acquisition loan and a

23    development loan is."

24              Jurors, that's reasonable doubt.  That is

25    reasonable doubt.

1          The other thing that the Judge told you --

2          Judge, may I ask you, how much --

3          THE COURT:  You have six minutes.

4          MR. LEWIS:  Thank you.

5          The other thing the Judge indicated to you is

6    common sense.  And this is -- this is really what makes --

7    look, I love the law, but what makes the jury system and

8    this country the best in the world, the jury system, is

9    common sense.

10         The judge tells you in considering evidence, use

11   your common sense.  Make deductions that reason and common

12   sense would lead you to make.

13         And that's why, with all due respect to the

14   government, when you keep asking the question over and over

15   if the money went from V to III to pay distributions, would

16   that concern you?  And over and over they got:  "Yes, of

17   course."  But it's a trick question.

18         It completely failed to recognize that there was a

19   transaction, a loan, a value-for-value transaction in the

20   middle, in the very middle.  Refinancing your house.  Paying

21   off your credit card with part of that.  That doesn't mean

22   that -- it's just -- it's a trick question.  Isn't it

23   possible?

24         That is reasonable doubt, Jurors.

25         Also want you -- it's fair in using your common

```
 1   sense.  Yes, this is not TV.  I agree with that.  I wish it
 2   was TV, but it's not TV.  It is serious, serious business.
 3   But your common sense will tell you in a fraud case, with
 4   the FBI around and their resources for six years, what's
 5   missing?  Where are the undercover tapes?  Where's the
 6   undercover interaction between the FBI?  They do it all the
 7   time.  Where is the evidence of misappropriation of all the
 8   money?
 9            Where is the evidence of unexplained wealth?
10   Living big.  Going on plane trips.  Buying -- spending like
11   a mad man.  Where is the evidence of shredding documents?
12   Where's the evidence of a co-conspirator at UDF or anywhere
13   who went over and said "Brandon, let's not put it on" -- or
14   the piece of evidence where Brandon -- I mean, they were
15   sending emails back and forth.  How about an email that
16   says:  "Brandon to Jeff Gilpatrick.  Don't disclose this to
17   anybody."
18            Nothing.  Nothing like that.  Nothing.  Nothing.
19   No video.  No concealing records.  No destroying records.
20   No shredding records.  And the indictment itself, they've
21   had six years to look.  No evidence of any -- just anything.
22            That is reasonable doubt, Jurors.
23            Other -- no money, and, yeah, yes, there was no
24   money lost.  I am going to say that.  Would you want to know
25   that in a bank fraud case?  No defendant took money they
```

 1    weren't entitled to.  There's nothing to contradict that in

 2    the record.

 3              They're still operating business openly.  It

 4    wasn't a Ponzi scheme.  It's not a Ponzi-like scheme.  As

 5    soon as a Ponzi scheme is discovered, it completely

 6    collapses on itself.  These people still did business and

 7    still do.

 8              Jurors, in closing, reasonable doubt, it is a hard

 9    guilty beyond a reasonable doubt.  I mean, it is hard to get

10    there.  It's not impossible, as the Judge said, but there

11    are so many -- the quality of the evidence matters.  The

12    quantity of the evidence matters.

13              And when you push it up just a little bit and then

14    you start looking at the cross-examination and the evidence

15    of innocence, this case is not even close.

16              Now, I'll leave it up, very quickly, and I suspect

17    the prosecutor will take it down.  And if you leave it up

18    great, but if you don't --

19              But these are questions, Jurors, that you should

20    ask and that the government should answer to you.

21              How is it not reasonable doubt when the

22    Whitley Penn witnesses testified they were okay with UDF IV

23    and V -- I mean, with V -- yes, IV and V, with common

24    borrowers?  How is that, in and of itself, not reasonable

25    doubt?

 1              How is it not reasonable doubt when all the

 2   investors benefit from the transactions at issue?  And on

 3   down.

 4              How is there not reasonable doubt when every

 5   expert, including Martinez, testified that Martinez's

 6   cash-tracing theory has never been accepted as legitimate in

 7   any prior federal fraud prosecution?

 8              Let me please say that one more time.

 9              How is there not reasonable doubt, Government,

10   when every expert, including Martinez, testified that

11   Martinez's cash-tracing theory has never been accepted as

12   legitimate in any -- in any prior fraud prosecution.

13              Jurors, again, I thank you for your patience with

14   us.  And I thank you for your time.  And I truly would urge

15   you to go back, review the evidence, review the Judge's

16   instructions, and I would urge you to reach the only, the

17   only fair and just and appropriate verdict, which is not

18   guilty as to Mr. Greenlaw, not guilty as to Mr. Wissink, not

19   guilty as to Ms. Obert, not guilty as to Mr. Jester, all

20   defendants, all counts.

21              And I thank you very much for your time.

22              MS. EGGERS:  Ladies and gentlemen, I'm going to

23   put something up here for you, too.  I'm going to put a

24   binder that has 365 through 475.  I'm going to put a binder

25   that has 398 through 408.  I'm going to put a binder that

 1   has 387 through 397.  I'm going to put a binder that has 376

 2   through 386 in it and then 409.

 3           None of these attorneys, not a one of them said

 4   anything about any of the emails in here.

 5           MR. STEPHENS:  Your Honor, I object.

 6           THE COURT:  Okay.  Overruled.

 7           Ladies and gentlemen, you will remember the

 8   evidence and the arguments.

 9           MS. EGGERS:  They don't want you to look.  There's

10   no way to sit here and put each and every email up there.

11   You will have it to go back in the jury room.  They don't

12   want you to look at those.  They don't want you to see what

13   is glaring.  And what is glaring is these transactions were

14   being done every single month for one purpose, and that was

15   to get distributions out the door to earlier investors.  One

16   purpose.

17           Yeah, they papered the file.  They papered it real

18   good to make it look like Mehrdad Moayedi is requesting

19   draws when he wasn't, to make it look like Blake Buffington

20   was requesting draws when they weren't.

21           The defendants in this case -- or the attorneys

22   have told you that this is just a disclosure case.  It is in

23   the disclosures that the defendants promised investors in V

24   that they would not engage in affiliated transactions.  They

25   lied.

 1          Defendants used an analogy of balancing your

 2   checkbook and suggested that's what they were doing.  The

 3   problem is, it is one person's checkbook with that analogy.

 4   What we have here is the individuals who had invested in

 5   UDF IV's money being used to balance UDF III's distributions

 6   and financing.  We have UDF V's investors' money being used

 7   for somebody else.

 8          That checkbook analogy doesn't hold.  Going to

 9   say, "Oh, well, it's just-in-time financing."  The problem

10   with that is, the defendants are using just-in-time

11   financing of UDF IV's investors' money to pay somebody else.

12   That's the problem.

13          Each bucket of investors was owed a fiduciary

14   obligation and the defendants didn't care.  The defendants

15   decided we'll just put it all together.

16          What was driving this ship was making sure these

17   happened like clockwork.

18          The defendants have repeatedly said that this

19   just-in-time financing strategy can be a legitimate business

20   model.  And you know what?  It may be.  It may be.  But they

21   got too greedy and they got overextended.  They loaned out

22   so much cash that they couldn't make the investor

23   distributions.

24          So to bail themselves out, they had to steal from

25   Peter to pay Paul and paper the file along the way.

1              They say there's no evidence of intent.  Then why

2    do all these paper cover ups, all the advance requests, all

3    the participation agreements.  Why email -- I mean, since

4    when does a borrower -- or excuse me -- a lender email a

5    borrower to tell them to take a draw on their loan to

6    finance at the same rate?

7              The defendants would have you believe that their

8    business is so complex the government doesn't understand it.

9    Oh, it's real simple.  You can read those bank statements

10   and you can see UDF III didn't have enough money in their

11   accounts.  You can read the words of Todd Etter on

12   December 3rd of 2015, they couldn't even pay a $1.25 million

13   quarterly payment that was woefully past due, well beyond

14   the grace period of 10 days.

15             UDF V sent money to III and IV to pay off loans

16   and make distribution to earlier investors.  That's real

17   simple, ladies and gentlemen.

18             Ponzi was an American scheme, too.

19             The technicalities the defendants rely on don't

20   change that.  It doesn't matter that UDF got liens and other

21   benefits in return.  And it doesn't matter that UDF often

22   had third-party borrowers to act as a go-between.  They're

23   basically a shell.  To come up here and suggest that Mehrdad

24   Moayedi was in control of any of those transactions.  Come

25   on now.

1          At the end of the day, UDF V sent money to its

2    affiliates and its affiliates sent assets back in return.

3    You can see the money in those bank statements.

4          The defense questions the simplest of math and

5    says this theory has never been tested in a court of law.

6    I'm going to say, ladies and gentlemen, it happens every

7    single day when we look at our own bank statements.  Not

8    enough money in this account, go to another account and get

9    it.  The problem is here, these men and women were going to

10   other investors' money to get it.

11         The forensic accountant cash-tracing method is a

12   theory.  Again, bank statements don't lie.  The money is in

13   there, you can watch it.  The emails don't lie.

14         The advance request to draws on Centurion and

15   Buffington loans were not for Centurion and Buffington, they

16   were for these guys to be able to get that 9.75 out the

17   door.

18         Confirmation bias.  That's good.  I'm not sure

19   what the confirmation bias of Mr. Eades was, or the

20   director, Mr. Kahane, or Ms. Lawson, the person that

21   actually -- it sounds like she almost took heat because the

22   mother company was a co-sponsor to this and she wouldn't

23   agree to let their broker/dealer settle.  Sounds like a lot

24   of confirmation bias for her.  She even knew a forensic

25   accountant needed to get involved.  And Scott Martinez is

1   the guy.

2            Mr. Kitchens is biased, probably not for

3   1.3 million.  Mr. McCormick, no bias there for the

4   plaintiff.  Mr. Ferguson, I think it was like over $300,000

5   for three months' worth of work.  Probably no bias there.

6            Defendants argue this was a good business in

7   making money.  Read the emails, ladies and gentlemen.  Some

8   of them are going to say things like this, Government's

9   Exhibit 518, this is somebody trying to get paid.

10           "This is the same invoice we've sent you for the

11  sixth time now.  We were supposed to be paid several years

12  ago."

13           544B, "I have spoken with you several times and

14  each time you have told me you will get back to me and have

15  not.  This is our final demand for payment."

16           552A, "Couple bills that are going to have to get

17  paid in the next week or two for us to continue on."

18           "I just finished a conversation with TBG about

19  past due bills.  At the risk of sounding like Chicken

20  Little, I'm afraid we're hitting a wall where our ability to

21  stretch our dollar may be becoming a liability."

22           That's an employee of UDF telling a superior at

23  UDF this.  That's in that email, Chicken Little.

24           This one right here, Government's Exhibit 301.

25  It's an email chain, I believe, between Ms. Tidwell and one

1    of the other ladies at UDF.  We're talking about an advance

2    request.

3              "This is to pay investor distributions so we have

4    to ensure it goes out today.  The ones we won't fund are the

5    actual draws to borrowers."

6              That tells you the tail's wagging the dog here.

7    That right there.  We're going to fund the ones to pay the

8    investors distributions but those poor developers that have

9    to come each month to keep the lights on, we're going to

10   hold those back.

11             Mr. Wissink, "UDF III doesn't have the capital to

12   fund these draws, what avenues do we have for UDF IV to fund

13   a repayment on a Centurion to provide capital to UDF III on

14   Monday morning?"

15             Greenlaw, "Someone needs to fight FINRA."

16             This one's good.  "This is the progression of

17   being addicted to distributions."  That's from that man

18   seated right there to that man seated right there.

19             Mr. Jester, "Let's fund it from 5030.  I can then

20   allocate some money to some of these new loans we'll be

21   closing in the next couple of weeks."

22             Aaron Richards, "That works.  Have it pay down

23   1530 in UDF III."

24             Jester, "FYI let's remember to fix this once we

25   finalize some of the new deals."

1        "I have it printed out" -- I have printed this out

2   and put it in the fix-it file."

3        "That one's getting pretty big."

4        "Huge."

5        Government's Exhibit 310, "We need to identify an

6   asset that we can fund $3 million today from UDF IV to repay

7   1529 and 1026."

8        Wissink, "We need 1.75 million today, and we can

9   figure out the rest later this week."

10       Richards, "Telling Renee Mueller he is wiring her

11  money and she is to wire it back to UDF IV."  On what planet

12  does that sound like a legitimate business?  "We are going

13  to wire you money and then you are going to wire it to our

14  other bank account."

15       129A, Ms. Goodman talked about whether or not

16  there has to be a contract or not a contract.  Government's

17  Exhibit 96 speaks for itself.  Whitley Penn was under the

18  impression there were executed contracts.  And did we bring

19  in all of the projects and every person from all over the

20  state of Texas for that?  No, we didn't, because we have

21  Government's Exhibit 129A.  Ms. Goodman didn't talk about

22  that one.

23       Matzinger, letter of intent and draft contract

24  submittal; there's no contract -- letter of intent and draft

25  submittal, no contract.  4S Ranch, no offer yet.  Crossings

 1    at Carmel Creek, heard Pulte and Ashton Woods are trying to

 2    buy.

 3              Heather Glenn, it's a Megatel Source deal.  Las

 4    Fontanas, re-engaging, due diligence.  Nor-Tex, letter of

 5    intent submitted.  Project is stalled.  Park Village, needs

 6    to complete underwriting and submit an offer.

 7              Reserve at Fair Oaks, another came in and had it

 8    under contract and then dropped.  Gilbert Tract, M/I Homes

 9    has under contract.

10              We didn't need to bring in all the men and women

11    across the state of Texas, because Mr. Gilpatrick laid it

12    all out there for you.  Those right there, no contract.

13    Whitley Penn led to believe there was a contract.

14              Specific intent.  Ladies and gentlemen, this is

15    not a situation where we have people that just got involved

16    on Friday in securities fraud.  These people are educated

17    people, one has a law degree.  They did this and they did it

18    for years.  And they honed their skills.

19              They specifically intended to tell the SEC and

20    everyone else that would read those UDF filings that they

21    were not going to do related-party transaction.  They made

22    that decision.

23              Other lenders, this Trez, or however you spell

24    that, and First Continental do it the same way.  Ladies and

25    gentlemen, I don't know who Trez and First Continental are,

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                    Vol 8 January 20, 2022                    Page 1581

 1  but I can tell you what's not at issue in this case is

 2  what's in their SEC filings.

 3            It's always rich when somebody says, well,

 4  somebody else is doing it, too.  Well, that's not a defense.

 5            Refinancing and land release payments.  That was

 6  said a lot.  I go back to when does a lender tell a borrower

 7  it's time to take another draw to pay down their own loan?

 8            Since when does a lender, at the end of the month,

 9  on the very same day when that money is due and needed to

10  transfer to UDF III for distributions?  When do they do

11  that?

12            The developers' loans ultimately paid off.  Again,

13  ladies and gentlemen, that is not a defense.  The banks got

14  paid back eventually, that is not a defense.

15            It was a good deal for the developers.  It doesn't

16  sound like too good of a deal.  Same interest rate from V to

17  IV, but okay, not a defense.

18            It was a good working environment.  Again, ladies

19  and gentlemen, that is not a defense to these crimes.

20            Defendants' arguments that they had friends and

21  co-workers come in and said they had good character.  None

22  of those friends and co-workers testified that they knew

23  what the defendants were putting into the SEC filings and

24  telling investors.  I wonder why they didn't ask that, huh?

25            A few things that show concealing the truth.  Look

 1  at that SK report, the spreadsheet, why not just say it's

 2  future and anticipated contracts?  Why not make sure it's

 3  clear to Whitley Penn that they knew that.  Not telling

 4  Mr. Kahane and the board of directors what they were doing.

 5  And Defendant Greenlaw and Defendant Jester not at least

 6  acknowledging that sales pitch.

 7           Ladies and gentlemen, they knew.  That email that

 8  Mr. Buffington sent, that hurt.  That really hurt.  Because

 9  those two men knew that if they came in here and

10  acknowledged that in October of 2013 this plan had been

11  hatched and they're telling Buffington one thing and telling

12  UDF V potential investors in an S11 they're going to do

13  another.  They knew that was a problem.  That shows you

14  evidence of their intent, not being truthful with you.

15           The defense says, "Well, the auditors thought it

16  was okay."  You know, auditors are not investigating

17  securities fraud.  Auditors are not looking at every single

18  email.  Heck, they're not even looking at every single bank

19  account.  They're looking at the books and ledgers.  They're

20  auditing financial statements and testing to see, well,

21  we'll test 10 or so transactions here, we're going to test

22  and see if the numbers crunch, and it looks like it's

23  materially accurate.

24           But Ms. Braislin, she was onto something.  Too bad

25  Ms. Braislin, when she found this on February 19, 2014, too

UNITED STATES vs HOLLIS MORRISON GREENLAW (1)

4:21-cr-289-O                    Vol 8 January 20, 2022                    Page 1583

 1   bad she didn't call the FBI that day.

 2           Look at Government Exhibit 101.  She was onto

 3   something.  They're making sure the credits and debits match

 4   and they're checking the numbers.  They're not investigating

 5   securities fraud.

 6           Ms. Powell told you she did not know what she saw

 7   in Government's Exhibit 101, but it was happening more than

 8   once.  You will have that in evidence.

 9           MR. STEPHENS:  Your Honor, I object to that

10   testimony.  It mischaracterizes the record.

11           THE COURT:  Okay.  Overruled.

12           Ladies and gentlemen, you will remember the

13   testimony.

14           MS. EGGERS:  The defendants picked the rules of

15   the game, and they must live by their decision.  The only

16   business decision that changed was in their disclosures, and

17   Judge O'Connor has given you the definition of affiliate.

18   The other way wasn't working anymore.  They needed to find

19   new people so they could pay Peter with Paul's money.

20           The defendants made a decision to engage in a

21   scheme to defraud, and it was using subsequent investors'

22   money to pay distributions to earlier investors.  The

23   defendants made a decision to put investors at risk.  They

24   specifically told the SEC and the investing public they

25   would not do.

1          The defendants had to choose failure or fraud, and

2    they chose fraud.  And they kept on and on and on and on.

3          Ladies and gentlemen, this is why we're here.  And

4    for them to suggest this was some great business.  Nobody

5    wanted to talk about Government's Exhibit 577.  This is just

6    going great, but they can't pay 1.25 million that they're

7    contractually obligated to pay.

8          Remember Mr. Pelletier was like, "I mean, there's

9    nothing wrong with them not paying the money."

10          And Mr. Downey just happened to take a little

11   note, says, "Well, they were under a contractual obligation

12   to pay us.  They could have stopped paying the

13   distributions."  But they didn't have enough money to do

14   both.  Why?  Because they were having to get it from V.

15   They were having to get it from IV.

16          Ladies and gentlemen, I ask you to find these

17   defendants guilty as charged.  They engaged in a large-scale

18   scheme, and they did it month after month.  And we're here

19   because they were committing wire fraud that was affecting

20   financial institutions and putting them at risk.

21          They were engaging in the conspiracy to commit

22   securities fraud, and they committed substantive acts of

23   securities fraud with each of those SEC filings that are

24   charged.  I ask you to find them guilty.

25          THE COURT:  All right.  Ladies and gentlemen, that

1  is all you will hear.  So you will retire here in a moment

2  to your jury room.

3          I will get the jury charge sent up to you.  All of

4  the exhibits are in the jury room.  So you will be able to

5  look at all of the exhibits that you want to look at, except

6  there are some exhibits that are electronic, so if you would

7  announce that now, please.

8          MS. EGGERS:  Yes, your Honor.

9          There's a thumb drive with both parties' exhibits,

10  and any exhibit that was in an Excel spreadsheet or anything

11  that was over 100 pages, they're on the thumb drive so they

12  can be accessed that way.  But all exhibits are on there as

13  well, but those are the once that will only be

14  electronically available.

15          THE COURT:  Okay.  Ladies and gentlemen, so do you

16  all agree with that?

17          Mr. Pelletier?

18          MR. PELLETIER:  Yes, sir.

19          MR. STEPHENS:  Yes, sir, your Honor.

20          MS. GOODMAN:  Yes.

21          THE COURT:  So if you want to look at an Excel

22  spreadsheet or if you want to look at an exhibit that was

23  more than 100 pages, it's going to be on the thumb drive.

24  We will get that set up for you.  Just send us a note that

25  tells us you want to look at those.  We will get those set

 1   up for you.  I just didn't want you looking for those

 2   documents if they're not actually physically there.  So

 3   please remember that.

 4           With that said, go and begin your deliberations.

 5   Lunch should be up there.  Remember, only deliberate when

 6   all of you are in the room.  At breaks, if some of you leave

 7   the room for a stretch break, whatever, you have to stop

 8   your deliberations.

 9       (The jurors exited the courtroom.)

10           THE COURT:  Okay.  Please be seated.

11           Anything else?

12           MS. EGGERS:  No, your Honor.

13           MR. STEPHENS:  Your Honor, can I just preserve?

14   Thank you, your Honor.  And I appreciate you allowing me to

15   do this outside the presence of the jury.

16           I was trying to do it in a way that was not

17   interrupting the flow of the proceedings.

18           THE COURT:  Yes.  Thank you.

19           MR. STEPHENS:  I do have some objection, both in

20   initial closing and counsel's rebuttal closing.  And I will

21   just take them in order as they happened.

22           The first one, your Honor, is an objection that

23   the government has sought to have an instructive amendment

24   of the indictment by switching theories and arguing

25   omissions that did not tell.

 1              There was several references early in the

 2    introductory closing argument about what the executives did

 3    not tell the market, as opposed to the affirmative false

 4    representations they're charged with about what they said

 5    about their disclosures.  So that's number one.

 6              Number two would relate to the argument on the

 7    issue of control in related-party transactions or affiliate

 8    transactions when they were discussing the definition of

 9    control.  There's no evidence that the government's put

10    forward that there's been a violation of the term "control."

11              The evidence in the record came from Mr. Kitchens

12    where he confirmed that -- the government in these

13    transactions there is no control over Centurion.  So to

14    suggest otherwise contradicts the facts in the case, and the

15    government knew it during the course of the closing

16    argument.

17              The third one is what is not a defense which came

18    up.  And it was any suggestion that the defendants had good

19    character which came in, in spades in the testimony and is

20    in the Court's instruction.

21              The initial closing argument suggested to the

22    jurors that they should disregard that evidence because it

23    doesn't constitute a defense.  That's legally and factually

24    inaccurate, so we would object to that.

25              In the rebuttal closing, the start of the rebuttal

1    closing was impugning the defense theories and suggesting

2    that the defense lawyers are trying to deceive the jury as

3    to what the evidence is.  That's improper rebuttal argument.

4    We would object to that.

5              The last one relates to the Susan Powell testimony

6    that she confirmed on cross-examination, which I

7    demonstrated to the jury in my argument, that she understood

8    and was aware and approved of the IV-to-III transactions and

9    knew that they were occurring.  The rebuttal closing just

10   suggested that that's not the case.  That's factually,

11   inaccurate, and improper to close that way in rebuttal.

12             THE COURT:  Okay.  Well, I instructed the Jury

13   that they're to follow the instructions, so the instructions

14   will tell them what they can and cannot convict for.  So I

15   think they're appropriately instructed and will follow that

16   instruction.

17             And then while not ruling, when you did object in

18   the final argument, I did instruct the jury that they are

19   the ones who will remember the evidence and what you-all

20   said.  So I did give them that instruction, and I think that

21   applies across the board to your objection.  So I will

22   overrule those objections.

23             Anything else?

24             MS. EGGERS:  No, your Honor.

25             MR. STEPHENS:  Nothing, your Honor.

 1                MR. LEWIS:  One brief side bar.  Two minutes.  One
 2   minute.
 3                THE COURT:  Yes.  Okay.
 4        (A sidebar was had.)
 5        (Recess.)
 6                THE COURT:  Okay.  Let's be seated.
 7                What's your response?
 8                MS. EGGERS:  Your Honor, the government exhibit
 9   that concerns that specific topic are Government's Exhibits
10   420 and 498 to 507.  I don't know if the defense has
11   identified any other exhibits.
12                MR. STEPHENS:  Your Honor, we're still in the
13   process.  We've got some of them, but I don't think we're
14   all the way through it yet.
15                THE COURT:  Okay.  Okay.  Where are we?
16                MR. STEPHENS:  Your Honor, we're just going
17   through the two last documents that will show a payoff.  And
18   they're -- they're longer documents.  They're trying to get
19   at them and then trying to find it.  So we're doing it as
20   quick as we can, your Honor.
21                Thank you.
22                Your Honor, I apologize that took a while.  We are
23   trying to do it as efficiently as we could.
24                So for us, we would agree with the numbers that
25   the government cited.  To that, we would add Government's

 1    Exhibit 507.1, and it's at page 6 inside the document.  We

 2    have Defense 3826 at page 54.  Defendant 3828 and a range of

 3    documents, Defendants' 3820 to 3840, which all relate to

 4    this transaction.

 5               And then three more, your Honor.  Defendants' 115

 6    and then Defendants' 118 at page 78 and defendant's 114 at

 7    page 57, 57.

 8               THE COURT:  Okay.  And what do you say?

 9               MS. EGGERS:  I'm sorry, your Honor, because I

10    didn't know what ones they are.  I was just looking at them.

11    I need to look at the --

12               THE COURT:  Yes, go ahead.

13               MS. EGGERS:  I need to look at the actual party's

14    joint admitted exhibit list because 38 and 36 -- if I may

15    have one moment, your Honor.  I'm sorry.

16               THE COURT:  Yes.

17               MS. EGGERS:  I'm not showing -- sorry.  I'm sorry,

18    your Honor.  I'm just double-checking.

19               THE COURT:  Yes.

20               MS. EGGERS:  I mean, this is including additional

21    records like a layout and that kind of stuff, which the

22    government is not saying that we have an objection to, but

23    the question seemed as though it was pretty specific.  But,

24    obviously, whatever the Court would prefer to do.

25               I'm not really sure what 115 has to do -- I mean,

 1  there appear to be defense exhibits that -- 115 is saying

 2  that it's an email regarding a reimbursement Metro study, so

 3  I'm not sure what that has to do with it.  I'm sorry --

 4           THE COURT:  The Defendants' Exhibit 115 is the

 5  8-K.

 6           MS. EGGERS:  I'm sorry.  Yes.

 7           THE COURT:  So it seems to me they're asking for

 8  backup documents for Frisco 113, and the date is

 9  12-22-20 and it's in the five cent, four cent amount.  So

10  how is an 8-K or a 10-K a backup document?

11           MR. STEPHENS:  It explains the transaction, your

12  Honor.  It's specific to the transaction.

13           THE COURT:  They're asking for backup documents.

14  And so let me -- what are your documents, 420?

15           MS. EGGERS:  Government's Exhibit 420, your Honor,

16  is that bank sheet with the bank accounts that went behind

17  it and the cash flow projections.  And then 498 through 507,

18  which would include 507.1, those are the email

19  communications and advance requests for Frisco 113.

20           THE COURT:  Okay.  And then -- okay.  So you want

21  to -- so the defense then wants to introduce this 8-K,

22  that's at 115.  A 10-K.  Two 10-Ks.

23           MR. STEPHENS:  And, your Honor, I can give you a

24  little background there.

25           THE COURT:  Well, I don't really need any

 1    background.  They're asking for backup documents.  I don't

 2    see how a 10-K or 8-K is a back-up document.

 3            MR. STEPHENS:  The 10-Ks can separate those.  The

 4    10-Ks are going to demonstrate that the loan was paid off.

 5    That's what I'm getting from my colleague.

 6            THE COURT:  But a backup document is a document

 7    that backs up the transaction internally.  These are public

 8    disclosures.  I don't think they're asking for where the

 9    public disclosures explaining these documents are.  So I

10    don't read it that way, I guess.

11            MR. STEPHENS:  Well, so, as a jury note, your

12    Honor, I don't know exactly what they're asking for.  We're

13    trying to make sure that we're being comprehensive in

14    response to them, given how many documents are in the case,

15    so that if this helps answer their question, which is what

16    we're trying to do is get them straight to the page cite on

17    those 10-Ks.  If the question is, is the loan paid off,

18    that's what those documents are going to show them.

19            THE COURT:  Okay.  Why don't we do this -- well,

20    okay.  So what do you say to 3820, for instance?

21            MS. EGGERS:  3820 to 3840?

22            THE COURT:  Yeah, Frisco 113 RSI Market Report,

23    3Q15, 3821 is an appraisal.

24            Let's bring them in.

25            MS. EGGERS:  If we're including all those other

 1   things, your Honor, there's also title records.  If we're

 2   going to start including title records, I believe it's

 3   Government's Exhibit 318.

 4            THE COURT:  Okay.  We're just going to ask them

 5   what they want.

 6            MS. EGGERS:  Yes, sir.

 7       (The jury was brought into court.)

 8            THE COURT:  Okay.  Please be seated.

 9            All right.  Who is our foreperson?

10            Okay, ma'am.  We've been going through documents

11   trying to interpret the note, but I thought it would be

12   better for us just to ask you.

13            Tell me exactly what you're looking for, because

14   we can read this very broadly, narrowly.  However, we want

15   to give you everything you want, and we don't want to under

16   give you or over give you.

17            So can you just explain for us what you're looking

18   for?

19            THE FOREPERSON:  So one of the jurors asked if --

20   they're wanting to see the journal of the payoff for the

21   retired loan from.  I think it was 5056, if I'm not

22   mistaken.

23            THE COURT:  Yes, you have 5056 here.  Frisco 113,

24   Retired 5056, UDF IV.

25            THE FOREPERSON:  Yes.

```
 1              THE COURT:  And then you have the 1.3 ending in 05

 2    and 1.3 ending in 04.

 3              THE FOREPERSON:  Correct.  They're wanting to see

 4    the payoff documents for those.

 5              THE COURT:  And when you say "payoff documents,"

 6    what exactly --

 7              THE FOREPERSON:  The lien releases.

 8              THE COURT:  The lien releases.

 9              And do you remember seeing those presented to you

10    during the trial, or you just know they exist and they're in

11    the documents?

12              THE FOREPERSON:  So one of the jurors does not

13    remember seeing that.

14              THE COURT:  Yes.

15              THE FOREPERSON:  We don't remember seeing that.

16    But we remember an email, where it says, "Please use these

17    funds to retire Loan 5056."

18              THE COURT:  Yes.

19              THE FOREPERSON:  And then those funds went back

20    to -- was it IV?  IV.

21              THE COURT:  Whichever one.

22              THE FOREPERSON:  Whichever one.

23              THE COURT:  Yes, I'm with you on that.

24              THE FOREPERSON:  Yes.

25              THE COURT:  So you for sure want the email?
```

1         THE FOREPERSON:  Yes.  Well, we have the email.

2    We saw the email.

3         THE COURT:  You have the email?

4         THE FOREPERSON:  So we don't need the email.

5         THE COURT:  So you don't need the email?

6         THE FOREPERSON:  I think where the issue is coming

7    in is we're having an issue with the disclosures on

8    affiliate and common borrower.  That's where we're stuck.

9         THE COURT:  Got you.  Got you.

10         THE FOREPERSON:  So that's where it's kind of

11    iffy.  So we're looking at the disclosures.  And that wire

12    is kind of where we're stuck --

13         THE COURT:  Okay.

14         THE FOREPERSON:  -- because we're thinking that,

15    if that amount -- where it says, "retired," we're thinking

16    paid off, that means there should be some loan documents

17    there to show --

18         THE COURT:  I see.

19         THE FOREPERSON:  -- that that loan was paid off.

20         THE COURT:  All right.

21         THE FOREPERSON:  And then, they're taking those

22    funds, I think it's 04, and bringing it back to the same

23    loan, right?

24         THE COURT:  Okay.

25         THE FOREPERSON:  So that means the collateral

1    should be on this end, instead of that end.

2              THE COURT:  I think that helps quite a bit.  We've

3    been working since the note came.  Let us go back to work.

4              If we have other questions, we may bring you back

5    down here to ask you again.

6              THE FOREPERSON:  Okay.

7              THE COURT:  But thank you for working so hard.  We

8    appreciate it very much.  And we'll get right to work.  So

9    if you'll go back and wait for us, we'll get it to you as

10   soon as we can.

11       (The following proceedings were had outside the

12       presence of the jury.)

13             THE COURT:  Okay.  Please be seated.

14             All right.  So now what do you all say?

15             MS. EGGERS:  I would say, your Honor, to also add

16   Government's Exhibit 318, and Government's Exhibit 323,

17   which will be the real property records that were filed in

18   the court record.  And then also the title company records,

19   your Honor, based upon what was described to us.

20             THE COURT:  Okay.  So are some of these documents

21   electronic, or are they all hard copy, or a mix?

22             MS. EGGERS:  So with regards, obviously, to the

23   8-Ks and that kind of thing the defense was requesting,

24   those are going to be over a hundred pages.  So they're

25   digital.

```
 1              THE COURT:  Digital.

 2              MS. EGGERS:  The 323 that I just cited, that's 93

 3   pages.  So that would have been in paper.

 4              Let me see.  I'm pretty sure -- 318 is two

 5   different PDFs.  So it's going to be rather large, your

 6   Honor, because there's a 318.1 and a 318.2, but it's the

 7   receipts and disbursement ledger for Frisco 113, so --

 8              It's actually just two PDFs, one of them is 47

 9   pages, so it will be printed.  That's, again, the supplement

10   to the title company.

11              And then 318.2, and there's a 318 -- all the way

12   to 318.4, so --

13              But those are the title company records, which

14   hearing the description, that sounds like what they're

15   possibly looking for.

16              THE COURT:  And are your documents in hard copy or

17   digital, these exhibits?

18              MR. STEPHENS:  Hard copy.

19              THE COURT:  They are in hard copy?

20              MR. STEPHENS:  Correct.

21              THE COURT:  All right.  And in terms of the

22   digital presentation, what do we have set up for them to

23   look at?

24              MS. EGGERS:  They have a laptop, your Honor, back

25   there for the digital.
```

1          THE COURT:  They do?

2          MS. EGGERS:  They do.  It's unencrypted.  I mean,

3    I think there's a password, they have to initially log on.

4    And they have a thumb drive with both parties' exhibits on

5    it.  So they have them both digitally and printed.

6          THE COURT:  All right.  So I think what I'll say

7    then is, in response to your note, we refer you to:  I'll

8    list all of these exhibits.  You have some pinpoint cites.

9          And I think I need to say, you know, please note

10   these will be -- all will be hard copies, except for

11   whatever exhibits, they will be digital.

12         MS. EGGERS:  Let me double-check and make sure

13   that --

14         THE COURT:  Because all of theirs are hard copies.

15         MS. EGGERS:  Yeah, ours might all be hard copy

16   too, your Honor.  I'm just double-checking one more.

17   Because I haven't seen something yet that was over

18   100 pages.  So they're quite possibly all right there in

19   hard copy.  I believe all the government's are in hard copy.

20         MR. STEPHENS:  Your Honor, and with that

21   additional information from the Jury, we are citing to

22   Defendants' 3820 through 3840.

23         THE COURT:  You already did.

24         MR. STEPHENS:  And I'm just confirming that --

25         THE COURT:  But all of those were admitted or not

```
 1    admitted?

 2              MS. EGGERS:  They were.

 3              MR. STEPHENS:  Yes.

 4              THE COURT:  Yes, okay.  Right.  So give me a

 5    second to write this out.

 6              Yes?

 7              MR. STEPHENS:  And, your Honor, I'm sorry.  I'm

 8    just confirming that you still have for us Government's --

 9              THE COURT:  507 is in.

10              MR. STEPHENS:  -- 507.1 and .6.

11              THE COURT:  Well, I'm just giving them 507.

12              MR. STEPHENS:  Okay.

13              THE COURT:  Okay.  Go show that to them.  Just go

14    show it to them.

15              MS. EGGERS:  Yes, sir.

16              THE COURT:  Are we good?

17              MR. STEPHENS:  Yes, your Honor.

18              THE COURT:  Okay.  I will sign it now and Melissa

19    will take it in.

20              Okay.  We will wait to hear from them.  They had

21    earlier indicated they were going to leave at 6.  I don't

22    know if that's still the case or not.

23              MR. PELLETIER:  Judge, do you bring them out

24    before you release them or do you just release them?

25              THE COURT:  I'll just release them, and we'll let
```

1    you know that they're released.

2          (The proceedings adjourned at 5:45 p.m.)

```
 1              C E R T I F I C A T E

 2

 3      I, Zoie M. Williams, RMR, RDR, FCCR certify that the

 4   foregoing is a transcript from the record of the proceedings

 5   in the foregoing entitled matter.

 6      I further certify that the transcript fees format comply

 7   with those prescribed by the Court and the Judicial

 8   Conference of the United States.

 9      This 21st day of January 2022.

10

11                         s/ Zoie M. Williams
                           s/ Kelli Ann Willis
12                         Official Court Reporters
                           The Northern District of Texas
13                         Fort Worth/Dallas Divisions

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$1.2** 1526:11

**$1.25** 1575:12

**$10.7** 1546:23

**$100** 1554:19

**$11** 1550:1

**$145,000** 1534:18

**$25,000** 1562:3,13 1563:7

**$3** 1579:6

**$300,000** 1577:4

**$7** 1554:18

**0**

**04** 1594:2 1595:22

**05** 1594:1

**1**

**1** 1461:24 1494:24 1495:18

**1.25** 1490:21 1584:6

**1.3** 1577:3 1594:1,2

**1.75** 1579:8

**1.8** 1512:18

**10** 1502:6 1505:2 1509:8 1575:14 1582:21

**10-K** 1495:25 1498:17 1499:14,22 1591:10,22 1592:2

**10-ks** 1591:22 1592:3, 4,17

**10-Q** 1495:25 1500:12 1501:2,21

**100** 1585:11,23 1598:18

**101** 1583:2,7

**1026** 1579:7

**11** 1526:14,19 1527:25

**113** 1529:25 1534:14 1546:23,24 1591:8,19 1592:22 1593:23 1597:7

**114** 1590:6

**115** 1590:5,25 1591:1,4, 22

**118** 1590:6

**12** 1475:22 1476:17 1539:24

**12-22-20** 1591:9

**1248(2)** 1476:24

**129A** 1579:15,21

**13** 1537:23 1555:7

**1343** 1464:15,21 1466:19

**1348** 1470:23 1471:3

**1348(1)** 1474:16 1475:10,12 1476:24

**1348(2)** 1474:24 1476:1,3

**1349** 1464:14,16 1470:22,24

**14** 1525:20 1527:1

**15** 1500:11

**15(d)** 1475:24 1476:19

**1529** 1579:7

**1530** 1578:23

**16** 1501:21

**17** 1505:23

**18** 1464:14,16,20 1466:18 1470:22,24 1471:3 1474:12,16,23 1475:11 1476:2 1510:5 1550:14

**19** 1539:25 1582:25

**1934** 1474:21 1475:6, 23,25 1476:18,20

**2**

**2** 1485:2,19 1508:17 1542:24

**2(a)** 1474:13

**20** 1505:2 1539:25 1552:2

**2008** 1523:5

**2011** 1461:25 1488:15, 21

**2012** 1523:5

**2013** 1526:10,23 1582:10

**2014** 1491:3,9,11 1498:17 1525:5,22 1526:10,23 1528:19 1582:25

**2015** 1461:25 1500:11 1520:7 1525:11 1575:12

**2016** 1511:6 1520:7 1525:17 1534:22

**2017** 1511:6 1520:8

**2018** 1511:6

**2019** 1511:8

**2020** 1511:9 1525:2 1531:13

**2021** 1511:10

**22** 1554:17

**24** 1525:5

**25** 1520:12

**29** 1461:25

**3**

**3** 1502:16 1505:22

**30** 1520:12

**3000** 1552:16

**301** 1577:24

**31** 1554:14,15

**310** 1579:5

**318** 1593:3 1596:16 1597:4,11

**318.1** 1597:6

**318.2** 1597:6,11

**318.4** 1597:12

**323** 1596:16 1597:2

**349** 1504:10

**35** 1519:18

**350** 1504:10,23

**36** 1590:14

**365** 1572:24

**376** 1573:1

**38** 1590:14

**3820** 1590:3 1592:20,21 1598:22

**3821** 1592:23

**3826** 1590:2

**3828** 1590:2

**3840** 1590:3 1592:21 1598:22

**386** 1573:2

**387** 1573:1

**3900** 1552:15

**3905** 1552:14

**3924** 1552:15

**397** 1573:1

**398** 1572:25

**3Q15** 1592:23

**3rd** 1575:12

**4**

**40** 1551:21 1554:5,22 1566:16

**4000** 1552:16

**408** 1572:25

**409** 1504:23 1573:2

**410** 1488:17 1504:22

**412** 1500:8

**413** 1503:1,13

**414** 1505:8

**420** 1500:18,20 1501:1 1589:10 1591:14,15

**429** 1507:15

**455** 1500:6

**47** 1597:8

**475** 1572:24

**498** 1589:10 1591:17

**4S** 1579:25

**4th** 1528:24

---

**5**

**5** 1538:16

**5030** 1578:19

**5056** 1593:21,23,24
1594:17

**507** 1589:10 1591:17
1599:9,11

**507.1** 1590:1 1591:18
1599:10

**518** 1577:9

**53** 1505:2 1550:15

**54** 1590:2

**544B** 1577:13

**552A** 1577:16

**57** 1590:7

**577** 1502:14 1584:5

**5:45** 1600:2

---

**6**

**6** 1498:19 1500:15
1590:1 1599:10,21

**60** 1502:10 1505:3

**60-month** 1551:4

**64A** 1453:6,8,11,14

**6th** 1528:24

---

**7**

**7** 1499:23

**7,000** 1519:25

**78** 1590:6

---

**8**

**8-K** 1591:5,10,21
1592:2

**8-ks** 1596:23

**80** 1551:3

**81** 1547:1

---

**9**

**9** 1502:3,4,6 1505:12

**9.75** 1507:5 1576:16

**93** 1597:2

**96** 1491:8 1528:17
1579:17

---

**A**

**Aaron** 1523:3 1527:5
1529:20 1530:1,5
1534:11 1578:22

**abetted** 1479:22

**abetting** 1474:12

**ability** 1458:16 1577:20

**absolutely** 1555:25

**accept** 1457:22
1461:12,14

**accepted** 1454:21
1572:6,11

**access** 1512:22
1520:17 1551:5

**accessed** 1585:12

**accident** 1463:19

**accomplish** 1464:25
1471:7 1473:4,7,10,16,
20

**accomplished** 1479:4

**accomplishing**
1466:6 1469:12
1472:14

**account** 1504:20
1505:8 1507:21
1521:10,11,12 1549:17,

19,22 1554:18 1576:8
1579:14 1582:19

**accountant** 1500:19
1545:24 1561:14
1566:12 1576:11,25

**accountants** 1565:19

**accounting** 1529:23
1530:2 1551:12
1554:20 1557:5 1566:3

**accounts** 1499:9
1500:21 1520:17
1521:6 1541:25
1549:16,21,23 1575:11
1591:16

**accuracy** 1458:20

**accurate** 1457:23
1536:18 1549:12
1553:12 1582:23

**accused** 1462:20
1479:16

**accuses** 1473:2

**ACH** 1504:17

**acknowledge** 1503:6
1542:12

**acknowledged** 1545:7
1582:10

**acknowledging**
1582:6

**acquire** 1543:22,24
1544:21

**acquiring** 1544:10

**acquisition** 1546:24,
25 1568:13,14,15,20,22

**acquit** 1455:7 1470:17
1514:9,15 1531:11
1537:20 1538:7
1558:22

**acres** 1547:1

**act** 1455:18 1462:5
1463:17 1466:15
1467:24 1468:16
1469:22 1472:23
1474:21,22 1475:6,7,
23,24 1476:18,19
1477:8 1479:2 1493:18
1498:9,13 1539:9
1541:3,14 1560:8

1575:22

**acted** 1467:8 1468:23
1470:11 1476:13
1490:12 1514:12
1538:3,10 1539:11
1557:8

**acting** 1479:8 1540:17
1545:9,15,24 1557:11
1565:20

**action** 1463:6 1468:1
1478:4 1480:16
1492:19 1543:6

**activity** 1511:23

**acts** 1467:23 1474:7
1477:7 1479:10,11,13,
15 1481:14 1534:9
1584:22

**actual** 1457:9 1541:1
1567:19 1578:5
1590:13

**Adams** 1526:25 1527:4
1532:6

**add** 1492:3 1589:25
1596:15

**added** 1528:2

**addicted** 1578:17

**additional** 1530:13
1590:20 1598:21

**Additionally** 1467:10

**address** 1565:2

**addressed** 1463:2
1468:14 1478:16

**adjourned** 1600:2

**admissible** 1456:15

**admit** 1521:15,16

**admitted** 1460:14
1548:12 1562:25
1590:14 1598:25
1599:1

**Adrianna** 1555:24

**advance** 1490:14,17
1496:25 1504:19
1506:10 1525:19,21
1554:3 1575:2 1576:14
1578:1 1591:19

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 156 of 182    PageID 13474
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 8 January 20, 2022                    Index: advances..attorney

**advances** 1466:15 1472:23

**affairs** 1455:20 1560:10,11 1563:9 1564:7 1565:12 1566:23 1567:22

**affect** 1460:21 1470:9 1515:12

**affected** 1467:14 1470:7 1484:6 1491:23 1494:2 1541:15

**affecting** 1464:11,13, 19 1486:11 1491:19 1492:12 1494:6 1541:6 1584:19

**affects** 1470:4

**affiliate** 1478:17 1489:13 1497:13,18 1503:3,9,18,21 1504:2 1508:2 1540:7,11,20 1542:9 1544:18 1545:12 1547:3 1583:17 1587:7 1595:8

**affiliated** 1503:19 1504:5,7 1519:7,10 1521:20 1542:14 1547:2,4,8,9,15 1554:1, 6,9 1573:24

**affiliated-party** 1518:21 1566:10

**affiliates** 1498:5 1500:4 1542:12 1543:22,23 1576:2

**affirmative** 1480:24 1587:3

**afraid** 1577:20

**agent** 1465:2 1471:9 1479:5 1500:18 1510:22 1512:3

**agents** 1519:23

**agree** 1467:24 1473:23, 25 1474:2,5 1477:7 1481:18 1495:10 1541:19 1555:23 1560:20 1570:1 1576:23 1585:16 1589:24

**agreed** 1465:8 1466:3

**agreement** 1453:9 1464:24 1465:11,24 1471:6,18 1472:6 1473:4,6,9,15,19 1477:12 1481:23 1486:19 1487:5,17 1488:6,7 1541:2,21

**agreements** 1575:3

**ahead** 1590:12

**aid** 1480:25

**aided** 1479:21

**aiding** 1474:11

**aims** 1466:11 1472:20

**Alice** 1502:4 1516:2 1518:4

**alleged** 1462:6 1465:16,24 1466:2,4,6 1469:1,7,12,19 1471:23 1472:6,10,12,13 1473:14,18,24 1477:22 1479:2 1487:23 1488:2

**Alliance** 1513:9

**allocate** 1578:20

**allocation** 1500:5

**allowable** 1548:5

**allowed** 1485:3 1530:25

**allowing** 1586:14

**alternative** 1467:23 1475:8 1477:6

**amendment** 1586:23

**America** 1506:19 1508:19 1515:22 1537:21 1540:9

**American** 1575:18

**amount** 1492:23 1591:9 1595:15

**amounts** 1534:23

**analogy** 1574:1,3,8

**analysis** 1456:7 1527:18,20 1548:24 1553:8

**analyst** 1510:23 1546:21 1547:8

**analytical** 1549:11

**analyze** 1536:19 1548:22

**analyzed** 1536:14 1540:24

**Andreatta** 1526:9 1534:2

**Anne** 1502:4 1516:2 1518:4

**announce** 1585:7

**annual** 1498:17

**Ansley** 1522:13 1525:1

**answers** 1563:14 1567:20

**anticipated** 1547:22 1582:2

**anymore** 1583:18

**apologize** 1522:12 1589:22

**applies** 1484:9 1529:12 1531:6 1556:23 1558:16,22 1588:21

**apply** 1453:25 1454:2, 15 1492:14,17 1494:16 1543:9

**appraisal** 1592:23

**approach** 1560:15

**appropriately** 1588:15

**approve** 1518:17

**approved** 1504:2,5,8 1588:8

**area** 1545:7,8,15

**argue** 1508:7 1577:6

**arguing** 1586:24

**argument** 1485:7 1497:14 1521:5 1587:2, 6,16,21 1588:3,7,18

**arguments** 1456:1 1506:13 1508:14 1573:8 1581:20

**arrive** 1540:18

**arrived** 1553:10

**arriving** 1453:25 1456:21 1556:20

**artifice** 1474:18,25 1475:15 1476:6 1477:18 1495:2,5,20 1496:18,20 1542:1,7

**Ashton** 1580:1

**asks** 1483:24 1484:2

**aspect** 1493:21 1536:17

**aspects** 1486:15

**assembled** 1466:11 1472:19

**asserts** 1457:9

**asset** 1523:2,4,5,6 1528:6,11 1532:12 1533:11 1543:24,25 1579:6

**assets** 1544:9,10 1576:2

**assist** 1461:6 1480:25

**assisted** 1533:10

**associate** 1479:16 1480:18

**assume** 1456:17 1523:20,22,23,24 1524:1,3

**attach** 1463:5

**attempt** 1469:18 1474:18,25 1495:1,4 1512:2 1533:19

**attempted** 1475:15 1476:6,9 1495:20 1496:8 1542:1

**attempting** 1474:10,14 1475:9 1476:22

**attention** 1454:12 1456:5 1509:17 1527:6

**attorney** 1543:5

**attorneys** 1573:3,21

**audit** 1545:23 1546:15
1547:23 1555:6,16,17
1567:12

**audited** 1567:4,8

**auditing** 1582:20

**auditor** 1546:20
1563:13 1565:17
1566:4 1567:10

**auditors** 1491:4,9
1522:24 1531:4
1540:15,17 1545:6,19
1547:7 1548:9 1550:20,
21,22,24 1551:7
1582:15,16,17

**August** 1525:21
1526:10

**author** 1530:5

**avenues** 1578:12

**avoid** 1508:2

**aware** 1588:8

---

**B**

---

**back** 1485:14 1491:5,9
1501:14 1505:15
1506:11,22 1508:9,16
1515:14 1522:1
1526:16 1535:25
1536:6 1537:25 1542:3
1545:22 1550:9
1555:14 1561:3
1568:16 1570:15
1572:15 1573:11
1576:2 1577:14
1578:10 1579:11
1581:6,14 1594:19
1595:22 1596:3,4,9
1597:24

**back-up** 1502:2 1592:2

**background** 1591:24
1592:1

**backroom** 1506:7

**backs** 1592:7

**backup** 1591:8,10,13
1592:1,6

**bad** 1468:19 1493:20
1508:19 1539:9
1582:24 1583:1

**bail** 1574:24

**Baker** 1513:5

**balance** 1483:11
1574:5

**balanced** 1515:19

**balancing** 1574:1

**bank** 1487:14 1488:5
1489:12 1491:25
1492:1,4,7,8,9 1498:19,
20 1499:4,5,8 1500:15,
20,21 1501:8,24
1504:4,20 1505:10
1506:24 1507:21
1509:25 1512:20
1516:3,4,6,8 1517:24
1520:17 1521:6
1549:16,17 1570:25
1575:9 1576:3,7,12
1579:14 1582:18
1591:16

**Bank's** 1499:1

**bankers** 1517:16

**banks** 1492:1 1494:3
1506:22 1512:5 1553:3
1581:13

**bar** 1589:1

**Bascha** 1526:21

**base** 1454:17 1492:4

**based** 1455:14 1456:15
1491:4,10 1524:2
1528:21 1529:5,6
1532:7 1546:8 1551:23
1552:1,4 1560:2 1561:5
1563:9 1566:21
1596:19

**basically** 1496:17
1524:11 1536:8
1575:23

**basis** 1540:9

**bear** 1459:8 1483:7
1552:14

**begin** 1453:16 1558:13
1586:4

**beginning** 1507:19

**begins** 1454:25

**behalf** 1534:24 1535:10

**belief** 1470:13,16
1514:14,17 1531:10
1533:3 1538:4,7

**beliefs** 1482:10

**believability** 1454:3
1457:25

**Believable** 1563:7

**believed** 1519:7,8,14

**believes** 1534:3

**bell** 1553:20

**benefit** 1548:1,23
1564:17,21 1572:2

**benefited** 1512:21

**benefiting** 1543:3
1553:7

**benefits** 1533:16
1549:13,14 1552:22
1553:6 1575:21

**Benjamin** 1483:19

**bias** 1482:2,6 1485:4
1508:11 1536:11
1548:20 1549:9 1550:2
1552:7 1553:9 1576:18,
19,24 1577:3,5

**biased** 1577:2

**big** 1488:17 1500:17
1519:13 1570:10
1579:3

**bill** 1515:16

**billion** 1511:1,2,7
1512:18

**bills** 1577:16,19

**binder** 1572:24,25
1573:1

**binders** 1527:25

**binding** 1456:9

**bit** 1494:2 1514:21
1535:25 1536:4 1542:9
1555:5 1556:21
1571:13 1596:2

**Blake** 1490:23 1505:22
1524:22 1573:19

**blame** 1563:17

**blank** 1483:16,19,22,25

**blindfold** 1485:6

**board** 1491:15
1503:15,20 1533:7
1582:4 1588:21

**Bodwell** 1546:15
1555:6

**bond** 1477:11

**books** 1582:19

**borrower** 1546:17
1547:21 1548:2,5
1549:3,4 1552:25
1553:17 1554:1 1575:4,
5 1581:6 1595:8

**borrower's** 1546:24,25

**borrowers** 1516:17,24
1523:17,18 1527:21
1528:12 1529:16,20
1530:21 1533:16
1546:11,12,14 1547:13,
16 1571:24 1575:22
1578:5

**borrowing** 1492:4

**bottom** 1484:14 1529:2

**bought** 1478:1

**boy** 1558:15 1566:15

**Braislin** 1555:19
1582:24,25

**Brandon** 1458:22
1483:25 1522:9,17,20
1523:1,5,20 1528:4
1531:1 1532:15,16
1533:3,17,25 1570:13,
14,16

**break** 1496:15 1541:21
1586:7

**breaks** 1586:6

**Breault** 1517:1,7
1519:16

**bright** 1502:4

**bring** 1468:2 1478:5
1479:17 1483:5 1485:7

1492:20 1513:6 1521:2
1579:18 1580:10
1592:24 1596:4
1599:23

**bringing** 1595:22

**broadly** 1593:14

**broker/dealer** 1516:23
1547:11 1576:23

**brought** 1485:21
1505:15 1520:9
1526:20 1527:23
1530:5 1534:12
1537:18 1555:14
1593:7

**Brown** 1502:4 1516:2
1518:4

**browsing** 1490:8

**bucket** 1574:13

**budgeting** 1524:13

**Buffington** 1490:23
1498:5 1524:22,23,24
1525:18,20,22 1526:4,
6,14 1528:10 1532:24,
25 1533:10,12 1573:19
1576:15 1582:8,11

**Buffington's** 1505:22

**build** 1553:1

**building** 1510:4

**built** 1568:2

**bulk** 1552:24

**burden** 1454:3 1455:5,
9 1459:10 1514:6
1520:25 1537:14,16,17,
20 1558:8,15,18
1559:7,9 1560:17,18,
19,22 1561:6,7 1563:18

**Burkhardt** 1523:8,12
1524:7

**business** 1469:24
1510:3,12 1512:3,9,19,
20 1515:18,22 1517:4,
15 1518:9 1520:19
1521:17 1524:12,15,16,
19,20,21 1525:13,17
1526:15 1531:2 1532:5
1533:18,19 1548:9
1550:11,23,24 1553:3,7

1555:10 1561:1
1563:23 1566:3 1570:2
1571:3,6 1574:19
1575:8 1577:6 1579:12
1583:16 1584:4

**businesses** 1515:23,
25

**buy** 1517:7,9 1580:2

**buying** 1517:12
1570:10

———————

**C**

**cake** 1495:15

**call** 1456:4 1495:14
1520:3 1583:1

**called** 1462:6 1514:23
1515:15 1519:24
1559:13

**calling** 1459:10

**calls** 1528:13

**capable** 1463:1
1468:13 1478:15
1493:12

**capital** 1491:25
1505:10 1512:18
1516:6 1520:16
1578:11,13

**Cara** 1458:22 1483:22

**card** 1569:21

**care** 1574:14

**careful** 1455:15 1560:3

**carefully** 1503:24
1556:17

**carelessness**
1463:13,14

**Carmel** 1580:1

**carried** 1466:3 1472:11
1487:21

**Carroci** 1548:11

**carry** 1469:18

**carrying** 1466:20

**case** 1454:2,5 1455:16
1456:4,9,19 1458:3,11

1459:9 1460:2 1461:18
1462:8,17 1464:2,4,7
1478:25 1481:24
1506:14 1508:12,23
1510:1 1521:25
1522:16,21,22,25
1523:8,19 1525:17
1529:14,17 1530:6
1532:11 1533:2 1534:1
1535:9,12 1536:9,23
1539:6,14 1540:16
1541:10 1542:16
1543:1,6 1545:1,11
1553:12,21 1556:20
1559:25 1560:4,15
1561:7 1568:7,15,17
1570:3,25 1571:15
1573:21,22 1581:1
1587:14 1588:10
1592:14 1599:22

**Casey** 1506:6 1523:4
1561:13

**cash** 1489:5 1504:17
1527:20 1529:8
1549:20 1552:4
1553:14 1554:10,11,14,
19,24 1555:3 1574:22
1591:17

**cash-tracing** 1549:1
1551:14,16,24 1572:6,
11 1576:11

**casting** 1563:17

**catching** 1488:5

**category** 1560:14

**caught** 1488:7

**caused** 1467:4 1469:17
1489:20

**causing** 1498:14

**cease** 1525:15

**cent** 1591:9

**center** 1523:16

**Centurion** 1498:5
1506:8 1523:10
1530:21 1542:15,20
1546:24 1547:3
1553:19 1561:14
1562:3,13 1576:14,15
1578:13 1587:13

**Centurion's** 1530:2

**certainty** 1568:21

**certificate** 1477:11,14,
15

**certified** 1566:13

**certifies** 1525:23

**certify** 1525:25

**Cetera** 1497:8

**chain** 1457:10 1577:25

**challenges** 1522:23

**change** 1482:8 1562:4,
5 1575:20

**changed** 1525:24
1583:16

**Chapter** 1542:24

**character** 1455:17
1459:25 1460:3,4,7
1515:2,3 1518:8,9
1520:22 1533:22,23,24
1534:1 1538:11,19,23,
25 1560:7 1581:21
1587:19

**charge** 1453:17
1454:23 1467:16
1473:17 1474:9 1477:1
1483:11 1484:17
1497:10 1585:3

**charged** 1460:5
1462:4,14,20 1464:12
1465:8 1467:23
1470:20 1471:16
1473:20 1477:7
1480:10 1481:7,13
1486:23 1487:22
1515:4 1540:3 1584:17,
24 1587:4

**charges** 1461:19
1536:9 1541:1

**chart** 1464:3 1488:17
1498:8,9,22 1499:5
1502:25 1503:1
1507:24 1551:1

**charts** 1463:24
1507:22 1553:18

**cheat** 1468:5 1478:8
1493:3 1539:18,22
1557:12

**check** 1554:19

**checkbook** 1515:19
1574:2,3,8

**checking** 1554:18
1583:4

**Cheryl** 1555:21

**Chicken** 1577:19,23

**choice** 1463:6

**choose** 1584:1

**chose** 1584:2

**chronology** 1504:13

**circumstances**
1457:11

**circumstantial**
1457:5,10,13,15
1505:14,18

**cite** 1592:16

**cited** 1589:25 1597:2

**cites** 1598:8

**citing** 1598:21

**citizen** 1459:25

**City** 1489:25

**civil** 1561:7

**claims** 1526:5

**class** 1474:20 1475:5

**clean** 1455:1 1514:2
1537:10 1558:7,13

**clear** 1488:23 1492:22
1550:16 1553:20
1582:3

**client** 1537:4

**clockwork** 1574:17

**close** 1521:24 1535:6
1571:15 1588:11

**closed** 1453:16
1520:17

**closely** 1469:16

**closing** 1485:7
1508:14 1521:4
1538:11 1571:8
1578:21 1586:20
1587:2,15,21,25

1588:1,9

**co-conspirator**
1570:12

**co-conspirators**
1502:10

**co-counsel** 1522:12

**co-sponsor** 1576:22

**co-workers** 1581:21,
22

**Code** 1464:14,16,20
1466:18 1470:22,24
1471:3 1474:13,16,23
1475:12 1476:3

**collapse** 1511:2

**collapses** 1511:15
1571:6

**collapsing** 1511:8

**collateral** 1517:21
1523:22,24 1595:25

**collateralized** 1512:16

**colleague** 1533:23
1538:12 1592:5

**colleagues** 1536:3

**collect** 1527:2

**Collin** 1547:1

**Columbia** 1463:23

**comment** 1518:18

**commerce** 1463:20
1467:6 1469:18
1489:21 1533:20

**commission** 1460:5
1480:4 1515:4

**commit** 1460:8
1464:10,12,17 1465:8
1470:19,21,25 1471:16
1473:3 1474:14 1475:9
1476:22 1479:10
1486:11,17,24 1487:18
1491:23 1492:11
1494:6,15,17,19
1532:15 1533:3 1539:1
1540:25 1541:1,2,18,19
1584:21

**committed** 1461:20,
22,24 1466:9 1467:24

1468:17 1472:17
1474:6 1477:8 1479:13,
20 1480:3,11 1481:2,3,
4,10 1493:18 1506:21
1584:22

**committee** 1567:12

**committing** 1467:17
1473:3 1474:14 1475:9
1476:21 1477:1
1584:19

**commodity** 1475:3,4

**common** 1455:15
1456:24 1457:1
1466:11 1472:19
1478:19 1497:20
1516:17,24 1528:6
1546:10,12,13,17
1547:13,16,21 1548:1,5
1549:3,4 1552:25
1553:17 1560:3 1569:6,
9,11,25 1570:3 1571:23
1595:8

**commonly** 1477:13

**communicate** 1483:3

**communication**
1466:20 1469:15
1493:23

**communications**
1467:5 1469:9,11,21,23
1591:19

**communities** 1510:4

**companies** 1540:8

**company** 1489:25
1490:7 1491:12,13
1510:12 1511:13
1517:2 1519:25 1527:1
1540:5,7,11,12 1551:5,
12 1576:22 1596:18
1597:10,13

**company's** 1546:22

**Compare** 1566:15

**comparison** 1508:1

**compatible** 1527:18

**complete** 1580:6

**completely** 1541:10
1553:16 1564:10
1569:18 1571:5

**complex** 1565:6
1575:8

**complied** 1543:13

**comprehensive**
1592:13

**computer** 1568:16

**concealing** 1499:17
1500:15 1501:3
1570:19 1581:25

**conceals** 1468:9
1478:12 1493:9

**concern** 1569:16

**concerned** 1457:4
1462:12

**concerns** 1495:24
1499:14,16 1501:6,7,21
1589:9

**concert** 1479:6

**conclude** 1567:22

**concluded** 1525:18

**conclusion** 1459:6
1483:1 1535:1 1540:18,
22 1545:10,25 1549:7,8
1554:12 1565:20

**conclusions** 1457:1
1545:11

**conduct** 1462:5
1463:16 1468:23
1477:22 1479:11,13
1480:24 1539:12

**conducted** 1527:18
1536:12

**conducting** 1512:20
1548:24 1552:2
1554:22

**confidence** 1519:25

**confirm** 1553:9

**confirmation** 1536:11
1548:20 1550:2 1552:7
1576:18,19,24

**confirmed** 1587:12
1588:6

**confirming** 1549:9
1598:24 1599:8

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 160 of 182    PageID 13478
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                                    Vol 8 January 20, 2022          Index: connected..Cox

connected 1477:20

connection 1473:8,12
1474:19 1475:2,16
1476:10 1477:17,21
1495:3,8,21 1496:11,
18,19

connotes 1468:20

conscious 1468:4
1478:7 1493:2 1539:17,
21

consequence 1481:5,
11

consequences
1454:16

consideration
1453:22 1455:15
1462:13,22 1481:25
1560:1,3

considerations
1458:20

considered 1462:16,
17 1503:20,25 1504:3,6
1518:20 1549:14

consistent 1460:19
1544:15 1559:11
1566:13

consistently 1512:8

conspiracies 1522:9

conspiracy 1464:10,
12,24 1465:2,14,20
1466:5,13,15,16
1470:19,21 1471:6,9,21
1472:2,13,21,23 1473:3
1481:3,5,7,9,12
1486:11,13,15,23,24
1487:2,7,8,11,13,14,15,
22,23 1488:10 1491:22
1492:11 1493:13
1494:5,15,16,19,21
1540:25 1541:18
1584:21

conspirator 1466:17
1472:24 1481:1,2,10

conspirators 1465:16,
24 1466:6 1471:23
1472:6,13 1473:15,19,
24 1488:2

conspire 1464:17

1470:25

constant 1528:11

constitute 1468:22
1481:15 1587:23

constituted 1540:19

constitutes 1468:9
1478:11 1493:8 1554:8

constituting 1479:2

constitution 1537:21
1556:22,23 1559:12,15

consult 1481:22

contact 1528:12

content 1460:15,17

contents 1456:14

contest 1543:18
1568:1

Continental 1524:6
1580:24,25

continue 1577:17

continued 1533:1

continuing 1491:13

continuously 1510:5

contract 1478:24
1491:6 1498:1 1524:3
1527:4,7,14 1529:11,18
1554:2,4,8 1579:16,23,
24,25 1580:8,9,12,13

contracts 1491:4,10
1498:2 1529:9,19,24
1579:18 1582:2

contractual 1584:11

contractually 1584:7

contradict 1453:8
1571:1

contradicts 1587:14

contrast 1536:15
1553:8

control 1456:8 1462:21
1478:19,21 1497:20,22
1542:16 1553:21
1554:1,8 1575:24
1587:7,9,10,13

controlled 1478:19
1497:20

controls 1478:18
1497:19 1553:19

convenience 1482:23

conversation 1525:2
1577:18

conversations 1506:7
1527:11 1529:21

convict 1465:20
1472:2 1566:6,21
1588:14

convinced 1457:15
1465:5 1466:22
1471:13 1480:7 1482:9

convincing 1455:17
1560:7

cooperated 1513:10

copies 1598:10,14

copy 1506:18 1537:24
1557:21 1596:21
1597:16,18,19 1598:15,
19

core 1522:24

Corporation 1470:3

correct 1517:24
1543:7,9 1547:5,6
1548:2,3,7,25 1567:8
1594:3 1597:20

correctly 1464:3

correctness 1454:13

corroborate 1512:13

costs 1525:7

counsel 1484:23
1497:15 1500:17
1508:14 1519:4 1522:8

counsel's 1586:20

count 1462:15 1464:10,
12,23 1470:19,20
1471:5 1473:2,21
1475:17,21 1476:12,16
1481:10,19 1482:24
1483:9,13,15,16,19,22,
25 1484:3,6,9,10,11,12
1486:10,13,18 1492:11,
15 1494:13,14,15

1495:22,23 1498:10,11
1499:13,14 1500:11
1501:2,6,16,21 1502:18
1546:8 1558:19

countless 1531:23

country 1540:6
1558:16 1569:8

counts 1474:9 1480:10
1481:7,13,15 1483:13
1486:14 1492:15
1493:13,15,16 1495:24
1498:6,7,8 1509:8
1533:5,7 1535:10
1541:25 1556:8
1557:14 1572:20

County 1547:1

couple 1507:23
1577:16 1578:21

court 1453:2 1454:19,
21 1459:20 1483:4
1484:22,24 1485:22
1509:11,13,14 1522:6,7
1535:16,18,19 1551:17
1556:10,12,13 1558:1
1569:3 1573:6 1576:5
1583:11 1584:25
1585:15,21 1586:10,18
1588:12 1589:3,6,15
1590:8,12,16,19,24
1591:4,7,13,20,25
1592:6,19,22 1593:4,7,
8,23 1594:1,5,8,14,18,
21,23,25 1595:3,5,9,13,
18,20,24 1596:2,7,13,
18,20 1597:1,16,19,21
1598:1,6,14,23,25
1599:4,9,11,13,16,18,
25

Court's 1587:20

courtroom 1482:21
1483:6 1586:9

cover 1526:3 1575:2

cover-up 1532:10

covered 1552:20
1553:14,15 1555:17

Covering 1505:7

COVID 1522:13

Cox 1555:21

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 161 of 182    PageID 13479
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 8 January 20, 2022                    Index: CPA..defrauding

**CPA** 1555:23 1566:12

**crazy** 1487:12 1493:5

**created** 1491:1 1523:24 1527:21

**credibility** 1457:24 1458:24 1460:21

**credible** 1511:24 1557:7

**credit** 1453:13 1500:4 1543:21 1544:17 1569:21

**credits** 1583:3

**Creek** 1580:1

**crew** 1530:2

**crime** 1460:5,8 1461:24 1462:14,21 1464:17,19 1465:1,5,8 1466:9,19, 22 1470:25 1471:2,8, 12,16 1472:17 1473:3 1474:14,17,24 1479:10, 17,18,19,20,22 1480:6, 25 1486:17 1487:5 1507:13 1515:4,21,23 1518:13,14 1521:13 1523:21 1532:15 1533:4 1539:1 1541:2, 20

**crimes** 1461:21 1462:4, 20 1581:19

**criminal** 1459:9 1463:16 1468:20 1470:12 1478:25 1480:13,15,18,19,21,23 1511:21,23,25 1512:1 1514:13 1538:3

**criminalization** 1533:19

**criminally** 1479:14

**criminals** 1513:17,20, 25

**critical** 1542:25

**cross** 1562:2

**cross-examination** 1506:14 1525:1,8,12 1544:14 1559:14,17,19, 21 1561:17,23 1562:15, 16,18 1565:24 1571:14

1588:6

**Crossings** 1579:25

**crucible** 1562:17

**crunch** 1582:22

**CTMG** 1547:2

**current** 1529:6 1535:4

**cut** 1554:19

---

**D**

**daily** 1540:9

**Dale** 1544:3

**danger** 1511:1

**dark** 1522:9 1531:19

**date** 1461:20,22,24 1483:2 1484:16 1498:12 1591:8

**dated** 1528:23

**dates** 1461:25

**day** 1500:22 1502:15 1512:20 1515:22 1521:3,11 1530:17 1556:18 1561:21 1576:1,7 1581:9 1583:1

**days** 1509:18 1543:4 1575:14

**deal** 1500:17 1507:1,3, 4,6 1580:3 1581:15,16

**deals** 1578:25

**debenture** 1477:11

**debits** 1583:3

**deceive** 1468:5 1470:12 1478:8 1493:3 1539:18,22 1588:2

**December** 1461:25 1502:3,4,6,16 1505:12 1531:13 1554:14,15,17 1575:12

**decent** 1522:3

**decide** 1453:21 1457:18 1458:4 1459:2 1462:2,11 1481:24 1482:15 1498:3

**decided** 1574:15

**decision** 1454:9 1455:19 1458:7 1459:4 1463:1 1464:22 1468:14 1471:5 1478:16 1482:4,6 1497:6 1498:3,4 1500:23,25 1501:1,15 1524:12 1526:15 1532:5 1560:10 1563:8 1566:3 1580:22 1583:15,16,20,23

**decision-maker** 1493:12

**decisions** 1533:18 1560:11,14 1563:23 1564:6

**deductions** 1456:25 1569:11

**defendant** 1454:24,25 1455:1,4,6,7 1457:16, 20 1459:9,12,14,22 1461:23 1462:4,5,8,10, 17,22,23 1463:16 1465:4,7,10,12,17,20, 21 1466:21,24 1467:4, 8,22,24 1468:23 1469:3,16 1470:11,13, 16,17 1471:11,12,15, 17,18,24 1472:2,3 1474:1,4,6 1477:6,8 1478:1,25 1479:1,9,11, 12,14,21,23,25 1480:3, 6,12,14,16,19,21,24 1481:6,9,12,14 1482:16 1483:15,19,22,25 1486:16,18,20 1487:9 1489:19 1490:11 1492:25 1496:1 1502:8 1514:4,7,10,12,14,15 1538:3,4,7,8,17 1541:3, 7,14,19 1558:19 1559:8 1570:25 1582:5 1590:2

**defendant's** 1515:2 1533:24 1538:23 1590:6

**defendants** 1453:12 1454:24 1458:3 1462:15 1464:11 1467:16,19 1470:20 1473:2 1474:10 1475:10,14,18 1476:1,

5,9,13,21 1477:1,3 1484:3,5 1487:25 1488:11,15 1489:4,6, 10,12,15 1490:25 1492:11,23 1494:14 1495:19 1496:8,12 1500:22 1502:5 1508:7, 23 1514:3 1515:8 1535:1 1537:10 1539:11 1541:25 1556:8 1572:20 1573:21,23 1574:1,10, 14,18 1575:7,19 1577:6 1581:23 1583:14,20,23 1584:1,17 1587:18

**defendants'** 1455:10, 13 1460:3 1521:24 1552:14 1581:20 1590:3,5,6 1591:4 1598:22

**defense** 1458:12 1497:14 1500:17 1506:20 1507:7,11 1508:14 1514:20 1542:6 1559:10 1576:4 1581:4,13,14,17,19 1582:15 1587:17,23 1588:1,2 1589:10 1590:2 1591:1,21 1596:23

**defined** 1480:2

**definition** 1492:14 1493:6,14,17 1497:12, 16 1553:21 1583:17 1587:8

**definitions** 1477:9 1492:14,16 1493:4 1497:9,10

**defraud** 1466:20,25 1467:2,9,14,25 1468:4, 11 1469:4 1470:4,12 1473:7 1474:2,11,19 1475:15,19 1476:14 1477:18 1478:3,7,13 1484:6 1488:12 1489:3 1490:12 1492:18 1493:2,10 1495:2,20 1496:2,13,18,19 1533:6 1539:16 1540:1 1541:8, 15 1542:2,8 1550:10,20 1583:21

**defrauding** 1469:20

**degree** 1468:20 1580:17

**deliberate** 1481:22 1586:5

**deliberately** 1479:16

**deliberating** 1485:15 1486:1 1561:4

**deliberation** 1482:20

**deliberations** 1453:8 1454:6 1477:10 1481:20 1482:7 1483:1, 3 1559:25 1586:4,8

**Delin** 1483:22

**delivery** 1475:3,4

**demand** 1577:15

**demonstrate** 1537:18 1538:9 1543:14 1557:11 1592:4

**demonstrated** 1553:17 1588:7

**demonstrates** 1537:19 1551:10

**demonstrating** 1550:16

**denied** 1520:16

**deployed** 1511:17 1512:16

**Deposit** 1470:2

**depository** 1470:1

**deprive** 1468:1 1478:4 1492:19

**depth** 1536:4

**describe** 1536:2 1553:25 1568:12

**describes** 1498:9 1529:4

**description** 1597:14

**descriptive** 1507:20

**deserves** 1460:25 1461:15

**designed** 1480:24 1549:7

**destroying** 1570:19

**detail** 1537:15

**details** 1465:15,25 1466:2 1469:1 1471:22 1472:7,10 1487:8,21

**determine** 1453:11 1455:22 1458:20 1460:18

**determining** 1454:8 1461:7 1463:6,12 1470:11 1494:1 1514:12 1538:2

**developer** 1517:25

**developers** 1507:2,6 1524:19 1578:8 1581:15

**developers'** 1506:15 1581:12

**development** 1522:21 1548:15 1568:14,15,20, 23

**developments** 1499:18 1501:4

**devise** 1466:25 1469:4 1488:12 1541:7

**devised** 1466:24 1469:4 1488:11 1541:7

**differ** 1458:18 1561:8

**difference** 1568:12,21, 22

**differences** 1543:1

**digital** 1596:25 1597:1, 17,22,25 1598:11

**digitally** 1598:5

**diligence** 1517:2 1527:25 1528:8 1532:5 1546:21 1547:8 1580:4

**dime** 1513:21,22

**dire** 1557:19

**direct** 1457:5,8,13,15 1478:21,22 1497:22,23 1505:14,18 1524:23 1525:5 1542:17 1552:12 1562:15

**directed** 1464:21

**destroying** 1571:4 1479:21

**directing** 1542:19

**direction** 1478:22 1479:5,6,8 1497:23 1542:17 1553:9

**directions** 1553:6

**directly** 1458:18 1465:25 1472:7 1478:17 1497:18

**director** 1523:6 1576:20

**directors** 1491:15 1503:15 1582:4

**dirty** 1534:16,19

**disagrees** 1533:18

**disbursement** 1597:7

**disclose** 1570:16

**disclosed** 1464:1 1490:16 1503:21 1512:19 1545:21 1547:14 1548:17

**disclosing** 1501:18 1502:23

**disclosure** 1522:22 1523:8 1548:13 1573:22

**disclosures** 1508:5 1522:23 1531:2 1543:16 1546:12 1557:4 1566:17 1573:23 1583:16 1587:5 1592:8,9 1595:7,11

**discovered** 1571:5

**discovery** 1511:15

**discredited** 1460:9,22

**discretion** 1529:19

**discretionary** 1554:3

**discuss** 1475:8

**discussed** 1466:11 1472:19

**discussing** 1587:8

**discussion** 1462:13

**disobey** 1468:19 1493:20 1539:10

**dispute** 1496:4

**dispute's** 1496:6

**disregard** 1454:11 1456:11,20 1464:8 1468:19 1493:20 1539:10 1587:22

**disregards** 1529:13

**distinction** 1457:12 1505:18

**distinctly** 1503:24

**distribution** 1499:2 1506:6,10 1507:5 1575:16

**distributions** 1488:18, 24,25 1489:6,8,17 1498:19 1500:1,14 1501:9,19,22 1502:20 1505:4 1509:5 1518:20 1521:11 1523:25 1550:18 1553:16 1569:15 1573:15 1574:5,23 1578:3,8,17 1581:10 1583:22 1584:13

**District** 1463:23

**document** 1513:12 1528:20,23 1529:11 1565:7 1568:16 1590:1 1591:10 1592:2,6

**documentation** 1499:8 1502:2 1530:12 1550:15

**documents** 1489:25 1536:18 1544:5 1548:5 1550:8 1551:9 1552:10, 18 1563:16,24 1564:2 1566:11 1570:11 1586:2 1589:17,18 1590:3 1591:8,13,14 1592:1,9,14,18 1593:10 1594:4,5,11 1595:16 1596:20 1597:16

**dog** 1578:6

**dollar** 1494:9 1506:24 1511:1,3,7 1530:20 1577:21

**dollars** 1517:11

**door** 1485:14 1486:1
1488:7 1573:15
1576:17

**Dorney** 1490:24 1526:5

**Dorney's** 1506:3

**double-check** 1598:12

**double-checking**
1590:18 1598:16

**doubt** 1455:6,8,11,12,
14,17 1457:16,20
1460:6 1461:23 1462:3
1465:6 1466:23
1467:12,13,22 1469:3,
14 1470:15 1471:14
1473:18 1474:1,3,6
1475:13 1476:4,23
1477:6 1479:22 1480:1,
8 1481:8 1482:17
1485:10,16 1486:3
1490:10 1494:3
1495:17 1507:8
1508:22 1514:7,8,11,13
1515:6,8 1521:24
1531:9 1532:14
1533:24 1535:7 1538:6,
24 1539:17 1540:23
1558:9,19,21 1559:5,9,
23,24 1560:2,6
1561:10,11 1563:11,19
1564:12 1565:13
1566:7,8,24,25
1567:17,18,23 1568:10,
24,25 1569:24 1570:22
1571:8,9,21,25 1572:1,
4,9

**Downey** 1545:18
1546:3 1584:10

**draft** 1579:23,24

**drafted** 1566:17

**draw** 1456:23 1457:2
1498:3 1502:11
1529:14,16 1530:1,20
1533:14 1575:5 1581:7

**drawn** 1455:3

**draws** 1526:11 1530:17
1573:19,20 1576:14
1578:5,12

**drive** 1549:7 1585:9,11,

23 1598:4

**driving** 1574:16

**dropped** 1580:8

**drove** 1518:6

**dry** 1500:15

**DST** 1490:4,5

**due** 1515:16,23 1517:2
1521:12 1522:13
1527:25 1528:8 1532:5
1546:21 1547:8
1563:11 1569:13
1575:13 1577:19
1580:4 1581:9

**dug** 1525:7

**duty** 1453:20,23
1454:9,15,17 1455:21
1459:10 1462:10
1481:21 1482:15

---

**E**

**Eades** 1546:21 1576:19

**earlier** 1455:21
1460:14,16,17,18,19
1489:1,9,17 1496:24
1497:3 1499:19,20
1500:1 1501:5,14
1509:5 1528:17
1533:15 1545:6
1573:15 1575:16
1583:22 1599:21

**early** 1488:15,20
1502:4 1587:1

**easy** 1521:25

**economic** 1523:17
1549:13,14

**economics** 1512:3

**educated** 1580:16

**education** 1461:9,16
1566:13

**effect** 1453:19 1482:11

**effectively** 1468:9
1478:12 1493:9

**efficiently** 1589:23

**effort** 1479:7 1481:22

**Eggers** 1459:17
1484:21,22,25 1528:17
1562:19 1572:22
1573:9 1583:14 1585:8
1586:12 1588:24
1589:8 1590:9,13,17,20
1591:6,15 1592:21,25
1593:6 1596:15,22
1597:2,24 1598:2,12,15
1599:2,15

**election** 1455:3

**electronic** 1585:6
1596:21

**electronically** 1585:14

**element** 1467:13
1476:24 1480:2,20
1490:11

**elements** 1464:19
1467:11 1471:2 1474:8
1475:13 1476:4 1486:2,
9,16,25 1488:8,10
1491:21 1494:16,20
1495:13,17 1496:7

**email** 1487:3,18
1491:12 1504:16
1520:9,13 1528:15
1530:6 1531:25 1532:2
1534:5,11,14 1570:15
1573:10 1575:3,4
1577:23,25 1582:7,18
1591:2,18 1594:16,25
1595:1,2,3,4,5

**emailing** 1502:5

**emails** 1490:7 1502:7
1504:11,21 1506:11
1520:10,11 1530:10
1531:22 1532:10,13,17,
18 1534:23 1539:13
1570:15 1573:4
1576:13 1577:7

**embarrass** 1566:20

**employed** 1467:2
1489:3 1535:2

**employee** 1511:19,20
1577:22

**employees** 1520:20
1531:20 1532:13
1535:3,4

**encountered** 1453:12

1555:2

**end** 1453:23 1488:6
1505:15 1515:15,20
1535:9 1554:12,13
1564:8 1567:25 1576:1
1581:8 1596:1

**ended** 1506:7 1563:2

**ending** 1594:1,2

**engage** 1489:13
1508:6 1573:24
1583:20

**engaged** 1468:3
1478:6 1479:13
1480:24 1492:21
1494:21 1496:17,20
1584:17

**engaging** 1584:21

**enhancements**
1500:4 1543:21
1544:17

**enjoy** 1507:9

**enjoys** 1507:13

**enlighting** 1559:19

**ensure** 1578:4

**enter** 1462:12 1473:6,9
1474:1,4

**entered** 1465:24
1472:6 1473:15,19

**entering** 1473:4

**enterprise** 1479:7

**entire** 1510:1 1522:2
1555:9

**entities** 1507:22,23

**entitled** 1571:1

**entity** 1463:1 1468:14
1478:16 1499:19,20
1500:24 1501:5
1507:18 1553:24

**entries** 1551:10

**environment** 1507:8
1581:18

**Ernst** 1513:6,9

**error** 1507:14

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 164 of 182    PageID 13482
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 8 January 20, 2022                    Index: escape..false

**escape** 1456:6

**essentially** 1523:15
1529:10

**establish** 1466:12
1472:20 1479:21

**established** 1457:2
1479:1 1480:20

**estate** 1500:3 1543:21
1551:22 1566:14
1567:6

**ethnic** 1482:5

**Etter** 1502:12,15
1575:11

**evaluate** 1543:6
1561:12,20

**evaluated** 1458:24

**event** 1466:8 1472:16

**events** 1457:10

**eventually** 1506:22
1581:14

**evidence** 1453:21
1454:18,24 1455:2,16,
23 1456:1,8,15,22
1457:3,4,5,6,8,10,13,
15,21,22 1459:11,12,
15,23 1460:1,3,10,15
1461:7,17 1462:16,23
1463:25 1464:2,4,7,8
1481:25 1482:11
1487:25 1488:14
1491:16 1492:10
1496:22 1502:15
1505:14,21 1509:22,25
1510:14 1511:17,24
1512:1,5,10,11,13
1513:22 1514:5,18
1515:2,17 1519:10
1521:9,23 1523:1
1531:12 1533:2,8,23
1536:9,14 1537:4,12,18
1538:9,17,20,23
1539:14,19 1540:24
1541:11,13 1542:16,20
1543:6,12 1545:16
1546:7,9 1547:20
1549:11 1550:16,21,22
1553:20 1555:5 1557:1,
7,10,15 1559:17 1560:3
1566:21 1569:10
1570:7,9,11,12,14,21

**1571**:11,12,14 1572:15
1573:8 1575:1 1582:14
1583:8 1587:9,11,22
1588:3,19

**ex-football** 1561:24

**exact** 1461:22 1523:10
1558:10,12

**examination** 1524:23
1525:5 1534:4

**Excel** 1585:10,21

**Exchange** 1474:21
1475:6,23,24 1476:18

**exclude** 1455:12

**exclusive** 1460:23
1469:12

**exclusively** 1529:10,
16 1551:24 1552:4

**excuse** 1463:15
1500:19 1510:22
1511:18 1575:4

**execute** 1469:18
1474:10,18,25 1475:15
1476:6,10 1495:1,2,4,5,
20 1496:8 1542:1

**executed** 1475:14
1476:5,9 1491:4,10
1495:19 1496:8 1524:2
1527:14 1529:8 1542:6
1579:18

**executing** 1467:6
1474:10 1489:21

**execution** 1498:10

**executives** 1511:14
1513:14 1539:8
1545:14 1587:2

**exercise** 1531:25

**exhibit** 1453:6,8,11,14
1456:14 1491:8 1492:4
1500:8,18 1501:1
1502:14 1503:1,13
1504:22 1505:8
1507:15 1528:17
1529:3 1552:13 1577:9,
24 1579:5,17,21
1583:2,7 1584:5
1585:10,22 1589:8
1590:1,14 1591:4,15
1593:3 1596:16

**exhibits** 1455:25
1456:11,12,24 1464:1
1492:7 1502:1 1504:10
1552:14,16 1585:4,5,6,
9,12 1589:9,11 1591:1
1597:17 1598:4,8,11

**exist** 1546:7 1551:9
1594:10

**existence** 1463:5
1466:13 1472:21

**exited** 1586:9

**expect** 1454:22
1487:17 1497:14
1502:16 1506:14
1510:14 1511:13
1534:10

**expected** 1516:11
1547:22

**experience** 1456:25
1461:8,16 1532:8
1551:21

**expert** 1548:11,12
1551:17 1554:5 1566:8
1572:5,10

**experts** 1512:22
1548:18 1551:20

**explain** 1453:24
1454:5,10,16 1481:21
1593:17

**explained** 1454:19
1464:21 1471:3
1476:25 1486:22
1491:20 1494:22
1499:23 1534:14

**explaining** 1464:1
1592:9

**explains** 1591:11

**exposed** 1494:10

**exposes** 1470:5
1494:7

**expressed** 1461:2,11

**extend** 1542:14

**extended** 1518:13

**extent** 1453:6,7 1464:6

**eyewitness** 1457:9

**F**

**facilities** 1469:11,15,
21,23

**fact** 1457:9,11 1461:7
1462:19 1466:10
1468:10 1472:18
1478:13 1485:8
1493:10 1500:14,20
1501:17,23 1510:19
1521:19 1530:4
1548:18 1551:9

**facts** 1454:7,9 1455:22
1456:5 1457:2 1464:1
1468:21 1482:15
1523:19 1531:6 1558:3
1587:14

**factually** 1587:23
1588:10

**fail** 1537:20

**failed** 1460:12 1520:25
1533:4 1569:18

**fails** 1455:6 1514:9
1558:20

**failure** 1584:1

**fair** 1546:18 1548:22
1549:1 1556:20
1565:22,24 1566:2
1569:25 1572:17
1580:7

**faith** 1470:13,16
1514:17 1531:6,10,13
1533:9,10 1536:22,23
1537:22 1538:7,8,10
1540:17,21 1542:4
1545:9,15,25 1553:7
1561:2 1565:20

**fall** 1527:8 1532:19
1560:14 1568:18

**false** 1467:2 1468:6,8
1469:5,10 1473:11
1475:1 1476:7 1478:9,
11 1489:4 1493:5,6,8,
23 1495:6 1496:9
1498:17 1499:15
1500:12 1501:7
1502:22 1513:17
1520:6 1539:25 1542:8
1587:3

Case 4:21-cr-00289-O     Document 308     Filed 01/29/22     Page 165 of 182     PageID 13483
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                                    Vol 8 January 20, 2022
Index: falsely..fund

falsely 1460:10

falsity 1468:7 1478:10
1498:13 1501:3
1539:24 1540:2

familiar 1544:22

family 1560:13 1564:6
1566:23

father 1564:13

FBI 1510:23 1570:4,6
1583:1

feasibility 1527:9

February 1526:25
1582:25

federal 1470:2
1474:17,24 1485:22
1551:17 1572:7

feel 1456:24 1482:3
1485:17

fellow 1482:1,12

felt 1485:10,11 1519:21

female 1504:15

Ferguson 1551:8
1552:2,8 1577:4

fiduciary 1574:13

field 1554:5

fight 1578:15

figure 1488:10 1504:19
1507:17 1544:6 1579:9

figuring 1502:11

file 1474:22 1475:6,23
1476:19 1573:17
1574:25 1579:2

filed 1500:11 1501:21
1596:17

files 1489:18 1490:9
1544:5

filing 1495:24 1498:13,
14,17 1499:22 1502:24

filings 1490:13,19
1492:1 1496:24 1497:1
1502:19 1503:6 1508:3
1523:13 1531:3
1580:20 1581:2,23
1584:23

final 1453:3,9,16
1456:6,7 1528:23
1577:15 1588:18

finalize 1578:25

finally 1454:5 1502:18
1537:3 1562:25

finance 1575:6

financial 1464:11,13,
20 1467:15 1468:2
1470:1,4,5,6,8,10
1478:5 1484:7 1486:11
1490:6 1491:19,24
1492:12,20 1494:2,6,7,
11,12 1507:20 1515:11,
12,13 1525:23 1541:6,
15 1551:22 1552:3
1582:20 1584:20

financing 1521:10
1568:3 1574:6,9,11,19

find 1457:17 1462:19
1464:3,6 1465:4
1466:21 1467:10
1471:11,12 1476:21,22
1479:22,25 1480:1,6
1481:8,12 1483:15,18,
21,24 1484:3,4,5,6
1509:7 1523:20
1532:14 1533:6 1538:8
1583:18 1584:16,24
1589:19

finger 1559:2

finished 1553:1
1577:18

FINRA 1566:9 1578:15

firma 1518:4

five-year 1534:17

fix 1578:24

fix-it 1579:2

flashed 1487:4

flew 1519:20 1563:12,
20

flexibility 1532:20

flow 1527:20 1529:8
1586:17 1591:17

flowing 1550:4
1552:22 1553:6

focus 1509:25

focused 1551:22

folks 1504:16

follow 1453:24 1454:6,
10,14 1469:23 1529:22
1588:13,15

follow-up 1484:2

Fontanas 1580:4

forbid 1515:9

forbids 1468:18
1493:19 1539:9

Ford 1523:4 1524:10
1561:13 1562:2

Ford's 1506:6

forecast 1524:12
1527:16 1529:8

forecasts 1524:15

foregoing 1477:16

forensic 1500:19
1513:9 1576:11,24

foreperson 1482:20,23
1483:2,4 1593:9,19,25
1594:3,7,12,15,19,22,
24 1595:1,4,6,10,14,19,
21,25 1596:6

foreseeable 1481:5,11

foreseen 1469:25

form 1482:22 1483:10
1484:14 1491:22

formal 1454:23
1465:24 1472:6
1487:16

forms 1483:12

Forty 1552:1

forward 1505:25
1506:2 1530:8,24
1533:16 1537:18
1587:10

foul 1506:23

found 1459:21 1462:10
1475:10 1476:1 1481:6
1582:25

founded 1558:16

fourth 1467:8 1476:15
1480:16 1490:11

framework 1543:5

Francisco 1563:12

fraud 1464:10,13,18,
19,22 1465:8 1466:18
1469:13 1470:19,21
1471:1,5,16 1473:4
1474:9,15,25 1475:9,11
1476:2,22 1480:9
1486:11,18,24,25
1487:19 1488:8,11
1489:19 1490:1,11
1491:19,21,23 1492:12
1493:21 1494:6,15,17,
19,20,23 1495:13,14,17
1496:16 1506:21
1540:4,25 1541:1,2,6,
18,20,24 1542:6
1550:21 1551:22,23,25
1552:2,3 1554:23
1557:13 1570:3,25
1572:7,12 1580:16
1582:17 1583:5 1584:1,
2,19,22,23

fraudulent 1469:5,10
1473:11 1475:1 1476:7
1477:22 1495:7 1542:8

Friday 1580:16

friend 1502:12

friendly 1555:18

friends 1581:20,22

Friesenhahn 1526:21

Frisco 1529:25
1534:14 1546:23,24
1591:8,19 1592:22
1593:23 1597:7

front 1488:6 1505:15
1511:13 1512:17
1534:5

full 1515:14 1516:2,8

fully 1511:17 1512:16,
20 1536:19

function 1456:2

fund 1498:14,15
1499:19,20 1500:10,24
1523:23 1543:7,10
1578:4,7,12,19 1579:6

**fundamental** 1522:14
1523:16

**funded** 1499:17
1504:17

**Funding** 1548:15

**funds** 1470:9 1498:18
1500:13,15 1501:9,13
1508:3 1511:17
1512:15 1515:11
1543:25 1544:22
1546:13 1555:17
1594:17,19 1595:22

**furtherance** 1481:4,11

**future** 1475:3,4
1524:13,14,20 1526:14,
15,18 1527:19 1528:5,
21 1532:3,20,22
1533:12 1582:2

**FYI** 1578:24

―――――――――――

**G**

**gain** 1468:2 1478:5
1492:20

**game** 1583:15

**gave** 1460:13 1485:1,
18,21 1487:12 1505:13,
20 1543:5 1555:1,12

**general** 1454:1
1459:15,23 1477:13
1538:18

**generally** 1486:15

**generating** 1512:16

**generic** 1498:15

**gentlemen** 1453:3
1484:25 1494:14
1504:9,24 1507:10
1508:9,13 1509:3,15
1510:3 1513:24
1518:15 1519:6 1520:5,
24 1521:22 1522:8
1535:20 1556:6
1572:22 1573:7
1575:17 1576:6 1577:7
1580:14,25 1581:13,19
1582:7 1583:12 1584:3,
16,25 1585:15

**Gilbert** 1580:8

**Gilpatrick** 1523:3
1525:3 1527:2,23
1528:7,14 1532:17,23
1570:16 1580:11

**give** 1453:4 1454:1,4,
11 1460:5,23 1461:14
1462:22 1482:10
1483:4 1485:7 1515:5
1533:24 1538:23
1552:13 1566:2,9
1588:20 1591:23
1593:15,16 1599:4

**giving** 1551:5 1599:11

**glaring** 1573:13

**Glenn** 1580:3

**go-between** 1575:22

**good** 1458:13 1459:12,
15,23 1460:7 1470:13,
16 1488:25 1507:1,3,4,
6,8 1508:20,21,24
1509:15 1514:17
1518:8,9 1520:1,9
1527:5 1531:6,9,13
1533:8,10 1535:20,21,
22 1536:22,23 1537:22
1538:7,8,10,11,13,18,
25 1540:17,21 1542:4
1545:9,15,24 1553:7
1555:24 1561:2
1563:21 1564:19,23
1565:20 1573:18
1576:18 1577:6
1578:16 1581:15,16,18,
21 1587:18 1599:16

**good-faith** 1514:14
1538:4

**Goodman** 1459:19
1522:5,8 1579:15,21
1585:20

**goodness** 1510:18
1559:21 1568:5

**government** 1455:5
1457:19 1458:12
1461:21,22 1462:2
1463:3 1465:5,23
1466:1,22 1467:10,12,
18,21 1468:25 1469:8
1471:13 1472:5,9
1473:14,25 1474:3,5

1476:23 1477:3,5,25
1480:7 1482:15 1485:9,
16 1487:16,20,22
1488:1 1493:22,24
1509:21,24 1511:8
1512:2 1513:10,16
1514:6 1515:7 1516:12
1518:16 1519:4 1520:5,
24 1522:3,14 1523:12,
15,19 1524:4,8 1526:8,
20 1529:7,9,13,15
1530:4,18,19 1531:14,
22 1533:4,17 1534:4,8,
22 1535:6 1537:16
1538:12 1539:6,16
1540:16,23 1542:13
1545:6 1546:4,5
1548:11,12 1554:16
1556:2 1558:8,18
1559:7,9 1560:21
1561:18 1566:20
1567:16 1569:14
1571:20 1572:9 1575:8
1583:2 1586:23
1587:12,15 1589:8,25
1590:22

**government's** 1455:9,
12 1491:8 1500:18
1501:1 1502:14 1503:1,
12 1504:10,22 1505:8
1507:14 1515:24
1521:14 1522:23
1523:8 1528:16 1533:9
1534:1 1536:11
1538:22 1548:18
1566:4 1577:8,24
1579:5,16,21 1583:7
1584:5 1587:9 1589:9,
25 1591:15 1593:3
1596:16 1598:19
1599:8

**grace** 1512:7 1575:14

**grand** 1513:20 1519:1

**Grapevine** 1563:21

**great** 1508:22 1520:22
1556:22 1571:18
1584:4,6

**greedy** 1574:21

**Greenlaw** 1458:22
1483:16 1493:1
1503:14 1513:19
1514:23 1520:16

1539:22 1572:18
1578:15 1582:5

**Greenlaw's** 1505:7

**groups** 1497:8

**guess** 1592:10

**guide** 1482:20

**guilt** 1454:24 1455:7,
10,13 1457:16,19
1462:7 1478:25
1514:10 1521:24
1546:8 1559:3

**guilty** 1455:6 1457:17
1462:4,10,20 1465:4
1466:21 1470:18
1471:11,12 1472:25
1473:1,17,22 1475:11
1476:2,21 1480:1,6
1481:7,12,17 1482:16,
25 1483:17,20,23
1484:1,3,5 1492:11
1494:14,23 1506:24
1509:7 1514:7,16
1521:8 1522:1 1523:21
1531:11 1535:10
1538:8 1556:7 1558:19
1559:1,4,8 1561:2,5,9
1571:9 1572:18,19
1584:17,24

**guy** 1504:14 1577:1

**guys** 1556:19 1576:16

―――――――――――

**H**

**Haan** 1516:16

**half** 1468:9 1478:12
1493:9

**hand** 1485:18 1486:5

**happen** 1522:9
1562:10

**happened** 1454:8
1504:25 1511:6
1518:23 1519:18
1536:19 1574:17
1584:10 1586:21

**happening** 1505:1,2
1583:7

**happy** 1511:21

**hard** 1562:17 1565:5 1568:11 1571:8,9 1596:7,21 1597:16,18, 19 1598:10,14,15,19

**harm** 1506:23 1512:6, 11 1517:13 1541:11

**Harry** 1526:25 1532:6

**hatched** 1582:11

**hear** 1458:14 1511:18, 20 1512:15 1513:16,21 1555:6 1559:20 1585:1 1599:20

**heard** 1459:2 1461:1 1485:8 1487:25 1490:3 1491:16,25 1492:3,6,22 1497:6,11 1500:8 1503:17,18,20,25 1504:3,6 1507:22 1510:22 1513:7 1515:21 1519:17 1520:14,16,20 1522:22 1523:3 1524:6,8,9 1525:19 1526:4,5,8,20, 25 1527:13,17 1528:4, 11 1529:20,25 1530:10, 19 1531:20 1532:6 1533:8,9,14,25 1534:1, 8,22,23,25 1535:3,4 1537:7,8 1538:21 1539:19 1540:8 1561:19 1565:1 1580:1

**hearing** 1506:13 1557:18 1597:14

**heart** 1559:24

**heartstrings** 1508:16

**heat** 1576:21

**Heather** 1580:3

**heavy** 1455:9 1560:19, 22

**Heck** 1582:18

**held** 1479:14

**helped** 1490:8 1555:22

**helpful** 1456:3

**helps** 1592:15 1596:2

**hesitate** 1482:7

**hesitating** 1563:6

**hesitation** 1455:19 1560:8,9

**Hey** 1501:11 1504:16 1563:20

**high** 1520:23 1541:23

**higher** 1468:20 1547:25

**highest** 1561:6,7

**highlighted** 1494:24

**hire** 1513:2

**historic** 1529:6

**hitting** 1577:20

**hold** 1517:10 1574:8 1578:10

**holders** 1474:11

**holds** 1479:11

**Hollis** 1458:22 1483:15

**home** 1529:5 1560:12

**homes** 1568:2 1580:8

**honed** 1580:18

**honest** 1458:9 1482:10 1534:3,6,7,10,13 1555:8 1557:2

**honesty** 1459:24 1514:25 1518:7 1538:19

**Honor** 1459:17,18 1509:9 1522:4,5 1535:17 1573:5 1583:9 1585:8,19 1586:12,13, 14,22 1588:24,25 1589:8,12,16,20,22 1590:5,9,15,18 1591:12,15,23 1592:12 1593:1 1596:15,19 1597:6,24 1598:16,20 1599:7,17

**honorable** 1522:3

**hope** 1487:2,17 1535:21 1558:2

**house** 1569:20

**Huge** 1579:4

**hundred** 1511:1 1596:24

**hurt** 1582:8

**hypothetical** 1488:4 1520:6 1521:19

**hypotheticals** 1512:14 1553:15 1565:2

**I**

**I's** 1505:9

**idea** 1508:22,24

**identified** 1475:17,20 1476:11,15 1503:22 1589:11

**identify** 1539:20 1543:7 1579:5

**identities** 1465:16 1471:23

**iffy** 1595:11

**ignores** 1523:15 1553:16

**II** 1470:19,20 1471:5 1473:2,21 1481:7 1484:9,10 1486:13,14 1493:13,16 1494:15 1516:24 1547:12

**III** 1467:1 1473:8 1474:9 1475:16,20 1476:11,15 1480:10 1481:10,13,15 1484:11 1488:13 1489:5,9 1490:15,20 1493:15 1495:21 1496:11,19 1498:8,11, 14,16 1499:11,25 1500:12 1501:7,13,20 1502:20 1503:9 1504:1, 4,20 1506:1 1508:1,3,7 1509:1 1516:13,20,24 1518:20 1524:1 1536:7 1541:9,25 1542:11 1543:2,8 1546:16,18 1547:12,18,20,25 1548:6 1549:3 1550:4, 18 1552:22 1553:3,5 1555:16 1568:3 1569:15 1575:10,15 1578:11,13,23 1581:10

**III's** 1489:10 1502:24 1505:10,11,12 1507:4 1574:5

**illegal** 1491:17

**imminent** 1511:2

**impact** 1516:2

**impacts** 1528:20

**impairment** 1528:18, 23

**impaneled** 1537:8

**impartial** 1455:15 1481:25

**import** 1562:12

**importance** 1463:5

**important** 1455:19 1458:1,6 1509:18 1510:6 1534:21 1537:9, 23 1556:18 1557:17 1558:1,2,15 1560:5,10, 11 1563:8,9 1564:6 1565:11 1566:22 1567:22

**imposes** 1459:9 1561:25

**impossible** 1560:18 1571:10

**impress** 1458:8

**impression** 1579:18

**improbable** 1460:6 1538:25

**improper** 1512:12 1531:21 1588:3,11

**impugning** 1588:1

**inaccurate** 1587:24 1588:11

**inappropriate** 1526:24 1534:18 1549:8

**include** 1493:15 1529:8 1591:18

**included** 1490:4,5 1493:4 1532:21

**including** 1455:24 1458:3 1463:23 1572:5, 10 1590:20 1592:25 1593:2

**income** 1512:17

inconsistent 1460:3, 12,19 1515:3

inconvenient 1512:4 1520:4

increased 1470:6 1494:7,11

independent 1492:9 1516:8 1534:25

indicating 1457:11

indicted 1568:18

indictment 1454:23 1461:19 1462:1,4,6,15 1464:12 1465:9 1466:3 1467:16,20 1469:1,7 1470:20 1471:17 1472:10 1473:2 1475:17,21 1476:12,16, 25 1477:4,19 1480:10 1481:19 1482:25 1483:9,13,16,20,23 1484:1 1496:12 1498:8 1507:16,17,19 1526:17, 18 1570:20 1586:24

indifference 1468:7 1478:10

indirect 1478:22 1497:23

indirectly 1478:18 1497:19

individual 1462:3 1527:23 1539:7

individually 1457:20 1462:18 1482:16

individuals 1536:20 1538:10,22 1541:11 1574:4

industry 1534:10

inference 1455:3

inferences 1456:5,23

inflammatory 1510:17

influence 1462:25 1468:13 1478:15 1482:3,6

influenced 1508:10

influencing 1463:1 1468:13 1478:15

1493:12

information 1498:18 1499:16 1500:13 1501:7,8 1502:21,22 1507:20 1553:11 1555:13,15 1566:10 1598:21

informed 1491:4

initial 1586:20 1587:21

initially 1598:3

innocence 1455:2 1514:5 1537:7 1571:15

innocent 1454:25 1537:11,12 1558:5,6,14

inside 1488:5 1590:1

insinuation 1534:15

instance 1498:11 1499:23 1592:20

institution 1464:11,13, 20 1467:15 1470:1,2,5, 6,9,10 1484:7 1486:12 1491:20,24 1492:12 1494:2,6,7,11,12 1515:11,12 1541:6,16

institutions 1490:6 1507:21 1515:14 1584:20

instruct 1514:1 1588:18

instructed 1462:9 1485:24 1531:7 1533:21 1588:12,15

instruction 1453:4 1454:12 1485:7,12,19, 20,23 1531:5,8 1537:23 1538:1,15 1557:20 1587:20 1588:16,20

instructions 1454:1,2 1456:19 1462:24 1464:22 1468:16 1471:4 1480:2 1485:1 1486:10 1505:13,19 1506:17,19,23 1507:12 1508:17 1536:22 1537:24,25 1538:16 1539:4 1558:11 1559:25 1560:19 1561:11 1572:16

1588:13

instructive 1586:23

instrument 1477:13

insufficient 1549:19

Insurance 1470:2

insured 1470:2

integrity 1459:25 1514:25 1518:7,8,10 1520:23 1538:19

intend 1541:7

intended 1466:25 1468:1 1469:4,11 1478:4 1488:11 1492:19,20 1515:9 1580:19

intent 1453:13 1465:13 1467:9 1468:4,5,10,18 1470:12 1471:19 1475:18 1476:13 1478:7,8,13 1479:10,17 1480:4,19 1490:12 1493:2,3,10,19 1496:1, 13 1514:13 1515:8 1531:12 1532:15 1533:3,4,5,6,7 1536:20 1538:3 1539:8,16,18,22 1540:1 1541:4,14 1542:2,3,4,8 1557:8,9, 12 1575:1 1579:23,24 1580:5,14 1582:14

intent-driven 1539:4

intentionally 1463:18 1465:18 1471:25 1487:10 1512:12 1539:10

interaction 1570:6

interest 1458:10 1477:11,14 1507:3 1512:6 1518:12 1527:11 1548:1 1581:16

interesting 1557:22

interests 1466:12 1472:20

interim 1477:15

intermediaries 1478:18 1497:19

internal 1531:15 1533:18

internally 1592:7

interpret 1555:3 1593:11

interpretation 1456:8

interrupting 1586:17

interstate 1463:20 1466:19 1467:5 1469:11,15,17,21 1489:20 1490:1

interviewed 1563:22

introduce 1591:21

introduced 1519:22

introductory 1587:2

invest 1503:11

invested 1505:5 1512:18 1574:4

investigating 1582:16 1583:4

investigation 1513:10 1531:16 1534:24 1536:11,12,16 1549:9 1551:23,25 1552:4,8 1553:10

investigations 1552:3 1554:23

investigator 1551:22

investing 1466:25 1488:12 1497:4 1499:11 1500:7 1501:11 1503:8 1541:8 1583:24

investment 1499:23 1520:2 1546:22 1564:18,22

investments 1500:3 1543:21 1548:14

investor 1505:4 1511:14 1547:10 1564:17,18,19,21,24 1574:22 1578:3

investors 1489:1,2,5,7, 9,10,13,16,18 1498:16 1500:1,10,16 1501:25 1502:21,24 1503:2

1504:1 1507:5 1508:25
1509:4,5 1511:14
1512:10,21 1516:10,11,
20 1517:5,12 1518:19
1520:1 1522:24 1531:4
1541:12 1548:23
1550:5,10,18 1552:23
1572:2 1573:15,23
1574:13 1575:16
1578:8 1581:24
1582:12 1583:22,23

investors' 1490:5,6
1501:14 1505:7 1509:2
1574:6,11 1576:10
1583:21

invoice 1577:10

invoices 1530:22

involved 1460:4
1487:13 1493:14
1515:4 1522:20
1526:22 1531:2,3
1549:3,4 1567:6
1576:25 1580:15

involvement 1492:24

involving 1461:3
1477:23 1547:21

issue 1461:7 1489:8,16
1504:19 1532:20
1540:3 1550:25 1572:2
1581:1 1587:7 1595:6,7

issuer 1474:20,21
1475:5,21 1476:16
1478:20 1497:21

issues 1456:19
1568:19

IV 1467:1 1473:8
1484:11 1488:13
1490:14,18 1495:21
1499:13,14,25 1500:16,
20 1503:6 1504:7
1506:1 1507:3 1508:1,
2,3,7,25 1516:20,24
1536:7 1541:9 1542:11
1543:2,8 1546:16,18
1547:12,18,21,25
1548:6,13 1549:2
1550:5,9 1552:19,23
1553:5 1568:3 1571:22,
23 1575:15 1578:12
1579:6,11 1581:17
1584:15 1593:24

1594:20

IV's 1489:7 1505:10
1574:5,11

IV-TO-III 1588:8


**J**

James 1490:24 1506:3
1526:5

January 1461:24
1488:15,20

Jeff 1519:16 1522:12
1523:3 1525:3 1527:2,
23 1528:6,14 1532:17,
23 1534:8 1555:11
1565:14 1570:16

Jeffrey 1483:25

Jester 1458:22 1483:25
1522:10,17,20 1523:1,
15,20 1528:4 1531:1,9,
18,20,23 1532:15,16
1533:3,17 1534:3,9,13,
16 1535:4,8,11 1539:23
1562:19 1572:19
1578:19,24 1582:5

Jester's 1531:12
1533:8,25

jilted 1511:14

job 1457:18 1458:1
1459:1 1507:13
1511:22 1530:7
1534:20

jobs 1510:4 1511:22
1522:1 1527:6 1532:13

join 1464:25 1471:7

joined 1465:12 1471:18
1486:20

joins 1465:18 1471:25
1479:9 1487:10

joint 1479:7 1590:14

Jones 1487:12

journal 1551:10
1593:20

judge 1454:3 1461:13
1485:1,12,18,20,24
1486:6,8,22 1491:20

1492:13,22 1494:22
1497:11,17 1505:13,20
1506:17 1514:1,2,20
1515:1,9 1531:7
1533:21 1557:18
1558:2,3,4,10,23
1559:6,10 1560:17
1561:11,25 1562:22
1569:1,2,5,10 1571:10
1583:17 1599:23

Judge's 1572:15

judges 1453:19 1454:7
1457:24 1482:14

judgment 1458:2
1545:7,16 1561:21

June 1491:11 1527:5

juror 1484:15,16

jurors 1454:7,21
1482:1,12 1557:1,6
1558:20 1559:10
1560:4,16,23 1561:3
1562:6,12 1564:5
1565:12 1566:8,24
1567:17,24 1568:10,24
1569:24 1570:22
1571:8,19 1572:13
1586:9 1587:22
1593:19 1594:12

jury 1453:17,18,20
1461:6 1482:18,24
1483:8,15,18,21,24
1484:16 1485:3,22
1486:10 1506:17,23
1507:12 1508:17
1509:16 1510:3
1513:20 1519:1 1522:9
1526:17 1531:5
1536:22 1537:24
1549:10 1558:3,24
1568:13 1569:7,8
1573:11 1585:2,3,4
1586:15 1588:2,7,12,18
1592:11 1593:7
1596:12 1598:21

just-in-time 1521:9
1574:9,10,19

Justice 1485:6

justified 1456:24

**K**

Kahane 1491:16,17
1503:16,17,19,20,25
1518:16 1576:20
1582:4

Kearney 1564:9

Kesler 1534:8

Kevin 1546:21

kids 1566:23

kind 1465:1 1471:8
1497:15 1503:10
1590:21 1595:10,12
1596:23

Kitchen 1551:1,21
1554:22

Kitchens 1540:8
1542:21 1544:3,15
1552:9,21 1553:20
1577:2 1587:11

knew 1463:10 1465:10
1471:17 1486:18
1488:25 1503:10
1509:24 1517:2,12
1519:19 1528:7,10
1532:25 1541:22
1547:14 1548:9,10,17
1561:24 1562:6 1568:5,
17,19 1576:24 1581:22
1582:3,7,9,13 1587:15
1588:9

Knight 1513:7

knowing 1465:15
1468:5 1471:22 1478:7
1479:24 1487:8 1493:3
1539:18,21 1565:8

knowingly 1463:17
1465:18 1466:24
1468:21 1469:4
1471:25 1473:4,7,10,
15,19 1474:10,17,24
1475:14 1476:5
1488:11 1495:1,4,19
1496:8 1541:7 1542:1,6

knowledge 1457:9
1461:4,6,8 1466:9,14
1468:21,23 1469:22
1472:17,22 1479:20
1480:21 1533:11

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 170 of 182    PageID 13488
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 8 January 20, 2022
Index: lack..mad

1539:12

## L

lack 1502:21 1511:15

lacking 1541:10

ladies 1453:3 1484:25
1494:13 1504:9,24
1507:10 1508:9,13
1509:3,15 1510:3
1513:24 1518:15
1519:6 1520:5,24
1521:22 1522:8
1535:20 1556:6
1572:22 1573:7
1575:17 1576:6 1577:7
1578:1 1580:14,24
1581:13,18 1582:7
1583:12 1584:3,16,25
1585:15

Lady 1485:6

laid 1580:11

land 1517:24 1523:11
1524:18 1530:3,9,24
1546:24,25 1547:1
1568:13,14,19,20,22
1581:5

language 1554:4

laptop 1597:24

large 1597:5

large-scale 1584:17

Las 1580:3

late 1484:19 1492:6,8
1512:6,8 1518:12

law 1453:24 1454:4,10,
15,18,25 1455:1
1456:20 1457:12,14
1459:9 1468:18,19,24
1479:3,11 1480:5
1486:9 1487:7 1493:19,
20 1506:18 1514:4
1515:9 1536:2 1537:6,
11,20 1539:9,10,12
1540:3,4,6,11,12
1541:21 1542:23
1556:22 1557:9,12,17,
23 1558:2,6,21 1561:5,
6,17 1569:7 1576:5
1580:17

law-abiding 1459:25

Lawlis 1545:22,23
1555:11 1565:14

laws 1559:12

Lawson 1563:12
1576:20

lawyer 1562:22

lawyers 1456:1,2,9
1493:5 1588:2

lay 1474:8 1536:1

layout 1590:21

lead 1457:1 1569:12

learned 1524:14
1526:6

leave 1571:16,17
1586:6 1599:21

led 1491:9 1580:13

ledger 1597:7

ledgers 1582:19

Lee 1483:19

left 1518:11,16 1556:25

Legacy 1489:11
1491:25 1492:6
1498:19 1499:1,5
1501:8,23 1505:10,12

legal 1470:14,17
1514:15 1531:10
1538:5

legally 1456:15
1587:23

legitimate 1536:16
1552:8 1572:6,12
1574:19 1579:12

legitimately 1521:17

lender 1567:4 1575:4
1581:6,8

lenders 1523:9 1524:3,
4,18 1530:13 1580:23

lending 1554:2

length 1552:21

letter 1525:4,6,7,9,10
1526:2 1579:23,24
1580:4

level 1523:2 1530:17

Lewis 1537:14
1556:11,12,14 1569:4
1589:1

liability 1577:21

lie 1557:12 1576:12,13

lied 1498:25 1573:25

lien 1594:7,8

liens 1575:20

life 1508:21

light 1456:24 1522:10
1531:19

lights 1578:9

Likewise 1466:1
1472:9

Linda 1530:10

list 1590:14 1598:8

listed 1507:24

listen 1508:13 1561:17,
18 1562:14

listening 1556:16

live 1583:15

lives 1522:2,3

living 1522:2 1570:10

loan 1489:12 1497:2
1498:19,20 1499:1
1500:15 1501:12,13
1504:4,7 1505:9,10,11,
12 1507:2 1516:4,5,6
1525:23 1528:18,22
1529:4,25 1530:1,3
1531:25 1533:10
1543:22,23 1544:5,20,
21 1546:23 1548:1,5
1552:23,24 1553:2,24
1562:3,13 1563:2,5
1568:14,22,23 1569:19
1575:5 1581:7 1592:4,
17 1593:21 1594:17
1595:16,19,23

loaned 1574:21

loaning 1499:24

loans 1489:8,17 1498:3
1499:16,17,18,19,20,25

1500:2,10 1501:4,5,18
1502:21,22 1506:1,15
1512:21 1515:14
1516:17 1517:22
1523:17,24 1524:1,24
1525:4 1533:15
1543:20 1544:16,17
1546:10,17 1547:15,20
1548:14,24 1553:3,5
1575:15 1576:15
1578:20 1581:12

log 1598:3

LOI 1527:1,3,15

LOIS 1527:2,10

long 1461:22 1509:16,
18 1514:24 1563:14
1568:6,7

longer 1484:18
1589:18

looked 1517:6 1526:14
1544:5 1546:5 1548:18
1549:22,23 1550:7
1552:10 1561:20
1567:14

lose 1506:24

loss 1470:6,7 1494:8,
11,13 1562:23 1563:1

lost 1494:8 1570:24

lot 1485:8 1491:5
1507:9,20,23 1517:2
1520:9 1529:12,14,25
1530:16 1556:19
1576:23 1581:6

lots 1529:9 1553:1

love 1511:22 1557:18
1561:16 1569:7

Loved 1555:25

Lunch 1586:5

Lyons 1487:13

## M

M/i 1580:8

mad 1502:3 1504:18
1515:15,16 1516:3
1518:11,13 1520:13
1570:11

**made** 1454:20 1456:1 1463:10 1468:7,10 1478:9,13 1488:23 1493:10 1494:3 1495:6 1497:5 1498:3,4 1499:7,17 1500:17,23,25 1501:1,4,15 1506:14 1524:1 1526:15 1533:18 1540:1 1547:25 1550:3 1559:4 1564:19,22 1580:21 1583:20,23

**maintained** 1520:19

**make** 1456:25 1459:4 1480:17 1491:1 1492:16 1497:2 1499:6 1500:2 1502:16 1515:19,21 1524:17 1527:8 1530:14 1543:20 1561:21 1563:8,23 1569:11,12 1573:18,19 1574:22 1575:16 1582:2 1592:13 1598:12

**makes** 1457:12 1464:16 1466:19 1470:24 1474:17,24 1510:17 1524:20 1569:6,7

**making** 1455:19 1458:2,7 1459:3 1516:17 1523:25 1524:14 1560:9 1564:5 1574:16 1577:7 1583:3

**man** 1505:24 1514:24 1534:6,7 1553:24 1567:2,20 1570:11 1578:17,18

**management** 1478:23 1497:24 1523:6 1542:17,19 1547:2

**manager** 1523:2,5 1528:6 1532:13

**managers** 1528:11 1533:11

**manipulated** 1491:3, 11,14

**manner** 1460:23

**March** 1491:3,9 1528:18,24

**margin** 1505:7

**market** 1527:7 1529:5, 6 1587:3 1592:22

**markets** 1520:17

**Marriage** 1560:13

**marshal** 1536:8 1537:12

**marshaling** 1543:12

**martial** 1549:11

**Martinez** 1500:19 1504:25 1510:22,23 1512:3 1536:13 1548:21 1549:6 1551:14,16 1564:4 1567:3 1572:5,10 1576:25

**Martinez's** 1550:14 1553:8 1572:5,11

**massive** 1534:23

**match** 1583:3

**material** 1462:25 1463:4,8 1467:3 1468:10,12 1469:9 1478:12,14 1489:4 1493:9,11 1496:9

**materiality** 1463:3,12

**materially** 1473:11 1476:7 1582:23

**math** 1534:17 1576:4

**Matt** 1506:4 1528:14,25

**matter** 1506:21 1575:20,21

**matters** 1461:3,10 1556:19 1571:11,12

**Matzinger** 1579:23

**Mccormick** 1513:7 1531:15 1534:23 1577:3

**means** 1463:17,20 1467:25 1468:4,16 1469:5,12 1470:1 1473:10 1475:1 1476:7 1477:10,18,22 1478:3, 7,17,21 1480:18,23 1492:18 1493:2 1495:6 1496:9 1497:18,22

**margin** 1539:7 1542:7 1545:24 1560:23 1595:16,25

**meant** 1532:17

**measured** 1554:11,13, 24

**meet** 1520:25 1531:14 1537:19

**meeting** 1506:4

**meetings** 1528:12 1529:22

**meets** 1558:8

**Megatel** 1580:3

**Mehrdad** 1573:18 1575:23

**Melissa** 1599:18

**member** 1465:2,3,14 1471:9,10,21 1481:3,9 1487:7 1503:15

**members** 1453:18 1466:5 1472:12 1487:24 1555:14

**memory** 1458:13 1562:23 1563:1

**men** 1503:2 1549:10 1568:12 1576:9 1580:10 1582:9

**mentioned** 1493:25 1498:6 1528:17 1537:22

**mentor** 1555:25

**mentored** 1555:22

**mere** 1466:8,9 1470:8 1472:16,17 1479:19 1482:12 1515:10

**message** 1483:4,6

**met** 1488:9 1563:21

**method** 1576:11

**methodology** 1549:2

**Metro** 1591:2

**Michael** 1546:15 1555:6

**middle** 1523:24 1554:25 1569:20

**million** 1490:21 1511:1 1526:11 1530:20 1546:23 1550:1 1575:12 1577:3 1579:6, 8 1584:6

**million-** 1510:25

**millions** 1520:11,12

**mind** 1459:3,8 1482:8 1483:7 1532:23 1539:5 1564:19

**minor** 1465:22 1472:4

**minute** 1559:18 1562:7 1565:1,3 1589:2

**minutes** 1485:1 1569:3 1589:1

**mirrors** 1537:1 1553:13

**misappropriated** 1512:2 1513:21

**misappropriation** 1570:7

**mischaracterizes** 1583:10

**misleading** 1498:14 1499:16 1500:12 1501:7 1559:21,22

**misled** 1512:5,10

**misreads** 1529:9

**misrepresentations** 1489:4

**missing** 1570:5

**mistake** 1463:18 1550:3,12

**mistaken** 1593:22

**misunderstanding** 1522:15,18

**mix** 1596:21

**Moayedi** 1553:25 1573:18 1575:24

**model** 1524:12 1551:15,16 1574:20

**modeling** 1524:2 1528:5 1532:3 1533:10

**models** 1524:16

**moment** 1557:25
1559:22 1585:1
1590:15

**Monday** 1521:18
1578:14

**money** 1468:1 1473:12
1474:4 1475:2 1476:6
1478:4 1488:16,19
1489:1,7,11,16 1490:5,
6,18,20 1492:19,23
1495:8 1496:9,21
1497:2 1499:2,8,10,24
1500:9,20,23 1501:11,
14,23 1502:12,13,17,23
1503:4,13 1504:1,3,6,
20 1505:3,7 1508:6,25
1509:1,2,4 1510:7,8,11
1511:14 1512:2
1515:20,22 1516:14,20
1518:19 1521:2,5,10
1534:16 1542:7
1547:24 1549:15,19
1550:4,9,17 1569:15
1570:8,23,24,25
1574:5,6,11 1575:10,15
1576:1,3,8,10,12
1577:7 1578:20
1579:11,13 1581:9
1583:19,22 1584:9,13

**month** 1502:9 1515:15,
20 1573:14 1578:9
1581:8 1584:18

**months'** 1577:5

**moral** 1520:22

**morning** 1453:7
1509:15 1521:18
1528:17 1535:14,20,22
1537:9,13,18 1543:14
1578:14

**Morrison** 1483:16

**mother** 1576:22

**motive** 1492:25 1493:1
1534:19

**Motors** 1524:11

**move** 1505:25 1530:8
1533:15

**moved** 1508:3,6

**movement** 1549:15

**moving** 1530:24
1550:9

**Mueller** 1579:10

**multi-hundred**
1510:25

**multiple** 1501:10

**Murphy** 1516:23
1517:3 1547:11

**mushy** 1497:15

**muster** 1461:12

---

**N**

**naivety** 1463:13,14

**named** 1467:19 1477:4
1507:23

**names** 1498:16,24

**narrative** 1520:6

**narrowly** 1593:14

**national** 1482:5

**natural** 1462:25
1468:12 1478:14
1493:11

**nature** 1465:17 1469:2
1471:24 1487:9

**Navigant** 1491:12,13

**Neal** 1535:23

**necessarily** 1466:12
1472:20

**needed** 1497:7 1506:7,
10 1519:21 1531:17
1555:15 1576:25
1581:9 1583:18

**negative** 1516:2
1556:3

**neglected** 1453:4

**negligence** 1463:13,15

**nice** 1508:15 1514:20
1520:20 1567:2,20

**night** 1555:23

**nomenclature**
1498:21

**nonexistence** 1463:6

**nonsense** 1516:3
1519:10

**Nor-tex** 1580:4

**note** 1461:19 1477:10
1584:11 1585:24
1592:11 1593:11
1596:3 1598:7,9

**notebooks** 1552:14

**notice** 1456:6 1494:16

**notifying** 1506:5

**notion** 1510:6

**notions** 1454:14

**nots** 1500:6

**November** 1501:21
1525:22

**number** 1482:19
1489:3,19 1490:3
1492:13 1496:1,2
1497:9 1499:2 1527:13
1528:22 1587:5,6

**numbers** 1507:21
1552:13 1582:22
1583:4 1589:24

**numerically** 1483:8

**numerous** 1528:11

---

**O**

**O'CONNOR** 1485:1,
13,18,20,24 1486:6,8,
22 1491:20 1492:13,22
1494:22 1497:12,17
1505:13,20 1506:17
1533:21 1558:10,23
1583:17

**Oaks** 1580:7

**oath** 1454:20

**Obert** 1458:22 1483:22
1535:24 1537:4
1539:21 1544:13,15,16
1547:24 1548:4 1555:5,
9,21 1556:1,4 1572:19

**object** 1573:5 1583:9
1587:24 1588:4,17

**objection** 1586:19,22
1588:21 1590:22

**objections** 1455:25
1456:10 1509:9
1588:22

**objective** 1473:23
1545:8 1553:10

**objectives** 1466:7
1472:15 1473:5,16,20
1499:24

**obligated** 1539:17
1584:7

**obligation** 1574:14
1584:11

**obtain** 1473:10 1474:4
1476:6 1495:6 1496:21
1542:7

**obtained** 1496:9
1499:18 1501:4

**occasion** 1465:19
1472:1 1487:11

**occasions** 1503:4,12

**occur** 1503:19

**occurred** 1464:8
1477:23

**occurring** 1588:9

**October** 1505:23
1525:22 1582:10

**offense** 1462:5
1464:13,18 1467:17
1468:22 1470:21
1471:1 1474:12,17
1477:1 1479:2 1480:2,9
1481:3,4,15

**offenses** 1461:20
1481:1,10,13

**offer** 1579:25 1580:6

**offered** 1453:9
1459:12,14,22,23
1538:17

**offering** 1511:24

**officer** 1483:5

**offices** 1513:13

**omissions** 1586:25

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 173 of 182    PageID 13491
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                    Vol 8 January 20, 2022                    Index: omits..people

**omits** 1468:9 1478:12 1493:9

**one's** 1578:16 1579:3

**one-sided** 1562:15

**open** 1497:7 1550:19 1551:7 1557:2

**opening** 1509:20 1510:14 1524:10 1529:18 1536:1,6 1542:25 1543:4,11,16 1547:19 1557:1

**openly** 1531:18 1571:3

**operated** 1522:10 1524:5,6,15 1531:18 1536:21,23

**operates** 1522:15 1531:1

**operating** 1510:4 1521:11 1540:21 1550:11 1561:2 1571:3

**operation** 1554:14

**operational** 1522:20, 21 1523:14 1531:1 1532:12

**operations** 1489:6 1523:2 1525:15 1554:10,11,19,24

**opinion** 1456:18 1459:13,15,22,23 1461:9,12,13,17 1482:12 1519:11 1538:18

**opinions** 1454:14 1461:2 1482:8 1497:16 1566:2

**opportunities** 1501:10

**opportunity** 1458:16

**opposed** 1587:3

**opposite** 1513:24 1525:14

**option** 1475:4

**order** 1470:7 1473:22 1488:18 1505:4 1523:20 1586:21

**orderly** 1525:13,16

**ordinarily** 1460:4 1479:3 1515:3

**ordinary** 1469:24

**organizational** 1507:21

**origin** 1482:6

**original** 1509:20 1553:3

**originate** 1544:16 1546:17

**originated** 1499:16

**origination** 1525:24

**outcome** 1458:11

**overextended** 1574:21

**overhead** 1525:7 1526:6,11

**overrule** 1588:22

**Overruled** 1573:6 1583:11

**owed** 1574:13

**ownership** 1478:24 1497:25

--- 

**P**

**p.m.** 1600:2

**pages** 1499:21 1504:11 1585:11,23 1596:24 1597:3,9 1598:18

**paid** 1489:8,17 1501:18,24 1502:5 1506:16,22 1512:6 1515:14 1516:2,8 1526:6,10 1533:15 1534:16 1550:17 1577:9,11,17 1581:12, 14 1592:4,17 1595:16, 19

**paper** 1504:19 1513:13 1519:13 1574:25 1575:2 1597:3

**papered** 1573:17

**paperwork** 1530:14

**paragraph** 1494:24

**Park** 1580:5

**Parker** 1528:15 1532:21

**Parker's** 1506:4 1528:25

**part** 1458:1,5 1463:16 1465:22 1472:4 1494:25 1497:10 1562:18 1569:21

**participant** 1479:23

**participate** 1479:17 1480:23 1500:3 1543:20,23,25 1544:17, 21

**participated** 1465:21 1472:3 1480:4,15 1481:14 1533:14

**participating** 1544:10

**participation** 1477:12, 14 1490:17 1575:3

**participations** 1490:14 1496:25

**parties** 1453:6 1454:22 1503:22

**parties'** 1585:9 1598:4

**partner** 1545:23 1546:15 1547:23 1555:6,16

**partners** 1555:17

**partnership** 1465:1 1471:8

**party** 1542:14

**party's** 1590:13

**password** 1598:3

**past** 1508:20 1522:12, 16 1575:13 1577:19

**path** 1505:25 1506:2

**patience** 1572:13

**pattern** 1467:25 1478:3 1492:18

**Paul** 1574:25

**Paul's** 1583:19

**pay** 1488:24 1489:1,6, 11 1490:20 1498:19 1499:19,25 1500:13 1501:9,13,14 1502:13, 17,20,24 1503:9 1504:1,4 1505:4 1509:5 1518:20 1521:11 1524:24 1525:6,14 1526:2 1547:25 1553:2, 16 1569:15 1574:11,25 1575:12,15 1578:3,7,22 1581:7 1583:19,22 1584:6,7,12

**pay-down** 1530:3

**paying** 1505:9,10,11,12 1509:1 1526:12 1527:6 1531:24 1569:20 1584:9,12

**payment** 1490:21 1502:16 1575:13 1577:15

**payment's** 1518:12

**payments** 1492:6,8,9 1497:2 1499:6 1512:6 1518:12 1523:11 1581:5

**payoff** 1589:17 1593:20 1594:4,5

**payroll** 1515:21,23 1521:12 1549:17

**PDFS** 1597:5,8

**Pelletier** 1509:13,15 1541:16 1549:17 1553:15 1584:8 1585:17,18 1599:23

**Penn** 1527:19 1528:18 1545:23 1547:23 1555:19 1565:18 1566:4 1571:22 1579:17 1580:13 1582:3

**people** 1485:8 1497:15 1503:2 1507:9 1510:17 1513:14 1518:8 1519:7, 8,12,13 1520:10,21,22 1521:8,17 1522:1 1523:3 1538:13 1545:8 1547:14 1556:18 1557:8 1561:8 1563:21 1566:2 1571:6 1580:15,

Case 4:21-cr-00289-O   Document 308   Filed 01/29/22   Page 174 of 182   PageID 13492
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                              Vol 8 January 20, 2022        Index: performed..projections

16,17 1583:19

**performed** 1516:6,11

**performs** 1479:10

**period** 1499:15 1512:7
1527:9 1534:17 1551:4
1554:11,13,25 1575:14

**permissible** 1508:4

**permitted** 1456:13,22
1485:22

**person** 1458:5,8
1460:7 1462:7 1463:1,
5,9 1465:8 1466:14
1468:2,14 1471:15
1472:22 1473:7
1474:19 1475:16
1478:5,16,17,23
1479:4,5,7,8,9 1480:3,
11 1483:8 1486:17
1490:18 1492:21
1494:23 1495:2,20
1496:19 1497:18,24
1508:15 1518:25
1538:25 1541:19
1542:18 1557:11
1559:1,3 1576:20
1579:19

**person's** 1506:24
1574:3

**personal** 1458:10

**personally** 1479:1
1517:9,10 1567:11

**personnel** 1533:12

**persons** 1462:8
1464:17,25 1466:4,10
1470:25 1471:7
1472:12,18 1479:7,12
1480:3 1487:23

**perspective** 1567:15

**pertaining** 1462:16

**pertains** 1522:23
1535:7

**Peter** 1574:25 1583:19

**phase** 1453:16 1477:23
1552:24

**phone** 1502:15
1528:13

**phrase** 1477:17

**physically** 1586:2

**picked** 1549:6 1583:14

**picking** 1558:24

**piece** 1513:13 1519:13
1570:14

**pinpoint** 1598:8

**pitch** 1490:23 1505:23,
24 1582:6

**place** 1502:25 1504:23
1568:16

**plain** 1500:22

**plaintiff** 1577:4

**plan** 1465:18,19
1467:25 1471:25
1472:1 1478:3 1487:10
1492:18 1524:14
1582:10

**plane** 1519:20 1570:10

**planet** 1579:11

**play** 1523:12

**played** 1465:22 1472:4

**player** 1561:24

**plumbing** 1530:22

**pocket** 1513:22

**point** 1456:2 1459:6,8
1486:1 1504:16
1508:23 1540:14
1542:22 1549:6
1554:10,25

**pointed** 1496:23
1497:3

**policies** 1478:23
1497:24 1542:18
1543:13

**policy** 1500:5

**polite** 1555:11,18
1564:16

**Ponzi** 1510:15,16,18,19
1511:1,3,7,12 1571:4,5
1575:18

**Ponzi-like** 1509:3
1571:4

**poor** 1489:23 1578:8

**portfolio** 1529:5
1530:17

**portfolios** 1528:5

**portion** 1553:2

**position** 1548:19

**possession** 1463:21,
22 1478:21 1497:22

**possibility** 1532:3

**possibly** 1564:12
1597:15 1598:18

**potential** 1582:12

**Powell** 1527:17
1547:23 1555:16
1583:6 1588:5

**power** 1478:22 1497:23
1542:17

**practice** 1548:9

**practices** 1551:13

**practicing** 1561:17

**Prairie** 1552:12 1568:2

**preceding** 1467:11

**precise** 1469:2

**predated** 1511:4

**prefer** 1590:24

**prejudice** 1454:19
1482:2 1485:4 1508:11

**prepare** 1547:19

**prepared** 1463:24
1482:22

**presence** 1466:8
1472:16 1479:19
1586:15 1596:12

**present** 1511:16

**presentation** 1597:22

**presented** 1455:23
1457:6 1594:9

**preserve** 1586:13

**preside** 1453:20

**presiding** 1484:15,16

**presumed** 1454:25
1537:11 1558:5,6,13

**presumption** 1537:7

**presumptions**
1557:16

**pretending** 1529:15

**pretenses** 1469:5
1473:11 1475:1 1476:8
1495:7 1496:10 1542:8

**pretty** 1579:3 1590:23
1597:4

**previously** 1476:25
1499:18 1501:4

**principal** 1480:20,25
1518:12

**principal's** 1480:21

**printed** 1579:1 1597:9
1598:5

**prior** 1502:23 1563:3
1572:7,12

**problem** 1532:4
1574:3,9,12 1576:9
1582:13

**problematic** 1551:6

**procedures** 1454:6

**proceedings** 1586:17
1596:11 1600:2

**proceeds** 1553:2

**process** 1484:9
1530:14 1557:19
1589:13

**produce** 1455:2 1514:5

**producing** 1459:10

**professional** 1555:8

**profit** 1477:12

**programs** 1548:15

**progression** 1578:16

**project** 1527:10
1530:16 1532:21
1546:25 1580:5

**project's** 1552:24

**projections** 1524:2,17
1525:11 1591:17

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 175 of 182    PageID 13493
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                Vol 8 January 20, 2022                    Index: projects..read

**projects** 1524:14,20
1526:15,16,18,19
1527:19 1528:1,5,7,21
1530:7,8,24 1532:3,9,
22 1533:12,15 1579:19

**promise** 1454:20
1488:23 1508:2,5

**promised** 1573:23

**promises** 1469:6
1473:12 1475:2 1476:8
1495:7 1496:10

**proof** 1454:3 1455:9,
12,16,17 1457:10
1466:12 1468:21,22
1472:9,20 1473:18
1479:1 1537:14
1539:11 1558:15
1559:4 1560:6,7,17
1561:6,7 1566:1

**proper** 1453:21

**properly** 1512:19

**properties** 1517:17
1518:2,5 1527:6

**property** 1468:2
1473:12 1474:5 1475:2
1476:7 1478:5 1492:20
1495:8 1496:9,21
1526:21,22 1527:4
1542:7 1596:17

**proposed** 1471:13

**prosecution** 1572:7,12

**prosecution's**
1512:13

**prosecutor** 1510:8,13
1514:19 1515:5,15
1518:25 1521:4
1553:22 1571:17

**prosecutor's** 1510:8

**prosecutors** 1516:19
1519:1

**prospectuses** 1517:1

**Prosperity** 1492:4,8

**protects** 1556:23
1558:5,17

**prove** 1453:13 1455:2
1460:15,17 1461:21
1463:3 1465:23 1466:2,

4 1467:18 1468:25
1469:8 1472:5,12
1473:14 1477:3
1487:16,20,23 1488:2
1493:22,24 1494:5
1495:9,16 1514:4
1515:7 1521:23 1539:6,
17 1541:12 1559:7

**proved** 1455:10
1457:19 1462:3 1465:5
1466:22 1469:3,14
1473:25 1474:3,5
1476:23 1480:7
1482:16 1485:9,16
1496:17

**proven** 1455:8
1467:11,13 1475:13
1476:4 1486:3 1495:11
1514:10

**proves** 1461:23
1467:21 1477:5 1558:8

**provide** 1500:3
1530:12 1543:21
1544:17 1551:17
1553:11 1578:13

**provided** 1468:10
1478:13 1482:24
1484:8 1493:10
1512:22 1540:1 1568:3

**providing** 1511:20
1549:10

**proving** 1455:5 1514:7
1535:7 1558:18
1563:18

**provision** 1554:2,7

**public** 1466:25 1488:12
1497:5 1498:16
1499:12 1500:7
1501:11 1503:8 1541:8
1583:24 1592:7,9

**pull** 1488:19

**pulls** 1515:22

**Pulte** 1580:1

**punished** 1486:5

**punishment** 1462:11,
12 1485:23 1486:7
1508:12

**purchase** 1473:13

1475:3 1476:10
1477:16,21,24 1495:8
1529:8 1560:12

**purpose** 1463:25
1465:1,11,13 1466:16
1467:6 1468:19 1469:2
1471:8,18,20 1472:24
1482:12 1486:19,21
1489:21 1493:20
1523:25 1539:9 1541:3,
4,22 1573:14,16

**purposefully** 1480:14

**purposely** 1468:17
1493:18

**purposes** 1537:15

**push** 1530:7 1571:13

**put** 1490:18 1494:24
1521:10 1526:15
1527:11 1532:2 1534:5
1546:11 1556:2 1559:2,
16 1565:15 1566:16
1567:14 1570:13
1572:23,24,25 1573:1,
10 1574:15 1579:2
1583:23 1587:9

**puts** 1504:22

**putting** 1581:23
1584:20

_____

**Q**

**qualified** 1461:8
1551:17

**qualifies** 1545:19

**quality** 1571:11

**quantity** 1571:12

**quarterback** 1521:18

**quarterly** 1490:21
1499:7 1575:13

**question** 1454:12
1456:14 1463:7
1483:18,21,24 1484:2
1485:23 1513:11
1523:11 1546:16
1547:4 1564:20,24
1565:4,5,23,24 1567:21
1569:14,17,22 1590:23
1592:15,17

**questions** 1455:25
1456:11,12 1458:8,17
1484:10 1491:21
1553:22 1555:12
1559:13 1563:13
1564:14 1565:1,2
1567:20 1571:19
1576:4 1596:4

**quick** 1589:20

**quickly** 1511:15
1515:13 1516:1
1553:13 1555:4
1564:20 1571:16

_____

**R**

**racial** 1482:5

**raided** 1519:19

**raise** 1485:17 1486:5

**ran** 1534:22

**Ranch** 1579:25

**range** 1590:2

**rate** 1507:3 1548:1
1575:6 1581:16

**re-engaging** 1580:4

**re-go** 1497:11

**reach** 1457:1 1459:6
1481:17,23 1540:21
1541:23 1545:10,25
1549:12 1553:11
1565:20 1567:16
1572:16

**reached** 1483:10
1488:6,7 1567:15

**reaching** 1454:8
1459:4 1464:22 1471:5

**reacted** 1562:6

**reacting** 1562:5

**read** 1453:17 1464:21
1471:4 1483:14
1492:16 1497:12,16
1504:21 1505:14
1506:11,17 1511:19
1517:1 1520:10,12,13
1529:10 1537:25
1550:17 1552:9
1557:22,25 1575:9,11

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 176 of 182    PageID 13494
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                  Vol 8 January 20, 2022                    Index: readers..requesting

1577:7 1580:20
1592:10 1593:14

**readers** 1520:9

**reading** 1557:20
1558:25

**ready** 1453:15,16

**real** 1490:16 1500:3
1510:3,4,9,10,12
1511:13 1512:19
1517:15,21,24 1543:20
1551:22 1561:1
1564:20 1566:14
1567:6 1573:17 1575:9,
16 1596:17

**realized** 1488:15,16,18
1520:7

**reason** 1455:14 1457:1
1458:9 1463:10
1490:13,16 1492:24
1496:25 1510:7,10
1523:7 1560:2 1569:11

**reasonable** 1455:6,8,
12,14,16 1456:23
1457:16,20 1460:6
1461:23 1462:3 1463:5
1465:6 1466:23
1467:11,13,22 1469:3,
14 1470:15 1471:14
1473:18 1474:1,3,6
1475:13 1476:4,23
1477:6 1479:22 1480:1,
8 1481:8 1482:17
1485:10,16 1486:3
1495:17 1514:7,8,11,13
1515:6,7 1521:24
1531:9 1532:14
1533:24 1535:7 1538:6,
24 1539:17 1540:16,22
1545:8,24 1558:9,19,20
1559:4,8,23,24 1560:2,
6,24,25 1561:8,10
1563:11,19 1564:12
1565:12,13,19 1566:7,
8,24,25 1567:17,23
1568:10,24,25 1569:24
1570:22 1571:8,9,21,24
1572:1,4,9

**reasons** 1461:17
1528:2,22 1556:6
1561:16

**rebuttal** 1586:20

**recall** 1562:8 1567:1

**recalled** 1525:2 1544:4

**receipt** 1477:15

**receipts** 1597:7

**receive** 1528:24

**received** 1454:18
1463:25 1492:24
1548:23

**receives** 1564:17,21

**recess** 1535:15 1589:5

**recipe** 1495:14

**reckless** 1468:7
1478:9

**recognize** 1569:18

**recognizes** 1479:3

**recollection** 1456:8

**recommend** 1517:5

**record** 1571:2 1583:10
1587:11 1596:18

**records** 1464:9 1499:4
1500:21 1531:17
1570:19,20 1590:21
1593:1,2 1596:17,18
1597:13

**redirect** 1523:12
1534:4

**reexamine** 1482:8

**refer** 1598:7

**reference** 1453:6

**references** 1587:1

**refinance** 1490:14
1546:23

**refinanced** 1547:20

**refinances** 1490:17

**refinancing** 1507:2
1530:23 1548:14
1569:20 1581:5

**reflects** 1464:4

**refuse** 1521:1

**registered** 1474:20

1587:25 1588:3,9,11

**recall** 1562:8 1567:1

**regulator** 1554:23

**regulators** 1522:24

**reimbursement**
1591:2

**REIT** 1566:17 1567:8

**reiterate** 1533:22

**reject** 1461:14

**relate** 1587:6 1590:3

**related** 1469:16
1484:10 1537:4
1542:14 1546:8
1568:15

**related-party** 1540:5,
13,19 1545:5,13,20
1546:1 1554:6 1565:14,
17,22 1580:21 1587:7

**relates** 1557:13 1588:5

**relationship** 1458:12
1477:19 1503:22

**release** 1523:11 1530:9
1581:5 1599:24,25

**released** 1600:1

**releases** 1530:24
1594:7,8

**relevant** 1507:11
1549:18 1554:10

**Reliable** 1563:7

**relied** 1463:24 1492:1
1564:10

**rely** 1455:18 1463:9,11
1464:4 1560:8 1564:5
1565:11 1566:22
1567:21 1575:19

**remainder** 1492:15

**remarks** 1538:11

**remember** 1453:14
1482:14 1485:5 1488:4
1498:21 1512:23
1514:23 1516:11
1518:16 1519:16,22
1520:10 1525:20
1527:24 1534:21
1546:11 1550:3

1561:13 1562:9,11,24
1563:13 1568:7 1573:7
1578:24 1583:12
1584:8 1586:3,5
1588:19 1594:9,13,15,
16

**remind** 1457:18

**Renee** 1579:10

**renewal** 1531:25

**repaid** 1494:3 1512:20
1516:4,5

**repay** 1499:1 1525:3,9
1579:6

**repaying** 1525:11

**repayment** 1578:13

**repeat** 1564:20

**repeatedly** 1530:6
1574:18

**reply** 1483:5

**report** 1498:15,16
1582:1 1592:22

**reported** 1534:25

**reports** 1474:22
1475:7,24 1476:19

**represent** 1535:24

**representation**
1462:24 1463:4 1468:6,
8,12 1478:8,11,14
1493:8 1539:24,25

**representations**
1467:3 1469:5 1473:11
1475:1 1476:8 1495:7
1496:10 1587:4

**representative** 1526:5

**represents** 1551:3

**reputation** 1459:13,15,
23 1493:11 1514:25
1538:18

**request** 1496:25
1504:19 1506:10
1530:2,20 1576:14
1578:2

**requesting** 1573:18,20
1596:23

**requests** 1490:14,17
1525:19,21 1529:15,16
1533:14 1575:2
1591:19

**require** 1455:1 1514:4

**required** 1455:11
1474:22 1475:6,23
1476:18 1488:24
1493:22,23 1494:4,5
1497:6 1516:6

**requires** 1457:14
1468:21,22 1539:11
1560:21

**Research** 1512:24

**Reserve** 1580:7

**residential** 1547:1

**resources** 1510:24
1511:2 1570:4

**respect** 1460:7
1538:25 1553:23,24
1563:11 1569:13

**respected** 1519:19

**respectful** 1555:8,12,
18

**respective** 1456:4
1475:17,21 1476:12,16

**response** 1534:6
1589:7 1592:14 1598:7

**responses** 1555:13

**responsible** 1479:11,
15 1481:1

**responsive** 1555:7,11,
18,19,20

**rest** 1579:9

**rested** 1453:15

**restriction** 1516:13

**restrictions** 1453:12

**resubmitted** 1527:2

**result** 1549:12,24
1553:12 1567:15

**retire** 1504:7 1585:1
1594:17

**retired** 1593:21,24
1595:15

**return** 1462:7 1473:16,
22 1535:10 1556:7
1575:21 1576:2

**returning** 1482:13

**reurged** 1527:2

**reveal** 1483:7

**revenue** 1512:18

**review** 1528:18,23
1552:16 1554:25
1555:5 1564:2 1572:15

**reviewed** 1544:3
1563:20

**reviewing** 1554:6

**rich** 1581:3

**Richards** 1523:3
1527:5 1529:21 1530:2,
5 1534:11 1578:22
1579:10

**Rick** 1547:11

**rise** 1460:5 1495:16
1515:5 1532:19
1533:24

**risk** 1470:6 1494:8,11
1513:9 1550:6 1577:19
1583:23 1584:20

**road** 1536:7 1540:10
1542:10,24 1543:10

**rob** 1487:13

**robbing** 1488:4

**Rogers** 1530:1

**role** 1523:13

**roll** 1506:1

**room** 1482:18 1526:17
1573:11 1585:2,4
1586:6,7

**RSI** 1592:22

**rule** 1454:13 1561:25

**rules** 1453:24 1454:4,
10 1536:7 1540:10
1542:10,24 1543:9
1583:14

**ruling** 1588:17

**run** 1515:18,24,25

1521:17 1549:8
1550:21,23 1555:10

**running** 1484:19
1508:24 1509:1 1512:9
1524:21 1542:20
1550:20

**Ryan** 1523:8 1524:7

────────────

**S**

────────────

**S11** 1582:12

**sale** 1473:13 1475:3
1476:11 1477:21,24
1495:8

**sales** 1505:23,24
1529:12 1582:6

**San** 1563:12

**Sanchez** 1504:15

**sat** 1559:12

**scenario** 1560:24,25

**scene** 1466:8 1472:16
1479:19

**scheme** 1465:15,18,19
1466:1,2,20,25 1467:2,
7,14,25 1468:3 1469:2,
4,16,18,19 1470:4,8
1471:22,25 1472:1,8,10
1473:7,10 1474:2,4,11,
18,25 1475:15 1476:6,
10 1477:18 1478:3,6
1484:6 1486:21 1487:9,
10 1488:12 1489:3,22
1491:23 1492:18,21
1493:25 1495:2,5
1496:18,20 1498:10
1509:3 1510:15,16,18,
20 1511:1,3,7,12,21,25
1512:1 1541:8,15
1542:1,7 1550:4,10,20
1571:4,5 1575:18
1583:21 1584:18

**school** 1555:23

**scientific** 1461:3,5

**scoop** 1527:9

**Scott** 1576:25

**scramble** 1502:3
1504:18 1515:15,16

1516:3 1518:12,13
1520:13

**scrap** 1519:12

**screen** 1487:4 1505:9
1565:15

**search** 1511:4,5
1512:23 1519:17
1520:16,18 1534:22

**seated** 1453:2 1578:18
1586:10 1589:6 1593:8
1596:13

**SEC** 1489:18,25
1490:9,13,19,22 1492:1
1495:24 1496:24
1497:1 1498:12,13,14
1499:22 1502:18
1503:6 1506:5 1508:3,5
1523:13 1531:3
1580:19 1581:2,23
1583:24 1584:23

**secret** 1481:20

**Section** 1464:14,15,16,
21 1466:19 1470:22,23,
24 1471:3 1474:13,16,
23 1475:10,12,22,24
1476:1,3,17,19,24

**securities** 1470:19,21
1471:1,2,5,16 1473:3,8,
13 1474:9,11,15,20,21
1475:5,6,9,11,16,22,24
1476:2,11,17,18,19,22
1478:2,24 1480:9
1487:19 1494:15,17,20,
23 1495:13,17,21
1496:2,5,13,16 1497:25
1506:21 1540:4
1541:18,20,24 1542:6
1557:13 1580:16
1582:17 1583:5
1584:22,23

**security** 1474:19
1475:4 1477:10,13,17,
20,22,24 1483:5 1495:3
1496:11

**seeking** 1564:18,22

**seized** 1529:7

**select** 1482:19

**selected** 1551:4
1557:20 1558:12

1559:6

**self-explanatory**
1483:12

**sell** 1543:22,24 1544:20
1553:1

**selling** 1544:9

**send** 1491:14 1529:22
1585:24

**sending** 1530:21
1570:15

**sense** 1455:15 1457:1
1524:20 1560:3 1569:6,
9,11,12 1570:1,3

**sentence** 1459:21
1508:12 1529:7

**separate** 1462:14,22
1592:3

**separately** 1462:17,18

**September** 1505:22
1524:24 1525:5,20,21
1526:9,10

**series** 1552:15,16

**set** 1585:24,25 1597:22

**settle** 1576:23

**sewage** 1530:22

**Shahan** 1552:12
1568:2

**shared** 1480:19

**shareholders** 1467:1
1488:13 1541:8

**sharing** 1477:12

**sheet** 1591:16

**shell** 1575:23

**ship** 1574:16

**short** 1509:16

**shortfall** 1550:2

**show** 1477:25 1494:8,
10 1510:14 1511:17
1531:24 1533:5
1542:21 1547:20
1552:19 1557:24
1559:22 1562:23
1581:25 1589:17

1592:18 1595:17
1599:13,14

**showed** 1509:22
1512:17 1529:18
1531:22

**showing** 1460:10
1533:6 1590:17

**shown** 1474:15
1488:14 1490:10
1495:21 1550:23
1557:2

**shows** 1491:8 1503:1,4
1505:16 1514:19
1538:9 1551:4 1582:13

**shredding** 1570:11,20

**side** 1459:5,8 1482:3
1522:20 1523:14
1531:1 1547:10
1559:20 1561:19
1589:1

**sidebar** 1509:10,12
1589:4

**sides** 1453:15 1456:4

**sign** 1483:2,10 1484:16
1529:20 1599:18

**significant** 1456:3
1493:1 1494:25
1512:16

**similarities** 1543:1

**simple** 1575:9,17

**simplest** 1576:4

**simply** 1459:4 1516:20
1529:9 1552:4

**single** 1513:13,21
1519:5 1532:20 1535:1
1539:20 1540:6,11,12
1555:2 1556:5 1573:14
1576:7 1582:17,18

**sir** 1535:19 1556:13
1585:18,19 1593:6
1599:15

**sit** 1504:11 1537:11
1558:4 1573:10

**situation** 1580:15

**sixth** 1577:11

**SK** 1512:23 1582:1

**skill** 1461:8 1532:8

**skills** 1580:18

**slate** 1455:1 1514:2
1537:10 1558:7,13

**slide** 1543:15 1547:19

**Smart** 1555:7,11,17

**smoke** 1537:1 1553:13

**snapshot** 1536:18
1554:17

**Snyder** 1564:9

**sold** 1478:2

**sole** 1457:24 1529:19

**solely** 1454:17 1456:15
1482:11 1523:25
1553:16 1559:9

**somebody's** 1508:15
1519:11

**someone's** 1513:22
1514:20

**sort** 1490:2 1494:25
1497:15 1502:25
1505:8,15 1556:25
1562:16 1563:14

**sought** 1480:16
1586:23

**sound** 1579:12
1581:16

**sounded** 1507:4,9
1508:22

**sounding** 1577:19

**soundness** 1461:16

**sounds** 1526:11
1576:21,23 1597:14

**source** 1498:18
1500:13 1501:9 1580:3

**SP** 1547:3

**space** 1482:24 1484:8,
15,16

**spades** 1587:19

**speak** 1482:20 1537:14
1557:18

**speaks** 1579:17

**special** 1454:11
1500:18 1546:25

**specialized** 1461:4,5

**specific** 1454:4 1467:9
1468:4,17 1469:12
1490:12 1493:2,19
1515:8 1539:8,16
1541:14 1554:24
1557:8,9,11 1580:14
1589:9 1590:23
1591:12

**specifically** 1524:23
1580:19 1583:24

**spectator** 1479:24

**speculate** 1456:12

**spell** 1580:23

**spend** 1556:24

**spending** 1570:10

**spent** 1468:20 1517:2
1529:14

**spoke** 1531:15,16

**spoken** 1577:13

**spreadsheet** 1491:3,
11,14 1506:5 1526:13,
14,16,24 1527:12,15,
21,24 1528:1,9,25
1529:1 1532:19,21
1533:13 1582:1
1585:10,22

**spreadsheets** 1532:25

**staff** 1529:23

**stalled** 1580:5

**stand** 1518:4 1527:3
1532:16,18 1539:20
1544:13,15 1545:7
1554:5 1556:2,3

**standard** 1539:15
1541:23

**stands** 1483:8

**start** 1459:20 1485:14
1486:1 1508:14 1514:2
1536:3 1537:6 1552:15
1556:25 1558:6
1562:21 1571:14
1587:25 1593:2

**started** 1484:20
1488:20 1508:10,24
1509:1,2,20 1542:5
1543:4

**starting** 1488:14
1533:9 1560:13

**starts** 1502:4,10
1508:21

**state** 1454:13 1461:9
1463:21,22 1539:5
1579:20 1580:11

**stated** 1461:25 1465:25
1472:7

**statement** 1460:17
1463:8,10 1509:20
1510:14 1536:1,6
1543:11,16 1565:22

**statements** 1455:25
1460:14,15,16,18,19
1575:9 1576:3,7,12
1582:20

**States** 1463:22,23
1464:14,16,20 1466:18
1470:22,24 1471:3
1474:13,16,23 1475:12
1476:3 1506:19
1508:18 1537:21
1540:5

**status** 1525:23

**stay** 1524:19

**steal** 1557:12 1574:24

**Stephanie** 1526:9
1534:2 1555:19

**Stephens** 1459:18
1509:9 1535:14,17,20,
23 1565:15 1566:16,19
1568:1 1573:5 1583:9
1585:19 1586:13,19
1588:25 1589:12,16
1591:11,23 1592:3,11
1597:18,20 1598:20,24
1599:3,7,10,12,17

**Stephens'** 1565:23

**stipulations** 1455:24

**stock** 1477:10,11
1517:7,9

**stop** 1524:25 1545:3
1564:25 1586:7

**stopped** 1584:12

**story** 1559:20 1561:19

**straight** 1562:11
1592:16

**strategy** 1574:19

**stretch** 1577:21 1586:7

**strict** 1455:9 1560:18,
21

**strictly** 1552:4

**structured** 1544:6
1548:10

**stuck** 1595:8,12

**study** 1591:2

**studying** 1556:20

**stuff** 1590:21

**stupidity** 1463:13,15

**subjected** 1544:13

**submit** 1495:11
1532:12 1580:6

**submittal** 1579:24,25

**submitted** 1498:13
1527:1,3,10 1580:5

**subparagraph**
1495:18 1496:7,16,20

**subscribe** 1477:16

**subsequent** 1489:2
1505:3 1552:23
1557:13 1583:21

**substance** 1523:17

**substantial** 1559:17

**substantially** 1469:6

**substantive** 1474:8
1495:23 1498:7
1541:24 1584:22

**substitute** 1454:14

**succeed** 1469:19

**succeeded** 1466:6
1472:14 1488:3
1493:25

**successful** 1480:17

**sudden** 1562:3

**suffered** 1470:7
1494:13 1512:6,11
1517:13

**sufficient** 1465:19
1467:21 1472:1 1477:5
1479:20 1521:23
1532:14 1533:2

**sugarcoat** 1509:5

**suggest** 1458:7
1554:23 1557:6,15
1559:18 1560:4
1567:24 1575:23
1584:4 1587:14

**suggested** 1507:1
1574:2 1587:21
1588:10

**suggesting** 1554:16
1588:1

**suggestion** 1587:18

**summaries** 1464:7

**summarize** 1550:13

**summarized** 1541:16

**summarizing** 1537:4

**summary** 1463:24
1464:3 1492:7 1498:21
1499:5 1500:8 1502:1
1507:15

**superior** 1577:22

**supplement** 1597:9

**supplies** 1529:6

**supportive** 1555:22

**supposed** 1499:6
1513:23 1521:15
1563:20 1566:9
1577:11

**supposedly** 1551:6

**surely** 1568:5,19

**surprise** 1516:16,18

**surrounding** 1527:25

**Susan** 1527:17
1547:23 1555:16
1588:5

**suspect** 1571:16

**sustained** 1456:10

**swears** 1525:22

**switching** 1586:24

**sworn** 1454:9 1455:23
1559:7

**sympathetic** 1485:11

**sympathy** 1454:20
1482:2 1485:4 1508:11

**syphoned** 1511:14

**system** 1569:7,8

---

**T**

**table** 1538:20 1539:2

**tail's** 1578:6

**takeaways** 1506:15

**takes** 1525:16

**taking** 1509:2,4
1595:21

**talk** 1489:24 1510:1,11
1511:10 1513:11,16
1515:13 1519:24
1524:22 1526:13
1528:16 1531:5,6,24
1536:6,10 1539:19
1542:11,16 1547:17
1551:14 1556:21
1557:16 1558:21
1559:23 1560:24
1561:10 1562:1
1564:25 1579:21
1584:5

**talked** 1485:2,5,13
1526:19 1530:16
1538:12 1542:9
1546:12 1548:20
1549:17 1563:22
1564:13 1579:15

**talking** 1508:15
1536:13 1543:8,9
1554:3 1556:24 1578:1

**talks** 1518:16 1525:9,
10

**tapes** 1570:5

**TBG** 1577:18

**team** 1555:9,14,20

**technical** 1461:3,5

**technicalities** 1575:19

**television** 1505:16
1508:18

**telling** 1499:11 1507:25
1509:21 1516:19
1547:7,9 1561:22
1564:8 1577:22
1579:10 1581:24
1582:3,11

**tells** 1514:19 1558:1
1569:10 1578:6
1585:25

**temporary** 1477:14

**tendency** 1462:25
1468:13 1478:15
1493:12

**term** 1468:15 1477:10,
21 1478:17 1497:18
1541:5 1542:14
1587:10

**terms** 1453:9 1597:21

**terra** 1518:4

**territory** 1463:21,22

**test** 1582:21

**tested** 1576:5

**testified** 1458:3,15,23
1460:10 1503:14
1527:5 1561:14
1571:22 1572:5,10
1581:22

**testify** 1455:4 1461:9

**testifying** 1459:7

**testimony** 1455:24
1456:16,23 1457:8
1458:1,2,6,18,19,23
1459:1,13,16,24
1460:9,13,20,24
1461:1,13,14 1464:1
1492:23 1500:9
1505:22 1506:3,5,6,9
1511:20 1519:16
1520:11 1538:18
1540:15,23 1542:21
1544:3,7,12,14 1545:1,
13 1550:24 1551:18

1554:4 1561:12,20
1562:13 1563:10
1564:4 1566:6,18
1567:19 1583:10,13
1587:19 1588:5

**testing** 1551:4 1582:20

**Texas** 1489:12 1492:1,
6 1498:20 1499:1,5
1501:8,24 1579:20
1580:11

**textbook** 1565:12

**theories** 1586:24
1588:1

**theory** 1551:18,24
1572:6,11 1576:5,12

**thing** 1482:18 1485:20,
25 1497:15 1501:22
1502:8,9 1503:11
1505:2 1507:25 1508:8
1510:2 1521:1 1523:10
1530:13 1540:2
1547:11 1548:12
1549:13 1551:8 1553:5
1556:22 1558:10,12,23,
24 1562:16 1564:19,23
1569:1,5 1582:11
1596:23

**things** 1456:3 1458:14
1467:19 1477:4
1496:23 1497:3 1505:6
1523:14 1527:7,8
1536:2 1544:8,11,24
1577:8 1581:25 1593:1

**think's** 1507:25

**thinking** 1561:4
1595:14,15

**third-party** 1491:12,13
1575:22

**Thompson** 1513:7

**thought** 1484:19
1487:2 1531:21 1562:7
1582:15 1593:11

**three-quarters-of-a-
million** 1517:10

**thumb** 1585:9,11,23
1598:4

**Tidwell** 1489:24
1555:24 1577:25

**Tilly** 1513:5

**Tim** 1531:15 1534:23

**time** 1460:11 1468:16
1481:9 1485:15
1499:14 1506:6,9
1509:17 1514:24
1517:3 1522:11 1524:8
1529:14 1533:1,25
1550:13 1553:4
1554:11,17,25 1555:3
1556:9,15,16,24
1562:25 1568:7 1570:7
1572:8,14,21 1577:11,
14 1581:7

**times** 1482:14 1485:8
1503:1 1505:1,2,3
1531:23 1560:13
1577:13

**title** 1464:14,16,20
1466:18 1470:22,24
1471:3 1474:12,16,23
1475:11 1476:2 1593:1,
2 1596:18 1597:10,13

**today** 1510:20,21
1511:9 1519:1 1538:9,
20 1578:4 1579:6,8

**Todd** 1575:11

**told** 1455:21 1472:25
1489:12 1500:6 1503:3
1510:24 1514:3 1515:5,
10 1516:21 1518:7,18,
25 1520:5,22 1521:4
1524:7,10,23 1526:2,9,
21 1528:2,5,14 1530:6,
11 1532:16,18 1534:13
1543:11 1547:24
1548:4 1557:3 1558:10,
11 1560:17 1562:22
1569:1 1573:22
1577:14 1583:6,24

**Tom** 1490:23 1548:11

**tomorrow** 1487:19

**toolbox** 1536:8

**top** 1528:13

**topic** 1589:9

**totally** 1516:5,8

**touch** 1529:23

**touched** 1536:3 1545:5

**Towey** 1514:23

**trace** 1499:8

**traced** 1504:25 1505:1,
2 1521:2

**tracing** 1552:5 1553:14

**Tract** 1580:8

**trail** 1460:20

**training** 1461:8

**traits** 1460:4,7 1515:3
1539:1

**transaction** 1463:7
1477:23 1503:19,23
1504:2,5,8 1518:21
1519:7,11 1521:20
1523:23 1536:17
1540:12,13,18,19,20
1545:5,9 1546:1,2
1547:4 1548:6 1549:4
1550:18 1554:1,9
1563:17,25 1564:2
1565:21,22 1569:19
1580:21 1590:4
1591:11,12 1592:7

**transactions** 1489:14
1491:18 1503:3,9,18,21
1508:2,6 1512:25
1523:16 1536:19
1540:6,7 1543:2
1544:4,6 1545:12,13,20
1546:5,13 1547:8,9,15
1548:10 1549:2 1550:9,
14,15 1551:3,6,23
1552:11 1554:6,7
1561:1 1565:15,17
1566:10 1572:2
1573:13,24 1575:24
1582:21 1587:7,8,13
1588:8

**transfer** 1470:9
1515:11 1581:10

**transfers** 1547:24

**transition** 1525:13
1547:17

**transmission** 1490:2

**transmitted** 1467:4,5
1469:9 1489:20

**transparency** 1511:15
1551:5,11

Case 4:21-cr-00289-O    Document 308    Filed 01/29/22    Page 181 of 182    PageID 13499
UNITED STATES vs HOLLIS MORRISON GREENLAW (1)
4:21-cr-289-O                                  Vol 8 January 20, 2022              Index: transparent..violated

transparent 1512:19
1550:19 1551:7,12
1557:3

transparently 1531:18

travel 1463:20

treasury 1477:11

treat 1560:15

treated 1505:19

trend 1527:18

trends 1529:6

Trez 1524:6 1580:23,25

trial 1453:5,17,18,20,23
1454:18 1455:23
1456:10,18,21 1460:13
1461:1 1462:5,8
1538:21 1558:13
1594:10

trick 1564:24,25
1565:1,4 1569:17,22

trips 1570:10

trouble 1486:4

true 1457:23 1460:16,
17 1490:13 1496:25
1511:3 1512:7 1518:24
1526:7

trust 1528:6

trustees 1534:25

truth 1458:10 1459:24
1464:7 1468:7,9
1478:10,12 1493:9
1520:4 1538:19 1557:3
1561:22 1562:17
1563:7 1581:25

truthful 1582:14

tug 1508:16

TV 1487:3 1570:1,2

type 1501:22 1515:1
1540:24 1548:6

typo 1459:21

Tyson 1506:9 1561:24

U

U.S. 1519:4

UDF 1467:1 1473:8
1475:16,20 1476:11,15
1488:13 1489:5,7,10,
12,15 1490:7,14,15,18,
20 1491:1,15 1492:3,24
1495:21 1496:19
1498:16 1499:11,14,17,
19 1500:9,12,16,20
1501:3,7,13,16,18,20,
25 1502:19,20,22,24
1503:2,4,6,9,11,13,18
1504:1,4,7,16,20
1505:9,10,11,12
1507:4,22,23 1508:1,25
1509:1,2 1511:17,19,20
1512:11,15,22 1516:11,
13,20,24 1517:15
1522:9,15,21 1523:10
1524:1,15 1526:10,11,
15 1527:1,21,22
1529:3,4 1530:11,20
1531:20 1532:24,25
1533:1,19 1534:17
1535:3,4 1536:7 1541:9
1542:11,19 1543:2,4,8,
9,13,17,18,22,23,24,25
1544:7,8,9,16,18,20,22,
24 1545:1,2,3,4 1546:6,
8,10,13,16,17,18,23
1547:8,12,17,18,20,21,
25 1548:6,13,23,24
1549:2,3 1550:4,5,9,10,
18 1552:19,22 1553:3,
5,19 1555:16 1557:2
1563:21 1570:12
1571:22 1574:5,6,11
1575:10,15,20,21
1576:1 1577:22,23
1578:1,11,12,13,23
1579:6,11 1580:20
1581:10 1582:12
1593:24

UDF's 1523:13 1527:20
1560:25

ultimately 1494:3
1505:11 1506:16
1581:12

unanimous 1473:1
1481:18 1482:23
1483:10

unanimously 1467:23
1477:7

uncontroverted

1491:16 1502:14

undercover 1570:5,6

underlined 1495:5
1497:25

underlying 1464:9
1499:7 1536:18 1544:5

underneath 1550:7
1552:10

understand 1458:17
1512:3,24 1517:4
1539:5 1540:10 1543:1
1565:8,10 1575:8

understanding 1461:6

understands 1465:17
1471:24 1487:9

understood 1503:17
1532:18 1548:4
1550:24 1588:7

underwriting 1580:6

undisclosed 1545:20

unencrypted 1598:2

unexplained 1570:9

unfettered 1512:22

United 1463:21,23
1464:14,16,20 1466:18
1470:22,24 1471:3
1474:12,16,23 1475:11
1476:2 1506:19
1508:18 1537:21
1540:5 1548:15

unlawful 1464:25
1465:10,13,15,17
1466:7 1471:7,17,19,
22,24 1472:14 1473:5,
16,20,23 1486:19,20,21
1487:5,8,9 1541:3,4,22

unreasonable 1463:9

untrue 1468:6 1478:9
1540:1

updates 1528:15

upload 1490:8

uploading 1489:25
1490:9

ups 1575:2

urge 1502:1 1504:12
1521:22,25 1560:15
1572:14,16

utilization 1470:8
1515:10

V

V's 1489:15 1499:14
1500:9 1501:25
1503:13 1574:6

value-for-value
1569:19

values 1529:4

venture 1480:13,15,17,
18,22,23,25

veracity 1459:24
1538:19

verdict 1453:25
1454:17 1456:14,21
1459:4 1462:7,21
1470:18 1472:25
1473:17,22 1481:17,18,
21 1482:13,22 1483:2,
10,11 1491:22 1514:16
1521:25 1531:11
1535:10,12 1556:7,20
1572:17

verge 1511:8

Veritex 1491:25
1505:9,11 1516:4
1517:24

versus 1508:1

VI 1484:11 1501:2

victim 1463:11,14,15

video 1570:19

view 1545:19

VII 1484:12 1501:6

VIII 1484:12 1501:16

VIIII 1484:12 1501:21

Village 1580:5

violate 1480:5 1557:8,
12

violated 1468:23
1539:12

**violation** 1464:14 1470:22 1474:12 1475:11 1476:2 1587:10

**Visser** 1530:10

**Vlasak** 1490:4 1504:14

**voir** 1557:19

**voluntarily** 1463:18 1468:17 1480:4 1493:18 1531:14

**volunteered** 1513:14, 19

**voting** 1478:24 1497:25

---

**W**

**wagging** 1578:6

**wait** 1485:18 1486:5 1545:2 1596:9 1599:20

**walk** 1509:23 1536:25 1539:3 1541:12

**walked** 1563:3

**wall** 1577:20

**Walter** 1561:24 1562:2, 21

**Walters'** 1506:9

**wanted** 1525:12 1567:16 1584:5

**wanting** 1593:20 1594:3

**warrant** 1477:15 1511:4,5 1512:23 1519:17 1520:18

**watch** 1576:13

**watched** 1556:15

**ways** 1463:4 1467:17 1474:16 1475:8 1477:2 1490:3 1494:22 1495:9, 12 1498:25 1545:14

**wealth** 1570:9

**web** 1490:8

**Wednesday** 1485:2,5, 21 1505:16

**week** 1502:13 1522:12 1524:10 1577:17 1579:9

**weekly** 1528:12

**weeks** 1509:16 1578:21

**weigh** 1457:6 1561:12

**weighed** 1458:23

**weighing** 1457:14

**weight** 1457:25 1460:24 1461:15 1482:11

**weights** 1457:12

**whichever** 1495:10 1594:21,22

**Whitley** 1527:19 1528:18 1545:23 1547:23 1555:19 1565:18 1566:4 1571:22 1579:17 1580:13 1582:3

**wholly** 1500:23

**willful** 1522:18 1541:23

**willfully** 1465:12 1468:15,22 1471:19 1486:20 1493:14,15,17 1539:3,7,11 1541:4,5

**wind-down** 1525:13,16

**wire** 1464:10,13,18,19, 22 1465:8 1466:18,20 1467:5 1469:9,11,15, 21,23 1486:11,18,24,25 1488:8,10 1489:19,20 1490:1,11 1491:19,23 1492:12 1493:21,23 1494:6,19 1495:13 1506:20 1540:4,25 1541:1,2,6 1557:13 1579:11,13 1584:19 1595:11

**wired** 1469:17 1491:21

**wires** 1490:4,5,6,7 1499:19

**wiring** 1579:10

**wisdom** 1454:12

**Wissink** 1483:19

**1502:8 1539:23 1572:18 1578:11 1579:8**

**witness's** 1458:1,18 1461:16

**witnesses** 1454:4 1455:24 1458:2,19 1459:5,7 1461:2 1516:12 1519:5 1520:14 1523:4,9 1526:20 1527:13 1533:9 1539:20 1540:16,24 1556:3 1559:14 1561:12 1562:1 1571:22

**woefully** 1520:25 1575:13

**women** 1503:2 1549:10 1568:13 1576:9 1580:10

**wonderful** 1562:16

**wondering** 1489:23

**Woods** 1580:1

**word** 1463:17 1467:17 1468:15 1477:2 1478:21 1493:15 1497:22 1557:24,25

**words** 1456:25 1479:25 1510:8,16 1575:11

**work** 1523:9 1524:18 1534:16 1549:7 1577:5 1596:3,8

**worked** 1523:4 1527:24 1532:24 1534:2,12 1555:7,24

**working** 1507:8,10 1555:25 1568:6 1581:18 1583:18 1596:3,7

**works** 1487:6,19 1518:11 1554:20 1555:21 1578:22

**world** 1569:8

**worth** 1565:16 1577:5

**would-be** 1489:7,12,15

**Wow** 1560:10

**wrap** 1537:3 1555:4

**write** 1482:23 1483:4 1498:23 1507:17 1599:5

**writing** 1467:6 1483:5 1489:21 1526:1,2

**written** 1453:9 1498:2

**wrong** 1482:9 1509:21, 24 1511:19 1520:7,25 1521:14,15,16,17 1527:12 1528:21 1532:1 1545:3 1584:9

---

**Y**

**y'all** 1485:5,14 1487:14 1489:23 1495:10 1497:6 1498:21

**y'all's** 1506:1

**year** 1524:18 1534:18

**years** 1495:24 1510:5 1511:9 1517:4,5 1519:18 1520:15,19 1521:2 1522:17 1525:16 1532:7 1551:21 1552:1,2 1554:5,22 1555:7,22 1561:15 1566:16 1568:8,17 1570:4,21 1577:11 1580:18

**yellow** 1494:25 1495:6

**York** 1489:25 1490:8

**you-all** 1588:19

**Young** 1513:6,9